UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

JUST ONE MORE RESTAURANT CORP.,      Case No. _____
and JUST ONE MORE HOLDING CORP.,[1]   Case No. _____

     Debtors.      Chapter 11 Cases
                                      (Joint Administration Pending)

_____/

### DECLARATION OF CHIEF RESTRUCTURING OFFICER, GERARD A. MCHALE, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Gerard A. McHale, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Restructuring Officer ("CRO") of Just One More Restaurant Corp. ("JOMR") and Just One More Holding Corp. ("JOMH" and together with JOMR, collectively, the "Debtors").  On the date hereof (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.  The Debtors continue to operate their business and manage their assets as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     I submit this declaration ("Declaration") in support of the Debtors' petitions and First Day Pleadings (defined below).  I am familiar with the contents of each First Day Pleading and, to the best of my knowledge after reasonable inquiry, believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to enter chapter 11 with minimal

---

[1]    The last four digits of each Debtor's federal tax identification number are Just One More Restaurant Corp. (5070) and Just One More Holding Corp. (6081).  The address of the Debtors is 8955 Fontana Del Sol Way, 2nd Floor, Naples, FL 34109.

disruption; (b) is critical to the Debtors' efforts to preserve value and maximize creditor and stakeholder recoveries; and (c) best serves the Debtors' estates and creditors' and stakeholders' interests.  Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these Chapter 11 Cases.

3.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' representatives, including but not limited to the employees of Palm Management Corporation ("PMC") which serves as the manager of JOMR pursuant to a certain Management Agreement dated January 1, 2007 (the "Management Agreement"), or my opinion based upon my experience with the Debtors' business activities and financial condition.  In making my statements based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' professionals and representatives, I have relied upon these professionals and representatives accurately recording, preparing or collecting such documentation and other information.  I am over the age of eighteen and if called to testify as a witness in this matter, I could and I would competently testify to each of the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      For the past 20 years, I have worked extensively in asset administration, management and recovery.  I have served as a chapter 11 bankruptcy trustee in numerous cases in several divisions of the Middle and Southern districts in Florida, as well as the Southern District of New York, the Eastern District of Virginia, the Eastern District of California and the District of Alaska.  I am a licensed CPA in the states of Florida and New York.  I am certified in financial forensics.

8930461-15

5.      I am the founding partner of McHale, P.A., which through me, has been involved in the bankruptcy arena for over 35 years, serving as a court-appointed trustee and examiner, chief restructuring officer, financial advisor for creditors' committees, expert witness and accountant for debtors including, but not limited to, the following matters:  *In re Purple Shovel, LLC,* Case No. 8:18-bk-04599-CED (Bankr. M.D. Fla. Aug. 8, 2018); *In re Peninsula Airways, Inc., dba PenAir,* Case No. 3:17-00282-GS (Bankr. D. Alaska July 9, 2018); *In re ATIF, Inc.,* Case No. 9:17-bk-01712-FMD (Bankr. M.D. Fla. Mar. 8, 2017); *In re East Coast Brokers & Packers, Inc.*, Case No. 8:13-bk-2894-KRM (Bankr. M.D. Fla. June 21, 2013); *In re Sky King, Inc.*, Case No. 12-35909-C-11 (Bankr. E.D. Cal. Feb. 14, 2014); *In re LandAmerica 1031 Exchange Services Inc.,* Case No. 3:08-35995-KRH (Bankr. E.D. Va.  Nov. 16, 2009); *In re The 1031 Tax Group LLC,* Case No. 07-11448-MG (Bankr. S.D. N.Y. Oct. 25, 2007); *In re Lancer Partners, LP,* Case No. 06-11721-JKO (Bankr. S.D. Fla. Feb. 27, 2009); *In re Brasota Mortgage Company,* Case No. 8:05-bk-06215-KRM (Bankr. M.D. Fla. Apr. 14, 2005); *In re Allied Portables, LLC,* Case No. 9:17-00865-FMD (Bankr. M.D. Fla. Mar. 9, 2017); *In re Ecoventure, Wiggins Pass, Ltd.,* Case No. 9:08-09197-ALP (Bankr. M.D. Aug. 25, 2008); and *In re Weeks Landing, LLC,* Case No. 9:06-01721-ALP (Bankr. M.D. Fla. Dec. 19, 2006). Through these various fiduciary roles, McHale, P.A. has recovered and distributed more than $1 billion to affected investors, creditors and beneficiaries.

6.      I was retained as the CRO for JOMR and JOMH on February 21, 2019, and I have served in such capacity for the Debtors since that time.  In my capacity as CRO, I have knowledge of, and experience (gained since my appointment as CRO) with the business and financial affairs of the Debtors.

8930461-15

7.      To minimize any adverse effects on their estates as a result of the commencement of these Chapter 11 Cases, the Debtors intend to request various types of relief in certain "first day" applications, motions and pleadings (including any attachments and exhibits thereto and any amendments, collectively, the "<u>First Day Pleadings</u>").  The First Day Pleadings seek relief, among other things, to establish the foundation for the smooth and efficient administration of these Chapter 11 Cases.  The relief requested in the First Day Pleadings is important to the success of the efforts of the Debtors to preserve and to maximize the value of their estates.

8.      Part I of this Declaration describes the history, business and affairs of the Debtors and the developments which led to the Debtors filing their voluntary chapter 11 petitions.  Part II summarizes the Debtors' primary objectives in these Chapter 11 Cases.  Part III sets forth the relevant facts in support of the various First Day Pleadings filed by the Debtors concurrently herewith.

**PART I**

**<u>BACKGROUND</u>**

**A.      Overview of the Debtors.**

9.      The Debtors, which are directed, controlled and coordinated out of Naples, Florida, represent the core of the storied history of "The Palm" restaurants – one of the most well-known steakhouse brands in the United States and Mexico.[2]

---

[2]    For consistency with various documents of the Debtors, I refer herein to "The Palm" as simply, the "Palm".

8930461-15

(i)      **The First Palm Restaurant Opened in New York City in 1926**

10.     The first Palm restaurant ("Palm One") was opened on Second Avenue in Manhattan in 1926 by Pio Bozzi ("Pio")[3] and John Ganzi ("John").[4]  In 1933, Pio and John formed JOMR to own and operate Palm One and to own its intellectual property.[5]  In 1946, JOMH was formed to own the real property under which Palm One operated and to rent the real property to JOMR.  During April 2015, Palm One was closed and JOMH sold the land to 837 Second Avenue Realty, LLC and 837 Second Ave B"H, LLC (an unrelated third party).

11.     As set forth on the website for the Palm, the family-owned Palm One became famous for its commitment to quality and a generosity of spirit with every guest who walked through its doors.  *See* https://www.thepalm.com/ (last visited on March 6, 2019).  What began as a restaurant became a second home to a vibrant cast of artists and writers, tycoons and civic leaders, screen starts and working families.  Palm One became renowned for the quality of its service, food and drink, and in particular, for the caricatures that adorned its walls, contributed by cartoonist customers who exchanged their cartoons for meals and signature dishes.

---

[3]   Pio Bozzi was the grandfather of Bruce Bozzi, Sr. (one of the two majority shareholders of JOMR and JOMH; "Bruce").

[4]   John Ganzi was the grandfather of (a) Walter Ganzi, Jr. (the other of the two majority shareholders of JOMR and JOMH; "Wally", and together with Bruce, collectively, they are the Defendant Majority Shareholders (defined herein) in the state-court Derivative Action), and (b) (i) Gary Ganzi ("Gary"), (ii) Claire Breen ("Claire"), and (iii) Gary Ganzi and Claire Breen, as attorneys-in-fact for the Estate of Charles Cook (the "Cook's Estate").  Together, Gary, Claire and the Cook Estate are the minority shareholders of JOMR and JOMH and are the Pltf. Minority Shareholders (defined below) in the state-court Derivative Action.

[5]   Pio Bozzi passed away in 1942.  JOMH was formed by John Ganzi and Mary Bozzi (the widow of Pio Bozzi).

**(ii)    The Palm Intellectual Property is Licensed for Use by New Palm-Branded Restaurants and to Create Palm-Branded Household Goods for Retail Stores**

12.    Beginning in 1972, the first of many Palm-branded restaurants (the "Palm Restaurants") were opened.  JOMR owns the Palm intellectual property – a series of trademarks and service marks, design elements of the Palm (such as its food quality choices and methods of preparation) and the Palm's decor, display of certain photographs, artistic caricatures, sketches, cartoons and other elements (i.e., the Marks and Works) (collectively, the "Palm IP").  JOMR licenses the Palm IP to the Palm Restaurants through individual licensing agreements.

13.    Today, there are 24 Palm Restaurants operating in the United States and Mexico.[6] The Debtors do not own any of the Palm Restaurants.[7]  Most of the Palm Restaurants pay JOMR a $6,000 annual fee for the use of the Palm IP.  However, three Palm Restaurants operate under separate license agreements to use the Palm IP that provide for licensing fees that include royalty fee payments calculated as a percentage of revenue, including (i) the Palm Restaurant located at John F. Kennedy International Airport which is operated by SSP America, Inc. ("SSP America") under a license granted to it by an entity which I am informed is an affiliate of PMC (Palm Airport,

---

[6]    The 24 Palm Restaurants are located in Atlanta, Atlantic City, Beverly Hills, Boston, Charlotte, Chicago, Denver, East Hampton (NY), Houston, Las Vegas, Los Angeles, Mexico City (two locations), Miami, Nashville, New York City (four locations, including three in Manhattan and one at JFK), Orlando, Philadelphia, San Antonio, Tysons Corner, and Washington, D.C.  For addresses to the 24 Palm Restaurants, please refer to the *Consolidated Case Management Summary*, filed contemporaneously herewith.

[7]    Upon information and belief, (i) 18 of the Palm Restaurants are owned 50%-50% by Bruce and Wally, (ii) the Palm Restaurants located in Philadelphia and Beverly Hills are owned 50% collectively by Bruce and Wally and 50% by other investors, (iii) the Palm Restaurant located in Chicago is owned 75% collectively by Bruce and Wally and 25% by other investors, (iv) the Palm Restaurant located at John F. Kennedy International Airport in New York operates under a license granted by an entity which I am informed is an affiliate of PMC (Palm Airport LLC) to SSP America (a business that operates airport food outlets), and (v) the two Palm Restaurants located in Mexico operate under license agreements granted by JOMR to Hoteles Presidente, S.A. de C.V.

8930461-15

LLC), and (ii) the two Palm Restaurants located in Mexico City under a license agreement granted to the owner of those Palm Restaurants by JOMR.

14.     In addition, PMC has granted a license to The TJX Companies, Inc. ("TJX") to use the Palm IP to create Palm-branded household goods for retail stores.  Under the license, TJX pays PMC a percentage of the purchase cost of each item provided for sale by TJX.

### (iii)     The Ownership of JOMR and JOMH

15.     When JOMR was created in 1933, JOMR issued ten shares of stock divided evenly between Pio and John.

16.     Similarly, JOMH issued ten shares of stock divided evenly between Mary Bozzi (the widow of Pio) and John when it was formed in 1946.

17.     Over time, the ownership and corporate management of JOMR and JOMH passed down the family tree to the founders' grandchildren.

18.     As set forth in the Decision (defined below), the current ownership of the capital stock of: (A) JOMR is as follows, (i) Bruce (50%), (ii) Wally (30%), (iii) together, Gary and Claire (10%), and (iv) Cook's Estate (10%); and (B) JOMH is as follows, (i) Bruce (50%), (ii) Wally (16 2/3%), (iii) together, Gary and Claire (16 2/3%), and (iv) Cook's Estate (16 2/3%).

19.     Upon information and belief, Wally is the President, and Bruce is the Treasurer and Secretary, of JOMR, and Bruce is the President, and Wally is the Treasurer and Secretary, of JOMH.

### (iv)     Palm Management Corporation Manages the Palm Restaurants

20.     On January 1, 2007, the Management Agreement and a separate Master License Agreement (the "MLA") were entered into by and between JOMR and PMC.  Upon information and belief, Wally and Bruce own 100% of the shares in PMC, and its senior management team

8930461-15

includes Wally, Bruce, Jeff Phillips (Chief Operating Officer), James Longo (Chief Financial

Officer), Joy Jones (General Counsel) and Bruce Bozzi, Jr. (Executive Vice President).

21.     Pursuant to the Management Agreement, PMC, among other things, provides

supervision, training, office detail work, clerical, purchasing and bookkeeping functions for

JOMR.  The Management Agreement is for a 1-year term, but provides that, absent contrary

arrangements, that 1-year term automatically renews, and it has done so since conclusion of the

initial 1-year term.  The Management Agreement provides that JOMR is to pay PMC an amount

totaling $25,999 per month for services rendered thereunder, and upon information and belief,

JOMR stopped making this monthly payment to PMC when Palm One was closed during April,

2015.

22.     Under the MLA, JOMR licensed to PMC an exclusive, worldwide, royalty-bearing,

sublicensable license to the Licensed Property, defined as the "Marks" (various trademarks) and

"Works" (certain photographs, drawings, paintings, caricatures, sketches, cartoons and other

images that are displayed at or otherwise used in connection with the Palm Restaurants) in

connection with, among other things, the operations at the various Palm restaurants.  The MLA

provides for a $12,000 annual license fee, and it has a term of 15 years with automatic renewals

for successive 5-year terms unless written notice is provided by either contract party 4 months

prior to the then-current term.  Under the MLA, PMC entered into sublicense agreements for the

use of the Palm IP (as described herein).

### (iv)     The Pre-Petition Derivative Action Pending in New York State Court

23.     On August 31, 2012, (i) Gary, (ii) Claire, and (iii) Cook's Estate (together with

Gary and Claire, collectively, the "Pltf. Minority Shareholders"), who are collectively the minority

shareholders of JOMR and JOMH, commenced litigation in the Supreme Court of the State of

8930461-15

New York, County of New York (Index No. 653074/2012, the "Derivative Action"), individually

and derivatively on behalf of JOMR and JOMH, against Bruce, Wally (together, Wally and Bruce,

collectively, the "Defendant Majority Shareholders"), JOMR (as a nominal defendant) and JOMH

(as a nominal defendant, and together with the Defendant Majority Shareholders and JOMR,

collectively, the "Defendants").

24.     In the Derivative Action, the Pltf. Minority Shareholders asserted various causes of

action against the Defendants, including breaches of fiduciary duties by allegedly: (i) engaging in

self-interest, self-dealing transactions that allegedly undervalued JOMR's assets by licensing the

Palm IP to substantially all of the Palm Restaurants for an annual fee of $6,000 per restaurant; (ii)

depriving JOMR of the market rate value for the exclusive right to license Palm IP to third parties

by entering into the MLA for an undervalued annual license fee of $12,000 and allegedly diverted

substantial licensing deals away from JOMR to PMC; and (iii) leasing JOMH's real property to

JOMR for undervalued rental rates and allegedly inequitably distributed sale proceeds to JOMH's

shareholders based on a 2006 evaluation of land owned by JOMH that concluded that the market

rent was $233,000.

25.     On November 15, 2018, the State Court rendered its *Decision After Non-Jury Trial*

(State Court Action, docket no. 253, the "Decision") and ruled in favor of the Pltf. Minority

Shareholders.  A copy of the Decision is attached hereto as **Exhibit "A"**.

26.     Among other things, the Decision awarded JOMR and JOMH certain amounts to

be set forth in a judgment to be entered by the Court at a later date.  *See* Decision, pp. 26-28.

27.     Critically important, the Decision purports to void the MLA and all of the licenses

entered into between JOMR and the Palm Restaurants.  *See* Decision, p. 28.  The Decision also

8930461-15

imposed an injunction prohibiting the Defendant Majority Shareholders from having JOMR enter into "below market licenses for the use of the Palm IP". *See Id.*

28.     On January 25, 2019, the State Court issued its Judgment (State Court Action, docket no. 272, the "Judgment").  A copy of the Judgment is attached hereto as **Exhibit "B"**.  The Judgment provides that JOMR and JOMH have judgments against the Defendant Majority Shareholders in an amount, as of the Petition Date, estimated at approximately $119.5 million.[8] The Judgment provides that JOMR alone has the right of execution with respect to all of the amounts awarded to both JOMR and JOMH.  *See* Judgment, ¶¶ 1(b), 2(b), 3(b), 4(b).

29.     Similar to the Decision, the Judgment purports to void all of the licenses entered into between JOMR and the Palm Restaurants.  *See* Judgment, ¶ 7.  The Judgment also imposes an injunction prohibiting the Defendant Majority Shareholders from having JOMR enter into "below-market licenses for the use of the Palm IP".  *See Id.*

30.     On February 11, 2019, the Defendant Majority Shareholders appealed the Judgement to the Appellate Division of the Supreme Court of the State of New York, First Judicial Department ("Appellate Court") (Index Nos. 2018-5759, 2019-565 and 2019-1084, the "Appeal").

31.     On February 13, 2019, the Appellate Court issued a temporary stay of the execution of the Judgment (the "Temporary Stay") in response to a motion to stay the enforcement of the Judgment pending appeal filed by the Defendant Majority Shareholders (the "Stay Motion").  A copy of the Temporary Stay is attached hereto as **Exhibit "C"**.

---

[8]     JOMR is a judgment creditor holding a Judgment against Bruce and Wally for approximately $116.5 million plus post-Judgment interest.  JOMH is a judgment creditor holding a Judgment against Bruce and Wally for approximately $2.97 million plus post-Judgment interest.  As stated herein, the Judgment provides that only JOMR has the right of execution on all amounts awarded by the Judgment.

8930461-15

32.     Pursuant to the Temporary Stay, the Appellate Court stayed the enforcement of the Judgment pending the Appellate Court's determination whether to grant on a final basis the relief requested in the Stay Motion.  The Appellate Court has scheduled March 11, 2019 as the "motion date" (i.e., the date on which the Stay Motion issue is considered to be fully-briefed and ready for consideration by the appellate panel).

**B.      The Debtors' Debt Structure.**

-JOMR is the Guarantor of a Term Loan

33.     JOMR is one of 27 corporate guarantors under a certain Third Amended and Restated Limited Guaranty dated October 20, 2017 (the "Term Loan Guaranty").  Pursuant to the Term Loan Guaranty, JOMR and the other guarantors have entered into a guaranty of payment of a term loan in the original stated principal amount of $11,320,961.58 provided by Bank of America, N.A. (the "Bank"), as lender, to Bruce and Wally, as borrowers (the "Borrowers"), as more particularly defined and described as "Facility No. 2" (the "Term Loan") in that certain *Fifth Amended and Restated Loan Agreement* dated as of October 20, 2017 (the "Loan Agreement"). As of the Petition Date, the principal amount of the debt owed to the Bank under the Term Loan is approximately $9,905,961.58.

-JOMR is a Guarantor of a Line of Credit

34.     JOMR is one of 27 corporate guarantors under a certain Second Amended and Restated Limited Guaranty dated October 20, 2017 (the "Line of Credit Guaranty").  Pursuant to the Line of Credit Guaranty, JOMR and the other guarantors have entered into a guaranty of payment of a line of credit in the original stated principal amount of up to $2,999,999.00 provided by BofA to Bruce and Wally as more particularly defined and described in the Loan Agreement.

11

As of the Petition Date, the principal amount of the debt owed to the Bank under the Line of Credit is approximately $1,842,000.00.

-BofA Security Interests

35.     The amounts due under the Loan Agreement are secured by, among other collateral, (i) the equipment owned by JOMR and the other the guarantors which are wholly-owned by the Borrowers, (ii) the intangibles owned by JOMR and the other guarantors which are wholly-owned by the Borrowers, and (iii) all equity interest owned by the Borrowers in JOMR and the other guarantors.

36.     As of the Petition Date, the amounts due under the Loan Agreement are not in default.

-Assets and Annual Revenue and Net Income/(Loss)

37.     As of the Petition Date, JOMR's primary assets include the amounts awarded to it totaling approximately $116.5 million under the Judgment which is currently on Appeal, the Palm IP and other assets, including cash in JOMR's bank account located at Bank of America in Naples, Florida in an amount totaling $127,000 and $9,989.97 in other assets, and JOMR lists in its books and records liabilities totaling approximately $6.5 million, comprised of $5.4 million due to PMC and $1.1 million due to Cooley LLP for legal fees and expenses related to the Derivative Action.

38.     JOMR's total annual revenues and earnings for prior fiscal years 2017 and 2018 were:

| FYE: | Total Revenue | Net Income (Loss) |
|------|---------------|-------------------|
| 2017 | $232,449 | ($1,589,963) |
| 2018 | $177,600 | ($  230,352) |

39.    As of the Petition Date, JOMH's primary asset are the amounts awarded to it totaling approximately $2.97 million under the Judgment which is currently on Appeal, the amounts due on a loan JOMH made to PMC pursuant to a promissory note dated July 11, 2016 in the principal amount totaling $1.5 million which matures on July 11, 2024, and JOMH lists in its book and records liabilities totaling approximately $1.1 million, comprised almost entirely of the alleged amounts due to Cooley LLP for legal fees and expenses related to the Derivative Action.

40.    JOMH's total annual revenues and earnings for prior fiscal years 2017 and 2018 were:

| FYE: | Total Revenue | Net Income (Loss) |
|---|---|---|
| 2017 | $148,222 | $147,070 |
| 2018 | $149,039 | $147,675 |

**C.    Event Leading to the Filing of the Chapter 11 Cases**

41.    The event precipitating the filing of the Chapter 11 Cases is the *Judgment* entered in the Derivative Action by the State Court which, among other things, would purport to void (if not stayed) the licenses of the Palm IP granted by JOMR to the Palm Restaurants, and would severely disrupt the business arrangements between and among the Debtors, the Palm Restaurants and the other licensees of the Palm IP, many of which have been in place for over 40 years.

42.    For this reason, the Debtors have filed these Chapter 11 Cases.

**PART II**
**DEBTORS' OBJECTIVES IN THIS CASE**

43.    The Debtors commenced these Chapter 11 Cases in order to gain the critically important "breathing spell" afforded by the automatic stay provisions of the Bankruptcy Code in

8930461-15

order to preserve and to maximize the value of the Debtors' estates for the benefit of the Debtors' creditors and stakeholders.

44.     With the protections of the automatic stay in place, the Debtors, through myself as the CRO, will expeditiously pursue a three-part strategy during the Chapter 11 Cases.  Under my leadership and control as the CRO, the Debtors will insure the preservation of their assets pending the appeal of the Judgment in the Derivative Action by the Defendant Majority Shareholders which is currently pending in the Appellate Court.  Also, under my leadership and control as the CRO, the Debtors will engage in negotiations with the Defendant Majority Shareholders and the Pltf. Minority Shareholders in an attempt to reach a global settlement in the Derivative Action.  As an integral part of those settlement negotiations, the Debtors under my leadership and control as the CRO will investigate and determine the resources which are available, on the part of the Palm Restaurants, the other licensees of the Palm IP and other sources, to fund a global settlement based upon, among other possible sources, renegotiated and new license agreements involving the Palm IP.  In addition, under my leadership and control as the CRO, the Debtors will pursue possible alternate ways to monetize the Judgment.

45.     The Debtors' immediate objective is to preserve and to maximize the value of their estates by obtaining the relief requested in the First Day Pleadings to minimize any adverse effects that these Chapter 11 Cases might otherwise have on their estates and then proceed expeditiously towards the goals of protecting the assets of the estates pending the appeal of the Judgment by the Defendant Majority Shareholders and attempting to reach a global settlement in the Derivative Action for the benefit of their creditors and stakeholders.

8930461-15

## PART III
## FIRST-DAY PLEADINGS

46.     Concurrently with the filing of these Chapter 11 Cases, the Debtors filed certain First Day Pleadings.  The Debtors respectfully request that the Court conduct a hearing as soon as practicable after the commencement of the Chapter 11 Case (the "First Day Hearing") to consider the First Day Pleadings.

47.     I have reviewed each of the First Day Pleadings, including the exhibits thereto and I believe that the relief sought in each of the First Day Pleadings is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to preserve and to maximize, and to avoid immediate and irreparable harm, to the Debtors' estates.

A.     **Debtors' Emergency Application for Approval, on an Interim and Final Basis, of the Employment of Paul Steven Singerman and the Law Firm of Berger Singerman LLP as Counsel for Debtors-in-Possession,** *Nunc Pro Tunc* **to Petition Date (the "BSLLP Application").**[9]

48.     The Debtors seek authority to retain, on an interim basis, Paul Steven Singerman and the law firm of Berger Singerman LLP ("BSLLP") as general bankruptcy counsel *nunc pro tunc* to the Petition Date.  As detailed in the BSLLP Application, the Debtors understand that Mr. Singerman and BSLLP have extensive experience representing chapter 11 debtors in this district (and other districts in Florida and across the country) and that they are well-qualified to serve as general bankruptcy counsel to the Debtors.  The Debtors believe it is in their best interests, and those of their creditors, that Mr. Singerman and BSLLP be retained to serve as Debtors' general bankruptcy counsel in their Chapter 11 Cases.

---

[9]     Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the respective motion or application, as defined, in this section of the Declaration.

8930461-15

49.     To the best of the Debtors' knowledge, except as disclosed in the *Declaration of Paul Steven Singerman on Behalf of Berger Singerman LLP, as Proposed Counsel for the Debtors Nunc Pro Tunc to the Petition Date*, affirmed by Mr. Singerman and attached to the BSLLP Application as Exhibit "A", neither Mr. Singerman nor BSLLP has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.  Counsel has informed me that corporations like JOMR and JOMH may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf.  Because there is a various relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened.  It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided.  In that regard, counsel advises that this relief has been granted in numerous chapter 11 cases in this and other Districts in Florida, including large chapter 11 cases.  *See, e.g.*, *In re National Auto Lenders, Inc.*, Case No. 18-24586-LMI (Bankr. S.D. Fla. Dec. 20, 2018); *In re Adinath Corp., et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. April 21, 2015); *In re McGuire Holdings*, Case No. 11-39347-RAM (Bankr. S.D. Fla. Oct. 27, 2011); *In re Old Corkscrew Plantation, LLC, et al.,* Case No. 11-14559-BSS (Bankr. M.D. Fla. Aug. 25, 2011); *In re HearUSA, Inc.*, Case No. 11-23341-EPK (Bankr. S.D. Fla. May 20, 2011); *In re American Homebuilders, Inc., et al.,* Case No. 09-05668-PMG (Bankr. M.D. Fla. Aug. 5, 2009); *In re Land Resource, LLC, et al.,* Case No. 08-10159-KSJ (Bankr. M.D. Fla. Dec. 9, 2008); *In re Gencor Industries, Inc., et al.,* Case No. 00-03597-KSJ (Bankr. M.D. Fla. Sept. 20, 2000), and by other bankruptcy courts throughout the country.  Accordingly, in the exercise of my business judgment, it is in the best

16

interests of the Debtors, their estate and creditors to retain BSLLP as the Debtors' corporate restructuring counsel.

**B.     Debtors' Application for an Order Authorizing Employment and Retention of McHale, P.A. and Gerard "Jerry" A. McHale as Chief Restructuring Officer to the Debtor, *Nunc Pro Tunc* to the Petition Date (the "<u>CRO Application</u>").**

50.     In the ordinary course, the Debtors seek authority to retain McHale, P.A., *nunc pro tunc* to the Petition Date, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors understand that McHale, P.A. and I have significant and extensive experience in providing interim management services in a Chief Restructuring Officer capacity.  The Debtors understand that McHale, P.A. and I have an excellent reputation for providing such services throughout Florida and the United States in restructuring matters, and that my firm and I are well-qualified to provide services to the Debtors in these Chapter 11 Cases.  The Debtors believe that it is in their best interests, and those of their creditors and other stakeholders, that McHale, P.A. and I be retained to serve as Chief Restructuring Officer to the Debtors in their Chapter 11 Cases.

51.     McHale, P.A. and I were employed by the Debtors prepetition on February 21, 2019.  In that capacity, McHale, P.A. and I have reviewed certain of the Debtors' books and records, and advised the Debtors in regard to maximizing the value of the organization for their creditors and other stakeholders.  The continued post-petition retention of McHale, P.A. is in the best interests of the Debtors and their estates.

52.     As a result of my prior service as interim Chief Restructuring Officer in restructuring matters, and the prepetition work done for the Debtors by McHale, P.A., the Debtors will suffer immediate and significant harm if they are unable to obtain my services and the services of McHale, P.A. in these Chapter 11 Cases.  It is, therefore, my belief that only with the granting of an order approving McHale, P.A.'s and my employment will such immediate and irreparable

8930461-15

injury be avoided. Accordingly, I believe that it is in the best interests of the Debtors and their estates that the Court grant the CRO Application.

**C.      Debtors' *Ex Parte* Motion for Joint Administration (the "<u>Joint Administration Motion</u>").**

53.      The Debtors believe that it would be more efficient for the administration of these cases if joint administration were authorized.  The Debtors anticipate that a significant portion of the activity during these cases and most hearings will be substantially identical for both of the Debtors resulting in duplicative pleadings repeatedly being filed should joint administration be denied. Consequently, joint administration would reduce costs and facilitate the economical, efficient and convenient administration of the Debtors' estates.

54.      The Debtors submit that the rights of the creditors and other stakeholders of each of the Debtors will not be adversely affected by joint administration of these cases.  The Debtors filed the Joint Administration Motion on an *ex parte* basis as contemplated by Local Rule 1015-1(B)(2)(a).  The Debtors submit that the entry of an Order approving joint administration of the Debtors' Chapter 11 Cases will be in their best interests and those of their creditors.

**D.      Debtors' Motion for Entry of an Order (I) Enforcing the Protections of Bankruptcy Code Section 362; (II) Prohibiting Plaintiff-Minority Shareholders from Executing on Judgment Obtained in Derivate Action; and (iii) Granting Related Relief *Nunc Pro Tunc* to the Petition Date (the "<u>Section 362 Enforcement Motion</u>").**

55.      Through the Section 362 Enforcement Motion, the Debtors seek entry of an order (i) enforcing the protections of Section 362 of the Bankruptcy Code; (ii) prohibiting the Pltf. Minority Shareholders from efforts to execute on the Judgment; and (iii) granting related relief *nunc pro tunc* to the Petition Date.  In order to facilitate the ability of the Debtors to preserve and to maximize the value of their estates through chapter 11 of the Bankruptcy Code, the Debtors must avoid having third party minority shareholders attempting to execute on the Judgment which

18

I am advised by counsel that, given the derivative nature of their lawsuit, belongs exclusively to the Debtors' estates since, by definition, derivative actions are brought on behalf of corporate entities like JOMR and JOMH.  As stated above, the amounts awarded in the Judgment are in excess of $119.5 million.

56.     I am further advised by counsel that, as a result of the commencement of these Chapter 11 Cases, and by operation of law pursuant to Bankruptcy Code section 362, the automatic stay enjoins all persons and all governmental units from, among other things, commencing or continuing any judicial, administrative, or other proceeding against the Debtors that was or could have been commenced before the Debtors' Chapter 11 Cases were commenced or recovering upon a claim against the Debtors that arose before the commencement of the Debtors' Chapter 11 Cases. *See* 11 U.S.C. § 362.  More specifically, Bankruptcy Code section 362(a)(3) prohibits non-debtors, like the Pltf. Minority Shareholders, from taking "any act to obtain possession of property of the estate…to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

57.     It would be inappropriate, and more to the point, extremely prejudicial to the Debtors' estates, to have the Pltf. Minority Shareholders exercising control over valuable property of the estate, that is, the Debtors' rights under the Judgment obtained on behalf of the Debtors should the Judgment be affirmed on appeal. I am advised by counsel that prevailing caselaw, including from and within the Eleventh Circuit, holds that pre-petition derivative actions constitute property of the bankruptcy estate under Bankruptcy Code section 541 upon the bankruptcy filing of the entity in whose name and on whose behalf the action was instituted.

58.     I believe that entry of an order granting the relief requested in the Section 362 Enforcement Motion, which the Debtors will be able to serve on affected parties, specifically including the Pltf. Minority Shareholders, will maximize the protections afforded by the automatic

stay provisions of Bankruptcy Code section 362, and be in the best interests of the estates and their creditors and other stakeholders.

59.     I am further advised by counsel that Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after a bankruptcy filing "to the extent that relief is necessary to avoid immediate and irreparable harm," Fed. R. Bankr. P. 6003(b), may apply to the Section 362 Enforcement Motion.

60.     For reasons discussed above, I believe that the relief requested in the Section 362 Enforcement Motion is integral to the Debtors' ability to preserve and to maximize the value of the Debtors' estates in these Chapter 11 Cases by allowing me as a fiduciary to maintain exclusive control over valuable property of the estates and that an order granting that Motion is in the best interests of the Debtors, their stakeholders, and their estates.  For these same reasons, I believe that the relief requested is necessary in order for the Debtors to protect the ongoing value of the Debtors' estates for the benefit of all creditors and other stakeholders.

61.     Accordingly, I believe that, to the extent applicable, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested.  Moreover, I believe that, in order to implement the relief requested, it is appropriate for an order of the Court provide that notice of the relief requested satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## PART IV
## CONCLUSION

62.     This Declaration illustrates the factors that have led to the commencement of the Chapter 11 Cases and the need for the relief requested in the First Day Pleadings.  For the reasons

8930461-15

described herein and in the First Day Pleadings which are incorporated herein by reference, I believe that the prospect for achieving the objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Pleadings.

### 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 7th day of March, 2019 in Fort Myers, Florida.

*/s/ Gerard A. McHale*
Gerard "Jerry" A. McHale, Chief
Restructuring Officer for Just One More
Restaurant Corp. and Just One More
Holding Corp.

21

8930461-15

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL PART 48

------------------------------------------------------------------------x

GARY GANZI, CLAIRE BREEN, and GARY GANZI
and CLAIRE BREEN, as Attorneys-in Fact for the
Estate of CHARLES COOK, Individually and
Derivatively on Behalf of Nominal Defendants
JUST ONE MORE RESTAURANT CORPORATION
and JUST ONE MORE HOLDING CORPORATION,

                        Plaintiffs,

                                                    *Redacted* 11/13/18

-against-

WALTER GANZI, JR. and BRUCE BOZZI, SR.,                  Index No.: 653074/2012

                        Defendants,

                                                    DECISION AFTER
and                                                 NON-JURY TRIAL

JUST ONE MORE RESTAURANT CORPORATION,
a New York corporation, and JUST ONE MORE
HOLDING CORPORATION, a New York corporation,

                        Nominal Defendants.

------------------------------------------------------------------------x

MASLEY, J.:

This action concerns allegedly improper transactions and practices of the

majority shareholders of closely-held family businesses: Just One More Restaurant

Corp. (JOMR), which owned the now-shuttered, renowned New York City

establishment, the original Palm Restaurant (Restaurant); and Just One More Holding

Corp. (JOMH), which owned real property at which the Restaurant was located. The

actions challenged by plaintiffs Gary Ganzi (Gary), Claire Breen (Claire), and the Estate

of Charles Cook (Cook's Estate) occurred decades after the ownership and

management of the businesses had been passed down the family trees to the

defendants, Bruce Bozzi Sr. (Bruce) and Walter Ganzi, Jr. (Wally), plaintiffs' cousin.

Page 1 of 29

The issues at trial surrounded the derivative claims of breach of fiduciary duty raised on behalf of JOMR and JOMH by plaintiffs, minority shareholders of those corporations, and defendants assertion of laches, statute of limitations, and acquiescence. The derivative breach of fiduciary claims against defendants, as the majority shareholders of JOMR, fall into two general categories relating to undervaluation of JOMR's intellectual property assets, and challenge: (1) JOMR's issuance of below market rate license agreements to restaurants and related entities owned in whole or in part by defendants; and (2) JOMR's issuance of a below market rate agreement granting exclusive licensing/sublicensing rights to its valuable intellectual property assets to defendants' wholly-owned management company, and the transactions that occurred thereunder. The trial also addressed plaintiffs' derivative claim that defendants, majority shareholders of JOMH, breached their fiduciary duties by leasing JOMH's real property to JOMR for below market rates.

## Background

In 1926, Pio Bozzi (Pio) (Bruce's grandfather) and John Ganzi (John)(grandfather of Wally, Gary, Claire, and the late Charles Cook) founded the Restaurant. (Palm time line, Defendants' Exhibit [DX] 78). John, a renowned chef who once worked at the 21 Club, had a "larger than life personality" and hobnobbed with celebrities while Pio managed the finances. (Gary Ganzi Trial Affidavit (TA) ¶¶ 50, 51, 53). They ran the Restaurant as a family business with their wives Mary Bozzi (Mary) and Adele Ganzi (Adele). (Statement of Agreed Upon Facts, Nov. 6, 2017 [SAUF] ¶ 2). The Restaurant became known as a steakhouse and famous for caricatures on its walls, contributed by cartoonist customers who exchanged their cartoons for meals and signature dishes

Page 2 of 29

such surf and turf. (DX 78; Gary ¶53). Eventually, ownership of the Restaurant took its corporate form in JOMR, with the founders splitting the shares. (DX 1).[1]

JOMR held its first meeting on April 8, 1933. (Id.). By 1963, Adele, Mary and their sons, Walter and Bruno, were JOMR's four officers and directors. (September 30, 1963 Board Minutes, DX 2). At the February 10, 1971 meeting, called to discuss a Management Report dated October 26, 1970, the board (1) agreed to institute an accounting system and internal financial controls; (2) agreed to reimburse officers for entertaining customers; and (3) adopted salaries for the officers and managers. (Minutes, DX 6). The officers and directors present were: Walter, president, Mary, vice president, Bruno, treasurer and Adele, secretary. (Id.). Also present for the meeting were Bruce and Wally, noted as managers at the time, and JOMR's accountant, Ralph Thomson. Another meeting was held on September 15, 1971 to adjust salaries. (Minutes, DX 79). At the February 9, 1972 board meeting, called to discuss the effective controls instituted the year before as well as the 25% increase in volume, salaries were approved for officers and managers. (Minutes, DX 8). For example, Adele and Mary each earned $23,125, defendants earned $35,625 each as part-time managers, and their fathers earned $44,250 each.[2] (DX 8 and plaintiffs' exhibit (PLX) 82; See also Bruce Tr 600:3 to 7).[3] The officers remained the same as well as the

---

[1] Ownership of the real property also took a corporate form with the founders each splitting the shares in 1946, according to the JOMH filing with the NYS Secretary of State.

[2] The value of Adele's salary today is $142,035.33. dollarshttps://www.bls.gov/data/inflation_calculator.htm

[3] For 1972, the family salary draw from JOMR totaled $206,000.

Page 3 of 29

managers and accountant; all were present. (Id.). Upon Bruno's death, a shareholder

meeting was held on May 15, 1974. (DX 79). A board and shareholder meeting was

called on April 30, 1976 to discuss the liquidation of the employees' pension plan.

(Minutes, DX 21 and 79). Present at the meeting were officers Walter, Bruce, Louise

Bozzi, and Victor Ganzi, as attorney (Wally's brother), and Thomson. (Id.). Adele,

secretary, and Wally, a shareholder, were noted as absent. (Id.). A meeting was held

in 1986 to address the liquor license. (Minutes, PLX 82). Until this litigation,[4] there is

no evidence of any JOMR corporate meetings called thereafter. (Bruce Tr 579:26 to

580:6; 581:1 to 5; Gary TA ¶142; and Joy Jones, Esq. Tr 671:14 to 672:16).

Over time, the ownership and corporate management of the Restaurant passed

down the family tree to the founders' grandchildren-- the parties here. (SAUF ¶ 2,

NYSCEF Doc. No. [Doc] 201; see also Doc 94). As relevant here, Bruce and Wally

began working at the Restaurant in the 1960s, before either had an ownership interest

in JOMR. (Gary TA ¶ 64). Meanwhile, they were running their own restaurants: Wally's

and Bruce's Pussycat. (Gary TA ¶66 and 67). By the late-1970s, defendants had each

obtained a minority interest in JOMR, and, by the late-1990s, defendants were the

majority shareholders of JOMR; defendants' majority ownership of JOMR continued

throughout all times relevant to the issues presented at trial, including the six-year

period, starting September 1, 2006, preceding initiation of the action. (Bruce Tr 580: 24-

26; Gary TA ¶ 86 and 87).

---

[4] A shareholder vote was taken in 2015 to close the Restaurant, over plaintiffs'
objections. (Gary TA ¶142).

The parties to this derivative action[5] are shareholders of JOMR and JOMH

through gifting, purchasing, and inheriting capital stock from family members. At the

time of trial, Gary and Claire together owned 10% of JOMR's capital stock and 16 2/3%

of JOMH's capital stock; Cook's Estate also held a 10% share of JOMR and 16 2/3%

share of JOMH. (Wally trial affidavit [TA] ¶¶ 12; Gary TA ¶¶ 10, 38, 86, 87, 88). It is

undisputed that defendants control JOMR and JOMH as majority shareholders: Bruce

owns 50% of JOMR and 50% of JOMH; Wally owns 30% of JOMR and 16 2/3% of

JOMH. (Wally TA ¶¶ 17-19; Gary TA ¶¶ 10, 38, 86-88; Bruce, trial tr [tr] 580:24-26). In

addition, Wally is CEO of JOMR and Bruce is CEO of JOMH.[6]

JOMR holds its valuable intellectual property (Palm IP);[7] at the time of trial, the

Restaurant has closed and JOMR's sole remaining asset is the Palm IP. (Gary TA ¶

142). The Palm IP includes a series of trademarks and service marks, design elements

of the Restaurant–such as its menu, food quality choices and methods of

preparation–and the Restaurant's decor, display of certain photographs, artistic

caricatures, sketches, cartoons, and other elements. (See generally Report of Pamela

---

[5] Three of plaintiffs' direct claims were summarily dismissed. (NYSCEF Doc. No. [Doc]
173). While certain direct claims survived summary judgment, plaintiffs' evidence at
trial, and plaintiffs' pre-trial and post-trial memoranda, address only their derivative
claims; accordingly, this decision does not consider the direct claims, which are deemed
abandoned.

[6] The court takes judicial notice of JOMR's and JOMH's filing with the NYS Secretary of
State.

[7] At trial, defendants assert that they created the Palm IP, aside from the Palm name,
independent of JOMR and for use in defendants' Palm-branded expansion restaurants.
The contested ownership of the Palm IP is addressed below in the court's findings of
fact and discussion.

Page 5 of 29

O'Neill, November 2, 2017 [O'Neill Report]; *See also* Nov. 6, 2017, credible testimony of
SSP vice president, Pat Murray). In 1984, the Palm's trademark – a palm tree – was
registered in JOMR's name. (Wally TA ¶ 51 and Bokhart Ex 14, Schedule of Palm
trademark registrations).

When JOMR was converted to an S-Corporation in 1986, each shareholder
received a K-1 each year reporting on their share of the profit and loss of JOMR.
(SAUF ¶8 and DX 141). The shareholder's share of JOMR's profit or loss was reported
in the space for "Ordinary Business Income (loss)" and the income that JOMR had
received from the license fees from each of the other Palm restaurants or other sources
was not separately recorded from the corporation's ordinary income or loss in the space
for "Royalties." (*Id.*).

The Restaurant's success[8] and the Palm IP were first exploited in 1972 when the
first of many new Palm-branded restaurants (New Palms) opened in Washington, D.C.
(DC Palm).[9] (Wally TA ¶ 26). Since 1972, New Palms have opened worldwide, and, at
the time of trial, defendants have an ownership interest in numerous New Palms and
their associated business entities; thus, defendants have used the Restaurant and the

---

[8]The court rejects defendants' testimony that the Restaurant was not successful until
defendants took over. (Wally TA ¶13, 15; Bruce TA ¶8, 20; Bruce Tr 594:10 to 595:18).
The handsome salaries paid to the family, even when they no longer worked at the
Restaurant, and board minutes showing success and increasing volume, document
otherwise, long before defendants' took control. (DX8, PLX 82).

[9] The DC Palm was established by 20 or more investors, including defendants. The
license agreement for New Palms, and the annual flat-fee payment for the use of Palm
IP, was first used in connection with the DC Palm.

Page 6 of 29

Palm brand to create an empire of Palm-branded businesses.[10] (Operating Statements 2002 to 2016, Doc 242). It is undisputed that all of the New Palms entered license agreements with JOMR, from the 1970s to 2011, which identified JOMR as the licensor and owner of "long established, famous and valuable service marks used in connection with the operation of distinctive, high quality restaurants," and that JOMR had "devised and developed certain confidential know-how relating to the management and operation of restaurants, including business practices, unique recipes, and formulae"; under those agreements, the New Palms agreed to pay JOMR an annual licensing fee of $6,000 "for the use of [JOMR's] Licensed Trademark and . . . know-how." (Licenses, e.g. DX 42-51, 82, 123). The $6,000 annual fee was imposed for all New Palms in which defendants had an ownership interest, regardless of when those restaurants first opened, for over 40 years. (SAUF ¶¶ 6, 7). At issue at the trial are 54 license agreements, which all include the $6,000 fee, entered between JOMR and the New Palms owned by defendants: 26 licenses in 2007, backdated to January 1, 2004 (2007

---

[10] Per stipulation, since 2006, Bruce and Wally have been officers and directors or members of the following Palm-related companies, in addition to JOMR and JOMH: Atlanta Palm Food Corporation; Atlantic City Palm, LLC; LA Downtown Palm, LLC; Palm Beverly Hills Restaurant; Boston Palm Corporation; Charlotte Palm Corporation; Chicago Palm, Inc.; Coral Gables Palm Restaurant, LLC; The Dallas Palm Restaurant, Inc.; Denver Palm Corporation; Palm Management Corporation; Palm Management Corp D/B/A James Lane Café at the Hedges; Palm Restaurant of Houston, Inc.; Palm Management Corp; D/B/A Palm Restaurant at The Hunting Inn; Palm Airport, LLC (does not operate a restaurant); Palm Restaurant of Las Vegas, Inc.; Palm UK LLC (does not operate a restaurant); The Los Angeles Palm, Inc.; Miami Palm Restaurant, Inc.; Nashville Palm Restaurant, LLC; Northbrook Palm, LLC; Palm Orlando Corporation; Palm West Corporation; Palm Restaurant of Philadelphia, Inc. (until 2016); Palm Philadelphia Restaurant, LLC (from 2016); Palm Restaurant Puerto Rico Corporation; Palm Restaurant, Inc.; San Antonio Palm Restaurant, Inc.; San Diego Palm, LLC; Tampa Palm Restaurant, LLC; Palm New York Downtown, LLC; Palm Tyson's Too, Inc.; The Washington Palm, Inc. (Doc 242).

Page 7 of 29

Licenses); and 28 licenses in 2011, backdated to January 1, 2010 (2011 Licenses).
(DX 82; see SAUF ¶ 19 to 15). Gross revenue for New Palms from 2006 to 2017 was
$1.5 billion. (Gary TA ¶16; DX 97).

Additionally, it is undisputed that defendants own 100% of the Palm Management
Corporation (PMC), which was formed in 1975. (DX 20; Gary TA ¶¶ 3, 11). In 2006,
Bruce and Wally each earned salaries of $____ million. (PLX 21 at 6911 to 6912).
From 2006 to 2016, their salaries were not less than $____ million each. (Tr 588:24-26).
In 2006, Wally charged PMC $____ in travel, lodging, meals and entertainment,
while Bruce charged PMC $____ (PLX 21 7138 and 7140).

Charles Ganzi (father of Gary and Claire)(Charlie) was a certified public
accountant and a partner of the accounting firm Fisher & Baker (F&B) of which
Thomson was also a partner. (Gary TA ¶68). There were no other employees. (F&B
tax returns, DX 135). Beginning in the 1970s, F&B prepared JOMR's financial
statements and tax returns. (F&B time sheets 1965 to 1983, DX 135). The detailed
time sheets demonstrate that Thomson provided the actual services to JOMR. (Id.). In
the 1970s, F&B did accounting work for the New Palms and, beginning in 1976, PMC
until all were moved to DC in 1985. (Id., DX 75, 96 and 193, and Wally TA ¶21). In
1970, a F&B Report concluded that Palm had been grossly mismanaged for some time,
there was " rather considerable vacuum at the management level," and that it provided
a "near perfect 'textbook' example of how not to manage a restaurant." (DX 5). The
Report also suggested that, if not for the Palm's large sales volume and "unrealistically
low rent," the Restaurant would have already gone bankrupt. (SAUF ¶3). In 1989,
Charlie evaluated JOMR's 1987 accounts and found a $50,000 discrepancy. (DX 33-

Page 8 of 29

38, 40 and 41). In 2004, Charlie invoiced JOMR for professional services to prepare a 2003 financial report. (DX 71).

In 1982, defendants' trademark attorney warned them that the $6,000[11] flat fee "may be deemed quite modest in a few years" and "[m]ost franchise contracts provide for a payment of a percentage of gross sales rather than a flat fee" and that they should consider "a royalty provision." (DX 25 at 6).

In 2007, PMC and JOMR entered into a Master License Agreement (MLA) through which PMC acquired the "exclusive, worldwide, royalty bearing, sub-licensable license" to the Palm IP for an annual flat payment of $12,000. (DX 104 and SAUF ¶ 17). Bruce signed the MLA for JOMR and CFO James Longo signed for PMC. (Gary TA ¶22). Under the MLA, PMC entered into sublicense agreements for the use of Palm IP with third parties for at or near market rate value, as opposed to the $6,000 flat fee paid by the New Palms.

In 2008, PMC entered an agreement with SSP America (SSP), a business that operates airport food outlets, which sublicensed the right to use the Palm IP to establish the Palm Bar and Grille at John F. Kennedy Airport (JFK Palm) in exchange for annual royalty payments to PMC of [ ]% of gross sales up to $[ ] million and [ ]% above $[ ] million at the JFK Palm (SSP License). (PLX 3). SSP paid an initial $[ ] license fee to PMC, and, since 2010, more than $[ ] million in royalties under the SSP License. (Id.). PMC also entered an agreement in 2008 with TJX under which TJX is granted the use of Palm IP to create Palm-branded household goods for retail stores in exchange

---

[11]In today's dollars, the fee is equivalent to $16,061.87.
https://www.bls.gov/data/inflation_calculator.htm

for licensing fees and annual royalty payments calculated as a percentage of TJX's gross revenues for that Palm product line (TJX License). (See PLX 5-11). From 2007 to 2016, PMC has paid JOMR $120,000 under the MLA while PMC received $___ from SSP and TJX. (Gary TA ¶32 and DX 134).

Plaintiffs allege in the complaint that defendants engaged in a decades-long pattern of exploiting JOMR's greatest asset—the Palm IP—to benefit defendants' own businesses (i.e., by licensing Palm IP to the New Palms for below market rates), and by improperly entering the MLA between JOMR and PMC and using the MLA to divert substantial revenue from JOMR to PMC. Plaintiffs further allege that defendants breached their fiduciary duties to JOMH, which owned the real estate in New York City at which the Restaurant and its offices were located, by leasing the space at below market level rates to JOMH's detriment. Defendants assert statute of limitations, laches, and acquiescence defenses. (Doc. 4).

This court, in its February 11, 2016 decision and order, granted defendants' motion for partial summary judgment insofar as three direct claims—the fifth, eighth, and tenth causes of action—were dismissed. (See Ganzi v Ganzi, 2016 WL 613815 [Sup Ct, NY County 2016] [Oing, J.] [Doc 173]). Notably, this court found that issues of fact exist as to: (a) when the limitations period for certain license agreements began tolling; (b) whether defendants were prejudiced by laches; and (c) whether the 2011 Licenses are enforceable. (See id). On appeal, the Appellate Division unanimously affirmed the decision and noted that issues of fact exist as to whether plaintiffs suffered from the allegedly improper licensing agreements which were executed within the applicable limitations period. (Ganzi v Ganzi, 144 AD3d 510, 510 [1st Dept 2016]).

Page 10 of 29

Accordingly, the claims at issue in this trial were the following causes of action: (1st) breach of fiduciary duty by executing self-dealing agreements with the New Palms, derivatively for JOMR; (2nd) breach of fiduciary duty by charging third-party companies below market value royalty rates, derivatively for JOMR; (3rd) breach of fiduciary duty by undervaluing real estate, derivatively for JOMH; and (4th) diversion of corporate opportunity, derivatively on behalf of JOMR.[12]

Plaintiffs now contend that the trial evidence establishes that defendants breached their fiduciary duties in that they:

(1) engaged in self-interested, self-dealing transactions that severely undervalued JOMR assets by licensing Palm IP to defendants' New Palms for an annual fee of $6,000; expert evidence established the market rate, per the near-universal business practice, is a percentage of licensee's sales or revenue, and assets comparable to the Palm IP command 5% rates;

(2) deprived JOMR of market rate value for the exclusive right to license Palm IP to third parties by entering the MLA for an undervalued fee of $12,000, and diverted substantial licensing deals away from JOMR to PMC; and

(3) leased JOMH's real property to JOMR for undervalued rental rates and inequitably distributed sale proceeds to JOMH's shareholders based on a 2006 evaluation of 837 Second Avenue that concluded that the market rent was $233,000. (SAUF ¶19).

---

[12] As noted above, this decision does not address plaintiffs' abandoned direct claims, including the following causes of action: (6th) breach of fiduciary duty in charging third parties below market royalty rates; (7th) breach of fiduciary duty in undervaluing real estate; and (9th) oppression of minority shareholders of JOMH.

Page 11 of 29

Plaintiffs assert the limitation period is six years; thus, JOMR should recover those damages which accrued after September 1, 2016, including the 54 agreements in the 2007 and 2011 Licenses, the MLA, and the SSP and TJX Licenses. Plaintiffs argue that defendants failed to establish any affirmative defense at trial.

Defendants contend that the trial evidence establishes that:

(1) defendants, through PMC for the New Palms, developed the valuable Palm IP elements, including the logo, the menu, recipes, and décor;

(2) the family members all knew about, and supported, the New Palms and the lack of objection shows that prior JOMR shareholders consented to the New Palms' licensing arrangements; alternatively, plaintiffs' predecessors in interest always knew that Palm IP was used by defendants in the New Palms for defendants' benefit, and that JOMR did not share in the success of the New Palms, constituting knowledge of the license arrangements;

(3) JOMR's past shareholders implicitly consented to the licensing arrangement each time defendants opened a New Palm;

(4) Charlie, from whom plaintiffs inherited certain JOMR shares, had knowledge of the license agreements because he was an accountant for family businesses, including JOMR, and was involved with family-member shareholders' financial affairs; thus, Charlie's knowledge of, and lack of objection to, the New Palms' licenses bars plaintiffs' challenges;

(5) the 2007 and 2011 Licenses accrued outside of the limitation period when each New Palm first opened; and

(6) defendants are prejudiced by laches because the Dead Man's statute

Page 12 of 29

prohibits them from testifying as to conversations with deceased family members/JOMR

shareholders as to consent and knowledge.

### Findings of Fact and Conclusions of Law

The court, having before it now all trial evidence, makes the following findings of

fact and conclusions of law. Any evidence not addressed in this decision is deemed

irrelevant to the issues and is afforded no weight.

These findings of fact and conclusions of law are framed by the bedrock legal

principle, and "inflexible rule," that fiduciaries:

> "cannot exercise the corporate powers for their private or personal
> advantage or gain. The law stringently and rigorously forbids to them the
> use or disposition of the funds or assets of the corporation for their
> individual enterprises or acquisition, and for any misfeasance or breach of
> duty or trust resulting in damage to the corporation they are subject to be
> called to account by the corporation in the appropriate action." (*Pollitz v
> Wabash R. Co.*, 207 NY 113, 124 [1912]).

The court finds Gary credible. In addition to his precise testimony, consistent

with his education and training as an engineer and patent attorney, his testimony was

logical and often corroborated by documentary evidence. (Gary_TA ¶6).

As majority shareholders of JOMR, with a combined 80% ownership, and

officers,[13] defendants are corporate insiders who owe fiduciary duties to JOMR. The

court finds that JOMR owned the Palm IP—including the name, logo, trademarks,

service marks, design elements of the restaurants such as menu, recipes, food quality

choices, methods of preparation, and decor, the display of certain photographs,

---

[13]While Wally is currently documented by the Secretary of State as JOMR's CEO,
Bruce's corporate position in JOMR, if any, is unknown since 1976 when his position as
JOMR's Treasurer was recorded.

characteristic caricatures, sketches, cartoons and/or other design elements—and JOMR was, and is, entitled to fair market value for any use of Palm IP assets. Notably, the first license agreement executed by JOMR for the use of Palm IP in connection with a New Palm restaurant—the 1972 license for the DC Palm—identifies the Palm name, unique recipes, logo, and know-how, among other things; thus, the 1972 license for the DC Palm contradicts defendants' contention that JOMR owned only the Palm name, not the entirety of the Palm IP.

The court rejects Wally's self-serving testimony, unsupported by any credible evidence, that defendants created the Palm IP. The credible evidence establishes that the Palm IP was the key to the success of defendants' business ventures. Their non-Palm restaurant ventures, Bruce's Pussycat and Wally's, were unsuccessful. Further, the quick succession of opening New Palms after 1972—including the Palm Too restaurant, in 1973, across the street from the original Restaurant, and the Los Angeles Palm in 1975—demonstrate that the Palm name, brand, and overall Palm IP were valuable assets belonging to JOMR before defendants had majority ownership of JOMR, and that exploiting the Palm IP was the key to defendants's success.

The evidence establishes that, before this action was filed, JOMR's last board and shareholder meeting occurred in 1976, and there is no evidence that any corporate meeting, properly noticed or not, occurred ever since;[14] however, the pre-1976 meeting

---

[14] Purported family discussions at a kitchen table in the 1970s do not constitute properly-noticed corporate meetings; in any event, there are no records from Adele's kitchen reporting that defendants were present. Even if those meetings occurred, they do not bear on the 2007 and 2011 Licenses. (Bruce Tr 580:12 to 23). Likewise, PMC meetings are not a substitute for JOMR meetings. (See Wally TA ¶35).

Page 14 of 29

notices and minutes show that the parties' predecessors understood corporate

formalities. (DX 21, 79).

The court also finds that defendants had notice that the $6,000 license fee was

becoming an issue as of 1982, when trademark counsel advised them that the $6,000

license fee was not the industry-norm and would be deemed unreasonably modest in

only a few years, and that the rate could raise red flags and render the transactions

vulnerable to shareholder challenges. (DX 25, at 6). The court also finds, however, that

there is no credible evidence that demonstrates that Charlie, his sister, Lorraine Cook,

or plaintiffs were aware of the 2007 or 2011 Licenses or the fees they contained.

While Charlie worked with JOMR's books and records, Ralph Thompson was

JOMR's accountant according to corporate minutes as early as 1970 and the detailed

time sheets corroborate that Charlie's contribution to the F&B Palm account was

minimal.

The court gives no weight to defendants' testimony that the $6,000 fee was

instituted to help pay the JOMR salaries of the Ganzi and Bozzi parents and

grandmothers.[15] The more logical explanation for the license agreement and flat fee is

that the numerous investors in the DC Palm demanded those provisions. In any event,

it is obvious and undeniable that the flat-fee $6,000 annual payment for the use of

---

[15] The DC Palm agreement was instituted in 1972, years after John and Pio passed
away in 1963 and 1946, respectively. (Gary TA ¶55 and Family Tree, PLX 77).
Further, in 1972, the Restaurant paid salaries to many family members, not all elderly;
Adele, Bruno, Bruce, Walter, Wally, and Mary all earned salaries that totaled $206,000
together. The fee in 1972—a single annual $6,000 payment—amounts to only 3% of
the salary expenditures for 1972; a negligible contribution, at best. That the payments
continued long after their deaths undermines defendants' credibility.

Page 15 of 29

JOMR's valuable trademarks, service marks, and "know-how" allowed the New Palms to earn greater revenues, at the expense of JOMR, especially considering that the $6,000 fee was applied for all New Palms in which defendants had ownership interests, without change, from 1972 onwards, spanning more than 40 years.

As defendants were on notice, since 1982, that a JOMR shareholder could challenge the licensing arrangement as undervaluing Palm IP and harming JOMR, a six-year look-back period was always a risk. (CPLR 213; DX 25, at 6). Even if the court were to find that defendants were prejudiced by the timing of plaintiffs' challenge and the six-year statute of limitations—which it does not—defendants assumed and perpetuated that known risk in causing JOMR to issue licenses to each New Palm, without changing the $6,000 fee, for over 40 years.

Defendants' self dealing is also exemplified by the JOMR-PMC service agreement of January 1, 2010, pursuant to which JOMR paid PMC $[    ] per month plus bonuses to Wally and Bruce of up to $[    ] per year. (Gary TA ¶135 and PLX 12. See also DX 31, 32, 217). There was no corporate formality, no independent management, and thus, no fair negotiation of these payments. Defendants have treated JOMR as their own without any regard to other shareholders.

It is undisputed that the family was proud of Wally and Bruce and they had much to be proud of. However, defendants impermissibly collapse this family pride with knowledge that JOMR had rights in its name and that Bruce and Wally were using the name for their own benefits, not JOMR's. Family pride is not a defense and does not give rise to knowledge of how that success was achieved and that it was unfair to JOMR.

Page 16 of 29

## Discussion of Plaintiffs' Claims

The court is compelled to find in favor of plaintiffs as to the first cause of action, the derivative claim for breach of defendants' fiduciary duty to JOMR by executing self-dealing, undervalued license agreements with defendants' New Palms. Plaintiffs have established the existence of a fiduciary relationship, misconduct by defendants, and damages directly caused by defendants' misconduct. (PJI 3:59). Defendants do not dispute that they owed JOMR fiduciary duties arising from their majority ownership. The issuance of the 2007 and 2011 Licenses for fees grossly favoring defendants' New Palms' interests over those of JOMR, depriving JOMR of fair market value for the valuable Palm IP, is a textbook example of fiduciary misconduct.

Corporate formalities ceased being followed when defendants took over JOMR. There was no corporate action, notice, or meeting to ratify any of the licenses at issue here, and no votes were cast by disinterested directors or shareholders of JOMR regarding those decisions. That JOMR is a closely-held corporation which began as an informal family affair does not excuse defendants from complying with their fiduciary obligations to JOMR and fellow shareholders. (See Global Mins and Metals Corp v Holme, 35 AD3d 93, 98 [1st Dept 2006]).

Accordingly, the burden is on defendants to establish that the license agreements were fair and reasonable to JOMR. (BCL § 713 [b]). Defendants have not satisfied that burden. All expert testimony established that the per-restaurant, annual flat-rate fee is not fair or reasonable. By all accounts, similar licensing fees in the restaurant industry are calculated as a percentage of sales. Even defendants' expert, Christopher Bokhart, testified that comparable rates for similar restaurants are

calculated as a percentage of gross sales: Smith & Wollensky, 2%; Capital Grille, 2.2%;

Morton's, 2.7%; Del Frisco's and Sullivan's, 1.8%; Ruth's Chris, 2.3%. Plaintiffs' expert,

Pamela O'Neill, found comparable rates of: 5.5% for Capital Grille; 3.3% for Long Horn

Steakhouse; and 3.7% for Morton's. Since 2006, the period at issue here, gross

revenue at the New Palms owned by defendants totaled $1.5 billion. Therefore, JOMR

would have earned significantly more for the licenses even at the lowest comparable

rate, 1.8%, identified by Bokhart.

Furthermore, defendants were aware, in 1999, that Palm IP licenses were then

valued at or around ⟨ ⟩: the rate at which the Mexico Palm restaurant was charged

annually. The court finds, however, that the most relevant rate, undisputably negotiated

at arm's length in 2008 between PMC and SSP for the SSP License for the JFK Palm,

is ⟨ ⟩ annually. Those rates demonstrate that the figures identified by plaintiffs' experts

are more reliable and comparable to the fair market rate of Palm IP licenses; the court

finds the rates identified by plaintiffs' experts are reasonable and fair.

As to the second cause of action for breach of fiduciary duty by entering the MLA

at a flat annual rate of $12,000 for PMC's exclusive right to sublicense Palm IP, the

same analysis applies. The self-interested transaction gave JOMR's greatest asset, the

Palm IP, to defendants' wholly-owned business, PMC, for a grossly-undervalued flat

annual fee, establishing another plainly self-interested transaction which constitutes

breach of defendants' fiduciary duties to JOMR to further their own interests.

Likewise, the court finds for plaintiffs as to the fourth cause of action for diversion

of corporate opportunities. Under the MLA, defendants, through PMC, diverted JOMR's

corporate opportunities to issue the SSP and TJX Licenses, and deprived JOMR of the

revenue from those substantial transactions. Indeed, rather than reap the benefits of those license agreements, JOMR collected a paltry $12,000 flat annual fee from PMC. Had JOMR received fair market value for the exclusive right to sublicense Palm IP to third parties, that rate would, by all accounts, dwarf the $12,000 annual flat fee. A more obvious example of the breach of a fiduciary's duty of loyalty is difficult to envision.

As to the derivative claim for breach of fiduciary duty by defendants' undervaluing the real estate at 837 Second Avenue, the court is compelled to find in favor of plaintiffs. The evidence establishes that defendants owed a fiduciary duty to JOMH as its majority shareholders, and that they breached those duties by causing JOMH to charge below market rate rent of $63,233 annually. The property was appraised as commanding rental value of $223,000 annually as of November 1, 2006. (SAUF ¶ 19). In 2016, the rental value had climbed to $597,325. (Gary TA ¶ 144). The building sold for $5.9 million in 2015. (Gary TA ¶143). Therefore, plaintiffs have demonstrated that JOMH was harmed by defendants' misconduct.

### Discussion of Defendants' Defenses

Defendants have the burden to prove their defenses. (*Lion Brewery of New York City v Loughran,* 223 AD 623, 625 [1st Dept 1928]). The affirmative defenses of acquiescence, statute of limitations, and laches are intended to ensure fairness in human affairs by preventing a party from defending alleged misconduct that occurred decades earlier—here, spanning back 40 years—when the "evidence has been lost, memories have faded and witnesses have disappeared." (*Blanco v American Tel. & Tel. Co.,* 689 NE2d 506, 513 [1997]). Nevertheless, defendants have failed to satisfy their burden of demonstrating facts necessary to support their affirmative defenses.

Page 19 of 29

## Statute of Limitations

The limitation period for claims of breach of fiduciary duty is six years. (CPLR 213). The 54 valid and enforceable agreements that comprise the 2007 and 2011 Licenses each fall within the six-year limitations period; they are not excepted from the applicable limitation period by virtue of the fact that substantially similar licenses were originally issued by JOMR to the corresponding New Palms when each establishment first opened years earlier. As this court previously ruled, this action is timely and the breach of fiduciary duty claims are not barred if the 2011 Licenses are valid and enforceable. The parties have stipulated to the validity and enforceability of the 2007 and 2011 Licenses. (SAUF ¶¶ 13-15). Further, the MLA, SSP License, and TJX License were all entered within the six-year limitation period.

The court rejects defendants' contention that each claim for the 2007 and 2011 Licenses accrued when the corresponding restaurant opened. Defendants' argue that the claims are barred because plaintiffs cannot establish any new harm; that argument is inapplicable and unsupported by any law authority by defendants. This court already rejected this argument when it ruled that "if the 2010 agreements are indeed valid, then the alleged harm results from the agreements entered into at that time, albeit it mirrors the alleged harm resulting from the earlier agreements." (Doc 173 at 15). The Appellate Division also rejected this argument in affirming this court's decision denying defendants' motion to summarily dismiss the first cause of action as time-barred, and finding that there are "triable issues relating to the harm [plaintiffs] suffered from the allegedly improper licensing agreements . . . executed within the limitations period." (*Ganzi*, 144 AD3d at 511). Thus, defendants' theory that new or incremental harm is

Page 20 of 29

20 of 29

necessitated has been rejected by this court, and that decision affirmed on appeal, and
this court will not, again, entertain the meritless argument.

Moreover, the statute of limitations "on claims against a fiduciary for breach of its
duty is tolled until such time as the fiduciary openly repudiates the role." (*AccessPoint
Med LLC v Mandell*, 106 AD3d 40, 45 [1st Det 2013]). Since defendants are fiduciaries
of the corporation, and there is no evidence of them repudiating, the statute of
limitations as to equitable relief was tolled. Such a rule reasonably rejects the idea that
defendants are protected by the statute of limitations because they have been taking for
themselves JOMR's corporate opportunity of a fair and reasonable rate for such a long
time. Such reliance on the statute of limitations would be antithetical to equity and is
inapplicable to the facts here.

Laches

Defendants assert that this action is barred by laches because plaintiffs or
plaintiffs' predecessors in interest knew about the license agreements with the New
Palms since 1972; thus, defendants argue that it is unfair now, after 40 years, to
challenge those transactions.

Preliminarily, a laches defense is not available to a fiduciary unless the fiduciary
openly repudiates the relationship. (*Matter of Barabash*, 31 NY2d 76, 82 [1972]).
Defendants are fiduciaries and there is no evidence that they ever repudiated their
fiduciary relationship; therefore, their laches defense applies, if at all, as a defense to
only plaintiffs' fourth cause of action alleging diversion of corporate opportunity.

To establish a valid defense of laches, defendants must prove that plaintiffs
delayed in bringing this action subsequent to the accrual of their causes of action within

Page 21 of 29

the statutory limitations period, and that defendants were prejudiced by the delay. As to

plaintiffs who became shareholders in 2010, they could not have acted sooner,

particularly given that litigation in Surrogate's Court was necessitated to obtain

corporate information to which they were entitled. Further, the fourth cause of action for

diversion of corporate opportunities pertains to only the 2007-2008 SSP and TJX

Licenses, there is no evidence that plaintiffs or their predecessors in interest were

aware of the details of the SSP or TJX Licenses, and, therefore, defendants cannot

establish that there was delay in bringing the action after accrual of that claim.

Furthermore, the challengers must have a clear indication of the facts giving rise

to the legal action before the laches clock begins to tick. (*Weiss v Mayflower Doughnut

Corp.*, 1 NY2d 310, 319-20 [1956]). Here, absent any evidence that corporate

formalities were followed after 1984, the court cannot find what JOMR or its

shareholders knew or did not know; rather, the lack of defendants' compliance with

corporate formalities at the relevant time demonstrates that JOMR's shareholders were

effectively denied knowledge and input as to JOMR's business. (*See Tierno v Puglisi*,

279 AD2d 836, 839 [3d Dept 2001]). In fact, defendants testified that they did not know

that JOMR owned the Palm IP prior to this litigation. (Bruce Tr 561-563).

Defendants' evidence that Charlie was aware of the licensing agreements for

New Palms in 1989 is inapplicable, as Charlie did not become a JOMR shareholder until

1995, at the age of 80. Even if he did, acquiesce to, or ratify, defendants' self-dealing

license agreements, that acquiescence does not extinguish the rights of other

shareholders who are not precluded by that acquiescence—i.e., Cook's Estate and its

predecessors in interest. (*Diamond v Diamond*, 307 NY 263, 266 [1954]). Thus, the

Page 22 of 29

court rejects defendants' laches contentions as to JOMR and JOMH, and, for the same

reasons: though Charlie was a JOMH shareholder beginning in 1972, and he was aware

of the JOMH rental agreements, his ratification of rental rates does not bar these

claims.[16] (Gary TA ¶81).

Defendants have also failed to establish they sustained any unfair prejudice from

a delay in commencing this action. The court rejects defendants' assertion that they

would have acted differently if the family had objected, and that they are harmed in that

the family shareholders of past are no longer alive to testify as to their consent to the

license arrangements. None of defendants' uncorroborated testimony is adequate to

establish prejudice that would support their defenses, and the court does not find

prejudice on the basis of defendants' unreliable conjecture as to how they would have

acted if things were different. (See Tri-State Environmental Contracting, Inc. v M.H.

Kane Const., Inc., 25 AD3d 436, 437 [1st Dept 2006]). Further, defendants were not

materially or meaningfully prejudiced by the dead man's statute. (Harley Davidson, Inc.

v O'Connell, 13 F Supp 2d 271, 282 [ND NY 1998]). Indeed, they benefitted greatly

from the ancient document rule which permitted them to enter hundreds of pages of

Charlie's documents, and which opened the door to testimony as to Charlie's

statements. (Victor TA ¶23-26; tr 961, 963-964). Finally, defendants "cannot credibly

claim that [they] suffered inequity" where all evidence demonstrates that they

---

[16] The court rejects defendants' assertion that other family members, including Adele,
Lorraine, and Cook, could divine the $6,000 license fee from K-1 tax forms. In any
event, those license fees are not at issue in the fourth cause of action for corporate
diversion. Accordingly, the court can make no determination that full knowledge of all
relevant facts was had by each of plaintiffs' predecessors in interest.

"indisputably profited enormously from [the] purported" improper conduct. (*Explorers Club, Inc. v Diageo PLC*, 45 Misc 3d 434, 440-441 [Sup Ct, NY County 2014]). Here, defendants were not harmed; rather, their businesses were engorged with millions of dollars of additional revenue at JOMR's expense for 40 years.

Acquiescence, Implied Ratification, and Equitable Estoppel

Acquiescence is a defense to torts, including business torts; the principal takes two forms: implied ratification (PJI 4:15) and equitable estoppel. In either form, the acquiescence of a shareholder's predecessor-in-interest may be binding on that shareholder's successors. (*Bangor Punta Operations, Inc. v Bangor & A.R. Co.*, 417 US 703, 710 [1974]). Acquiescence is particularly applicable to a close corporation, as opposed to a publicly-traded corporation, as there is an expectation to object affirmatively to an improper action. (*Pinnacle Consultants v Leucadia Nat'l Corp.*, 94 NY2d 426, 433 [2000]). Nevertheless, acquiescence in any form is not a defense to the breach of fiduciary duty claims alleged here. (*See Petrella v Metro-Goldwyn-Mayer, Inc.*, 572 US 663, 675 [2014]). Defendants reliance on *Sakow v 633 Seafood Restaurant, Inc.* (25 AD3d 418 [1st Dept 2006]) is misplaced. In *Sakow*, the shareholder-plaintiff objected to the board's decision to increase board member compensation; however, that case was a derivative action raised after the challenged board action occurred—that is, outside of the statute of limitations—and the relief sought was equitable (accounting claim), not legal. In any event, corporate waste, a wrong to the company, as established here, repeatedly, cannot be ratified. *(Aronoff v Albanese*, 85 AD2d 3, 4 [2d Dept 1982]).

Further, while defendants have not even established the facts to demonstrate a

Page 24 of 29

valid implied ratification defense, that defense is totally inapplicable here in the absence

of evidence that plaintiffs or their predecessors in interest had sufficient knowledge of

the transactions at issue–that is, the 2007 and 2011 Licenses being issued, the MLA, or

the SSP and TJX Licenses, or the rental agreements during the limitation period.

Likewise, without evidence that plaintiffs' predecessors knew of the particular

transactions, estoppel is inapplicable here. A party may be found to have acquiesced to

a matter when she remained silent despite the opportunity and duty to act; however,

"[t]he duty to speak is not necessarily a legal obligation to do so but it is founded upon a

sense of justice and fair play invoked by the Courts to compel a man to act when in all

good conscience an honest man would have acted." (*Simmons v Westwood

Apartments Co.*, 46 Misc 2d 1093, 1096-1096 [Sup Ct, Onondaga County 1965]).

Charlie, a minority shareholder and predecessor-in-interest, first obtained

standing to object to any JOMR agreements in 1995 when he became a shareholder;

accordingly, Charlie's actions or inactions in 1986 and 1991 are immaterial. The court

also, again, rejects defendants' legally-unsupported contention that Charlie's knowledge

can be imputed to Adele and Lorraine because he prepared their taxes.

While the court does find that Charlie did ratify JOMH's below market rate rent

prices in that Charlie was a JOMH shareholder in 1996, 2001, and 2006 when he clearly

advocated for the below market rate rent prices. (DX 155, 159-161; *see also* DX 99),

that ratification does not suffice because, for ratification to bar a derivative action, the

ratification must be unanimous. (*See Capital Wine & Spirit Corp v Pokrass*, 277 AD

184, 188 [1st Dept 1950]). There is no evidence of unanimous ratification among

plaintiffs or their predecessors-in-interest at any relevant time as to either JOMH or

Page 25 of 29

JOMR business decisions.

## Remedies

JOMR and JOMH are entitled to amounts by which defendants were enriched at the expense of the corporations as follows:

As to the 2007 Licenses and 2011 Licenses (54 license agreements in total), JOMR is entitled to a royalty rate of 5%. (O'Neill TA ¶ 13). Professor David Franklyn, a recognized authority on trademark issues, opined using a weighted average that 5% is the appropriate royalty rate. (See also Battersby on Licensing Royalty Rate, DX 120 and 178). This rate is also supported by the SSP License for the JFK Palm.

Pamela O'Neill, an experienced valuation authority, corroborated that 5% is the correct royalty rate. (O'Neill TA ¶ 13). O'Neill's evidentiary basis for that valuation is defendants' own presentations to bankers and public filings. (O"Neill Appendix B). She also compared the Palm IP to other relevant brands. She performed several relief from royalty analyses to determine the implied royalty rate which yields the cost savings of relief from paying royalty payments. (O'Neill TA ¶ 30-31). Her testimony was credible, comparisons are valid and her assumptions and conclusions supported. Therefore, the court adopts the valuation as set forth in the O'Neill Report and trial affidavit and testimony. (See generally, O'Neill Report and TA).

The court declines to rely on Christopher Bokhart's unsupported calculations. Aside from mathematical errors identified by O'Neill, Bokhart's assumptions as to revenue, discount rate, and growth were unsupported. (O'Neill TA ¶¶ 42, 44). For example, the 20% growth rate used for five years fails to recognize that the recession in 2007 and 2008. Further, he used a discount rate for the entire company instead of one

Page 26 of 29

for intangible assets, failed to adjust for geographic issues such as that there are several Palm-branded restaurants in the New York area, and adjusted Ruth's Chris's rate without an analysis of the services Ruth's Chris provides to franchisees.

The court declines to rely on Scott Roehr's analysis which, as Roehr himself admits, is novel and "unique." (Tr 752:260-753:4; 753:26-754:6). The court observed that during his testimony, he appeared confused by O'Neill's chart C5a. (*Id.*). Roehr admittedly failed to consider that JOMR is an S corporation. (Tr 774:15).

Based on the plaintiffs' experts' evaluations, the court finds that JOMR is entitled to $68,158,000 for the damages arising from the New Palm royalties plus interest. (*See* O'Neill TA Ex C-1).[17]

As to the MLA, PMC usurped JOMR's corporate opportunity to do business with SSP and TJX yielding a loss of $3,146,995. (O'Neill TA Ex C-1). JOMR is entitled to the income since both deals were made within the limitations period beginning in 2006, less any brokerage fee to which PMC would be entitled for arranging the deal, and less the annual $12,000 paid to JOMR. O'Neill opines based on her discussion with a brand licensing agency that JOMR would be entitled to 75% of the SSP and TJX proceeds. Effectively, PMC would take a 25% brokerage fee. This estimated fee is consistent with the 8 to 12% brokerage fee PMC paid to Sela Sales Ltd. for introducing and negotiating the deals.[18] (Gary TA ¶30 and DX 111). Plaintiffs shall have judgment for $3,146,995 plus interest.

---

[17]O'Neill prepared C1 using audited statements for 2006 to 2014. She estimated 2015 to 2017 since audited financial were not provided. (O'Neill March 7, 2014 Report and Ex C-13). There is no factual basis to question these historically based estimates.

[18]Effectively, PMC would receive a 13% brokerage fee if Sela's 12% is subtracted from the proposed 25% fee.

Page 27 of 29

As to below market rents, JOMH is entitled to $1,742,000 in damages representing lost rent from November 1, 2006 to the date of the sale of the building with interest. (O'Neill TA ¶¶ 37-38 and Ex C-10). Regardless of whether Charlie acquiesced in the low market rent, thus barring Charlie or his progeny from initiating legal action as to those claims, Cook's Estate certainly had no such legal bar from initiating this action.

After the sale of the building for $5.9 million, defendants paid JOMR $780,000 for loss of its under market lease caused by the sale. (Gary TA ¶151). Plaintiffs are entitled to their share of the proceeds from JOMH's sale of the building.

The 2007 and 2011 Licenses here are clearly impermissible self-interested transactions. Self-interested transactions by corporate fiduciaries are void unless ratified by vote of the disinterested directors or shareholders, or demonstrated by the proponents of that transaction to be entirely fair and reasonable to the corporation. (BCL § 713). For the reasons stated above, plaintiffs have established that the 54 agreements comprising the 2007 and 2011 Licenses were not ratified by disinterested directors or shareholders, and defendants failed to establish that they are fair or reasonable. Accordingly, the court declares that the 2007 and 2011 Licenses between · JOMR and the New Palms are void.

Likewise, the court grants plaintiffs' request for an injunction prohibiting defendants from continuing to harm JOMR with below market licenses for the use of Palm IP.

While PMC has paid defendants' legal fees of approximately $  ]million, PMC has charged JOMR and JOMH creating a liability on their books and records. No legal basis has been provided to the court to support payment of defendants' legal bills by JOMR or JOMH. Having found that defendants breached their fiduciary duties to JOMR

Page 28 of 29

and JOMH, defendants shall credit JOMR and JOMH, accordingly.

Pursuant to BCL § 626 (e), plaintiffs are entitled to attorneys' fees. Within 60 days, plaintiffs shall submit an affidavit of services including resumes detailing experience and training to justify hourly rates, invoices, and time sheets. Otherwise, waived. Defendants may object within 30 days thereafter. Otherwise, waived.

Plaintiffs shall submit a judgment including proposed interest calculations on notice within 30 days to the Part Clerk for Part 48 in Courtroom 242.

DATED: November 13, 2018

ENTER:

ANDREA MASLEY, J.S.C.

**HON. ANDREA MASLEY
J.S.C.**

**EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GARY GANZI, CLAIRE BREEN, and
GARY GANZI and CLAIRE BREEN, as Attorneys-
in-Fact for the ESTATE OF CHARLES COOK,
Individually and Derivatively on Behalf of Nominal
Defendants JUST ONE MORE RESTAURANT
CORPORATION and JUST ONE MORE HOLDING
CORPORATION,

                        Plaintiffs,

- against -

WALTER GANZI, JR. and BRUCE BOZZI, SR.,

                        Defendants,

and

JUST ONE MORE RESTAURANT
CORPORATION, a New York corporation, and JUST
ONE MORE HOLDING CORPORATION, a New
York corporation,

                    Nominal Defendants.

Index No. 653074/2012

~~[PROPOSED]~~ JUDGMENT    1/25/19

WHEREAS, Justice Andrea Masley, Justice of the Supreme Court, Commercial Division,

of the State of New York, County of New York, issued a Decision After Non-Jury Trial on

November 13, 2018 (the "Decision"), which was entered in the Office of the New York County

Clerk on November 15, 2018, providing for certain remedies;

1.     NOW, THEREFORE, IT IS HEREBY ADJUDGED AND ORDERED ~~DECREED~~, that

Nominal Defendant Just One More Restaurant Corporation ("JOMR"), having an address at

1730 Rhode Island Avenue, NW, Suite 900, Washington, DC 20036, shall have judgment against

Defendant Walter Ganzi, Jr., having an address at 8171 Bay Colony Drive, #1902, Naples,

Florida 34108, and Bruce Bozzi, Sr., having an address at 2161 Gulf of Mexico Drive, Apt. 3B-

1, Longboat Key, Florida 34228, jointly and severally, in the amount of $68,158,000.00, with

1 /5

653074/12

    a. pre-verdict interest through November 13, 2018, at the legal rate of 9% per

annum, in the amount of $41,031,115.64, and

    b. interest from verdict to judgment, in the amount of $16,806.09, per diem,

for a total amount of $ 110,684,857.65, and that JOMR have execution therefor; and it is

further

    2.    ADJUDGED AND ~~DECREED~~ *Ordered* that JOMR shall have judgment against

Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., jointly and severally, in the amount of

$3,146,995.00, with

    a. pre-verdict interest through November 13, 2018, at the legal rate of 9% per

annum, in the amount of $1,505,724.06, and

    b. interest from verdict to judgment, in the amount of $775.97, per diem,

for a total amount of $ 4,721,780.39, and that JOMR have execution therefor; and it is

further

    3.    ADJUDGED AND ~~DECREED~~ *Ordered* that Just One More Holding Corporation

("JOMH"), having an address at 1730 Rhode Island Avenue, NW, Suite 900, Washington, DC

20036, shall have judgment against Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., jointly

and severally, in the amount of $1,742,000.00, with

    a. pre-verdict interest through November 13, 2018, at the legal rate of 9% per

annum, in the amount of $1,177,002.61, and

    b. interest from verdict to judgment, in the amount of $429.53, per diem,

for a total amount of $ 2,957,230.78, and that JOMR have execution therefor; and it is

further

2/5

653074/12

4.    ADJUDGED AND *Ordered* ~~DECREED~~ that Plaintiffs Gary Ganzi, having an address at 74 Valleyfield St., Lexington, MA 02421, Claire Breen, having an address at 7 Ryan Street, Syosset, New York 11791, and the Estate of Charles Cook, care of Meredithe Shields, having an address at 58 Bluestone Court, Kingston, New York 12401, shall have judgment against Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., jointly and severally, in the amount of $496,567.00, with

   a.    pre-verdict interest through November 13, 2018, at the legal rate of 9% per annum, in the amount of $143,623.50, and

   b.    interest from verdict to judgment, per diem, in the amount of $122.44,

for a total amount of $ *651,087.66* *omy0/b*, and that JOMR have execution therefor; and it is further

~~5.    ADJUDGED AND DECREED that JOMR shall hereafter receive a royalty rate of 5% of gross revenues for licensing of the Palm IP, as defined in the Decision, from any entity owned in whole or in part or operated or controlled by Defendant Walter Ganzi, Jr. or Bruce Bozzi, Sr., or their successors, heirs, or assigns; and it is further~~

~~6.    ADJUDGED AND DECREED that JOMR is enjoined and prohibited from entering into or accepting any agreement to license the Palm IP for a royalty of less than 5% of licensee's gross revenues, absent the consent of all Plaintiffs, or their successors, heirs, or assigns; and it is further~~

7.    ADJUDGED AND *Declared* ~~DECREED~~ that the 2007 and 2011 Licenses, as defined in the Decision, between JOMR and the New Palms, as defined in the Decision, are void; and it is further

*and MZA*

653074/12

8. ADJUDGED AND ~~DECREED~~ *Declared* that Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., or their successors, heirs, or assigns are prohibited from continuing to harm JOMR with below-market licenses for the use of Palm IP; and it is further

9. ADJUDGED AND DECREED that JOMR shall hereafter receive 75% of the gross revenues of all licensing of the Palm IP brokered and/or managed by Defendants Walter Ganzi, Jr. or Bruce Bozzi, Sr., or their successors, heirs, or assigns, or by Palm Management Corporation, Palm Airport LLC, or any other entity owned, controlled, or operated by Defendants Walter Ganzi, Jr. or Bruce Bozzi, Sr., or their successors, heirs, or assigns; and it is further

10. ADJUDGED AND ~~DECREED~~ *Declared* that Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr. shall credit JOMR and JOMH for the legal fees of Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr. that were charged as a liability on the books and records of JOMR and JOMH.

11. Attorneys' fees and expenses are addressed in a separate application, pursuant to Justice Masley's Decision after Non-Jury Trial.

Dated: New York, New York
~~December~~ ___, 2019

_____
Andrea Masley, J.S.C.

4/5

653074/12

11.    **ORDERED that that portion of the plaintiff's action that seeks the recovery of
attorneys' fees is severed and the issue of the amount of reasonable attorney's fees
plaintiff may recover against the defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., the
issue of attorneys' fees shall be determined by the court and is scheduled for a hearing
on January 31, 2019 at 10 a.m.; and it is further**

Dated: 1/25/19

ENTER:

_____
J.S.C.

**HON. ANDREA MASLEY**
**J.S.C.**

# FILED

FEB 1 1 2019

COUNTY CLERK'S OFFICE
NEW YORK

_____
CLERK

✱ See annexed 13 page Chart for Calculation.

5/5

RECEIVED NYSCEF: 12/14/2018

NYSCDDSLONO. 262

## TOTAL DAMAGE AWARD AND INTEREST

| Year | Total Lost Royalty Cash Flows | Lost Palm Royalties | Lost Master License Royalties | Lost Rental Cash Flows | Interest Total Lost Royalty Cash Flows | Interest Lost Palm Royalties | Interest Lost Master License Royalties | Interest Lost Rental Cash Flows |
|---|---|---|---|---|---|---|---|---|
| 2006 | $2,390,236.69 | | | 56,518.15 | $2,580,254.75 | $2,580,254.75 | $0.00 | $61,011.28 |
| 2007 | $6,914,513.50 | | | 176,247.80 | $7,049,329.06 | $7,049,329.06 | $0.00 | $179,684.40 |
| 2008 | $6,482,517.91 | | $269,250.00 | 185,347.57 | $6,025,483.64 | $5,775,215.82 | $250,267.82 | $172,280.49 |
| 2009 | $5,738,146.05 | | $72,035.00 | 184,352.81 | $4,817,159.78 | $4,756,686.86 | $60,472.92 | $154,764.16 |
| 2010 | $6,006,563.56 | | $219,182.00 | 188,313.84 | $4,501,904.70 | $4,337,627.84 | $164,276.86 | $141,140.37 |
| 2011 | $6,520,811.69 | | $252,573.00 | 196,362.87 | $4,300,459.20 | $4,133,887.72 | $166,571.48 | $129,500.68 |
| 2012 | $6,523,337.68 | | $479,415.00 | 201,814.53 | $3,715,024.30 | $3,441,998.85 | $273,025.45 | $114,932.95 |
| 2013 | $6,686,734.77 | | $363,506.00 | 205,789.56 | $3,206,272.56 | $3,031,972.02 | $174,300.54 | $98,675.48 |
| 2014 | $6,498,350.82 | | $492,062.00 | 210,093.50 | $2,531,091.34 | $2,339,434.16 | $191,657.18 | $81,830.82 |
| 2015 | $6,409,234.32 | | $428,252.00 | 137,159.38 | $1,919,549.76 | $1,791,289.35 | $128,260.41 | $43,181.98 |
| 2016 | $5,881,820.25 | | $301,487.00 | | $1,232,226.60 | $1,169,065.90 | $63,160.70 | $0.00 |
| 2017 | $5,252,727.75 | | $269,233.00 | | $658,084.01 | $624,353.11 | $33,730.70 | $0.00 |
| | $71,304,994.99 | | $3,146,995.00 | $1,742,000.01 | $42,536,839.70 | $41,031,115.64 | $1,505,724.06 | $1,177,002.61 |
| Rounded | $71,304,995.00 | $68,158,000.00 | | $1,742,000.00 | | | | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

V/13

RECEIVED NYSCEF: 12/14/2018

NYSCEF DOC. NO. 62
2006 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 12 | Interest [Years] 11 | Sub Period 11/13/2018 | Total Interest | [Month] Stub Calc |
|---|---|---|---|---|---|---|---|
| | $2,390,236.69 | | | | | | |
| 9/30/2006 | $597,559.17 | $53,780.33 | $645,363.96 | | $6,422.27 | $651,786.23 | 9.433 |
| 10/31/2006 | $597,559.17 | $53,780.33 | $645,363.96 | | $1,940.57 | $647,304.53 | 8.433 |
| | | | | | | | 7.433 |
| | | | | | | | 6.433 |
| | | | | | | | 5.433 |
| | | | | | | | 4.433 |
| 11/30/2006 | $597,559.17 | $53,780.33 | $591,583.63 | | $51,239.21 | $642,822.84 | 3.433 |
| 12/31/2006 | $597,559.17 | $53,780.33 | $591,583.63 | | $46,757.52 | $638,341.15 | 2.433 |
| | | | | | | | 1.433 |
| | | | | | | | 0.433 |
| Total | | | | | | $2,580,254.75 | |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 12 | Interest [Years] 11 | Sub Period 11/13/2018 | Total Interest | [Month] Stub Calc |
|---|---|---|---|---|---|---|
| $0.00 | | | | | | |
| | $0.00 | $0.00 | | $0.00 | $0.00 | 9.433 |
| | $0.00 | $0.00 | | $0.00 | $0.00 | 8.433 |
| | | | | | | 7.433 |
| | | | | | | 6.433 |
| | | | | | | 5.433 |
| | | | | | | 4.433 |
| | $0.00 | $0.00 | | $0.00 | $0.00 | 3.433 |
| | $0.00 | $0.00 | | $0.00 | $0.00 | 2.433 |
| | | | | | $0.00 | 1.433 |
| | | | | | | 0.433 |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] 12 | Interest [Years] 11 | Sub Period 11/13/2018 | Total Interest | [Month] Stub Calc |
|---|---|---|---|---|---|---|---|
| | $6,518.15 | | | | | | |
| 9/30/2006 | $14,129.54 | $1,271.66 | $15,259.92 | | $151.86 | $15,411.78 | 9.433 |
| 10/31/2006 | $14,129.54 | $1,271.66 | $15,259.92 | | $45.89 | $15,305.81 | 8.433 |
| | | | | | | | 7.433 |
| | | | | | | | 6.433 |
| | | | | | | | 5.433 |
| | | | | | | | 4.433 |
| | | | | | | | 3.433 |
| 11/30/2006 | $14,129.54 | $1,271.66 | $13,988.26 | | $1,211.57 | $15,199.83 | 2.433 |
| 12/31/2006 | $14,129.54 | $1,271.66 | $13,988.26 | | $1,105.60 | $15,093.86 | 1.433 |
| | | | | | | | 6.433 |
| Total | | | | | | $61,011.28 | 11.433 |
| | | | | | | | 10.433 |

DRAFT-SUBJECT TO CHANGE. CONFIDENTIAL.

NYSCEF... 2007 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $6,914,513.50 | Annual Interest Paid 9.0% | Interest [Years] 11 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $40,765.38 | $611,212.73 |
| 2/28/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $36,443.81 | $606,891.16 |
| 3/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $32,122.24 | $602,569.59 |
| 4/30/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $27,800.67 | $598,248.02 |
| 5/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $23,479.09 | $593,926.44 |
| 6/30/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $19,157.52 | $589,604.87 |
| 7/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $14,835.95 | $585,283.30 |
| 8/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $10,514.38 | $580,961.73 |
| 9/30/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $6,192.81 | $576,640.16 |
| 10/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $1,871.24 | $572,318.59 |
| | | | Interest [Years] 10 | | |
| 11/30/2007 | $576,209.46 | $51,858.85 | $518,588.50 | $49,408.52 | $567,997.02 |
| 12/31/2007 | $576,209.46 | $51,858.85 | $518,588.50 | $45,086.95 | $563,675.45 |
| Total | | | | | $7,049,329.06 |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows $0.00 | Annual Interest Paid 9.0% | Interest [Years] 11 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 9.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 8.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 7.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 6.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 5.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 4.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 3.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 2.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 1.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.433 |
| | | Interest [Years] 10 | | | |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 11.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 10.433 |
| $0.00 | | | | | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow $176,247.80 | Annual Interest Paid 9.0% | Interest [Years] 11 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $1,039.09 | $15,579.55 | 9.433 |
| 2/28/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $928.94 | $15,469.40 | 8.433 |
| 3/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $818.78 | $15,359.24 | 7.433 |
| 4/30/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $708.63 | $15,249.09 | 6.433 |
| 5/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $598.47 | $15,138.93 | 5.433 |
| 6/30/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $488.32 | $15,028.78 | 4.433 |
| 7/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $378.16 | $14,918.62 | 3.433 |
| 8/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $268.01 | $14,808.47 | 2.433 |
| 9/30/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $157.85 | $14,698.31 | 1.433 |
| 10/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $47.70 | $14,588.16 | 0.433 |
| | | | Interest [Years] 10 | | | |
| 11/30/2007 | $14,687.32 | $1,321.86 | $13,218.60 | $1,259.40 | $14,478.00 | 11.433 |
| 12/31/2007 | $14,687.32 | $1,321.86 | $13,218.60 | $1,149.25 | $14,367.85 | 10.433 |
| Total | | | | | $179,683.40 | |

DRAFT SUBJECT TO CHANGE, CONFIDENTIAL

3/13

2008 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 10 | Sub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | $6,482,512.91 | | | | | |
| 1/31/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $8,218.49 | $524,407.29 | 9.433 |
| 2/28/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $4,166.92 | $520,355.72 | 8.433 |
| 3/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $0,115.34 | $516,304.14 | 7.433 |
| 4/29/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $6,066.77 | $512,252.57 | 6.433 |
| 5/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $2,012.20 | $508,201.00 | 5.433 |
| 6/29/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $7,960.62 | $504,149.42 | 4.433 |
| 7/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $3,909.05 | $500,097.85 | 3.433 |
| 8/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $9,857.48 | $496,046.28 | 2.433 |
| 9/29/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $5,805.90 | $491,994.70 | 1.433 |
| 10/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $1,754.33 | $487,943.13 | 0.433 |
| | | | Interest [Years] 9 | | | |
| 11/29/2008 | $540,209.83 | $48,618.88 | $437,569.92 | $46,321.64 | $483,891.56 | 11.433 |
| 12/30/2008 | $540,209.83 | $48,618.88 | $437,569.92 | $42,270.06 | $479,839.98 | 10.433 |
| Total | | | | | $6,025,433.64 | |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 10 | Sub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $269,250.00 | | | | | |
| $22,437.50 | $2,019.38 | $20,193.80 | $1,587.40 | $21,781.20 | 9.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $1,419.12 | $21,612.92 | 8.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $1,250.84 | $21,444.64 | 7.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $1,082.56 | $21,276.36 | 6.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $914.27 | $21,108.07 | 5.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $745.99 | $20,939.79 | 4.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $577.71 | $20,771.51 | 3.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $409.43 | $20,603.23 | 2.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $241.15 | $20,434.95 | 1.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $72.87 | $20,266.67 | 0.433 |
| | | Interest [Years] 9 | | | |
| $22,437.50 | $2,019.38 | $18,174.42 | $1,923.96 | $20,098.38 | 11.433 |
| $22,437.50 | $2,019.38 | $18,174.42 | $1,755.68 | $19,930.10 | 10.433 |
| | | | | $250,267.82 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] 10 | Sub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | 185,347.57 | | | | | |
| 1/31/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $1,092.74 | $14,993.84 | 9.433 |
| 2/28/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $976.90 | $14,878.00 | 8.433 |
| 3/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $861.06 | $14,762.16 | 7.433 |
| 4/29/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $745.21 | $14,646.31 | 6.433 |
| 5/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $629.37 | $14,530.47 | 5.433 |
| 6/29/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $513.55 | $14,414.65 | 4.433 |
| 7/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $397.69 | $14,298.79 | 3.433 |
| 8/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $281.84 | $14,182.94 | 2.433 |
| 9/29/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $166.00 | $14,067.10 | 1.433 |
| 10/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $50.16 | $13,951.26 | 0.433 |
| | | | Interest [Years] 9 | | | |
| 11/29/2008 | $15,445.63 | $1,390.11 | $12,510.99 | $1,324.43 | $13,835.42 | 11.433 |
| 12/30/2008 | $15,445.63 | $1,390.11 | $12,510.99 | $1,208.58 | $13,719.57 | 10.433 |
| Total | | | | | $172,280.49 | |

DRAFT SUBJECT TO CHANGE, CONFIDENTIAL

4/13

NYSCEF DOC. NO. 62
2009 SUPPORTING SCHEDULE - CASH FLOWS

### TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $55,738,146.05 | Annual Interest Paid 9.0% | Interest [Years] 9 | Sub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $33,829.96 | $421,154.86 |
| 2/28/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $30,243.62 | $417,568.52 |
| 3/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $26,657.28 | $413,982.18 |
| 4/30/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $23,070.94 | $410,395.84 |
| 5/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $19,484.59 | $406,809.40 |
| 6/30/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $15,898.25 | $403,223.15 |
| 7/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $12,311.91 | $399,636.81 |
| 8/31/2009 | $478,178.84 | $43,036.10 | $382,324.90 | $8,725.57 | $396,050.47 |
| 9/30/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $5,139.23 | $392,464.13 |
| 10/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $1,552.89 | $388,877.79 |
| | | | Interest [Years] 8 | | |
| 11/30/2009 | $478,178.84 | $43,036.10 | $344,288.30 | $41,002.64 | $385,291.44 |
| 12/31/2009 | $458,178.84 | $43,036.10 | $344,288.30 | $37,416.30 | $381,705.10 |
| Total | | | | | $4,817,159.78 |

### MASTER LICENSE CASH FLOWS

| Master License Cash Flows $72,035.00 | Annual Interest Paid 9.0% | Interest [Years] 9 | Sub Period 11/13/2018 | Total Interest | [Months] Sub Calc |
|---|---|---|---|---|---|
| $6,002.92 | $540.26 | $4,862.34 | $424.69 | $5,287.03 | 9.433 |
| $6,002.92 | $540.26 | $4,862.34 | $379.67 | $5,242.01 | 8.433 |
| $6,002.92 | $540.26 | $4,862.34 | $334.65 | $5,196.90 | 7.433 |
| $6,002.92 | $540.26 | $4,862.34 | $289.62 | $5,151.96 | 6.433 |
| $6,002.92 | $540.26 | $4,862.34 | $244.60 | $5,106.94 | 5.433 |
| $6,002.92 | $540.26 | $4,862.34 | $199.58 | $5,061.92 | 4.433 |
| $6,002.92 | $540.26 | $4,862.34 | $154.56 | $5,016.90 | 3.433 |
| $6,002.92 | $540.26 | $4,862.34 | $109.54 | $4,971.88 | 2.433 |
| $6,002.92 | $540.26 | $4,862.34 | $64.52 | $4,926.86 | 1.433 |
| $6,002.92 | $540.26 | $4,862.34 | $19.40 | $4,881.83 | 0.433 |
| | | Interest [Years] 8 | | | |
| $6,002.92 | $540.26 | $4,322.08 | $514.73 | $4,836.81 | 11.433 |
| $6,002.92 | $540.26 | $4,322.08 | $469.71 | $4,791.79 | 10.433 |
| | | | | $60,472.92 | |

### RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow $184,352.81 | Annual Interest Paid 9.0% | Interest [Years] 9 | Sub Period 11/13/2018 | Total Interest | [Monthly] Sub Calc |
|---|---|---|---|---|---|---|
| 1/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $1,086.88 | $13,530.73 | 9.433 |
| 2/28/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $971.66 | $13,415.51 | 8.433 |
| 3/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $856.44 | $13,300.29 | 7.433 |
| 4/30/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $741.22 | $13,185.07 | 6.433 |
| 5/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $625.99 | $13,069.84 | 5.433 |
| 6/30/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $510.77 | $12,954.62 | 4.433 |
| 7/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $395.55 | $12,839.40 | 3.433 |
| 8/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $280.33 | $12,724.18 | 2.433 |
| 9/30/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $165.11 | $12,608.96 | 1.433 |
| 10/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $49.89 | $12,493.74 | 0.433 |
| | | | Interest [Years] 8 | | | |
| 11/30/2009 | $15,362.73 | $1,382.65 | $11,061.20 | $1,317.32 | $12,378.52 | 11.433 |
| 12/31/2009 | $15,362.73 | $1,382.65 | $11,061.20 | $1,202.10 | $12,263.30 | 10.433 |
| Total | | | | | $154,764.16 | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

5/13

RECEIVED NYSCEF: 12/14/2018

NYC EXHIBITS CALCULATION 62

**2010 SUPPORTING SCHEDULE - CASH FLOWS**

### TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $6,006,563.56 | Annual Interest Paid 9.0% | Interest [Years] 8 | Sub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $35,412.45 | $395,806.29 |
| 2/28/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $31,658.35 | $392,052.19 |
| 3/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $27,904.24 | $388,298.08 |
| 4/30/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $24,150.14 | $384,543.98 |
| 5/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $20,396.04 | $380,789.88 |
| 6/30/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $16,641.94 | $377,035.78 |
| 7/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $12,887.83 | $373,281.67 |
| 8/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $9,133.73 | $369,527.57 |
| 9/30/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $5,379.63 | $365,773.47 |
| 10/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $1,625.53 | $362,019.37 |
| | | | Interest [Years] 7 | | |
| 11/30/2010 | $500,546.96 | $45,049.23 | $315,344.61 | $12,920.65 | $388,265.26 |
| 12/31/2010 | $500,546.96 | $45,049.23 | $315,344.61 | $9,166.55 | $354,511.16 |
| Total | | | | | $4,501,904.70 |

### MASTER LICENSE CASH FLOWS

| Master License Cash Flows $219,182.00 | Annual Interest Paid 9.0% | Interest [Years] 8 | Sub Period 11/13/2018 | Total Interest | [Months] Sub Calc |
|---|---|---|---|---|---|
| $18,265.17 | $1,643.87 | $13,150.96 | $1,292.22 | $14,443.18 | 9.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $1,155.23 | $14,306.19 | 8.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $1,018.24 | $14,169.20 | 7.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $881.25 | $14,032.21 | 6.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $744.26 | $13,895.22 | 5.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $607.27 | $13,758.23 | 4.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $470.28 | $13,621.24 | 3.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $333.39 | $13,484.25 | 2.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $196.31 | $13,347.27 | 1.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $59.32 | $13,210.28 | 0.433 |
| | | Interest [Years] 7 | | | |
| $18,265.17 | $1,643.87 | $11,507.09 | $1,566.20 | $13,073.29 | 11.433 |
| $18,265.17 | $1,643.87 | $11,507.09 | $1,429.21 | $12,936.30 | 10.433 |
| | | | | $164,726.86 | |

### RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow 188,311.84 | Annual Interest Paid 9.0% | Interest [Years] 8 | Sub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $1,110.22 | $12,409.02 |
| 2/28/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $992.53 | $12,291.33 |
| 3/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $874.83 | $12,173.63 |
| 4/30/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $757.14 | $12,055.94 |
| 5/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $639.44 | $11,938.24 |
| 6/30/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $521.75 | $11,820.55 |
| 7/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $404.05 | $11,702.85 |
| 8/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $286.35 | $11,585.15 |
| 9/30/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $168.66 | $11,467.46 |
| 10/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $50.96 | $11,349.76 |
| | | | Interest [Years] 7 | | |
| 11/30/2010 | $15,692.82 | $1,412.35 | $9,886.45 | $1,345.62 | $11,232.07 |
| 12/31/2010 | $15,692.82 | $1,412.35 | $9,886.45 | $1,227.92 | $11,114.37 |
| Total | | | | | $141,140.37 |

| [Months] Sub Calc |
|---|
| 9.433 |
| 8.453 |
| 7.433 |
| 6.433 |
| 5.433 |
| 4.433 |
| 3.433 |
| 2.433 |
| 1.433 |
| 0.433 |
| 11.433 |
| 10.433 |

DRAFT SUBJECT TO CHANGE, CONFIDENTIAL

6/13

RECEIVED NYSCEF: 12/14/2018

2011 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 7 | Sub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | $6,520,811.69 | | | | | |
| 1/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $38,444.26 | $380,786.89 | 9.433 |
| 2/28/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $34,368.75 | $376,711.38 | 8.433 |
| 3/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $30,293.23 | $372,635.88 | 7.433 |
| 4/30/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $26,217.74 | $368,560.37 | 6.433 |
| 5/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $22,142.23 | $364,484.86 | 5.433 |
| 6/30/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $18,066.72 | $360,409.35 | 4.433 |
| 7/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $11,991.22 | $356,333.85 | 3.433 |
| 8/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $9,915.71 | $352,258.34 | 2.433 |
| 9/30/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $5,840.20 | $348,182.83 | 1.433 |
| 10/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $1,764.69 | $344,106.32 | 0.433 |
| | | | Interest [Years] 6 | | | |
| 11/30/2011 | $543,400.97 | $48,906.09 | $293,436.54 | $46,595.28 | $340,031.82 | 11.433 |
| 12/31/2011 | $543,400.97 | $48,906.09 | $293,436.54 | $42,519.77 | $335,956.31 | 10.433 |
| Total | | | | | $4,300,459.20 | |

## MASTER LICENSE CASH FLOWS

| Date | Master License Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 7 | Sub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | $252,573.00 | | | | | |
| 1/31/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $1,489.08 | $14,749.18 | 9.433 |
| 2/28/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $1,331.22 | $14,591.32 | 8.433 |
| 3/31/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $1,173.36 | $14,433.46 | 7.433 |
| 4/30/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $1,015.50 | $14,275.60 | 6.433 |
| 5/31/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $857.64 | $14,117.74 | 5.433 |
| 6/30/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $699.79 | $13,959.89 | 4.433 |
| 7/31/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $541.93 | $13,802.03 | 3.433 |
| 8/31/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $384.07 | $13,644.17 | 2.433 |
| 9/30/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $226.21 | $13,486.31 | 1.433 |
| 10/31/2011 | $21,047.75 | $1,894.30 | $13,260.10 | $68.35 | $13,328.45 | 0.433 |
| | | | Interest [Years] 6 | | | |
| 11/30/2011 | $21,047.75 | $1,894.30 | $11,365.80 | $1,804.79 | $13,170.59 | 11.433 |
| 12/31/2011 | $21,047.75 | $1,894.30 | $11,365.80 | $1,646.94 | $13,012.74 | 10.433 |
| Total | | | | | $166,571.48 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] 7 | Sub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | $196,362.87 | | | | | |
| 1/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $1,157.68 | $11,466.72 | 9.433 |
| 2/28/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $1,034.95 | $11,343.99 | 8.433 |
| 3/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $912.23 | $11,221.27 | 7.433 |
| 4/30/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $789.50 | $11,098.54 | 6.433 |
| 5/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $666.77 | $10,975.81 | 5.433 |
| 6/30/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $544.05 | $10,853.09 | 4.433 |
| 7/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $421.32 | $10,730.36 | 3.433 |
| 8/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $298.59 | $10,607.63 | 2.433 |
| 9/30/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $175.87 | $10,484.91 | 1.433 |
| 10/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $53.14 | $10,362.18 | 0.433 |
| | | | Interest [Years] 6 | | | |
| 11/30/2011 | $16,363.57 | $1,472.72 | $8,836.32 | $1,403.13 | $10,239.45 | 11.433 |
| 12/31/2011 | $16,363.57 | $1,472.72 | $8,836.32 | $1,280.41 | $10,116.73 | 10.433 |
| Total | | | | | $129,500.68 | |

DRAFT SUBJECT TO CHANGE; CONFIDENTIAL

7/13

RECEIVED NYSCEF: 12/14/2018

2012 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $6,523,337.68 | Annual Interest Paid 9.0% | Interest [Years] 6 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $38,459.13 | $332,009.31 | 9.433 |
| 2/28/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $34,382.06 | $327,932.24 | 8.433 |
| 3/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $30,304.98 | $323,855.16 | 7.433 |
| 4/29/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $26,227.89 | $319,778.07 | 6.433 |
| 5/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $22,150.81 | $315,700.99 | 5.433 |
| 6/29/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $18,073.72 | $311,623.90 | 4.453 |
| 7/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $13,996.64 | $307,546.82 | 3.433 |
| 8/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $9,919.55 | $303,469.73 | 2.431 |
| 9/29/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $5,842.46 | $299,392.64 | 1.433 |
| 10/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $1,765.38 | $295,315.56 | 0.433 |
| | | | Interest [Years] 5 | | | |
| 11/29/2012 | $543,611.47 | $48,925.03 | $244,625.15 | $46,611.32 | $291,238.47 | 11.433 |
| 12/30/2012 | $543,611.47 | $48,925.03 | $244,625.15 | $42,536.24 | $287,161.39 | 10.433 |
| Total | | | | | $3,715,024.30 | |

## MASTER LICENSE CASH FLOWS

| Date | Master License Cash Flows $479,415.00 | Annual Interest Paid 9.0% | Interest [Years] 6 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $2,826.45 | $24,400.11 | 9.433 |
| 2/28/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $2,526.81 | $24,100.47 | 8.433 |
| 3/30/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $2,227.18 | $23,800.84 | 7.433 |
| 4/29/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $1,927.55 | $23,501.21 | 6.433 |
| 5/30/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $1,627.91 | $23,201.57 | 5.433 |
| 6/29/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $1,328.28 | $22,901.94 | 4.453 |
| 7/30/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $1,028.64 | $22,602.30 | 3.433 |
| 8/30/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $729.01 | $22,302.67 | 2.431 |
| 9/29/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $429.38 | $22,003.04 | 1.433 |
| 10/30/2012 | $39,951.25 | $3,595.61 | $21,573.66 | $129.74 | $21,703.40 | 0.433 |
| | | | Interest [Years] 5 | | | |
| 11/29/2012 | $39,951.25 | $3,595.61 | $17,978.05 | $3,425.72 | $21,403.77 | 11.433 |
| 12/30/2012 | $39,951.25 | $3,595.61 | $17,978.05 | $3,126.08 | $21,104.13 | 10.433 |
| Total | | | | | $273,025.45 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow $201,814.53 | Annual Interest Paid 9.0% | Interest [Years] 6 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $1,189.82 | $10,271.48 | 9.433 |
| 2/28/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $1,063.69 | $10,145.35 | 8.433 |
| 3/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $937.56 | $10,019.22 | 7.433 |
| 4/29/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $811.42 | $9,893.08 | 6.433 |
| 5/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $685.29 | $9,766.95 | 5.433 |
| 6/29/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $559.15 | $9,640.81 | 4.433 |
| 7/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $433.02 | $9,514.68 | 3.435 |
| 8/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $306.88 | $9,388.54 | 2.431 |
| 9/29/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $180.75 | $9,262.41 | 1.433 |
| 10/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $54.62 | $9,136.28 | 0.433 |
| | | | Interest [Years] 5 | | | |
| 11/29/2012 | $16,817.88 | $1,513.61 | $7,568.05 | $1,442.09 | $9,010.14 | 11.433 |
| 12/30/2012 | $16,817.88 | $1,513.61 | $7,568.05 | $1,315.96 | $8,884.01 | 10.433 |
| Total | | | | | $114,937.95 | |

DRAFT SUBJECT TO CHANGE; CONFIDENTIAL

8/13

NPScesT160sCCUMAJ109 62
2013 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows 9.0% | Interest [Years] 5 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
|  | $6,686,734.77 |  |  |  |  |
| 1/31/2013 | $557,227.90 | $250,752.55 | $39,422.48 | $290,175.03 | 9.433 |
| 2/28/2013 | $557,227.90 | $250,752.55 | $35,243.27 | $285,995.82 | 8.433 |
| 3/31/2013 | $557,227.90 | $250,752.55 | $31,064.06 | $281,816.61 | 7.433 |
| 4/30/2013 | $557,227.90 | $250,752.55 | $26,885.85 | $277,637.40 | 6.433 |
| 5/31/2013 | $557,227.90 | $250,752.55 | $22,705.64 | $273,458.19 | 5.433 |
| 6/30/2013 | $557,227.90 | $250,752.55 | $18,526.43 | $269,278.98 | 4.433 |
| 7/31/2013 | $557,227.90 | $250,752.55 | $14,347.23 | $265,099.78 | 3.433 |
| 8/31/2013 | $557,227.90 | $250,752.55 | $10,168.02 | $260,920.57 | 2.433 |
| 9/30/2013 | $557,227.90 | $250,752.55 | $5,988.81 | $256,741.36 | 1.433 |
| 10/31/2013 | $557,227.90 | $250,752.55 | $1,809.60 | $252,562.15 | 0.433 |
|  |  | Interest [Years] 4 |  |  |  |
| 11/30/2013 | $557,227.90 | $200,602.04 | $47,780.90 | $248,382.94 | 11.433 |
| 12/31/2013 | $557,227.90 | $200,602.04 | $43,601.69 | $244,203.73 | 10.433 |
| Total |  |  |  | $1,206,222.56 |  |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows $363,506.00 | Annual Interest Paid 9.0% | Interest [Years] 5 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $30,292.17 | $2,726.30 | $13,631.50 | $2,143.10 | $15,774.60 | 9.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,915.91 | $15,547.41 | 8.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,688.72 | $15,320.22 | 7.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,461.52 | $15,093.02 | 6.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,234.33 | $14,865.83 | 5.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,007.14 | $14,638.64 | 4.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $779.95 | $14,411.45 | 3.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $552.76 | $14,184.26 | 2.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $325.55 | $13,957.07 | 1.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $98.37 | $13,729.87 | 0.433 |
|  |  | Interest [Years] 4 |  |  |  |
| $30,292.17 | $2,726.30 | $10,905.20 | $2,592.48 | $13,502.68 | 11.433 |
| $30,292.17 | $2,726.30 | $10,905.20 | $2,370.29 | $13,275.49 | 10.433 |
|  |  |  |  | $174,300.54 |  |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow $205,789.56 | Annual Interest Paid 9.0% | Interest [Years] 5 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $1,213.26 | $8,930.36 | 9.433 |
| 2/28/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $1,084.64 | $8,801.74 | 8.433 |
| 3/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $956.02 | $8,673.12 | 7.433 |
| 4/30/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $827.40 | $8,544.50 | 6.433 |
| 5/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $698.78 | $8,415.88 | 5.433 |
| 6/30/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $570.17 | $8,287.27 | 4.433 |
| 7/31/2013 | $17,149.13 | $1,543.42 | $7,717.16 | $441.55 | $8,158.65 | 3.433 |
| 8/31/2013 | $17,149.13 | $1,543.42 | $7,717.16 | $312.93 | $8,030.03 | 2.433 |
| 9/30/2013 | $17,149.13 | $1,543.42 | $7,717.16 | $184.31 | $7,901.41 | 1.433 |
| 10/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $55.69 | $7,772.79 | 0.433 |
|  |  |  | Interest [Years] 4 |  |  |  |
| 11/30/2013 | $17,149.13 | $1,543.42 | $6,173.68 | $1,470.49 | $7,644.17 | 11.433 |
| 12/31/2013 | $17,149.13 | $1,543.42 | $6,173.88 | $1,341.88 | $7,515.56 | 10.433 |
| Total |  |  |  |  | $98,675.48 |  |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

9/13

RECEIVED NYSCEF: 12/14/2018

## 2014 SUPPORTING SCHEDULE - CASH FLOWS

### TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 4 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | $6,498,350.82 | | | | | |
| 1/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $38,311.84 | $233,262.36 | 9.433 |
| 2/28/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $34,250.37 | $229,200.89 | 8.433 |
| 3/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $30,188.90 | $225,139.42 | 7.433 |
| 4/30/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $26,127.43 | $221,077.95 | 6.433 |
| 5/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $22,065.96 | $217,016.48 | 5.433 |
| 6/30/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $18,004.49 | $212,955.01 | 4.433 |
| 7/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $13,943.02 | $208,893.54 | 3.433 |
| 8/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $9,881.55 | $204,832.07 | 2.433 |
| 9/30/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $5,820.09 | $200,770.61 | 1.433 |
| 10/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $1,758.62 | $196,709.14 | 0.433 |
| | | | Interest [Years] 3 | | | |
| 11/30/2014 | $541,529.24 | $48,737.63 | $146,212.90 | $46,434.78 | $192,647.67 | 11.433 |
| 12/31/2014 | $541,529.24 | $48,737.63 | $146,212.90 | $42,373.31 | $188,586.20 | 10.433 |
| Total | | | | | $2,531,091.34 | |

### MASTER LICENSE CASH FLOWS

| Master License Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 4 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $492,062.00 | | | | | |
| $41,005.17 | $3,690.47 | $14,761.88 | $2,991.02 | $17,662.90 | 9.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $2,593.48 | $17,355.36 | 8.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $2,285.94 | $17,047.82 | 7.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $1,978.40 | $16,740.28 | 6.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $1,670.86 | $16,432.74 | 5.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $1,363.32 | $16,125.20 | 4.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $1,055.78 | $15,817.66 | 3.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $748.24 | $15,510.12 | 2.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $440.70 | $15,202.58 | 1.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $133.16 | $14,895.04 | 0.433 |
| | | Interest [Years] 3 | | | |
| $41,005.17 | $3,690.47 | $11,071.41 | $3,516.10 | $14,587.51 | 11.433 |
| $41,005.17 | $3,690.47 | $11,071.41 | $3,208.56 | $14,279.97 | 10.433 |
| | | | | $191,657.18 | |

### RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] 4 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | 210,093.50 | | | | | |
| 1/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $1,238.63 | $7,541.43 | 9.433 |
| 2/28/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $1,107.32 | $7,410.12 | 8.433 |
| 3/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $976.01 | $7,278.81 | 7.433 |
| 4/30/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $844.71 | $7,147.51 | 6.433 |
| 5/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $713.40 | $7,016.20 | 5.433 |
| 6/30/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $582.09 | $6,884.89 | 4.433 |
| 7/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $450.78 | $6,753.58 | 3.433 |
| 8/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $319.47 | $6,622.27 | 2.433 |
| 9/30/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $188.16 | $6,490.96 | 1.433 |
| 10/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $56.86 | $6,359.66 | 0.433 |
| | | | Interest [Years] 3 | | | |
| 11/30/2014 | $17,507.79 | $1,575.70 | $4,727.10 | $1,501.25 | $6,228.35 | 11.433 |
| 12/31/2014 | $17,507.79 | $1,575.70 | $4,727.10 | $1,369.94 | $6,097.04 | 10.433 |
| Total | | | | | $81,830.92 | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

10/13

NYSCEF DOC. NO. 62
2015 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 3 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| | $6,409,234.32 | | | | |
| 1/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $17,786.44 | $181,994.22 |
| 2/28/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $33,780.67 | $177,988.45 |
| 3/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $29,774.90 | $173,982.68 |
| 4/30/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $25,769.13 | $169,976.91 |
| 5/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $21,763.36 | $165,971.14 |
| 6/30/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $17,757.59 | $161,965.37 |
| 7/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $13,751.81 | $157,959.59 |
| 8/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $9,746.04 | $153,953.82 |
| 9/30/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $5,740.27 | $149,948.05 |
| 10/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $1,734.50 | $145,942.28 |
| | | | Interest [Years] 2 | | |
| 11/30/2015 | $534,102.86 | $48,069.26 | $96,138.52 | $45,797.99 | $141,936.51 |
| 12/31/2015 | $534,102.86 | $48,069.26 | $96,138.52 | $41,792.22 | $137,930.74 |
| Total | | | | | $1,919,549.76 |

## MASTER LICENSE CASH FLOWS

| Date | Master License Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 3 | Stub Period 11/13/2018 | Total Interest | [Month] Stub Calc |
|---|---|---|---|---|---|---|
| | $428,252.00 | | | | | |
| 1/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $2,524.81 | $12,160.48 | 9.433 |
| 2/28/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $2,257.16 | $11,892.83 | 8.433 |
| 3/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $1,989.50 | $11,625.17 | 7.433 |
| 4/30/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $1,721.84 | $11,357.51 | 6.433 |
| 5/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $1,454.18 | $11,089.85 | 5.433 |
| 6/30/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $1,186.53 | $10,822.20 | 4.433 |
| 7/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $918.87 | $10,554.54 | 3.433 |
| 8/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $651.21 | $10,286.88 | 2.433 |
| 9/30/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $383.55 | $10,019.22 | 1.433 |
| 10/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $115.90 | $9,751.57 | 0.433 |
| | | | Interest [Years] 2 | | | |
| 11/30/2015 | $35,687.65 | $3,211.89 | $6,423.78 | $3,060.13 | $9,483.91 | 11.433 |
| 12/31/2015 | $35,687.65 | $3,211.80 | $6,423.78 | $2,792.47 | $9,216.25 | 10.433 |
| Total | | | | | $128,260.41 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] 1 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| | $137,159.38 | | | | |
| 1/31/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $1,228.32 | $5,916.06 |
| 2/28/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $1,098.10 | $5,785.84 |
| 3/31/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $967.89 | $5,655.63 |
| 4/30/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $837.67 | $5,525.41 |
| 5/31/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $707.46 | $5,395.20 |
| 6/30/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $577.24 | $5,264.98 |
| 7/31/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $447.03 | $5,134.77 |
| 8/31/2015 | $15,625.76 | $1,406.32 | $4,218.96 | $285.13 | $4,504.09 |
| 9/30/2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/31/2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | Interest [Years] 2 | | |
| 11/30/2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/31/2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | | | | | $43,181.98 |

| | [Month] Stub Calc |
|---|---|
| | 9.433 |
| | 8.433 |
| | 7.433 |
| | 6.433 |
| | 5.433 |
| | 4.433 |
| | 3.433 |
| | 2.433 |
| | 1.433 |
| | 0.433 |
| | 11.433 |
| | 10.433 |

DRAFT SUBJECT TO CHANGE. CONFIDENTIAL.

11/13

RECEIVED NYSCEF: 12/14/2018

MASTER LICENSE CUMULATIVE 6.2
2016 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows [$5,881,820.25] | Annual Interest Paid 9.0% | Interest [Years] 2 | Stub Period 11/13/2018 | Total Interest | [Month] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $34,677.01 | $122,904.31 | 9.433 |
| 2/28/2016 | $490,151.69 | $44,113.65 | $88,225.10 | $31,000.87 | $119,228.17 | 8.433 |
| 3/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $27,324.73 | $115,552.03 | 7.433 |
| 4/29/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $23,648.59 | $111,875.89 | 6.433 |
| 5/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $19,972.46 | $108,199.76 | 5.433 |
| 6/29/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $16,296.32 | $104,523.62 | 4.433 |
| 7/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $12,620.18 | $100,847.48 | 3.433 |
| 8/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $8,944.01 | $97,171.34 | 2.433 |
| 9/29/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $5,267.91 | $93,495.21 | 1.433 |
| 10/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $1,591.77 | $89,819.07 | 0.433 |
| 11/29/2016 | $490,151.69 | $44,113.65 | $44,113.65 | $42,029.28 | $86,142.93 | 11.433 |
| 12/30/2016 | $490,151.69 | $44,113.65 | $44,113.65 | $38,353.14 | $82,466.79 | 10.433 |
| Total | | | | | $1,232,226.60 | |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows [$301,487.00] | Annual Interest Paid 9.0% | Interest [Years] 2 | Stub Period 11/13/201X | Total Interest | [Month] Stub Calc |
|---|---|---|---|---|---|
| $25,123.92 | $2,261.15 | $4,522.30 | $1,277.45 | $6,299.75 | 9.433 |
| $25,123.92 | $2,261.15 | $4,522.30 | $1,589.02 | $6,111.32 | 8.433 |
| $25,123.92 | $2,261.15 | $4,522.30 | $1,408.59 | $5,922.89 | 7.433 |
| $25,123.92 | $2,261.15 | $4,522.30 | $1,212.16 | $5,734.46 | 6.433 |
| $25,123.92 | $2,261.15 | $4,522.30 | $1,023.74 | $5,546.04 | 5.433 |
| $25,123.92 | $2,261.15 | $4,522.30 | $835.31 | $5,357.61 | 4.433 |
| $25,123.92 | $2,261.15 | $4,522.30 | $646.88 | $5,169.18 | 3.433 |
| $25,123.92 | $2,261.15 | $4,522.30 | $458.45 | $4,980.75 | 2.433 |
| $25,123.92 | $2,261.15 | $4,522.30 | $270.02 | $4,792.32 | 1.433 |
| $25,123.92 | $2,261.15 | $4,522.30 | $81.59 | $4,603.89 | 0.433 |
| $25,123.92 | $2,261.15 | $2,261.15 | $2,154.31 | $4,415.46 | 11.433 |
| $25,123.92 | $2,261.15 | $2,261.15 | $1,965.88 | $4,227.03 | 10.433 |
| | | | | $63,160.70 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 0.0% | Interest [Years] 2 | Stub Period 11/13/201X | Total Interest | [Month] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 9.433 |
| 2/28/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 8.433 |
| 3/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 7.433 |
| 4/29/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 6.433 |
| 5/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 5.433 |
| 6/29/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 4.433 |
| 7/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 3.433 |
| 8/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 2.433 |
| 9/29/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 1.433 |
| 10/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.433 |
| 11/29/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 11.433 |
| 12/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 10.433 |
| Total | | | | | $0.00 | |

DRAFT SUBJECT TO CHANGE; CONFIDENTIAL

12/13

2017 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 1 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| | $5,252,727.75 | | | | |
| 1/31/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $35,618.28 | $80,929.35 |
| 2/28/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $31,842.35 | $77,153.42 |
| 3/31/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $28,066.43 | $73,377.50 |
| 4/30/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $24,290.51 | $69,601.58 |
| 5/31/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $20,514.59 | $65,825.66 |
| 6/30/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $16,738.66 | $62,049.73 |
| 7/31/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $12,962.74 | $58,273.81 |
| 8/31/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $9,186.82 | $54,497.89 |
| 9/30/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $5,410.90 | $50,721.97 |
| 10/31/2017 | $503,456.33 | $45,311.07 | $45,311.07 | $1,634.97 | $46,946.04 |
| | | | Interest [Years] 0 | | |
| 11/13/2017 | $218,164.41 | $19,634.80 | $0.00 | $18,707.06 | $18,707.06 |
| 12/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | $658,084.01 |

## MASTER LICENSE CASH FLOWS

| Date | Master License Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 1 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | $269,233.00 | | | | | |
| 1/31/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $1,825.65 | $4,148.11 | 9.433 |
| 2/28/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $1,632.11 | $3,954.57 | 8.433 |
| 3/31/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $1,438.57 | $3,761.03 | 7.433 |
| 4/30/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $1,245.03 | $3,567.49 | 6.433 |
| 5/31/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $1,051.49 | $3,373.95 | 5.433 |
| 6/30/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $857.96 | $3,180.42 | 4.433 |
| 7/31/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $664.42 | $2,986.88 | 3.433 |
| 8/31/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $470.88 | $2,793.34 | 2.433 |
| 9/30/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $377.34 | $2,599.80 | 1.433 |
| 10/31/2017 | $25,805.08 | $2,322.46 | $2,322.46 | $83.80 | $2,406.26 | 0.433 |
| | | | Interest [Years] 0 | | | |
| 11/13/2017 | $11,182.70 | $1,006.40 | $0.00 | $958.85 | $958.85 | 11.433 |
| 12/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 10.433 |
| | $269,233.00 | | | | $33,730.70 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] 1 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 9.433 |
| 2/28/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 8.433 |
| 3/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 7.433 |
| 4/30/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 6.433 |
| 5/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 5.433 |
| 6/30/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 4.433 |
| 7/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 3.433 |
| 8/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 2.433 |
| 9/30/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 1.433 |
| 10/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.433 |
| | | | Interest [Years] 0 | | | |
| 11/13/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 11.433 |
| 12/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 10.433 |
| Total | | | | | $0.00 | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

13/13

HOGUET NEWMAN REGAL & KENNEY, LLP

653074/12

10 East 40th Street, 35th Floor
New York, NY 10016
Phone: 212-689-8808

*Attorneys for Plaintiffs Gary Charles Ganzi, Claire*
*Ganzi Breen, and Estate of Charles Ganzi Cook*

Judgment

4 - 2

**FILED AND
DOCKETED**
FEB 11 2019
AT      2:46 PM
N.Y., CO. CLK'S OFFICE

**EXHIBIT C**

FILED: APPELLATE DIVISION - 1ST DEPT 02/13/2019 01:58 PM
NYSCEF DOC. NO. 12

2018-5759

RECEIVED NYSCEF: 02/13/2019

# SUMMARY STATEMENT ON APPLICATION FOR
# EXPEDITED SERVICE AND/OR INTERIM RELIEF
### (SUBMITTED BY MOVING PARTY)

Date: February 13, 2019

Title of Matter: Gary C. Ganzi, Claire G. Breen, and The Estate of Charles G. Cook   Index/Indict/Docket # 653074/2012

v. Walter Ganzi Jr. and Bruce Bozzi Sr.

Appeal by Defendants from

Order ☐
Judgment ☑ of
Decree ☐

Supreme ☑
Surrogate's ☐
Family ☐

County New York County

Court entered on 02/11 ,20 19

Name of Judge Andrea Masley

Notice of Appeal filed on 02/11 ,20 19

If from administrative determination, state agency _____

Nature of action or proceeding Non-Jury trial of a shareholder derivative action brought by minority shareholders of Just One More Restaurant ("JOMR"), a closely held family corporation, purportedly on JOMR's behalf.

Provisions of:
☐ order
☑ judgment appealed from
☐ decree

The trial court erroneously ruled that plaintiffs' claims are not barred by the statute of limitations and doctrines of acquiescence and laches.

Further, the damages awarded by the trial court are excessive and disregard the evidence presented at trial.

This application by appellant/respondent is for a stay of enforcement of the judgment entered in this action until Defendants-Appellants' motion to stay the enforcement of the judgment pending the appeal has been decided.

If applying for a stay, state reason why requested Absent a stay, JOMR, the company on behalf of which plaintiffs sue, will be irreparably harmed as the Palm Restaurant business, JOMR's sole source of revenue, will lose the financing it requires to operate and be forced to close; the judgment likely will be reversed; a stay will not materially harm plaintiffs.

Has any undertaking been posted No   If "yes", state amount and type _____

Has application been made to court below for this relief No
Has there been any prior application here in this court No

If "yes", state Disposition _____
If "yes", state dates and nature _____

Has adversary been advised of this application Yes

Does he/she consent No

| Attorney for Movant | Attorney for Opposition |
|---|---|
| Name Kasowitz Benson Torres LLP | Hogut, Newman, Regal & Kenney LLP |
| Address 1633 Broadway | Fredric S. Newman |
| New York, New York 10019 | One Grand Central Place, 60 East 42nd St., 48th Floor |
| | New York, New York 10165 |
| Tel. No. (212) 506-1700 | |
| Appearing by Marc E. Kasowitz | Dunning Rievman & Davies LLP |
| Sarmad M. Khojasteh | Joshua D. Rievman |
| | 434 West 33rd Street |
| | New York, New York 10001 |

**(Do not write below this line)**

DISPOSITION

Pending determination of the underlying motion. Enforcement of the judgment is STAYED. The motion is Marked expedited.

Justice JJG                                    2/13/19.
                                                  Date

Motion Date  3/11/19    Opposition  3/4    Reply  3/11

EXPEDITE ____✓____ PHONE ATTORNEYS _____ DECISION BY _____

ALL PAPERS TO BE SERVED PERSONALLY.

                                        EUf
                                        Court Attorney

"Revised 06/18"