UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In re:                                          Case No. 9:19-bk-01947-FMD

JUST ONE MORE RESTAURANT CORP.                  (Jointly Administered with
and JUST ONE MORE HOLDING CORP.,                Case No. 9:19-bk-01948-FMD)
                                                Chapter 11 Cases
        Debtors.
_____/

## RENEWED MOTION TO DISMISS CHAPTER 11 CASES

Gary Ganzi and Claire Breen, individually and as Attorneys-in-Fact for the Estate of Charles Cook (together, the "**Derivative Plaintiffs**"), by counsel, hereby file their *Renewed Motion to Dismiss Chapter 11 Cases* pursuant to 11 U.S.C. § 1112(b)(1) and Fed. R. Bankr. P. 1014(a)(2). The Derivative Plaintiffs had timely moved to dismiss these cases on March 27, 2019 but voluntarily withdrew their Motion to Dismiss without prejudice and with a full reservation of rights after the initial status conference on April 5, 2019, in consideration of this Court's encouragement to give CRO McHale a chance to resolve the dispute.[1] The Derivative Plaintiffs state in support of their renewed motion as follows:

## A.   Introduction

Chapter 11 petitions must be filed for a legitimate purpose consistent with the Congressional aim of enabling financially distressed debtors to achieve rehabilitation through the remedial provisions of Chapter 11 of the Bankruptcy Code.[2] Here, the undisputed facts establish that the corporate debtors are not financially distressed but to the contrary, they are flush, solvent, and not in need of any restructuring. Their total assets exceed their liabilities by over $100 million, and they are not being pressed by any creditors. Debtors Just One More

---

[1] *See* Doc. 133.
[2] *In re Hammersmith Trust, LLC*, 243 B.R. 795, 801 (Bankr. M.D. Fla. 1999) (Paskay, J.).

Restaurant Corp.    ("**JOMR**") and Just One More Holding Corp. ("**JOMH**") (collectively referred to as the "**Judgment Creditors**") are the nominal defendants on whose behalf the New York State Supreme Court entered a *$119.5 million judgment* on February 11, 2019 (herein, the "**Judgment**").[3]

The Judgment came after seven years of contested litigation.  There was a full bench trial in the New York State Supreme Court, Commercial Division, with seventeen witnesses, including four experts, several hundred trial exhibits, and over six days of cross-examination. Under applicable New York law, the Judgment Debtors were required to post a supersedeas bond to stay enforcement of the Judgment pending appeal, or obtain a court-ordered stay of enforcement.  The Judgment Debtors did seek a stay but their motion was denied by a unanimous five judge panel of the New York Appellate Division on April 4, 2019.  *See* Doc. 119.  While these Chapter 11 cases were filed in March before the New York appellate decision denying a full stay, counsel for the Judgment Debtors had been advised by New York Appellate Division Justice Judith Gische on February 13th, when she granted an interim stay pending resolution of the stay motion (which she called a "band-aid"), that a supersedeas bond would be required to support a full stay pending appeal.

Just weeks later, these Chapter 11 filings were caused by Walter Ganzi, Jr. and Bruce Bozzi, Sr. (collectively, the "**Judgment Debtors")**.  Desiring both to avoid paying the Judgment that the New York Appellate Division had declined to stay, and to avoid filing personal bankruptcy which would have afforded them an automatic stay but exposed their very significant

---

[3] The trial court's findings of fact in the *Decision After Non-Jury Trial* and the *Judgment* (attached hereto as <u>Composite Exhibit 1</u>) are entitled to full-faith-and-credit and cannot be relitigated or the subject of a *de facto* appeal in this Court.  28 U.S.C. § 1738; *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); U.S. Const., Art. IV, section 1.

assets, the Judgment Debtors directed the filings to serve their own improper purpose of creating

a firewall between themselves and the now $125 million Judgment.

Indeed, the initial filings themselves bespeak of the true purpose of these cases:

**The Debtors commenced these Chapter 11 Cases in order to gain the critically important "breathing spell" afforded by the automatic stay provisions of the Bankruptcy Code in order to preserve and to maximize the value of the Debtors' estates for the benefit of the Debtors' creditors and stakeholders.[4]**

They candidly admitted in the initial filings that there was a "three-part strategy": (1) take

advantage of the automatic stay available through the Judgment Creditors' bankruptcy cases

pending the Judgment Debtors' appeal of the New York action because the Judgment Debtors

could not obtain a stay from the New York courts, (2) engage in negotiations to reach a global

settlement, and (3) preserve the value of the Debtors' assets without execution of the Judgment.[5]

In other words, the Judgment Debtors just don't want to pay any part of the Judgment, now

$125,000,000, against them, and they don't want to file personal bankruptcy proceedings either –

filings that would, in fact, have afforded them an automatic stay.

In sum, the *Judgment Debtors* forced the clearly solvent *Judgment Creditors,* which were

never in financial distress, to hire a *Chief Restructuring Officer* (who is required to report to

them) and caused the *Judgment Creditors* to file Chapter 11 petitions for the purpose of

thwarting, frustrating, hindering, and delaying enforcement of the Judgment *against them***.**  Those

objectives plainly constitute an abuse of the provisions, purpose and spirit of the Bankruptcy

Code.  Since the Judgment Debtors lacked good faith in causing these bankruptcy cases to be

filed and sham cases cannot be cured by the employment of a CRO, no matter how highly

regarded, these cases should be dismissed with prejudice.

---

[4] Consolidated Chapter 11 Case Management Summary, Doc. 9, p. 3, ¶ 5 "Reason for Filing Chapter 11".
[5] *Id.*

Apparently relying on Mr. McHale's "well-founded impeccable reputation for exercising independence in tough situations", this Court encouraged the parties to give him a chance to find a resolution, and the Derivative Plaintiffs did that by withdrawing their initial motion to dismiss and refraining from any litigation for months.  The Derivative Plaintiffs have met with CRO McHale and his counsel several times, in Ft. Myers, in Miami, and New York, in an effort to reach a global settlement and avoid litigation.  The Derivative Plaintiffs, who have been trying to settle this two-party dispute since 2011, have made several meaningful concessions under CRO McHale's guidance.  While CRO McHale has been extraordinarily diligent and has done his best, there has been no meaningful progress leaving the Derivative Plaintiffs no alternative to this motion.

The Chapter 11 filings were in bad faith and should be dismissed.  First, the Chapter 11 filings are an obvious end run around the orderly trial and appellate processes in New York.  Importantly, neither JOMR nor JOMH owns or operates a single restaurant.  There is absolutely no risk to the Palm restaurant enterprise.  It still has gross sales of $120 million annually among 25 restaurants, generating at least $7-10 million in operating earnings.  There is no risk to JOMR or JOMH of damaging the "golden goose" that will adversely affect the collection of the Judgment.  Next, the filings themselves were not properly authorized under New York corporate law.  There was no meeting of disinterested directors, and there was no properly noticed meeting of shareholders.  The only directors who voted to authorize the Chapter 11 filings and the hiring of the Chief Restructuring Officer were the two Judgment Debtors, Messrs. Ganzi and Bozzi, who were hopelessly conflicted and interested in the corporate action they authorized.  Finally, this is the wrong venue.  Both Debtors are New York corporations with no presence in Florida.

B.     **Parties**

1.     **JOMR and JOMH**

JOMR and JOMH are New York corporations which have their principal places of business in New York County, New York.[6]  Significantly, JOMR and JOMH have never been authorized to transact business in Florida, have never transacted business in Florida, and have never obtained the required business tax license (also known as an occupational license) in Collier County, Florida.[7]

Since 2015, JOMR and JOMH have not had any day-to-day business operations or active workforce.  They have no employees.  JOMR's sole business is the ownership and licensing of the intangible Intellectual Property of the Palm trademarks and related rights.  JOMR generates revenue by licensing those rights to third parties pursuant to pre-petition license agreements and a master license agreement governed by New York law.  To be clear, JOMR does not own or operate any restaurants and is a separate and distinct entity from the counterparties to the license agreements that do.  JOMH is a dormant company which merely owns a promissory note evidencing an *ultra vires* loan to the Judgment Debtors' wholly owned corporation and collects the payments due thereunder.

According to JOMR's Schedules, it had total assets of $118,186,628.32 and total liabilities of $18,243,030.36.  The liabilities include a current guarantee liability to Bank of America in the amount of $11,747,961.58; those funds went to the Judgment Debtors, who are

---

[6] JOMR's and JOMH's corporate information with the New York State Department of State, Division of Corporations, is attached hereto as <u>Composite Exhibit 2</u>.  In paragraph 10 of their Answer to the Derivative Action (as defined below), the Judgment Debtors acknowledged that "JOMR and JOMH have their principal places of business in New York City."  A copy of the Answer is attached hereto as <u>Exhibit 3</u>.  Their Statements of Financial Affairs also state, consistent with the CRO's testimony during the meetings of creditors, that JOMR's and JOMH's books and records are located in and maintained in Washington, D.C. – not in Florida. Doc. Nos. 72, CM/ECF pp. 6-7, and 76, CM/ECF pp. 5-6.

[7] The search results from the Florida Division of Corporations and Collier County are attached hereto as <u>Composite Exhibit 4</u>.

the principal obligors, for use in their wholly-owned Palm restaurants, and all Palm restaurants as well as Palm Management Corporation have also signed the guarantees.[8]  *See* Doc. 71.  Notably, JOMR did not (i) have any inventory; (ii) own or lease any office furniture, fixtures, equipment or collectibles; (iii) own or lease any machinery, equipment, or vehicles; or (iv) own or lease any real property, on the petition date.  *Id*.

According to JOMH's Schedules, it had total assets of $4,523,537.61 and total liabilities of $1,082,586.43 on the petition date.  *See* Doc. 75.   Notably, as well, JOMH did not (i) have any inventory; (ii) own or lease any office furniture, fixtures, equipment or collectibles; (iii) own or lease any machinery, equipment, or vehicles; or (iv) own or lease any real property, on the petition date.  *Id*.

### 2.    The Derivative Plaintiffs

The Derivative Plaintiffs own 20% of JOMR and 33.33% of JOMH.  *See* Doc. Nos. 74 and 78.   In their capacities as minority shareholders, the Derivative Plaintiffs filed and prosecuted the action styled *Gary Ganzi, Claire Breen, and Gary Ganzi and Claire Breen, as Attorneys-in-Fact for the Estate of Charles Cook, Individually and Derivatively on Behalf of Nominal Defendants Just One More Restaurant Corporation and Just One More Holding Corporation v. Walter Ganzi, Jr. and Bruce Bozzi, Sr.*, Supreme Court of the State of New York, County of New York, Index Number 653074/2012 (the "**Derivative Action**") from 2012 through 2019.[9]   Significantly, the Derivative Plaintiffs had the right (perhaps the responsibility) to enforce the Judgment entered in the Derivative Action against the Judgment Debtors under New York law.  *See Earl v. Brewer*, 248 A.D. 314 (N.Y. App. Div. 1936) (holding that derivative

---

[8] The scheduled creditors include Cooley LLP for legal fees incurred by the Judgment Debtors in their personal capacities for their defense of the Derivative Action (as defined below) and Palm Management Corporation, an insider, for alleged management and accounting fees.  *See* Doc. Nos. 71, CM/ECF p. 10, and 75, CM/ECF p. 8.

[9] A copy of the Docket of the Derivative Action is attached hereto as Exhibit 5.

plaintiffs control execution of derivative judgment since the "corporation is still in the control of the very defendants, or some of them, who owed the judgment"); *accord Mencher v. Richards*, 256 A.D. 280, 283 (N.Y. App. Div. 1939) ("It is the stockholder or stockholders who control the action while it is pending and even after judgment has been rendered.") (Davis, J., concurring). Knowing this, the Judgment Debtors caused JOMR and JOMH to file a *Motion For Entry Of An Order (I) Enforcing The Protections Of Bankruptcy Code Section 362; (II) Prohibiting Plaintiff-Minority Shareholders From Attempting To Execute On A Judgment Obtained In A Derivative Action; And (III) Granting Related Relief Nunc Pro Tunc To The Petition Date [Expedited Hearing Requested]* (Doc. 12) as a "first-day motion" in their bankruptcy cases. This filing, alone, exposes the Judgment Debtors' true motivation for causing these cases to be filed (to thwart, frustrate, hinder, and delay enforcement of the Judgment *against them*).[10]

### 3.    The Judgment Debtors (The Majority Shareholders)

At all relevant times, the Judgment Debtors owned 80% of JOMR and 66.67% of JOMH. *See* Doc. Nos. 74 and 78.  At the same time, the Judgment Debtors owned 100% of the majority of the Palm restaurants and Palm Management Corporation, and they dominated and controlled the rest of the restaurants.  Because they were on both sides of all IP licensing transactions, the Judgment Debtors caused their 80% owned JOMR to license the Palm IP rights to their 100% owned counterparties at grossly below market rates, diverting tens of millions of dollars from JOMR to themselves.  This was the crux of the Derivative Action and Judgment.[11]

---

[10] Indeed, "it is clear that if a stay applies, it is automatic, and the debtor does not have to seek the protection of the stay or make a showing that it is entitled to protection of the stay."  *In re Hillsborough Holdings Corp.*, 130 B.R. 603, 606 (Bankr. M.D. Fla. 1991) (Paskay, J.).

[11] The Judgment Debtors likewise caused JOMH to lease the building it owned to JOMR, in which these Judgment Debtors owned a greater stake, at grossly below-market rental rates.

In the *Decision After Non-Jury Trial*, the trial court found as follows:

"The issuance of the 2007 and 2011 Licenses for fees grossly favoring [the Majority Shareholders'] New Palms' interests over those of JOMR, depriving JOMR of fair market value for the valuable Palm IP, *is a textbook example of fiduciary misconduct*." *See* Composite Exhibit 1 hereto, p. 17;[12]

"The self-interested transaction gave JOMR's greatest asset, the Palm IP, to [the Majority Shareholders'] wholly-owned business, PMC, for a grossly-undervalued flat annual fee, *establishing another plainly self-interested transaction which constitutes breach of [the Judgment Debtors] fiduciary duties to JOMR to further their own interests*." *See id.* at p. 18;

"Indeed, rather than reap the benefits of those license agreements, JOMR collected a paltry $12,000 flat annual fee from PMC.  Had JOMR received fair market value for the exclusive right to sublicense Palm IP to third parties, that rate would, by all accounts, dwarf the $12,000 annual flat fee. *A more obvious example of the breach of a fiduciary's duty of loyalty [by the Judgment Debtors] is difficult to envision*." *See id.* at p. 19.; and

[The Judgment Debtors] "cannot credibly claim that [they] suffered inequity" where *all evidence demonstrates that they "indisputably profited enormously from [the] purported" improper conduct*. *(Explorers Club, Inc. v. Oiageo PLC,* 45 Misc. 3d 434, 440-441 [Sup Ct, NY County 2014]). *Here, [the Judgment Debtors] were not harmed; rather, their businesses were engorged with millions of dollars of additional revenue at JOMR's expense for 40 years*." *See id.* at pp. 23-24.

## C.    <u>Governing Standard</u>

Section 1112(b) of the Bankruptcy Code "provides that a Chapter 11 case may be dismissed if the court finds that it is in the best interest of creditors and the estate **for cause**. Thereafter, the Section lists ten specific grounds for dismissal.  It is clear that the specifics are merely illustrative, and the term 'cause' clearly includes lack of good faith and conversely the bad faith of the Debtor in filing the Petition for Relief under Chapter 11."  *In re Adell*, 310 B.R. 460, 464 (Bankr. M.D. Fla. 2004) (Paskay J.).  Significantly, a case may be dismissed for lack of good faith even though the debtor did not have any sort of fraudulent or malicious intent or scheme in mind when filing because malfeasance is not a prerequisite to bad faith.  *In re Liptak*, 304 B.R. 820, 828 (Bankr. N.D. Ill. 2004).  Indeed, the courts have noted that focusing on terms

---

[12] Unless otherwise indicated, all emphasis is added and all internal quotation marks, citations, and brackets are omitted.

such as good or bad faith in filing is misleading to some degree as the question is really whether the debtor has presented a legitimate reorganization objective within the scope of the Bankruptcy Code or rather has presented tactical reasons unrelated to reorganization. *Liptak*, supra.

"Broadly speaking, the basic inquiry [of whether a bankruptcy case was filed in bad faith] should be whether or not under the circumstances of the case there has been an abuse of the provisions, purposes or spirit of (the chapter) in the proposal." *In re Quartz Hill Mining, LLC*, 2014 WL 8381311, at *3 (Bankr. S.D. Fla. Aug. 4, 2014). In other words, courts may consider any factor that evidences an intent to abuse the protections, provisions, purpose, or spirit of the Bankruptcy Code. *In re Schaffer*, 597 B.R. 777, 792 (Bankr. E.D. Pa. 2019). The overriding consideration is proof of an "intent to abuse the judicial process and the purposes of the reorganization process." *In re Lezdey***,** 332 B.R. 217, 222 (Bankr. M.D. Fla. 2005) (citing *In re Springs Plaza Associates, L.P.*, 188 B.R. 48, 49 (Bankr. M.D. Fla. 1995) for the statement that "[i]n the last analysis, the key considerations are (1) the debtor's motivation to file the petition; (2) the economic vitality of the debtor; (3) the debtor's real need to reorganize; and (4) the ability of the debtor to achieve reorganization").

Standard scenarios exemplifying a Chapter 11 case being filed without good faith were discussed by Judge Wedoff in *In re N.R. Guaranteed Retirement*, 112 B.R. 263 (Bankr. N.D. Ill. 1990). *Liptak*, supra at 830. The first focuses on the need for a bankruptcy case in light of the debtor's financial condition and the type of assets available for satisfying judgments; the second focuses on the case's effect on creditors' nonbankruptcy collection rights and whether it is merely being used as a tactic to delay pursuit of these rights without any offsetting benefits to the creditor body. *Id.*

In *Adell*, Judge Paskay surveyed the case law concerning the prudent action that should be taken with regard to a Chapter 11 case that was filed without good faith and stated as follows:

> A statement by the Tenth Circuit in *Breeding Motor, supra*, a pre-Code case, still represents a viable principle. In this case, the Tenth Circuit stated that courts are not required to retain on their docket a proceeding for reorganization which is merely a visionary or impractical scheme of resuscitation. Judge Tjoflat speaking for the Eleventh Circuit, held that the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposals thus any plan would fail to meet Section 1229(a)(3) of the Code, which requires that the plan submitted has been proposed in good faith. The Eleventh Circuit noted that in light of this conclusion, it is doubtful that Congress intended that a creditor's right be delayed merely to allow the bad faith debtor to present a reorganization plan, which, as a matter of law, could not be approved, by the court."

*Adell*, supra at 465. In other words, "no amount of equity can cleanse a [p]etition which was filed in bad faith." *Hammersmith Trust*, supra at 800. The Eleventh Circuit Court of Appeals has similarly noted that "[b]ad-[f]aith bankruptcy filings significantly burden the legal system in general and bankruptcy courts in particular…. [W]e should not artificially limit the tools Congress has given bankruptcy courts to protect their 'jurisdictional integrity'…. [W]e see no reason why prepetition bad faith should not constitute an adequate or sufficient reason for dismissal. To hold otherwise would 'create[] the appearance that such an abusive practice is implicitly condoned by the [Bankruptcy] Code." *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253, 1262 (11th Cir. 2013).

"Cause for dismissal under 11 U.S.C. § 1112 is determined on the basis of the 'totality of the circumstances.'" *Quartz Hill Mining*, supra at *3. "A determination of bad faith requires a full examination of all the circumstances of the case; it is a highly factual determination but also one that may sweep broadly…. However, when the record is sufficiently well developed to allow the bankruptcy court to draw the necessary inferences to dismiss a Chapter 11 case for

cause, the bankruptcy court may do so." *Fraternal Composite Services, Inc. v. Karczewski*, 315 B.R. 253, 256 (N.D.N.Y. 2004).

D.   **Cause exists to dismiss these bankruptcy cases pursuant to 11 U.S.C. § 1112(b).**

An objective evaluation of the undisputed facts amply demonstrates that these cases were not filed for a legitimate purpose consistent with the Congressional aim of enabling financially distressed debtors to achieve rehabilitation through the remedial provisions of Chapter 11 of the Bankruptcy Code.  At all relevant times, JOMR and JOMH were clearly solvent, were never in financial distress, and did not require a breathing spell from the handful of creditors who were not applying any pressure whatsoever to collect the *de minimis*, insider, and questionable debt purportedly owed them.  The inescapable conclusion is that the Judgment Debtors caused JOMR and JOMH to file these Chapter 11 cases: (i) approximately three weeks after the Judgment was entered; (ii) to stay execution of the Judgment without posting a supersedeas bond; (iii) in a district where JOMR and JOMH have never been authorized to transact business, have never transacted business, and have never obtained the required business tax license; (iii) for the purpose of making an end run around the judicial labor and rulings of the New York trial court and nullifying the Derivative Plaintiffs' right to enforce the Judgment under New York law; and (iv) thereby thwarting, frustrating, hindering, and delaying enforcement of the Judgment against them.  Consistent with their past practice of breaching their fiduciary duties to JOMR and JOMH, the Judgment Debtors have now subjected these entities to bankruptcy in order to further their personal objectives.   These actions plainly constitute an abuse of the provisions, purpose and spirit of the Bankruptcy Code.  These cases are predominantly a two-party dispute between the non-debtor Derivative Plaintiffs and the non-debtor Majority Shareholders/Judgment Debtors

under New York law, that consumed seven years of litigation in New York courts, and that resulted in entry of the Judgment following a bench trial by the New York court.

In *Liptak*, the court noted that while "[i]t is true that insolvency is not a requirement for filing a bankruptcy case under any Chapter, ...  solvency is a factor to consider in determining whether a debtor has filed in good faith because of his genuine need to preserve the going-concern value of a business.  The number of creditors involved in a bankruptcy case, while not by any means dispositive, is also a relevant consideration.  That is, the more that the bankruptcy case appears to be a forum-shopping attempt for what is largely a two-party dispute, the less the debtor has a need for the type of bankruptcy relief contemplated by the Bankruptcy Code.  *Liptak*, supra at 832.

Similarly, in *Quartz Hill Mining*, the court held that "[t]he Debtors' timing of the bankruptcy filings, within weeks of an adverse state court judgment, to apparently avoid posting a supersedeas bond on appeal to subvert the sheriff's sale, are indicia of bad faith….  Under such circumstances, when the Chapter 11 petitions are filed at the very moment that state court litigation has taken a turn for the worse and foreclosure is imminent, a bankruptcy court may dismiss a bad faith filing on an interested party's motion or dismiss."  *Quartz Hill Mining*, supra at * 4.  Indeed, "[a] Chapter 11 filing may not be used as a litigation tactic to avoid the posting of a supersedeas bond."  *In re The Bridge to Life, Inc.*, 330 B.R. 351, 356-357 (Bankr. E.D.N.Y. 2005) (citing *In re A.Z. Services, Inc.*, 208 B.R. 578, 580-81 (Bankr. S.D. Fla. 1997); *In re Edwards*, 140 B.R. 515, 519 (Bankr. W.D. Mo. 1992); *In re Smith*, 58 B.R. 448, 451 (Bankr. W.D. Ky. 1986); *In re Karum Group, Inc.*, 66 B.R. 436, 438 (Bankr. W.D. Wash. 1986); *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984)).

As Judge Feller eloquently stated in *Bridge to Life*, "Chapter 11 petitions filed for the purpose of frustrating the legitimate processes of a non-bankruptcy forum constitute use of the reorganization vehicle inconsistent with the congressional intent.  Chapter 11 relief should not be available to entities filing to obtain a perceived advantage in litigation with others or to provide an alternative judicial forum…. An important factor to consider in determining whether a Chapter 11 case was initiated in good faith is whether the reorganization effort essentially involves a two-party dispute which can be resolved in a non-bankruptcy forum.  These Chapter 11 cases do not represent efforts pitched to a business's reorganization or to restructure a business's finances.  They are essentially a two-party civil lawsuit involving non-bankruptcy law brought in the bankruptcy court in the guise of being a reorganization of some sort under Chapter 11.  Chapter 11 was never intended to be used as a fist in a two party bout.  The Chapter is entitled reorganization and not litigation".  *Bridge to Life*, supra at 357 (citing *In re HBA East, Inc.*, 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988)).

The *Fraternal Composite Services* case is closely analogous to the matter *sub judice*. *Fraternal Composite* involved an appeal of an order granting a minority shareholder's motion to dismiss a corporate Chapter 11 case as a bad faith filing.  Prior to the Chapter 11 filing, the minority shareholder sought judicial dissolution of the corporation pursuant to New York law and the corporation elected to purchase his stock in lieu of dissolution.  *Fraternal Composite*, supra at 255.  Thereafter, a Referee issued a report determining the value of the minority shareholder's interest and both parties filed objections thereto.  *Id*.  The trial court was scheduled to hear the matter and issue a judgment on April 30, 2003, but the majority shareholder caused the corporation to file a Chapter 11 case on April 29, 2003.  *Id*.  The minority shareholder filed a motion to dismiss the Chapter 11 case.  *Id*. at 254.  The bankruptcy court granted the motion

because, among other things, the corporation's intent was to use the bankruptcy process solely as a means to delay, frustrate and relitigate the state-court issues and because the corporation was not experiencing any serious financial difficulties and was current on all obligations to pay its employees and to fulfill customer contracts.[13]  *Id*. at 255-256.   The corporation appealed the decision.  *Id*.  In analyzing the issue of whether the corporation filed its Chapter 11 petition in bad faith, the court noted that "[c]ourts that have addressed this issue have concluded that a debtor has filed its Chapter 11 petition in good faith when it finds itself in difficult financial situations with a need to financially reorganize and rehabilitate.  Although the debtor need not be in *extremis* to file a Chapter 11 petition, it must, at least, be experiencing a level of financial difficulty that, if it did not file at that time, it would likely need to file in the future….  On the other hand, courts have found that a debtor has filed its Chapter 11 petition in bad faith when it had no reason to reorganize or rehabilitate and its filing of a Chapter 11 petition was merely an attempt to avoid litigating issues in state court."  *Id*. at 256-257.  In affirming the dismissal of the bankruptcy case, the district court concluded that "the corporation was a completely solvent, profit-earning company that was up-to-date on all of its obligations to its creditors when it filed its Chapter 11 petition" and that the filing was intended to thwart entry of an adverse judgment in state court, a purpose not consonant with the letter or spirit of the Bankruptcy Code."  *Id*. at 257-258.

As the above facts and case law demonstrate, dismissal of these cases is not only warranted but is required by fundamental principles of Bankruptcy law.  The continued pendency of these cases constitutes a blithe disregard for the state court judicial process.  As one court

---

[13]  The bankruptcy court noted that the debtor's petition reflected assets of $2,426,794 and liabilities of $1,820,418.80 (inclusive of the debts arising from the shareholders' interest) shortly before the petition date, that the Summary of Schedules reflected total liabilities of $374,799.01, and estimated monthly revenues of $342,655 and monthly expenses of $342,300.  *Fraternal Composite Services*, supra at 248-249.

recognized under similar circumstances, "[t]he likelihood that Congress intended that the special debtor-as-trustee provisions of Chapter 11 should be used as a weapon to gain leverage in battling one's [state court adversary] in bitterly contested [post-judgment] litigation is zero.   If this case were not dismissed, [the debtor's] inability to perform his fiduciary obligation to [the state court adversary] in this case would likely require the appointment of a Chapter 11 trustee or the conversion of the case to a Chapter 7 case with a Chapter 7 trustee…." *Liptak*, supra at 843.

E.    <u>**These cases were filed in an improper venue and must be dismissed.**</u>

Venue is governed by 28 U.S.C. § 1408. Section 1408 requires that a debtor have a domicile, residence, principal place of business or principal assets in the district for at least 180 days prior to the commencement of the action. Those requirements were not met in these Chapter 11 cases.  Intentionally filing a Chapter 11 case in an improper venue, in order to escape or evade adverse rulings by a court in a proper venue following nearly seven years of hard-fought litigation, is the epitome of bad faith.

The undisputed facts establish that JOMR and JOMH (i) are New York corporations; (ii) have their principal places of business in New York County, New York; (iii) have never been authorized to transact business in Florida, have never transacted business in Florida, and have never obtained the required business tax license (also known as an occupational license) in Collier County, Florida; and (iv) only own intangible assets having a nexus in New York. JOMR's and JOMH's domicile and residence is New York, the state where they are incorporated. *See In re B.L. of Miami, Inc.*, 294 B.R. 325, 328 (Bankr. D. Nev. 2003); *Rosenfeld v. S.F.C. Corp.*, 702 F.2d 282, 283 (1st Cir. 1983).

In *In re Penn-Mont Benefit Services, Inc.*, 2013 WL 6405046, at *8 (Bankr. M.D. Fla. 2013) (Funk, J.), the court determined that venue was improper in the Middle District of Florida

where: (i) [e]ach of the Debtors is a Pennsylvania entity formed pursuant to the laws of the Commonwealth of Pennsylvania; (ii) [i]t is undisputed that, per the records maintained by the Florida Department of State, Division of Corporations, none of the Debtors is registered to conduct business in the State of Florida; (iii) the trust agreements provided that they shall be administered, construed, and enforced according to the laws of the Commonwealth of Pennsylvania; (iv) the Debtors previously listed Pennsylvania addresses as their principal place of business in official records and judicial filings. *Id*. at *7-8.  With regard to the forum selection clauses in the trust agreements electing personal and subject matter jurisdiction in Pennsylvania, the court noted that "Bankruptcy Courts give great weight to forum selection clauses included in agreements related to a debtor's assets when determining the proper venue for a debtor's bankruptcy case." *Id*. at *11.  In so holding, the court noted that the Florida bankruptcy filings were apparently filed to side-step rulings by the Pennsylvania courts and that it could not "sanction such apparent abuse of the bankruptcy process." *Id*. at *7.

Similarly, in *In re Newport Creamery, Inc.*, 265 B.R. 614 (Bankr. M.D. Fla. 2001) (Williamson, J.), the court determined that venue was improper in Florida for a Chapter 11 case filed by the operator of an "iconic" family restaurant chain in Rhode Island, Massachusetts, and Connecticut.  In so ruling, the court noted that the Debtor was incorporated under the laws of Rhode Island, that it was not qualified to do business in the State of Florida, and that the Debtor's operational records on a day-to-day basis were not maintained in Florida but, rather, at its place of business in Rhode Island.  *Id*. at 616-617.  Accordingly, the court rejected the Debtor's argument that "its 'nerve center' [was] located in Florida since that it where the Debtor's two principal directors live[d] and it is in Florida that they [made] the strategic decisions involving the Debtor." *Id*. at 616.  In determining whether to dismiss or transfer a case

due to improper venue, a consideration or factor is "a state's interest in having local controversies decided within its borders." *Id*. at 618.  (Citations omitted).

The *Penn-Mont* and *Newport Creamery* cases support dismissal of these cases due to improper venue.  Also, under the reasoning of *Newport Creamery*, New York clearly has a superior and compelling interest in this case.  JOMR and JOMH are incorporated in New York. The Derivative Action was filed and prosecuted under New York law and in a New York trial court for nearly seven years.  The Judgment was entered following a bench trial by the New York trial court and is readily enforceable under New York law.[14]  There is also no suggestion that a New York bankruptcy court would be less efficient, less economical, or less fair than this Court.

**F.**     **Conclusion**

Since the Judgment Debtors lacked good faith in causing these bankruptcy cases to be filed and sham cases cannot be cured by the employment of a highly regarded restructuring officer and bankruptcy counsel, these cases should be dismissed with prejudice.

---

[14] The Judgment has not been domesticated in Florida or filed in the Florida Judgment Lien Database.

WHEREFORE, the Derivative Plaintiffs respectfully request the Court to enter an Order (i); dismissing these cases with prejudice; and (ii) providing such other and further relief as the Court may deem just and proper.

Respectfully submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
*Attorneys for the Derivative Plaintiffs*
200 East Broward Boulevard, Suite 1110
Fort Lauderdale, Florida 33301
Telephone: (954) 453-8000
Telecopier: (954) 331-2907

By: /s/ Robert F. Elgidely
    Robert F. Elgidely, Esq. (FBN 111856)
    E-Mail: relgidely@gjb-law.com

      and,

HOGUET NEWMAN
REGAL & KENNEY, LLP

By:/s/ Fredric S. Newman
    Fredric S. Newman
    *Specially admitted pro hac counsel*
    One Grand Central Place
    60 E. 42nd St., 48th Fl.
    New York, New York 10016
    Telephone: (212) 689-8808


DUNNING RIEVMAN & DAVIES, LLP

By: /s/ Joshua D. Rievman
    Joshua D. Rievman
    *Specially admitted pro hac counsel*
    434 W. 33d St.
    New York, New York 10001
    Telephone: (646) 435-0027

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on June 28, 2019, I electronically filed the foregoing *Renewed Motion to Dismiss Chapter 11 Cases* with the Clerk of the Court using the CM/ECF System. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means and a copy was also forwarded via first-class mail to all parties identified on the attached mailing matrix who are not registered users of the Court's CM/ECF system.

By: /s/ Robert F. Elgidely
Robert F. Elgidely, Esq.

# COMPOSITE EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL PART 48
-----------------------------------------------------------------------x
GARY GANZI, CLAIRE BREEN, and GARY GANZI
and CLAIRE BREEN, as Attorneys-in Fact for the
Estate of CHARLES COOK, Individually and
Derivatively on Behalf of Nominal Defendants
JUST ONE MORE RESTAURANT CORPORATION
and JUST ONE MORE HOLDING CORPORATION,

Plaintiffs,

*Redacted  11/13/18*

-against-

WALTER GANZI, JR. and BRUCE BOZZI, SR.,                    Index No.: 653074/2012

Defendants,

**DECISION AFTER
NON-JURY TRIAL**

and

JUST ONE MORE RESTAURANT CORPORATION,
a New York corporation, and JUST ONE MORE
HOLDING CORPORATION, a New York corporation,

Nominal Defendants.

-----------------------------------------------------------------------x

MASLEY, J.:

This action concerns allegedly improper transactions and practices of the

majority shareholders of closely-held family businesses: Just One More Restaurant

Corp. (JOMR), which owned the now-shuttered, renowned New York City

establishment, the original Palm Restaurant (Restaurant); and Just One More Holding

Corp. (JOMH), which owned real property at which the Restaurant was located.  The

actions challenged by plaintiffs Gary Ganzi (Gary), Claire Breen (Claire), and the Estate

of Charles Cook (Cook's Estate) occurred decades after the ownership and

management of the businesses had been passed down the family trees to the

defendants, Bruce Bozzi Sr. (Bruce) and Walter Ganzi, Jr. (Wally), plaintiffs' cousin.

Page 1 of 29

The issues at trial surrounded the derivative claims of breach of fiduciary duty raised on behalf of JOMR and JOMH by plaintiffs, minority shareholders of those corporations, and defendants assertion of laches, statute of limitations, and acquiescence. The derivative breach of fiduciary claims against defendants, as the majority shareholders of JOMR, fall into two general categories relating to undervaluation of JOMR's intellectual property assets, and challenge: (1) JOMR's issuance of below market rate license agreements to restaurants and related entities owned in whole or in part by defendants; and (2) JOMR's issuance of a below market rate agreement granting exclusive licensing/sublicensing rights to its valuable intellectual property assets to defendants' wholly-owned management company, and the transactions that occurred thereunder. The trial also addressed plaintiffs' derivative claim that defendants, majority shareholders of JOMH, breached their fiduciary duties by leasing JOMH's real property to JOMR for below market rates.

## Background

In 1926, Pio Bozzi (Pio) (Bruce's grandfather) and John Ganzi (John)(grandfather of Wally, Gary, Claire, and the late Charles Cook) founded the Restaurant. (Palm time line, Defendants' Exhibit [DX] 78). John, a renowned chef who once worked at the 21 Club, had a "larger than life personality" and hobnobbed with celebrities while Pio managed the finances. (Gary Ganzi Trial Affidavit (TA) ¶¶ 50, 51, 53). They ran the Restaurant as a family business with their wives Mary Bozzi (Mary) and Adele Ganzi (Adele). (Statement of Agreed Upon Facts, Nov. 6, 2017 [SAUF] ¶ 2). The Restaurant became known as a steakhouse and famous for caricatures on its walls, contributed by cartoonist customers who exchanged their cartoons for meals and signature dishes

Page 2 of 29

2 of 29

such surf and turf. (DX 78; Gary ¶53). Eventually, ownership of the Restaurant took its corporate form in JOMR, with the founders splitting the shares. (DX 1).[1]

JOMR held its first meeting on April 8, 1933. (*Id.*). By 1963, Adele, Mary and their sons, Walter and Bruno, were JOMR's four officers and directors. (September 30, 1963 Board Minutes, DX 2). At the February 10, 1971 meeting, called to discuss a Management Report dated October 26, 1970, the board (1) agreed to institute an accounting system and internal financial controls; (2) agreed to reimburse officers for entertaining customers; and (3) adopted salaries for the officers and managers. (Minutes, DX 6). The officers and directors present were: Walter, president, Mary, vice president, Bruno, treasurer and Adele, secretary. (*Id.*). Also present for the meeting were Bruce and Wally, noted as managers at the time, and JOMR's accountant, Ralph Thomson. Another meeting was held on September 15, 1971 to adjust salaries. (Minutes, DX 79). At the February 9, 1972 board meeting, called to discuss the effective controls instituted the year before as well as the 25% increase in volume, salaries were approved for officers and managers. (Minutes, DX 8). For example, Adele and Mary each earned $23,125, defendants earned $35,625 each as part-time managers, and their fathers earned $44,250 each.[2]  (DX 8 and plaintiffs' exhibit (PLX) 82; *See also* Bruce Tr 600:3 to 7).[3]  The officers remained the same as well as the

---

[1]Ownership of the real property also took a corporate form with the founders each splitting the shares in 1946, according to the JOMH filing with the NYS Secretary of State.

[2]The value of Adele's salary today is $142,035.33. dollarshttps://www.bls.gov/data/inflation_calculator.htm

[3]For 1972, the family salary draw from JOMR totaled $206,000.

Page 3 of 29

managers and accountant; all were present. (*Id.*). Upon Bruno's death, a shareholder
meeting was held on May 15, 1974. (DX 79). A board and shareholder meeting was
called on April 30, 1976 to discuss the liquidation of the employees' pension plan.
(Minutes, DX 21 and 79). Present at the meeting were officers Walter, Bruce, Louise
Bozzi, and Victor Ganzi, as attorney (Wally's brother), and Thomson. (*Id.*). Adele,
secretary, and Wally, a shareholder, were noted as absent. (*Id.*). A meeting was held
in 1986 to address the liquor license. (Minutes, PLX 82). Until this litigation,[4] there is
no evidence of any JOMR corporate meetings called thereafter. (Bruce Tr 579:26 to
580:6; 581:1 to 5; Gary TA ¶142; and Joy Jones, Esq. Tr 671:14 to 672:16).

Over time, the ownership and corporate management of the Restaurant passed
down the family tree to the founders' grandchildren-- the parties here. (SAUF ¶ 2,
NYSCEF Doc. No. [Doc] 201; *see also* Doc 94). As relevant here, Bruce and Wally
began working at the Restaurant in the 1960s, before either had an ownership interest
in JOMR. (Gary TA ¶ 64). Meanwhile, they were running their own restaurants: Wally's
and Bruce's Pussycat. (Gary TA ¶66 and 67). By the late-1970s, defendants had each
obtained a minority interest in JOMR, and, by the late-1990s, defendants were the
majority shareholders of JOMR; defendants' majority ownership of JOMR continued
throughout all times relevant to the issues presented at trial, including the six-year
period, starting September 1, 2006, preceding initiation of the action. (Bruce Tr 580: 24-
26; Gary TA ¶ 86 and 87).

---

[4]A shareholder vote was taken in 2015 to close the Restaurant, over plaintiffs'
objections. (Gary TA ¶142).

The parties to this derivative action[5] are shareholders of JOMR and JOMH

through gifting, purchasing, and inheriting capital stock from family members. At the

time of trial, Gary and Claire together owned 10% of JOMR's capital stock and 16 2/3%

of JOMH's capital stock; Cook's Estate also held a 10% share of JOMR and 16 2/3%

share of JOMH. (Wally trial affidavit [TA] ¶¶ 12; Gary TA ¶¶ 10, 38, 86, 87, 88). It is

undisputed that defendants control JOMR and JOMH as majority shareholders: Bruce

owns 50% of JOMR and 50% of JOMH; Wally owns 30% of JOMR and 16 2/3% of

JOMH. (Wally TA ¶¶ 17-19; Gary TA ¶¶ 10, 38, 86-88; Bruce, trial tr [tr] 580:24-26). In

addition, Wally is CEO of JOMR and Bruce is CEO of JOMH.[6]

JOMR holds its valuable intellectual property (Palm IP);[7] at the time of trial, the

Restaurant has closed and JOMR's sole remaining asset is the Palm IP. (Gary TA ¶

142). The Palm IP includes a series of trademarks and service marks, design elements

of the Restaurant–such as its menu, food quality choices and methods of

preparation–and the Restaurant's decor, display of certain photographs, artistic

caricatures, sketches, cartoons, and other elements. (See generally Report of Pamela

---

[5] Three of plaintiffs' direct claims were summarily dismissed. (NYSCEF Doc. No. [Doc] 173). While certain direct claims survived summary judgment, plaintiffs' evidence at trial, and plaintiffs' pre-trial and post-trial memoranda, address only their derivative claims; accordingly, this decision does not consider the direct claims, which are deemed abandoned.

[6] The court takes judicial notice of JOMR's and JOMH's filing with the NYS Secretary of State.

[7] At trial, defendants assert that they created the Palm IP, aside from the Palm name, independent of JOMR and for use in defendants' Palm-branded expansion restaurants. The contested ownership of the Palm IP is addressed below in the court's findings of fact and discussion.

Page 5 of 29

O'Neill, November 2, 2017 [O'Neill Report]; *See also* Nov. 6, 2017, credible testimony of SSP vice president, Pat Murray). In 1984, the Palm's trademark – a palm tree – was registered in JOMR's name. (Wally TA ¶ 51 and Bokhart Ex 14, Schedule of Palm trademark registrations).

When JOMR was converted to an S-Corporation in 1986, each shareholder received a K-1 each year reporting on their share of the profit and loss of JOMR. (SAUF ¶8 and DX 141). The shareholder's share of JOMR's profit or loss was reported in the space for "Ordinary Business Income (loss)" and the income that JOMR had received from the license fees from each of the other Palm restaurants or other sources was not separately recorded from the corporation's ordinary income or loss in the space for "Royalties." (*Id.*).

The Restaurant's success[8] and the Palm IP were first exploited in 1972 when the first of many new Palm-branded restaurants (New Palms) opened in Washington, D.C. (DC Palm).[9] (Wally TA ¶ 26). Since 1972, New Palms have opened worldwide, and, at the time of trial, defendants have an ownership interest in numerous New Palms and their associated business entities; thus, defendants have used the Restaurant and the

---

[8]The court rejects defendants' testimony that the Restaurant was not successful until defendants took over. (Wally TA ¶13, 15; Bruce TA ¶8, 20; Bruce Tr 594:10 to 595:18). The handsome salaries paid to the family, even when they no longer worked at the Restaurant, and board minutes showing success and increasing volume, document otherwise, long before defendants' took control. .(DX8, PLX 82).

[9] The DC Palm was established by 20 or more investors, including defendants. The license agreement for New Palms, and the annual flat-fee payment for the use of Palm IP, was first used in connection with the DC Palm.

Page 6 of 29

Palm brand to create an empire of Palm-branded businesses.[10] (Operating Statements

2002 to 2016, Doc 242). It is undisputed that all of the New Palms entered license

agreements with JOMR, from the 1970s to 2011, which identified JOMR as the licensor

and owner of "long established, famous and valuable service marks used in connection

with the operation of distinctive, high quality restaurants," and that JOMR had "devised

and developed certain confidential know-how relating to the management and operation

of restaurants, including business practices, unique recipes, and formulae"; under those

agreements, the New Palms agreed to pay JOMR an annual licensing fee of $6,000 "for

the use of [JOMR's] Licensed Trademark and . . . know-how." (Licenses, e.g. DX 42-

51, 82, 123). The $6,000 annual fee was imposed for all New Palms in which

defendants had an ownership interest, regardless of when those restaurants first

opened, for over 40 years. (SAUF ¶¶ 6, 7). At issue at the trial are 54 license

agreements, which all include the $6,000 fee, entered between JOMR and the New

Palms owned by defendants: 26 licenses in 2007, backdated to January 1, 2004 (2007

---

[10] Per stipulation, since 2006, Bruce and Wally have been officers and directors or
members of the following Palm-related companies, in addition to JOMR and JOMH:
Atlanta Palm Food Corporation; Atlantic City Palm, LLC; LA Downtown Palm, LLC; Palm
Beverly Hills Restaurant; Boston Palm Corporation; Charlotte Palm Corporation;
Chicago Palm, Inc.; Coral Gables Palm Restaurant, LLC; The Dallas Palm Restaurant,
Inc.; Denver Palm Corporation; Palm Management Corporation; Palm Management
Corp D/B/A James Lane Café at the Hedges; Palm Restaurant of Houston, Inc.; Palm
Management Corp; D/B/A Palm Restaurant at The Hunting Inn; Palm Airport, LLC (does
not operate a restaurant); Palm Restaurant of Las Vegas, Inc.; Palm UK LLC (does not
operate a restaurant); The Los Angeles Palm, Inc.; Miami Palm Restaurant, Inc.;
Nashville Palm Restaurant, LLC; Northbrook Palm, LLC; Palm Orlando Corporation;
Palm West Corporation; Palm Restaurant of Philadelphia, Inc. (until 2016); Palm
Philadelphia Restaurant, LLC (from 2016); Palm Restaurant Puerto Rico Corporation;
Palm Restaurant, Inc.; San Antonio Palm Restaurant, Inc.; San Diego Palm, LLC;
Tampa Palm Restaurant, LLC; Palm New York Downtown, LLC; Palm Tyson's Too, Inc.;
The Washington Palm, Inc. (Doc 242).

Licenses); and 28 licenses in 2011, backdated to January 1, 2010 (2011 Licenses). (DX 82; *see* SAUF ¶ 19 to 15). Gross revenue for New Palms from 2006 to 2017 was $1.5 billion. (Gary TA ¶16; DX 97).

Additionally, it is undisputed that defendants own 100% of the Palm Management Corporation (PMC), which was formed in 1975. (DX 20; Gary TA ¶¶ 3, 11). In 2006, Bruce and Wally each earned salaries of $___] million. (PLX 21 at 6911 to 6912). From 2006 to 2016, their salaries were not less than $___million each. (Tr 588:24-26). In 2006, Wally charged PMC $___ ___, in travel, lodging, meals and entertainment, while Bruce charged PMC $___ ] (PLX 21 7138 and 7140).

Charles Ganzi (father of Gary and Claire)(Charlie) was a certified public accountant and a partner of the accounting firm Fisher & Baker (F&B) of which Thomson was also a partner. (Gary TA ¶68). There were no other employees. (F&B tax returns, DX 135). Beginning in the 1970s, F&B prepared JOMR's financial statements and tax returns. (F&B time sheets 1965 to 1983, DX 135). The detailed time sheets demonstrate that Thomson provided the actual services to JOMR. (*Id*.). In the 1970s, F&B did accounting work for the New Palms and, beginning in 1976, PMC until all were moved to DC in 1985. (*Id*., DX 75, 96 and 193, and Wally TA ¶21). In 1970, a F&B Report concluded that Palm had been grossly mismanaged for some time, there was " rather considerable vacuum at the management level," and that it provided a "near perfect 'textbook' example of how not to manage a restaurant." (DX 5). The Report also suggested that, if not for the Palm's large sales volume and "unrealistically low rent," the Restaurant would have already gone bankrupt. (SAUF ¶3). In 1989, Charlie evaluated JOMR's 1987 accounts and found a $50,000 discrepancy. (DX 33-

Page 8 of 29

38, 40 and 41). In 2004, Charlie invoiced JOMR for professional services to prepare a 2003 financial report. (DX 71).

In 1982, defendants' trademark attorney warned them that the $6,000[11] flat fee "may be deemed quite modest in a few years" and "[m]ost franchise contracts provide for a payment of a percentage of gross sales rather than a flat fee" and that they should consider "a royalty provision." (DX 25 at 6).

In 2007, PMC and JOMR entered into a Master License Agreement (MLA) through which PMC acquired the "exclusive, worldwide, royalty bearing, sub-licensable license" to the Palm IP for an annual flat payment of $12,000. (DX 104 and SAUF ¶ 17). Bruce signed the MLA for JOMR and CFO James Longo signed for PMC. (Gary TA ¶22). Under the MLA, PMC entered into sublicense agreements for the use of Palm IP with third parties for at or near market rate value, as opposed to the $6,000 flat fee paid by the New Palms.

In 2008, PMC entered an agreement with SSP America (SSP), a business that operates airport food outlets, which sublicensed the right to use the Palm IP to establish the Palm Bar and Grille at John F. Kennedy Airport (JFK Palm) in exchange for annual royalty payments to PMC of ⅜% of gross sales up to $ ̄ million and ∫ ̄% above $ ̄ million at the JFK Palm (SSP License). (PLX 3). SSP paid an initial $ ̄ license fee to PMC, and, since 2010, more than $ ̄ million in royalties under the SSP License. (Id.). PMC also entered an agreement in 2008 with TJX under which TJX is granted the use of Palm IP to create Palm-branded household goods for retail stores in exchange

---

[11]In today's dollars, the fee is equivalent to $16,061.87. https://www.bls.gov/data/inflation_calculator.htm

for licensing fees and annual royalty payments calculated as a percentage of TJX's gross revenues for that Palm product line (TJX License). (See PLX 5-11). From 2007 to 2016, PMC has paid JOMR $120,000 under the MLA while PMC received $‗ from SSP and TJX. (Gary TA ¶32 and DX 134).

Plaintiffs allege in the complaint that defendants engaged in a decades-long pattern of exploiting JOMR's greatest asset—the Palm IP—to benefit defendants' own businesses (i.e., by licensing Palm IP to the New Palms for below market rates), and by improperly entering the MLA between JOMR and PMC and using the MLA to divert substantial revenue from JOMR to PMC. Plaintiffs further allege that defendants breached their fiduciary duties to JOMH, which owned the real estate in New York City at which the Restaurant and its offices were located, by leasing the space at below market level rates to JOMH's detriment. Defendants assert statute of limitations, laches, and acquiescence defenses. (Doc. 4).

This court, in its February 11, 2016 decision and order, granted defendants' motion for partial summary judgment insofar as three direct claims—the fifth, eighth, and tenth causes of action—were dismissed. (See Ganzi v Ganzi, 2016 WL 613815 [Sup Ct, NY County 2016] [Oing, J.] [Doc 173]). Notably, this court found that issues of fact exist as to: (a) when the limitations period for certain license agreements began tolling; (b) whether defendants were prejudiced by laches; and (c) whether the 2011 Licenses are enforceable. (See id). On appeal, the Appellate Division unanimously affirmed the decision and noted that issues of fact exist as to whether plaintiffs suffered from the allegedly improper licensing agreements which were executed within the applicable limitations period. (Ganzi v Ganzi, 144 AD3d 510, 510 [1st Dept 2016]).

Page 10 of 29

Accordingly, the claims at issue in this trial were the following causes of action: (1st) breach of fiduciary duty by executing self-dealing agreements with the New Palms, derivatively for JOMR; (2nd) breach of fiduciary duty by charging third-party companies below market value royalty rates, derivatively for JOMR; (3rd) breach of fiduciary duty by undervaluing real estate, derivatively for JOMH; and (4th) diversion of corporate opportunity, derivatively on behalf of JOMR.[12]

Plaintiffs now contend that the trial evidence establishes that defendants breached their fiduciary duties in that they:

(1) engaged in self-interested, self-dealing transactions that severely undervalued JOMR assets by licensing Palm IP to defendants' New Palms for an annual fee of $6,000; expert evidence established the market rate, per the near-universal business practice, is a percentage of licensee's sales or revenue, and assets comparable to the Palm IP command 5% rates;

(2) deprived JOMR of market rate value for the exclusive right to license Palm IP to third parties by entering the MLA for an undervalued fee of $12,000, and diverted substantial licensing deals away from JOMR to PMC; and

(3) leased JOMH's real property to JOMR for undervalued rental rates and inequitably distributed sale proceeds to JOMH's shareholders based on a 2006 evaluation of 837 Second Avenue that concluded that the market rent was $233,000. (SAUF ¶19).

---

[12] As noted above, this decision does not address plaintiffs' abandoned direct claims, including the following causes of action: (6th) breach of fiduciary duty in charging third parties below market royalty rates; (7th) breach of fiduciary duty in undervaluing real estate; and (9th) oppression of minority shareholders of JOMH.

Page 11 of 29

Plaintiffs assert the limitation period is six years; thus, JOMR should recover those damages which accrued after September 1, 2016, including the 54 agreements in the 2007 and 2011 Licenses, the MLA, and the SSP and TJX Licenses. Plaintiffs argue · that defendants failed to establish any affirmative defense at trial.

Defendants contend that the trial evidence establishes that:

(1) defendants, through PMC for the New Palms, developed the valuable Palm IP elements, including the logo, the menu, recipes, and décor;

(2) the family members all knew about, and supported, the New Palms and the lack of objection shows that prior JOMR shareholders consented to the New Palms' licensing arrangements; alternatively, plaintiffs' predecessors in interest always knew that Palm IP was used by defendants in the New Palms for defendants' benefit, and that JOMR did not share in the success of the New Palms, constituting knowledge of the license arrangements;

(3) JOMR's past shareholders implicitly consented to the licensing arrangement each time defendants opened a New Palm;

(4) Charlie, from whom plaintiffs inherited certain JOMR shares, had knowledge of the license agreements because he was an accountant for family businesses, including JOMR, and was involved with family-member shareholders' financial affairs; thus, Charlie's knowledge of, and lack of objection to, the New Palms' licenses bars plaintiffs' challenges;

(5) the 2007 and 2011 Licenses accrued outside of the limitation period when each New Palm first opened; and

(6) defendants are prejudiced by laches because the Dead Man's statute

Page 12 of 29

prohibits them from testifying as to conversations with deceased family members/JOMR

shareholders as to consent and knowledge.

### Findings of Fact and Conclusions of Law

The court, having before it now all trial evidence, makes the following findings of

fact and conclusions of law. Any evidence not addressed in this decision is deemed

irrelevant to the issues and is afforded no weight.

These findings of fact and conclusions of law are framed by the bedrock legal

principle, and "inflexible rule," that fiduciaries:

> "cannot exercise the corporate powers for their private or personal
> advantage or gain. The law stringently and rigorously forbids to them the
> use or disposition of the funds or assets of the corporation for their
> individual enterprises or acquisition, and for any misfeasance or breach of
> duty or trust resulting in damage to the corporation they are subject to be
> called to account by the corporation in the appropriate action." (*Pollitz v
> Wabash R. Co.*, 207 NY 113, 124 [1912]).

The court finds Gary credible. In addition to his precise testimony, consistent

with his education and training as an engineer and patent attorney, his testimony was

logical and often corroborated by documentary evidence. (Gary_TA ¶6).

As majority shareholders of JOMR, with a combined 80% ownership, and

officers,[13] defendants are corporate insiders who owe fiduciary duties to JOMR. The

court finds that JOMR owned the Palm IP—including the name, logo, trademarks,

service marks, design elements of the restaurants such as menu, recipes, food quality

choices, methods of preparation, and decor, the display of certain photographs,

---

[13]While Wally is currently documented by the Secretary of State as JOMR's CEO,
Bruce's corporate position in JOMR, if any, is unknown since 1976 when his position as
JOMR's Treasurer was recorded.

characteristic caricatures, sketches, cartoons and/or other design elements—and JOMR was, and is, entitled to fair market value for any use of Palm IP assets. Notably, the first license agreement executed by JOMR for the use of Palm IP in connection with a New Palm restaurant—the 1972 license for the DC Palm—identifies the Palm name, unique recipes, logo, and know-how, among other things; thus, the 1972 license for the DC Palm contradicts defendants' contention that JOMR owned only the Palm name, not the entirety of the Palm IP.

The court rejects Wally's self-serving testimony, unsupported by any credible evidence, that defendants created the Palm IP. The credible evidence establishes that the Palm IP was the key to the success of defendants' business ventures. Their non-Palm restaurant ventures, Bruce's Pussycat and Wally's, were unsuccessful. Further, the quick succession of opening New Palms after 1972—including the Palm Too restaurant, in 1973, across the street from the original Restaurant, and the Los Angeles Palm in 1975—demonstrate that the Palm name, brand, and overall Palm IP were valuable assets belonging to JOMR before defendants had majority ownership of JOMR, and that exploiting the Palm IP was the key to defendants's success.

The evidence establishes that, before this action was filed, JOMR's last board and shareholder meeting occurred in 1976, and there is no evidence that any corporate meeting, properly noticed or not, occurred ever since;[14] however, the pre-1976 meeting

---

[14] Purported family discussions at a kitchen table in the 1970s do not constitute properly-noticed corporate meetings; in any event, there are no records from Adele's kitchen reporting that defendants were present. Even if those meetings occurred, they do not bear on the 2007 and 2011 Licenses. (Bruce Tr 580:12 to 23). Likewise, PMC meetings are not a substitute for JOMR meetings. (See Wally TA ¶35).

notices and minutes show that the parties' predecessors understood corporate formalities. (DX 21, 79).

The court also finds that defendants had notice that the $6,000 license fee was becoming an issue as of 1982, when trademark counsel advised them that the $6,000 license fee was not the industry-norm and would be deemed unreasonably modest in only a few years, and that the rate could raise red flags and render the transactions vulnerable to shareholder challenges. (DX 25, at 6). The court also finds, however, that there is no credible evidence that demonstrates that Charlie, his sister, Lorraine Cook, or plaintiffs were aware of the 2007 or 2011 Licenses or the fees they contained.

While Charlie worked with JOMR's books and records, Ralph Thompson was JOMR's accountant according to corporate minutes as early as 1970 and the detailed time sheets corroborate that Charlie's contribution to the F&B Palm account was minimal.

The court gives no weight to defendants' testimony that the $6,000 fee was instituted to help pay the JOMR salaries of the Ganzi and Bozzi parents and grandmothers.[15] The more logical explanation for the license agreement and flat fee is that the numerous investors in the DC Palm demanded those provisions. In any event, it is obvious and undeniable that the flat-fee $6,000 annual payment for the use of

---

[15] The DC Palm agreement was instituted in 1972, years after John and Pio passed away in 1963 and 1946, respectively. (Gary TA ¶55 and Family Tree, PLX 77). Further, in 1972, the Restaurant paid salaries to many family members, not all elderly; Adele, Bruno, Bruce, Walter, Wally, and Mary all earned salaries that totaled $206,000 together. The fee in 1972—a single annual $6,000 payment—amounts to only 3% of the salary expenditures for 1972; a negligible contribution, at best. That the payments continued long after their deaths undermines defendants' credibility.

Page 15 of 29

JOMR's valuable trademarks, service marks, and "know-how" allowed the New Palms to earn greater revenues, at the expense of JOMR, especially considering that the $6,000 fee was applied for all New Palms in which defendants had ownership interests, without change, from 1972 onwards, spanning more than 40 years.

As defendants were on notice, since 1982, that a JOMR shareholder could challenge the licensing arrangement as undervaluing Palm IP and harming JOMR, a six-year look-back period was always a risk. (CPLR 213; DX 25, at 6). Even if the court were to find that defendants were prejudiced by the timing of plaintiffs' challenge and the six-year statute of limitations—which it does not—defendants assumed and perpetuated that known risk in causing JOMR to issue licenses to each New Palm, without changing the $6,000 fee, for over 40 years.

Defendants' self dealing is also exemplified by the JOMR-PMC service agreement of January 1, 2010, pursuant to which JOMR paid PMC $[    ] per month plus bonuses to Wally and Bruce of up to $[    ] per year. (Gary TA ¶135 and PLX 12. See also DX 31, 32, 217). There was no corporate formality, no independent management, and thus, no fair negotiation of these payments. Defendants have treated JOMR as their own without any regard to other shareholders.

It is undisputed that the family was proud of Wally and Bruce and they had much to be proud of. However, defendants impermissibly collapse this family pride with knowledge that JOMR had rights in its name and that Bruce and Wally were using the name for their own benefits, not JOMR's. Family pride is not a defense and does not give rise to knowledge of how that success was achieved and that it was unfair to JOMR.

Page 16 of 29

16 of 29

## Discussion of Plaintiffs' Claims

The court is compelled to find in favor of plaintiffs as to the first cause of action, the derivative claim for breach of defendants' fiduciary duty to JOMR by executing self-dealing, undervalued license agreements with defendants' New Palms. Plaintiffs have established the existence of a fiduciary relationship, misconduct by defendants, and damages directly caused by defendants' misconduct. (PJI 3:59). Defendants do not dispute that they owed JOMR fiduciary duties arising from their majority ownership. The issuance of the 2007 and 2011 Licenses for fees grossly favoring defendants' New Palms' interests over those of JOMR, depriving JOMR of fair market value for the valuable Palm IP, is a textbook example of fiduciary misconduct.

Corporate formalities ceased being followed when defendants took over JOMR. There was no corporate action, notice, or meeting to ratify any of the licenses at issue here, and no votes were cast by disinterested directors or shareholders of JOMR regarding those decisions. That JOMR is a closely-held corporation which began as an informal family affair does not excuse defendants from complying with their fiduciary obligations to JOMR and fellow shareholders. (See Global Mins and Metals Corp v Holme, 35 AD3d 93, 98 [1st Dept 2006]).

Accordingly, the burden is on defendants to establish that the license agreements were fair and reasonable to JOMR. (BCL § 713 [b]). Defendants have not satisfied that burden. All expert testimony established that the per-restaurant, annual flat-rate fee is not fair or reasonable. By all accounts, similar licensing fees in the restaurant industry are calculated as a percentage of sales. Even defendants' expert, Christopher Bokhart, testified that comparable rates for similar restaurants are

calculated as a percentage of gross sales: Smith & Wollensky, 2%; Capital Grille, 2.2%;

Morton's, 2.7%; Del Frisco's and Sullivan's, 1.8%; Ruth's Chris, 2.3%. Plaintiffs' expert,

Pamela O'Neill, found comparable rates of: 5.5% for Capital Grille; 3.3% for Long Horn

Steakhouse; and 3.7% for Morton's. Since 2006, the period at issue here, gross

revenue at the New Palms owned by defendants totaled $1.5 billion. Therefore, JOMR

would have earned significantly more for the licenses even at the lowest comparable

rate, 1.8%, identified by Bokhart.

Furthermore, defendants were aware, in 1999, that Palm IP licenses were then

valued at or around ⟨ ⟩: the rate at which the Mexico Palm restaurant was charged

annually. The court finds, however, that the most relevant rate, undisputably negotiated

at arm's length in 2008 between PMC and SSP for the SSP License for the JFK Palm,

is ⟨ ⟩ annually. Those rates demonstrate that the figures identified by plaintiffs' experts

are more reliable and comparable to the fair market rate of Palm IP licenses; the court

finds the rates identified by plaintiffs' experts are reasonable and fair.

As to the second cause of action for breach of fiduciary duty by entering the MLA

at a flat annual rate of $12,000 for PMC's exclusive right to sublicense Palm IP, the

same analysis applies. The self-interested transaction gave JOMR's greatest asset, the

Palm IP, to defendants' wholly-owned business, PMC, for a grossly-undervalued flat

annual fee, establishing another plainly self-interested transaction which constitutes

breach of defendants' fiduciary duties to JOMR to further their own interests.

Likewise, the court finds for plaintiffs as to the fourth cause of action for diversion

of corporate opportunities. Under the MLA, defendants, through PMC, diverted JOMR's

corporate opportunities to issue the SSP and TJX Licenses, and deprived JOMR of the

Page 18 of 29

revenue from those substantial transactions. Indeed, rather than reap the benefits of those license agreements, JOMR collected a paltry $12,000 flat annual fee from PMC. Had JOMR received fair market value for the exclusive right to sublicense Palm IP to third parties, that rate would, by all accounts, dwarf the $12,000 annual flat fee. A more obvious example of the breach of a fiduciary's duty of loyalty is difficult to envision.

As to the derivative claim for breach of fiduciary duty by defendants' undervaluing the real estate at 837 Second Avenue, the court is compelled to find in favor of plaintiffs. The evidence establishes that defendants owed a fiduciary duty to JOMH as its majority shareholders, and that they breached those duties by causing JOMH to charge below market rate rent of $63,233 annually. The property was appraised as commanding rental value of $223,000 annually as of November 1, 2006. (SAUF ¶ 19). In 2016, the rental value had climbed to $597,325. (Gary TA ¶ 144). The building sold for $5.9 million in 2015. (Gary TA ¶143). Therefore, plaintiffs have demonstrated that JOMH was harmed by defendants' misconduct.

### Discussion of Defendants' Defenses

Defendants have the burden to prove their defenses. (*Lion Brewery of New York City v Loughran*, 223 AD 623, 625 [1st Dept 1928]). The affirmative defenses of acquiescence, statute of limitations, and laches are intended to ensure fairness in human affairs by preventing a party from defending alleged misconduct that occurred decades earlier—here, spanning back 40 years—when the "evidence has been lost, memories have faded and witnesses have disappeared." (*Blanco v American Tel. & Tel. Co.*, 689 NE2d 506, 513 [1997]). Nevertheless, defendants have failed to satisfy their burden of demonstrating facts necessary to support their affirmative defenses.

Page 19 of 29

Statute of Limitations

The limitation period for claims of breach of fiduciary duty is six years. (CPLR
213). The 54 valid and enforceable agreements that comprise the 2007 and 2011
Licenses each fall within the six-year limitations period; they are not excepted from the
applicable limitation period by virtue of the fact that substantially similar licenses were
originally issued by JOMR to the corresponding New Palms when each establishment
first opened years earlier. As this court previously ruled, this action is timely and the
breach of fiduciary duty claims are not barred if the 2011 Licenses are valid and
enforceable. The parties have stipulated to the validity and enforceability of the 2007
and 2011 Licenses. (SAUF ¶¶ 13-15). Further, the MLA, SSP License, and TJX
License were all entered within the six-year limitation period.

The court rejects defendants' contention that each claim for the 2007 and 2011
Licenses accrued when the corresponding restaurant opened. Defendants' argue that
the claims are barred because plaintiffs cannot establish any new harm; that argument
is inapplicable and unsupported by any law authority by defendants. This court already
rejected this argument when it ruled that "if the 2010 agreements are indeed valid, then
the alleged harm results from the agreements entered into at that time, albeit it mirrors
the alleged harm resulting from the earlier agreements." (Doc 173 at 15). The
Appellate Division also rejected this argument in affirming this court's decision denying
defendants' motion to summarily dismiss the first cause of action as time-barred, and
finding that there are "triable issues relating to the harm [plaintiffs] suffered from the
allegedly improper licensing agreements . . . executed within the limitations period."
(Ganzi, 144 AD3d at 511). Thus, defendants' theory that new or incremental harm is

necessitated has been rejected by this court, and that decision affirmed on appeal, and this court will not, again, entertain the meritless argument.

Moreover, the statute of limitations "on claims against a fiduciary for breach of its duty is tolled until such time as the fiduciary openly repudiates the role." (*AccessPoint Med LLC v Mandell*, 106 AD3d 40, 45 [1st Det 2013]). Since defendants are fiduciaries of the corporation, and there is no evidence of them repudiating, the statute of limitations as to equitable relief was tolled. Such a rule reasonably rejects the idea that defendants are protected by the statute of limitations because they have been taking for themselves JOMR's corporate opportunity of a fair and reasonable rate for such a long time. Such reliance on the statute of limitations would be antithetical to equity and is inapplicable to the facts here.

Laches

Defendants assert that this action is barred by laches because plaintiffs or plaintiffs' predecessors in interest knew about the license agreements with the New Palms since 1972; thus, defendants argue that it is unfair now, after 40 years, to challenge those transactions.

Preliminarily, a laches defense is not available to a fiduciary unless the fiduciary openly repudiates the relationship. (*Matter of Barabash*, 31 NY2d 76, 82 [1972]). Defendants are fiduciaries and there is no evidence that they ever repudiated their fiduciary relationship; therefore, their laches defense applies, if at all, as a defense to only plaintiffs' fourth cause of action alleging diversion of corporate opportunity.

To establish a valid defense of laches, defendants must prove that plaintiffs delayed in bringing this action subsequent to the accrual of their causes of action within

Page 21 of 29

the statutory limitations period, and that defendants were prejudiced by the delay. As to

plaintiffs who became shareholders in 2010, they could not have acted sooner,

particularly given that litigation in Surrogate's Court was necessitated to obtain

corporate information to which they were entitled. Further, the fourth cause of action for

diversion of corporate opportunities pertains to only the 2007-2008 SSP and TJX

Licenses, there is no evidence that plaintiffs or their predecessors in interest were

aware of the details of the SSP or TJX Licenses, and, therefore, defendants cannot

establish that there was delay in bringing the action after accrual of that claim.

Furthermore, the challengers must have a clear indication of the facts giving rise

to the legal action before the laches clock begins to tick. (*Weiss v Mayflower Doughnut*

*Corp.*, 1 NY2d 310, 319-20 [1956]). Here, absent any evidence that corporate

formalities were followed after 1984, the court cannot find what JOMR or its

shareholders knew or did not know; rather, the lack of defendants' compliance with

corporate formalities at the relevant time demonstrates that JOMR's shareholders were

effectively denied knowledge and input as to JOMR's business. (*See Tierno v Puglisi*,

279 AD2d 836, 839 [3d Dept 2001]). In fact, defendants testified that they did not know

that JOMR owned the Palm IP prior to this litigation. (Bruce Tr 561-563).

Defendants' evidence that Charlie was aware of the licensing agreements for

New Palms in 1989 is inapplicable, as Charlie did not become a JOMR shareholder until

1995, at the age of 80. Even if he did, acquiesce to, or ratify, defendants' self-dealing

license agreements, that acquiescence does not extinguish the rights of other

shareholders who are not precluded by that acquiescence—i.e., Cook's Estate and its

predecessors in interest. (*Diamond v Diamond*, 307 NY 263, 266 [1954]). Thus, the

Page 22 of 29

22 of 29

court rejects defendants' laches contentions as to JOMR and JOMH, and, for the same reasons: though Charlie was a JOMH shareholder beginning in 1972, and he was aware of the JOMH rental agreements, his ratification of rental rates does not bar these claims.[16] (Gary TA ¶81).

Defendants have also failed to establish they sustained any unfair prejudice from a delay in commencing this action. The court rejects defendants' assertion that they would have acted differently if the family had objected, and that they are harmed in that the family shareholders of past are no longer alive to testify as to their consent to the license arrangements. None of defendants' uncorroborated testimony is adequate to establish prejudice that would support their defenses, and the court does not find prejudice on the basis of defendants' unreliable conjecture as to how they would have acted if things were different. (*See Tri-State Environmental Contracting, Inc. v M.H. Kane Const., Inc.*, 25 AD3d 436, 437 [1st Dept 2006]). Further, defendants were not materially or meaningfully prejudiced by the dead man's statute. *(Harley Davidson, Inc. v O'Connell*, 13 F Supp 2d 271, 282 [ND NY 1998]). Indeed, they benefitted greatly from the ancient document rule which permitted them to enter hundreds of pages of Charlie's documents, and which opened the door to testimony as to Charlie's statements. (Victor TA ¶23-26; tr 961, 963-964). Finally, defendants "cannot credibly claim that [they] suffered inequity" where all evidence demonstrates that they

---

[16] The court rejects defendants' assertion that other family members, including Adele, Lorraine, and Cook, could divine the $6,000 license fee from K-1 tax forms. In any event, those license fees are not at issue in the fourth cause of action for corporate diversion. Accordingly, the court can make no determination that full knowledge of all relevant facts was had by each of plaintiffs' predecessors in interest.

"indisputably profited enormously from [the] purported" improper conduct. (*Explorers Club, Inc. v Diageo PLC*, 45 Misc 3d 434, 440-441 [Sup Ct, NY County 2014]). Here, defendants were not harmed; rather, their businesses were engorged with millions of dollars of additional revenue at JOMR's expense for 40 years.

Acquiescence, Implied Ratification, and Equitable Estoppel

Acquiescence is a defense to torts, including business torts; the principal takes two forms: implied ratification (PJI 4:15) and equitable estoppel. In either form, the acquiescence of a shareholder's predecessor-in-interest may be binding on that shareholder's successors. (*Bangor Punta Operations, Inc. v Bangor & A.R. Co.*, 417 US 703, 710 [1974]). Acquiescence is particularly applicable to a close corporation, as opposed to a publicly-traded corporation, as there is an expectation to object affirmatively to an improper action. (*Pinnacle Consultants v Leucadia Nat'l Corp.*, 94 NY2d 426, 433 [2000]). Nevertheless, acquiescence in any form is not a defense to the breach of fiduciary duty claims alleged here. (*See Petrella v Metro-Goldwyn-Mayer, Inc.*, 572 US 663, 675 [2014]). Defendants reliance on *Sakow v 633 Seafood Restaurant, Inc.* (25 AD3d 418 [1st Dept 2006]) is misplaced. In *Sakow*, the shareholder-plaintiff objected to the board's decision to increase board member compensation; however, that case was a derivative action raised after the challenged board action occurred—that is, outside of the statute of limitations—and the relief sought was equitable (accounting claim), not legal. In any event, corporate waste, a wrong to the company, as established here, repeatedly, cannot be ratified. (*Aronoff v Albanese*, 85 AD2d 3, 4 [2d Dept 1982]).

Further, while defendants have not even established the facts to demonstrate a

Page 24 of 29

valid implied ratification defense, that defense is totally inapplicable here in the absence of evidence that plaintiffs or their predecessors in interest had sufficient knowledge of the transactions at issue—that is, the 2007 and 2011 Licenses being issued, the MLA, or the SSP and TJX Licenses, or the rental agreements during the limitation period. Likewise, without evidence that plaintiffs' predecessors knew of the particular transactions, estoppel is inapplicable here. A party may be found to have acquiesced to a matter when she remained silent despite the opportunity and duty to act; however, "[t]he duty to speak is not necessarily a legal obligation to do so but it is founded upon a sense of justice and fair play invoked by the Courts to compel a man to act when in all good conscience an honest man would have acted." (*Simmons v Westwood Apartments Co.*, 46 Misc 2d 1093, 1096-1096 [Sup Ct, Onondaga County 1965]).

Charlie, a minority shareholder and predecessor-in-interest, first obtained standing to object to any JOMR agreements in 1995 when he became a shareholder; accordingly, Charlie's actions or inactions in 1986 and 1991 are immaterial. The court also, again, rejects defendants' legally-unsupported contention that Charlie's knowledge can be imputed to Adele and Lorraine because he prepared their taxes.

While the court does find that Charlie did ratify JOMH's below market rate rent prices in that Charlie was a JOMH shareholder in 1996, 2001, and 2006 when he clearly advocated for the below market rate rent prices. (DX 155, 159-161; *see also* DX 99), that ratification does not suffice because, for ratification to bar a derivative action, the ratification must be unanimous. (*See Capital Wine & Spirit Corp v Pokrass*, 277 AD 184, 188 [1st Dept 1950]). There is no evidence of unanimous ratification among plaintiffs or their predecessors-in-interest at any relevant time as to either JOMH or

Page 25 of 29

JOMR business decisions.

## Remedies

JOMR and JOMH are entitled to amounts by which defendants were enriched at the expense of the corporations as follows:

As to the 2007 Licenses and 2011 Licenses (54 license agreements in total), JOMR is entitled to a royalty rate of 5%. (O'Neill TA ¶ 13). Professor David Franklyn, a recognized authority on trademark issues, opined using a weighted average that 5% is the appropriate royalty rate. (*See also* Battersby on Licensing Royalty Rate, DX 120 and 178). This rate is also supported by the SSP License for the JFK Palm.

Pamela O'Neill, an experienced valuation authority, corroborated that 5% is the correct royalty rate. (O'Neill TA ¶ 13). O'Neill's evidentiary basis for that valuation is defendants' own presentations to bankers and public filings. (O"Neill Appendix B). She also compared the Palm IP to other relevant brands. She performed several relief from royalty analyses to determine the implied royalty rate which yields the cost savings of relief from paying royalty payments. (O'Neill TA ¶ 30-31). Her testimony was credible, comparisons are valid and her assumptions and conclusions supported. Therefore, the court adopts the valuation as set forth in the O'Neill Report and trial affidavit and testimony. (*See generally,* O'Neill Report and TA).

The court declines to rely on Christopher Bokhart's unsupported calculations. Aside from mathematical errors identified by O'Neill, Bokhart's assumptions as to revenue, discount rate, and growth were unsupported. (O'Neill TA ¶¶ 42, 44). For example, the 20% growth rate used for five years fails to recognize that the recession in 2007 and 2008. Further, he used a discount rate for the entire company instead of one

Page 26 of 29

for intangible assets, failed to adjust for geographic issues such as that there are several Palm-branded restaurants in the New York area, and adjusted Ruth's Chris's rate without an analysis of the services Ruth's Chris provides to franchisees.

The court declines to rely on Scott Roehr's analysis which, as Roehr himself admits, is novel and "unique." (Tr 752:260-753:4; 753:26-754:6). The court observed that during his testimony, he appeared confused by O'Neill's chart C5a. (Id.). Roehr admittedly failed to consider that JOMR is an S corporation. (Tr 774:15).

Based on the plaintiffs' experts' evaluations, the court finds that JOMR is entitled to $68,158,000 for the damages arising from the New Palm royalties plus interest. (See O'Neill TA Ex C-1).[17]

As to the MLA, PMC usurped JOMR's corporate opportunity to do business with SSP and TJX yielding a loss of $3,146,995. (O'Neill TA Ex C-1). JOMR is entitled to the income since both deals were made within the limitations period beginning in 2006, less any brokerage fee to which PMC would be entitled for arranging the deal, and less the annual $12,000 paid to JOMR. O'Neill opines based on her discussion with a brand licensing agency that JOMR would be entitled to 75% of the SSP and TJX proceeds. Effectively, PMC would take a 25% brokerage fee. This estimated fee is consistent with the 8 to 12% brokerage fee PMC paid to Sela Sales Ltd. for introducing and negotiating the deals.[18] (Gary TA ¶30 and DX 111). Plaintiffs shall have judgment for $3,146,995 plus interest.

---

[17]O'Neill prepared C1 using audited statements for 2006 to 2014. She estimated 2015 to 2017 since audited financial were not provided. (O'Neill March 7, 2014 Report and Ex C-13). There is no factual basis to question these historically based estimates.

[18]Effectively, PMC would receive a 13% brokerage fee if Sela's 12% is subtracted from the proposed 25% fee.

As to below market rents, JOMH is entitled to $1,742,000 in damages representing lost rent from November 1, 2006 to the date of the sale of the building with interest. (O'Neill TA ¶¶ 37-38 and Ex C-10). Regardless of whether Charlie acquiesced in the low market rent, thus barring Charlie or his progeny from initiating legal action as to those claims, Cook's Estate certainly had no such legal bar from initiating this action.

After the sale of the building for $5.9 million, defendants paid JOMR $780,000 for loss of its under market lease caused by the sale. (Gary TA ¶151). Plaintiffs are entitled to their share of the proceeds from JOMH's sale of the building.

The 2007 and 2011 Licenses here are clearly impermissible self-interested transactions. Self-interested transactions by corporate fiduciaries are void unless ratified by vote of the disinterested directors or shareholders, or demonstrated by the proponents of that transaction to be entirely fair and reasonable to the corporation. (BCL § 713). For the reasons stated above, plaintiffs have established that the 54 agreements comprising the 2007 and 2011 Licenses were not ratified by disinterested directors or shareholders, and defendants failed to establish that they are fair or reasonable. Accordingly, the court declares that the 2007 and 2011 Licenses between · JOMR and the New Palms are void.

Likewise, the court grants plaintiffs' request for an injunction prohibiting defendants from continuing to harm JOMR with below market licenses for the use of Palm IP.

While PMC has paid defendants' legal fees of approximately $ ]million, PMC has charged JOMR and JOMH creating a liability on their books and records. No legal basis has been provided to the court to support payment of defendants' legal bills by JOMR or JOMH. Having found that defendants breached their fiduciary duties to JOMR

and JOMH, defendants shall credit JOMR and JOMH, accordingly.

Pursuant to BCL § 626 (e), plaintiffs are entitled to attorneys' fees. Within 60 days, plaintiffs shall submit an affidavit of services including resumes detailing experience and training to justify hourly rates, invoices, and time sheets. Otherwise, waived. Defendants may object within 30 days thereafter. Otherwise, waived.

Plaintiffs shall submit a judgment including proposed interest calculations on notice within 30 days to the Part Clerk for Part 48 in Courtroom 242.

DATED: November 13, 2018

ENTER:

ANDREA MASLEY, J.S.C.

**HON. ANDREA MASLEY**
**J.S.C.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GARY GANZI, CLAIRE BREEN, and
GARY GANZI and CLAIRE BREEN, as Attorneys-
in-Fact for the ESTATE OF CHARLES COOK,
Individually and Derivatively on Behalf of Nominal
Defendants JUST ONE MORE RESTAURANT
CORPORATION and JUST ONE MORE HOLDING
CORPORATION,

                        Plaintiffs,

- against -

WALTER GANZI, JR. and BRUCE BOZZI, SR.,

                        Defendants,

and

JUST ONE MORE RESTAURANT
CORPORATION, a New York corporation, and JUST
ONE MORE HOLDING CORPORATION, a New
York corporation,
                        Nominal Defendants.

Index No. 653074/2012

~~PROPOSED~~ JUDGMENT  1/25/19

WHEREAS, Justice Andrea Masley, Justice of the Supreme Court, Commercial Division, of the State of New York, County of New York, issued a Decision After Non-Jury Trial on November 13, 2018 (the "Decision"), which was entered in the Office of the New York County Clerk on November 15, 2018, providing for certain remedies;

1.    NOW, THEREFORE, IT IS HEREBY ADJUDGED AND ~~DECREED~~ ORDERED that Nominal Defendant Just One More Restaurant Corporation ("JOMR"), having an address at 1730 Rhode Island Avenue, NW, Suite 900, Washington, DC 20036, shall have judgment against Defendant Walter Ganzi, Jr., having an address at 8171 Bay Colony Drive, #1902, Naples, Florida 34108, and Bruce Bozzi, Sr., having an address at 2161 Gulf of Mexico Drive, Apt. 3B-1, Longboat Key, Florida 34228, jointly and severally, in the amount of $68,158,000.00, with

1  /5

FILED: NEW YORK COUNTY CLERK 01/28/2019 03:04 PM
NYSCEF DOC. NO. 264

INDEX NO. 653074/2012

Case 9:19-bk-01947-FMD   Doc 161   Filed 06/28/19   Page 51 of 121

653074/12

RECEIVED NYSCEF: 01/28/2019

a. pre-verdict interest through November 13, 2018, at the legal rate of 9% per annum, in the amount of $41,031,115.64, and

b. interest from verdict to judgment, in the amount of $16,806.09, per diem,

for a total amount of $_____, and that JOMR have execution therefor; and it is further

2. ADJUDGED AND ~~DECREED~~ *Ordered* that JOMR shall have judgment against Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., jointly and severally, in the amount of $3,146,995.00, with

a. pre-verdict interest through November 13, 2018, at the legal rate of 9% per annum, in the amount of $1,505,724.06, and

b. interest from verdict to judgment, in the amount of $775.97, per diem,

for a total amount of $_____, and that JOMR have execution therefor; and it is further

3. ADJUDGED AND ~~DECREED~~ *Ordered* that Just One More Holding Corporation ("JOMH"), having an address at 1730 Rhode Island Avenue, NW, Suite 900, Washington, DC 20036, shall have judgment against Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., jointly and severally, in the amount of $1,742,000.00, with

a. pre-verdict interest through November 13, 2018, at the legal rate of 9% per annum, in the amount of $1,177,002.61, and

b. interest from verdict to judgment, in the amount of $429.53, per diem,

for a total amount of $_____, and that JOMR have execution therefor; and it is further

2

4. ADJUDGED AND ~~DECREED~~ *Ordered)* that Plaintiffs Gary Ganzi, having an address at 74 Valleyfield St., Lexington, MA 02421, Claire Breen, having an address at 7 Ryan Street, Syosset, New York 11791, and the Estate of Charles Cook, care of Meredithe Shields, having an address at 58 Bluestone Court, Kingston, New York 12401, shall have judgment against Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., jointly and severally, in the amount of $496,567.00, with

    a. pre-verdict interest through November 13, 2018, at the legal rate of 9% per annum, in the amount of $143,623.50, and

    b. interest from verdict to judgment, per diem, in the amount of $122.44,

for a total amount of $_____, and that JOMR have execution therefor; and it is further

~~5. ADJUDGED AND DECREED that JOMR shall hereafter receive a royalty rate of 5% of gross revenues for licensing of the Palm IP, as defined in the Decision, from any entity owned in whole or in part or operated or controlled by Defendant Walter Ganzi, Jr. or Bruce Bozzi, Sr., or their successors, heirs, or assigns; and it is further~~

~~6. ADJUDGED AND DECREED that JOMR is enjoined and prohibited from entering into or accepting any agreement to license the Palm IP for a royalty of less than 5% of licensee's gross revenues, absent the consent of all Plaintiffs, or their successors, heirs, or assigns; and it is further~~

7. ADJUDGED AND ~~DECREED~~ *Declared)* that the 2007 and 2011 Licenses, as defined in the Decision, between JOMR and the New Palms, as defined in the Decision, are void; and it is further *and MZA*

8. ADJUDGED AND ~~DECREED~~ *Declare* that Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., or their successors, heirs, or assigns are prohibited from continuing to harm JOMR with below-market licenses for the use of Palm IP; and it is further

9. ADJUDGED AND DECREED that JOMR shall hereafter receive 75% of the gross revenues of all licensing of the Palm IP brokered and/or managed by Defendants Walter Ganzi, Jr. or Bruce Bozzi, Sr., or their successors, heirs, or assigns; or by Palm Management Corporation, Palm Airport LLC, or any other entity owned, controlled, or operated by Defendants Walter Ganzi, Jr. or Bruce Bozzi, Sr., or their successors, heirs, or assigns; and it is further

10. ADJUDGED AND ~~DECREED~~ *Declare* that Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr. shall credit JOMR and JOMH for the legal fees of Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr. that were charged as a liability on the books and records of JOMR and JOMH.

11. Attorneys' fees and expenses are addressed in a separate application, pursuant to Justice Masley's Decision after Non-Jury Trial.

Dated: New York, New York
~~December~~ ____, 2019

Andrea Masley, J.S.C.

4

11.

**ORDERED that that portion of the plaintiff's action that seeks the recovery of attorneys' fees is severed and the issue of the amount of reasonable attorney's fees plaintiff may recover against the defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr., the issue of attorneys' fees shall be determined by the court and is scheduled for a hearing on January 31, 2019 at 10 a.m.; and it is further**

Dated: 1/25/19

ENTER:

J.S.C.

HON. ANDREA MASLEY
J.S.C.

* See annexed 13 page Chart for calculation.

5/5

FILED: NEW YORK COUNTY CLERK 01/28/2019 03:04 PM
NYSCEF DOC. NO. 272
INDEX NO. 653074/2012
RECEIVED NYSCEF: 01/28/2019

**CONCLUSION**

**TOTAL DAMAGE AWARD AND INTERST**

| | Total Lost Royalty Cash Flows | Lost Palm Royalties | Lost Master License Royalties | Lost Rental Cash Flows | Interest | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total Lost Royalty Cash Flows | Lost Palm Royalties | Lost Master License Royalties | Lost Rental Cash Flows |
| 2006 | $2,390,236.69 | | | 56,518.15 | $2,580,254.75 | $2,580,254.75 | $0.00 | $61,011.28 |
| 2007 | $6,914,513.50 | | | 176,247.80 | $7,049,329.06 | $7,049,329.06 | $0.00 | $179,684.40 |
| 2008 | $6,482,517.91 | | $269,250.00 | 185,347.57 | $6,025,483.64 | $5,775,215.82 | $250,267.82 | $172,280.49 |
| 2009 | $5,738,146.05 | | $72,035.00 | 184,352.81 | $4,817,159.78 | $4,756,686.86 | $60,472.92 | $154,764.16 |
| 2010 | $6,006,563.56 | | $219,182.00 | 188,313.84 | $4,501,904.70 | $4,337,627.84 | $164,276.86 | $141,140.37 |
| 2011 | $6,520,811.69 | | $252,573.00 | 196,362.87 | $4,300,459.20 | $4,133,887.72 | $166,571.48 | $129,500.68 |
| 2012 | $6,523,337.68 | | $479,415.00 | 201,814.53 | $3,715,024.30 | $3,441,998.85 | $273,025.45 | $114,932.95 |
| 2013 | $6,686,734.77 | | $363,506.00 | 205,789.56 | $3,206,272.56 | $3,031,972.02 | $174,300.54 | $98,675.48 |
| 2014 | $6,498,350.82 | | $492,062.00 | 210,093.50 | $2,531,091.34 | $2,339,434.16 | $191,657.18 | $81,830.82 |
| 2015 | $6,409,234.32 | | $428,252.00 | 137,159.38 | $1,919,549.76 | $1,791,289.35 | $128,260.41 | $43,181.98 |
| 2016 | $5,881,820.25 | | $301,487.00 | | $1,232,226.60 | $1,169,065.90 | $63,160.70 | $0.00 |
| 2017 | $5,252,727.75 | | $269,233.00 | | $658,084.01 | $624,353.31 | $33,730.70 | $0.00 |
| | $71,304,994.99 | | $3,146,995.00 | $1,742,000.01 | $42,536,839.70 | $41,031,115.64 | $1,505,724.06 | $1,177,002.61 |
| Rounded | $71,304,995.00 | $68,158,000.00 | | $1,742,000.00 | | | | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

**INTEREST CALCULATION 62**
**2006 SUPPORTING SCHEDULE - CASH FLOWS**

### TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 12 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| | $2,390,236.69 | | | | |
| 9/30/2006 | $597,559.17 | $53,780.33 | $645,363.96 | $6,422.27 | $651,786.23 |
| 10/31/2006 | $597,559.17 | $53,780.33 | $645,363.96 | $1,940.57 | $647,304.53 |
| | | | Interest [Years] 11 | | |
| 11/30/2006 | $597,559.17 | $53,780.33 | $591,583.63 | $51,239.21 | $642,822.84 |
| 12/31/2006 | $597,559.17 | $53,780.33 | $591,583.63 | $46,757.52 | $638,341.15 |
| Total | | | | | $2,580,254.75 |

### MASTER LICENSE CASH FLOWS

| Master License Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 12 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|
| $0.00 | | | | |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | Interest [Years] 11 | | |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | $0.00 |

### RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] 12 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| | $56,518.15 | | | | |
| 9/30/2006 | $14,129.54 | $1,271.66 | $15,259.92 | $151.86 | $15,411.78 |
| 10/31/2006 | $14,129.54 | $1,271.66 | $15,259.92 | $45.89 | $15,305.81 |
| | | | Interest [Years] 11 | | |
| 11/30/2006 | $14,129.54 | $1,271.66 | $13,988.26 | $1,211.57 | $15,199.83 |
| 12/31/2006 | $14,129.54 | $1,271.66 | $13,988.26 | $1,105.60 | $15,093.86 |
| Total | | | | | $61,011.28 |

### [Months] Stub Calc

| [Months] Stub Calc |
|---|
| 9.433 |
| 8.433 |
| 7.433 |
| 6.433 |
| 5.433 |
| 4.433 |
| 3.433 |
| 2.433 |
| 1.433 |
| 0.433 |
| 11.433 |
| 10.433 |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

RECEIVED NYSCEF: 12/14/20...

**2007 SUPPORTING SCHEDULE - CASH FLOWS**

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $6,914,513.50 | Annual Interest Paid 9.0% | Interest [Years] 11 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $40,765.38 | $611,212.73 | 9.433 |
| 2/28/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $36,443.81 | $606,891.16 | 8.433 |
| 3/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $32,122.24 | $602,569.59 | 7.433 |
| 4/30/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $27,800.67 | $598,248.02 | 6.433 |
| 5/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $23,479.09 | $593,926.44 | 5.433 |
| 6/30/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $19,157.52 | $589,604.87 | 4.433 |
| 7/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $14,835.95 | $585,283.30 | 3.433 |
| 8/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $10,514.38 | $580,961.73 | 2.433 |
| 9/30/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $6,192.81 | $576,640.16 | 1.433 |
| 10/31/2007 | $576,209.46 | $51,858.85 | $570,447.35 | $1,871.24 | $572,318.59 | 0.433 |
| | | | Interest [Years] 10 | | | |
| 11/30/2007 | $576,209.46 | $51,858.85 | $518,588.50 | $49,408.52 | $567,997.02 | 11.433 |
| 12/31/2007 | $576,209.46 | $51,858.85 | $518,588.50 | $45,086.95 | $563,675.45 | 10.433 |
| Total | | | | | $7,049,329.06 | |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows $0.00 | Annual Interest Paid 9.0% | Interest [Years] 11 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 9.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 8.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 7.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 6.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 5.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 4.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 3.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 2.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 1.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.433 |
| | | Interest [Years] 10 | | | |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 11.433 |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 10.433 |
| | | | | $0.00 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow 176,247.80 | Annual Interest Paid 9.0% | Interest [Years] 11 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $1,039.09 | $15,579.55 | 9.433 |
| 2/28/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $928.94 | $15,469.40 | 8.433 |
| 3/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $818.78 | $15,359.24 | 7.433 |
| 4/30/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $708.63 | $15,249.09 | 6.433 |
| 5/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $598.47 | $15,138.93 | 5.433 |
| 6/30/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $488.32 | $15,028.78 | 4.433 |
| 7/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $378.16 | $14,918.62 | 3.433 |
| 8/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $268.01 | $14,808.47 | 2.433 |
| 9/30/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $157.85 | $14,698.31 | 1.433 |
| 10/31/2007 | $14,687.32 | $1,321.86 | $14,540.46 | $47.70 | $14,588.16 | 0.433 |
| | | | Interest [Years] 10 | | | |
| 11/30/2007 | $14,687.32 | $1,321.86 | $13,218.60 | $1,259.40 | $14,478.00 | 11.433 |
| 12/31/2007 | $14,687.32 | $1,321.86 | $13,218.60 | $1,149.25 | $14,367.85 | 10.433 |
| Total | | | | | $179,684.40 | |

DRAFT-SUBJECT TO CHANGE, CONFIDENTIAL

3/13

INTEREST CALCULATION 62
2008 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows [$6,482,517.91] | Annual Interest Paid 9.0% | Interest [Years] 10 | Sub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $38,218.49 | $524,407.29 | 9.433 |
| 2/28/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $34,166.92 | $520,355.72 | 8.433 |
| 3/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $30,115.34 | $516,304.14 | 7.433 |
| 4/29/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $26,063.77 | $512,252.57 | 6.433 |
| 5/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $22,012.20 | $508,201.00 | 5.433 |
| 6/29/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $17,960.62 | $504,149.42 | 4.433 |
| 7/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $13,909.05 | $500,097.85 | 3.433 |
| 8/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $9,857.48 | $496,046.28 | 2.433 |
| 9/29/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $5,805.90 | $491,994.70 | 1.433 |
| 10/30/2008 | $540,209.83 | $48,618.88 | $486,188.80 | $1,754.33 | $487,943.13 | 0.433 |
| | | | Interest [Years] 9 | | | |
| 11/29/2008 | $540,209.83 | $48,618.88 | $417,569.92 | $46,321.64 | $483,891.56 | 11.433 |
| 12/30/2008 | $540,209.83 | $48,618.88 | $417,569.92 | $42,270.06 | $479,830.08 | 10.433 |
| Total | | | | | $6,025,483.64 | |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows $269,250.00 | Annual Interest Paid 9.0% | Interest [Years] 10 | Sub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $22,437.50 | $2,019.38 | $20,193.80 | $1,587.40 | $21,781.20 | 9.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $1,419.12 | $21,612.92 | 8.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $1,250.84 | $21,444.64 | 7.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $1,082.56 | $21,276.36 | 6.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $914.27 | $21,108.07 | 5.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $745.99 | $20,939.79 | 4.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $577.71 | $20,771.51 | 3.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $409.43 | $20,603.23 | 2.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $241.15 | $20,434.95 | 1.433 |
| $22,437.50 | $2,019.38 | $20,193.80 | $72.87 | $20,266.67 | 0.433 |
| | | Interest [Years] 9 | | | |
| $22,437.50 | $2,019.38 | $18,174.42 | $1,923.96 | $20,098.38 | 11.433 |
| $22,437.50 | $2,019.38 | $18,174.42 | $1,755.68 | $19,930.10 | 10.433 |
| | | | | $250,267.82 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow 185,347.57 | Annual Interest Paid 9.0% | Interest [Years] 10 | Sub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $1,092.74 | $14,993.84 | 9.433 |
| 2/28/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $976.90 | $14,878.00 | 8.433 |
| 3/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $861.06 | $14,762.16 | 7.433 |
| 4/29/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $745.21 | $14,646.31 | 6.433 |
| 5/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $629.37 | $14,530.47 | 5.433 |
| 6/29/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $513.53 | $14,414.63 | 4.433 |
| 7/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $397.69 | $14,298.79 | 3.433 |
| 8/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $281.84 | $14,182.94 | 2.433 |
| 9/29/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $166.00 | $14,067.10 | 1.433 |
| 10/30/2008 | $15,445.63 | $1,390.11 | $13,901.10 | $50.16 | $13,951.26 | 0.433 |
| | | | Interest [Years] 9 | | | |
| 11/29/2008 | $15,445.63 | $1,390.11 | $12,510.99 | $1,324.43 | $13,835.42 | 11.433 |
| 12/30/2008 | $15,445.63 | $1,390.11 | $12,510.99 | $1,208.58 | $13,719.57 | 10.433 |
| Total | | | | | $172,280.49 | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

2009 SUPPORTING SCHEDULE - CASH FLOWS

### TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $5,738,146.05 | Annual Interest Paid 9.0% | Interest [Years] 9 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $33,829.96 | $421,154.86 | 9.433 |
| 2/28/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $30,243.62 | $417,568.52 | 8.433 |
| 3/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $26,657.28 | $413,982.18 | 7.433 |
| 4/30/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $23,070.94 | $410,395.84 | 6.433 |
| 5/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $19,484.59 | $406,809.40 | 5.433 |
| 6/30/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $15,898.25 | $403,223.15 | 4.433 |
| 7/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $12,311.91 | $399,636.81 | 3.433 |
| 8/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $8,725.57 | $396,050.47 | 2.433 |
| 9/30/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $5,139.23 | $392,464.13 | 1.433 |
| 10/31/2009 | $478,178.84 | $43,036.10 | $387,324.90 | $1,552.89 | $388,877.70 | 0.433 |
| | | | Interest [Years] 8 | | | |
| 11/30/2009 | $478,178.84 | $43,036.10 | $344,288.80 | $41,002.64 | $385,291.44 | 11.433 |
| 12/31/2009 | $478,178.84 | $43,036.10 | $344,288.80 | $37,416.30 | $381,705.10 | 10.433 |
| Total | | | | | $4,817,159.78 | |

### MASTER LICENSE CASH FLOWS

| Master License Cash Flows $72,035.00 | Annual Interest Paid 9.0% | Interest [Years] 9 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $6,002.92 | $540.26 | $4,862.34 | $424.69 | $5,287.03 | 9.433 |
| $6,002.92 | $540.26 | $4,862.34 | $379.67 | $5,242.01 | 8.433 |
| $6,002.92 | $540.26 | $4,862.34 | $334.65 | $5,196.99 | 7.433 |
| $6,002.92 | $540.26 | $4,862.34 | $289.62 | $5,151.96 | 6.433 |
| $6,002.92 | $540.26 | $4,862.34 | $244.60 | $5,106.94 | 5.433 |
| $6,002.92 | $540.26 | $4,862.34 | $199.58 | $5,061.92 | 4.433 |
| $6,002.92 | $540.26 | $4,862.34 | $154.56 | $5,016.90 | 3.433 |
| $6,002.92 | $540.26 | $4,862.34 | $109.54 | $4,971.88 | 2.433 |
| $6,002.92 | $540.26 | $4,862.34 | $64.52 | $4,926.86 | 1.433 |
| $6,002.92 | $540.26 | $4,862.34 | $19.49 | $4,881.83 | 0.433 |
| | | Interest [Years] 8 | | | |
| $6,002.92 | $540.26 | $4,322.08 | $514.73 | $4,836.81 | 11.433 |
| $6,002.92 | $540.26 | $4,322.08 | $469.71 | $4,791.79 | 10.433 |
| | | | | $60,472.92 | |

### RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow 184,352.81 | Annual Interest Paid 9.0% | Interest [Years] 9 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $1,086.88 | $13,530.73 | 9.433 |
| 2/28/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $971.66 | $13,415.51 | 8.433 |
| 3/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $856.44 | $13,300.29 | 7.433 |
| 4/30/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $741.22 | $13,185.07 | 6.433 |
| 5/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $625.99 | $13,069.84 | 5.433 |
| 6/30/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $510.77 | $12,954.62 | 4.433 |
| 7/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $395.55 | $12,839.40 | 3.433 |
| 8/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $280.33 | $12,724.18 | 2.433 |
| 9/30/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $165.11 | $12,608.96 | 1.433 |
| 10/31/2009 | $15,362.73 | $1,382.65 | $12,443.85 | $49.89 | $12,493.74 | 0.433 |
| | | | Interest [Years] 8 | | | |
| 11/30/2009 | $15,362.73 | $1,382.65 | $11,061.20 | $1,317.32 | $12,378.52 | 11.433 |
| 12/31/2009 | $15,362.73 | $1,382.65 | $11,061.20 | $1,202.10 | $12,263.30 | 10.433 |
| Total | | | | | $154,764.16 | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

**FILED: NEW YORK COUNTY CLERK 01/28/2019 03:04 PM**  INDEX NO. 653074/2012

NYSCEF DOC. NO. 262   Case 9:19-bk-01947-FMD   Doc 161   Filed 06/28/19   Page 60 of 121   RECEIVED NYSCEF: 12/14/2... / NYSCEF: 01/28/2019

2010 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $6,006,563.56 | Annual Interest Paid 9.0% | Interest [Years] 8 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $35,412.45 | $395,806.29 | 9.433 |
| 2/28/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $31,658.35 | $392,052.19 | 8.433 |
| 3/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $27,904.24 | $388,298.08 | 7.433 |
| 4/30/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $24,150.14 | $384,543.98 | 6.433 |
| 5/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $20,396.04 | $380,789.88 | 5.433 |
| 6/30/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $16,641.94 | $377,035.78 | 4.433 |
| 7/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $12,887.83 | $373,281.67 | 3.433 |
| 8/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $9,133.73 | $369,527.57 | 2.433 |
| 9/30/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $5,379.63 | $365,773.47 | 1.433 |
| 10/31/2010 | $500,546.96 | $45,049.23 | $360,393.84 | $1,625.53 | $362,019.37 | 0.433 |
| | | | Interest [Years] 7 | | | |
| 11/30/2010 | $500,546.96 | $45,049.23 | $315,344.61 | $42,920.65 | $358,265.26 | 11.433 |
| 12/31/2010 | $500,546.96 | $45,049.23 | $315,344.61 | $39,166.55 | $354,511.16 | 10.433 |
| Total | | | | | $4,501,904.70 | |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows $219,182.00 | Annual Interest Paid 9.0% | Interest [Years] 8 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $18,265.17 | $1,643.87 | $13,150.96 | $1,292.22 | $14,443.18 | 9.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $1,155.23 | $14,306.19 | 8.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $1,018.24 | $14,169.20 | 7.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $881.25 | $14,032.21 | 6.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $744.26 | $13,895.22 | 5.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $607.27 | $13,758.23 | 4.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $470.28 | $13,621.24 | 3.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $333.29 | $13,484.25 | 2.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $196.31 | $13,347.27 | 1.433 |
| $18,265.17 | $1,643.87 | $13,150.96 | $59.32 | $13,210.28 | 0.433 |
| | | Interest [Years] 7 | | | |
| $18,265.17 | $1,643.87 | $11,507.09 | $1,566.20 | $13,073.29 | 11.433 |
| $18,265.17 | $1,643.87 | $11,507.09 | $1,429.21 | $12,936.30 | 10.433 |
| | | | | $164,276.86 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow $188,313.84 | Annual Interest Paid 9.0% | Interest [Years] 8 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $1,110.22 | $12,409.02 | 9.433 |
| 2/28/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $992.53 | $12,291.33 | 8.433 |
| 3/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $874.83 | $12,173.63 | 7.433 |
| 4/30/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $757.14 | $12,055.94 | 6.433 |
| 5/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $639.44 | $11,938.24 | 5.433 |
| 6/30/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $521.75 | $11,820.55 | 4.433 |
| 7/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $404.05 | $11,702.85 | 3.433 |
| 8/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $286.35 | $11,585.15 | 2.433 |
| 9/30/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $168.66 | $11,467.46 | 1.433 |
| 10/31/2010 | $15,692.82 | $1,412.35 | $11,298.80 | $50.96 | $11,349.76 | 0.433 |
| | | | Interest [Years] 7 | | | |
| 11/30/2010 | $15,692.82 | $1,412.35 | $9,886.45 | $1,345.62 | $11,232.07 | 11.433 |
| 12/31/2010 | $15,692.82 | $1,412.35 | $9,886.45 | $1,227.92 | $11,114.37 | 10.433 |
| Total | | | | | $141,140.37 | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

NYSEF DOCUMENTATION 62

**2011 SUPPORTING SCHEDULE - CASH FLOWS**

### TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $6,520,811.69 | Annual Interest Paid 9.0% | Interest [Years] 7 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $38,444.26 | $380,786.89 |
| 2/28/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $34,368.75 | $376,711.38 |
| 3/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $30,293.25 | $372,635.88 |
| 4/30/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $26,217.74 | $368,560.37 |
| 5/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $22,142.23 | $364,484.86 |
| 6/30/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $18,066.72 | $360,409.35 |
| 7/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $13,991.22 | $356,333.85 |
| 8/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $9,915.71 | $352,258.34 |
| 9/30/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $5,840.20 | $348,182.83 |
| 10/31/2011 | $543,400.97 | $48,906.09 | $342,342.63 | $1,764.69 | $344,107.32 |
| | | | **Interest [Years] 6** | | |
| 11/30/2011 | $543,400.97 | $48,906.09 | $293,436.54 | $46,595.28 | $340,031.82 |
| 12/31/2011 | $543,400.97 | $48,906.09 | $293,436.54 | $42,519.77 | $335,956.31 |
| **Total** | | | | | **$4,300,459.20** |

### MASTER LICENSE CASH FLOWS

| | Master License Cash Flows $252,573.00 | Annual Interest Paid 9.0% | Interest [Years] 7 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | $21,047.75 | $1,894.30 | $13,260.10 | $1,489.08 | $14,749.18 | 9.433 |
| | $21,047.75 | $1,894.30 | $13,260.10 | $1,331.22 | $14,591.32 | 8.433 |
| | $21,047.75 | $1,894.30 | $13,260.10 | $1,173.36 | $14,433.46 | 7.433 |
| | $21,047.75 | $1,894.30 | $13,260.10 | $1,015.50 | $14,275.60 | 6.433 |
| | $21,047.75 | $1,894.30 | $13,260.10 | $857.64 | $14,117.74 | 5.433 |
| | $21,047.75 | $1,894.30 | $13,260.10 | $699.79 | $13,959.89 | 4.433 |
| | $21,047.75 | $1,894.30 | $13,260.10 | $541.93 | $13,802.03 | 3.433 |
| | $21,047.75 | $1,894.30 | $13,260.10 | $384.07 | $13,644.17 | 2.433 |
| | $21,047.75 | $1,894.30 | $13,260.10 | $226.21 | $13,486.31 | 1.433 |
| | $21,047.75 | $1,894.30 | $13,260.10 | $68.35 | $13,328.45 | 0.433 |
| | | | **Interest [Years] 6** | | | |
| | $21,047.75 | $1,894.30 | $11,365.80 | $1,804.79 | $13,170.59 | 11.433 |
| | $21,047.75 | $1,894.30 | $11,365.80 | $1,646.94 | $13,012.74 | 10.433 |
| | | | | | **$166,571.48** | |

### RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow $96,362.87 | Annual Interest Paid 9.0% | Interest [Years] 7 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $1,157.68 | $11,466.72 |
| 2/28/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $1,034.95 | $11,343.99 |
| 3/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $912.23 | $11,221.27 |
| 4/30/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $789.50 | $11,098.54 |
| 5/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $666.77 | $10,975.81 |
| 6/30/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $544.05 | $10,853.09 |
| 7/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $421.32 | $10,730.36 |
| 8/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $298.59 | $10,607.63 |
| 9/30/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $175.87 | $10,484.91 |
| 10/31/2011 | $16,363.57 | $1,472.72 | $10,309.04 | $53.14 | $10,362.18 |
| | | | **Interest [Years] 6** | | |
| 11/30/2011 | $16,363.57 | $1,472.72 | $8,836.32 | $1,403.13 | $10,239.45 |
| 12/31/2011 | $16,363.57 | $1,472.72 | $8,836.32 | $1,280.41 | $10,116.73 |
| **Total** | | | | | **$129,500.68** |

| [Months] Stub Calc |
|---|
| 9.433 |
| 8.433 |
| 7.433 |
| 6.433 |
| 5.433 |
| 4.433 |
| 3.433 |
| 2.433 |
| 1.433 |
| 0.433 |
| 11.433 |
| 10.433 |

**DRAFT SUBJECT TO CHANGE; CONFIDENTIAL**

7/13

NJ STATISTICAL CALCULATION 62

**2012 SUPPORTING SCHEDULE - CASH FLOWS**

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $56,523,337.68 | Annual Interest Paid 9.0% | Interest [Years] 6 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $38,459.15 | $332,009.33 |
| 2/28/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $34,382.06 | $327,932.24 |
| 3/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $30,304.98 | $323,855.16 |
| 4/29/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $26,227.89 | $319,778.07 |
| 5/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $22,150.81 | $315,700.99 |
| 6/29/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $18,073.72 | $311,623.90 |
| 7/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $13,996.64 | $307,546.82 |
| 8/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $9,919.55 | $303,469.73 |
| 9/29/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $5,842.46 | $299,392.64 |
| 10/30/2012 | $543,611.47 | $48,925.03 | $293,550.18 | $1,765.38 | $295,315.56 |
|  |  |  | Interest [Years] 5 |  |  |
| 11/29/2012 | $543,611.47 | $48,925.03 | $244,625.15 | $46,611.32 | $291,236.47 |
| 12/30/2012 | $543,611.47 | $48,925.03 | $244,625.15 | $42,536.24 | $287,161.39 |
| Total |  |  |  |  | $3,715,024.30 |

## MASTER LICENSE CASH FLOWS

| [Months] Stub Calc | Master License Cash Flows $479,415.00 | Annual Interest Paid 9.0% | Interest [Years] 6 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 9.433 | $39,951.25 | $3,595.61 | $21,573.66 | $2,826.45 | $24,400.11 |
| 8.433 | $39,951.25 | $3,595.61 | $21,573.66 | $2,526.81 | $24,100.47 |
| 7.433 | $39,951.25 | $3,595.61 | $21,573.66 | $2,227.18 | $23,800.84 |
| 6.433 | $39,951.25 | $3,595.61 | $21,573.66 | $1,927.55 | $23,501.21 |
| 5.433 | $39,951.25 | $3,595.61 | $21,573.66 | $1,627.91 | $23,201.57 |
| 4.433 | $39,951.25 | $3,595.61 | $21,573.66 | $1,328.28 | $22,901.94 |
| 3.433 | $39,951.25 | $3,595.61 | $21,573.66 | $1,028.64 | $22,602.10 |
| 2.433 | $39,951.25 | $3,595.61 | $21,573.66 | $729.01 | $22,302.67 |
| 1.433 | $39,951.25 | $3,595.61 | $21,573.66 | $429.38 | $22,003.04 |
| 0.433 | $39,951.25 | $3,595.61 | $21,573.66 | $129.74 | $21,703.40 |
|  |  |  | Interest [Years] 5 |  |  |
| 11.433 | $39,951.25 | $3,595.61 | $17,978.05 | $1,425.72 | $21,403.77 |
| 10.433 | $39,951.25 | $3,595.61 | $17,978.05 | $1,126.08 | $21,104.13 |
|  |  |  |  |  | $273,025.45 |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow $201,814.53 | Annual Interest Paid 9.0% | Interest [Years] 6 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $1,189.82 | $10,271.48 |
| 2/28/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $1,063.69 | $10,145.35 |
| 3/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $937.56 | $10,019.22 |
| 4/29/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $811.42 | $9,893.08 |
| 5/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $685.29 | $9,766.95 |
| 6/29/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $559.15 | $9,640.81 |
| 7/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $433.02 | $9,514.68 |
| 8/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $306.88 | $9,388.54 |
| 9/29/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $180.75 | $9,262.41 |
| 10/30/2012 | $16,817.88 | $1,513.61 | $9,081.66 | $54.62 | $9,136.28 |
|  |  |  | Interest [Years] 5 |  |  |
| 11/29/2012 | $16,817.88 | $1,513.61 | $7,568.05 | $1,442.09 | $9,010.14 |
| 12/30/2012 | $16,817.88 | $1,513.61 | $7,568.05 | $1,315.96 | $8,884.01 |
| Total |  |  |  |  | $114,932.95 |

## [Months] Stub Calc (Rental)

| [Months] Stub Calc |
|---|
| 9.433 |
| 8.433 |
| 7.433 |
| 6.433 |
| 5.433 |
| 4.433 |
| 3.433 |
| 2.433 |
| 1.433 |
| 0.433 |
| 11.433 |
| 10.433 |

**DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL**

8 / 13

2013 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows [$6,686,734.77] | Annual Interest Paid 9.0% | Interest [Years] 5 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $39,422.48 | $290,175.03 |
| 2/28/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $35,243.27 | $285,995.82 |
| 3/31/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $31,064.06 | $281,816.61 |
| 4/30/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $26,884.85 | $277,637.40 |
| 5/31/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $22,705.64 | $273,458.19 |
| 6/30/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $18,526.43 | $269,278.98 |
| 7/31/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $14,347.23 | $265,099.78 |
| 8/31/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $10,168.02 | $260,920.57 |
| 9/30/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $5,988.81 | $256,741.36 |
| 10/31/2013 | $557,227.90 | $50,150.51 | $250,752.55 | $1,809.60 | $252,562.15 |
| | | | Interest [Years] 4 | | |
| 11/30/2013 | $557,227.90 | $50,150.51 | $200,602.04 | $47,780.90 | $248,382.94 |
| 12/31/2013 | $557,227.90 | $50,150.51 | $200,602.04 | $43,601.69 | $244,203.73 |
| Total | | | | | $1,206,272.56 |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows [$363,506.00] | Annual Interest Paid 9.0% | Interest [Years] 5 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $30,292.17 | $2,726.30 | $13,631.50 | $2,143.10 | $15,774.60 | 9.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,915.91 | $15,547.41 | 8.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,688.72 | $15,320.22 | 7.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,461.52 | $15,093.02 | 6.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,234.33 | $14,865.83 | 5.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $1,007.14 | $14,638.64 | 4.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $779.95 | $14,411.45 | 3.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $552.76 | $14,184.26 | 2.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $325.57 | $13,957.07 | 1.433 |
| $30,292.17 | $2,726.30 | $13,631.50 | $98.37 | $13,729.87 | 0.433 |
| | | Interest [Years] 4 | | | |
| $30,292.17 | $2,726.30 | $10,905.20 | $2,597.48 | $13,502.68 | 11.433 |
| $30,292.17 | $2,726.30 | $10,905.20 | $2,370.29 | $13,275.49 | 10.433 |
| | | | | $174,300.54 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow [205,789.56] | Annual Interest Paid 9.0% | Interest [Years] 5 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $1,213.26 | $8,930.36 | 9.433 |
| 2/28/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $1,084.64 | $8,801.74 | 8.433 |
| 3/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $956.02 | $8,673.12 | 7.433 |
| 4/30/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $827.40 | $8,544.50 | 6.433 |
| 5/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $698.78 | $8,415.88 | 5.433 |
| 6/30/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $570.17 | $8,287.27 | 4.433 |
| 7/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $441.55 | $8,158.65 | 3.433 |
| 8/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $312.93 | $8,030.03 | 2.433 |
| 9/30/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $184.31 | $7,901.41 | 1.433 |
| 10/31/2013 | $17,149.13 | $1,543.42 | $7,717.10 | $55.69 | $7,772.79 | 0.433 |
| | | | Interest [Years] 4 | | | |
| 11/30/2013 | $17,149.13 | $1,543.42 | $6,173.68 | $1,470.49 | $7,644.17 | 11.433 |
| 12/31/2013 | $17,149.13 | $1,543.42 | $6,173.68 | $1,341.88 | $7,515.56 | 10.433 |
| Total | | | | | $98,675.48 | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

2014 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| [Months] Stub Calc | Date | Annual Royalty Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 4 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|---|
| | | $6,498,350.82 | | | | |
| 9.433 | 1/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $38,311.84 | $233,262.36 |
| 8.433 | 2/28/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $34,250.37 | $229,200.89 |
| 7.433 | 3/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $30,188.90 | $225,139.42 |
| 6.433 | 4/30/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $26,127.43 | $221,077.95 |
| 5.433 | 5/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $22,065.96 | $217,016.48 |
| 4.433 | 6/30/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $18,004.49 | $212,955.01 |
| 3.433 | 7/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $13,943.02 | $208,893.54 |
| 2.433 | 8/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $9,881.55 | $204,832.07 |
| 1.433 | 9/30/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $5,820.09 | $200,770.61 |
| 0.433 | 10/31/2014 | $541,529.24 | $48,737.63 | $194,950.52 | $1,758.62 | $196,709.14 |
| | | | | Interest [Years] 3 | | |
| 11.433 | 11/30/2014 | $541,529.24 | $48,737.63 | $146,212.89 | $46,434.78 | $192,647.67 |
| 10.433 | 12/31/2014 | $541,529.24 | $48,737.63 | $146,212.89 | $42,373.31 | $188,586.20 |
| | Total | | | | | $2,531,091.34 |

## MASTER LICENSE CASH FLOWS

| Master License Cash Flows | Annual Interest Paid 9.0% | Interest [Years] 4 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|
| $492,062.00 | | | | | |
| $41,005.17 | $3,690.47 | $14,761.88 | $2,901.02 | $17,662.90 | 9.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $2,593.48 | $17,355.36 | 8.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $2,285.94 | $17,047.82 | 7.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $1,978.40 | $16,740.28 | 6.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $1,670.86 | $16,432.74 | 5.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $1,363.32 | $16,125.20 | 4.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $1,055.78 | $15,817.66 | 3.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $748.24 | $15,510.12 | 2.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $440.70 | $15,202.58 | 1.433 |
| $41,005.17 | $3,690.47 | $14,761.88 | $133.16 | $14,895.04 | 0.433 |
| | | Interest [Years] 3 | | | |
| $41,005.17 | $3,690.47 | $11,071.41 | $3,516.10 | $14,587.51 | 11.433 |
| $41,005.17 | $3,690.47 | $11,071.41 | $3,208.56 | $14,279.97 | 10.433 |
| | | | | $191,657.18 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] 4 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| | 210,093.50 | | | | |
| 1/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $1,238.63 | $7,541.43 |
| 2/28/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $1,107.32 | $7,410.12 |
| 3/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $976.01 | $7,278.81 |
| 4/30/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $844.71 | $7,147.51 |
| 5/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $713.40 | $7,016.20 |
| 6/30/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $582.09 | $6,884.89 |
| 7/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $450.78 | $6,753.58 |
| 8/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $319.47 | $6,622.27 |
| 9/30/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $188.16 | $6,490.96 |
| 10/31/2014 | $17,507.79 | $1,575.70 | $6,302.80 | $56.86 | $6,359.66 |
| | | | Interest [Years] 3 | | |
| 11/30/2014 | $17,507.79 | $1,575.70 | $4,727.10 | $1,501.25 | $6,228.35 |
| 12/31/2014 | $17,507.79 | $1,575.70 | $4,727.10 | $1,369.94 | $6,097.04 |
| Total | | | | | $81,840.82 |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

NYSE...CUMATION 62
2015 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $6,409,234.32 | Annual Interest Paid 9.0% | Interest [Years] 3 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $37,786.44 | $181,994.22 |
| 2/28/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $33,780.67 | $177,988.45 |
| 3/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $29,774.90 | $173,982.68 |
| 4/30/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $25,769.13 | $169,976.91 |
| 5/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $21,763.36 | $165,971.14 |
| 6/30/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $17,757.59 | $161,965.37 |
| 7/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $13,751.81 | $157,959.59 |
| 8/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $9,746.04 | $153,953.82 |
| 9/30/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $5,740.27 | $149,948.05 |
| 10/31/2015 | $534,102.86 | $48,069.26 | $144,207.78 | $1,734.50 | $145,942.28 |
| | | | Interest [Years] 2 | | |
| 11/30/2015 | $534,102.86 | $48,069.26 | $96,138.52 | $45,797.99 | $141,936.51 |
| 12/31/2015 | $534,102.86 | $48,069.26 | $96,138.52 | $41,792.22 | $137,930.74 |
| Total | | | | | $1,919,540.76 |

## MASTER LICENSE CASH FLOWS

| Date | Master License Cash Flows $428,252.00 | Annual Interest Paid 9.0% | Interest [Years] 3 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $2,524.81 | $12,160.48 | 9.433 |
| 2/28/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $2,257.16 | $11,892.83 | 8.433 |
| 3/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $1,989.50 | $11,625.17 | 7.433 |
| 4/30/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $1,721.84 | $11,357.51 | 6.433 |
| 5/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $1,454.18 | $11,089.85 | 5.433 |
| 6/30/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $1,186.53 | $10,822.20 | 4.433 |
| 7/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $918.87 | $10,554.54 | 3.433 |
| 8/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $651.21 | $10,286.88 | 2.433 |
| 9/30/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $383.55 | $10,019.22 | 1.433 |
| 10/31/2015 | $35,687.67 | $3,211.89 | $9,635.67 | $115.90 | $9,751.57 | 0.433 |
| | | | Interest [Years] 2 | | | |
| 11/30/2015 | $35,687.67 | $3,211.89 | $6,423.78 | $3,060.13 | $9,483.91 | 11.433 |
| 12/31/2015 | $35,687.67 | $3,211.89 | $6,423.78 | $2,792.47 | $9,216.25 | 10.433 |
| Total | | | | | $128,260.41 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow 137,159.38 | Annual Interest Paid 9.0% | Interest [Years] 3 | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| 1/31/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $1,228.32 | $5,916.06 | 9.433 |
| 2/28/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $1,098.10 | $5,785.84 | 8.433 |
| 3/31/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $967.89 | $5,655.63 | 7.433 |
| 4/30/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $837.67 | $5,525.41 | 6.433 |
| 5/31/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $707.46 | $5,395.20 | 5.433 |
| 6/30/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $577.24 | $5,264.98 | 4.433 |
| 7/31/2015 | $17,361.95 | $1,562.58 | $4,687.74 | $447.03 | $5,134.77 | 3.433 |
| 8/31/2015 | $15,625.76 | $1,406.32 | $4,218.96 | $285.13 | $4,504.09 | 2.433 |
| 9/30/2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 1.433 |
| 10/31/2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.433 |
| | | | Interest [Years] 2 | | | |
| 11/30/2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 11.433 |
| 12/31/2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 10.433 |
| Total | | | | | $43,181.98 | |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

NYSCEF... CUMATION 62
**2016 SUPPORTING SCHEDULE - CASH FLOWS**

### TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows $5,881,820.25 | Annual Interest Paid 9.0% | Interest [Years] 2 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $34,677.01 | $122,904.31 |
| 2/28/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $31,009.87 | $119,228.17 |
| 3/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $27,324.73 | $115,552.03 |
| 4/29/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $23,648.59 | $111,875.89 |
| 5/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $19,972.46 | $108,199.76 |
| 6/29/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $16,296.32 | $104,523.62 |
| 7/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $12,620.18 | $100,847.48 |
| 8/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $8,944.04 | $97,171.34 |
| 9/29/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $5,267.91 | $93,495.21 |
| 10/30/2016 | $490,151.69 | $44,113.65 | $88,227.30 | $1,591.77 | $89,819.07 |
| | | | Interest [Years] 1 | | |
| 11/29/2016 | $490,151.69 | $44,113.65 | $44,113.65 | $42,029.28 | $86,142.93 |
| 12/30/2016 | $490,151.69 | $44,113.65 | $44,113.65 | $38,353.14 | $82,466.79 |
| Total | | | | | $1,232,226.60 |

### MASTER LICENSE CASH FLOWS

| Date | [Months] Stub Calc | Master License Cash Flows $301,487.00 | Annual Interest Paid 9.0% | Interest [Years] 2 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|---|
| 1/31/2016 | 9.433 | $25,123.92 | $2,261.15 | $4,522.30 | $1,777.45 | $6,299.75 |
| 2/28/2016 | 8.433 | $25,123.92 | $2,261.15 | $4,522.30 | $1,589.02 | $6,111.32 |
| 3/30/2016 | 7.433 | $25,123.92 | $2,261.15 | $4,522.30 | $1,400.59 | $5,922.89 |
| 4/29/2016 | 6.433 | $25,123.92 | $2,261.15 | $4,522.30 | $1,212.16 | $5,734.46 |
| 5/30/2016 | 5.433 | $25,123.92 | $2,261.15 | $4,522.30 | $1,023.74 | $5,546.04 |
| 6/29/2016 | 4.433 | $25,123.92 | $2,261.15 | $4,522.30 | $835.31 | $5,357.61 |
| 7/30/2016 | 3.433 | $25,123.92 | $2,261.15 | $4,522.30 | $646.88 | $5,169.18 |
| 8/30/2016 | 2.433 | $25,123.92 | $2,261.15 | $4,522.30 | $458.45 | $4,980.75 |
| 9/29/2016 | 1.433 | $25,123.92 | $2,261.15 | $4,522.30 | $270.02 | $4,792.32 |
| 10/30/2016 | 0.433 | $25,123.92 | $2,261.15 | $4,522.30 | $81.59 | $4,603.89 |
| | | | | Interest [Years] 1 | | |
| 11/29/2016 | 11.433 | $25,123.92 | $2,261.15 | $2,261.15 | $2,154.31 | $4,415.46 |
| 12/30/2016 | 10.433 | $25,123.92 | $2,261.15 | $2,261.15 | $1,965.88 | $4,227.03 |
| Total | | | | | | $63,160.70 |

### RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] 2 | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| 1/31/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2/28/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 4/29/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 5/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 6/29/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 8/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 9/29/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | Interest [Years] 1 | | |
| 11/29/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/30/2016 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | | | | | $0.00 |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

12/13

2017 SUPPORTING SCHEDULE - CASH FLOWS

## TOTAL ROYALTY CASH FLOWS

| Date | Annual Royalty Cash Flows | Annual Interest Paid 9.0% | Interest [Years] | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| | $5,254,727.75 | | 1 | | |
| 1/31/2017 | $503,456.33 | $45,311.07 | | $35,618.28 | $80,929.35 |
| 2/28/2017 | $503,456.33 | $45,311.07 | | $31,842.35 | $77,153.42 |
| 3/31/2017 | $503,456.33 | $45,311.07 | | $28,066.43 | $73,377.50 |
| 4/30/2017 | $503,456.33 | $45,311.07 | | $24,290.51 | $69,601.58 |
| 5/31/2017 | $503,456.33 | $45,311.07 | | $20,514.59 | $65,825.66 |
| 6/30/2017 | $503,456.33 | $45,311.07 | | $16,738.66 | $62,049.73 |
| 7/31/2017 | $503,456.33 | $45,311.07 | | $12,962.74 | $58,273.81 |
| 8/31/2017 | $503,456.33 | $45,311.07 | | $9,186.82 | $54,497.89 |
| 9/30/2017 | $503,456.33 | $45,311.07 | | $5,410.90 | $50,721.97 |
| 10/31/2017 | $503,456.33 | $45,311.07 | | $1,634.97 | $46,946.04 |
| | | | Interest [Years] 0 | | |
| 11/13/2017 | $218,164.41 | $19,634.80 | $0.00 | $18,707.06 | $18,707.06 |
| 12/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | $658,084.01 |

## MASTER LICENSE CASH FLOWS

| Date | Master License Cash Flows | Annual Interest Paid 9.0% | Interest [Years] | Stub Period 11/13/2018 | Total Interest | [Months] Stub Calc |
|---|---|---|---|---|---|---|
| | $269,233.00 | | 1 | | | |
| 1/31/2017 | $25,805.08 | $2,322.46 | | $1,825.65 | $4,148.11 | 9.433 |
| 2/28/2017 | $25,805.08 | $2,322.46 | | $1,632.11 | $3,954.57 | 8.433 |
| 3/31/2017 | $25,805.08 | $2,322.46 | | $1,438.57 | $3,761.03 | 7.433 |
| 4/30/2017 | $25,805.08 | $2,322.46 | | $1,245.03 | $3,567.49 | 6.433 |
| 5/31/2017 | $25,805.08 | $2,322.46 | | $1,051.49 | $3,373.95 | 5.433 |
| 6/30/2017 | $25,805.08 | $2,322.46 | | $857.96 | $3,180.42 | 4.433 |
| 7/31/2017 | $25,805.08 | $2,322.46 | | $664.42 | $2,986.88 | 3.433 |
| 8/31/2017 | $25,805.08 | $2,322.46 | | $470.88 | $2,793.34 | 2.433 |
| 9/30/2017 | $25,805.08 | $2,322.46 | | $277.34 | $2,599.80 | 1.433 |
| 10/31/2017 | $25,805.08 | $2,322.46 | | $83.80 | $2,406.26 | 0.433 |
| | | | Interest [Years] 0 | | | |
| 11/13/2017 | $11,182.20 | $1,006.40 | $0.00 | $958.85 | $958.85 | 11.433 |
| 12/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 10.433 |
| | $269,233.00 | | | | $33,730.70 | |

## RENTAL CASH FLOWS

| Date | Lost Rental Cash Flow | Annual Interest Paid 9.0% | Interest [Years] | Stub Period 11/13/2018 | Total Interest |
|---|---|---|---|---|---|
| | - | | 1 | | |
| 1/31/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 2/28/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 3/31/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 4/30/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 5/31/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 6/30/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 7/31/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 8/31/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 9/30/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| 10/31/2017 | $0.00 | $0.00 | | $0.00 | $0.00 |
| | | | Interest [Years] 0 | | |
| 11/13/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/31/2017 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | | | | | $0.00 |

| [Months] Stub Calc |
|---|
| 9.433 |
| 8.433 |
| 7.433 |
| 6.433 |
| 5.433 |
| 4.433 |
| 3.433 |
| 2.433 |
| 1.433 |
| 0.433 |
| 11.433 |
| 10.433 |

DRAFT-SUBJECT TO CHANGE; CONFIDENTIAL

13/13

# COMPOSITE EXHIBIT 2

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through June 17, 2019.

Selected Entity Name: JUST ONE MORE RESTAURANT CORP.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | JUST ONE MORE RESTAURANT CORP. |
| **DOS ID #:** | 44609 |
| **Initial DOS Filing Date:** | APRIL 07, 1933 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

C/O CORPORATE CREATIONS NETWORK INC.
15 NORTH MILL STREET
NYACK, NEW YORK, 10960

**Chief Executive Officer**

WALTER J GANZI, JR
1630 RHODE ISLAND AVE
NW SUITE 900
WASHINGTON, DISTRICT OF COLUMBIA, 20036

**Principal Executive Office**

PALM MANAGEMENT CORPORATION
1730 RHODE ISLAND AVE
NW SUITE 900
WASHINGTON, DISTRICT OF COLUMBIA, 20036

## Registered Agent

CORPORATE CREATIONS NETWORK INC.
15 NORTH MILL STREET
NYACK, NEW YORK, 10960

This office does not record information regarding
the names and addresses of officers, shareholders
or directors of nonprofessional corporations except
the chief executive officer, if provided, which
would be listed above. Professional corporations
must include the name(s) and address(es) of the
initial officers, directors, and shareholders in the
initial certificate of incorporation, however this
information is not recorded and only available by
viewing the certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|-------------|---------------|-------------------|
| 100 | Par Value | 100 |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|-------------|-----------|-------------|
| APR 07, 1933 | Actual | JUST ONE MORE RESTAURANT CORP. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in
New York State. The entity must use the fictitious name when conducting its activities or business in
New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results    New Search

Services/Programs    |    Privacy Policy    |    Accessibility Policy    |    Disclaimer    |    Return to DOS
Homepage    |    Contact Us

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through June 17, 2019.

---

Selected Entity Name: JUST ONE MORE HOLDING CORP.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | JUST ONE MORE HOLDING CORP. |
| **DOS ID #:** | 59207 |
| **Initial DOS Filing Date:** | JUNE 28, 1946 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

C/O CORPORATE CREATIONS NETWORK INC.
15 NORTH MILL STREET
NYACK, NEW YORK, 10960

### Chief Executive Officer

BRUCE E BOZZI
1730 RHODE ISLAND AVE NW
STE 900
WASHINGTON, DISTRICT OF COLUMBIA, 20036

### Principal Executive Office

JUST ONE MORE HOLDING CORP.
1730 RHODE ISLAND AVENUE NW
SUITE 900
WASHINGTON, DISTRICT OF COLUMBIA, 20036

## Registered Agent

CORPORATE CREATIONS NETWORK INC.
15 NORTH MILL STREET
NYACK, NEW YORK, 10960

This office does not record information regarding
the names and addresses of officers, shareholders
or directors of nonprofessional corporations except
the chief executive officer, if provided, which
would be listed above. Professional corporations
must include the name(s) and address(es) of the
initial officers, directors, and shareholders in the
initial certificate of incorporation, however this
information is not recorded and only available by
viewing the certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 100 | No Par Value | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUN 28, 1946 | Actual | JUST ONE MORE HOLDING CORP. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in
New York State. The entity must use the fictitious name when conducting its activities or business in
New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results    New Search

Services/Programs    |    Privacy Policy    |    Accessibility Policy    |    Disclaimer    |    Return to DOS
Homepage    |    Contact Us

# EXHIBIT 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------- X

GARY GANZI, CLAIRE BREEN, and GARY    :
GANZI and CLAIRE BREEN, as Attorneys-in-
Fact for the ESTATE OF CHARLES COOK,   :
Individually and Derivatively on Behalf of
Nominal Defendants JUST ONE MORE       :
RESTAURANT CORPORATION and JUST
ONE MORE HOLDING CORPORATION,          :

        Plaintiffs,                         :

    - against -                            :

WALTER GANZI, JR. and BRUCE BOZZI,     :
SR.,

        Defendants,                        :

    and                                    :

JUST ONE MORE RESTAURANT              :
CORPORATION, a New York corporation, and
JUST ONE MORE HOLDING                 :
CORPORATION, a New York corporation,
                                      :
       Nominal Defendants.

------------------------------------- X

INDEX No. 653074/2012

**AMENDED ANSWER**

    Defendants Walter Ganzi, Jr. ("Ganzi") and Bruce E. Bozzi ("Bozzi"), by their

undersigned attorneys, Cooley LLP, answer the allegations contained in the complaint of Gary

Ganzi, Claire Breen, and the Estate of Charles Cook, dated August 31, 2012 (the "Complaint")

as follows:

1.    Deny the allegations of paragraph 1, except admit that (a) Plaintiffs have brought the action described in the first sentence, (b) that Just One More Restaurant Corporation ("JOMR") is the owner of the original Palm Restaurant (the "Palm") in New York City and of the Palm's related intellectual property, and (c) that Just One More Holding Corporation ("JOMH") owns real estate at 837 Second Avenue, including the building that houses the Palm Restaurant.

2.    Deny the allegations of paragraph 2, except admit that Plaintiffs have brought the action described.

3.    Deny the allegations contained in the first sentence of paragraph 3, except admit that JOMR owns certain intellectual property for the Palm (the "Palm IP"). The last sentence of paragraph 3 contains a conclusion of law to which no responsive pleading is required and a fact allegation ("[t]he marks . . . have been referred to as ["famous marks"] in at least one legal textbook") as to which Defendants lack information on which to form a belief.

4.    Deny the allegations of paragraph 4.

5.    Deny the allegations of paragraph 5.

6.    Deny the allegations of paragraph 6.

7.    Deny the allegations of paragraph 7, except admit that Walter Ganzi, Jr. owns a greater share in JOMR than in JOMH.

8.    Deny the allegations of paragraph 8.

-2-

9.   Admit that the Individual and Nominal Defendants transact business within the state. The other allegation contained in paragraph 9 is a conclusion of law to which no responsive pleading is required.

10.   Admit that JOMR and JOMH have their principal places of business in New York City. The other allegation contained in paragraph 10 is a conclusion of law to which no responsive pleading is required.

11.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11.

12.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 12.

13.   Admit the allegations of paragraph 13, except deny knowledge or information sufficient to form a belief as to whether Mr. Ganzi is a co-chairman of Palm Management Corporation.

14.   Admit the allegations of paragraph 14, except deny knowledge or information sufficient to form a belief as to whether Mr. Bozzi is a co-chairman of Palm Management Corporation.

15.   Admit the allegations of paragraph 15.

16.   Admit the allegations of paragraph 16.

17.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 17, except admit that Individual Defendant Bozzi owns a 50% stake in JOMR and a 50% stake in JOMH, and Individual Defendant Ganzi owns a 30% stake in JOMR and a 16 2/3% stake in JOMH.

-3-

18.   Admit the allegations of paragraph 18.

19.   Deny the allegations of the first and second sentences of paragraph 19, except admit that JOMR owns the Palm IP.  Deny the allegations of the third sentence of paragraph 19, except admit that the Palm's website states that "What began as a restaurant became a legend."   Deny the allegations of the fourth sentence of paragraph 19.

20.   Deny the allegations of paragraph 20, except admit that the Individual Defendants are shareholders in entities established to own and operate Palm restaurants and also participate in managing those entities, and also admit that the Individual Defendants are shareholders in the entity that owns the Huntting Inn in East Hampton, NY and that they also participate in managing that entity.

21.   Deny the allegations of paragraph 21, except admit that JOMR has entered into licensing agreements with entities established to own and operate Palm Restaurants and refer to those agreements for their terms and number.

22.   Deny the allegations of paragraph 22, except refer to the agreements for the identity of their signatories.

23.   Deny the allegations of paragraph 23, except admit that that entities established to own and operate Palm Restaurants licensed the Palm IP from JOMR prior to 2010 and that the Individual Defendants are owners of those entities and participate in the management of those entities, and also admit that a Palm Restaurant in Washington, D.C. opened in 1972, and that this was the first of the Palm Restaurants to open after the original Palm Restaurant in New York ("Palm One").

-4-

24.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 24.

25.   Deny the allegations of the first and second sentences of paragraph 25, except admit that Palm Airport LLC entered into a license agreement with SSP America, Inc. for the purpose of operating a Palm restaurant at JFK Airport in New York and refer to that agreement for its terms. Deny the allegations contained in the third sentence of paragraph 25. Deny the allegations contained in the fourth sentence of paragraph 25, except admit that JOMR is not a party to the SSP America, Inc. Master License Agreement.

26.   Deny the allegations of paragraph 26, except admit that Individual Defendants are owners of entities created to own and operate Palm restaurants, and that those Palm restaurants use Palm IP.

27.   Deny the allegations of paragraph 27, except admit that JOMR has also licensed the Palm IP to entities owned in whole or in part by third parties, which entities operate Palm Restaurants, including the London Palm, the Mexico City – Santa Fe Palm, and the Mexico City – Polanco Palm, and also admit that the London Palm and Mexico City Palms use the Palm IP.

28.   Deny the allegations reflected in the first and second sentences of paragraph 28 but admit that these restaurants pay a percent of revenues to JOMR for the use of the Palm IP, and also admit that the entity that owns and operates the Mexico City Palms is Hoteles Presidente, S.A. de C.V. and that the license agreement between JOMR and Hoteles Presidente for the Palm IP was negotiated at arms length. Deny the allegations

-5-

reflected in the third and fourth sentences of paragraph 28 except refer to the agreement for its terms.

29.  Deny the allegations of paragraph 29, except admit that the Individual Defendants own and participate in the management of JOMR, which is the entity that owns and operates the original Palm Restaurant.

30.  Deny the allegations of paragraph 30, except admit that when Palm Too was opened in 1973, the restaurant was intended, among other purposes, to serve patrons who could not be served in the original Palm Restaurant, and admit that the Palm Restaurant is closed on Sundays and certain holidays.

31.  Deny the allegations of paragraph 31, except admit that JOMR entered into a license agreement with PMC dated January 1, 2007, that the Individual Defendants are owners of PMC and participate in its management, that PMC is a New York corporation, that the subject license agreement addresses PMC's use of Palm IP for retail sales, and refer to the subject agreement for its terms.

32.  Deny the allegations of paragraph 32 and refer to the subject agreement for its terms.

33.  Deny information or knowledge sufficient to form a belief as to the truth of the allegation of paragraph 33 that the PMC agreement with the TJX Companies was "unbeknownst to Plaintiffs." Deny the remaining allegations of paragraph 33, except admit that PMC entered into a license agreement with the TJX Companies for the use of the Palm IP for retail goods.

34.  Deny the allegations of paragraph 34, except admit that, in 2011, the TJX Companies paid PMC more than the amount that PMC paid to JOMR under the Master License

Agreement between PMC and JOMR dated January 1, 2007 (the "Master License Agreement"), and refer to the License Agreement between PMC and the TJX Companies for its terms.

35.  Deny the allegations of paragraph 35, except admit that PMC receives the revenues from retail sales on the Palm's website, and that those internet sales are governed by the Master License Agreement between PMC and JOMR.

36.  Deny the allegations of paragraph 36, except admit that JOMR has entered into a Master License Agreement with PMC and refer to its terms.

37.  Admit the allegations of paragraph 37.

38.  Deny the allegations of paragraph 38.

39.  Deny the allegations of paragraph 39.

40.  Deny information sufficient to form a belief as to the truth of the allegations of paragraph 40 but admit that plaintiffs purport to have had certain real estate appraised at $4.3 million in September 2011.

41.  Deny the allegations of the first sentence of paragraph 41.  Deny the allegations of the second sentence of paragraph 41, except admit that Palm Restaurant, Inc. did enter into leases for the properties that house the Palm Too.  Deny the allegations of the third and fourth sentences of paragraph 41.  Deny the allegations of the fifth sentence of paragraph 41, except admit that Palm Too owns one of the three buildings that the restaurant occupies.

42.  Deny the allegations of paragraph 42, except admit that plaintiffs have brought the action described therein.

43. Deny the allegations of paragraph 43.

44. Deny the allegations of paragraph 44, except deny knowledge or information sufficient to form a belief as to whether or not Plaintiffs' counsel's is "experienced" in litigating this type of action.

## RESPONSE TO FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty by Executing Self-Dealing Agreements with Secondary Palm Restaurants)**

45. Repeat and reassert their answers to paragraphs 1 through 44 of this Answer as if fully set forth herein.

46. Deny the allegations of paragraph 46, except admit that Plaintiffs brought the action described.

47. Deny the allegations of paragraph 47, except admit that Individual Defendants are shareholders and directors of JOMR and refer to paragraph 17 for their percentage ownership.  The allegations of the remainder of paragraph 47 contain conclusions of law to which no responsive pleading is required.

48. Deny the allegations of paragraph 48.

49. Deny the allegations of paragraph 49.

50. Admit the allegations of paragraph 50.

51. Deny the allegations of paragraph 51.

52. Deny the allegations of paragraph 52.

## RESPONSE TO SECOND CAUSE OF ACTION

**(Breach of Fiduciary Duty by Charging the TJX Companies and Other Third Parties Below Market Value Royalty Rates)**

-8-

53.   Repeat and reassert their answers to paragraphs 1 through 52 of this Answer as if fully set forth herein.

54.   Deny the allegations of paragraph 54, except admit that Plaintiffs brought the action described.

55.   Deny the allegations of paragraph 55, except admit that Individual Defendants are shareholders and directors of JOMR and refer to paragraph 17 for their percentage ownership.  The allegations of the remainder of paragraph 55 contain conclusions of law to which no responsive pleading is required.

56.   Deny the allegations of paragraph 56, except admit that JOMR entered in to a Master License Agreement with PMC and a license agreement with Palm UK LLC, and refer to those agreements for their terms.

57.   Deny the allegations of paragraph 57, except admit that PMC entered into a licensing agreement with the TJX Companies dated November 1, 2008 and refer to that agreement for its terms.

58.   Deny the allegations of paragraph 58, except admit that PMC entered into a license agreement with the TJX Companies dated November 1, 2008, and refer to that agreement for its terms.

59.   Deny the allegations of paragraph 59.

60.   Deny the allegations of paragraph 60, except admit that JOMR entered into a license agreement with PMC and refer to that agreement for its terms.

61.   Deny the allegations of paragraph 61.

## RESPONSE TO THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty by Undervaluation of Real Estate)

62.  Repeat and reassert their answers to paragraphs 1 through 61 of this Answer as if fully set forth herein.

63.  Deny the allegations of paragraph 63, except admit that Plaintiffs brought the action described.

64.  Deny the allegations of paragraph 64, except admit that Individual Defendants are shareholders and directors of JOMH and refer to paragraph 17 for their percentage ownership.  The allegations of the remainder of paragraph 64 contain conclusions of law to which no responsive pleading is required.

65.  Deny the allegations of paragraph 65.

66.  Deny the allegations of paragraph 66.

67.  Deny the allegations of paragraph 67.

## RESPONSE TO FOURTH CAUSE OF ACTION

### (Diversion of Corporate Opportunity)

68.  Repeat and reassert their answers to paragraphs 1 through 67 of this Answer as if fully set forth herein.

69.  Deny the allegations of paragraph 69, except admit that Plaintiffs brought the action described.

70.  Deny the allegations of paragraph 70, except admit that Individual Defendants are shareholders and directors of JOMR and refer to paragraph 17 for their percentage

ownership.  The allegations of the remainder of paragraph 70 contain conclusions of law to which no responsive pleading is required.

71. Deny the allegations of paragraph 71, except admit that JOMR entered into a Master License Agreement with PMC, and refer to that agreement for its terms.

72. The allegations of paragraph 72 contain conclusions of law to which no responsive pleading is required.

73. Deny the allegations of the first sentence of paragraph 73, except admit that JOMR and the entities established to own and operate Palm restaurants entered in to license agreements for the use of the Palm IP and refer to those agreements for their terms. Deny the allegations of the second sentence of paragraph 73.

74. Deny the allegations of the first sentence of paragraph 74.  Deny the allegations of the second sentence of paragraph 74, except admit that when Palm Too was opened in 1973, the restaurant was intended, among other purposes, to serve patrons who could not be served in the original Palm Restaurant, and admit that the Palm Restaurant is closed on Sundays and certain holidays.

75. Deny the allegations of paragraph 75.

## RESPONSE TO FIFTH CAUSE OF ACTION

**(Breach of Fiduciary Duty by Executing Self-Dealing Agreements with Secondary Palm Restaurants)**

76. Repeat and reassert their answers to paragraphs 1 through 75 of this Answer as if fully set forth herein.

77. Deny the allegations of paragraph 77, except admit that Plaintiffs brought the action described.

78. Deny the allegations of paragraph 78, except admit that Individual Defendants are shareholders and directors of JOMR and refer to paragraph 17 for their percentage ownership. The allegations of the remainder of paragraph 78 contain conclusions of law to which no responsive pleading is required.

79. Deny the allegations of paragraph 79.

80. Deny the allegations of paragraph 80.

81. Admit the allegations of paragraph 81.

82. Deny the allegations of paragraph 82.

83. Deny the allegations of paragraph 83.

## RESPONSE TO SIXTH CAUSE OF ACTION

**(Breach of Fiduciary Duty by Charging the TJX Companies and Other Third Parties Below Market Value Royalty Rates)**

84. Repeat and reassert their answers to paragraphs 1 through 83 of this Answer as if fully set forth herein.

85. Deny the allegations of paragraph 85, except admit that Plaintiffs brought the action described.

86. Deny the allegations of paragraph 86, except admit that Individual Defendants are shareholders and directors of JOMR and refer to paragraph 17 for their percentage ownership. The allegations of the remainder of paragraph 86 contain conclusions of law to which no responsive pleading is required.

87. Deny the allegations of paragraph 87, except admit that JOMR entered into a Master License Agreement with PMC and refer to that agreement for its terms.

88. Deny the allegations of paragraph 88, except admit that PMC entered into a licensing agreement with the TJX Companies dated November 1, 2008 and refer to that agreement for its terms.

89. Deny the allegations of paragraph 58, except admit that PMC entered into a license agreement with the TJX Companies dated November 1, 2008, and refer to that agreement for its terms.

90. Deny the allegations of paragraph 90.

91. Deny the allegations of paragraph 91.

## RESPONSE TO SEVENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty by Undervaluation of Real Estate)

92. Repeat and reassert their answers to paragraphs 1 through 91 of this Answer as if fully set forth herein.

93. Deny the allegations of paragraph 93, except admit that Plaintiffs brought the claim described.

94. Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94 that Plaintiffs each own a greater share of JOMH than JOMR.  Deny the remainder of paragraph 94.

95. Deny the allegations of paragraph 95, except admit that Individual Defendants are shareholders and directors of JOMH and refer to paragraph 17 for their percentage

-13-

ownership.  The allegations of the remainder of paragraph 95 contain conclusions of law to which no responsive pleading is required.

96. Deny the allegations of paragraph 96.

97. Deny the allegations of paragraph 97.

98. Deny the allegations of paragraph 98.

## RESPONSE TO EIGHTH CAUSE OF ACTION

### (Oppression of Minority Shareholders of JOMR)

99. Repeat and reassert their answers to paragraphs 1 through 98 of this Answer as if fully set forth herein.

100. Deny the allegations of paragraph 100, except admit that Plaintiffs brought the action described.

101. Deny knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiffs are minority shareholders in JOMR.  Admit that the Individual Defendants are shareholders of JOMR and refer to paragraph 17 for their percentage ownership.  The allegations contained in the remainder of paragraph 101 are conclusions of law to which no responsive pleading is required.

102. Deny the allegations of paragraph 102.

103. Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 103.

104. Deny the allegations of paragraph 104.

105. Deny the allegations of paragraph 105.

-14-

## RESPONSE TO NINTH CAUSE OF ACTION

### (Oppression of Minority Shareholders of JOMH)

106. Repeat and reassert their answers to paragraphs 1 through 105 of this Answer as if fully set forth herein.

107. Deny the allegations of paragraph 107, except admit that Plaintiffs brought the action described.

108. Deny knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiffs are minority shareholders in JOMR.  Admit that the Individual Defendants are shareholders of JOMR and refer to paragraph 17 for their percentage ownership.  The allegations contained in the remainder of paragraph 101 are conclusions of law to which no responsive pleading is required.

109. Deny the allegations of paragraph 109.

110. Deny knowledge or information sufficient to form a belief as to the allegations of paragraph 110.

111. Deny the allegations of paragraph 111, except admit that certain floors of 837 Second Avenue are not presently rented.

112. Deny the allegations of the first sentence of paragraph 112.  The second sentence of paragraph 112 contains conclusions of law to which no responsive pleading is required.

## RESPONSE TO TENTH CAUSE OF ACTION

### (Unjust Enrichment)

113. Repeat and reassert their answers to paragraphs 1 through 112 of this Answer as if fully set forth herein.

-15-

114. Deny the allegations of paragraph 114, except admit that Plaintiffs brought the action described.

115. Deny the allegations of paragraph 115, except admit that JOMR entered in to a Master License Agreement with PMC, and refer to that agreement for its terms.

116.  Deny the allegations of paragraph 116.

117. Deny the allegations of the first sentence of paragraph 117, except admit that JOMR entered into license agreements with more than twenty entities created to own and operate Palm restaurants, those entities pay license fees to JOMR for the use of the Palm IP and refer to those agreements for their terms.  Deny the allegations of the second sentence of paragraph 117.

118. Deny the allegations of paragraph 118.

119. Deny the allegations of paragraph 119.

## PRAYER FOR RELIEF

120. Individual Defendants deny that Plaintiffs are entitled to Judgment in their favor or to any of the relief they seek.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE
### (Statute of Limitations)

121. Plaintiffs' claims are barred by the applicable statutes of limitations.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE
### (Legal Capacity to Sue)

122. Plaintiffs' claims are barred because they lack the legal capacity to bring this suit on behalf of themselves and the Estate of Charles Cook.

-16-

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE
### (Inconsistent Pleading of Direct and Derivative Claims)

123. Plaintiffs' claims are barred to the extent that Plaintiffs have asserted direct claims for

the same conduct for which they have asserted derivative claims.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE
### (Estoppel, Ratification, and Acquiescence)

124. The shareholders from whom plaintiffs acquired their alleged ownership interests in

JOMR and JOMH either acquiesced, participated in, accepted the benefits of, or

consented to the conduct at issue, and, therefore, the plaintiffs are estopped from

bringing these claims.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE
### (Corporate Consent)

125. Plaintiffs' fourth cause of action is barred because JOMR consented to the actions taken

by Individual Defendants.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE
### (Laches)

126. Plaintiffs' claims are barred by laches because Plaintiffs, or the shareholders from

whom Plaintiffs acquired their alleged ownership interests in JOMR and JOMH, had

full knowledge of the conduct at issue, failed to object to that conduct within a

reasonable amount of time, and Defendants have been prejudiced as a result of that

failure.

Dated:  New York, New York
          November 29, 2012

Respectfully submitted,

COOLEY LLP


By:   /s/ Alan Levine
          Alan Levine
          Ian Shapiro
          Jennifer Pavane Kenter

          1114 Avenue of the Americas
          New York, NY 10036-7798
          Phone: (212) 479-6000
          Fax: (212) 479-6275

          *Attorneys for Defendants*
          *Walter Ganzi, Jr. and Bruce Bozzi, Sr., and*
          *Nominal Defendants Just One More*
          *Restaurant Corporation and Just One More*
          *Holding Corporation*

# COMPOSITE EXHIBIT 4

Florida Department of State

DIVISION OF CORPORATIONS



Department of State / Division of Corporations / Search Records / Search By Entity Name /

Next List

Entity Name Search

Search

## Entity Name List

| Corporate Name | Document Number | Status |
|---|---|---|
| JUST ONE MORE LLC. | L12000015880 | Active |
| JUST ONE MORE, INC. | M45857 | INACT |
| JUST ONE MORE, INC. | P04000057314 | INACT |
| JUST ONE MORE, INC. | P96000093492 | INACT |
| JUST ONE MORE 4CM, LLC | L19000116338 | Active |
| JUST ONE MORE BAR, INC. | P15000047501 | Active |
| JUST ONE MORE BAR, INC. | W15000027027 | Active |
| JUST ONE MORE THE BEER PUB, LLC | L14000149327 | INACT |
| JUST ONE MORE CAST, LLC | L18000030337 | Active |
| JUST ONE MORE CHARTERS, INC | P19000003507 | Active |
| JUST ONE MORE CLEANING SERVICES, INC. | P01000023121 | INACT |
| JUST ONE MORE DAY FOR LOVE, HOPE & A CURE, INC. | N07000010922 | INACT |
| JUST ONE MORE ENTERPRISE INC | P18000096060 | Active |
| JUST ONE MORE MANAGEMENT CO., INC. | P04000068864 | INACT |
| JUST ONE MORE NETWORK, INC. | N18000004877 | Active |
| JUST ONE MORE ORCHID CORP | P18000008691 | Active |
| JUST ONE MORE PUBLISHING COMPANY | S11404 | INACT |
| JUST ONE MORE SPECIALTY SNACKS, LLC | L16000005191 | Active |
| JUST ONE MORE TIME, INC. | J10734 | INACT |
| JUST ONE MORE TIME CORPORATION | P92000007844 | INACT |

Next List

Entity Name Search

Search

Florida Department of State, Division of Corporations

Florida Department of State

DIVISION OF CORPORATIONS



[Previous List](#)    [Next List](#)

| Fictitious Name Search |
| :-- |
| Submit |

## Fictitious Name List

| Fictitious Name | Address | City | State | County | Status |
| --- | --- | --- | --- | --- | --- |
| JUST ONE MORE | 1202 SARNO ROAD | MELBOURNE | FL | BREVARD | E |
| JUST ONE MORE | 1202 SARNO ROAD | MELBOURNE | FL | BREVARD | A |
| JUST ONE MORE | 2375 NE 25TH AVE | OCALA | FL | MARION | A |
| JUST ONE MORE | 4385 SE 59TH STREET | OCALA | FL | MARION | A |
| JUST ONE MORE | 4510 W JACKSON ST | PENSACOLA | FL | ESCAMBIA | E |
| JUST-ONE-MORE | 49 CANTON RD | LAKE WORTH | FL | PALM BEACH | E |
| JUST ONE MORE BITE | P.O. BOX 540714 | ORLANDO | FL | ORANGE | E |
| JUST ONE MORE CLEANING SERVICE | 11028 MILLCREEK WAY # 2904 | FORT MYERS | FL | MULTIPLE | E |
| JUST ONE MORE PRODUCTION | 4010 CRESCENT DR. | PANAMA CITY BEACH | FL | BAY | E |
| "JUST ONE MORE" SPORTS BAR & GRILL | 8121 HIGHWAY 90 EAST | MILTON | FL | SANTA ROSA | E |
| JUST ONE SMILE / SOLO UNA SONRISA | 14960 SW 8 LANE | MIAMI | FL | MIAMI-DADE | E |
| JUST ONE- SOLO UNO | 17215 NW 71 PLACE | MIAMI | FL | MIAMI-DADE | E |
| JUST ONE SOURCE | 17 SEVILLE CIRCLE | DAVIE | FL | BROWARD | E |
| JUST ONE SPARK | 1613 BORDEAUX DR. | LEESBURG | FL | LAKE | E |
| JUST ONE SPARK | P.O. BOX 491657 | LEESBURG | FL | LAKE | E |
| JUST ONE TIME PRODUCTIONS | 1970 ANN ARBOR AVE | TALLAHSSEE | FL | LEON | E |
| JUST ONE TOUCH | 1639 N.E. 31ST AVENUE | GAINESVILLE | FL | ALACHUA | A |
| JUSTO NETWORKS | 2105 HOWELL BRANCH ROAD, #14A | MAITLAND | FL | MULTIPLE | E |
| JUSTON KONSULT | C/O DB ENVIRONMENTAL | ROCKLEDGE | FL | PALM BEACH | E |
| JUSTON OF PALM BEACH SALON | 281 ROYAL POINCIANA WAY | PALM BEACH | FL | PALM BEACH | E |

[Previous List](#)    [Next List](#)

| Fictitious Name Search |
| :-- |
| Submit |

Florida Department of State, Division of Corporations

How Do I Start a Business? Frequently Asked Questions | Collier County, FL        Page 1 of 3

Case 9:19-bk-01947-FMD    Doc 161    Filed 06/28/19    Page 95 of 121

OK

## How Do I Start a Business? Frequently Asked Questions

**If you don't find it in our FAQs, please contact us!**



## What's required to open a business and operate a business in Collier County?

**Depending upon your specific business, the following steps are required — although there may be more requirements prescribed by various county divisions involved in your process.**

- For general questions, contact the Collier County Zoning Division (239) 252-5603 or email GMD.ZoningFrontDesk@colliercountyfl.gov.
- For every commercial business operating in the county, you should file a Zoning Certificate application, which will provide outright zoning approval at a location for a particular use.
- Home based businesses require only proof of residence within Collier County (a valid Florida Driver's License or a copy of a lease agreement) and acceptance of the LDC 5.02.03 regulations.
- If purchase or lease of a property is contingent upon some type of zoning approval or you are in a due-diligence phase of a contract, a zoning verification letter can be submitted for review and response. A zoning verification letter is best for properties with unique situations, new or creative business models, or that may be seeking redevelopment or rezoning.

**To incorporate or set up an LLC or fictional business name (DBA/Doing Business As)** in Florida, go to this Florida Department of State general information and available resources page, call (850)245-6000, or email corphelp@dos.myflorida.com.

How Do I Start a Business? Frequently Asked Questions | Collier County, FL          Page 2 of 3

Case 9:19-bk-01947-FMD    Doc 161    Filed 06/28/19    Page 96 of 121

**Contact the relevant fire district to request a fire inspection.** See what district you're located in on this Fire District Map.

**North Collier Fire Control & Rescue District** (includes North Naples and Big Corkscrew): 6495 Taylor Rd., Naples, FL 34110. (239) 597-9227, Fax # (239) 597-3522
https://www.northcollierfire.com/

**For inspection payments in the North Collier Fire District**, go here.


**Greater Naples Fire Rescue District's** Fire & Life Safety Division (includes East Naples, Golden Gate, Isles of Capri and Ochopee):  2700 N. Horseshoe Drive, Naples, FL  34104. (239)774-2800, Fax # (239) 774-3116.

**To schedule an appointment**, fill out this form.


# MOST IMPORTANTLY

## All businesses in Collier County must have a business tax license.

To find out more about that, www.colliertax.com has an informative "Business Tax Receipts" tab on its pages, or read and print this:  "How do I apply for a Business Tax Receipt?"
**To contact the Collier County Business Tax Receipt Division,  email:**  btr@colliertax.com or call 239-252-2477.


- **Zoning, Planning, Permitting and regulatory information about building in Collier County:**
  Growth Management Department
  2800 N. Horseshoe Drive
  Naples, FL  34104
  Phone: (239) 252-2400

  Building plan reviews and inspections

  Development reviews

  Engineering reviews


- **Why relocate or expand your business in Collier County?**

  See why here (a picture's worth a thousand words!) and here. See the businesses that have headquarters in Naples, Collier County, here.

How Do I Start a Business? Frequently Asked Questions | Collier County, FL          Page 3 of 3

Case 9:19-bk-01947-FMD    Doc 161    Filed 06/28/19    Page 97 of 121

- **Looking for land to build?**

  Check our economic development partner, SWFLEDA's,**Automated search for buildings and sites or** Zoom Prospector's**Automated search for buildings and sites**


- **Economic Development Incentives:**

  Here's our printable Incentives overview brochure, or visit our incentives page.



Jace Kentner, Director
Collier County Office of Business & Economic Development
2660 Horseshoe Drive N., Ste. 105
Naples, FL 34104
(239) 252-8990

Jace.Kentner@colliercountyFL.gov

Like us on Facebook and follow us on Twitter!

 How are we doing? Tell us in a short survey here.


Page updated Jan. 10, 2019



### TaxSys® Search

| Just One More Restaurant Corp. | Search |
| --- | --- |

| Property tax | Business Tax | ✔ Property tax AND Business Tax |
| --- | --- | --- |

Advanced search

No accounts matched your search. Try using different or fewer search terms. The following tips may also help:

Make sure you spell names, streets, etc., correctly.

Try leaving off words like drive, road, avenue, etc., that are often abbreviated. For example, search for `123 Main` instead of `123 Main Street.`

Try other owners' names; some properties are in one spouse's name, and some are in both names.

Watch out for terms that have multiple spellings, like First Street and 1st St.

If you used quotation marks, try again without them: `John Smith` won't find properties owned by "Smith, John," but simply typing `John Smith` will find both.

Remove special characters, such as `()|\"`

    

© 1997–2019, **Grant Street Group**. All rights reserved.

**Help** - **Contact us** - **Terms of service** - **Tax Collector home**





## TaxSys® Search

| Just One More Restaurant Corporation | Search |
|---|---|

| Property tax | Business Tax | ✔ Property tax AND Business Tax |
|---|---|---|

**Advanced search**

No accounts matched your search. Try using different or fewer search terms. The following tips may also help:

Make sure you spell names, streets, etc., correctly.

Try leaving off words like drive, road, avenue, etc., that are often abbreviated. For example, search for `"123 Main"` instead of `"123 Main Street."`

Try other owners' names; some properties are in one spouse's name, and some are in both names.

Watch out for terms that have multiple spellings, like First Street and 1st St.

If you used quotation marks, try again without them: `"John Smith"` won't find properties owned by "Smith, John," but simply typing `John Smith` will find both.

Remove special characters, such as `()|\"`

    

© 1997–2019, **Grant Street Group**. All rights reserved.

**Help** - **Contact us** - **Terms of service** - **Tax Collector home**





*TaxSys®* *Search*

| Just One More Holding Corp. | Search |

| Property tax | Business Tax | ✔ Property tax AND Business Tax |

**Advanced search**

No accounts matched your search. Try using different or fewer search terms. The following tips may also help:

Make sure you spell names, streets, etc., correctly.

Try leaving off words like drive, road, avenue, etc., that are often abbreviated. For example, search for `"123 Main"` instead of `"123 Main Street."`

Try other owners' names; some properties are in one spouse's name, and some are in both names.

Watch out for terms that have multiple spellings, like First Street and 1st St.

If you used quotation marks, try again without them: `"John Smith"` won't find properties owned by "Smith, John," but simply typing `John Smith` will find both.

Remove special characters, such as `()|\"`

    

© 1997–2019, **Grant Street Group**. All rights reserved.

**Help** - **Contact us** - **Terms of service** - **Tax Collector home**





### TaxSys® Search

| Just One More Holding Corporation | Search |

| Property tax | Business Tax | ✔ Property tax AND Business Tax |

Advanced search

No accounts matched your search. Try using different or fewer search terms. The following tips may also help:

Make sure you spell names, streets, etc., correctly.

Try leaving off words like drive, road, avenue, etc., that are often abbreviated. For example, search for `123 Main` instead of `123 Main Street.`

Try other owners' names; some properties are in one spouse's name, and some are in both names.

Watch out for terms that have multiple spellings, like First Street and 1st St.

If you used quotation marks, try again without them: `John Smith` won't find properties owned by "Smith, John," but simply typing `John Smith` will find both.

Remove special characters, such as `()|\"`

    

© 1997–2019, **Grant Street Group**. All rights reserved.

**Help** - **Contact us** - **Terms of service** - **Tax Collector home**



# EXHIBIT 5

Case Caption:  **Gary C Ganzi et al - v. - Walter Ganzi Jr. et al**
Judge Name:  **Andrea Masley**

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|---|---|---|---|---|
| 1 | SUMMONS + COMPLAINT<br>Summons and Complaint | Processed | 08/31/2012 | Melzer, M. |
| 2 | STIPULATION - OTHER<br>Stipulation for Extension of Time to Answer | Processed | 09/25/2012 | Levine, A. |
| 3 | STIPULATION - OTHER<br>Stipulation for an extension of time to respond to the complaint | Processed | 10/25/2012 | Shapiro, I. |
| 4 | ANSWER<br>Answer on behalf of Defendants Ganzi and Bozzi | Processed | 11/09/2012 | Shapiro, I. |
| 5 | ANSWER (AMENDED)<br>Defendants Walter Ganzi, Jr., Bruce Bozzi, Sr. and Nomial Defendants Just One More Restaurant Corp. (..) | Processed | 11/29/2012 | Levine, A. |
| 6 | RJI -RE: REQUEST FOR PRELIMINARY CONFERENCE<br>RJI Request for Preliminary Conference | Processed | 12/05/2012 | Melzer, M. |
| 7 | ADDENDUM - COMMERCIAL DIVISION (840C)<br>Commercial Division Addendum (840C) | Processed | 12/05/2012 | Melzer, M. |
| 8 | PRELIMINARY CONFERENCE REQUEST<br>Request for Preliminary Conference | Processed | 12/05/2012 | Melzer, M. |
| 9 | ADDENDUM - GENERAL (840A)<br>RJI Addendum (840A) | Processed | 12/05/2012 | Melzer, M. |
| 10 | ORDER - PRELIMINARY CONFERENCE<br>Re: Appearance #001, PRELIMINARY CONFERENCE ORDER entered in the office of the County Clerk on Janua(..) | Processed | 01/08/2013 | Court User |
| 11 | ORDER - PRE-TRIAL<br>Re: Appearance #001, PRE-TRIAL ORDER entered in the office of the County Clerk on January 8, 2013 | Processed | 01/08/2013 | Court User |
| 12 | ORDER - PRE-TRIAL<br>Re: Appearance #001, PRE-TRIAL ORDER entered in the office of the County Clerk on January 8, 2013 | Processed | 01/08/2013 | Court User |
| 13 | NOTICE OF MOTION - *Corrected* | Returned For Correction | 05/24/2013 | Melzer, M. |
| 14 | AFFIRMATION<br>Affirmation of Joshua D. Rievman | Processed | 05/24/2013 | Melzer, M. |
| 15 | ORDER ( PROPOSED ) - *Corrected*<br>Corrected Proposed Order Granting Open Commission | Processed | 05/24/2013 | Melzer, M. |
| 16 | COMMISSION (PROPOSED) - *Corrected*<br>Corrected Proposed Open Commission | Processed | 05/24/2013 | Melzer, M. |
| 17 | ORDER TO SHOW CAUSE ( PROPOSED ) | Processed | 06/07/2013 | Melzer, M. |
| 18 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF PROPOSED OSC/EXPARTE APP<br>Affirmation of Joshua D. Rievman | Processed | 06/07/2013 | Melzer, M. |
| 19 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF PROPOSED OSC/EXPARTE APP<br>Affirmation of Emergency | Processed | 06/07/2013 | Melzer, M. |
| 20 | AFFIRMATION<br>Withdrawal of Seq 002 | Processed | 06/07/2013 | Melzer, M. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 21 | ORDER TO SHOW CAUSE<br>re: motion no. 001, ORDER TO SHOW CAUSE entered in the office of the County Clerk on June 10, 2013 | Processed | 06/10/2013 | Court User |
| 22 | DECISION + ORDER ON MOTION<br>re: motion no. 002, DECISION + ORDER ON MOTION entered in the office of the County Clerk on June 17,(..) | Processed | 06/17/2013 | Court User |
| 23 | STIPULATION - OTHER<br>Stipulation as to issuance of commission | Processed | 06/20/2013 | Melzer, M. |
| 24 | EXPARTE ORDER  (PROPOSED) | Processed | 06/20/2013 | Melzer, M. |
| 25 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF PROPOSED OSC/EXPARTE APP | Processed | 06/20/2013 | Melzer, M. |
| 26 | STIPULATION - OTHER | Processed | 06/20/2013 | Melzer, M. |
| 27 | COMMISSION (PROPOSED) | Processed | 06/20/2013 | Melzer, M. |
| 28 | COMMISSION (PROPOSED) | Processed | 06/20/2013 | Melzer, M. |
| 29 | DECISION + ORDER ON MOTION<br>re: motion no. 001, DECISION + ORDER ON MOTION entered in the office of the County Clerk on June 21,(..) | Processed | 06/21/2013 | Court User |
| 30 | DECISION + ORDER ON MOTION<br>re: motion no. 003, DECISION + ORDER ON MOTION entered in the office of the County Clerk on June 27,(..) | Processed | 06/27/2013 | Court User |
| 31 | STIPULATION - OTHER | Processed | 07/31/2013 | Kenter, J. |
| 32 | STIPULATION - SO ORDERED<br>SO ORDERED STIPULATION entered in the office of the County Clerk on August 1, 2013 | Processed | 08/01/2013 | Court User |
| 33 | NOTICE OF APPEARANCE (POST RJI) | Processed | 09/30/2013 | Rauterberg, G. |
| 34 | AFFIRMATION<br>Emergency Affirmation of Gabriel Rauterberg in Support of Petitioners' Order to Show Cause seeking p(..) | Processed | 10/01/2013 | Shapiro, I. |
| 35 | ORDER TO SHOW CAUSE ( PROPOSED )<br>Proposed Order to Show Cause with Temporary Restraining Order for Order Granting Petitioners Leave t(..) | Processed | 10/01/2013 | Shapiro, I. |
| 36 | DECISION + ORDER ON MOTION<br>re: motion no. 004, DECISION + ORDER ON MOTION entered in the office of the County Clerk on October (..) | Processed | 10/02/2013 | Court User |
| 37 | TRANSCRIPT - SO ORDERED | Processed | 10/15/2013 | Court User |
| 38 | STIPULATION - OTHER | Processed | 11/13/2013 | Melzer, M. |
| 39 | STIPULATION - OTHER<br>Stipulation | Processed | 12/19/2013 | Kenter, J. |
| 40 | STIPULATION - SO ORDERED<br>SO ORDERED STIPULATION entered in the office of the County Clerk on December 20, 2013 | Processed | 12/20/2013 | Court User |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 41 | STIPULATION - OTHER<br>Stipulation Extending Discovery | Processed | 03/18/2014 | Melzer, M. |
| 42 | STIPULATION - SO ORDERED<br>Re: Appearance #006, SO ORDERED STIPULATION<br>entered in the office of the County Clerk on March 19,<br>2(..) | Processed | 03/19/2014 | Court User |
| 43 | STIPULATION - OTHER<br>Stipulation re Discovery | Processed | 04/28/2014 | Shapiro, I. |
| 44 | ORDER - OTHER<br>OTHER ORDER entered in the office of the County<br>Clerk on May 1, 2014 | Processed | 05/01/2014 | Court User |
| 45 | STIPULATION - OTHER<br>Stipulation Re Discovery | Processed | 05/08/2014 | Shapiro, I. |
| 46 | NOTE OF ISSUE:WITHOUT JURY | Processed | 06/13/2014 | Melzer, M. |
| 47 | STIPULATION - OTHER | Processed | 06/19/2014 | Kenter, J. |
| 48 | NOTICE OF MOTION<br>for Partial Summary Judgment | Processed | 06/19/2014 | Levine, A. |
| 49 | MEMORANDUM OF LAW<br>in Support of Motion for Partial Summary Judgment<br>(Redacted) | Processed | 06/19/2014 | Levine, A. |
| 50 | STATEMENT OF MATERIAL FACTS<br>(Redacted) | Processed | 06/19/2014 | Levine, A. |
| 51 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF<br>MOTION<br>Brett Kabik (Redacted) | Processed | 06/19/2014 | Levine, A. |
| 52 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF<br>MOTION<br>Chris Gillman (Redacted) | Processed | 06/19/2014 | Levine, A. |
| 53 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF<br>MOTION<br>Bruce E. Bozzi | Processed | 06/19/2014 | Levine, A. |
| 54 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF<br>MOTION<br>Walter J. Ganzi | Processed | 06/19/2014 | Levine, A. |
| 55 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF<br>MOTION<br>Patricia Ganzi | Processed | 06/19/2014 | Levine, A. |
| 56 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF<br>MOTION<br>Jennifer Pavane Kenter Declaration and Exhibits 1 - 40 | Processed | 06/19/2014 | Levine, A. |
| 57 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF<br>MOTION<br>Jennifer Pavane Kenter Declaration and Exhibits 41 - 72 | Processed | 06/19/2014 | Levine, A. |
| 58 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF<br>MOTION<br>Jennifer Pavane Kenter Declaration and Exhibits 73 - 94 | Processed | 06/19/2014 | Levine, A. |
| 59 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>FOR UNREDACTED COPIES OF ALL DOCUMENTS<br>FILED IN SUPPORT OF DEFENDANTS' MOTION FOR<br>PARTIAL SUMMARY JU(..) | Processed | 06/20/2014 | Kenter, J. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 60 | STIPULATION - SO ORDERED<br>SO ORDERED STIPULATION entered in the office of the County Clerk on June 23, 2014 | Processed | 06/23/2014 | Court User |
| 61 | STIPULATION - OTHER<br>Stipulation to adjourn opposition and reply for Defendants' Motion for Summary Judgment | Processed | 07/24/2014 | Lin, K. |
| 62 | STIPULATION - ADJOURNMENT OF MOTION - BEFORE JUDGE<br>Stipulation to adjourn opposition, reply, and return date for Defendants' Motion for Summary Judgmen(..) | Processed | 08/01/2014 | Lin, K. |
| 63 | STIPULATION - SO ORDERED<br>Re: Motion #005, SO ORDERED STIPULATION entered in the office of the County Clerk on August 6, 2014 | Processed | 08/06/2014 | Court User |
| 64 | MEMORANDUM OF LAW IN OPPOSITION | Processed | 08/29/2014 | Lin, K. |
| 65 | RESPONSE TO STATEMENT OF MATERIAL FACTS | Processed | 08/29/2014 | Lin, K. |
| 66 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION<br>Affirmation of Joshua D. Rievman | Processed | 08/29/2014 | Lin, K. |
| 67 | EXHIBIT(S)<br>Exhibit A to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 68 | EXHIBIT(S)<br>Exhibit B to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 69 | EXHIBIT(S)<br>Exhibit C to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 70 | EXHIBIT(S)<br>Exhibit D to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 71 | EXHIBIT(S)<br>Exhibit E to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 72 | EXHIBIT(S)<br>Exhibit F to Rievman Affirmation - PART 1 | Processed | 08/29/2014 | Lin, K. |
| 73 | EXHIBIT(S)<br>Exhibit F to Rievman Affirmation - PART 2 | Processed | 08/29/2014 | Lin, K. |
| 74 | EXHIBIT(S)<br>Exhibit F to Rievman Affirmation - PART 3 | Processed | 08/29/2014 | Lin, K. |
| 75 | EXHIBIT(S)<br>Exhibit F to Rievman Affirmation - PART 4 | Processed | 08/29/2014 | Lin, K. |
| 76 | EXHIBIT(S)<br>Exhibit F to Rievman Affirmation - PART 5 | Processed | 08/29/2014 | Lin, K. |
| 77 | EXHIBIT(S)<br>Exhibit F to Rievman Affirmation - PART 6 | Processed | 08/29/2014 | Lin, K. |
| 78 | EXHIBIT(S)<br>Exhibit F to Rievman Affirmation - PART 7 | Processed | 08/29/2014 | Lin, K. |
| 79 | EXHIBIT(S)<br>Exhibit F to Rievman Affirmation - PART 8 | Processed | 08/29/2014 | Lin, K. |
| 80 | EXHIBIT(S)<br>Exhibit G to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 81 | EXHIBIT(S)<br>Exhibit H to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |

NYSCEF
New York County Supreme Court

Case 9:19-bk-01947-FMD    Doc 161    Filed 06/28/19    Page 111 of 121

Document List

Index #   653074/2012

Created on:03/12/2019 08:31 AM

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 82 | EXHIBIT(S)<br>Exhibit I to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 83 | EXHIBIT(S)<br>Exhibit J to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 84 | EXHIBIT(S)<br>Exhibit K to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 85 | EXHIBIT(S)<br>Exhibit L to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 86 | EXHIBIT(S)<br>Exhibit M to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 87 | EXHIBIT(S)<br>Exhibit N to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 88 | EXHIBIT(S)<br>Exhibit O to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 89 | EXHIBIT(S)<br>Exhibit P to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 90 | EXHIBIT(S)<br>Exhibit Q to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 91 | EXHIBIT(S)<br>Exhibit R to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 92 | EXHIBIT(S)<br>Exhibit S to Rievman Affirmation | Processed | 08/29/2014 | Lin, K. |
| 93 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION<br>Affidavit of Gary Ganzi | Processed | 08/29/2014 | Lin, K. |
| 94 | EXHIBIT(S)<br>Exhibit A to Ganzi Affidavit | Processed | 08/29/2014 | Lin, K. |
| 95 | EXHIBIT(S)<br>Exhibit B to Ganzi Affidavit | Processed | 08/29/2014 | Lin, K. |
| 96 | EXHIBIT(S)<br>Exhibit C to Ganzi Affidavit | Processed | 08/29/2014 | Lin, K. |
| 97 | EXHIBIT(S)<br>Exhibit D to Ganzi Affidavit | Processed | 08/29/2014 | Lin, K. |
| 98 | EXHIBIT(S)<br>Exhibit E to Ganzi Affidavit | Processed | 08/29/2014 | Lin, K. |
| 99 | EXHIBIT(S)<br>Exhibit F to Ganzi Affidavit | Processed | 08/29/2014 | Lin, K. |
| 100 | EXHIBIT(S)<br>Exhibit G to Ganzi Affidavit | Processed | 08/29/2014 | Lin, K. |
| 101 | EXHIBIT(S)<br>Exhibit H to Ganzi Affidavit | Processed | 08/29/2014 | Lin, K. |
| 102 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION<br>Affidavit of Claire Breen | Processed | 08/29/2014 | Lin, K. |
| 103 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION<br>Affidavit of Aaron Magley | Processed | 08/29/2014 | Lin, K. |
| 104 | STIPULATION - ADJOURNMENT OF MOTION -IN SUBMISSIONS PART -RM 130 | Processed | 10/14/2014 | Shapiro, I. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 105 | AFFIDAVIT OR AFFIRMATION IN REPLY<br>Affirmation of Rebecca Welsh in Further Support of<br>Defendants' Motion for Partial Summary Judgment | Processed | 11/10/2014 | Welsh, R. |
| 106 | EXHIBIT(S)<br>Exhibit 95 to Affirmation of Rebecca Welsh in Further<br>Support of Defendants' Motion for Partial Summ(..) | Processed | 11/10/2014 | Welsh, R. |
| 107 | EXHIBIT(S)<br>Exhibit 96 to Affirmation of Rebecca Welsh in Further<br>Support of Defendants' Motion for Partial Summ(..) | Processed | 11/10/2014 | Welsh, R. |
| 108 | EXHIBIT(S)<br>Exhibit 97 to Affirmation of Rebecca Welsh in Further<br>Support of Defendants' Motion for Partial Summ(..) | Processed | 11/10/2014 | Welsh, R. |
| 109 | EXHIBIT(S)<br>Exhibit 98 to Affirmation of Rebecca Welsh in Further<br>Support of Defendants' Motion for Partial Summ(..) | Processed | 11/10/2014 | Welsh, R. |
| 110 | EXHIBIT(S)<br>Exhibit 99 to Affirmation of Rebecca Welsh in Further<br>Support of Defendants' Motion for Partial Summ(..) | Processed | 11/10/2014 | Welsh, R. |
| 111 | EXHIBIT(S)<br>Exhibit 100 to Affirmation of Rebecca Welsh in Further<br>Support of Defendants' Motion for Partial Sum(..) | Processed | 11/10/2014 | Welsh, R. |
| 112 | EXHIBIT(S)<br>Exhibit 101 to Affirmation of Rebecca Welsh in Further<br>Support of Defendants' Motion for Partial Sum(..) | Processed | 11/10/2014 | Welsh, R. |
| 113 | MEMORANDUM OF LAW IN SUPPORT<br>Defendants' Reply to Plaintiffs' Opposition to<br>Defendants' Motion for Partial Summary Judgment | Processed | 11/10/2014 | Shapiro, I. |
| 114 | RESPONSE TO STATEMENT OF MATERIAL FACTS<br>Defendants' Response to Plaintiffs' Response to<br>Defendants' Statement of Undisputed Material Facts | Processed | 11/10/2014 | Shapiro, I. |
| 115 | COMMISSION<br>Commission never E-Filed. It is being filed now to<br>complete the record. | Processed | 01/06/2015 | Court User |
| 116 | COMMISSION<br>Commission never E-Filed. It is being filed now to<br>complete the record. | Processed | 01/06/2015 | Court User |
| 117 | ORDER - EXPARTE<br>Exparte Order never E-filed. It is being filed now to<br>complete the record. | Processed | 01/06/2015 | Court User |
| 118 | NOTICE OF MOTION<br>Defendants Walter Ganzi, Jr. and Bruce E. Bozzi's<br>Notice of Motion to Amend and Partial Motion to Di(..) | Processed | 01/12/2015 | Shapiro, I. |
| 119 | MEMORANDUM OF LAW IN SUPPORT<br>Defendants Walter Ganzi, Jr. and Bruce E. Bozzi's<br>Memorandum of Law in Support of their Notice of Mo(..) | Processed | 01/12/2015 | Shapiro, I. |
| 120 | APPENDIX<br>Appendix A - C to Memorandum of Law In Support of<br>Defendants Walter Ganzi, Jr. and Bruce E. Bozzi's (..) | Processed | 01/12/2015 | Shapiro, I. |
| 121 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF<br>MOTION<br>Declaration of Ian Shapiro in Support of Defendants<br>Walter Ganzi, Jr. and Bruce E. Bozzi's Notice of(..) | Processed | 01/12/2015 | Shapiro, I. |
| 122 | EXHIBIT(S)<br>Exhibits A-J to Declaration of Ian Shapiro in Support of<br>Defendants Walter Ganzi, Jr. and Bruce E. B(..) | Processed | 01/12/2015 | Shapiro, I. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 123 | EXHIBIT(S)<br>Exhibits K-Q to Declaration of Ian Shapiro in Support of Defendants Walter Ganzi, Jr. and Bruce E. B(..) | Processed | 01/12/2015 | Shapiro, I. |
| 124 | EXHIBIT(S)<br>Exhibits R-Z to Declaration of Ian Shapiro in Support of Defendants Walter Ganzi, Jr. and Bruce E. B(..) | Processed | 01/12/2015 | Shapiro, I. |
| 125 | EXHIBIT(S)<br>Exhibits AA-EE to Declaration of Ian Shapiro in Support of Defendants Walter Ganzi, Jr. and Bruce E.(..) | Processed | 01/12/2015 | Shapiro, I. |
| 126 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>Affirmation of Service of the Defendants' Unredacted Motion, Memorandum of Law and Declaration of Ia(..) | Processed | 01/13/2015 | Kenter, J. |
| 127 | STIPULATION - OTHER<br>Stipulation extending the briefing schedule and return date of the Motion to Amend and Partial Motio(..) | Processed | 01/22/2015 | Kenter, J. |
| 128 | STIPULATION - SO ORDERED<br>Re: Motion #006, SO ORDERED STIPULATION entered in the office of the County Clerk on January 26, 201(..) | Processed | 01/26/2015 | Court User |
| 129 | STIPULATION - ADJOURNMENT OF MOTION -IN SUBMISSIONS PART -RM 130 | Processed | 02/06/2015 | Kenter, J. |
| 130 | STIPULATION - SO ORDERED<br>SO ORDERED STIPULATION entered in the office of the County Clerk on February 9, 2015 | Processed | 02/09/2015 | Court User |
| 131 | MEMORANDUM OF LAW IN OPPOSITION | Processed | 02/13/2015 | Melzer, M. |
| 132 | AFFIRMATION<br>Affirmation of Joshua D. Rievman | Processed | 02/13/2015 | Melzer, M. |
| 133 | EXHIBIT(S)<br>Complaint (Part One of Two) | Processed | 02/13/2015 | Melzer, M. |
| 134 | EXHIBIT(S)<br>Complaint (Part Two of Two) | Processed | 02/13/2015 | Melzer, M. |
| 135 | EXHIBIT(S)<br>November 9, 2012 Answer | Processed | 02/13/2015 | Melzer, M. |
| 136 | EXHIBIT(S)<br>11/29/12 Amended Answer | Processed | 02/13/2015 | Melzer, M. |
| 137 | EXHIBIT(S)<br>Preliminary Conference Order Commercial Division | Processed | 02/13/2015 | Melzer, M. |
| 138 | EXHIBIT(S)<br>Note of Issue | Processed | 02/13/2015 | Melzer, M. |
| 139 | EXHIBIT(S)<br>2010 License Agreements | Processed | 02/13/2015 | Melzer, M. |
| 140 | EXHIBIT(S)<br>6/2/11 Emails Between Liz Slovensky, Shari Clark and Maria Tiarks | Processed | 02/13/2015 | Melzer, M. |
| 141 | EXHIBIT(S)<br>6/3/11 Email Chain Between Liz Slovensky and Maria Tiarks | Processed | 02/13/2015 | Melzer, M. |
| 142 | EXHIBIT(S)<br>6/6/11 Email Chain Between Liz Slovensky and Maria Tiarks | Processed | 02/13/2015 | Melzer, M. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 143 | EXHIBIT(S) <br> Excerpts from 7/17/13 Deposition of James Longo | Processed | 02/13/2015 | Melzer, M. |
| 144 | EXHIBIT(S) <br> 2004 License Agreements - Part 1 of 8 | Processed | 02/13/2015 | Melzer, M. |
| 145 | EXHIBIT(S) <br> 2004 License Agreements - Part 2 of 8 | Processed | 02/13/2015 | Melzer, M. |
| 146 | EXHIBIT(S) <br> 2004 License Agreements - Part 3 of 8 | Processed | 02/13/2015 | Melzer, M. |
| 147 | EXHIBIT(S) <br> 2004 License Agreements - Part 4 of 8 | Processed | 02/13/2015 | Melzer, M. |
| 148 | EXHIBIT(S) <br> 2004 License Agreements - Part 5 of 8 | Processed | 02/13/2015 | Melzer, M. |
| 149 | EXHIBIT(S) <br> 2004 License Agreements - Part 6 of 8 | Processed | 02/13/2015 | Melzer, M. |
| 150 | EXHIBIT(S) <br> 2004 License Agreements - Part 7 of 8 | Processed | 02/13/2015 | Melzer, M. |
| 151 | EXHIBIT(S) <br> 2004 License Agreements - Part 8 of 8 | Processed | 02/13/2015 | Melzer, M. |
| 152 | EXHIBIT(S) <br> Timeline from Palm Website | Processed | 02/13/2015 | Melzer, M. |
| 153 | EXHIBIT(S) <br> 6/2/11 Email Chain Between Liz Slovensky and Maria Tiarks | Processed | 02/13/2015 | Melzer, M. |
| 154 | EXHIBIT(S) <br> Excerpts from 7/25/13 Deposition of Walter Ganzi, Jr. | Processed | 02/13/2015 | Melzer, M. |
| 155 | EXHIBIT(S) <br> Excerpts from 7/11/13 Deposition of Bruce Bozzi | Processed | 02/13/2015 | Melzer, M. |
| 156 | EXHIBIT(S) <br> Excerpts from 7/30/13 Deposition of Victor Ganzi | Processed | 02/13/2015 | Melzer, M. |
| 157 | EXHIBIT(S) <br> 6/12/14 Deposition of Christopher Bokhart | Processed | 02/13/2015 | Melzer, M. |
| 158 | EXHIBIT(S) <br> Expert Report of David J. Franklyn | Processed | 02/13/2015 | Melzer, M. |
| 159 | EXHIBIT(S) <br> Expert Report of Pamela M. O'Neill | Processed | 02/13/2015 | Melzer, M. |
| 160 | EXHIBIT(S) <br> Master License Agreement between Palm Airport LLC and SSP America, Inc. | Processed | 02/13/2015 | Melzer, M. |
| 161 | EXHIBIT(S) <br> 2007 Master License Agreement between JOMR and Palm Management Corporation | Processed | 02/13/2015 | Melzer, M. |
| 162 | EXHIBIT(S) <br> Palm Restaurant License Agreement between JOMR and Hoteles Presidente, S.A. de C.V. | Processed | 02/13/2015 | Melzer, M. |
| 163 | EXHIBIT(S) <br> 5/16/12 Email from James Longo to Victor Ganzi | Processed | 02/13/2015 | Melzer, M. |
| 164 | AFFIDAVIT <br> Affidavit of Aaron Magley | Processed | 02/13/2015 | Melzer, M. |
| 165 | STIPULATION - OTHER <br> Stipulation to Adjourn Briefing | Processed | 02/20/2015 | Kenter, J. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 166 | STIPULATION - SO ORDERED<br>Re: Motion #006, SO ORDERED STIPULATION entered in the office of the County Clerk on February 24, 20(..) | Processed | 02/24/2015 | Court User |
| 167 | STIPULATION - ADJOURNMENT OF MOTION - BEFORE JUDGE<br>Stipulation to Adjourn Motion to 3/19/15 | Processed | 03/13/2015 | Kenter, J. |
| 168 | MEMORANDUM OF LAW IN REPLY<br>Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion to Amend and Partial Motion to Dis(..) | Processed | 03/17/2015 | Shapiro, I. |
| 169 | AFFIDAVIT OR AFFIRMATION IN SUPPORT<br>Declaration of Ian Shapiro in Support of Defendants' Reply to Plaintiffs' Opposition | Processed | 03/17/2015 | Shapiro, I. |
| 170 | EXHIBIT(S)<br>Exhibits 1 through 10 to Declaration of Ian Shapiro in Support of Defendants' Reply to Plaintiffs' O(..) | Processed | 03/17/2015 | Shapiro, I. |
| 171 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>Affirmation of Service of Unredacted Copies of Defendants' Memorandum of Law in Support of Defendant(..) | Processed | 03/18/2015 | Kenter, J. |
| 172 | STIPULATION - SO ORDERED<br>SO ORDERED STIPULATION entered in the office of the County Clerk on March 20, 2015 | Processed | 03/20/2015 | Court User |
| 173 | DECISION + ORDER ON MOTION | Processed | 02/16/2016 | Court User |
| 174 | DECISION + ORDER ON MOTION | Processed | 02/17/2016 | Court User |
| 175 | DECISION + ORDER ON MOTION | Processed | 03/08/2016 | Court User |
| 176 | DECISION + ORDER ON MOTION | Processed | 03/08/2016 | Court User |
| 177 | NOTICE OF ENTRY<br>Notice of Entry with Decision and Order dated 2/11/216 re: Motion Seq # 5 & 6. | Processed | 03/15/2016 | Levine, A. |
| 178 | NOTICE OF APPEAL<br>Notice of Appeal with the Notice of Entry dated 03/15/206 | Processed | 03/16/2016 | Shapiro, I. |
| 179 | PRE-ARGUMENT STATEMENT | Processed | 03/16/2016 | Shapiro, I. |
| 180 | LETTER / CORRESPONDENCE TO JUDGE<br>Letter re: pre-trial conference on 3/23/2016. | Processed | 03/22/2016 | Levine, A. |
| 181 | NOTICE OF CROSS APPEAL | Processed | 03/28/2016 | Newman, F. |
| 182 | PRE-ARGUMENT STATEMENT | Processed | 03/28/2016 | Newman, F. |
| 183 | NOTICE OF ENTRY<br>Notice of Entry of Decision and Order of the Appellate Division | Processed | 11/15/2016 | Melzer, M. |
| 184 | EXHIBIT(S)<br>Decision and Order of the Appellate Division, First Department | Processed | 11/15/2016 | Melzer, M. |
| 185 | LETTER / CORRESPONDENCE TO JUDGE | Processed | 11/15/2016 | Rievman, J. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 186 | NOTICE OF ENTRY | Processed | 11/15/2016 | Rievman, J. |
| 187 | REMITTITUR | Processed | 11/25/2016 | Court User |
| 188 | LETTER / CORRESPONDENCE TO JUDGE<br>Letter from Alan Levine on behalf of Defendants<br>respectfully requesting an adjournment of the trial (..) | Processed | 01/03/2017 | Levine, A. |
| 189 | LETTER / CORRESPONDENCE TO JUDGE<br>Letter from Joshua Rievman on behalf of Plaintiffs<br>regarding Defendants' request to adjourn the tria(..) | Processed | 01/03/2017 | Melzer, M. |
| 190 | LETTER / CORRESPONDENCE TO JUDGE | Processed | 01/04/2017 | Rievman, J. |
| 191 | TRIAL DOCUMENTS<br>Defendants Proposed List of Trial Witnesses. | Processed | 10/16/2017 | Levine, A. |
| 192 | TRIAL DOCUMENTS<br>Plaintiffs' List of Proposed Trial Witnesses | Processed | 10/16/2017 | Melzer, M. |
| 193 | STIPULATION - OTHER - ( REQUEST TO SO ORDER )<br>Stipulation and [Proposed] Order for Extension of Time. | Processed | 10/18/2017 | Levine, A. |
| 194 | TRIAL DOCUMENTS<br>Defendants' Amended Proposed List of Trial Witnesses. | Processed | 10/19/2017 | Levine, A. |
| 195 | STIPULATION - SO ORDERED | Processed | 10/25/2017 | Court User |
| 196 | NOTICE OF APPEARANCE (POST RJI)<br>Notice of Appearance of Raquel O. Alvarenga, Esq. | Processed | 10/25/2017 | Alvarenga, R. |
| 197 | MARKED PLEADINGS<br>JX-1 - Summons+Complaint (as filed with redactions) | Processed | 10/30/2017 | Melzer, M. |
| 198 | MARKED PLEADINGS<br>JX-2 - Amended Answer | Processed | 10/30/2017 | Melzer, M. |
| 199 | NOTICE OF APPEARANCE (POST RJI) | Processed | 10/30/2017 | Brod, J. |
| 200 | PRE-TRIAL MEMORANDUM | Processed | 11/06/2017 | Brod, J. |
| 201 | TRIAL DOCUMENTS<br>Parties' Statement of Agreed Upon Facts. | Processed | 11/06/2017 | Levine, A. |
| 202 | PRE-TRIAL MEMORANDUM<br>Defendants' Pre-Trial Memorandum. | Processed | 11/06/2017 | Levine, A. |
| 203 | PRE-TRIAL DOCUMENT(S)<br>Defendants' Deposition Designations. | Processed | 11/08/2017 | Levine, A. |
| 204 | PRE-TRIAL DOCUMENT(S)<br>Plaintiffs' Deposition Designations with attached<br>transcript excerpts | Processed | 11/09/2017 | Melzer, M. |
| 205 | TRIAL DOCUMENTS<br>Trial Affidavit of Gary Ganzi | Processed | 11/10/2017 | Brod, J. |
| 206 | TRIAL DOCUMENTS<br>Trial Affidavit of David J. Franklyn | Processed | 11/10/2017 | Brod, J. |
| 207 | TRIAL DOCUMENTS<br>Trial Affidavit of Pamela O'Neil | Processed | 11/10/2017 | Brod, J. |
| 208 | TRIAL DOCUMENTS<br>Plaintiffs' List of Trial Exhibits | Processed | 11/10/2017 | Brod, J. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 209 | TRIAL DOCUMENTS<br>Plaintiffs' Trial Exhibits 001 - 079 | Processed | 11/10/2017 | Brod, J. |
| 210 | TRIAL DOCUMENTS<br>Plaintiffs' Trial Exhibits 080 - 091 | Processed | 11/10/2017 | Brod, J. |
| 211 | TRIAL DOCUMENTS<br>Chris Bokhart Testimony_Redacted | Processed | 11/10/2017 | Levine, A. |
| 212 | TRIAL DOCUMENTS<br>Direct Testimony of Jim Longo | Processed | 11/10/2017 | Levine, A. |
| 213 | TRIAL DOCUMENTS<br>Direct Testimony of Patricia Ganzi | Processed | 11/10/2017 | Levine, A. |
| 214 | TRIAL DOCUMENTS<br>Scott A. Roehr Testimony_Redacted | Processed | 11/10/2017 | Levine, A. |
| 215 | TRIAL DOCUMENTS<br>Direct Testmony of Jeff Phillips_Redacted | Processed | 11/10/2017 | Levine, A. |
| 216 | TRIAL DOCUMENTS<br>Direct Testimony of Wally Ganzi_Redacted | Processed | 11/10/2017 | Levine, A. |
| 217 | TRIAL DOCUMENTS<br>Direct Testimony of Victor Ganzi_Redacted | Processed | 11/10/2017 | Levine, A. |
| 218 | TRIAL DOCUMENTS<br>Direct Testimony of Patrick Murray_Redacted | Processed | 11/10/2017 | Levine, A. |
| 219 | TRIAL DOCUMENTS<br>Direct Testimony of Joy Jones_Redacted | Processed | 11/10/2017 | Levine, A. |
| 220 | TRIAL DOCUMENTS<br>Direct Testimony of Chris Gilman | Processed | 11/10/2017 | Levine, A. |
| 221 | TRIAL DOCUMENTS<br>Direct Testimony of Bruce E. Bozzi_Redacted | Processed | 11/10/2017 | Levine, A. |
| 222 | TRIAL DOCUMENTS<br>Direct Testimony of Brett Kabik | Processed | 11/10/2017 | Levine, A. |
| 223 | TRIAL DOCUMENTS<br>Direct Testimony of Alfred L. Thimm_Redacted | Processed | 11/10/2017 | Levine, A. |
| 224 | TRIAL DOCUMENTS<br>Direct Testimony of Alexis Gibson | Processed | 11/10/2017 | Levine, A. |
| 225 | TRIAL DOCUMENTS<br>Defendants' Exhibit Index | Processed | 11/10/2017 | Levine, A. |
| 226 | TRIAL DOCUMENTS<br>DX-001 through DX-025 | Processed | 11/10/2017 | Levine, A. |
| 227 | TRIAL DOCUMENTS<br>DX-026 through DX-050 | Processed | 11/10/2017 | Levine, A. |
| 228 | TRIAL DOCUMENTS<br>DX-051 through DX-075 | Processed | 11/10/2017 | Levine, A. |
| 229 | TRIAL DOCUMENTS<br>DX-076 through DX-100 | Processed | 11/10/2017 | Levine, A. |
| 230 | TRIAL DOCUMENTS<br>DX-101 through DX-125 | Processed | 11/10/2017 | Levine, A. |
| 231 | TRIAL DOCUMENTS<br>DX-126 through DX-150 | Processed | 11/10/2017 | Levine, A. |
| 232 | TRIAL DOCUMENTS<br>DX-151 through DX-175 | Processed | 11/10/2017 | Levine, A. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 233 | TRIAL DOCUMENTS<br>DX-176 through DX-200 | Processed | 11/10/2017 | Levine, A. |
| 234 | TRIAL DOCUMENTS<br>DX-201 through DX-225 | Processed | 11/10/2017 | Levine, A. |
| 235 | TRIAL DOCUMENTS<br>DX-226 through DX-250 | Processed | 11/10/2017 | Levine, A. |
| 236 | TRIAL DOCUMENTS<br>DX-251 through DX-260 | Processed | 11/10/2017 | Levine, A. |
| 237 | LETTER / CORRESPONDENCE TO JUDGE<br>Letter from Ian Shapiro to the Honorable Andrea Masley dated November 20, 2017 addressing the remain(..) | Processed | 11/20/2017 | Shapiro, I. |
| 238 | EXHIBIT(S)<br>Exhibits A-C to Letter from Ian Shapiro dated November 20, 2017 addressing the remaining objections (..) | Processed | 11/20/2017 | Shapiro, I. |
| 239 | LETTER / CORRESPONDENCE TO JUDGE<br>Letter from Marc Melzer to the Honorable Andrea Masley dated November 20, 2017 in opposition to Defe(..) | Processed | 11/20/2017 | Melzer, M. |
| 240 | LETTER / CORRESPONDENCE TO JUDGE<br>Letter from Alan Levine addressed to the Honorable Andrea Masley | Processed | 11/22/2017 | Levine, A. |
| 241 | TRIAL DOCUMENTS<br>Stipulation regarding legal fees | Processed | 12/18/2017 | Melzer, M. |
| 242 | TRIAL DOCUMENTS<br>Stipulation regarding corporate ownership | Processed | 12/18/2017 | Melzer, M. |
| 243 | TRIAL MEMORANDUM<br>Plaintiffs' Post-Trial Memorandum of Law | Processed | 12/29/2017 | Alvarenga, R. |
| 244 | MEMORANDUM<br>Defendants' Post-Trial Brief | Processed | 12/30/2017 | Levine, A. |
| 245 | EXHIBIT(S)<br>Brief for Defendants-Appellants | Processed | 12/30/2017 | Levine, A. |
| 246 | EXHIBIT(S)<br>Reply Brief for Defendants-Appellants-Cross-Respondents | Processed | 12/30/2017 | Levine, A. |
| 247 | TRIAL MEMORANDUM<br>Revised Post-Trial Memorandum | Processed | 01/12/2018 | Brod, J. |
| 248 | TRIAL MEMORANDUM<br>Post-Trial Reply Memorandum | Processed | 01/12/2018 | Brod, J. |
| 249 | MEMORANDUM<br>Defendants' Post-Trial Reply Brief | Processed | 01/13/2018 | Levine, A. |
| 250 | MEMORANDUM<br>Revised Defendants' Post-Trial Reply Brief | Processed | 01/19/2018 | Shapiro, I. |
| 251 | NOTICE OF APPEARANCE (POST RJI)<br>Notice of Appearance of Nicholas Flath on behalf of Defendants Walter Ganzi, Jr. and Bruce Bozzi, Sr(..) | Processed | 03/26/2018 | Flath, N. |
| 252 | NOTICE OF CHANGE OF FIRM NAME OR ADDRESS (POST RJI) | Processed | 10/25/2018 | Brod, J. |
| 253 | ORDER - OTHER | Processed | 11/15/2018 | Court User |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|--------------------------|--------|---------------|----------|
| 254 | NOTICE OF ENTRY | Processed | 11/15/2018 | Brod, J. |
| 255 | NOTICE OF CHANGE OF ATTORNEY (POST RJI)<br>Notice of Substitution of Counsel | Processed | 12/07/2018 | Kasowitz, M. |
| 256 | CONSENT TO CHANGE ATTORNEY (POST RJI) | Processed | 12/07/2018 | Kasowitz, M. |
| 257 | | Deleted | | |
| 258 | NOTICE OF APPEAL<br>Notice of Appeal from the decision and order by the<br>Honorable Andrea Masley of the Supreme Court of (..) | Pending | 12/13/2018 | Kasowitz, M. |
| 259 | LETTER / CORRESPONDENCE TO JUDGE<br>Letter to Justice Masley from Marc E. Kasowitz dated<br>December 13, 2018 Re: Proposed Judgment | Processed | 12/13/2018 | Kasowitz, M. |
| 260 | | Deleted | | |
| 261 | LETTER / CORRESPONDENCE TO JUDGE | Processed | 12/14/2018 | Rievman, J. |
| 262 | EXHIBIT(S)<br>Interest Calculation | Processed | 12/14/2018 | Rievman, J. |
| 263 | LETTER / CORRESPONDENCE TO JUDGE<br>Letter to Hon. Andrea Masley in response to plaintiffs' December 14, 2018 lett(..) | Processed | 12/17/2018 | Kasowitz, M. |
| 264 | NOTICE OF APPEARANCE (POST RJI)<br>Notice Of Appearance of David S. Rosner | Processed | 12/17/2018 | Rosner, D. |
| 265 | NOTICE OF APPEARANCE (POST RJI)<br>Notice Of Appearance of Sarmad M. Khojasteh | Processed | 12/17/2018 | Khojasteh, S. |
| 266 | NOTICE OF APPEARANCE (POST RJI) | Processed | 12/19/2018 | Blosveren, J. |
| 267 | AFFIRMATION OF ATTORNEY FEES | Processed | 01/11/2019 | Grant, D. |
| 268 | EXHIBIT(S)<br>Attorney resumes | Processed | 01/11/2019 | Grant, D. |
| 269 | EXHIBIT(S)<br>Daily time records | Processed | 01/11/2019 | Grant, D. |
| 270 | EXHIBIT(S)<br>Categorical breakdown and receipts | Processed | 01/11/2019 | Grant, D. |
| 271 | EXHIBIT(S)<br>Legal fees stipulation | Processed | 01/11/2019 | Grant, D. |
| 272 | ORDER - OTHER | Processed | 01/28/2019 | Court User |
| 273 | NOTICE OF ENTRY | Processed | 01/28/2019 | Brod, J. |
| 274 | NOTICE OF APPEAL<br>Notice of Appeal from the Judgment by the Honorable<br>Andrea Masley of the Supreme Court of New York C(..) | Pending | 01/28/2019 | Kasowitz, M. |
| 275 | ORDER - OTHER | Processed | 01/29/2019 | Court User |
| 276 | CONSENT TO CHANGE ATTORNEY (POST RJI) | Processed | 01/30/2019 | Rievman, J. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 277 | | Deleted | | |
| 278 | JUDGMENT | Processed | 02/11/2019 | Court User |
| 279 | NOTICE OF APPEAL<br>Notice of Appeal of Judgment issued by the Honorable Andrea Masley, dated January 25, 2019, entered (..) | Pending | 02/11/2019 | Kasowitz, M. |
| 280 | NOTICE OF ENTRY | Processed | 02/11/2019 | Brod, J. |
| 281 | MEMORANDUM<br>Defendants' Objection to Plaintiffs' Request for Attorneys' Fees | Processed | 02/11/2019 | Kasowitz, M. |
| 282 | AFFIRMATION OF ATTORNEY FEES | Processed | 02/19/2019 | Grant, D. |
| 283 | EXHIBIT(S)<br>A revised version of invoices that were previously provided to this court as Exhibit 3 to the Affirm(..) | Processed | 02/19/2019 | Grant, D. |
| 284 | AFFIRMATION<br>Defendants' Affirmation in Further Support of their Objection to Plaintiffs' Request for Attorneys' (..) | Processed | 02/19/2019 | Khojasteh, S. |
| 285 | EXHIBIT(S)<br>Expert Declaration of David Paige of Legal Fee Advisors | Processed | 02/19/2019 | Khojasteh, S. |
| 286 | EXHIBIT(S)<br>David Paige CV | Processed | 02/19/2019 | Khojasteh, S. |
| 287 | EXHIBIT(S)<br>Tagged Invoices | Processed | 02/19/2019 | Khojasteh, S. |
| 288 | EXHIBIT(S)<br>Objection Totals | Processed | 02/19/2019 | Khojasteh, S. |
| 289 | EXHIBIT(S)<br>Tagging Guide | Processed | 02/19/2019 | Khojasteh, S. |
| 290 | STIPULATION - OTHER - ( REQUEST TO SO ORDER ) | Processed | 02/22/2019 | Grant, D. |
| 291 | STIPULATION - SO ORDERED | Processed | 03/08/2019 | Court User |
| 292 | AFFIRMATION<br>Defendants Affirmation In Support Of Its Market Analysis Of Attorney Billing Rates | Processed | 03/08/2019 | Khojasteh, S. |
| 293 | AFFIDAVIT<br>Affidavit of David Paige | Processed | 03/08/2019 | Khojasteh, S. |
| 294 | EXHIBIT(S)<br>David Paige CV | Processed | 03/08/2019 | Khojasteh, S. |
| 295 | EXHIBIT(S)<br>2018 Real Rate Report | Processed | 03/08/2019 | Khojasteh, S. |
| 296 | MEMORANDUM | Processed | 03/08/2019 | Newman, F. |
| 297 | AFFIRMATION<br>Fredric Newman Affirmation | Processed | 03/08/2019 | Newman, F. |
| 298 | EXHIBIT(S)<br>Time entries by year | Processed | 03/08/2019 | Newman, F. |
| 299 | AFFIRMATION<br>Affirmation of Joshua Rievman | Processed | 03/08/2019 | Newman, F. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 300 | EXHIBIT(S)<br>Cooley fees - Platinum Management | Processed | 03/08/2019 | Newman, F. |
| 301 | EXHIBIT(S)<br>Cooley - Charming Charlie Fees | Processed | 03/08/2019 | Newman, F. |
| 302 | EXHIBIT(S)<br>Cooley - Draw Another Circle Fees | Processed | 03/08/2019 | Newman, F. |
| 303 | EXHIBIT(S)<br>Kasowitz Benson Torres - Nine West Fees | Processed | 03/08/2019 | Newman, F. |
| 304 | EXHIBIT(S)<br>Time Entries by Legal Argument | Processed | 03/08/2019 | Newman, F. |
| 305 | EXHIBIT(S)<br>Filings regarding direct claims | Processed | 03/08/2019 | Newman, F. |