UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

JUST ONE MORE RESTAURANT CORP.,       Case No. 9:19-bk-1947
and JUST ONE MORE HOLDING CORP.,[1]    (Jointly Administered with
                                       Case No. 9:19-bk-1948)
     Debtors.                         Chapter 11 Cases
_____/

In re:

BRUCE E. BOZZI, SR.,                   Case No. 9:19-bk-09677-FMD
                                       Chapter 7
     Debtor.
_____/

In re:

WALTER J. GANZI, JR.,                  Case No. 9:19-bk-09680-FMD
                                       Chapter 7
     Debtor.
_____/

**JOINT MOTION FOR ENTRY OF AN ORDER (I) APPROVING
PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN
ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE OF
BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR
OF ALL CLAIMS AND LIENS EXCEPT FOR PERMITTED LIENS, ENCUMBRANCES
AND ASSUMED LIABILITIES, (III) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
OF CHAPTER 11 DEBTOR JOMR, AND (IV) GRANTING RELATED RELIEF
(Expedited Preliminary Hearing Requested on February 25, 2020 at 3:30 p.m.;
Expedited Final Hearing Requested on March 9, 2020 (if no Auction is held)
or either March 10, 2020 or March 11, 2020 (if an Auction is Held)[2]
(Shortened Notice for Sale Hearing Requested)**

---

[1]    The last four digits of each Chapter 11 Debtor's (defined herein) federal tax identification number are Just One More Restaurant Corp. (5070) and Just One More Holding Corp. (6081). The address of the Chapter 11 Debtors is 8955 Fontana Del Sol Way, 2nd Floor, Naples, FL 34109.

[2]    The Movants respectfully request that the Court set this Sale Motion for a preliminary hearing on February 25, 2020 at 3:30 p.m. which is the same date and time that the Court has set a hearing in the Debtors' bankruptcy cases. In the event that no Auction (defined herein) is held, the Movants respectfully request that the Court set this Sale Motion for a final hearing on March 9, 2020. In the event that an Auction is held, the Movants respectfully request that the Court set the final hearing on this Sale Motion for either March 10, 2020 or March 11, 2020.

9559611-9

Just One More Restaurant Corp. ("JOMR") and Just One More Holding Corp. ("JOMH" and together with JOMR, collectively, the "Chapter 11 Debtors") through Gerard A. McHale, Jr., not in his individual capacity but solely in his capacity as the Chief Restructuring Officer of the Chapter 11 Debtors (the "CRO"), and Robert E. Tardif, Jr., not in his individual capacity but solely in his capacity as the trustee (the "Trustee", and together with the CRO, collectively, the "Movants") appointed in the chapter 7 bankruptcy cases of each of Bruce E. Bozzi, Sr. ("Bozzi") and Walter J. Ganzi, Jr. ("Ganzi" and together with Bozzi, collectively, the "Chapter 7 Debtors"; together, the Chapter 11 Debtors and the Chapter 7 Debtors, collectively, the "Debtors") on behalf of the estates of the Chapter 7 Debtors and each of the business entities listed on the attached **Exhibit "A"** (collectively, the "Palm OpCos"[3] and together with the Chapter 11 Debtors, collectively, the "Company") by the authority granted to the Movants by title 11 of the United States Code (the "Bankruptcy Code") and the Palm OpCos Authorization Orders (defined herein), by and through the undersigned counsel for the Chapter 11 Debtors and the Trustee, file this motion (the "Sale Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit "B"** (the "Sale Order"): (i) approving the  Purchase Agreement (the "Agreement"), a copy of which is attached hereto as **Exhibit "C"**, among the Debtors and Golden Nugget, LLC (together with its permitted successors, assigns and designees, the "Stalking Horse Bidder"), or a Successful Bidder,[4] as applicable, and authorizing the sale of the Purchased Assets outside of the ordinary course of business; (ii) authorizing the sale free and clear of all Claims and Liens (as defined in the attached Agreement) (other than Assumed Liabilities and Encumbrances and Liens that the

---

[3]    Unless otherwise indicated on **Exhibit "A"**, the Chapter 7 Debtors have reported in their bankruptcy schedules filed with the Court that they own 100% of the equity interests in each of the Palm OpCos.

[4]    Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Agreement or the Bidding Procedures Motion (defined below), as applicable.

Stalking Horse Bidder has agreed to permit under the Agreement or as otherwise set forth in the Agreement) (the "Sale") of the Purchased Assets to the Purchaser; (iii) authorizing the assumption and assignment of the Assigned JOMR Contracts; and (iv) granting related relief.  In support of the Sale Motion, the Movants respectfully state as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of the Debtors' bankruptcy cases and this Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

2.    The statutory predicates for the relief requested herein are sections 105, 363, 365, 503, and 507 of chapter 11 of title 11 of the Bankruptcy Code, rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 2081-1(h) of the Local Bankruptcy Rules for the Middle District of Florida (the "Local Rules").

## BACKGROUND

-The Chapter 11 Debtors

3.    On March 7, 2019 (the "Chapter 11 Petition Date"), each of the Chapter 11 Debtors commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.    The Chapter 11 Debtors are managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.    On April 9, 2019, the Court entered an order approving the employment of Berger Singerman LLP as counsel to the Chapter 11 Debtors in their bankruptcy cases (Case No. 9:19-bk-01947-FMD, Doc. 121).

9559611-9

6.      On April 16, 2019, the Court entered an order authorizing the Chapter 11 Debtors to appoint Gerard A. McHale, Jr. as the CRO of each of the Chapter 11 Debtors (Case No. 9:19-bk-01947-FMD, Doc. 139).

7.      On May 13, 2019, the United States Trustee filed a notice with the Court indicating that the United States Trustee will not appoint a committee of unsecured creditors.

8.      For a detailed description of the Chapter 11 Debtors, the Chapter 11 Debtors respectfully refer the Court and parties in interest to the *Declaration of Chief Restructuring Officer, Gerard A. McHale, in Support of Chapter 11 Petitions and First Day Pleadings* (Case No. 9:19-bk-01947-FMD, Doc. 7) (the "First Day Declaration") filed on the Chapter 11 Petition Date which the Chapter 11 Debtors incorporate herein by reference.

-The Chapter 7 Debtors

9.      On October 11, 2019 (the "Chapter 7 Petition Date", and together with the Chapter 11 Petition Date, collectively, the "Petition Dates"), each of the Chapter 7 Debtors commenced their cases by filing a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

10.     Robert E. Tardif, Jr. has been appointed the Trustee in each of the cases of the Chapter 7 Debtors.

11.     On December 6, 2019, the Court entered orders granting the Trustee's applications to employ Berger Singerman LLP as transaction counsel to the Trustee (Bozzi, Case No. 9:19-bk-09677-FMD, Doc. 54; Ganzi, Case No. 9:19-bk-09677-FMD, Doc. 49).

12.     On December 4, 2019, the Trustee filed in each of the Chapter 7 Cases an *Amended Motion for Entry of an Order Authorizing the Trustee to Exercise the Debtor's Rights and Interests in the Corporate Entity* (Bozzi, Case No. 9:19-bk-09677-FMD, Doc. 52; Ganzi, Case No. 9:19-bk-09680-FMD, Doc. 47) (collectively, the "Initial Palm OpCos Authorization Motions").

4

9559611-9

13.    In the Initial Palm OpCos Authorization Motions, the Trustee sought authority to exercise the ownership interests of the Chapter 7 Debtors in, among other entities, the Palm OpCos, but not with respect to JOMR and JOMH.

14.    On December 11, 2019, the Court entered orders granting the Initial Palm OpCos Authorization Motions (Bozzi, Case No. 9:19-bk-09677-FMD, Doc. 58; Ganzi, Case No. 9:19-bk-09680-FMD, Doc. 55) (collectively, the "Initial Palm OpCos Authorization Orders").

15.    On February 10, 2020, the Trustee filed in each of the Chapter 7 Cases a *Supplemental Motion for Entry of an Order Authorizing the Trustee to Exercise the Debtor's Rights and Interests in Corporate Entity* (Bozzi, Case No. 9:19-bk-09677-FMD, Doc. 112; Ganzi, Case No. 9:19-bk-09680-FMD, Doc. 94) (collectively, the "Supplemental Palm OpCos Authorization Motions" and together with the Initial Palm OpCos Authorization Motions, collectively, the "Palm OpCos Authorization Motions").

16.    In the Supplemental Palm OpCos Authorization Motions, the Trustee sought authority to exercise the ownership interests in two additional entities which the Trustee's investigation revealed are owned by the Chapter 7 Debtors—BB Chicago, LLC (an entity owned 100% by Mr. Bozzi) and WG Chicago, LLC (an entity owned 100% by Mr. Ganzi).

17.    At the hearing held on February 13, 2020, the Court approved the Supplemental Palm OpCos Authorization Motions (Bozzi, Case No. 9:19-bk-09677-FMD, Doc. 130 (Hearing Proceeding Memo); Ganzi, Case No. 9:19-bk-09680-FMD, Doc. 112 (Hearing Proceeding Memo)).

18.    On February 20, 2020, the Court entered orders granting the Supplemental Palm OpCos Authorization Motions (Bozzi, Case No. 9:19-bk-09677-FMD, Doc. 136; Ganzi, Case No. 9:19-bk-09680-FMD, Doc. 117) (collectively, the "Supplemental Palm OpCos Authorization

5

Orders" and together with the Initial Palm OpCos Authorization Orders, collectively, the "Palm OpCos Authorization Orders").

## THE MARKETING OF THE DEBTORS' INTERESTS
## IN THE PALM RESTAURANT GROUP
## AND THE SELECTION OF THE STALKING HORSE BIDDER

19.    On December 20, 2019, the Trustee and the CRO filed a *Joint Application for Entry of an Order Authorizing the Employment and Retention of Raymond James & Associates, Inc. as Investment Banker for (i) Just One Restaurant Corp., (ii) Just One More Holding Corp., and (iii) the Chapter 7 Trustee on Behalf of the Palm OpCos Owned by the Chapter 7 Debtors* (JOMR/JOMH, Case No. 9:19-bk-01947-FMD, Doc. 274; Bozzi, Case No. 9:19-bk-09677-FMD, Doc. 77; Ganzi, Case No. 9:19-bk-09680-FMD, Doc. 70) (collectively, the "Raymond James Retention Application").

20.    On December 30-31, 2019, the Court entered separate orders granting the Raymond James Retention Application *nunc pro tunc* to December 12, 2019 (JOMR/JOMH, Case No. 9:19-bk-01947-FMD, Doc. 278; Bozzi, Case No. 9:19-bk-09677-FMD, Doc. 77; Ganzi, Case No. 9:19-bk-09680-FMD, Doc. 70) (collectively, the "Raymond James Retention Order").

21.    Consistent with terms of the retention of Raymond James & Associates, Inc. ("Raymond James"), the Movants began a formal marketing process on December 12, 2019, for a sale of the Purchased Assets—i.e., the assets directly and indirectly owned by the Debtors related to the Company.  Since being retained, Raymond James has approached 184 potential purchasers, including both strategic and financing buyers.  Subsequently, the Movants executed confidentiality agreements with 51 potential buyers, who were provided a confidential information memorandum containing significant due diligence information.  Raymond James then held extensive diligence

6

calls with most of these parties to facilitate all diligence needed to submit non-binding financing proposals, and a number of these diligence calls were attended by the undersigned counsel.

22.     The Movants received 14 non-binding purchase proposals.  Of these 14, Raymond James organized and held management presentations with eight of them, having determined that six non-binding purchase proposals offered consideration significantly below the other non-binding purchase proposals.  Subsequently, the Movants received three purchase proposals.  After receiving and analyzing various purchase proposals, the Movants selected the Stalking Horse Bidder in connection with a sale transaction subject to higher or otherwise better bids.

23.     Raymond James continues to market the Debtors' interests in the Company.  The Movants expect that Raymond James' marketing process may result in competing bids being submitted by the proposed Bid Deadline of March 6, 2020.  The Movants believe that, based on consultations with Raymond James, the marketing period, which will have spanned approximately twelve (12) weeks during these bankruptcy cases by the time the proposed Auction is held on March 9, 2020, is a reasonable and sufficient period during which to solicit bids on the Debtors' interests in the Company.  The Movants believe that the marketing efforts will be sufficient to ensure the highest or otherwise best offer.

24.     The Movants also believe that, based on consultations with Raymond James, their proposed Bidding Procedures will result in the highest or otherwise best offer for the Debtors' interests in the Company.

## **PROPOSED SALE**

25.     The proposed Sale includes all of the Purchased Assets which are those assets directly and indirectly owned by the Debtors that are related to the Company—i.e., the iconic "The Palm" which is one of the most well-known steakhouse brands and restaurant chains in the United

States and Mexico.  The Purchased Assets subject of the proposed Sale include, among others: (i) the Chapter 7 Debtors' ownership interests in the Palm OpCos which directly and indirectly, own and manage 21 The Palm restaurants located across the United States; (ii) the ownership of the intellectual property for The Palm—a series of trademarks and service marks, design elements of The Palm (such as its food quality choices and methods of preparation) and the Palm's decor, display of certain photographs, artistic caricatures, sketches, cartoons and other elements (collectively, the "Palm IP"); (iii) the licensing rights with respect to the Palm IP, including licensing rights with respect to three The Palm restaurants, one of which is located at John F. Kennedy International Airport in New York City and two others in Mexico City; and (iv) owned real property located at 838 Second Avenue in New York, New York and 94 Main Street, East Hampton, New York.

26.     The Movants have filed contemporaneously herewith the *Joint Motion for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling a Hearing to Consider the Transaction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Procedures, and (VI) Granting Related Relief* (the "Bidding Procedures Motion"), which is incorporated herein by reference.  The Bidding Procedures Motion seeks approval of, among other things, the Bidding Procedures.  The Bidding Procedures provide for, among other things, the requirements for Qualified Bidders to submit Qualified Bids and participate in an Auction.

27.     The following chart summarizes key provisions and aspects of the Agreement, but is qualified in its entirety by reference to the actual Agreement attached hereto as **Exhibit "C"**.[5]

---

[5]     This description of the Agreement is intended as a summary only. To the extent that there is any discrepancy between this summary and the Agreement, the terms of the Agreement shall govern.

9559611-9

| SUMMARY OF MATERIAL TERMS OF THE AGREEMENT | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| **Cash Purchase Price** | In consideration of the sale, transfer and delivery of the Purchased Assets, the Purchase Price is cash in the amount of $50 million, subject to certain adjustments set forth in Section 2.7 of the agreement, plus the assumption of the Assumed Liabilities. | Section 2.6(a) |
| **Sale to Insider** | The Stalking Horse Bidder is not an insider of any of the Debtors. | |
| **Good Faith Deposit** | All Qualified Bidders, including the Stalking Horse Bidder, are required to provide a good faith deposit as set forth in the Bidding Procedures, being ten percent (10%) of the Cash Purchase Price and non-cash consideration of a Bid. | Section 2.8(a); Bidding Procedures |
| **Competitive Bidding/Auction** | The Agreement shall be subject to an Auction to be conducted in accordance with the Bidding Procedures Order. | Section 7.5 |
| **Purchased Assets** | The assets to be sold are substantially all of the Debtors' interests in the assets of the Company, other than the Excluded Assets. Specifically, the Purchased Assets include:<br><br>a.  the Equity Interests (i.e., the equity interests of the Chapter 7 Debtors in each Company);<br><br>b.  the JOMR IP (i.e., the intellectual property rights owned by JOMR);<br><br>c.  Assigned JOMR Contracts (i.e., the rights of JOMR under the License Agreements);<br><br>d.  all books, records, files, and papers of Sellers, including in electronic form, relating solely to the Purchased Assets, except to the extent the same constitutes an Excluded Asset; and<br><br>e.  all utility deposits and other vendor deposits made by any Company with third parties. | Section 2.1 |
| **Excluded Assets** | Excluded Assets include:<br><br>a.  except for the Assigned JOMR Contracts, any unexpired lease or other contract of any Seller;<br><br>b.  all rights of Sellers arising under the Agreement (including without limitation, | Section 2.2 |

| SUMMARY OF MATERIAL TERMS OF THE AGREEMENT | | |
| --- | --- | --- |
| **Term** | **Summary** | **Reference** |
| | rights to the Purchase Price) or in connection with the Transactions; | |
| | c.  any Tax refund or reimbursement due to Sellers with respect to any tax period ending on or before the Closing Date; | |
| | d.  all amounts owed to any Seller by, and all claims of any Seller against, any other Seller, Debtor, or any of their respective Affiliates other than any Company or Subsidiary; provided, however, that any claims against a Company or Subsidiary shall hall be released by Sellers at Closing; | |
| | e.  *Intentionally omitted*; | |
| | f.  Sellers' rights and benefits relating to insurance coverages with respect to events occurring prior to Closing; | |
| | g.  all amounts paid as of the Closing Date to any Seller under any and all License Agreements or sublicense agreements between PMC and any third party relating to any period prior to the Closing Date; | |
| | h.  all minute books, organizational documents, stock records, and corporate seals of JOMR; | |
| | i.  the equity interests of the Chapter 7 Debtors in any entities not identified on Annex I of the Agreement as a "Company"; | |
| | j.  all claims, avoidance recovery, subordination, or other causes of action arising out of the commencement of, related to, or involving the Bankruptcy Cases, including without limitation those arising under chapter 5 of the Bankruptcy Code (e.g., §§ 502(d), 506, 510, 542 - 551 and 553 of the Bankruptcy Code), or arising under applicable state Law or otherwise and the proceeds thereof, other than claims and avoidance recovery, subordination, or other such actions against the Companies (collectively, the "<u>Bankruptcy Causes of Action</u>"); | |
| | k.  all claims and causes of action, including, without limitation, commercial tort claims, and any proceeds thereof, that any representatives of any of the Sellers have the | |

9559611-9

| SUMMARY OF MATERIAL TERMS OF THE AGREEMENT | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | right to bring under applicable state and local Law, by order of the Bankruptcy Court, or otherwise, whether relating to the pre- or post-petition time period, against Bruce E. Bozzi, Sr., Walter J. Ganzi, Jr., or Victor F. Ganzi, or any of their respective Affiliates, or any professionals engaged by any of them, including malpractice and other claims against such professionals, excluding, in all instances, any such claims and causes of action against the Companies or any Subsidiary (collectively, the "<u>Other Causes of Action</u>");and<br><br>l.  Sellers' rights and benefits, including any proceeds thereof (including, without limitation, any proceeds from available insurance) arising out of, related to or involving the Decision and Judgment (the "<u>Derivative Action Causes of Action</u>"). | |
| **Agreements with Management** | No agreements with management or key employees have been entered into as of the date of the filing of the Sale Motion. | |
| **Sale of Avoidance Actions** | The Bankruptcy Causes of Action (defined to include avoidance actions) and are not being sold to the Stalking Horse Bidder.  The Bankruptcy Causes of Action are Excluded Assets. | Section 2.2(j) |
| **Releases** | The Agreement does not provide for any releases of individuals | |
| **Assumed Liabilities** | The Assumed Liabilities include:<br><br>a.  all Liabilities arising in connection with the ownership of the Purchased Assets from and after the Closing;<br><br>b.  all Liabilities of Sellers related to or arising under the Assigned JOMR Contracts;<br><br>c.  all Cure Costs in respect of the Assigned JOMR Contracts, if any; and<br><br>d.  any other Liabilities specifically imposed upon or assumed by Purchaser pursuant to the Agreement. | Section 2.3 |
| **Excluded Liabilities** | Notwithstanding any other provision of the Agreement to the contrary, and except as provided in Section 2.3 ("Assumed Liabilities"), the Stalking Horse Bidder is not assuming any other Claim against or Liability | Section 2.4 |

11

| SUMMARY OF MATERIAL TERMS OF THE AGREEMENT | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | of Sellers of whatever nature, whether presently in existence or arising thereafter. All such other Claims and Liabilities not being assumed (collectively, the "Excluded Liabilities") shall be retained by and remain the Liabilities of Sellers; provided, however, that, for avoidance of doubt, each Company and each Subsidiary shall retain all of its assets and remain liable for all of its Liabilities, in each case, as existing as of the Closing (provided that any Liabilities owed by any Company or any Subsidiary to any Seller or any Seller's Affiliates (including, without limitation, the Chapter 7 Debtors) and any Claims held by any Seller or any Seller's Affiliates (including, without limitation, the Chapter 7 Debtors) against any Company or Subsidiary arising prior to Closing shall be released as of the Closing). | |
| **Sale Free and Clear of Liens** | The Purchased Assets shall be transferred to the Stalking Horse Bidder free and clear of all Claims and Liens (except for Permitted Liens and Encumbrances and the Assumed Liabilities). | Sections 2.1, 3.10, 7.5 |
| **Record Retention** | On and after the Closing Date, upon reasonable advance notice, the Stalking Horse Bidder will afford promptly to Sellers and their counsel, advisors, and other agents reasonable access during normal business hours to the Stalking Horse Bidder's books and records relating to the Purchased Assets to the extent necessary for financial reporting and accounting matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, Claim, or assessment, the reconciliation of Claims in the Bankruptcy Cases, to permit Sellers to determine any matter relating to Sellers' rights and obligations under the Agreement, any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities, or in connection with addressing any other issues arising in connection with or relating to the Bankruptcy Cases, the Bankruptcy Causes of Action, the Other Causes of Action or the Derivative Action Causes of Action; provided, | Section 6.1 |

| SUMMARY OF MATERIAL TERMS OF THE AGREEMENT | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | however, that any such access by Sellers shall not unreasonably interfere with the conduct of the business of the Stalking Horse Bidder. | |
| **Representations and Warranties** | The Agreement contains certain representations and warranties by Sellers and the Stalking Horse Bidder. | Sections 3 and 4 |
| **Closing** | The Closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of the Escrow Agent (Berger Singerman LLP in Miami, Florida), on a date mutually agreeable to the Parties (which date shall be after, but no later than five (5) Business Days after, satisfaction of the conditions set forth in Section 10 of the Agreement (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as the Stalking Horse Bidder and Sellers may agree; provided that the Closing must occur on or before the Outside Date. | Sections 2.9, 12.1(b) |
| **Conditions Precedent to Obligations of Seller and Buyer** | *The conditions precedent to both the Stalking Horse Bidder's and Seller's performance under the Agreement include the following*: <br><br> a.  The Sale Order has been entered, is in full force and effect and has not been stayed, vacated or reversed; and <br><br> b.  No injunction, stay, or similar Order has been issued by any Governmental Authority that restrains, enjoins, stays or prohibits the consummation of the Transactions. <br><br> *The conditions precedent to the Stalking Horse Bidder's performance (or waiver by the Stalking Horse Bidder) under the Agreement include the following*: <br><br> a.  Sellers have performed in all material respects all of their obligations under the Agreement required to be performed by Sellers on or prior to the Closing Date; <br><br> b.  The representations and warranties of Sellers contained in the Agreement are true | Section 10 |

9559611-9

| SUMMARY OF MATERIAL TERMS OF THE AGREEMENT | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect; | |
| | c.  Sellers have delivered all of the items required by Section 2.10 of the Agreement; and | |
| | d.  No Material Adverse Effect shall have occurred and be continuing with respect to the Purchased Assets or the Business. | |
| | *The conditions precedent to Seller's performance (or waiver by Sellers) under the Agreement include the following:* | |
| | a.  the Stalking Horse Bidder has performed in all material respects all of its obligations under the Agreement required to be performed by it at or prior to the Closing Date; | |
| | b.  the representations and warranties of the Stalking Horse Bidder contained in the Agreement are true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date); | |
| | c.    Sellers have received all documents they may reasonably request relating to the existence of Stalking Horse Bidder and the authority of Stalking Horse Bidder for the Agreement all in form and substance reasonably satisfactory to Sellers; and | |
| | d.  the Stalking Horse Bidder has delivered all of the items required by Section 2.11 of the Agreement. | |
| **Termination Events** | The Agreement may be terminated at any time prior to the Closing: | Section 12 |
| | a.  by mutual written agreement of Sellers and the Stalking Horse Bidder; | |

| SUMMARY OF MATERIAL TERMS OF THE AGREEMENT | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | b.  by Sellers or the Stalking Horse Bidder, if the Closing has not been consummated on or before March 31, 2020 (the "Outside Date"), unless the Party seeking termination is in breach of its obligations thereunder; provided, however, that the Sellers may extend the Outside Date until no later than April 17, 2020 in response to circumstances beyond Sellers' reasonable control; | |
| | c.  by Sellers or the Stalking Horse Bidder, if any condition set forth in <u>Section 10.1</u> is incapable of being satisfied, or through no fault of the Party seeking termination, is not satisfied, by the Outside Date; | |
| | d.  by Purchaser, if any condition set forth in <u>Section 10.2</u> is incapable of being satisfied, or through no fault of the Stalking Horse Bidder, is not satisfied, by the Outside Date; | |
| | e.  by Sellers, if any condition set forth in <u>Section 10.3</u> is incapable of being satisfied, or through no fault of Sellers, is not satisfied, by the Outside Date; | |
| | f.  by the Stalking Horse Bidder, if any Seller breaches any of its representations warranties or covenants and agreements set forth in the Agreement and fails to cure the same within ten (10) days after written notice thereof from the Stalking Horse Bidder to Sellers (other than Sellers' failure to close the Transactions for which no notice shall be required and no cure period afforded), unless the Stalking Horse Bidder is in breach of its obligations thereunder; | |
| | g.  by Sellers, if the Stalking Horse Bidder breaches any of its representations warranties or covenants and agreements set forth in the Agreement and fails to cure the same within ten (10) days after written notice thereof from Sellers to the Stalking Horse Bidder (other than the Stalking Horse Bidder's failure to close the Transactions for which no notice shall be required and no cure period afforded), unless any Seller is in breach of its obligations thereunder; | |

| SUMMARY OF MATERIAL TERMS OF THE AGREEMENT | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | h. by Sellers or the Stalking Horse Bidder if the Bankruptcy Court enters an Order in the Bankruptcy Cases approving the sale of all or a portion of the Purchased Assets to a Person other than the Stalking Horse Bidder; <br><br> i. by the Stalking Horse Bidder if the Sale Order shall not have been entered by the Bankruptcy Court on or before March 13, 2020 (subject to adjournment of the Sale Approval Hearing for circumstances beyond Sellers' reasonable control); or <br><br> j. automatically and without any action or notice by Sellers to the Stalking Horse Bidder, or the Stalking Horse Bidder to Sellers, immediately upon: (i) approval by the Bankruptcy Court of an Alternative Transaction, unless the Stalking Horse Bidder is designated a Backup Bidder; or (ii) if the Stalking Horse Bidder is designated a Backup Bidder, the consummation of an Alternative Transaction. | |
| **Break-Up Fee** | Upon the consummation of an Alternative Transaction, Sellers shall pay to the Stalking Horse Bidder cash or other immediately available funds in an amount equal to $1,250,000, being 2.5% of the Purchase Price. | Section 7.5(c)(i) |
| **Expense Reimbursement** | The Stalking Horse Bidder will be entitled to reimbursement of actual and documented out of pocket expenses associated with this Agreement (including, without limitation, travel, due diligence, and professional fees) of up to a maximum amount of $275,000.00. | Section 7.5(c)(i) |
| **Relief from Bankruptcy Rule 6004(h)** | The Movants will seek relief pursuant to Bankruptcy Rule 6004(h). | Definition of "Sale Order"; Section 7.5(e) |

## **RELIEF REQUESTED**

28.     By this Sale Motion, the Movants seek the entry of an order substantially in the

form attached hereto as **Exhibit "B"**: (i) approving the Agreement and authorizing the Sale outside

the ordinary course of business, (ii) authorizing the Sale free and clear of all Claims and Liens

(other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has

9559611-9

agreed to permit under the Agreement or as otherwise set forth in the Agreement), (iii) authorizing

the assumption and assignment of the Assigned JOMR Contracts, and (iv) granting related relief.

29.    For the reasons stated herein, the Movants request, pursuant to Bankruptcy Rule

2002 and 9006(c), to have this Sale Motion heard on shortened notice.

## THE REQUESTED RELIED SHOULD BE GRANTED

**A.    The Proposed Sale Is Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors**.

30.    The Movants submit that ample authority exists for approval of the proposed Sale

of the Purchased Assets pursuant to either the (i) Agreement or (ii) Successful Bid, as applicable.

Section 363(b)(1) of the Bankruptcy Code, in turn, authorizes a trustee to use property of the estate

"outside of the ordinary course of business" so long as the trustee can demonstrate a sound business

justification for the transaction.  *See, e.g., In re 160 Royal Palm, LLC*, 600 B.R. 119, 129 (D. Fla.

2019) (Chapter 11) (courts use the business judgment test to evaluate proposed actions under

section 363(b)(1); *In re Diplomat Const., Inc.*, 481 B.R. 215, 218 (Bankr. N.D. Ga. 2012) (Chapter

7) ("The business judgment test is the prevailing rubric to evaluate the proposed transaction under

§ 363(b)(1)"); *see also In re Antunes*, 2019 WL 913704, at *8 (Bankr. E.D. Pa. Feb. 19, 2019)

(section 363 of the Bankruptcy Code allows the chapter 7 trustee, after notice and hearing, to use

other than in the ordinary course of business, property of the state, by articulating some business

justification).  Furthermore, section 105(a) of the Bankruptcy Code provides a bankruptcy court

with considerable discretion in the administration of bankruptcy cases.  *See In re City of Detroit,

Michigan*, 519 B.R. 673, 679 (Bank. E.D. Mich. 2014).  Specifically, section 105(a) states that

"[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out

the provisions of [the Bankruptcy Code]."  *See* 11 U.S.C. § 105(a).  Based upon a careful review

of the terms of the proposed Sale, the Movants believe that it provides the highest level of proceeds to the Debtors' estates.

31.     The "sound business judgment" generally test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (i) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (ii) that adequate and reasonable notice has been provided to interested persons; (iii) that the debtor has obtained a fair and reasonable price; and (iv) good faith. *See, e.g., In re Abbotts Dairies*, 788 F.2d at 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.,* 104 B.R. 702, 704 (Bankr-. E.D. Pa. 1989).  A debtor's showing of a sound business purpose need not be unduly exhaustive, rather a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983; *In re Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program and holding that the business purpose requirement was fulfilled, because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

        (i)     <u>A "Sound Business Purpose" Supports the Sale</u>.

32.     It is black letter law that a chapter 7 trustee has a fiduciary duty to maximize the value of a debtor's estate.  *See, e.g., In re VCR I, L.L.C.*, 922 F.3d 323, 327 (5th Cir. 2019) (stating rule); *In re CVA Associates*, 171 B.R. 122, 128 (D. Utah 1994) ("a Chapter 7 trustee seeks to maximize the value of the debtor's estate"); *In re Mims*, 355 B.R. 324, 326 (Bankr. M.D. Ala. 2006) ("[t]he chapter 7 trustee has a fiduciary duty to maximize distribution to creditors") (citing *United States* v. *Aldrich (In re Rigden)*, 795 F.2d 727, 730 (9th Cir. 1986)); *In re Dryland Marina,*

18

*Inc.*, 180 B.R. 487, 489 (Bankr. W.D. Mich. 1995) ("the goal of a Chapter 7 trustee is to maximize and protect the value of the debtor's estate"); *In re EPI Products USA, Inc.*, 162 B.R. 1, 3 (Bankr. C.D. Cal. 1993) ("the [chapter 7] trustee must maximize and protect the value of the debtor's estate"); 6 COLLIER ON BANKRUPTCY ¶ 704.04[2]  (Alan N. Resnick & Henry J. Sommer eds. 16th ed.) (hereinafter "COLLIER") (a chapter 7 trustee "must carefully preserve the estate's assets from deterioration or dissipation").  This same rule applies with equal force to chapter 11 debtors.  *See In re Lykes Bros. Steamship Co., Inc.*, 207 B.R. 282, 284 (Bankr. M.D. Fla. 1997).  For the reasons expressed herein and in the Bidding Procedures Motion, the proposed Sale will maximize the value of the Debtors' estates.

33.    A chapter 7 trustee requires broad discretion in order to accomplish the statutory requirements of his or her appointment.  As the Fourth Circuit observed in *In re Merry-Go Round Enterprises, Inc.*, the "purpose of a Chapter 7 case is to administer efficiently the liquidation of the estate for the benefit of the creditors." (citation omitted.)  To accomplish this often seemingly impossible task, the Chapter 7 trustee requires *considerable discretion*."  180 F.3d 149, 162 (4th Cir. 1999) (emphasis supplied); *see also In re Nangle*, 288 B.R. 213, 219 (B.A.P. 8th Cir. 2003) (stating rule); *In re Nissley*, 2015 WL 6556983, at *1 (Bankr. M.D. Pa. Oct. 29, 2015) (same); 6 COLLIER ¶ 704.02[1] (a chapter 7 trustee has "the authority to exercise wide-ranging authority over the debtor's assets").  Similarly, chapter 11 debtors possess broad discretion to fulfill their duties under the Bankruptcy Code.  *See, e.g., In re Nine West Holdings, Inc.*, 588 B.R. 678, 686 (Bankr. S.D.N.Y. 2018) (chapter 11 debtors have broad discretion to use, sell or lease property of the estate other than in the ordinary course of business so long as such use is supported by a good business reason).

34.     In the Movants' exercise of the Debtors' reasonable business judgment, the Movants have determined that the most effective way to maximize the value of the Debtors' assets for all of their creditors and stakeholders is to pursue a Sale of the Debtors' interests in the Company.  Here, the Agreement establishes a floor price for what the Movants anticipate will be a robust Auction.  The Agreement and the Bidding Procedures permit the Movants to seek out higher or otherwise better offers at the Auction.  This will ensure that the market sets the value for the Purchased Assets and that the Sale will maximize the value of the Debtors' interests in the Company for the benefit of all of the Debtors' stakeholders. Accordingly, the Movants have provided a sound business purpose in pursuing the approval of the Sale.

**(ii)     Sufficient Notice of the Proposed Sale Has Been Provided to Interested Parties**.

35.     Pursuant to Bankruptcy Rule 2002(a), the Movants, on behalf of the Debtors, are required to provide creditors with twenty-one days' notice of the Sale Hearing.  The Movants believe that sufficient cause exists to shorten the notice period for the Sale Hearing.  In view of the need to immediately pursue a value-maximizing transaction to protect the value of the Debtors' interests in the Company, and at the same time, ensure sufficient time to explore market interest and conduct a competitive bidding process, the Movants believe that the proposed timeline for the bidding and sale process, including the proposed date of the Sale Hearing, are both reasonable and necessary under the circumstances.  Additionally, commencing the bidding process, conducting the Auction and holding the Sale Hearing on the proposed timeline are necessary to comply with the Milestones under the DIP Loan Facility.  Absent the bidding and sale process on the timeline contemplated by the Bidding Procedures and this Sale Motion, the Movants believe they will be unable to maximize the value of the Debtors' interests in the business as a going concern for the

benefit of all stakeholders.  Accordingly, the Movants submit that approval of the requested date for the Sale Hearing and the other relief requested in this Sale Motion are critical.

36.     In addition, the Movants are requesting only a minor deviation from the standard 21-day notice period.  The Movants are filing this Sale Motion on February 20, 2020.  As such, the standard 21-day notice period would normally permit a hearing on or after March 12, 2020. As requested herein, the Movants are requesting a Sale Hearing on a date falling between March 9-11, 2020 (subject to the Court's availability).  Thus, the Movants' request amounts to shortening the notice with respect to the Sale Hearing by, at most, just one to three days, and as such, the Movants believe that no party will be prejudiced in any manner by the shortened notice period. Accordingly, and for the reasons stated herein and in the Bidding Procedures Motion, the Movants respectfully request the Court to approve the request to schedule the Sale Hearing on shortened notice.

**(iii)     The Proposed Sale is for a Fair and Reasonable Price**.

37.     The Movants submit that the Purchase Price for the Purchased Assets is fair and reasonable.  As explained above, the Purchase Price in the Agreement will serve as the floor price for competing bids.  In addition, the Agreement provides for the Stalking Horse Bidder's assumption of the Assumed Liabilities.

38.     The Bidding Procedures have been designed to ensure that the highest or otherwise best offer for the Purchased Assets will be attained. With the assistance of Raymond James, the Movants are (i) conducting a comprehensive marketing process in order to maximize value, (ii) soliciting the interest of various potential strategic and financial buyers, and (iii) entertaining offers for a sale transaction that will maximize the value of the Debtors' interests in the Company.  The Movants expect that their marketing efforts will result in the submission of one or more competing Qualified Bids prior to the proposed Bid Deadline.  In the event the Movants receive Qualified

9559611-9

Bids other than the Agreement, the Bidding Procedures provide that an Auction will be held to determine the highest or otherwise best bid.

39.     Because the ultimate purchase price for the Purchased Assets will be determined in accordance with the Court-approved Bidding Procedures at an Auction, it will be fair and reasonable as contemplated by Bankruptcy Code section 363.  *See, e.g., In re Abbotts Dairies*, 788 F.2d at 149 (finding that "[generally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt."); *In re Nat'l Health & Safety Corp.*, 1999 Bankr. LEXIS 1126, at *8 (Bankr. E.D. Pa. Sept. 2, 1999) (citing *Abbotts Dairies* for the proposition that an auction may be sufficient to establish that one has paid value for the assets of a debtor, and relying upon auction results to verify that the purchase price represented value).

### (iv)     The Proposed Sale Has Been Negotiated at Arm's Length and in Good Faith.

40.     The "good faith" prong of the *Abbotts Dairies* standard also is satisfied.  The Movants request that the Court find that the Stalking Horse Bidder or the Successful Bidder, as applicable, is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the Sale.  Bankruptcy Code section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b)... of this section of a sale ... of property does not affect the validity of a sale ... under such authorization to an entity that purchased .. . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

41.     Bankruptcy Code section 363(m) thus protects the buyer of assets sold pursuant to Bankruptcy Code section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, Bankruptcy Code section 363(m) applies to sales of interests in tangible assets, such as the Purchased Assets.

9559611-9

42.     The Movants submit, and will present evidence at the Sale Hearing to establish that the Agreement was an arm's-length transaction, in which the Stalking Horse Bidder or the Successful Bidder, as applicable, acted in good faith.  The Movants and the Stalking Horse Bidder negotiated the Agreement in good faith and without collusion or fraud of any kind. The Stalking Horse Bidder has not engaged in collusion or any conduct that would otherwise control or tend to control the sale price as between or among potential bidders.  The Bidding Procedures are designed to maximize rather than chill competitive bidding and the Auction promotes an open and competitive sale process.   The Movants have had their own legal counsel in negotiations over the Agreement and will have their own legal counsel to negotiate on their behalf throughout the Auction and the Sale.  Accordingly, the Movants request that the Court make a finding at the Sale Hearing that the Successful Bidder, including, if applicable, the Stalking Horse Bidder has purchased the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**(v)     All Pertinent Information Regarding the Proposed Sale Has Been Fully Disclosed.**

43.     The Movants have presented the proposed asset sale openly and in good faith.  The Stalking Horse Bidder's identity and any connection with the Debtors has been fully disclosed in this and other pleadings filed with the Bankruptcy Court.  The Movants have fully disclosed and requested the Bankruptcy Court's approval of all of the terms and conditions of the proposed Sale. Sufficient and adequate notice of this Sale Motion has been provided to interested parties and such parties will receive further notice of the Sale and all relevant dates and deadlines related thereto through the Bankruptcy Court-approved Sale Notice.

44.     The Movants will introduce evidence at the Sale Hearing regarding the arm's-length, good faith nature of the Auction and the negotiation of the Agreement.  Indeed, the Movants

will demonstrate that the Agreement with the Stalking Horse Bidder or the Successful Bidder, as applicable, represents the highest or otherwise best bid available to the Movants on behalf of the Debtors for the Purchased Assets following a robust marketing and competitive bidding process. Accordingly, the Sale pursuant to the Agreement has been proposed and fully disclosed in good faith and represents the sound business judgment of the Movants on behalf of the Debtors, and, as such, is entitled to Bankruptcy Court approval.

**B.**      **The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code**.

45.      Under section 363(f) of the Bankruptcy Code, a debtor may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc*. v. *Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Bankruptcy Code section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

46.      The Sale satisfies the criteria set forth in Bankruptcy Code section 363(f).  The Movants believe that, at a minimum, it satisfies the second prong of section 363(f) because the proposed Sale of the Purchased Assets free and clear of all Claims and Liens (except for Permitted Liens and Encumbrances and the Assumed Liabilities) will provide more than sufficient consideration to satisfy the claims of the DIP lender.  Second, the Movants submit that holders of

any Claims and Liens could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction equal to the amount of their Lien, Claim, encumbrance, or interest.

47.    In addition, pursuant to the Bidding Procedures, the Movants will send the Sale Notice to the interested parties in the Debtors' estates, including all parties who could potentially assert any Claim or Lien against the Purchased Assets.  Accordingly, the Movants submit that the Sale of the Purchased Assets free and clear of any Claims or Liens (other than Permitted Liens and Encumbrances and the Assumed Liabilities) satisfies the statutory prerequisites of Bankruptcy Code section 363(f).

C.     **The Assumption and Assignment of the Assigned JOMR Contracts Should Be Authorized**.

48.    Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat. Fuel Gas Dist. Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989).  The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co.* (*In re Wheeling-Pittsburgh Steel Corp.*), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (*quoting In re Stable Mews Assoc.*, 41 B.R. at 596).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase

25

costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co.* v. *Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

49.    Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

50.    Bankruptcy Code section 365(f) provides, in pertinent part, that a trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

51.    Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Moreover, Bankruptcy Code section 365(b) codifies the requirements for assuming an executory contract of a debtor. This provision provides that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such

26

contract or lease unless, at the time of assumption of such contract or lease, the trustee -

    (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default... ;

    (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

    (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

52.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

53.    As set forth in the Agreement (or as shall be set forth in any Qualified Bid), to the extent any defaults exist under any of the three Assigned JOMR Contracts, the Purchaser has agreed to be responsible for the payment of all Cure Costs as required under Bankruptcy Code section 365(b)(1).  Based on the foregoing, the Movants respectfully submit that the assumption

9559611-9

and assignment of the Assigned JOMR Contracts satisfies the requirements under Bankruptcy Code section 365(f)(2)(A) and (B).

**D.    Request for Relief Under Bankruptcy Rules 6004(h) and 6006(d)**.

54.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Movants request that the Bidding Procedures Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

55.    The primary purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* 10 COLLIER ON BANKRUPTCY ¶ 6004.11  (Alan N. Resnick & Henry J. Sommer eds. 16th ed.) ("COLLIER").  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, COLLIER suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *See id.*  Furthermore, COLLIER provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *See id.*

56.    To preserve the value of the Purchased Assets and limit the costs of administering and preserving such assets, it is critical that the Movants close the Sale as soon as possible after all closing conditions have been achieved or waived.  Accordingly, the Movants hereby request

that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

57.    Based upon the foregoing, the Movants submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

## <u>RESERVATION OF RIGHTS</u>

58.    Nothing contained in this Sale Motion or any actions taken by the Movants or the Debtors pursuant to relief granted in the order is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against any Debtor; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Sale Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code other than the Assigned JOMR Contracts; (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Sale Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

9559611-9

**WHEREFORE**, the Chapter 11 Debtors, through the Chief Restructuring Officer, and the Trustee on behalf of the estates of the Chapter 7 Debtors and the Palm OpCos, respectfully request the Court (a) grant this Sale Motion and enter the Sale Order substantially the form attached hereto as **Exhibit "B"**, (b) approve the Agreement and authorizing the Sale of the Purchased Assets outside the ordinary course of business, (c) authorize the sale of assets free and clear of all Claims and Liens (other than Assumed Liabilities and Encumbrances and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement or as otherwise set forth in the Agreement), (d) authorizing the assumption and assignment of the Assigned JOMR Contracts, and (e) granting such other and further relief as the Court deems just and proper.

Dated:  February 20, 2020

Respectfully submitted,

BERGER SINGERMAN LLP
*Counsel for JOMR, JOMH and
Transaction counsel for the Trustee*
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:  *Christopher Andrew Jarvinen*
    Paul Steven Singerman
    Florida Bar No. 0378860
    singerman@bergersingerman.com
    Christopher Andrew Jarvinen
    Florida Bar No. 021745
    cjarvinen@bergersingerman.com

9559611-9

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served electronically through the Court's CM/ECF system upon all parties registered to receive electronic notice in this case as reflected on the attached Electronic Mail Notice List and via U.S. Regular Mail, postage prepaid, upon all parties on the attached Creditor Matrix and Additional Service List, unless otherwise served electronically through the Court's CM/ECF system on this 20th day of February, 2020.

*Christopher Andrew Jarvinen*
Christopher Andrew Jarvinen

9559611-9

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- Andrew T. Jenkins    ajenkins@bushross.com, mlinares@bushross.com;ksprehn@bushross.com
- Benjamin E. Lambers    Ben.E.Lambers@usdoj.gov
- Brenda E Carpenter    FLMD.bankruptcy@phelanhallinan.com, Stefan.Beuge@phelanhallinan.com
- Christopher A Jarvinen    cjarvinen@bergersingerman.com, efile@bergersingerman.com;mdiaz@bergersingerman.com;efile@ecf.inforuptcy.com
- Eric D Jacobs    ejacobs@gjb-law.com, gjbecf@ecf.courtdrive.com;gjbecf@gjb-law.com;chopkins@gjb-law.com;vlambdin@gjb-law.com;btraina@gjb-law.com;mrodriguez-salva@gjb-law.com
- Fredric S. Newman    fnewman@hnrklaw.com, docket@hnrklaw.com
- Gerard A McHale    jerrym@thereceiver.net
- Gregg A Steinman    gregg.steinman@dlapiper.com, tennille.wilson@dlapiper.com
- J Steven Wilkes    steven.wilkes@usdoj.gov
- Joshua D Rievman    jrievman@drdllplaw.com
- Julia A May    juliamay@mvalaw.com
- Marian G Kennady    mkennady@reedsmith.com, khernandez@reedsmith.com
- Megan Preusker    mpreusker@mwe.com
- Paul A Avron    pavron@bergersingerman.com, efile@bergersingerman.com;efile@ecf.inforuptcy.com;mday@bergersingerman.com
- Paul Steven Singerman    singerman@bergersingerman.com, efile@bergersingerman.com;mdiaz@bergersingerman.com;efile@ecf.inforuptcy.com
- Robert A. Schatzman    robert.schatzman@gray-robinson.com, Amador.Ruiz-Baliu@gray-robinson.com;Ana.Marmanillo@gray-robinson.com
- Robert E Tardif    rtardif@comcast.net, graceheidkamp@gmail.com;blkenney2@comcast.net;rtardif@ecf.axosfs.com;ecf.alert+Tardif@titlexi.com
- Robert E Tardif, Attorney for Trustee    rtardif@comcast.net, graceheidkamp@gmail.com;blkenney2@comcast.net
- Robert F Elgidely    relgidely@foxrothschild.com, mmiller-hayle@foxrothschild.com;rsolomon@foxrothschild.com;AngelaTerrell@foxrothschild.com
- Steven J Solomon    steven.solomon@gray-robinson.com, Ana.Marmanillo@gray-robinson.com;Amador.Ruiz-Baliu@gray-robinson.com
- United States Trustee - TPA7/13    USTPRegion21.TP.ECF@USDOJ.GOV

## Exhibit "A"

## The Palm OpCos[6]

Atlanta Palm Food Corporation
Atlantic City Palm, LLC
BB Chicago, LLC[7]
B.W. Associates, Inc.[8]
Boston Palm Corporation
Charlotte Palm Corporation
Chicago Palm, Inc.[9]
Denver Palm Corporation
DGMB Associates, Inc.[10]
LA Downtown Palm, LLC
Miami Palm Restaurant, Inc.
Nashville Palm Restaurant, LLC
Palm Airport, LLC
Palm Beverly Hills Restaurant, LLC[11]
Palm Beverly Hills Restaurant Manager, LLC
Palm Management Corporation
Palm New York Downtown, LLC
Palm Orlando Corporation
Palm Philadelphia Investor, LLC
Palm Philadelphia Manager, LLC
Palm Philadelphia Restaurant, LLC[12]
Palm Restaurant, Inc.
Palm Restaurant of Houston, Inc.
Palm Restaurant of Las Vegas, Inc.
Palm Tysons Too, Inc.
Palm West Corporation
San Antonio Palm Restaurant, Inc.
The Washington Palm, Inc.
WG Chicago, LLC[13]

---

[6]   Sources: (a) Schedules filed in the United States Bankruptcy Court for the Middle District of Florida by Bozzi (Case no. 9:19-bk-09677-FMD, Doc. 85, pp. 7-8 out of 62) and Ganzi (Case no. 9:19-bk-09680-FMD, docket no. 76, pp. 9-10 out of 56); (b) Hearing proceeding memos entered by the Court with respect to BB Chicago, LLC (Bozzi; Case no. 9:19-bk-09677-FMD, Doc. 130) and WG Chicago, LLC (Ganzi; case no. 9:19-bk-09680-FMD, Doc. 112); and (c) information provided by bankruptcy counsel to Messrs. Bozzi and Ganzi.

[7]   Mr. Bozzi owns 100% of the interests in BB Chicago, LLC.

[8]   BW Associates, Inc. is a wholly-owned entity of Palm Restaurant of Houston, Inc.

[9]   81.62% of the equity of Chicago Palm, Inc. is indirectly owned by Messrs. Ganzi and Bozzi through their respective 100% direct ownerships of BB Chicago, LLC (Mr. Bozzi) and WG Chicago, LLC (Mr. Ganzi).

[10]   DGMB Associates, Inc. is a wholly-owned entity of San Antonio Palm Restaurant, Inc.

[11]   50% of the equity of Palm Beverly Hills Restaurant, LLC is indirectly owned by Messrs. Bozzi and Ganzi through their collective 100% direct ownership of Palm Beverly Hills Restaurant Manager, LLC.

[12]   50% of the equity of Palm Philadelphia Restaurant, LLC is indirectly owned by Messrs. Bozzi and Ganzi through their collective 100% direct ownership of Palm Philadelphia Investor, LLC.

[13]   Mr. Ganzi owns 100% of the interests in WG Chicago, LLC.

## Exhibit "B"

**Proposed  Order**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

JUST ONE MORE RESTAURANT CORP.,          Case No. 9:19-bk-1947
and JUST ONE MORE HOLDING CORP.,[1]       (Jointly Administered with
                                          Case No. 9:19-bk-1948)
          Debtors.                        Chapter 11 Cases
_____/


In re:

BRUCE E. BOZZI, SR.,                      Case No. 9:19-bk-09677-FMD
                                          Chapter 7
          Debtor.
_____/


In re:

WALTER J. GANZI, JR.,                     Case No. 9:19-bk-09680-FMD
                                          Chapter 7
          Debtor.
_____/

---

[1]    The last four digits of each Chapter 11 Debtor's federal tax identification number are Just One More Restaurant Corp. (5070) and Just One More Holding Corp. (6081).  The address of the Chapter 11 Debtors is 8955 Fontana Del Sol Way, 2nd Floor, Naples, FL 34109.

**ORDER APPROVING
JOINT MOTION FOR ENTRY OF AN ORDER (I) APPROVING
PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN
ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE OF
BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR
OF ALL CLAIMS AND LIENS EXCEPT FOR PERMITTED LIENS, ENCUMBRANCES
AND ASSUMED LIABILITIES, (III) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
OF CHAPTER 11 DEBTOR JOMR, AND (IV) GRANTING RELATED RELIEF**

THIS MATTER came before the Court in Tampa, Florida for a preliminary hearing on Tuesday, February 25, 2020 at 3:30 p.m. and for a final hearing on _____, March __, 2020 at _____ a.m./p.m. (collectively, the "Sale Hearing") upon the *Joint Motion for Entry of an Order (I) Approving Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Claims and Liens Except for Permitted Liens, Encumbrances and Assumed Liabilities, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts of Chapter 11 Debtor JOMR, and (IV) Granting Related Relief* (Doc. ___) (the "Sale Motion")[2] filed by Just One More Restaurant Corp. ("JOMR") and Just One More Holding Corp. ("JOMH" and together with JOMR, collectively, the "Chapter 11 Debtors") through Gerard A. McHale, Jr., not in his individual capacity but solely in his capacity as the Chief Restructuring Officer of the Chapter 11 Debtors (the "CRO"), and Robert E. Tardif, Jr., not in his individual capacity but solely in his capacity as the trustee (the "Trustee", and together with the CRO, collectively, the "Movants") appointed in the chapter 7 bankruptcy cases of each of Bruce E. Bozzi, Sr. ("Bozzi") and Walter J. Ganzi, Jr. ("Ganzi" and together with Bozzi, collectively, the "Chapter 7 Debtors"; together, the Chapter 11 Debtors and the Chapter 7 Debtors, collectively, the "Debtors") on behalf of the estates of the

---

[2]    Any capitalized term not explicitly defined herein shall have the meaning ascribed to it, as applicable, in (i) the Sale Motion, (ii) the Bidding Procedures, or (iii) the Agreement (as defined herein).

2

Chapter 7 Debtors and each of the business entities listed on <u>Exhibit "A"</u> attached to the Sale Motion (collectively, the "<u>Palm OpCos</u>" and together with the Chapter 11 Debtors, collectively, the "<u>Company</u>") by the authority granted to the Movants by title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and the Palm OpCos Authorization Orders.  The Sale Motion requests the entry of an order: (i) approving the Purchase Agreement (the "<u>Agreement</u>"), a copy of which is attached to the Sale Motion as <u>Exhibit "C"</u>, among the Debtors and Golden Nugget, LLC (together with its permitted successors, assigns and designees, the "<u>Stalking Horse Bidder</u>"), or a Successful Bidder,[3] as applicable, and authorizing the sale of the Purchased Assets outside of the ordinary course of business; (ii) authorizing the sale free and clear of all Claims and Liens (as defined in the Agreement) (other than Assumed Liabilities and Encumbrances and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement) (the "<u>Sale</u>") of the Purchased Assets to the Purchaser; (iii) authorizing the assumption and assignment of the Assigned JOMR Contracts; and (iv) granting related relief, all as more fully set forth in the Sale Motion; and pursuant to this Court's *Order Approving Joint Motion for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling a Hearing to Consider the Transaction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Procedures, and (VI) Granting Related Relief* (Doc. __) (the "<u>Bidding Procedures Order</u>"), this Court having authorized the Sellers to enter into that certain Purchase Agreement by and between the Sellers and Golden Nugget, LLC, dated as of February 20, 2020 (as may be amended or otherwise modified from time to time and including all related instruments, documents, exhibits, schedules, and agreements thereto, collectively, the "<u>Agreement</u>"), a copy of which is attached

---

[3]    Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Agreement or the Bidding Procedures Motion (defined below), as applicable.

hereto as **Exhibit "A"**, pursuant to which Golden Nugget, LLC (together with its permitted successors, designees and assigns, collectively "Purchaser")) agreed to serve as the "Stalking Horse Bidder" with respect to the Purchased Assets, free and clear of certain Claims and Liens (as each is defined in the attached Agreement) (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement), with such sale to be in accordance with the terms and conditions of the Agreement; and the Bidding Procedures Order having authorized the Movants to conduct, and approved the terms and conditions of, an auction as set forth in the Bidding Procedures Order (the "Auction") to consider higher or otherwise better offers for the Purchased Assets, establishing a date for the Auction, and approving, among other things: (i) certain Bidding Procedures (the "Bidding Procedures") to be used in connection with the Auction; (ii) the form and manner of notice of the Auction and Bidding Procedures; (iii) the procedures relating to the assumption and assignment of the Assigned JOMR Contracts; and (iv) the Termination Fee; and this Court having established the date of the Sale Hearing; and this Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and in the Sale Motion, the relief requested therein, and [the responses thereto] being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties [and all responses and objections to the Sale Motion having been duly noted in the record of the Sale Hearing]; and upon the record of the Sale Hearing, and all other pleadings and proceedings in these bankruptcy cases; and this Court having found that the relief requested in the Sale Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Movants' notice of the Sale and the Sale Motion and opportunity for a

hearing on the Sale Motion were appropriate and no other notice need be provided; and this Court having reviewed the Sale Motion and having heard the statements in support of the relief requested therein at the Sale Hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court and at the Sale Hearing; and after due deliberation and sufficient cause appearing therefor, does for the reasons stated in the Sale Motion and on the record of the Sale Hearing, all of which are incorporated herein:

**IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:**

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.     To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.     This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Purchased Assets to be sold, transferred, or conveyed pursuant to the Agreement, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2).  Venue of these bankruptcy cases and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs

entry of this Order as set forth herein and the closing of all Transactions contemplated hereby without regard to any stay or delay in its implementation.

   E.  The statutory and rule-based predicates for the relief requested in the Sale Motion and for the approvals and authorizations herein are (i) sections 102, 105, 363 and 365, 503 and 507 of the Bankruptcy Code, (ii) Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014 and (iii) Local Rule 2081-1(h).

   F.  Proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding: the Sale Motion, the Auction, the Sale Hearing, and the Transactions contemplated by the Agreement, including the sale of the Purchased Assets (the "Sale") have been provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006, 9007, 9008, and 9014, the local rules of the Court, the procedural due process requirements of the United States Constitution, and in compliance with the Bidding Procedures Order. The Movants also gave due and proper notice of the potential assumption and assignment of the Assigned JOMR Contracts to each non-debtor party under each such Assigned JOMR Contract, as well as landlords to the non-debtor restaurant locations (collectively, the "Landlords").  Such notice was good and sufficient and appropriate under the particular circumstances, and the counterparties to the Assigned JOMR Contracts and the Landlords are hereby deemed to consent to the relief granted herein unless otherwise provided in this Order.  No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Sale Motion, the Auction, the Sale Hearing, the assumption and assignment of the Assigned JOMR Contracts, or of the entry of this Order is necessary or shall be required.

   G.  A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities, including, without limitation, (i) all entities

9589219-7

that claim any interest in or lien upon the Purchased Assets, (ii) all non-debtor parties to the Assigned JOMR Contracts assumed and assigned pursuant to this Order, (iii) the Landlords, (iv) all relevant governmental taxing authorities that have, or as a result of the transfer of the Purchased Assets may have, Claims, contingent or otherwise, against the Debtors, (v) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002 or Local Rule 2002-1, (vi) all creditors (whether their Claims are liquidated, contingent, or unmatured) of the Debtors, (vii) all interested governmental authorities in the Debtors' bankruptcy cases, (viii) the Office of the United States Trustee for the Middle District of Florida, and (ix) all entities that heretofore entered into non-disclosure agreements with the Movants with respect to potential purchase of the Debtors' interests in the Company.  Other parties interested in bidding on the Purchased Assets were provided, pursuant to the Bidding Procedures Order, sufficient information to make an informed judgment on whether to bid on the Purchased Assets.

H.    The Purchased Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

I.    The Movants, in the exercise of the Debtors' reasonable business judgment, have demonstrated a sufficient basis and the existence of reasonable, appropriate and compelling circumstances requiring them, on behalf of the Debtors' estates, to enter into the Agreement, to transfer the Purchased Assets and assume and assign the Assigned JOMR Contracts, to the Purchaser under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' reasonable business judgment and in the best interests of the Debtors, their estates and their stakeholders.

J.    The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive, substantively and procedurally fair to all of the relevant parties.

9589219-7

K.    The Movants and their professionals have complied, in good faith, in all respects with the Bidding Procedures Order. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing or submitted by affidavit or declaration at or prior to the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, the Movants (a) afforded interested investors a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase all of the Debtors' interests in the Company (i.e., the Purchased Assets), (b) provided interested investors, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets, and (c) considered any bids submitted on or before the deadline to submit bids as set forth in the Bidding Procedures (the "Bid Deadline").

L.    The Purchaser has put forth the highest or otherwise best offer for the Purchased Assets pursuant to the terms of the Bidding Procedures Order.  The Bidding Procedures obtained the highest or best value for the Purchased Assets for the Debtors and their estates.

M.    The offer of the Purchaser, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agreement, (i) is the highest or best offer received by the Debtors and their estates, (ii) is fair and reasonable, (iii) is in the best interests of the Debtors' stakeholders and estates, (iv) constitutes full and fair consideration and reasonably equivalent value for the Purchased Assets, and (v) will provide a greater recovery for the Debtors' creditors, and other interested parties than would be provided by any other practically available alternative.  No other entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors' estates than the Purchaser.

8

N.    The Purchaser is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code and the decisions thereunder.  The Purchaser is a purchaser in "good faith," as that term is used in the Bankruptcy Code and the decisions thereunder and is entitled to the protections of section 363(m) and (n) of the Bankruptcy Code with respect to the Purchased Assets.  The Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind.  Neither the Movants, on behalf of the Debtors' estates, nor the Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) of the Bankruptcy Code to the Agreement or to the consummation of the sale transaction and transfer of the Purchased Assets, and the Assigned JOMR Contracts, to the Purchaser.  The Purchaser is purchasing the Purchased Assets (including the Assigned JOMR Contracts) in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is, therefore, entitled to the protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that:  (i) the Purchaser recognized that the Movants, on behalf of the Debtors' estates, were free to deal with any other party interested in acquiring the Purchased Assets, (ii) the Purchaser complied with the provisions in the Bidding Procedures Order, (iii) all consideration to be paid by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the sale have been disclosed, (iv) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction, and (v) the negotiations and execution of the Agreement and any other agreements or instruments related thereto were in good faith.

O.    The Debtors' estates have full corporate power and authority to execute the Agreement (and all other documents contemplated thereby) and to consummate the Transactions

contemplated therein, and the sale or transfer of the Purchased Assets has been duly and validly authorized by all necessary corporate actions on the part of the Debtors' estates. No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Debtors' estates to consummate such Transactions.

P.    The Movants, on behalf of the Debtors' estates, have advanced sound business reasons for entering into the Agreement and transferring, or assuming and assigning (with respect to the Assigned JOMR Contracts), the Purchased Assets, as more fully set forth in the Sale Motion and the Agreement and as demonstrated at the Sale Hearing, and it is a reasonable exercise by the Movants of the Debtors' business judgment to transfer, or assume and assign (with respect to the Assigned JOMR Contracts), the Purchased Assets to the Purchaser and to consummate the Transactions contemplated by the Agreement with the Purchaser. Notwithstanding any requirement for approval or consent by any person, the transfer of the Purchased Assets to the Purchaser and the assumption and assignment of the Assigned JOMR Contracts represent a legal, valid, and effective transfer of the Purchased Assets.

Q.    The terms and conditions of the Agreement, including the consideration to be realized by the Debtors' estates pursuant to the Agreement, are fair and reasonable, and the Transactions contemplated by the Agreement and reflected in this Order are in the best interests of the Debtors' estates.

R.    Except with respect to the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement, the Purchased Assets shall be sold free and clear of any and all liens (statutory or otherwise, including, without limitation, mechanics, materialmens' and other consensual and non-consensual liens and statutory liens), hypothecations, encumbrances, security interests,

9589219-7

mortgages, debts, levies, indentures, pledges, restrictions (whether on voting, sale, transfer, disposition or otherwise), charges, instruments, preferences, priorities, security agreements, conditional sales agreements, title retention contracts, options, Claims, judgments, offsets, rights of recovery, rights of pre-emption, rights of first refusal or other third party rights, Claims for reimbursement (other than the Sellers' rights and claims in the Agreement and other documents executed by the Purchaser in connection with the Transactions), contribution, indemnity, exoneration, products liability, alter-ego, environmental, or Tax (including Claims for any and all foreign, federal, state and local Taxes), decrees of any court or foreign or domestic governmental entity, orders of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any Claim based on any theory that either the Purchaser is a successor or a continuation of the Debtors or the Debtors' business), reclamation Claims, obligations, liabilities, demands, and guaranties, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, including Claims otherwise arising under doctrines of successor liability (collectively, as defined in the Agreement, the "Liens").

S.     Except with respect to the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement, the Liens shall attach to the consideration to be received by the Debtors in the

same priority and subject to the same defenses and avoidability, if any, as before the closing of the Transactions contemplated by the Agreement (the "Closing"), and the Purchaser would not enter into the Agreement to purchase the Purchased Assets or proceed to the Closing otherwise.

T.      The transfer of the Purchased Assets to the Purchaser under this Agreement and the Order will be a legal, valid, and effective transfer of the Purchased Assets to the Purchaser, with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any and all Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement). Except as specifically provided in the Agreement or this Order, the Purchaser shall not assume or become liable for any Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) relating to the Purchased Assets being sold by the Debtors.

U.      The transfer of the Purchased Assets to the Purchaser free and clear of all Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement) will not result in any undue burden or prejudice to any holders of any Liens, because all such Liens of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Purchased Assets received by the Debtors in the order of their priority, with the same validity, force, and effect which they now have as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. All persons having Liens of any kind or nature whatsoever against or in any of the Debtors, the Purchased Assets shall be forever barred and estopped from pursuing or asserting such Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as

9589219-7

otherwise set forth in the Agreement) against the Purchaser, or any of their respective assets, property, successors or assigns, the Purchased Assets.

V.      The Debtors may sell the Purchased Assets free and clear of all Liens of any kind or nature whatsoever (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement) because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  The (i) holders of Liens and (ii) non-debtor parties to the Assigned JOMR Contracts, who did not object, or who withdrew their objections, to the sale of the Purchased Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Except as set forth below, any objections to the Sale Motion, including objections by non-debtor parties to the Assigned JOMR Contracts, have been overruled or resolved.  Those holders of Liens who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, if any, attach to the proceeds of the Sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may claim any Liens, with such Liens being subject to treatment as prescribed in any chapter 11 plan or by separate order of this Court.

W.      Not selling the Purchased Assets free and clear of all Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) would adversely impact the Debtors' estates, and the sale of Purchased Assets other than one free and clear of all Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) would be of substantially less value to the Debtors' estates.

13

X.    The sale of the Purchased Assets outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan or reorganization of the Debtors.  The Sale does not constitute a *sub rosa* chapter 11 plan.

Y.    The Movants, on behalf of the Debtors' estates, and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including subsections 365(b)(1)(A), (B) and 365(f), in connection with the sale and the assumption and assignment of the Assigned JOMR Contracts.  The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned JOMR Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.

Z.    The assumption and assignment of the Assigned JOMR Contracts pursuant to the terms of this Order is integral to the Agreement and is in the best interests of the Debtors, their estates, their stakeholders and other parties in interest, and represents the exercise by the Movants of the sound and prudent business judgment of the Debtors' estates.

AA.    The Assigned JOMR Contracts are assignable notwithstanding any provisions contained therein to the contrary.  Pursuant to the Agreement, the Purchaser shall have sole responsibility for paying all Cure Costs required to assume and assign the Assigned JOMR Contracts to the Purchaser.  The notice and opportunity to object provided to the contract counterparties to such contracts and to other parties in interest, as set forth in the Bidding Procedures Order and Agreement, fairly and reasonably protects any rights that such contract counterparties and other parties in interest may have with respect to such contracts.

9589219-7

BB.     The notice and opportunity to object provided to the Debtors' parties in interest, as set forth in the Bidding Procedures Order and the Agreement, fairly and reasonably protects any rights of any party in interest.

CC.     The Movants, on behalf of the Debtors' estates, and the Purchaser will be acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the Transactions contemplated by the Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to any stay, including, without limitation, as provided by Bankruptcy Rules 6004(h), 6006(d) and Local Rule 2081-1(h).

DD.     Except as otherwise provided in the Agreement, (i) the Transactions contemplated under the Agreement do not amount to a consolidation, merger, or de facto merger of the Purchaser, on the one hand, and the Debtors and/or the Debtors' estates, on the other, (ii) there is not substantial continuity between the Purchaser, on the one hand, and the Debtors, on the other, (iii) there is no continuity of enterprise between the Debtors and the Purchaser, neither is the Purchaser is a mere continuation of the Debtors or their estates, and (ii) the Purchaser is not a successor to the Debtors or their estates.

EE.     The Agreement was not entered into, and none of the Movants, on behalf of the Debtors' estates, nor the Purchaser, have entered into the Agreement or proposed to consummate the Transactions contemplated thereby, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors.  The total consideration provided by the Purchaser for the Purchased Assets was the highest or otherwise best offer received by the Movants, on behalf of the Debtors' estates, and the Purchase Price and other consideration under the Agreement, including the assumption of the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, or otherwise set forth in the Agreement,

15

constitute (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

FF.    Time is of the essence in consummating the Sale.  In order to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Agreement.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

GG.    At and effective as of the Closing, the Purchaser shall assume sole responsibility for paying and satisfying the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, or otherwise set forth in the Agreement, including all liabilities and obligations of Sellers related to or arising under the Assigned JOMR Contracts.  After the Closing, the Debtors shall have no liability whatsoever with respect to the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, or as otherwise set forth in the Agreement.  The Purchaser shall have no obligations with respect to any liabilities of the Debtors other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement or as otherwise set forth in the Agreement.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Sale Motion is **GRANTED** as set forth herein and the Agreement is approved, subject to the terms and conditions contained herein.

9589219-7

2.      Except as otherwise expressly set forth herein, all objections, responses, reservations of rights, and requests for continuance concerning the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing. To the extent any such objection, response, reservation of rights, or request for continuance was not otherwise withdrawn, waived, or settled, it is overruled and denied on the merits with prejudice.

3.      Notice of the Sale Hearing was fair, equitable, proper, and sufficient under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, the Local Rules, and as required by the Bidding Procedures Order. For the reasons stated in the Sale Motion and at the Sale Hearing, the Court grants the Movants' request for shortened notice with respect to the relief requested in the Sale Motion.

4.      The Movants, on behalf of the Debtors, in transferring the Purchased Assets pursuant to this Order and section 363 of the Bankruptcy Code, are deemed, under section 1107(a) of the Bankruptcy Code, to have all rights and powers to perform all the functions and duties of a trustee serving in a bankruptcy case, and will transfer the property pursuant to this Order.

5.      Subject to the terms of this Order, the sale of the Purchased Assets, the terms and conditions of the Agreement (including all schedules and exhibits affixed thereto), and the Transactions contemplated thereby shall be, and hereby are, authorized and approved in all respects, and shall be enforceable against each of the Parties thereto.

6.      The failure specifically to include any particular provisions of the Agreement or any of the documents, ancillary documents, or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, Agreement, or instrument, it being the intent of the Court, the Movants (on behalf of the Debtors' estates), and

the Purchaser, that the Agreement and each document, ancillary document, or instrument be authorized and approved in its entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing Date.

7.      The Agreement and any related ancillary document(s), or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided, that any such modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the Agreement and any related ancillary documents.

8.      The sale of the Purchased Assets and the consideration provided by the Purchaser under the Agreement are fair and reasonable, the highest or otherwise best offer for the Purchased Assets and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.  The Sale of the Purchased Assets to the Purchaser is a legal, valid and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent of any entity.

9.      The Purchaser is hereby granted and is entitled to all the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code, including with respect to the transfer of the Assigned JOMR Contracts as part of the sale of the Purchased Assets pursuant to section 365 of the Bankruptcy Code and this Order.

10.     The Movants, on behalf of the Debtors' estates, and their employees, professional advisors, and agents shall be, and hereby are, authorized and directed to fully assume, perform under, consummate, and implement the terms of the Agreement together with any and all additional instruments and documents that may be necessary or desirable in connection with implementing and effectuating the terms of the Agreement, this Order, and/or the sale of the

Purchased Assets, including, without limitation, the certificates, deeds, assignments, and other instruments of transfer, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession, any or all of the Purchased Assets, or Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, or otherwise set forth in the Agreement, as may be necessary or appropriate to the performance of the obligations of the Debtors' estates in accordance with, or as contemplated by, the Agreement, without any further corporate action or orders of this Court.

11.    The Movants, on behalf of the Debtors' estates, and each other person or entity having duties or responsibilities under the Agreement, any agreements or instruments related thereto or this Order, and their respective directors, officers, managers, employees, members, agents, representatives, attorneys, and other retained professionals are authorized and empowered, subject to the terms and conditions contained in the Agreement and this Order, to carry out all of the provisions of the Agreement and any related agreements or instruments; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement and any related agreements or instruments; to take any and all actions contemplated by the Agreement, any related agreements or instruments, or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary, desirable or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements or instruments, and this Order and the Transactions contemplated thereby and hereby, all without further application to, or order of, the Court or further action by their respective

19

directors, officers, managers, employees, members, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, managers, employees, members, agents, representatives, and attorneys of such entities. The Chief Restructuring Officer, on behalf of the Chapter 11 Debtor JOMR, and the Trustee, on behalf of the Chapter 7 Debtors' estates and the Palm OpCos, shall be, and each hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable). The Movants, on behalf of the Debtors' estates, and the Purchaser are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Authority at the Purchaser's sole expense any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Transactions contemplated by the Agreement, any related agreements and this Order, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable Governmental Authorities or as the Movants, on behalf of any of the Debtors, may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporate laws of the states of formation of each corporate Debtor and all other applicable business, corporation, trust, and other laws of the applicable Governmental Authorities with respect to the implementation and consummation of the Agreement, any related agreements or instruments and this Order, and the Transactions contemplated thereby and hereby.

12.    To the fullest extent permitted by law, effective as of the Closing, (a) the transfer of the Purchased Assets to the Purchaser, shall constitute a legal, valid, and effective transfer of

9589219-7

the Purchased Assets notwithstanding any requirement for approval or consent by any Person and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets, free and clear of all Liens of any kind (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of the Assumed Liabilities, Encumbrances and Liens by the Purchaser shall constitute a legal, valid and effective delegation and assignment of all Assumed Liabilities, Encumbrances and Liens to the Purchaser and shall divest the Debtors' estates of all liability with respect to any Assumed Liabilities, Encumbrances and Liens.  Unless otherwise agreed to by the Movants, on behalf of the Debtors' estates, and the Purchaser, the Closing Date shall be March 31, 2020.  For the avoidance of doubt, the Purchaser shall be responsible for performing under the Assigned JOMR Contracts in accordance with the provisions of the applicable Assigned JOMR Contract.

13.    The sale of the Purchased Assets is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

14.    At the Closing, the Movants, on behalf of the Debtors' estates, shall be, and hereby are, authorized, empowered, and directed, pursuant to sections 105, 363(b), and 365 of the Bankruptcy Code, to transfer any such Purchased Assets to the Purchaser.  The transfer of the Purchased Assets shall vest the Purchaser with all right, title and interest of the Debtors to the Purchased Assets, in each instance, free and clear of any and all Liens (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement or except as otherwise set forth in the Agreement) with all such Liens to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now

have in or against the Purchased Assets, subject to all claims and defenses the Debtors may possess with respect thereto.  Following the Closing Date, no holder of any Liens in the Purchased Assets (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) shall interfere with the Purchaser's enjoyment of the Purchased Assets based on or related to such Liens, or any actions that the Movants, on behalf of the Debtors' estates, may take in the Debtors' bankruptcy cases and no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the Transactions contemplated in or by the Agreement or this Order.

15.     The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Liens (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) shall be self-executing, and neither the Movants, on behalf of the Debtors' estates, nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.  However, the Movants, on behalf of the Debtors' estates, the Purchaser, and each of their respective officers, employees, attorneys, other retained professionals, and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Movants, on behalf of the Debtors' estates, or the Purchaser deem necessary, desirable or appropriate to implement and effectuate the terms of the Agreement and this Order, including amendments to the Agreement.

16.     On or before the Closing Date, the Debtors' creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release, effective as of the Closing, any Liens (other than the Assumed Liabilities, Encumbrances, and Liens that the

22

Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) of any kind against the Purchased Assets, as such Liens may have been recorded or may otherwise exist.  Except as expressly provided in the Agreement, if any Person that has filed financing statements or other documents or agreements evidencing any Liens in or against the Purchased Assets (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) shall not have delivered to the Movants, on behalf of the Debtors' estates, prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Liens that the Person has with respect to the Purchased Assets, effective as of the Closing, the Movants, on behalf of the Debtors' estates, and the Purchaser are hereby authorized to execute at the Purchaser's sole expense such statements, instruments, releases, and other documents on behalf of the Person with respect to such Purchased Assets prior to the Closing, and the Purchaser is authorized to file such documents after Closing.

17.    The Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, approval, certificate of occupancy, authorization, operating permit, registration, plan and the like of any Governmental Authority relating to the Purchased Assets or held by the Debtors' estates, and to the greatest extent available under applicable law, all such licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like of any Governmental Authority are deemed to have been, and hereby are, deemed to be transferred to the Purchaser, as of the Closing Date.  Furthermore, immediately upon the Closing, the Purchaser shall be entitled to continue to sell alcoholic beverages at the premises included in the Purchased Assets upon the same terms such premises are currently selling such

9589219-7

alcoholic beverages, until such time as the Purchaser has obtained its own Liquor Licenses (as defined in the Agreement). All applicable state alcoholic beverage control, law enforcement, and regulatory agencies shall not interrupt any of the Business without first bringing the matter before this Court. Furthermore, the Business shall continue operating under all existing Liquor Licenses of the Debtors until such licenses have been changed to the name of the Purchaser, including but limited to state alcoholic beverage licenses, state food service licenses, local occupational licenses, and any other licenses need to operate the Business with no interruption to the Business.

18.     The Purchased Assets to be acquired by the Purchaser under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser. Upon the occurrence of the Closing, this Order shall be considered and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interest in the Purchased Assets under the Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets to the Purchaser.

19.     Except as otherwise provided in the Agreement, the Purchaser is not assuming nor shall it or any Affiliate of the Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the Closing Date, or any liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to the Closing Date, which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Purchaser or any affiliate of the Purchaser.

9589219-7

20.     Except as otherwise expressly provided in the Agreement, all Persons presently or on or after the Closing Date in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Purchaser, as applicable, on the Closing Date or at such time thereafter as the Purchaser may request.

21.     Subject to the terms of the Agreement and the occurrence of the Closing Date, the assumption by the Debtors of the Assigned JOMR Contracts, as provided for or contemplated by the Agreement, be, and hereby is, authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code.

22.     Unless otherwise provided herein, the Landlords shall be deemed to consent to the Transactions approved hereby and the Purchaser's go-forward operation of non-debtors' subject premises.

23.     The Assigned JOMR Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and assigned to the Purchaser at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to the payment of the Cure Costs by the Purchaser.

24.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest in and to each Assigned JOMR Contracts.  The Movants, on behalf of the Debtors' estates, shall reasonably cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

25.     Pursuant to sections 365(b)(l)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Order, within seven (7) days of the Closing Date, or such other date that the Assigned JOMR Contracts are assumed by JOMR and assigned to the Purchaser, the Purchaser

9589219-7

shall pay or cause to be paid to the non-debtor parties to any Assigned JOMR Contract the requisite Cure Costs agreed to between the non-Debtor party to the Assigned JOMR Contract and the Purchaser, or as to be determined by Court order, as the case may be, following the assumption and assignment thereof.   The Cure Costs are hereby fixed at the amounts set forth on the record of the Sale Hearing, as otherwise agreed between the non-Debtor party to the Assigned JOMR Contract and the Purchaser, or as determined by Court order, as the case may be, and each non-debtor party to any Assigned JOMR Contract is forever bound by such Cure Costs applicable to such Assigned JOMR Contract. For the avoidance of doubt, each counterparty to any of the Assigned JOMR Contracts shall also forever bound by the Cure Costs applicable to such Assigned JOMR Contract, except, but solely to the extent, the counterparty timely asserted an objection in accordance with the provisions of the Bidding Procedures Order.

26.    All defaults or other obligations under the Assigned JOMR Contracts arising prior to the Closing Date (without giving effect to any acceleration clauses, assignment fees, increases, advertising rates, or any other default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Costs and the counterparties to the Assigned JOMR Contracts shall be forever barred and estopped from asserting or claiming against the Debtors' estates or the Purchaser that any amounts are due or other defaults exist under such Assigned JOMR Contract as of the date of the assignment of such Assigned JOMR Contract; provided, however, but subject to the Agreement and the Bidding Procedures Order, that the Purchaser shall be responsible for the payment of any accrued but unbilled obligations with respect to any year-end adjustments or reconciliations when billed in accordance with the terms of the Assigned JOMR Contracts that become due and owing after the Closing Date (irrespective of whether such obligations accrued or relate to the period before the Closing Date).

9589219-7

27.     Any provision in any Assigned JOMR Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Assigned JOMR Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Costs, if any.  No sections or provisions of any Assigned JOMR Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor party to the Assigned JOMR Contract shall have any force and effect with respect to the sale transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code and no assignment of any Assigned JOMR Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Assigned JOMR Contract.  The non-debtor party to each Assigned JOMR Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the Debtors' rights and benefits under each such Assigned JOMR Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

28.     The Movants, on behalf of the Debtors' estates, and the Purchaser have satisfied all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under the Assigned JOMR Contracts.

29.     The Debtors and their estates shall have no liability for any claims accruing from and after the Closing under any of the Assigned JOMR Contracts, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

9589219-7

30.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all parties to the Assigned JOMR Contracts shall have no claims against the Purchaser relating to any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assigned JOMR Contracts existing as of the Closing Date or arising by reason of the Closing Date, except for any amounts that are Assumed Liabilities, including Cure Costs, being assumed by the Purchaser under the Agreement.

31.     In the event that the Sale does not close, none of the Assigned JOMR Contracts shall be assumed by virtue of this Order and shall remain subject to further administration in JOMR's bankruptcy case.

32.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement and this Order.  This Order and the Agreement shall be binding upon and govern the acts of all such federal, state, and local governmental agencies and departments, including any filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.

33.     To the extent permitted by section 525 of the Bankruptcy Code, no Governmental Authority may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Debtors' bankruptcy cases or the consummation of the Transactions contemplated by the Agreement.

34.     The Purchaser has not assumed or is otherwise not obligated for any of the Debtors

liabilities (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse

Bidder has agreed to permit under the Agreement and except as otherwise set forth in the

Agreement), and the Purchaser has not purchased any of the Debtors' assets expressly excluded

from the Purchased Assets pursuant to the Agreement (as defined in the Agreement, the "Excluded

Assets"). Consequently, all Persons, Governmental Units (as defined in sections 101(27) and

101(41) of the Bankruptcy Code) and all holders of Liens (other than the Permitted Liens) based

upon or arising out of liabilities retained by the Debtors may not take any action against the

Purchaser, or the Purchased Assets to recover any Liens or on account of any liabilities of the

Debtors (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse

Bidder has agreed to permit under the Agreement and except as otherwise set forth in the

Agreement).  All persons holding or asserting any Liens in the Excluded Assets may not assert or

prosecute such Liens or any cause of action against the Purchaser or the Purchased Assets for any

liability associated with the Excluded Assets.

35.     Except as otherwise provided by the Agreement, the Purchaser is not a "successor"

to the Debtors or their estates by reason of any theory of law or equity, and the Purchase shall not

assume, or be deemed to assume, or in any way be responsible for any liability or obligation of

any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor

liability, or similar liability (other than the Assumed Liabilities, Encumbrances, and Liens that the

Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth

in the Agreement).  Except as otherwise provided for in the Agreement, neither the transfer of the

Purchased Assets to the Purchaser, nor the fact that the Purchaser is using any of the Purchased

Assets previously owned by the Debtors, will cause the Purchaser or any of its affiliates, to be

9589219-7

deemed a successor in any respect to the Debtors' business within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

36.     Further, except as otherwise provided in the Agreement, the transfer of title and possession of the Purchased Assets shall be free and clear of any Claims pursuant to any successor or successor-in-interest liability theory, including the following: (a) any employment or labor agreements, (b) all deeds of trust and security interests, (c) any pension or medical benefit plan of the Debtors, compensation or other employee benefit plan of the Debtors, welfare, agreements, practices and programs, (d) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, Claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985 (unless otherwise provided for under such statute and any regulations promulgated thereunder), (x) state discrimination laws, (xi) state unemployment compensation laws or any other similar state laws, or (xii) any other state or federal benefits or Claims relating to any employment with the Debtors or any predecessors, (e) environmental or other Claims or Liens arising from existing conditions prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting or

contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq*., or other state or federal statute, (f) any bulk sales or similar law, (g) any Tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and (h) any and all theories of successor liability, including any theories on successor products liability grounds or otherwise.

37.     Except as otherwise provided in the Agreement, pursuant to sections 105 and 363 of the Bankruptcy Code, all Persons including, but not limited to, the Debtors, all debt holders, equity security holders, the Debtors' employees or former employees, Governmental Authorities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a Lien of any kind or nature whatsoever against, in, or with respect to any of the Debtors or the Purchased Assets (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement), arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Purchased Assets to the Purchaser in accordance with the Agreement and this Order, shall be forever barred and estopped from asserting, prosecuting, or otherwise pursuing such Lien, including assertion of any right of setoff or subrogation, and enforcement, attachment, or collection of any judgment, award, decree, or order, against the Purchaser or any of their affiliates, successors or assigns thereof and each of their respective current and former members, officers, directors, attorneys, employees, partners, affiliates, financial advisors, and representatives (each of the foregoing in its individual capacity), with respect to the Purchased Assets.

38.     Without limiting the generality of the foregoing, except as otherwise provided in the Agreement, the Purchaser shall not assume or be obligated to pay, perform or otherwise discharge any workers' compensation debts, obligations, and liabilities of the Debtors arising pursuant to state law or otherwise, and this Order is intended to be all inclusive and shall encompass, but not be limited to, workers' compensation Claims or suits of any type, whether now known or unknown, whenever incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination, or other incidents, acts, or injuries prior to the Closing Date, including, but not limited to, any and all workers' compensation Claims filed or to be filed, or any reopening of such Claims, by or on behalf of any of the Business' current or former employees, persons on laid-off, inactive or retired status, or their respective dependents, heirs or assigns, as well as any and all premiums, assessments, or other obligations of any nature whatsoever of the Business relating in any way to workers' compensation liability, except as otherwise specifically set forth in the Agreement.

39.     Subject to the terms of the Agreement, the Agreement and any related agreements and/or instruments may be waived, modified, amended, or supplemented by agreement of the Movants, on behalf of the Debtors' estates, and the Purchaser, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not materially adverse to the Debtors' estates and substantially conforms to, and effectuates, the Agreement and any related agreements and/or instruments and this Order.

40.     The failure specifically to include any particular provisions of the Agreement or any related agreements or instruments in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court, the Movants, on behalf of the Debtors' estates, and the Purchaser that the Agreement and any related agreements and instruments are authorized

32

9589219-7

and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing, and each such provision of the Agreement shall be enforceable by or against each of the Parties thereto.

41.     Upon the commencement of the Chapter 7 bankruptcy cases by the Chapter 7 Debtors, the Trustee, not in his individual capacity but solely in his capacity as the Trustee of the estates of the Chapter 7 Debtors, shall be deemed admitted as a member of each of the Palm OpCos established as a Limited Liability Company (such entities, collectively, the "Palm Opco LLCs"). To the extent that the commencement of the Chapter 7 cases by the Chapter 7 Debtors caused any Palm Opco LLCs to dissolve under applicable non-bankruptcy law, such dissolution is hereby revoked as if it never occurred, and the Trustee, not in his individual capacity but solely in his capacity as the Trustee of the estates of the Chapter 7 Debtors and on behalf of the Chapter 7 Debtors, shall be deemed a member of the Palm Opco LLCs with the power and authority to transfer the subject assets to the Purchaser.

42.     The Sale approved hereby, and the Purchaser's acquisition of the assets described herein and in the Agreement, shall not constitute a change of control as such term is used, understood or implied in any affiliated agreement, contract, lease or similar instrument entered into by a non-debtor subsidiary of the Company and a third party relating to restaurants operated by the Palm Opcos.

43.     Nothing contained in this Order shall affect or impair the claims, rights, and powers of the United States of America; provided, however, that, except as otherwise provided in the Agreement, any such claims, rights or powers of the United States of America shall not be construed in any way as Assumed Liabilities under this Order or the Agreement.

9589219-7

44.     No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the Transactions contemplated by the Agreement.

45.     This Order and the Agreement shall be binding upon, enforceable against, and govern the acts of all Persons including, without limitation, the Movants, the Debtors and their estates, and the Purchaser, their respective successors, and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Chapter 11 Debtors' estates, any committee subsequently appointed in the cases of the Chapter 11 Debtors or any trustee appointed in a chapter 7 case if the cases of the Chapter 11 Debtors are converted from chapter 11 to a case under chapter 7 of the Bankruptcy Code, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.

46.     The Movants, on behalf of the Debtors' estates, on the one hand, and the Purchaser, on the other hand, hereby release each other from any and all claims except for such claims that are set forth in or arise from the Agreement and this Order.

47.     Nothing in any order of this Court or contained in any plan of reorganization or liquidation that may be confirmed in the cases of the Chapter 11 Debtors, or in any subsequent or converted cases of the Chapter 11 Debtors to cases under chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

48.     Notwithstanding Bankruptcy Rules 6004, 6006, and 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any Person obtaining a stay pending appeal, the Movants, on behalf of the Debtors'

estates, and the Purchaser are free to close under the Agreement at any time, subject to the terms of the Agreement.  In the absence of any Person obtaining a stay pending appeal, if the Movants, on behalf of the Debtors' estates, and the Purchaser close under the Agreement, the Movants, the Sellers and the Purchase shall be deemed to be acting in "good faith" and the Purchaser shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the Transactions under and pursuant to the Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

49.     The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the terms and conditions of the Agreement and the provisions of this Order.

50.     The provisions of this Order shall be binding on and inure to the benefit of all successors and assignees of the Movants, the Sellers and the Purchaser.

51.     The Movants are authorized to enforce their rights under any confidentiality agreements they entered into with other potential bidders with respect to the Purchased Assets for the benefit of the Purchaser for the term of each respective confidentiality agreement.

52.     The Movants are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Sale Motion.

53.     In the event there is any inconsistency between the Sale Motion or this Order, this Order shall govern.

54.     This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order, the Bidding Procedures Order, and the Agreement in all respects and to decide any disputes concerning this Order, the Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Agreement and this Order including, but not limited to, the

9589219-7

interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Assigned Contracts, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of all Liens (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement).

*(Christopher Andrew Jarvinen, Esq. is directed to serve a copy of this order on interested parties who are non-CM/ECF users and to file a proof of service within three days of entry of the order.)*

9589219-7

## Exhibit "C"

**Agreement**

EXECUTION COPY

**PURCHASE AGREEMENT**

**BY AND AMONG**

**GOLDEN NUGGET, LLC,**

**AS PURCHASER**

**AND**

**JUST ONE MORE RESTAURANT CORP.**
**AND**
**ROBERT E. TARDIF, JR., AS TRUSTEE FOR**
**BRUCE E. BOZZI, SR. AND WALTER J. GANZI, JR.,**

**AS SELLERS**

**FEBRUARY 20, 2020**

EXECUTION COPY

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement"), dated as of February 20, 2020, is entered into by and among Golden Nugget, LLC, a Nevada limited liability company ("Purchaser"), on the one hand, and (i) Just One More Restaurant Corp., a New York corporation and a debtor-in-possession under chapter 11 of the United States Bankruptcy Code ("JOMR"), and (ii) Robert E. Tardif, Jr., solely in his capacity as Trustee appointed in the chapter 7 bankruptcy cases of Bruce E. Bozzi, Sr. ("Bozzi") and Walter J. Ganzi, Jr. ("Ganzi" and together with Bozzi, each a "Chapter 7 Debtor" and collectively the "Chapter 7 Debtors"; and the Chapter 7 Debtors, together with JOMR, each a "Debtor" and collectively the "Debtors") under chapter 7 of the United States Bankruptcy Code (the "Trustee", and together with JOMR, each a "Seller" and collectively "Sellers"), and not individually, on the other hand. Purchaser and Sellers are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## Recitals

WHEREAS, on March 7, 2019 (the "Chapter 11 Petition Date"), JOMR filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States District Court for the Middle District of Florida, Fort Myers Division (the "Bankruptcy Court"), which case is being jointly administered with that of Just One More Holding Corp. under Case No. 9:19-bk-1947-FMD (the "Chapter 11 Case"), and JOMR is managing its affairs as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on October 11, 2019 (the "Chapter 7 Petition Date"), Bozzi filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in the Bankruptcy Court, which case is being administered under Case No. 9:19-bk-09677-FMD (the "Bozzi Chapter 7 Case");

WHEREAS, on the Chapter 7 Petition Date, Ganzi filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in the Bankruptcy Court, which case is being administered under Case No. 9:19-bk-09680-FMD (the "Ganzi Chapter 7 Case" and, together with the Bozzi Chapter 7 Case, the "Chapter 7 Cases"; and the Chapter 7 Cases, together with the Chapter 11 Case, collectively the "Bankruptcy Cases");

WHEREAS, the Trustee has been appointed as the Chapter 7 Trustee of the estates of each of the Chapter 7 Debtors;

WHEREAS, either or both of the Chapter 7 Debtors own equity interests in each of the entities identified on Annex I attached hereto (each a "Company" and collectively the "Companies");

WHEREAS, certain of the Companies or their respective Subsidiaries own or lease and operate full service restaurants featuring steak and lobster under the brand name "Palm Restaurant" or a derivative thereof (each a "Restaurant" and collectively the "Restaurants") at the locations set forth on Exhibit A attached hereto (the "Business");

WHEREAS, JOMR owns and, subject to the Decision and Judgment on appeal, licenses to each of the Operating Companies certain intellectual property used at the Restaurants (as more

particularly described below as the JOMR IP), including the tradename, trademarks, and design and décor elements used at the Restaurants; and

WHEREAS, Sellers desire to sell, transfer, convey, assign and deliver to Purchaser the Purchased Assets (as defined below) and to assign to Purchaser the Assumed Liabilities (as defined below), and Purchaser desires to purchase and acquire such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein; and

WHEREAS, the transactions between JOMR and Purchaser contemplated by this Agreement with respect to the JOMR IP, and between the Trustee and Purchaser contemplated by this Agreement with respect to the Equity Interests in the Companies (collectively, the "Transactions") are subject to the approval of the Bankruptcy Court and will be consummated pursuant to a Bidding Procedures Order (as defined below) and a Sale Order (as defined below) entered in the Bankruptcy Cases under Sections 105(a), 363, 365 and other applicable provisions of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and other good and valuable considerations, the receipt and adequacy of which are conclusively acknowledged, in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.    **Definitions**.  The following terms, as used herein, have the following meanings:

"Accounts Payable Reserve" has the meaning set forth in Section 2.7(c).

"Accounts Payable Threshold Amount" has the meaning set forth in Section 2.7(c).

"Accrued Accounts Payable" has the meaning set forth in Section 2.7(c).

"Accrued Percentage Rent" has the meaning set forth in Section 2.7(b)(iv).

"Additional Percentage Rent" has the meaning set forth in Section 2.7(b)(iv).

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

"Agreement" has the meaning set forth in the preamble.

"Allocation Notice of Objection" has the meaning set forth in Section 2.6(b).

"Alternative Transaction" means a transaction or series of transactions pursuant to which the Trustee or any Debtor, (i) pursuant to the Bidding Procedures Order, accepts a Qualified Bid, other than that of Purchaser, as the highest or best offer for the Purchased Assets, or (ii) sells, transfers, leases, or otherwise disposes of, directly or

2

indirectly, including through an asset sale, stock sale, merger, reorganization, or other similar transaction (by any Seller or otherwise), including pursuant to a chapter 11 plan or refinancing, all or any portion of the Purchased Assets to a Person or Persons other than Purchaser, including the sale of the Purchased Assets to a Person other than Purchaser pursuant to the Auction.

"Applicable Law" means any Law to which a specified Person or property is subject.

"Assigned JOMR Contracts" has the meaning set forth in Section 2.1(c).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" has the meaning set forth in the Bidding Procedures Motion.

"Backup Bid" has the meaning set forth in Section 7.5(c)(ii).

"Backup Bidder" has the meaning set forth in Section 7.5(c)(ii).

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Causes of Action" has the meaning set forth in Section 2.2(j).

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plans" means each "employee benefit plan," as defined in Section 3(3) of ERISA and each and every other written, unwritten, formal or informal plan, agreement, program, policy, or other arrangement involving direct or indirect compensation (other than workers' compensation, unemployment compensation, and other government programs), employment, severance, consulting, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock appreciation rights, other forms of incentive compensation, post-retirement insurance benefits, or other benefits, entered into, maintained or contributed to by any Company or any Subsidiary, or to which any Company or any Subsidiary has or may in the future have any Liabilities (contingent or otherwise).

"Bidding Procedures" means the bidding procedures, required under Section 7.5 of this Agreement, approved pursuant to the Bidding Procedures Order.

"Bidding Procedures Motion" means a motion filed by the Debtors with the Bankruptcy Court seeking the entry of the Bidding Procedures Order. For the avoidance of doubt, the Bidding Procedures Motion may be filed as one motion with the Sale Motion.

3

"Bidding Procedures Order" means an Order of the Bankruptcy Court, approving, among other things, the Bidding Procedures, in the form attached hereto as Exhibit C.

"Bozzi" has the meaning set forth in the preamble.

"Bozzi and Ganzi Notes" means (i) the $1,000,000 Secured Promissory Note, dated July 5, 2019, made by PMC to Bozzi and (ii) the $1,000,000 Secured Promissory Noted, dated July 5, 2019, made by PMC to Ganzi.

"Bozzi Chapter 7 Case" has the meaning set forth in the Recitals.

"Breakup Fee" has the meaning set forth in Section 7.5(c)(i).

"Business" has the meaning set forth in the Recitals.

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Naples, Florida are authorized or required by Law to close.

"Chapter 7 Cases" has the meaning set forth in the Recitals.

"Chapter 7 Debtor" has the meaning set forth in the preamble.

"Chapter 7 Petition Date" has the meaning set forth in the Recitals.

"Chapter 11 Petition Date" has the meaning set forth in the Recitals.

"Chapter 11 Case" has the meaning set forth in the Recitals.

"Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"Closing" means the consummation of the purchase and sale and assignment of the Purchased Assets and assumption of the Assumed Liabilities, as contemplated by this Agreement, on the Closing Date.

"Closing Date" means the date on which the Closing occurs, as determined pursuant to Section 2.9.

"Closing Statement" has the meaning set forth in Section 2.10(n).

"Closure Payables" has the meaning set forth in Section 7.9.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Recitals.

"Company Assignments" has the meaning set forth in Section 5.1.

"Company Permitted Liens and Encumbrances" means (i) Liens granted by Purchaser at or after the Closing in connection with any financing of Purchaser related to the purchase of the Purchased Assets pursuant to this Agreement (or otherwise arising by, through or under the Purchaser); (ii) Liens that arise under zoning, building codes, land use, and other similar Laws, and utility and other easements granted to third parties, none of which would materially interfere with the ownership or operation by Purchaser or the Companies of the Business following the Closing in substantially the manner as owned and operated by the Companies immediately prior to the execution of this Agreement; (iii) Liens for Taxes not yet due and payable; (iv) matters of record and matters appearing on any Title Commitment that do not render title to the PMC Real Property unmarketable or uninsurable or are not timely objected to or waived by Purchaser; and (v) with respect to leased or licensed property, Liens arising under, or pursuant to the other terms and conditions of the lease or license applicable thereto.

"Competing Bid" has the meaning set forth in Section 7.5(a).

"Confidentiality Agreement" means the Confidentiality Agreement dated January 8, 2020 between Sellers and Purchaser.

"Contract" means any contract, agreement, lease, license, purchase order, commitment or other legally binding arrangement with respect to which any one or more of the Companies is a party (inclusive of all amendments, modifications, supplements, extensions, renewals, assignments, easements, restatements, and exhibits thereto).

"Cure Costs" means, for the Assigned JOMR Contracts, all amounts that must be paid as determined by a final and non-appealable order of the Bankruptcy Court, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with either or both the assumption and assignment of the Assigned JOMR Contracts to Purchaser as provided herein.

"Data Room" means the project identified as The Palm in the Merrill DataSiteOne electronic data room located at https://datasiteone.merrill.corp.com/global/ projects.

"Debtor" has the meaning set forth in the preamble.

"Decision and Judgment" means that certain Decision After Non-Jury Trial entered on November 13, 2018 and that certain Judgment entered on January 25, 2019, both in the case titled Gary Ganzi, Claire Breen and Gary Ganzi and Claire Breen, as Attorneys-in-Fact for the Estate of Charles Cook, individually and derivatively on behalf of nominal defendants Just One More Restaurant Corporation and Just One More Holding Corporation, Plaintiffs, vs. Walter Ganzi, Jr. and Bruce Bozzi, Sr., Defendants, and Just One More Restaurant Corporation, a New York corporation, and Just One More Holding Corporation, a New York corporation, Nominal Defendants, in the Supreme Court of The State of New York, County of New York, Index No. 653074/2012, as appealed to the Appellate Division, First Judicial Department, Supreme Court of the State of New York (Index 2018-5759, 2019-565 and 2019-1084).

5

"Derivative Action Causes of Action" has the meaning set forth in Section 2.2(l).

"Designated LLC" means each of Palm Beverly Hills Restaurant, LLC, and Palm Philadelphia Restaurant, LLC.

"Earnest Money Deposit" has the meaning set forth in Section 2.8(a).

"Equity Interests" means the equity interests of each of Bozzi and Ganzi in each Company, whether as a shareholder or stockholder, a general or limited partner, a member, or the holder of any other form of equity security or ownership interest in a Company as reflected on attached Schedule 3.14.

"ERISA" means the Employment Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to an Person, any other Person that together with such Person would be deemed a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"Escrow Agent" means Berger Singerman LLP.

"Escrow Agreement" has the meaning set forth in Section 2.8(a).

"Estimated Accounts Payable" has the meaning set forth in Section 2.7(c).

"Estimated Credit Card Receivables" has the meaning set forth in Section 2.7(a).

"Estimated Percentage Rent" has the meaning set forth in Section 2.7(b)(iv).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" means the date of this Agreement.

"Exercising JV Holders" has the meaning set forth in Section 2.6(c).

"Expense Reimbursement" has the meaning set forth in Section 7.5(c)(i).

"Final Allocation Statement" has the meaning set forth in Section 2.6(b).

"Final Order" means an order of the Bankruptcy Court or any other court as to which (i) any appeal or petition for review, rehearing or certiorari that has been taken has been finally determined or dismissed, or (ii) the time for appeal or petition for review, rehearing or certiorari has expired and no appeal has been filed timely. In the case of an order of the Bankruptcy Court, the time for appeal, for purposes of this definition, shall be

9586842-10

the time permitted for an appeal to the United States District Court for the Middle District of Florida.

"Form 1120S" has the meaning set forth in Section 9.3(d)(i).

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Ganzi" has the meaning set forth in the preamble.

"Ganzi Chapter 7 Case" has the meaning set forth in the Recitals.

"Governmental Approvals" means those approvals, authorizations, and exemptions from Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding to prevent the Closing by, any Governmental Authority, that are required to be obtained or taken to consummate the Transactions under Applicable Law.

"Governmental Authority" means any federal, state, local, municipal, foreign, or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official, or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, regulatory, or taxing authority.

"Income Tax Returns" has the meaning set forth in Section 9.3(a).

"Indemnified Professional Expenses" means all amounts alleged to be due to Pre-Closing Company Professionals from the Companies with respect to any services provided by the Pre-Closing Company Professionals on or prior to the Closing Date.

"Intellectual Property Rights" means all intellectual property rights, including: (i) patents, patent applications, and patent rights; (ii) trademarks (registered, unregistered, and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, websites, social media accounts, domain names, and other indicia of source, and all goodwill associated therewith (subject to those restrictions under the License Agreements), whether owned or licensed; (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, recipes, databases, and data collections; (v) all source and object code, software, algorithms, architecture, structure, display screens, layouts, inventions, development tools; and (vi) all documentation and media constituting, describing, or relating to the above, including manuals, memoranda, and records.

"JOMR" has the meaning set forth in the preamble.

"JOMR IP" means all Intellectual Property Rights of JOMR, including, without limitation, the trademarks, trade names, service marks, design elements (including food quality choices and methods of preparation), trade dress, décor, display of photographs, artistic caricatures, sketches, cartoons and other elements, including, without limitation, those set forth on Exhibit D attached hereto, together with JOMR's interest (if any) in photographs, drawings, paintings, caricatures, sketches, cartoons, and other images displayed at the Restaurants.

"JOMR Assignment and Assumption Agreement" has the meaning set forth in Section 2.10(c).

"JOMR IP Assignment" has the meaning set forth in Section 2.10(b).

"JV Companies" means Chicago Palm, Inc., Palm Beverly Hills Restaurant, LLC, and Palm Philadelphia Restaurant, LLC.

"JV Holders" has the meaning set forth in Section 2.6(c).

"JV Purchase Price" has the meaning set forth in Section 2.6(c).

"Knowledge" with respect to any Seller (or any similar knowledge qualification in this Agreement) means facts actually known by the following individuals: James Hamilton, Ernesto Mandowsky, Jeff Phillips, and Rose Whitelocke.

"Law" means any law, statute, regulation, code, decree, constitution, ordinance, treaty, Order of a Governmental Authority administered or enforced by or on behalf of any Governmental Authority or any rule of common law.

"Leased Real Property" means all of the real property leased or subleased by (i) an Operating Company in connection with conducting the Business at the locations identified in the column titled "Address of Restaurant" on Exhibit A attached hereto or (ii) by PMC.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private), or any proceedings by or before a Governmental Authority, and any appeal from any of the foregoing.

"Liability" means any debt, loss, damage, adverse claim, fine, penalty, liability, or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), whether contingent, at law or in equity, or otherwise, including any liability based on successor liability theories.

"License Agreements" means the Master License Agreement and the Mexico License Agreements.

"Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown. For the avoidance of doubt, the definition of Lien shall not be deemed to include: (i) the grant of any license or sublicense by any Seller of Intellectual Property Rights or (ii) rights granted pursuant to any License Agreement.

"Liquor License" has the meaning set forth in Section 7.4(a).

"Liquor License Transfer Documents" has the meaning set forth in Section 7.4(a).

"Liquor Management Agreement" has the meaning set forth in Section 7.4(b).

"Management Agreement" means that certain Management Agreement dated January 1, 2007, between JOMR and PMC, as amended.

"Master License Agreement" means that certain Master License Agreement dated as of January 1, 2007, between JOMR, as licensor, and PMC, as licensee, relating to the JOMR IP, as it may be amended or modified.

"Material Adverse Effect" means an occurrence or event that materially adversely affects the value of the Purchased Assets taken as a whole, or that materially adversely affects the ability of a Party hereto to perform its obligations under this Agreement or timely consummate the Transactions contemplated herein, excluding any such effect to the extent resulting from or arising in connection with (i) the pendency or consummation of the Transactions contemplated hereby or the public announcement thereof; (ii) changes or conditions affecting the industries generally in which Sellers operate unless such change has a disproportionate effect on the Business or the Purchased Assets; (iii) changes in national or international business, economic, political, or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America; (iv) changes in financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) changes in Law or in GAAP or interpretations thereof; (vi) changes resulting from the commencement and continuation of the Bankruptcy Cases; (vii) failure of any one or more of the Sellers to meet financial projections, or (viii) any action taken by any Seller as required or contemplated by this Agreement.

"Material Contract" has the meaning set forth in Section 3.16.

"Mexico License Agreements" means either or both of (i) that certain Palm Restaurant License Agreement dated as of March 15, 1999, between JOMR and Hoteles Presidente, S.A. de C.V., as amended, and (ii) that certain Palm Restaurant License

9

Agreement dated as of May 1, 2012, between JOMR, Hoteles Presidente, S.A. de C.V., Impulsora de Empresas Turisticas, S.A. de C.V., and Forea S.A P. I de C.V., as amended.

"Operating Company" means each Company that operates a Restaurant (including a hotel with respect to PMC) and any direct or indirect Subsidiary of a Company that operates a Restaurant.

"Order" means any award, decision, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by, any Governmental Authority.

"Other Causes of Action" has the meaning set forth in Section 2.2(k).

"Outside Date" has the meaning set forth in Section 12.1(b).

"Permitted Liens and Encumbrances" means (i) Liens granted by Purchaser at or after the Closing in connection with any financing of Purchaser related to the purchase of the Purchased Assets pursuant to this Agreement (or otherwise arising by, through or under the Purchaser); (ii) Liens for Taxes not yet due and payable; and (iii) with respect to licensed JOMR IP, Liens arising under, or pursuant to the other terms and conditions of the license applicable thereto.

"Person" means an individual, corporation, partnership, limited liability company, association, joint venture, trust, or other entity or organization, including a Governmental Authority.

"Phantom Stock Plans" means (i) the Amended and Restated Palm Appreciation Plan effective as of January 1, 2009; and (ii) the Amended and Restated Palm Long Term Incentive Plan effective as of January 1, 2009.

"Philadelphia Equity Interests" means Equity Interests of the Chapter 7 Debtors in Palm Philadelphia Restaurant Manager, LLC and Palm Philadelphia Investor, LLC.

"PMC" means Palm Management Corporation, a New York corporation and a Company hereunder.

"PMC Real Property" means that certain real property owned by PMC at the locations in the State of New York as described on Exhibit B attached hereto, one of which locations (the "NYC PMC Real Property") is leased by PMC to another Operating Company for the conduct of the business of a Restaurant, and the other of which (the "East Hampton PMC Real Property") is operated by PMC as a Restaurant and hotel, as described on Exhibit B.

"Post-Closing Period Tax Returns" has the meaning set forth in Section 9.3(a).

"Post-Closing Tax Period" has the meaning set forth in Section 2.7(b)(i).

9586842-10

"Pre-Closing Company Professionals" means the Persons identified on Schedule 1.1(c) attached hereto, as supplemented by Sellers within ten (10) days of the date of this Agreement.

"Pre-Closing Period Tax Returns" has the meaning set forth in Section 9.3(a).

"Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"Pre-Closing Taxes" has the meaning set forth in Section 9.3(b).

"Professional Expense Escrow" means a cash escrow for the sole purpose of reimbursing Purchaser and the Companies for any Indemnified Professional Expenses that Purchaser or any Company is required to pay to the Pre-Closing Company Professionals at any time after the Closing.

"Professional Expense Escrow Agreement" means an escrow agreement among Sellers, Purchaser, and an escrow agent mutually acceptable to Sellers and Purchaser, entered into at Closing for purposes of holding and disbursing the Professional Expense Escrow, which agreement shall be in form and substance reasonably acceptable to Sellers and Purchaser.

"Property Taxes" means all real property Taxes and similar ad valorem obligations levied with respect to any Leased Real Property or PMC Real Property for any Tax period.

"Proposed Allocation Statement" has the meaning set forth in Section 2.6(b).

"Proposed Amendment" has the meaning set forth in Section 9.3(d)(ii).

"Purchase Price" has the meaning set forth in Section 2.6(a).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchaser" has the meaning set forth in the preamble.

"Qualified Bid" has the meaning set forth in the Bid Procedures.

"Real Estate Leases" means the leases and subleases for the Leased Real Property, as listed on Exhibit E hereto, and all amendments, modifications, supplements, extensions, renewals, assignments, guaranties, easements, restatements, and exhibits thereto.

"Reconciled Accounts Payable" has the meaning set forth in Section 2.7(c).

"<u>Restaurant</u>" has the meaning set forth in the Recitals.

"<u>Retention Payment Agreements</u>" means the agreements providing for retention payments for non-debtor employees entered into between PMC, on the one hand, and each of the non-debtor employees identified in <u>Schedule 1.1(b)</u>, on the other hand.

"<u>Sale Approval Hearing</u>" means a hearing of the Bankruptcy Court to consider the Sale Motion.

"<u>Sale Motion</u>" means a motion filed by the Debtors with the Bankruptcy Court seeking the entry of the Sale Order. For the avoidance of doubt, the Sale Motion may be filed as one motion with the Bidding Procedures Motion.

"<u>Sale Order</u>" means an Order of the Bankruptcy Court that has become a Final Order in the Bankruptcy Cases consistent with the terms of this Agreement (a) authorizing Sellers to close on the terms of this Agreement and the Transactions contemplated hereby, in accordance with §363 of the Bankruptcy Code, that finds, among other things, that Purchaser is a good-faith purchaser for value and otherwise entitles Purchaser to the protections of §363(m) of the Bankruptcy Code, (b) approving the sale of the Purchased Assets to Purchaser free and clear of any and all Liens to the maximum extent permitted by law (other than Permitted Liens and Encumbrances and Liens that Purchaser has agreed to permit or assume hereunder or hereafter) pursuant to §363(f) of the Bankruptcy Code; (c) determining (or providing for the procedure to subsequently determine) the Cure Costs and approving the assumption and assignment to Purchaser of the Assigned JOMR Contracts solely on the terms of such Assigned JOMR Contracts; (d) providing that the provisions of Rules 6004(h) and 6006(d) of the Rules are rendered inapplicable and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; (e) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement; and (f) determining this Agreement (as it may be modified prior to the Sale Approval Hearing) to be the highest and best bid for the Purchased Assets as a result of the Auction.  The form of Sale Order that the Seller will propose that the Bankruptcy Court enter is attached hereto as <u>Exhibit F</u>, but in any event shall be in form and substance reasonably acceptable to the Parties.

"<u>Sale Order Deadline</u>" has the meaning set forth in <u>Section 7.5(d)</u>.

"<u>Seller</u>" has the meaning set forth in the preamble.

"<u>Sellers' Release</u>" means a release executed by Sellers, the Companies, and Subsidiaries pursuant to which Sellers release all Claims Sellers have or may have against any Company or Subsidiary excluding any Claims arising under this Agreement that is in form and substance acceptable to Sellers and Purchaser.

"<u>SSP License Agreement</u>" means that certain Master License Agreement dated January 25, 2008 between Palm Airport, LLC, as licensor, and SSP America, Inc., as licensee, as modified or amended.

"Store Level Credit Card Receivables" means all accounts receivable and other amounts owed to an Operating Company (whether current or non-current) in connection with any customer purchases from any Restaurant operated by such Operating Company that are made with credit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to such Operating Company. Store Level Credit Card Receivables shall specifically include all Store Level Credit Card Receivables generated with respect to sales occurring during the three days immediately prior to the Closing Date, including any amounts received by or payable to an Operating Company with respect to such sales occurring during such three days immediately prior to the Closing Date.

"Store Level Opening Cash Balances" means (i) store level cash in cash registers at each Restaurant on the Closing Date, in customary amounts and consistent with past practice, as set forth on Schedule 1.1(a); and (ii) all customer deposits held by any Operating Company for any event or booking at any Restaurant or at the hotel owned by PMC that has not occurred prior to the Closing Date.

"Straddle Period Tax Returns" has the meaning set forth in Section 9.3(b).

"Straddle Periods" has the meaning set forth in Section 9.3(b).

"Subsidiary" means any Person of which one or more Companies (or other specified Person) owns directly or indirectly at least 50% of the outstanding equity interests entitled to vote generally or otherwise has the power to elect a majority of the governing body of such Person or the legal power to direct the business or policies of such Person.

"Sublicense Agreements" means each and both of the SSP License Agreement and the TJX License Agreement.

"Tax" means (i) any tax, governmental fee, or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax, or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in clause (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

"Tax Arbiter" has the meaning set forth in Section 9.3(d)(iv).

"Tax Proceeding" has the meaning set forth in Section 9.3(f)(i).

"Title Commitments" means the commitments for owner's title insurance policies for the PMC Real Property issued by Fidelity National Title Insurance Company (Commitment Nos. 30623023 and 30623000) as set forth in the Data Room.

"TJX License Agreement" means that certain License Agreement dated November 1, 2008, between PMC, as licensor, and The TJX Companies, Inc., as licensee, as it may be modified or amended.

"Transactions" has the meaning set forth in the Recitals.

"Transfer Taxes" has the meaning set forth in Section 9.2.

"True-Up" has the meaning set forth in Section 2.7(d).

"True-Up Statement" has the meaning set forth in Section 2.7(d).

"Trustee" has the meaning set forth in the preamble.

"USPTO" has the meaning set forth in Section 3.7(b).

"Withholding Reserves" means all amounts (i) withheld from employee wages held by any Company pending remittance to the appropriate Governmental Authority; and (ii) collected as sale, use, or other Taxes from third parties pending remittance to the appropriate Governmental Authority.

## 2.    Purchase and Sale.

2.1.    Purchase and Sale. Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers agree to sell, transfer, and deliver to Purchaser, and Purchaser agrees to purchase, acquire, and accept from Sellers, on an **"AS IS, WHERE IS"** basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or (except as expressly set forth in this Agreement) otherwise, all right, title, and interest of each Seller as of the Closing Date in and to the following tangible and intangible assets, properties, and rights (the "Purchased Assets"), but in all cases excluding the Excluded Assets:

(a)    the Equity Interests;

(b)    the JOMR IP;

(c)    the rights of JOMR under the License Agreements (the "Assigned JOMR Contracts");

(d)    all books, records, files, and papers of Sellers, including in electronic form, relating solely to the Purchased Assets, except to the extent the same constitutes an Excluded Asset; and

(e)    all utility deposits and other vendor deposits made by any Company with third parties.

Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear (except for Permitted Liens and Encumbrances and the Assumed Liabilities) of any and all liens (as defined in Section 101(37) of the Bankruptcy Code) and Claims, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Chapter 11 Petition Date or the Chapter 7 Petition Date, as applicable.

2.2.    <u>Excluded Assets</u>. Notwithstanding any other provision of this Agreement to the contrary, the Purchased Assets shall not include any assets, properties or rights not specifically identified in <u>Section 2.1</u> or not directly related to the ownership or operation of the Business (the "<u>Excluded Assets</u>"), including, without limitation:

(a)    Except for the Assigned JOMR Contracts, any unexpired lease or other contract of any Seller;

(b)    all rights of Sellers arising under this Agreement (including without limitation, rights to the Purchase Price) or in connection with the Transactions;

(c)    any Tax refund or reimbursement due to Sellers with respect to any tax period ending on or before the Closing Date;

(d)    all amounts owed to any Seller by, and all claims of any Seller against, any other Seller, Debtor, or any of their respective Affiliates other than any Company or Subsidiary; <u>provided</u>, <u>however</u>, that any claims against a Company or Subsidiary shall be released by Sellers at Closing;

(e)    Intentionally omitted;

(f)    Sellers' rights and benefits relating to insurance coverages with respect to events occurring prior to Closing;

(g)    all amounts paid as of the Closing Date to any Seller under any and all License Agreements or sublicense agreements between PMC and any third party relating to any period prior to the Closing Date;

(h)    all minute books, organizational documents, stock records, and corporate seals of JOMR;

(i)    the equity interests of the Chapter 7 Debtors in any entities not identified on <u>Annex I</u> as a "Company";

(j)    all claims, avoidance recovery, subordination, or other causes of action arising out of the commencement of, related to, or involving the Bankruptcy Cases, including without limitation those arising under chapter 5 of the Bankruptcy Code (e.g., §§ 502(d), 506, 510, 542 - 551 and 553 of the Bankruptcy Code), or arising under applicable state Law or otherwise and the proceeds thereof, other than claims and avoidance recovery, subordination, or other such actions against the Companies (collectively, the "<u>Bankruptcy Causes of Action</u>");

(k)    all claims and causes of action, including, without limitation, commercial tort claims, and any proceeds thereof, that any representatives of any of the Sellers have the right to bring under applicable state and local Law, by order of the Bankruptcy Court, or otherwise, whether relating to the pre- or post-petition time period, against Bruce E. Bozzi, Sr., Walter J. Ganzi, Jr., or Victor F. Ganzi, or any of their respective Affiliates, or any professionals engaged by any of them, including malpractice

15

and other claims against such professionals, excluding, in all instances, any such claims and causes of action against the Companies or any Subsidiary (collectively, the "Other Causes of Action");and

(l)    Sellers' rights and benefits, including any proceeds thereof (including, without limitation, any proceeds from available insurance) arising out of, related to or involving the Decision and Judgment (the "Derivative Action Causes of Action").

2.3.    Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform, and discharge, promptly when payment or performance is due or required, only the following liabilities and obligations of Sellers (the "Assumed Liabilities"):

(a)    all Liabilities arising in connection with the ownership of the Purchased Assets from and after the Closing;

(b)    all Liabilities of Sellers related to or arising under the Assigned JOMR Contracts;

(c)    all Cure Costs in respect of the Assigned JOMR Contracts, if any; and

(d)    any other Liabilities specifically imposed upon or assumed by Purchaser pursuant to this Agreement.

Notwithstanding the foregoing, nothing in this Agreement or the Sale Order shall make or deem Purchaser responsible for, or otherwise liable for payment or satisfaction of any of, the Liabilities of the Companies or any Subsidiaries, which Liabilities shall remain the sole obligation of the applicable Company or Subsidiary.

2.4.    Excluded Liabilities. Notwithstanding any other provision of this Agreement to the contrary, except as provided in Section 2.3, Purchaser is not assuming any other Claim against or Liability of Sellers of whatever nature, whether presently in existence or arising hereafter. All such other Claims and Liabilities not being assumed (collectively, the "Excluded Liabilities") shall be retained by and remain the Liabilities of Sellers; provided, however, that, for avoidance of doubt, each Company and each Subsidiary shall retain all of its assets and remain liable for all of its Liabilities, in each case, as existing as of the Closing (provided that any Liabilities owed by any Company or any Subsidiary to any Seller or any Seller's Affiliates (including, without limitation, Bozzi and Ganzi) and any Claims held by any Seller or any Seller's Affiliates (including, without limitation, Bozzi and Ganzi) against any Company or Subsidiary arising prior to Closing shall be released as of the Closing).

2.5.    Assumption/Assignment of Contracts and Rights. The Assigned JOMR Contracts shall be assumed by JOMR and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code. Purchaser shall have the sole responsibility for paying all Cure Costs due in connection with the assumption and assignment of the Assigned JOMR Contracts. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall

constitute an agreement to assign all Assigned JOMR Contracts and rights thereunder to Purchaser unless a third party objects to the assignment and it is determined by the Bankruptcy Court that JOMR is incapable as a matter of law of assigning that particular Assigned JOMR Contract.

2.6.    Purchase Price; Allocation of Purchase Price.

(a)    In addition to the assumption of the Assumed Liabilities, in consideration for the sale, transfer, and delivery of the Purchased Assets, Purchaser shall pay to Sellers at the times set forth herein Fifty Million Dollars ($50,000,000.00) (the "Cash Purchase Price" and together with the Assumed Liabilities, the "Purchase Price"). The Cash Purchase Price shall be adjusted in accordance with Section 2.7.

(b)    (i)    Within sixty (60) days after the Closing Date, Purchaser will deliver to Seller a draft of an allocation statement setting forth the proposed allocation of the Purchase Price (and other amounts treated as purchase price for Federal income Tax purposes), among the Purchased Assets of each Seller (the "Proposed Allocation Statement"). The Proposed Allocation Statement will be prepared in accordance with the allocation methodology set forth in Schedule 2.6(b) and Section 1060 of the Code, the applicable Treasury regulations promulgated thereunder, and any similar provision of applicable State, local, or non-U.S. Applicable Law. Sellers will have thirty (30) Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of Sellers' respective objections. If Sellers fail to timely deliver an Allocation Notice of Objection in accordance with this Section 2.6(b), then the Proposed Allocation Statement will be conclusive and binding on all Parties (subject to Section 2.6(b)(ii) below) and will become the "Final Allocation Statement." If Sellers timely submit an Allocation Notice of Objection in accordance herewith, then for twenty (20) Business Days after the date Purchaser's receipt of the Allocation Notice of Objection, Purchaser and Sellers will work in good faith and use their respective commercially reasonable efforts to agree on the allocation. In the event that the Parties are not able to resolve all objections raised in the Allocation Notice of Objection within such twenty (20) Business Day period, then the Proposed Allocation Statement will be amended to reflect all undisputed items to which the Parties have agreed, and all disputed items will be reported by the Parties separately in good faith, and the Proposed Allocation Statement as amended to reflect the undisputed items will become the Final Allocation Statement, or at the election of either Party, the disputed items will be resolved by the Bankruptcy Court and, as amended, become the Final Allocation Statement.

(ii)    (A)    Subject to Section 2.6(b)(ii)(B) below, (x) Sellers and Purchaser will report and file (and will cause their respective Affiliates to report and file) Tax returns (including IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement; and (y) neither Sellers nor Purchaser will take any position (or will allow any of their respective Affiliates to take any position) whether in audits, Tax returns, or otherwise that is inconsistent with the Final Allocation Statement, except, in each case, to the extent otherwise required by Applicable Law.

(B)    In connection with the administration of any Legal Proceeding and the income tax reporting by Sellers, the Bankruptcy Court and Sellers shall not be required to apply the Final Allocation Statement in determining the manner in which the Purchase Price should be allocated as between or among any of the Sellers and Sellers' respective estates (and no allocation hereunder shall supersede, usurp, or otherwise affect the jurisdiction and authority of the Bankruptcy Court to value the Purchased Assets for purposes of distributions to the Sellers' respective estates under the Bankruptcy Code).  For clarity, any allocation of the Purchase Price among the Sellers that differs from that set forth in the Final Allocation Statement shall not amend or modify the allocation of the Purchase Price between or among the asset classes as expressly set forth in the Final Allocation Statement.  Sellers, on the one hand, and Purchaser, on the other hand, each agree to provide the other promptly with any other information required to complete IRS Form 8594.

(C)    Neither Purchaser nor any Seller shall agree to any proposed adjustment based upon or arising out of the Final Allocation Statement by any Governmental Authority (other than the Bankruptcy Court as provided in Section 2.6(b)(ii)(B) above) without first giving the other Party reasonable prior written notice; provided, however, that (x) nothing contained herein shall prevent Purchaser or any Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Final Allocation Statement and (y) neither Purchaser nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Final Allocation Statement.

(iii)    The agreements with respect to the Final Allocation Statement set forth in this Section 2.6(b) shall survive the Closing.

(c)    Purchaser acknowledges that the equity holders in the JV Companies include parties other than Sellers (such third parties, collectively, the "JV Holders").  Pursuant to the limited liability company agreements or stockholders' agreement applicable to a JV Company, the JV Holders may have or claim rights to "tag-along" on the sale Transactions contemplated by this Agreement, at values determined as provided in the applicable limited liability company agreements or stockholders agreement.  If any JV Holder shall exercise their tag-along rights (such JV Holder, an "Exercising JV Holder"), at the Closing Purchaser shall (i) acquire the equity interest in the applicable JV Company of the Exercising JV Holder and (ii) pay to the Exercising JV Holder the purchase price payable to the Exercising JV Holder in respect of their equity interest in the applicable JV Company ("JV Purchase Price"), all in accordance with the applicable JV Company's limited liability company agreements or stockholders' agreement.

2.7.    Adjustment of Purchase Price.  At Closing, the Cash Purchase Price shall be adjusted as follows:

(a)     The Cash Purchase Price shall be (i) reduced by the estimated Store Level Credit Card Receivables received or receivable by the Operating Companies with respect to sales occurring during the three (3) days immediately prior to the Closing Date (the "Estimated Credit Card Receivables") and (ii) increased by Store Level Opening Cash Balances in excess of those amounts per Restaurant set forth in Schedule 1.1(a) hereto. Sellers shall deliver to Purchaser a calculation of the Estimated Credit Card Receivables at least one (1) Business Day prior to Closing.

(b)     The following expenses relating to the Leased Real Property and the PMC Real Property shall be pro-rated to the date of Closing, based upon the number of days elapsed in the applicable period in which the Closing occurs that are prior to the Closing Date and the number of days on and after the Closing Date that are remaining in the applicable period in which the Closing occurs, with Purchaser being treated as the owner of the Leased Real Property and PMC Real Property on the Closing Date.  To the extent Seller or an Operating Company is required by the terms of this Section to pay certain amounts to third parties (such as rent, Taxes, and assessments) and Seller or such Operating Company does not so pay such amounts then due at Closing, Purchaser may elect to receive a credit at Closing for such unpaid amounts.

(i)     All Property Taxes (A) in respect of the PMC Real Property (other than any PMC Real Property in respect of which the Property Taxes are paid by the tenant under the Real Estate Lease of such PMC Real Property) and (B) in respect of Leased Real Property, to the extent the tenant under the related Real Estate Lease is required to pay Property Taxes and not as part of rent that is pro-rated pursuant to Section 2.7(b)(ii), for a Tax period that includes (but does not end on) the Closing Date shall be apportioned between the Trustee, on the one hand, and Purchaser, on the other hand, based on the number of days of such Tax period included in the Pre-Closing Tax Period and the number of days of such Tax period after the Closing Date (with respect to any such Tax period, the "Post-Closing Tax Period").  The Trustee shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.  Property Taxes shall be prorated based on the current year's tax.  If Closing occurs at a date when the current year's millage is not fixed and current year's assessment is available, Property Taxes will be prorated based upon such assessment and prior year's millage.  If current year's assessment is not available, then Property Taxes will be prorated on the prior year's tax.

(ii)     Rent (inclusive of all common area maintenance, Taxes, insurance, and all other amounts paid or payable to a landlord under the applicable Real Estate Lease), exclusive of percentage rent, as provided for under each applicable Real Estate Lease for each Leased Real Property for the month in which the Closing occurs that has been prepaid by a Company shall be pro-rated based upon the number of days of the month prior to Closing and the number of days of the month that remain after the Closing (including the Closing Date ).  No post-Closing adjustments in respect of overpayments or underpayments of common area maintenance shall be made, and Purchaser shall retain all refunds of common area

maintenance from landlords and shall be liable to landlords for all underpayments of common area maintenance that are adjusted after Closing.

(iii)    Utilities and similar expenses (A) in respect of the PMC Real Property (other than any PMC Real Property in respect of which the utilities and similar expenses are payable by the tenant under the Real Estate Lease of such PMC Real Property) and (B) in respect of Leased Real Property, to the extent the tenant under the related Real Estate Lease is required to pay utilities and similar expenses and not as part of rent that is pro-rated pursuant to Section 2.7(b)(ii), will be apportioned based upon the number of calendar days occurring before the Closing Date and after (and including) the Closing Date during the billing period for each such charge. Final meter readings on all utilities charged to the PMC Real Property and Leased Real Property shall be made as of the day preceding the Closing Date if feasible.  The Trustee shall use reasonable efforts to arrange for and shall pay for final billings of utilities to the day preceding the Closing Date, and Purchaser shall be responsible for utilities used on or after the Closing Date.  Any prepaid water, sewer, and other utility charges allocable to the period from and after the Closing Date shall be credited to the Trustee and any unpaid water, sewer, and other utility charges allocable to the period prior to the Closing Date shall be credited to Purchaser.  The Trustee and Purchaser shall deliver written notices to the applicable utility companies notifying them of the change in ownership. Notwithstanding the above, no proration of utility accounts will occur should Purchaser open new accounts under its own name.

(iv)    Prior to the Closing, the Trustee and Purchaser shall  agree on the estimated amount of rent (the "Estimated Percentage Rent") accrued under any of the Real Estate Leases immediately prior to the Closing with respect to rent that is based on a percentage of the sales of the Business generated prior to Closing (the "Accrued Percentage Rent").  Sellers shall deliver to Purchaser a calculation of Estimated Percentage Rent at least one (1) Business Day prior to Closing.  To the extent that any Estimated Percentage Rent is not yet due and payable to a landlord or has not been paid at or prior to Closing, Purchaser shall receive a credit at Closing against the Purchase Price for such amounts and Purchaser shall be responsible for the payments of such amounts following Closing.  If the Accrued Percentage Rent, once finally agreed upon with the applicable landlords, does not equal the Estimated Percentage Rent, the Trustee or Purchaser, as applicable, shall promptly pay to the other the amount of such difference, provided that in no event shall Sellers, in the aggregate, be liable to Purchaser for payment of more than an additional amount of $250,000 (the "Additional Percentage Rent") in respect of Accrued Percentage Rent.  At Closing, the Trustee shall retain and not disburse from the Closing proceeds $250,000 in respect of the Additional Percentage Rent and the Trustee shall make disbursements from such funds (up to the aggregate amount of the Additional Percentage Rent) upon submission by Purchaser of requests (together with supporting documentation in reasonable detail) for additional amounts of Accrued Percentage Rent payable by Purchaser to landlords in respect of periods prior to the Closing.  To the extent that there are undisbursed funds held by the Trustee pursuant to this Section 2.7(b)(iv) on May 31, 2020 (as

to which Purchaser has not requested disbursement), such amounts shall be disbursed by the Trustee in accordance with the Orders of the Bankruptcy Court, and Purchaser shall have no further rights relating to any amounts of Accrued Percentage Rent.  The provisions of this <u>Section 2.7(b)(iv)</u> shall survive the Closing.

(c)     Within three (3) Business Days after the date of the Auction (or three (3) Business Days after Sellers' determination that there will not be an Auction), the Trustee and Purchaser shall  agree on the estimated aggregate amount of trade accounts payable and accrued liabilities (excluding liabilities relating to gift cards and frequent diner or other loyalty programs) of the Operating Companies (the "<u>Estimated Accounts Payable</u>") accruing, accrued, or to be accrued by the Operating Companies as of the Closing Date with respect to the Business and excluding (x) amounts payable to the Chapter 7 Debtors, Victor F. Ganzi, or their respective Affiliates, (y) Indemnified Professional Expenses, and (z) Pre-Closing Taxes that are payable by Sellers with respect to any Straddle Period pursuant to <u>Section 9.3(b)</u> (the "<u>Accrued Accounts Payable</u>").  All accounts payable and accrued liabilities of the Operating Companies, excluding (w) liabilities relating to gift cards and frequent diner or other loyalty programs, (x) amounts payable to the Chapter 7 Debtors, Victor F. Ganzi or their respective Affiliates, (y) Indemnified Professional Expenses, and (z) Pre-Closing Taxes that are payable by Sellers with respect to any Straddle Period pursuant to <u>Section 9.3(b)</u>, shall be current in accordance with their respective terms as of the Closing.  For avoidance of doubt, Accrued Accounts Payable shall be calculated as of the Closing using and applying the Company's accounting methods.  Within sixty (60) days after the Closing, Purchaser shall deliver to the Trustee a reconciliation of the Accrued Accounts Payable (the "<u>Reconciled Accounts Payable</u>") together with supporting documentation in reasonable detail for Accrued Accounts Payable as of the Closing, and using the same accounting policies and methodology of calculation as used to determine the Estimated Accounts Payable; <u>provided</u>, <u>however</u>, that if the Philadelphia Equity Interests are excluded from Purchased Assets pursuant to <u>Section 7.9</u>, Estimated Accounts Payable and Accrued Accounts Payable shall each be reduced by the amount of Closure Payables.  Unless the Trustee notifies the Purchaser in writing within thirty (30) days after receipt by the Trustee of the Reconciled Accounts Payable of any objections thereto (specifying in reasonable detail the basis therefor), the Reconciled Accounts Payable shall be final and binding for all purposes. If the Trustee timely notifies the Purchaser of any such objection, Purchaser and the Trustee shall attempt in good faith to reach an agreement as to the matter in dispute.  If the Parties shall have failed to resolve any such dispute within twenty (20) Business Days after receipt of timely notice of such objection, then any such disputed matter may, at the election of Purchaser or the Trustee, be submitted to the Bankruptcy Court for resolution, which resolution shall be final and binding upon the Parties.  If the Reconciled Accounts Payable, as initially submitted (if no objection is timely made) or as modified by agreement of the Parties or by the Bankruptcy Court after timely objection, reflects that Reconciled Accounts Payable exceed Estimated Accounts Payable by more than $200,000 (the "<u>Accounts Payable Threshold Amount</u>"), then the Trustee shall promptly pay to Purchaser an amount equal to the Reconciled Accounts Payable <u>less</u> the Estimated Accounts Payable, provided that in no event shall Sellers, in the aggregate, be liable to Purchaser for payment of more than an additional amount of $2,000,000 (the "<u>Accounts Payable Reserve</u>") in

21

respect of Accrued Accounts Payable.  If Reconciled Accounts Payable do not exceed Estimated Accounts Payable by more than the Accounts Payable Threshold Amount, then Sellers shall not be liable to Purchaser for any additional amounts with respect to Additional Accounts Payable.  At Closing, the Trustee shall retain and not disburse from the Closing proceeds the amount of the Accounts Payable Reserve and the Trustee shall make disbursements to the Purchaser, if any, from the Accounts Payable Reserve (up to the aggregate amount of the Accounts Payable Reserve) within ten (10) Business Days after final determination of the Reconciled Accounts Payable.  To the extent that there are undisbursed funds held by the Trustee in the Accounts Payable Reserve after payment of any amounts required to be paid to Purchaser, such amounts shall be disbursed by the Trustee in accordance with the Orders of the Bankruptcy Court, and Purchaser shall have no further rights to the Accounts Payable Reserve or on account of the Reconciled Accounts Payable.  The provisions of this Section 2.7(c) shall survive the Closing.

(d)    Within thirty (30) days after the Closing Date, Purchaser shall cause to be prepared, at Purchaser's expense, a reconciliation of the Estimated Credit Card Receivables with the actual Credit Card Receivables for the same period (together with supporting calculations in reasonable detail, the "True-Up Statement") which shall show the amount of such expenses payable by Sellers and the amount payable by Purchaser (the "True-Up"), using the same accounting policies and methodology of calculation as used to determine the Estimated Credit Card Receivables.  Upon completion of such statement, Purchaser shall deliver the True-Up Statement to Sellers.  If Purchaser fails to timely deliver a True-Up Statement, Sellers may cause to be prepared and delivered to Purchaser a True-Up Statement within forty-five (45) days following the Closing Date. If none of the Parties timely delivers a True-Up Statement, no True-Up of the Estimated Credit Card Receivables shall be made.  Upon completion of such statement, Purchaser shall deliver the True-Up Statement to Sellers. Unless the Party receiving the True-Up Statement notifies the other Party in writing within thirty (30) days after receipt by it of the True-Up Statement of any objections thereto (specifying in reasonable detail the basis therefor), such statement shall be final and binding for all purposes. If the recipient of the True-Up Statement timely notifies the delivering Party of any such objection, Purchaser and Sellers shall attempt in good faith to reach an agreement as to the matter in dispute. If the Parties shall have failed to resolve any such dispute within twenty (20) Business Days after receipt of timely notice of such objection, then any such disputed matter may, at the election of Purchaser or Sellers, be submitted to the Bankruptcy Court for resolution, which resolutions shall be final and binding upon the Parties.  If the True-Up Statement, as initially submitted (if no objection is timely made) or as modified by the Bankruptcy Court after timely objection, shows that Sellers owe Purchaser, or Purchaser owes Sellers, any amounts in respect of Store Level Credit Card Receivables, the Party owing such amount shall pay it to the Party to whom it is owed within ten (10) Business Days after (i) receipt of the True-Up Statement, if no objection thereto is timely made, or (ii) resolution of the True-Up Statement by the Bankruptcy Court, if objection thereto is timely made.

2.8.    Earnest Money Deposit.

(a)    Not later than 3:00 Eastern Time on February 21, 2020, Purchaser shall deposit with Escrow Agent cash in immediately available federal funds by wire

transfer to an account or accounts designated in writing by Escrow Agent, an amount equal to Five Million Dollars ($5,000,000) (the "Earnest Money Deposit"), being ten percent (10%) of the Cash Purchase Price (prior to any adjustments). Escrow Agent shall hold the Earnest Money Deposit pursuant to an escrow agreement in the form attached hereto as Exhibit G (the "Escrow Agreement").

(b)     If the Closing is consummated, the Earnest Money Deposit shall be paid to Sellers as a credit against the Purchase Price.

(c)     If the Closing does not occur, the Earnest Money Deposit shall be disbursed in accordance with the provisions of the Escrow Agreement and Section 12.2.

2.9.     Closing. The Closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of the Escrow Agent, on a date mutually agreeable to the Parties (which date shall be after, but no later than five (5) Business Days after, satisfaction of the conditions set forth in Section 10 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Sellers may agree; provided that the Closing must occur on or before the Outside Date.

2.10.     Deliveries by Sellers. At the Closing, Sellers will deliver or cause to be delivered to Purchaser or such other Person specified below (unless delivered previously) the following:

(a)     (i) to the extent in the possession of the Chapter 7 Debtors, the original certificates representing the Equity Interests, together with (A) in the case of shares of stock, original stock powers duly endorsed by the Chapter 7 Debtors in respect of their respective Equity Interests, and (B) in the case of limited liability company interests, transfer powers (if the interests are certificated) and assignments of limited liability company interests in the form attached hereto as Exhibit H-1, duly executed by the Chapter 7 Debtors in respect of their respective Equity Interests and (ii) to the extent not in the possession of the Chapter 7 Debtors, lost certificate affidavits with respect to any Equity Interests in the case of any shares of stock or certificated limited liability company interests in the form attached hereto as Exhibit H-2;

(b)     a duly executed Assignment pursuant to which JOMR shall assign to Purchaser the JMOR IP, in the form attached hereto as Exhibit I (the "JOMR IP Assignment");

(c)     a duly executed Assignment and Assumption Agreement pursuant to which JOMR shall assign to Purchaser the Assigned JOMR Contracts and Purchaser shall assume the obligations of JOMR thereunder, in the form attached hereto as Exhibit J (the "JOMR Assignment and Assumption Agreement");

(d)     a certificate executed by a duly authorized representative of each Seller to the effect that all of the conditions to Closing set forth in Sections 10.2(a), (b) and (c) have been satisfied and to Sellers' actual knowledge, no Material Adverse Effect has occurred and is continuing with respect to the Purchased Assets or the Business from the date of this Agreement to Closing, in the form attached hereto as Exhibit K;

23

(e)     if required, such affidavits, documents and certificates reasonably required by the Title Company to permit the Title Company to issue its title policy in respect of the PMC Real Property to Purchaser subject only to any Company Permitted Liens and Encumbrances;

(f)     evidence of termination of the Management Agreement;

(g)     evidence of the release by Debtors of all Liabilities owed by the Companies to Debtors or their respective Affiliates and all claims of Debtors and their respective Affiliates against the Companies;

(h)     evidence that any licenses relating to the use of the JOMR IP (other than the License Agreements, the Sublicense Agreements, and licenses between JOMR and any Operating Company) have been terminated;

(i)     duly executed resignations of each of the officers, managers, and directors of each Company from their respective positions with such Company;

(j)     evidence that all actions necessary to terminate the Phantom Stock Plans have been taken, that the Phantom Stock Plans has been terminated, and that all amounts payable to any employee of any Operating Company (other than the Chapter 7 Debtors) have been paid in full (which amounts may be paid by Sellers out of proceeds of the Cash Purchase Price at Closing);

(k)     duly executed consents, authorizations, resolutions, or other documentation required to permit the transfer of Equity Interests in the JV Companies to Purchaser and the admission of Purchaser or Purchaser's designee(s) as a member of each Designated LLC that are executed by Trustee;

(l)     (i)    duly executed releases or satisfactions with respect to any recorded mortgages on the PMC Real Property, including, without limitation, any mortgages in favor of Bozzi and Ganzi, (ii) Form UCC-3 termination statements with respect to any Liens on the Purchased Assets, the assets of any Company, or the assets of any Subsidiary, and (iii) all evidence of or duly executed documentation to release any other Lien existing on the Purchased Assets, including, without limitation, any Liens or notice of Liens filed with the USPTO (which may be evidenced by the Sale Order providing for the Purchased Assets free and clear of Liens);

(m)     an affidavit from Sellers dated as of the Closing Date, in form and substance required under the Code issued pursuant to Section 1445 of the Code stating that Sellers are not a foreign person as defined in Section 1445 of the Code;

(n)     a closing settlement statement, in form and substance reasonably acceptable to the Parties (the "Closing Statement"), executed by Sellers;

(o)     all passwords, usernames, and any similar access codes used in connection with any Purchased Assets or the Companies;

(p)     a certified copy of the Sale Order as entered by the Bankruptcy Court on the docket maintained for the Bankruptcy Cases;

(q)     any resolutions, consents, agreements, amendments to organizational documents, or other documents or filings as may be necessary to revoke the dissolution of any Company or Subsidiary or otherwise allow for the continuation of any dissolved Company or Subsidiary executed by Trustee;

(r)     the duly executed Professional Expense Escrow Agreement;

(s)     the duly executed Sellers' Release, executed by Sellers, the Companies, and each Subsidiary;

(t)     the duly executed Company Assignments; and

(u)     all other customary documents, instruments and writings reasonably requested by Purchaser to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

In addition, at Closing, all outstanding mortgages, judgment liens, tax liens, and construction liens, if any, that encumber any of the PMC Real Property (other than Company Permitted Liens and Encumbrances) shall be paid in full; provided that such payment may be made from the proceeds of the Transactions.

2.11.   Deliveries by Purchaser. At the Closing, Purchaser will deliver or cause to be delivered to Sellers (unless previously delivered) the following:

(a)     an amount equal to the Cash Purchase Price (including adjustments thereto) less (x) an amount necessary to fund the Professional Expense Escrow and (y) the Earnest Money Deposit delivered to Sellers pursuant to Section 2.8, which amount shall be delivered by wire transfer of immediately available federal funds to a bank account (or accounts) as shall be jointly designated in writing no later than one (1) day prior to the Closing Date by the Trustee and JOMR to Purchaser;

(b)     a letter authorizing and directing Escrow Agent to release the Earnest Money Deposit to Sellers, duly executed by Purchaser;

(c)     the JOMR Assignment and Assumption Agreement, duly executed by Purchaser;

(d)     a certificate executed by a duly authorized representative of Purchaser to the effect that all of the conditions to Closing set forth in Sections 10.3(a), (b), and (d) have been satisfied, in the form attached hereto as Exhibit L;

(e)     resolutions duly adopted by the Board of Directors of Purchaser (and any other Persons whose consent is required) authorizing the execution, delivery, and performance of this Agreement, and any other agreement or instruments contemplated

25

9586842-10

hereby or thereby, and the consummation of the Transactions contemplated herein by Purchaser;

       (f)     the Closing Statement, duly executed by Purchaser;

       (g)     such documents as shall be required to be executed by Purchaser to admit Purchaser or Purchaser's designee as a member of each Designated LLC;

       (h)     the duly executed Professional Expense Escrow Agreement; and

       (i)     all other documents, instruments and writings reasonably requested by Sellers to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

In addition, at Closing (or thereafter if the Cure Costs payable by Purchaser have not been determined as of Closing), Purchaser shall pay the Cure Costs in respect of the Assigned JOMR Contracts in accordance with the Sale Order. Purchaser's obligation to pay the Cure Costs in respect of the Assigned JOMR Contracts in accordance with the Sale Order shall survive the Closing. At Closing, in addition to the Purchase Price, Purchaser shall pay to each Exercising JV Holder the JV Purchase Price payable to such Exercising JV Holder.

      2.12.  <u>Closing Costs</u>. In addition to any other costs to be borne by Sellers pursuant to this Agreement, Sellers shall pay the cost of obtaining the Bidding Procedures Order and the Sale Order. In addition to any other costs to be borne by Purchaser pursuant to this Agreement, Purchaser shall pay all Taxes applicable to, imposed upon or arising out of the sale or transfer of the Purchased Assets to Purchaser and the other transactions contemplated by this Agreement (including, but not limited to, sales, use, gross receipts, and intangible Taxes), and all costs and expenses incurred by Purchaser as a result of any financing obtained by Purchaser. Except as set forth in this Section or elsewhere in this Agreement, each of the Parties shall bear its own expenses and the expenses of its counsel and other agents in connection with the Transactions contemplated hereby.

      2.13.  <u>Bulk Sales Laws</u>. Purchaser hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

      2.14.  **"AS IS" TRANSACTION. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, NOTWITHSTANDING THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN <u>SECTION 3</u>, (A) THE CONSENT OF A PARTY TO THE CLOSING SHALL CONSTITUTE A WAIVER BY SUCH PARTY OF ANY CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING DATE, AND (B) FOLLOWING CLOSING SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL OR REAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR THAT IS THE SUBJECT OF ANY LEASE OR CONTRACT**

9586842-10

**TO BE ASSIGNED TO PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR ANY OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS, AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>SECTION 3</u>, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING IN THEIR "AS IS," "WHERE IS," AND "WITH ALL FAULTS" CONDITION.**

3.    <u>**Representations and Warranties of Sellers**</u>.  Subject to the terms, conditions and limitations set forth in this Agreement, (i) JOMR, solely with respect to itself and the JOMR IP and the Assigned JOMR Contracts, and (ii) the Trustee, solely on behalf of the Chapter 7 Debtors and with respect to the Equity Interests, severally represent and warrant to Purchaser as of the date of this Agreement as follows:

3.1.    <u>Organization</u>.

(a)    Each Seller is either a duly appointed Trustee in the Chapter 7 Case or an entity validly existing under the Laws of the jurisdiction listed for such Seller in the preamble to this Agreement, and has the power and authority to own, lease, and operate the Purchased Assets that such Seller owns, leases, or operates.

(b)    Each Company is duly formed or organized, as applicable, and validly existing in good standing under the Laws of the jurisdiction of such Company's formation or organization, is duly qualified to conduct business in each jurisdiction where the failure to do so would have a Material Adverse Effect, and has the power and authority to own, lease, and operate the Business (to the extent operated by such Company).

27

3.2.    <u>Due Authorization</u>. The execution, delivery, and performance by Sellers of this Agreement and the consummation of the Transactions are within Sellers' personal, trustee, corporate, or organizational powers and have been duly authorized by all necessary actions on the part of Sellers. Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and Sale Order in the Bankruptcy Cases, this Agreement constitutes a valid and binding agreement of Sellers that is enforceable in accordance with its terms.

3.3.    <u>Governmental Authorization</u>. Except as disclosed on <u>Schedule 3.3</u>, the execution, delivery, and performance by Sellers of this Agreement and the consummation of the Transactions by Sellers require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not be reasonably likely to have a Material Adverse Effect.

3.4.    <u>Non-contravention</u>. Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order in the Bankruptcy Cases, and except for Permitted Liens and Encumbrances and Assumed Liabilities or Liens that will be released at or prior to Closing, the execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions do not and will not (a) violate any Seller's organizational documents, (b) assuming compliance with the matters referred to in <u>Section 3.3</u>, violate any Applicable Law, (c) except as to matters that would not reasonably be likely to have a Material Adverse Effect, and subject to obtaining the consents described in <u>Section 3.5</u> and consents required from counterparties under Material Contracts (including Real Estate Leases), constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which any Seller is entitled under any provision of any Material Contract binding upon such Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code, or (d) result in the creation or imposition of any other Lien on any Purchased Asset.

3.5.    <u>Required Consents</u>.  Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and as otherwise set forth on <u>Schedule 3.5</u>, there is no Material Contract binding upon Sellers requiring a consent or other action by any Governmental Authority as a result of the execution, delivery and performance of this Agreement which has not been obtained (or will not have been obtained at or prior to Closing), except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date.

3.6.    <u>Litigation</u>. Except as disclosed on <u>Schedule 3.6</u>, as of the date hereof, there is no action, suit, investigation or proceeding pending against, or to the Knowledge of Sellers, threatened against or affecting, the Purchased Assets (other than the Bankruptcy Cases) before any Governmental Authority which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

3.7.    <u>Intellectual Property Rights</u>.

(a)    <u>Schedule 3.7(a)</u> sets forth an accurate and complete list of all registered JOMR IP, social media accounts, and domain names included in the Purchased

28

Assets and currently used by the Operating Companies in the operation of the Business. Except as set forth on Schedule 3.7(a), to the Knowledge of JOMR, there exist (i) no outstanding challenges to the ownership and use by JOMR and the Operating Companies of the JOMR IP included in the Purchased Assets, (ii) no alleged infringements of such Intellectual Property rights by third parties, and (iii) no restrictions on the use of such Intellectual Property by JOMR or the Operating Companies. Except as set forth on Schedule 3.7(b) and in the License Agreements and Sublicense Agreements, none of the JOMR IP included in the Purchased Assets has been licensed by JOMR or PMC to any other Person.  Pursuant to the Decision and Judgment, the Supreme Court of the State of New York determined that the licenses between JOMR and the Companies for the use by the Companies of the JOMR IP are void; the Decision and Judgment is currently on appeal to the Supreme Court of the State of New York.  The JOMR IP is fully transferable and will be transferred to Purchaser at the Closing without restriction and, except as provided in this Agreement, without payment of any kind to any Person.

(b)     All necessary renewals due through the date of this Agreement in connection with any registered trademarks included in the JOMR IP have been timely filed. All assignments of registered trademarks to JOMR and proper documentation of chain of title thereto have been executed in writing and properly recorded with the United States Patent and Trademark Office ("USPTO") or any foreign equivalents in the name of JOMR. Except as set forth on Schedule 3.7(b), there are no actions that are required to be taken by JOMR within ninety (90) days of the date of this Agreement with respect to the Registered Trademarks that if not taken will have a Material Adverse Effect on any registered trademarks included in the JOMR IP, or the prosecution of applications or registrations relating thereto, including the payment of any registration, maintenance, or renewal fees or the filing of any response to USPTO actions or any foreign equivalents.

3.8.    License Agreements.

(a)     JOMR has delivered to Purchaser true, correct, and complete copies of all of the License Agreements, together with all amendments, modifications, or supplements thereto.  Except as to matters that would not reasonably be likely to have a Material Adverse Effect and except as set forth on Schedule 3.8(a), each of the License Agreements is in full force and effect and is the legal, valid, and binding obligation of JOMR and of the other parties thereto, enforceable against each of them in accordance with their respective terms. Except as set forth on Schedule 3.8(a), and except for defaults caused by the commencement of the Bankruptcy Cases or that are not reasonably likely to have a Material Adverse Effect, to the Knowledge of Sellers, (i) JOMR is not in default under any License Agreement, nor, (ii) to the Knowledge of Sellers, is any other party to any License Agreement in breach of or default thereunder. Except as set forth on Schedule 3.8(a), no party to any of the License Agreements has exercised any termination rights with respect thereto, and no party has given notice of any dispute with respect to any License Agreement that is reasonably likely to have a Material Adverse Effect.

(b)     PMC and Palm Airport, LLC have delivered to Purchaser true, correct, and complete copies of all of the Sublicense Agreements, together with all amendments, modifications, or supplements thereto.  Except as to matters that would not

reasonably be likely to have a Material Adverse Effect, each of the Sublicense Agreements is in full force and effect and is the legal, valid, and binding obligation of PMC and Palm Airport, LLC, respectively, and of the other parties thereto, enforceable against each of them in accordance with their respective terms. Except for defaults that are not reasonably likely to have a Material Adverse Effect, to the Knowledge of Sellers, (i) neither PMC nor Palm Airport, LLC is in default under any Sublicense Agreement, nor (ii), to the Knowledge of Sellers, is any other party to any Sublicense Agreement in breach of or default thereunder. To the Knowledge of Sellers, no party to any of the Sublicense Agreements has exercised any termination rights with respect thereto, and no party has given notice of any dispute with respect to any Sublicense Agreement that is reasonably likely to have a Material Adverse Effect.

3.9.    Compliance with Laws and Court Orders. To the Knowledge of Sellers, no Seller or Company is in violation of any Law applicable to the Purchased Assets, except for violations that would not reasonably be likely to have a Material Adverse Effect.

3.10.    PMC Real Property.  PMC owns good and marketable fee simple title to the PMC Real Property, subject to the Company Permitted Liens and Encumbrances and any Liens that will be released at Closing.  Except for the PMC Real Property owned by PMC, no other Company owns fee simple title to any real property.  To the Knowledge of Sellers, no purchase option, option to sell, right of first refusal, first offer, or first negotiation to purchase exists with respect to the PMC Real Property.  At the Closing, PMC will own the PMC Real Property free and clear of any Liens other than Company Permitted Liens and Encumbrances.

3.11.    Environmental Matters.  To the Knowledge of Sellers, no Company has received written notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the PMC Real Property or any Leased Real Property that remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the PMC Real Property or any Leased Real Property that remains unperformed.

3.12.    Financial Statements.    Copies of the consolidated audited financial statements of the Palm Restaurant Group for the calendar years ended December 31, 2017, and 2018, have been furnished to Purchaser in the Data Room.  Schedule 3.12 contains the unaudited consolidated balance sheet of the Palm Restaurant Group as of October 31, 2019, and the related unaudited statement of operations for the ten-month period then ended. The financial statements referred to in this Section 3.12 are collectively referred to as the "Financial Statements." Except as set forth on Schedule 3.12, the Financial Statements have been prepared from the books and records of the Companies and their Subsidiaries on an accrual basis consistent with the Company's internal accounting practices.

3.13.    Subsidiaries.  Except as set forth on Schedule 3.13, none of the Companies has any Subsidiaries or owns equity interests in any other Person.  Schedule 3.13 sets forth the issued and outstanding percentage ownership of each Subsidiary of a Company.

3.14.    Ownership of Equity Interests.  Schedule 3.14 sets forth the issued and outstanding percentage ownership of each Company.  The Equity Interests represent all of the

equity interests of the Companies issued to the Chapter 7 Debtors. All of the Equity Interests have been duly authorized and validly issued. There are no outstanding options, warrants, calls, rights of conversion or other rights, agreements, arrangements, or commitments relating to the equity securities or interests of any Company to which such Company is a party, or by which it is bound, obligating such Company to issue, deliver, or sell, or cause to be issued, delivered, or sold, any equity securities or interests of such Company. Except as set forth on Schedule 3.14, there are (a) no rights, agreements, arrangements, or commitments relating to the equity securities or interests of any Company to which such Company or any Seller is a party or by which any Company or any Seller is bound, obligating any Company to repurchase, redeem, or otherwise acquire any issued and outstanding equity securities or interests of such Company; (b) except for the Phantom Stock Plan, no outstanding or authorized stock appreciation, phantom stock, profit participation, or other similar rights with respect to any Company; and (iii) no voting trusts, stockholder agreements, proxies, or other agreements or understandings in effect to which such Company or Seller is a party or by which it is bound, with respect to the governance of such Company or the voting or transfer of any equity interests in such Company.

3.15.   Brokers. Except as set forth on Schedule 3.15, no broker, investment banker or other Person engaged by Sellers is entitled to any broker's, finder's or other similar fee or commission payable by Purchaser in connection with the Transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers.

3.16.   Material Contracts. To Sellers' Knowledge, true and complete copies of all Material Contracts (including, without limitation, copies of all Real Estate Leases) are set forth in the Data Room and are listed on Schedule 3.16 attached hereto. To Sellers' Knowledge, except as to matters that would not reasonably be likely to have a Material Adverse Effect and except as set forth on Schedule 3.16, each of the Material Contracts is in full force and effect and no party thereto is in breach of or default thereunder. As used herein, "Material Contract" means the Real Estate Leases and any other Contract relating to a Restaurant or the Business or the PMC Real Property that both (a) requires annual payments to the counterparty of more than $100,000 per year or (b) the uncured breach of which would have or reasonably be likely to have a Material Adverse Effect.

3.17.   Compliance with Laws. To the Knowledge of Sellers (which qualification applies to each and every representation made in the subsections below):

(a)     Each Company and each Subsidiary that is an Operating Company presently complies in all material respects with all Laws applicable to the Business, its respective properties and operations. Except as set forth in Schedule 3.17(a), all permits, licenses, certificates, registrations, variances, exemptions, orders, approvals, and franchises from all Governmental Authorities ("Permits") required by Law to carry on the Business as it is conducted on the date of this Agreement, or that are material to the operation of the Business are held by the Operating Companies (and each Operating Company is in compliance therewith in all material respects) and are valid and in full force and effect. No suspension, cancellation, or modification of any of the Permits is pending or threatened, and no investigation or review by any Governmental Authorities with respect to any Operating Company is pending or threatened, other than investigations or reviews that, individually or in the aggregate, do not and are not reasonably likely to have a Material

31

Adverse Effect.  No Operating Company nor any of their respective representatives, directors, managers, members, partners, or officers, has (i) used any fund of any Operating Company for any unlawful contribution, endorsement, gift, entertainment, or other unlawful payment or expense relating to political activity, (ii) made any direct or indirect unlawful payment to any domestic government official or employee from any of any Operating Company's funds, or (iii) made any bribe, rebate, payoff, influence payment, "kickback," or other unlawful payment to any Person with respect to any of any Operating Company's matters.  Sellers acknowledge and agree that nothing in this representation shall reduce or limit any other representation or warranty of Sellers set forth herein that specifically addresses any compliance issue.

(b)    Schedule 3.17(b) sets forth a true, correct, and complete list of all Liquor Licenses held by any Operating Company in connection with the operation of the Restaurants.  To the extent required by applicable Law or regulation, each Operating Company possesses a Liquor License for the Restaurant operated by such Operating Company.  Each of the Liquor Licenses is in full force and effect and adequate for the current conduct of operations by each Operating Company and at the Restaurant for which it is issued and has been validly issued.  No Restaurant has received any written notice of any pending or threatened, modification, suspension, or cancellation of any Liquor License or any proceeding relating thereto.  There are no (i) pending disciplinary actions or (ii) past disciplinary actions that have had or are reasonably likely to have a Material Adverse Effect on the current operation of the Business or the nature or level of discipline imposed on account of future violations of the Laws related to sales and service of alcoholic beverages.  No Operating Company is subject to any pending or, to the extent such actions have had or are reasonably likely to have a Material Adverse Effect on the current operation of the Business or the nature or level of discipline imposed on account of future violations of the Laws related to sales and service of alcoholic beverages, past, disciplinary actions for violation of any Laws related to sales or service of alcoholic beverages in any state in which a Restaurant is located.

3.18.    Real Estate Leases; Personal Property.  To the Knowledge of Sellers (which qualification applies to each and every representation made in the subsections below):

(a)    Exhibit E sets forth a true, correct, and complete list of each Real Estate Lease, including all amendments in the possession of the Companies, to which any Operating Company is a party, beneficiary, or obligor or that relate to the Business or any of the Purchased Assets (collectively, the "Real Estate Leases"), along with any guaranties of any such Real Estate Leases.  The Real Estate Leases constitute all of the real properties leased by any Operating Company or used in connection with the Business, and there are no co-tenants under any of such Real Estate Leases.  Each Real Estate Lease is in full force and effect and is valid, binding, and enforceable in accordance with its terms against (i) each Operating Company that is party thereto and (ii) the other parties thereto.  Except as set forth on Schedule 3.18(a), no Operating Company has received any written notice of default or termination with respect to any Real Estate Lease.  Copies of each Real Estate Lease have been made available in the Data Room.

32

(b)    No Real Estate Lease has been assigned or subleased by any Operating Company.

(c)    No Operating Company has received any written notice from any Governmental Authority to the effect that any condemnation (or action in lieu thereof) or any material rezoning proceedings are pending or threatened with respect to any Real Estate Leases.  There are no proposed or contemplated changes to the configuration or layout of any center or common development in which a Real Estate Lease is located, or to roads, access ways, or parking areas used in connection with operations at each such Real Estate Lease, that would reasonably be likely have a Material Adverse Effect on the operations of the Restaurant at such location.

(d)    Each Operating Company owns or leases all material furniture, fixtures equipment, operating supplies, and other personal property used in connection with the Business, in each case free and clear of all Liens other than Company Permitted Liens and Encumbrances and Liens that will be released at Closing, subject to (i) any Liens and rights in favor of the landlords as set forth in the Real Estate Leases and (ii) any capital leases, equipment leases, or other Liens resulting from financings used to acquire such personal property.

3.19.    <u>Employment Matters</u>.  To the Knowledge of Sellers (which qualification applies to each and every representation made in the subsections below):

(a)    <u>Schedule 3.19(a)</u> sets forth a true, correct, and complete list of each material Benefit Plan.

(b)    Sellers have made available the following documents to Purchaser with respect to each material Benefit Plan:  (1) true, correct, and complete copies of all documents embodying such Benefit Plan, including, without limitation, all amendments thereto, and all related trust documents; (2) a written description of any such Benefit Plan that is not set forth in a written document; (3) the most recent summary plan description together with the summary or summaries of material modifications thereto, if any; and (4) all material correspondence to or from any Governmental Authority received by any Operating Company or any Benefit Plan in the last three (3) years.

(c)    Each Benefit Plan has been maintained and administered in all material respects in compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules, and regulations (foreign and domestic), including, without limitation, ERISA and the Code, that are applicable to such Benefit Plans. All contributions, reserves, or premium payments required to be made or accrued as of the date hereof to the Benefit Plans have been timely made or accrued.  Each Benefit Plan intended to be qualified under Section 401(a) of the Code and each trust intended to qualify under Section 501(a) of the Code is so qualified and has obtained a currently effective favorable determination notification, advisory or opinion letter, as applicable, as to its qualified status (or the qualified status of the master or prototype form on which it is established) from the Internal Revenue Service, and no amendment to such Benefit Plan has been adopted since

33

the date of such letter covering such Benefit Plan that would reasonably be expected to adversely affect such favorable determination.

(d)　　The execution of this Agreement and the consummation of the transactions contemplated by this Agreement (alone or together with any other event that, standing alone, would not by itself trigger such entitlement or acceleration) will not (1) entitle any Person to any payment, forgiveness of indebtedness, vesting, distribution, or increase in benefits under or with respect to any Benefit Plan, (2) otherwise trigger any acceleration (of vesting or payment of benefits or otherwise) under or with respect to any Benefit Plan, or (3) trigger any obligation to fund any Benefit Plan.

(e)　　Except as set forth on Schedule 3.19(e), no Operating Company is a party to any collective bargaining agreements and there are no labor unions or other organizations representing any employee of the Business or of any Operating Company. There are no labor unions or other organizations that have filed a petition with the National Labor Relations Board or any other Governmental Authority seeking certification as the collective bargaining representative of any employee of any Operating Company, and, except as set forth on Schedule 3.19(e), no labor union or organization is engaged in any organizing activity with respect to any employee of any Operating Company.  In the three (3) years prior to the Closing Date there has not been, and there is not now pending or threatened, (i) any strike, lockout, slowdown, picketing, or work stoppage with respect to the employees of any Operating Company or (ii) any unfair labor practice charge against any Operating Company.

(f)　　Except as set forth on Schedule 3.19(f), each Seller has  materially complied, and is presently in material compliance, with all statutes, laws, ordinances, rules or regulations, or any orders, rulings, decrees, judgments or arbitration awards of any court, arbitrator, or any government agency relating to employment, equal opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, income tax withholding, occupational safety and health, or privacy rights of employees.

3.20.　Taxes.  To the Knowledge of Sellers (which qualification applies to each and every representation made in the subsections below):

(a)　　All Tax returns required to be filed by Sellers, the Operating Companies, or any other Subsidiary with respect to the Business, the Purchased Assets, and the Assumed Liabilities have been duly and timely filed, all such Tax returns were true, correct, and complete in all material respects, and all Taxes due with respect to the Business, the Purchased Assets, and the Assumed Liabilities have been duly and timely paid, except to the extent the failure to file or failure to pay is not reasonably likely, individually or in the aggregate, to result in a Material Adverse Effect.

(b)　　Each of the Companies has withheld all material Taxes required to be withheld with respect to any employees, independent contractors, or other third parties related to the Business or the Purchased Assets and, to the extent due and payable, has duly and timely paid to the appropriate authorities or set aside in an account for such purpose

34

9586842-10

proper and accurate amounts for all periods through the date of this Agreement and through the Closing Date in compliance with applicable laws.

(c)     There is no Lien for Taxes upon any of the assets of the Operating Companies or any other Subsidiary or the Purchased Assets nor is any taxing authority in the process of imposing any lien for Taxes on any of assets of the Operating Companies or any other Subsidiary or the Purchased Assets, other than liens for Taxes that are not yet due and payable.

(d)     There is no action, suit, proceeding, investigation, audit, claim, or assessment presently in progress or proposed in writing with regard to any Taxes that relate to either the Purchased Assets or the Business.

3.21.   <u>Company Litigation</u>.  To the Knowledge of Sellers, except as set forth on <u>Schedule 3.21</u>, there are no claims, actions, suits, proceedings or investigations pending or threatened against or affecting the Business, any Company or Subsidiary, or any of their respective properties or assets (i) that, individually or in the aggregate, has or is reasonably likely to (A) have a Material Adverse Effect or (B) prevent or delay the consummation of the transactions contemplated by this Agreement or (ii) that in any manner seeks to prevent or enjoin, alter or delay the transactions contemplated by this Agreement.  To the Knowledge of Sellers, there is no Order of any Governmental Authority or arbitrator outstanding against any Operating Company that has or is reasonably likely to have a Material Adverse Effect.

3.22.   <u>Condition of Property</u>.  To the Knowledge of Sellers, (i) all buildings, structures, improvements, furniture, fixtures, building systems, and equipment, and all components thereof, included in the Real Property Leases or as part of the PMC Real Property are structurally sound, free from material defects, have been maintained in accordance with normal industry practice, and are in sufficient working order to conduct the Business presently conducted therein or thereon, subject to normal wear and tear; and (ii)  all machinery, equipment and other personal property used by the Operating Companies in the operation of the Business are free from material defects, have been maintained in accordance with normal industry practice, and are in sufficient working order to conduct the Business presently conducted therewith, in each case (with respect to both clauses (i) and (ii) above) except as would not reasonably be likely to have a Material Adverse Effect.

3.23.   <u>USA PATRIOT Act</u>.  To the Knowledge of Sellers, Sellers and each Operating Company have complied in all material respects with the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001 (as in effect on the date of this Agreement), which comprises Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 and the regulations promulgated to date thereunder, and the rules and regulations administered to date by the United States Department of Treasury's Office of Foreign Assets Control, to the extent such Laws are applicable to each such Seller and Operating Company.

**4.     Representations and Warranties of Purchaser**.  Purchaser represents and warrants to Sellers as follows:

9586842-10

4.1.    Organization. Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of Nevada and has all limited liability company powers and all material governmental licenses, authorizations, permits, consents, and approvals required to carry on its business as now conducted.

4.2.    Corporate Authorization. The execution, delivery, and performance by Purchaser of this Agreement and the consummation of the Transactions are within the limited liability company powers of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3.    Governmental Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material adverse effect on the Purchaser or its ability to close the Transactions.

4.4.    Non-contravention. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of the organizational documents of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation, or acceleration under, any of the terms, conditions, or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease, or other contract, instrument, or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c), and (d) such requirements, violations, conflicts, defaults, or rights that would not adversely affect the ability of Purchaser to consummate the Transactions.

4.5.    Financing. Purchaser has sufficient cash, available lines of credit, or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

4.6.    Litigation. There is no action, suit, investigation, or proceeding pending against or, to the knowledge of Purchaser, threatened against, or affecting Purchaser before any Governmental Authority that in any manner challenges or seeks to prevent, enjoin, alter, or materially delay the Transactions.

4.7.    Brokers. Except as set forth on Schedule 4.7, Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

4.8.    Inspections; No Other Representations. Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and

purchase of properties and assets such as the Purchased Assets and assumption of liabilities such as the Assumed Liabilities as contemplated hereunder. Purchaser has undertaken such investigations and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery, and performance of this Agreement. Purchaser acknowledges that Sellers have given Purchaser reasonable and open access to the key employees, documents, and facilities of Sellers, the Companies, the Business, and the PMC Real Property.  Purchaser acknowledges and agrees that the Purchased Assets are being sold on an "**AS IS, WHERE IS**" basis and Purchaser agrees to accept the Purchased Assets and the Assumed Liabilities in the condition they are in on the Closing Date based on its own inspection, examination and determination with respect to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Sellers, except as expressly set forth in this Agreement, including, without limitation, the representations and warranties of Sellers set forth in Section 3. Without limiting the generality of the foregoing, Purchaser acknowledges that Sellers make no representation or warranty with respect to (a) any projections, estimates, or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows, or future financial condition (or any component thereof) of the Business or the PMC Real Property or the future prospects or operations of the Business or the PMC Real Property or (b) any other information or documents made available to Purchaser or its counsel, accountants, or advisors with respect to the Business or the PMC Real Property, except as expressly set forth in this Agreement. Purchaser acknowledges and agrees with the provisions of Section 2.14 herein.

5.      **Covenants of Sellers**.  Sellers covenant and agree that:

5.1.    Purchased Assets. From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12 and the Closing Date, except (i) as may be required by the Bankruptcy Court, (ii) for the consequences resulting from the continuation of the Bankruptcy Cases, or (iii) as may be required or contemplated by this Agreement, each Seller shall (a) maintain its respective Purchased Assets and cause each Company to maintain such Company's assets and operate the Business in the ordinary course, and (b) cause each Company and any Subsidiary to keep current, in accordance with the terms of, and pay all accounts payable arising from the operations of the Business in the ordinary course (excluding (x) amounts payable (i) to the Chapter 7 Debtors, Victor F. Ganzi and their respective Affiliates, (ii) to the Pre-Closing Company Professionals, and (iii) with respect to gift cards and frequent diner and other loyalty programs, and (y) Indemnified Professional Expenses) and rent obligations as they come due, in each case (with respect to both clauses (a) and (b) of this Section 5.1 (and all subclauses of those clauses)), in a manner consistent with prior practice during the pendency of the Bankruptcy Cases and subject to compliance with the budget approved by the DIP lender in the Bankruptcy Cases. Notwithstanding the foregoing, Purchaser acknowledges and agrees that, prior to Closing, each Company shall distribute its cash, other than (1) Store Level Opening Cash Balances, (2) Withholding Reserves, (3) any amounts held in any accounts for all outstanding and uncashed checks, drafts, ACH transfers, outgoing wires, or similar transfers from any Companies or any Subsidiaries, and (4) any amounts held by any JV Companies, and each Company shall assign and transfer, pursuant to assignments in form and substance reasonably acceptable to Purchaser and Sellers (collectively, the "Company Assignments"), (a) all amounts owed to it by Sellers, Debtors, or their respective Affiliates and (b) all of its respective claims (including, without limitation, all

Other Causes of Action that any of the Companies have the right to bring and Derivative Action Causes of Action) against any Seller, Debtor, Bruce E. Bozzi, Sr., Walter J. Ganzi, Jr., or Victor F. Ganzi, or any of their respective Affiliates (excluding the Companies and Subsidiaries), or any professionals engaged by any of them, including malpractice and other claims against such professionals, and the proceeds thereof, to JOMR or the Trustee, as applicable, and as designated by Sellers.

5.2.    <u>Notices of Certain Events</u>. Sellers shall promptly notify Purchaser of and deliver copies to Purchaser of:

(a)    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)    any material written communication from any Governmental Authority in connection with or relating to the Transactions;

(c)    the commencement of any actions, suits, investigations or proceedings relating to Sellers, any Company, the Business, or any PMC Real Property that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to <u>Section 3.6</u>;

(d)    any fact or condition that causes or constitutes a breach of any of any Sellers' representations or warranties made as of the date of this Agreement Date or the occurrence after the date of this Agreement of any fact or condition that would or would be reasonably likely to (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had that representation or warranty been made as of the time of the occurrence of, or such Seller's discovery of, such fact or condition; <u>provided</u>, <u>however</u>, that such notification shall not limit, affect, waive, or modify any rights of Purchaser or obligations of any Seller hereunder; and

(e)    the occurrence of any breach of any covenant of any Seller in this Agreement or of the occurrence of any event that may make the satisfaction of the conditions in <u>Section 10</u> impossible or unlikely; <u>provided</u>, <u>however</u>, that such notification shall not limit, affect, waive, or modify any rights of Purchaser or obligations of any Seller hereunder.

5.3.    <u>Termination of Management Agreement</u>.  On or prior to the Closing, JOMR and PMC shall terminate the Management Agreement.

5.4.    <u>Termination of Certain License Agreements</u>.  Immediately prior to the Closing, JOMR and each entity owned by Debtors that is not a Company identified on <u>Exhibit A</u> shall terminate any license agreements between them relating to the JOMR IP (other than the License Agreements).

5.5.    <u>Termination of Phantom Stock Plan; Retention Payments</u>.  On or prior to the Closing:

(a)     Sellers shall cause the Companies to terminate the Phantom Stock Plans and pay all amounts payable to any participant in the Phantom Stock Plans (other than the Chapter 7 Debtors), which payments may be made out of the proceeds of the Cash Purchase Price.

(b)     Sellers shall cause the Companies to pay all amounts payable to any non-debtor employees under the Retention Payment Agreements, which payments may be made out of proceeds of the Cash Purchase Price.

5.6.    Operation of the Companies.  Following the date of this Agreement and prior to the Closing and except as otherwise permitted or required by the terms of this Agreement, without the consent of Purchaser, Sellers shall not cause or permit the Companies, any Subsidiary that is an Operating Company, or any other Subsidiary to do any of the following to the extent that any such action would have a Material Adverse Effect:

(a)     sell, lease, license, transfer, or dispose of (other than in the ordinary course of business), or subject to any Lien other than Company Permitted Liens and Encumbrances and Liens existing as of the date hereof, any of the material assets or properties of such Company or Subsidiary;

(b)     terminate, amend, extend, modify, breach, waive, or allow any rights to lapse under any Material Contract, other than any modification or amendment of the DIP financing loan made in the Bankruptcy Cases;

(c)     authorize or enter into any Contract, arrangement, or commitment other than a Contract that is both (i) in the ordinary course of business and (ii) not a Contract that would constitute a Material Contract if it were effective as of the date of this Agreement;

(d)     except as provided in this Agreement, amend, modify, or breach the organizational documents of any Company or Subsidiary;

(e)     enter into any Contract or contractual obligation with any Seller or enter into any other Contract that obligates any Company for any payment or amount in excess of $100,000 that is not terminable within ninety (90) days;

(f)     settle any claims, actions, arbitrations, disputes, or other proceedings, unless such amount is payable prior to Closing out of then available cash or is covered entirely by insurance or unless such claim, action, arbitration, dispute or other proceeding is in favor of Sellers;

(g)     other than in the ordinary course of business, authorize, undertake, make, or enter into any commitments obligating any Company or Subsidiary to (i) make or accelerate any unbudgeted capital expenditures or (ii) undertake or approve any material renovation or rehabilitation of any Restaurant;

(h)     (i) cancel or compromise any material debt owed to the Company or Subsidiary or claim or waive any rights of material value to the Business, any Company or

39

9586842-10

Subsidiary, or any Purchased Asset other than in the ordinary course of business or (ii) voluntarily suffer any loss other than in the ordinary course of business;

        (i)      do any other act that would, to the Knowledge of Sellers, cause any representation or warranty of any Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect; or

        (j)      authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

        5.7.   <u>Maintenance of Permits</u>.   Sellers shall cause the Companies to use commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits (including Liquor Licenses) necessary or required by Law to own, lease, and operate each Company's respective properties and assets and to carry on the Business or that are material to the operation of the Business or the Purchased Assets, including by taking all actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date (or within thirty (30) days thereafter).

        5.8.   <u>Maintenance of Insurance</u>.   Sellers shall cause the Companies to maintain insurance coverage (including self-insurance health care arrangements with insurance stop loss coverages) with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained with respect to the Business and Companies on the date of this Agreement and shall pay all insurance premiums with respect thereto when due.

        5.9.   <u>Withholding and Other Trust Fund Taxes; Employee Payments</u>.   Sellers shall cause the Companies to: (i) timely remit when payable to the applicable Governmental Authority (A) all sales Tax, use Tax, liquor Tax, and other Taxes collected or withheld from third parties and (B) any employee related costs, liabilities, and withholding Taxes; and (ii) to the extent not payable to an applicable Governmental Authority prior to the Closing, hold all such amounts withheld or collected as a Withholding Reserve.  In addition, Sellers shall cause the Companies to timely remit when payable, or pay at Closing, any employee related costs, including salaries, payroll, benefits, bonuses, and any other employee related costs, other than to the Chapter 7 Debtors.

        5.10.   <u>Bozzi and Ganzi Notes</u>.  At least one (1) Business Day prior to the Closing, the Trustee shall cause the Bozzi and Ganzi Notes together with all accrued interest and other amounts due or payable under the Bozzi and Ganzi Notes to be contributed to PMC as a capital contribution.

        5.11.   <u>401-K Plans</u>. Not less than two (2) Business Days before the anticipated Closing Date, the board of directors, managers, or other governing body of each Company or Subsidiary, as applicable, shall adopt resolutions and take such action as is necessary to terminate any Benefit Plan that is maintained pursuant to Section 401(k) of the Code effective as of the date prior to the Closing Date. Following the Closing, the assets thereof shall be distributed to the participants, and Purchaser shall, to the extent permitted by any "eligible retirement plan" (within the meaning of Section 401(a)(31) of the Code) of Purchaser or any of its subsidiaries (the

"Purchaser 401(k) Plan") and consistent with Purchaser policies with respect to Purchaser's current employees, permit the employees of each Company or Subsidiary who are then actively employed to make rollover contributions of "eligible rollover distributions" (within the meaning of Section 401(a)(31) of the Code, inclusive of loans to participants), in the form of cash (or, in the case of loans, notes), in an amount equal to the eligible rollover distribution portion of the account balance distributed to such employee from such terminated Benefit Plan to the Purchaser 401(k) Plan. Purchaser shall be responsible for the post-Closing administration and winding down of any terminated Benefit Plans maintained pursuant to Section 401(k) of the Code following termination of such Benefit Plan by the Companies.

6.    **Covenants of Purchaser**. Purchaser covenants and agrees that:

6.1.    Access. On and after the Closing Date, upon reasonable advance notice, Purchaser will afford promptly to Sellers and their counsel, advisors, and other agents reasonable access during normal business hours to Purchaser's books and records relating to the Purchased Assets to the extent necessary for financial reporting and accounting matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, Claim, or assessment, the reconciliation of Claims in the Bankruptcy Cases, to permit Sellers to determine any matter relating to Sellers' rights and obligations hereunder, any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities, or in connection with addressing any other issues arising in connection with or relating to the Bankruptcy Cases, the Bankruptcy Causes of Action, the Other Causes of Action or the Derivative Action Causes of Action; provided, however, that any such access by Sellers shall not unreasonably interfere with the conduct of the business of Purchaser. Sellers will hold, and will use their commercially reasonable efforts to cause their officers, directors, employees, accountants, counsel, consultants, advisors, and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all confidential documents and information concerning Purchaser or the Business provided to them pursuant to this Section 6.1.

7.    **Covenants of Purchaser and Sellers**. Purchaser and Sellers agree that:

7.1.    Access to Information. From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12 and the Closing Date, Sellers shall continue to afford to Purchaser and its counsel, accountants, and other representatives, access (at reasonable times during normal business hours) to the Data Room and officers and other employees of Sellers on the same basis as previously provided to Purchaser, subject to the terms of the Confidentiality Agreement. No investigation pursuant to this Section 7.1 shall alter any representation or warranty given hereunder by any Seller.

7.2.    Efforts; Further Assurances. Subject to the terms and conditions of this Agreement, Purchaser and Sellers will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Laws to consummate the Transactions contemplated by this Agreement, including, without limitation, to obtain all required consents of third parties with respect to any Real Estate Leases (at no out of pocket cost to Sellers); provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets). Sellers

41

and Purchaser agree to execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

7.3.    <u>Public Announcements</u>. Neither Sellers nor Purchaser shall make any public announcements or statements concerning the Transactions without the prior written consent of the other Parties, which consent shall not be unreasonably withheld. Purchaser acknowledges and agrees that Sellers may provide copies of this Agreement to parties in interest in the Bankruptcy Cases and to those parties to whom Sellers determine it is necessary to provide copies in connection with soliciting higher or better bids for the Purchased Assets or as otherwise necessary or desirable in connection with the Bankruptcy Cases. Sellers also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the contemplated Transactions in any newspaper selected by Sellers.

7.4.    <u>Liquor Licenses</u>.

(a)    The Trustee, at Purchaser's sole risk and expense, shall use commercially reasonable efforts to cooperate with Purchaser and Purchaser's Affiliates in connection with the preparation of the documents and forms required by any applicable Governmental Authority (the "<u>Liquor License Transfer Documents</u>") to transfer to Purchaser or Purchaser's designees, or to obtain any approvals necessary in connection with the change in ownership of the applicable licensee with respect to, all licenses and permits that are necessary to serve or sell liquor, beer, wine, and other alcoholic beverages from any restaurants, snack bars, bars, mini bars, lounges, and other food and beverage sales locations (collectively, the "<u>Liquor Licenses</u>") in respect of any of the Restaurants or the hotel owned by PMC following the Closing or, as applicable, to provide that such Liquor Licenses remain in effect notwithstanding the Closing, or the other transactions contemplated hereby, and the Trustee shall timely duly execute and deliver the executed originals of such Liquor License Transfer Documents to Purchaser or Purchaser's designee as may be requested from time to time.

(b)    In the event that a Liquor License cannot be transferred, the required approvals in connection with a change in ownership of the applicable licensee, or the continuation of any such Liquor License will not continue for any other reason after the Closing for the benefit of the Purchaser, Purchaser's designee, any Operating Company, or any other Subsidiary, then, subject to any approvals required by the Bankruptcy Court, the Parties shall exercise commercially reasonable efforts to enter into either or both a reasonable and customary liquor management agreement and concession agreement (a "<u>Liquor Management Agreement</u>"), whereby one Party shall assist in the operation of liquor concessions on behalf of the other Party pending the issuance of the Liquor License or a temporary permit to operate on behalf of the existing licensee. Any such Liquor Management Agreement shall (i) be cost-neutral, (ii) provide that Purchaser will indemnify, defend, and hold the other Party harmless from and against any and all claims, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs) arising from such operation or a breach of such Liquor Management Agreement, and (iii) require the Purchaser to obtain reasonable insurance coverage for the benefit of the

42

other Party against any liability arising from or relating to the operation of such liquor concessions.

7.5.    Bankruptcy Issues.

(a)    Solicitation of Competing Bids. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or otherwise better competing bids in respect of all of the Purchased Assets or separate bids with respect to any of the Purchased Assets that, when taken together, constitute a higher or better bid (any such competing bid or combination of bids, a "Competing Bid"). Sellers may market and pursue a Competing Bid or other Alternative Transaction (it being agreed and understood that bidders shall be permitted to bid separately for any of the portion of the assets made available for purchase by Sellers (and, in each case, together with any related assets)) and may perform any and all acts related thereto subject to and in accordance with the Bankruptcy Code, the Bidding Procedures Order and any other Applicable Law.

(b)    Filing of Sale and Bidding Procedures Motion. Within two (2) Business Day following the execution of this Agreement by the Parties hereto, the Trustee and the Chapter 11 Debtor shall file with the Bankruptcy Court (1) the Bidding Procedures Motion and (2) the Sale Motion (for the avoidance of doubt, the Bidding Procedures Motion and the Sale Motion may be filed as one motion and shall be in form and substance reasonably acceptable to the Parties).

(c)    Bidding Procedures. The Bidding Procedures, to be approved pursuant to the Bankruptcy Court's entry of the Bidding Procedures Order, shall be in the form attached hereto as Exhibit M and otherwise reasonably acceptable to the Parties, and include, among other things, the following:

(i)    Breakup Fee. Unless Purchaser is the Backup Bidder pursuant to subsection (ii) below, upon the approval of a sale of all or any portion of the Purchased Assets to any third party (other than Purchaser) for all or any portion of the Purchased Assets, Sellers shall cause the Escrow Agent to return the Earnest Money Deposit to Purchaser. Upon the consummation of an Alternative Transaction, Sellers shall cause the Escrow Agent to return the Earnest Money Deposit to Purchaser (to the extent not previously returned to the Purchaser) and shall pay to Purchaser cash or other immediately available funds in an amount equal to $1,250,000, being 2.5% of the Purchase Price (the "Breakup Fee") and an expense reimbursement of actual and documented out of pocket expenses associated with this Agreement (including, without limitation, travel, due diligence, and professional fees) of up to a maximum amount of $275,000.00 (the "Expense Reimbursement"); provided, however, the Breakup Fee and Expense Reimbursement shall not be due and payable if Purchaser has committed a material breach of this Agreement prior to consummation of an Alternative Transaction. The Parties agree that the Breakup Fee, the Expense Reimbursement, and the return of the Earnest Money Deposit shall be the full and liquidated damages of Purchaser arising out of any termination of this Agreement pursuant to Sections 12.1(h) or 12.1(j).    The provisions of this Section 7.5(c)(i) shall survive any termination of

43

this Agreement pursuant to Sections 12.1(h) or 12.1(j). The Breakup Fee and the Expense Reimbursement shall be approved in the Bidding Procedures Order as an allowed administrative expense claim in the Bankruptcy Cases, and shall be paid to Purchaser within three (3) Business Days following the closing of an Alternative Transaction.

          (ii)     Backup Bid. At the conclusion of the Auction, if any, Sellers shall identify and certify the bid that constitutes the second highest or best offer for the Purchased Assets (the "Backup Bid" and the Qualified Bidder submitting such bid, the "Backup Bidder"). The Backup Bidder may be required by Sellers to close on the Backup Bid no later than thirty (30) days after the conclusion of the Auction and no sooner than ten (10) Business Days after the date the Backup Bidder receives written notice of the requirement to close on the Backup Bid, which notice shall be given no later than thirty (30) days after the Auction. In the event that the Backup Bidder fails to close on the transaction contemplated in the Backup Bid, Sellers shall be permitted to retain the Backup Bidder's good faith deposit as liquidated damages and that shall be Sellers' sole and exclusive remedy in connection with such failure.  Purchaser agrees to serve as Backup Bidder if required by the Bidding Procedures and this Agreement, as modified at the Auction, shall constitute Purchaser's bid.

          (d)     Sale Order.   The Sellers shall request that the Sale Order, in substantially the form attached hereto as Exhibit F, be entered no later than three (3) days after the Sale Approval Hearing (the "Sale Order Deadline"). The Sale Order presented to the Bankruptcy Court shall, in any event, be in form and substance acceptable to Purchaser, the Trustee, and the Chapter 11 Debtor in their reasonable discretion.

          (e)     Bankruptcy Court Approval of Sale. Sellers and Purchaser shall cooperate, assist, and consult with each other and each use commercially reasonable efforts to secure the entry of the Sale Order, including furnishing affidavits, declarations, or other documents or information for filing with the Bankruptcy Court; provided, however, Sellers shall be entitled to take such actions as may be required in connection with the discharge of their fiduciary duties in the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets). In connection with the assumption and assignment of the Assigned JOMR Contracts pursuant to Section 365 of the Bankruptcy Code, Purchaser shall take all actions reasonably required or otherwise as directed by the Bankruptcy Court to provide "adequate assurance of future performance" by Purchaser under the Assigned JOMR Contracts after the Closing. The Sale Order shall also indicate that the Transactions may be consummated immediately upon entry of the Sale Order and any stays provided by the Bankruptcy Rules, including those set forth in Fed. R. Bankr. P. 6004(h) and 6006(d), shall be waived. In the event the Sale Order is appealed, Sellers shall use their commercially reasonable efforts to oppose any such appeal.

          (f)     Consents.   Debtors and Purchaser shall use their commercially reasonable efforts prior to Closing to obtain all required consents of third parties whose consent is required under §365 of the Bankruptcy Code in order for Debtors to validly assign the Assigned JOMR Contracts to Purchaser at Closing (other than those obviated by

the Sale Order). Notwithstanding the foregoing or anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any lease or contract or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, notwithstanding the Sale Order or without the consent of a third party thereto, would constitute a default thereunder or in any way materially adversely affect the rights of Purchaser thereunder.  If such consent is not obtained, or if an attempted assignment thereof would be ineffective or would materially adversely affect the rights of Purchaser thereunder, Debtors shall use their commercially reasonable efforts after Closing, and at Purchaser's expense, to provide to Purchaser the benefits under any such lease or contract.  Purchaser shall pay any Cure Costs relating to any Assigned JOMR Contracts.   Purchaser shall be responsible for complying with the provisions of §365(b)(1)(C)) of the Bankruptcy Code.

7.6.  Notices.  If at any time (a) Purchaser actually becomes aware of any material breach by Sellers of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Sellers, or (b) Sellers actually become aware of any breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 13.1, in writing of such breach. Upon such notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the Outside Date, to cure such breach prior to the exercise of any remedies in connection therewith.

7.7.  Payments Received.  Sellers and Purchaser each agree that after the Closing they will hold in trust and as fiduciary for the other, and will promptly transfer and deliver to the other from time to time as and when received by them and in the exact form received by them, any cash, checks (with appropriate endorsement where necessary to permit collection), or other property that they may receive on or after the Closing that properly belongs to the other party (as determined in accordance with the provisions of this Agreement), including, without limitation, payments from account debtors in respect of accounts receivable outstanding as of the Closing, and each Party will account to the other for all such receipts.  The provisions of this Section shall survive the Closing.

7.8.  Chicago Restaurant.  At least five (5) days prior to Closing, Sellers shall determine to the reasonable satisfaction of Purchaser whether (i) the Chapter 7 Debtors directly own stock of Chicago Palm, Inc. constituting, in the aggregate, 81.62% of the issued and outstanding stock of Chicago Palm, Inc. or (ii) WG Chicago LLC and BB Chicago LLC own stock of Chicago Palm, Inc. constituting, in the aggregate, 81.62% of the issued and outstanding stock of Chicago Palm, Inc.  In the event a determination is made that the stock of Chicago Palm, Inc. is owned individually by the Chapter 7 Debtors, such stock will constitute Equity Interests hereunder and be acquired by Purchaser or Purchaser's designee at Closing, and, in such case, Purchaser will have the option to exclude any Equity Interests in WG Chicago LLC or BB Chicago LLC from Purchased Assets.

7.9.



**8.**     [**Intentionally Omitted**].

**9.**     **Tax Matters**.

9.1.    <u>Tax Cooperation</u>. Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax. Sellers and Purchaser shall cooperate with each other in good faith in the conduct of any Tax Proceedings involving the Companies, the Purchased Assets, or the Business.

9.2.    <u>Transfer Taxes</u>. Purchaser will be responsible for all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any interest, penalties and additions with respect to such Taxes and fees) arising from the Closing (collectively, "<u>Transfer Taxes</u>"), regardless of the Party on whom Liability is imposed under the provisions of the Applicable Laws relating to such Transfer Taxes.  Sellers and Purchaser will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take commercially reasonable efforts to obtain any available exemptions from or reductions in such Transfer Taxes. To the extent any Seller is required by Applicable Law to pay any Transfer Taxes to a Taxing Authority (including pursuant to a post-Closing adjustment or Order ), Purchaser will remit an amount equal to such Transfer Taxes to such Seller not less than five Business Days prior to the due date for such payment.

9.3.    <u>Tax Returns</u>.

(a)    <u>Tax Returns</u>.  The Parties agree that for purposes of any Tax imposed on the income of the Companies the taxable year of each of the Companies shall terminate as of the Closing Date and the Parties shall make any elections permitted or required under the Code, including, without limitation, under Section 1377(a)(2) of the Code, or other applicable Law to provide for the termination of each Company's taxable year on the Closing Date.  Sellers shall, at Sellers' expense, prepare and file, or cause to be prepared and filed, all Tax returns (including such Tax returns filed pursuant to any valid extension of time to file and any amendments thereto "<u>Income Tax Returns</u>") required to be filed by each Company with respect to any Pre-Closing Tax Period ("<u>Pre-Closing Period</u>

9586842-10

Tax Returns"), and the applicable Sellers shall be liable for all Taxes and any related Liabilities, including audit defense costs, with respect to such Pre-Closing Period Tax Returns (and any other Taxes attributable to a Pre-Closing Tax Period). Such Pre-Closing Period Tax Returns shall be prepared on a basis consistent with the Income Tax Returns previously filed by each Company, unless otherwise required by applicable Law. Purchaser shall furnish any information reasonably requested by the Trustee necessary for the preparation of the Pre-Closing Period Tax Returns. Purchaser shall prepare and file all Income Tax Returns required to be filed by each Company for all taxable periods beginning after the Closing Date ("Post-Closing Period Tax Returns"), and Purchaser shall pay, or cause to be paid, all Taxes and any related Liabilities, including audit defense costs, with respect to such Post-Closing Period Tax Returns.

(b)     Straddle Period Tax Returns.    Purchaser shall, at Purchaser's expense, prepare and file, or cause to be prepared and filed, any Tax returns (other than Income Tax Returns) required to be filed by each Company for any taxable periods that include but do not end on the Closing Date ("Straddle Periods") (such Tax returns, "Straddle Period Tax Returns"), and Purchaser shall pay, or cause to be paid, all Taxes and any related Liabilities, including audit defense costs, with respect to such Straddle Period Tax Returns, subject to the responsibility of the Sellers for the Taxes and any related Liabilities, including audit defense costs, of such Straddle Period attributable to the portion of the Straddle Period ending at the close of business on the Closing Date ("Pre-Closing Taxes") as determined in accordance with this Agreement. Purchaser shall provide a copy of each Straddle Period Tax Return and a statement certifying the amount of Pre-Closing Taxes shown on such Straddle Period Tax Return, if any, that are chargeable to Sellers for review and comment for a reasonable period of time (such reasonable period to be not less than twenty (20) days in the case of Taxes other than sales or use Taxes and not less than five (5) days in the case of sales or use Taxes) before such Straddle Period Tax Return is filed, and shall consider in good faith any comments provided by Sellers. Sellers shall pay to Purchaser any Pre-Closing Taxes for which the Companies are responsible pursuant to this Section within ten (10) Business Days after Purchaser's written notification to Seller of the Pre-Closing Taxes liability.

(c)     Calculation of Taxes for Straddle Period Tax Returns.    Pre-Closing Taxes for Straddle Period Tax Returns shall be calculated based on a closing of the taxable period of each Company as of the close of business on the Closing Date; provided, however, that in the case of a Tax not based on income, receipts, proceeds, profits, payroll, purchases, sales, or similar items, Pre-Closing Taxes shall be equal to the amount of Tax for the entire Straddle Period, multiplied by a fraction the numerator of which is the total number of days from the beginning of the Straddle Period through and including the Closing Date and the denominator of which is the total number of days in the Straddle Period.

(d)     Amendments and Modifications.

(i)     After the Closing Date, Purchaser and its Affiliates (A) shall not amend any income Tax Return filed by any Company with respect to any Pre-Closing Tax Period without the advance written consent of the applicable Sellers,

which the applicable Sellers may grant or withhold in their sole discretion; provided, however, that Purchaser or its Affiliates shall have the right to propose an amendment to a Form 1120S, U.S. Income Tax Return for an S Corporation ("Form 1120S"), filed by any Company with respect to any Pre-Closing Tax Period if, based on the advice of a qualified Tax advisor, Purchaser or its Affiliates determine that such an amendment is required by applicable Law to reflect that such Company did not qualify as a "small business corporation" within the meaning of Section 1361(b) of the Code and the Treasury Regulations thereunder for such period, and, in such event, the provisions of clause (ii) below shall apply; and (B) shall not amend any other Tax Return filed by any Company with respect to any Pre-Closing Tax Period without the advance written consent of the Sellers, which consent shall not be unreasonably withheld, conditioned or delayed.

(ii)    In the event that, after the Closing Date, Purchaser or its Affiliate determines in its reasonable judgment and upon the advice of a qualified Tax advisor that, in accordance with the terms and conditions of clause (i) above, it is necessary to amend, modify or otherwise change any Form 1120S filed by a Company with respect to any Pre-Closing Tax Period (each, a "Proposed Amendment"), Purchaser shall give written notice thereof to the Sellers, together with supportive documentation with respect to Purchaser's determination that such Proposed Amendment is required by Law.  The Sellers shall have thirty (30) days following receipt of such delivery during which to notify Purchaser of any dispute of any item contained in the Proposed Amendment, which notice shall set forth in reasonable detail the basis for such dispute.  During such thirty (30) day period, Purchaser shall provide the Sellers and their advisors with reasonable access during normal business hours to the applicable employees and advisors of Purchaser and such books and records of Purchaser as may be reasonably requested by Sellers to verify the information contained in the Proposed Amendment and the contents thereof.  At any time within such thirty (30) day period, the Sellers shall be entitled to agree with any or all of the items set forth in the Proposed Amendment.

(iii)    If the Sellers do not notify Purchaser of any such dispute within such thirty (30) day period, or notify Purchaser of their agreement with the Proposed Amendment prior to the expiration of the thirty (30) day period, Purchaser shall file the Proposed Amendment.

(iv)    If the Sellers notify Purchaser of any such dispute within such thirty (30) day period, such dispute regarding the Proposed Amendment shall be resolved as follows: (A) Purchaser and Sellers shall cooperate in good faith to resolve any such dispute as promptly as possible;  (B) in the event Purchaser and Sellers are unable to resolve any such dispute within fifteen (15) days (or such longer period as Purchaser and Sellers shall mutually agree in writing) of notice of such dispute, such dispute and each Party's work papers related thereto shall be submitted to, and all issues having a bearing on such dispute shall be resolved by, an independent tax accountant mutually appointed by the Purchaser and the Companies (the "Tax Arbiter").  Purchaser and Sellers shall cooperate fully with the Tax Arbiter at their own cost and expense.  The Tax Arbiter's resolution shall

48

be final and binding on the Parties, be based solely on presentations of Purchaser and Sellers and not on the Tax Arbiter's independent review of any other documents or information, shall be limited to only those matters in dispute, shall affirm in all respects the presentations of only one Party on any specific issue, and reject in all respects the presentations of the other on such issue. Purchaser and Sellers shall use commercially reasonable efforts to cause the Tax Arbiter to complete its work within thirty (30) days following its engagement. Purchaser shall file any Proposed Amendment which the Tax Arbiter determines, in accordance with the terms and conditions hereof, is required by Law to be filed. The fees, costs, and expenses of the Tax Arbiter shall be paid one-half by Purchaser and one-half by Sellers.

(e)     Cooperation. Sellers and Purchaser shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the preparation and filing of Tax Returns pursuant to this Section and any Tax Proceeding (as defined below). Such cooperation shall include signing any Tax Returns, amended Tax Returns, claims or other documents necessary to settle any Tax Proceeding, the retention and (upon the other Party's request) the provision of records and information which are reasonably relevant to any such Tax Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereby.

(f)     Tax Proceedings.

(i)     After the Closing, Purchaser shall promptly notify the applicable Sellers in writing of the proposed assessment or the commencement of any Tax audit or administrative or judicial proceeding or of any demand or claim on Purchaser or any Company (a "Tax Proceeding") that, if determined adversely to the taxpayer or after the lapse of time, could be grounds for payment of Taxes by the applicable Sellers or their respective beneficial owners; provided, however, that a failure by Purchaser to provide such notice shall not relieve any Sellers of any Liability hereunder except to the extent that such failure actually and materially prejudices the defense of such Tax Proceeding. After the Closing, the applicable Sellers shall promptly notify Purchaser in writing of any Tax Proceeding relating to any Company, notice of which is received by such applicable Seller. Notices required to be given by or to Purchaser or Sellers shall contain factual information (to the extent known to Purchaser or Sellers, as the case may be) describing the asserted Tax Liability in reasonable detail and shall include copies of any notice or other document received from any Governmental Authority in respect of any such asserted Tax Liability.

(ii)     In the case of a Tax Proceeding that relates solely to any Pre-Closing Tax Period, but excluding any Straddle Periods and excluding any Tax Proceeding that may result in criminal, equitable, or other non-monetary sanctions against a Company, Sellers shall have the right to direct and control the conduct of such Tax Proceeding; provided, however, that the Purchaser shall have the right to participate (at such Purchaser's own expense) in any such Tax Proceeding. Purchaser's right to participate shall include, but shall not be limited to, the right to receive copies of all correspondence from any Governmental Authority relating to

such Tax Proceeding, attend meetings, and review and comment on submissions relating to any such Tax Proceeding, and Sellers shall consider in good faith any comments provided by Purchaser and shall not settle any such Tax Proceedings without the advance written consent of Purchaser (such consent not to be unreasonably withheld, delayed, or conditioned).   Sellers may elect to waive in writing their right under this Section to direct and control any Tax Proceeding for a Pre-Closing Tax Period.   In the event that any Seller does not have a right, or waives its right, to direct and control a Tax Proceeding for a Pre-Closing Tax Period, Purchaser shall assume control of such Tax Proceeding, and such Seller shall be liable to Purchaser for all costs and expenses reasonably incurred in the conduct of such Tax Proceeding.   With respect to any such Tax Proceeding controlled by Purchaser, such Seller shall have the right to participate (at Seller's own expense) in any such Tax Proceeding.   Such Seller's right to participate shall include, but shall not be limited to, the right to receive copies of all correspondence from any Governmental Authority relating to such Tax Proceeding, attend meetings, and review and comment on submissions relating to any such Tax Proceeding, and Purchaser shall consider in good faith any comments provided by such Seller and shall not settle any such Tax Proceeding without the advance written consent of such Seller (such consent not to be unreasonably withheld, delayed or conditioned).

(iii)    In the case of a Tax Proceeding that relates to any Straddle Periods, Purchaser shall have the right to control the conduct of such Tax Proceeding; provided, however, that the applicable Sellers shall have the right to participate (at each such Seller's own expense) in any such Tax Proceeding involving any asserted Tax Liability for such Straddle Period with respect to which payment may be sought from such Seller pursuant to this Agreement.   Such Seller's right to participate shall include, but shall not be limited to, the right to receive copies of all correspondence from any Governmental Authority relating to such Tax Proceeding, attend meetings, and review and comment on submissions relating to any Tax Proceeding, and Purchaser shall consider in good faith any comments provided by such Seller and, solely to the extent that any amounts payable in connection with the Tax Proceeding could be grounds for the payment of Taxes by the applicable Seller or its beneficial owners hereunder, shall not settle any such Tax Proceeding without the advance written consent of such Seller (such consent not to be unreasonably withheld, delayed or conditioned).

9.4.    Stock Sale.

(a)    Section 338(h)(10) Election.   In connection with the sale to Purchaser of the Equity Interests in those Companies that are classified as associations taxable as "S corporations" for federal tax purposes, at the written request of Purchaser (the "338 Election Notice"), Sellers and Purchaser (or Purchaser's applicable designee) shall (i) join in making an election under Section 338(h)(10) of the Code (and any election corresponding to Section 338(h)(10) of the Code under state or local Tax Law) (the "Section 338(h)(10) Election") with respect to the purchase of all of the outstanding stock or other equity interests of each Company identified by Purchaser in a 338 Election Notice

50

(the "Target Companies"); (ii) provide to the other Party the necessary information to permit the Section 338(h)(10) Election to be made; and (iii) take all actions necessary and appropriate (including filing any necessary forms, returns, elections, schedules, and other documents) as may be required to effect and preserve timely the Section 338(h)(10) Election in accordance with the provisions of Treasury Regulations Section 1.338(h)(10)-1 (or any comparable regulations under state or local Tax Law). Any 338 Election Notice shall be delivered on or before 5:00 p.m. Eastern Time on the sixtieth (60th) day after the Closing, with time of the essence. If Purchaser fails to timely deliver a 338 Election Notice, then Purchaser's right to require a Section 338(h)(10) Election hereunder with respect to any applicable Company shall lapse, automatically, without further action by any Party.

(b)    Adjustment Base.

(i)    If Purchaser timely delivers a 338 Election Notice, then, within forty-five (45) days after the Parties' preparation of the Final Allocation Statement pursuant to Section 2.6(b), Sellers shall deliver to Purchaser Sellers' determination of the excess, if any (any such excess, the "Adjustment Base"), of the following (the "Proposed 338 Adjustment Schedule"): (A) the total federal, state, and local income Taxes payable by Sellers in the aggregate with respect to the sale of the Target Companies pursuant to this Agreement; over (B) the total federal, state, and local income Taxes that would have been payable by Sellers in the aggregate with respect to the sale of the Target Companies pursuant to this Agreement if the Parties had not made the Section 338(h)(10) Election. Sellers shall include with the Proposed 338 Adjustment Schedule the "ADSP Allocation Schedule" as defined herein and such schedules, computations, and other documents as are reasonably necessary to verify the computation of the Adjustment Base. If Sellers fail to timely deliver a Proposed 338 Adjustment Schedule as provided herein, then Sellers' right to assert a claim to a "338 Gross-Up Payment" as defined and provided herein shall lapse, automatically, without further action by any Party.

(ii)    The computation of the Adjustment Base under this Section 9.4 shall be based on the Final Allocation Statement. In connection therewith, the "aggregate deemed sales price" (as defined in Treasury Regulations Section 1.338-4) (the "ADSP") and the "adjusted gross-up basis" (as defined in Treasury Regulations Section 1.338-5) shall be allocated among the assets of the Target Companies in accordance with Treasury Regulations Section 1.338-7 (such allocation, the "ADSP Allocation Schedule").

(iii)    Purchaser shall have forty-five (45) days following receipt of the Proposed 338 Adjustment Schedule during which to notify Sellers of any dispute of any item contained in the 338 Adjustment Schedule, which notice shall set forth in reasonable detail the basis for such dispute (the "Responsive 338 Adjustment Schedule").

(iv)    If, within ten (10) days of Sellers' receipt of the Responsive 338 Adjustment Schedule, Sellers do not notify Purchaser in writing of any dispute with respect to the Responsive 338 Adjustment Schedule, or Sellers notify Purchaser in

writing of Sellers' agreement with the adjustments set forth in the Responsive 338 Adjustment Schedule, the Responsive 338 Adjustment Schedule shall be deemed to be final and binding on the Parties.

(v)     If Sellers notify Purchaser in writing of any dispute with respect to the Responsive 338 Adjustment Schedule within ten (10) days of Sellers' receipt thereof, then such dispute regarding the Responsive 338 Adjustment Schedule shall be resolved as follows:  (A) Sellers and Purchaser shall cooperate in good faith to seek to resolve any such dispute as promptly as possible; and (B) if Sellers and Purchaser are unable to resolve any such dispute within fifteen (15) days of Sellers' delivery of timely written notice to Purchaser of such dispute (or such longer period as Sellers and Purchaser mutually may agree in writing), such dispute, together with the Proposed 338 Adjustment Schedule, the Responsive 338 Adjustment Schedule, and each Party's work papers related thereto, shall be submitted to, and all issues having a bearing on such dispute shall be resolved by, the Tax Arbiter.  Sellers and Purchaser shall use commercially reasonable efforts to cooperate with the Tax Arbiter at their own cost and expense.  The Tax Arbiter's resolution shall be final and binding on the Parties, shall be based solely on the submissions of Sellers and Purchaser and not on the Tax Arbiter's independent review of any other documents or information, shall be limited to only those matters in dispute, shall affirm in all respects the computations and determinations of only one Party on any specific issue, and shall reject in all respects the presentations of the other Party on such issue.  Sellers and Purchaser shall use commercially reasonable efforts to cause the Tax Arbiter to complete its work within thirty (30) days following its engagement. The fees, costs, and expenses of the Tax Arbiter shall be paid one-half by Purchaser and one-half by Sellers.

(vi)     Purchaser shall prepare and Sellers and Purchaser shall file, on or before any deadline prescribed by the Treasury Regulations promulgated under Section 338 of the Code, IRS Form 8023 and IRS Form 8883 and any other state and local forms required to make or perfect the Section 338(h)(10) Election in accordance herewith.  The Parties agree not to take any position inconsistent with the final ADSP Allocation Schedule as determined hereunder for Tax reporting purposes; provided, however, that notwithstanding the foregoing or any other provision of this Section 9.4 to the contrary, (i) Purchaser's cost for the assets that it is deemed to acquire may differ from the total amount allocated hereunder to reflect the inclusion in the total cost of items (for example, capitalized acquisition costs) not included in the amount so allocated;  (ii) the amount realized by Sellers may differ from the total amount allocated hereunder to reflect transaction costs that reduce the amount realized for federal income tax purposes; and  (iii) the provisions of Section 2.6(b)(ii)(B) shall apply in connection with a Section 338(h)(10) Election hereunder.

(c)     Cooperation.  In connection with the determination of the Adjustment Base, Purchaser shall provide Sellers and Sellers' advisors with reasonable access during normal business hours to the Target Companies' books, records, and schedules reasonably requested by Sellers in connection with the preparation of any Proposed 338 Adjustment

Schedule or verify the information and calculations set forth in any Responsive 338 Adjustment Schedule.

(c)    Gross-Up Payment.  Within five (5) days of the determination of the final ADSP Allocation Schedule hereunder, Purchaser shall pay and remit to Sellers an amount (the "Gross-Up Payment") equal to the sum of (i) the Adjustment Base, if any, plus (ii) the product of the Adjustment Base, if any, multiplied by the combined federal, state, and local effective income tax rate of Sellers applicable to the net taxable income and gain of net taxable income and gain of the Target Companies allocable to Sellers and arising from the Section 338(h)(10) Election.  For the avoidance of doubt, Purchaser's obligation to pay the Gross-Up Payment hereunder shall apply in the event that the Adjustment Base is positive, without regard to the application of any net operating losses, credits, deductions, or other income tax attributes of any Seller.  The Gross-Up Payment, if any, shall constitute additional Purchase Price hereunder.

9.5.    Sellers' Representative.  The Trustee shall be the sole representative and contact for all notices and deliveries to and from Sellers relating to the matters set forth in this Section 9, and shall have the sole authority for the determination and resolutions of all Tax matters under this Agreement.

10.    **Closing Conditions**.

10.1.    Conditions to Obligations of Purchaser and Sellers. The obligations of Purchaser and Sellers to consummate the Closing are subject to the satisfaction of the following conditions:

(a)    The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Cases, authorizing the Transactions and approving this Agreement under Sections 105(a), 363, and 365, of the Bankruptcy Code, in form and substance reasonably acceptable to Sellers and Purchaser, and as of the Closing Date the Sale Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed; and

(b)    No injunction, stay, or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the Transactions.

10.2.    Conditions to Obligations of Purchaser. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)    Sellers shall have performed in all material respects all of their obligations, covenants, and agreements hereunder required to be performed or complied with by Sellers on or prior to the Closing Date;

(b)    the representations and warranties of Sellers contained in this Agreement shall be true and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date,

9586842-10

they shall be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be likely to have a Material Adverse Effect;

(c)      Sellers shall have delivered all of the items required by Section 2.10; and

(d)      No Material Adverse Effect shall have occurred and be continuing with respect to the Purchased Assets or the Business.

10.3.    <u>Conditions to Obligations of Sellers</u>. The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Sellers) of the following further conditions:

(a)      Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b)      the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date);

(c)      Sellers shall have received all documents they may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Sellers; and

(d)      Purchaser shall have delivered all of the items required by Section 2.11.

10.4.    <u>Waiver of Closing Conditions</u>. Notwithstanding anything to the contrary contained herein, if any of the conditions to Closing were not fulfilled at or prior to the Closing and the Parties hereto agree to close the Transactions contemplated by this Agreement, then following the Closing all such conditions to Closing shall be deemed to have been waived effective as of the Closing.

**11.**    **<u>Survival</u>**. The (a) representations and warranties of Sellers, and (b) the covenants and agreements of Sellers and Purchaser that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing. The covenants and agreements of Sellers and Purchaser contained herein that by their terms are to be performed after Closing shall survive the Closing.

**12.**    **<u>Termination</u>**.

12.1.    <u>Grounds for Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a)      by mutual written agreement of Sellers and Purchaser;

(b)     by Sellers or Purchaser, if the Closing shall not have been consummated on or before March 31, 2020 (the "Outside Date"), unless the Party seeking termination is in breach of its obligations hereunder; provided, however, that the Sellers may extend the Outside Date until no later than April 17, 2020 in response to circumstances beyond Sellers' reasonable control;

(c)     by Sellers or Purchaser, if any condition set forth in Section 10.1 is incapable of being satisfied, or through no fault of the Party seeking termination, is not satisfied, by the Outside Date;

(d)     by Purchaser, if any condition set forth in Section 10.2 is incapable of being satisfied, or through no fault of Purchaser, is not satisfied, by the Outside Date;

(e)     by Sellers, if any condition set forth in Section 10.3 is incapable of being satisfied, or through no fault of Sellers, is not satisfied, by the Outside Date;

(f)     by Purchaser, if any Seller breaches any of its representations warranties or covenants and agreements set forth in this Agreement and fails to cure the same within ten (10) days after written notice thereof from Purchaser to Sellers (other than Sellers' failure to close the Transactions for which no notice shall be required and no cure period afforded), unless Purchaser is in breach of its obligations hereunder;

(g)     by Sellers, if Purchaser breaches any of its representations warranties or covenants and agreements set forth in this Agreement and fails to cure the same within ten (10) days after written notice thereof from Sellers to Purchaser (other than Purchaser's failure to close the Transactions for which no notice shall be required and no cure period afforded), unless any Seller is in breach of its obligations hereunder;

(h)     by Sellers or Purchaser if the Bankruptcy Court enters an Order in the Bankruptcy Cases approving the sale of all or a portion of the Purchased Assets to a Person other than Purchaser;

(i)     by Purchaser if the Sale Order shall not have been entered by the Bankruptcy Court on or before March 13, 2020 (subject to adjournment of the Sale Approval Hearing for circumstances beyond Sellers' reasonable control); or

(j)     automatically and without any action or notice by Sellers to Purchaser, or Purchaser to Sellers, immediately upon:

(i)     approval by the Bankruptcy Court of an Alternative Transaction, unless Purchaser is designated a Backup Bidder; or

(ii)     if Purchaser is designated a Backup Bidder, the consummation of an Alternative Transaction.

The Party desiring to terminate this Agreement pursuant to this Section 12.1 (other than pursuant to Sections 12.1(a) and (j)) shall give notice of such termination to the other Party and to Escrow Agent under the Escrow Agreement in accordance with Section 13.1.

12.2.    Effect of Termination. If this Agreement is terminated by Purchaser or Sellers pursuant to Section 12.1 for any reason other than pursuant to Section 12.1(g), the Earnest Money Deposit shall be returned to Purchaser within five (5) Business Days after any termination of this Agreement.  If this Agreement is terminated by Sellers pursuant to Section 12.1(g), the Earnest Money Deposit shall be paid to Sellers as liquidated damages.  If the Earnest Money Deposit is paid to Sellers pursuant to this Section 12.2, the Earnest Money Deposit will be deemed liquidated damages in favor of Sellers and not as a penalty; it being agreed that Sellers' actual damages are impossible to estimate and that the amount of liquidated damages is a good faith estimate of the actual damages that would be suffered by Sellers as a result of a termination of this Agreement pursuant to Section 12.1(g), and that such liquidated damages shall be in lieu of any other right or remedy of Sellers (at law or in equity) and shall constitute the sole and exclusive remedy of Sellers whether at law or in equity.  If this Agreement is terminated as permitted by Section 12.1, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant, or representative of such Party) to the other Party to this Agreement except as expressly provided in this Section 12.2.  The provisions of Sections 2.6, 11.2, 12.2, 12.3, 12.4, 13.1, 13.4, 13.5, 13.6, 13.7, 13.8, 13.9, and 13.11 shall survive any termination hereof pursuant to Section 12.1.

12.3.    Expenses. Except as otherwise set forth expressly herein, all costs and expenses incurred in connection with this Agreement or the Transactions shall be paid by the Party incurring such cost or expense.

12.4.    Exclusive Remedies.

(a)    Effective as of Closing, Purchaser waives irrevocably any rights and Claims Purchaser may have against Sellers, whether in Law or in equity, relating to (i) any breach of a representation, warranty, covenant or agreement contained herein and occurring on or prior to the Closing, or (ii) the Purchased Assets, the Assumed Liabilities, or the Business. Purchaser and Sellers acknowledge and agree that if this Agreement is terminated pursuant to Section 12.1, the provisions of Section 12.2 and this Section 12.4 set forth the sole and exclusive remedies of the Parties.

(b)    Sellers acknowledge and agrees that any breach of this Agreement would give rise to irreparable harm for which monetary damages would not be an adequate remedy.  Sellers accordingly agree that after entry of the Sale Order, Purchaser, provided Purchaser is not in breach of this Agreement and is then capable of fulfilling Sellers' conditions to Closing, shall be entitled to enforce the terms of this Agreement by decree of specific performance without the necessity of proving the inadequacy of monetary damages as a remedy and to obtain preliminary, temporary, and permanent injunctive relief against any breach or threatened breach of this Agreement, without posting any bond or other undertaking.

## 13.    **Miscellaneous**.

13.1.    Notices. All notices, requests, demands, claims, and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally

to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

if to Purchaser, to:

Golden Nugget, LLC
c/o Landry's Inc.
1510 West Loop South
Houston, TX 77027
Attn:          Steven L. Scheinthal
E-mail:       SScheinthal@ldry.com

with a copy to (that shall not constitute notice):

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N. King Street
Wilmington, DE 19801
Attn:          Craig D. Grear, Esq.
E-mail:       cgrear@ycst.com

if to Sellers, to:

Robert E. Tardif, Jr.
1601 Jackson Street, Suite 105
Fort Myers, Florida 33901
E-mail:       rtardif@comcast.net

and

Gerard A. McHale, CPA
1601 Jackson Street, Suite 200
Fort Myers, Florida 33901
E-mail:       jerrym@thereceiver.net

with copies to (that shall not constitute notice):

Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Attn:   Paul Steven Singerman, Esq.
E-mail:       singerman@bergersingerman.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request, or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

13.2.    <u>Waivers</u>. No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

13.3.    <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; <u>provided, however</u>, that Sellers may not assign, delegate or otherwise transfer any of their rights or obligations under this Agreement without the written consent of the Purchaser; and <u>provided, further</u>, that Purchaser may assign all or any portion of its rights hereunder to one or more Persons without the consent of Sellers, provided that Purchaser shall remain liable to Sellers for any obligations hereunder.

13.4.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Florida and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

13.5.    <u>Jurisdiction</u>.

(a)    Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in the Bankruptcy Court or that any such suit, action or proceeding that is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action, or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 13.1</u> shall be deemed effective service of process on such Party.

(b)    After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action, or proceeding, and that any cause of action

9586842-10

arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Florida, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action, or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 13.1 shall be deemed effective service of process on such Party.

13.6.    Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

13.7.    No Third-Party Beneficiaries. No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

13.8.    Entire Agreement; Amendments; Counterparts. This Agreement (including the Schedules and Exhibits hereto) and the Confidentiality Agreement set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Sellers. This Agreement may be executed in counterparts, each of which when taken together shall constitute an original. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.  This Agreement may be delivered by electronic transmission with the same effect as delivery of an original.

13.9.    Headings, Interpretation. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

13.10.    Disclosure Schedules. The Parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Sellers of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material. If any Schedule discloses an item or information, the matter shall be deemed to have been disclosed in all other Schedules for which such information is reasonably apparent, notwithstanding the omission of an appropriate cross-reference to such other Schedules.

13.11.  <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this Agreement or any other document executed or delivered in connection with this Agreement, and notwithstanding the fact that any party to any such transaction document may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees, and acknowledges that no Persons other than the Persons that are expressly parties to this Agreement will have any obligation thereunder and that it has no rights of recovery thereunder against, and no recourse thereunder or in respect of, any oral representations made or alleged to be made in connection therewith will be had against, any former, current, or future Affiliate, incorporator, controlling Person, fiduciary, representative, co-owner, or equity holder of any Party (other than another Party), or any of their respective successors or permitted assignees (each, a "<u>Party Affiliate</u>"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract, or otherwise) by or on behalf of such Person against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation, or other Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Person under any document governing the Transactions or the transaction contemplated thereby, under any documents or instruments delivered contemporaneously therewith, in respect of any oral representations made or alleged to be made in connection therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PURCHASER:

GOLDEN NUGGET, LLC

By: _____
Name: Steven L. Scheinthal
Title: Executive Vice President and General Counsel

SELLERS:

JUST ONE MORE RESTAURANT CORP.

By: _____
     Gerard A. McHale
     Chief Restructuring Officer

_____
ROBERT E. TARDIF, JR.,
in his capacity as Trustee appointed in the Bankruptcy Cases of Bruce E. Bozzi, Sr. and Walter J. Ganzi, Jr. under chapter 7 of the U.S. Bankruptcy Code

[SIGNATURE PAGE TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PURCHASER:

GOLDEN NUGGET, LLC

By: _____
Name:
Title:

SELLERS:

JUST ONE MORE RESTAURANT CORP.

By: _____
    Gerard A. McHale
    Chief Restructuring Officer

_____
ROBERT E. TARDIF, JR.,
in his capacity as Trustee appointed in the
Bankruptcy Cases of Bruce E. Bozzi, Sr. and
Walter J. Ganzi, Jr. under chapter 7 of the U.S.
Bankruptcy Code

[SIGNATURE PAGE TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PURCHASER:

GOLDEN NUGGET, LLC

By: _____
Name:
Title:


SELLERS:

JUST ONE MORE RESTAURANT CORP.


By: _____
    Gerard A. McHale
    Chief Restructuring Officer


_____
ROBERT E. TARDIF, JR.,
in his capacity as Trustee appointed in the
Bankruptcy Cases of Bruce E. Bozzi, Sr. and
Walter J. Ganzi, Jr. under chapter 7 of the U.S.
Bankruptcy Code

[SIGNATURE PAGE TO PURCHASE AGREEMENT]

EXECUTION COPY

# ANNEX I

## COMPANIES

Atlanta Palm Food Corporation, a Georgia corporation
Atlantic City Palm, LLC, a New Jersey limited liability company
BB Chicago, LLC, a Delaware limited liability company[1]
Boston Palm Corporation, a Massachusetts corporation
Charlotte Palm Corporation, a North Carolina corporation
Denver Palm Corporation, a Colorado corporation
L.A. Downtown Palm, LLC, a California limited liability company
Miami Palm Restaurant, Inc., a Florida corporation
Nashville Palm Restaurant, L.L.C., a Tennessee limited liability company
Palm Airport, LLC, a Delaware limited liability company
Palm Beverly Hills Restaurant Manager, LLC, a Delaware limited liability company[2]
Palm Management Corporation, a New York corporation
Palm New York Downtown, LLC, a New York limited liability company
Palm Orlando Corporation, a Florida corporation
Palm Philadelphia Investor, LLC, a Delaware limited liability company[3]
Palm Philadelphia Manager, LLC, a Delaware limited liability company[4]
Palm Restaurant Inc., a New York corporation
Palm Restaurant of Houston, Inc., a Texas corporation
Palm Restaurant of Las Vegas, Inc., a Nevada corporation
Palm Tysons Too, Inc., a Virginia corporation
Palm West Corporation, a New York corporation
San Antonio Palm Restaurant, Inc., a Texas corporation
The Washington Palm, Inc., a District of Columbia corporation
WG Chicago, LLC, a Delaware limited liability company[5]

---

[1] Owns stock of Chicago Palm, Inc.
[2] Owns limited liability company interest in Palm Beverly Hills Restaurant, LLC.
[3] Owns limited liability company interest in Palm Philadelphia Restaurant, LLC.
[4] Manager of Palm Philadelphia Restaurant, LLC.
[5] Owns stock of Chicago Palm, Inc.

LIST OF EXHIBITS:

| | |
|---|---|
| A | Operating Companies and Restaurant Locations |
| B | PMC Real Property |
| C | Form of Bidding Procedures Order |
| D | JOMR IP |
| E | Real Estate Leases of Operating Companies |
| F | Form of Sale Order |
| G | Escrow Agreement |
| H-1 | Form of Assignment of Limited Liability Company Interests |
| H-2 | Form of Lost Certificate Affidavit |
| I | Form of JOMR IP Assignment |
| J | Form of JOMR Assignment and Assumption Agreement |
| K | Seller's Closing Certificate |
| L | Purchaser's Closing Certificate |
| M | Bidding Procedures |

**EXHIBIT A**

| OPERATING COMPANY | ADDRESS OF RESTAURANT |
|---|---|
| Atlanta Palm Food Corporation | The Westin Hotel<br>3391 Peachtree Road, N.E.<br>Atlanta, GA  30326 |
| Atlantic City Palm, LLC | The Quarter at Tropicana Hotel & Casino<br>2801 Pacific Avenue, Ste. 102<br>Atlantic City, NJ  08401 |
| Boston Palm Corporation | 200 Dartmouth Street<br>Boston, MA  02116 |
| Charlotte Palm Corporation | 6705-B Phillips Place Court<br>Charlotte, NC  28210 |
| Chicago Palm, Inc. | Swissotel<br>323 East Wacker Drive<br>Chicago, IL 60601[1] |
| Denver Palm Corporation | The Westin Downtown Hotel<br>1672 Lawrence Street<br>Denver, CO  80202 |
| L.A. Downtown Palm, LLC | 1100 S. Flower Street<br>Los Angeles, CA  90015 |
| Miami Palm Restaurant, Inc. | 9560 E. Bay Harbor Drive<br>Bay Harbor Islands, FL  33154 |
| Nashville Palm Restaurant, L.L.C. | 140 5th Avenue South<br>Nashville, TN  37203 |

---

[1] This location is leased to and operated by Chicago Palm, Inc., equity interests in which are owned by WG Chicago, LLC, BB Chicago, LLC and third parties.

| | |
|---|---|
| Palm Airport, LLC | JFK Airport – Terminal 4<br>Jamaica, NY  11430[2] |
| Palm Beverly Hills Restaurant, LLC | 267 N. Canon Drive<br>Beverly Hills, CA 90210[3] |
| Palm Management Corporation | The Huntting Inn<br>94 Main Street<br>East Hampton, NY 11937 |
| Palm New York Downtown, LLC | 206 West Street<br>New York, NY  10282 |
| Palm Orlando Corporation | 5800 Universal Boulevard<br>Hard Rock Hotel @ Universal Orlando<br>Orlando, FL  32819 |
| Palm Philadelphia Restaurant, LLC | 200 South Broad Street<br>Philadelphia, PA  19102[4] |
| Palm Restaurant Inc. | 838 Second Avenue<br>New York, NY 10017[5] |
| Palm Restaurant of Las Vegas, Inc. | 3500 Las Vegas Blvd. South Ste. A7<br>Las Vegas, NV  89109 |
| Palm Restaurant of Houston, Inc. | 6100 Westheimer Road<br>Houston, TX  77057 |
| Palm Tysons Too, Inc. | 1750 Tysons Boulevard<br>McLean, VA  22102 |

---

[2] This location is leased to and operated by a third party pursuant to a License Agreement between Palm Airport LLC and SSP America, Inc.

[3] This location is leased to and operated by Palm Beverly Hills Restaurant, LLC, a subsidiary of Palm Beverly Hills Restaurant Manager, LLC.

[4] This location is leased to and operated by Palm Philadelphia Restaurant, LLC, a subsidiary of Palm Philadelphia Investor, LLC.

[5] The real property at this location is owned by Palm Management Corporation.

| Palm West Corporation | 250 West 50th Street<br>New York, NY  10019 |
| San Antonio Palm Restaurant, Inc. | 233 East Houston Street<br>San Antonio, TX  78205 |
| The Washington Palm, Inc. | 1225 19th Street N.W.<br>Washington, DC  20036 |

**EXHIBIT B**

PMC Real Property

1.    All that certain plot, piece or parcel of land situate, lying and being in the Borough of Manhattan, County of New York, City of New York and State of New York, bounded and described as follows:

BEGINNING at a point on the Easterly side of Second Avenue, distant one hundred twenty-seven feet, five inches Northerly of the Northeasterly corner of Second Avenue and Forty-fourth Street; thence Easterly and parallel with Forty-fourth Street and part of the way through a party wall, seventy feet; thence Northerly and parallel with Second Avenue, eighteen feet; thence Westerly and again parallel with Forty-fourth Street, and part of the way through a party wall seventy feet to the Easterly side of Second Avenue; thence Southerly along the Easterly side of Second Avenue, eighteen feet to the point or place of BEGINNING.

Having an address of 838 Second Avenue, New York, New York.

2.    All that certain plot, piece or parcel of land situate, lying and being in the Incorporated Village of East Hampton, Town of East Hampton, County of Suffolk and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southeasterly side of Main Street and the southerly side of Huntting Lane and from said point of beginning running thence along the southerly side of Huntting Lane, South 68 degrees 51 minutes 02 seconds East 352.71 feet to a concrete monument and land now or formerly of Shirley M. Pitt; running thence along said land South 19 degrees 02 minutes 55 seconds West 210.46 feet to the land now or formerly of Thomas R. Burns; running thence along said land now or formerly of Thomas R. Burns and land now or formerly of Amelia Reininger and land now or formerly of Bessie E. and David H. Smith the following three courses and distances: (1) North 70 degrees 14 minutes 05 seconds West 228.93 feet; (2) North 69 degrees 35 minutes 05 seconds West 183.38 feet; and (3) North 55 degrees 22 minutes 45 seconds West 55.99 feet to the southeasterly side of Main Street; running thence along the southeasterly side of Main Street, North 48 degrees 31 minutes 55 seconds East 231.02 feet to the corner first above mentioned, the point or place of BEGINNING.

Having an address of 94 Main Street, East Hampton, New York.

9586842-10

## **EXHIBIT C**

Form of Bidding Procedures Order

(See attached)

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

JUST ONE MORE RESTAURANT CORP.,          Case No. 9:19-bk-1947
and JUST ONE MORE HOLDING CORP.,[1]       (Jointly Administered with
                                          Case No. 9:19-bk-1948)
      Debtors.                          Chapter 11 Cases
_____/

In re:

BRUCE E. BOZZI, SR.,                      Case No. 9:19-bk-09677-FMD
                                          Chapter 7
      Debtor.
_____/

In re:

WALTER J. GANZI, JR.,                     Case No. 9:19-bk-09680-FMD
                                          Chapter 7
      Debtor.
_____/

---

[1]  The last four digits of each Chapter 11 Debtor's federal tax identification number are Just One More Restaurant Corp. (5070) and Just One More Holding Corp. (6081).  The address of the Chapter 11 Debtors is 8955 Fontana Del Sol Way, 2nd Floor, Naples, FL 34109.

**ORDER APPROVING**
**JOINT MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING**
**PROCEDURES, (II) SCHEDULING THE BID DEADLINES AND THE AUCTION,**
**(III) SCHEDULING A HEARING TO CONSIDER THE TRANSACTION,**
**(IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (V)**
**APPROVING CONTRACT PROCEDURES, AND (VI) GRANTING RELATED RELIEF**

**THIS MATTER** came before the Court in Tampa, Florida on Tuesday, February 25, 2020

at 3:30 p.m. (the "Hearing") upon the *Joint Motion for Entry of an Order (I) Approving Bidding*

*Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling a Hearing to*

*Consider the Transaction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving*

*Contract Procedures, and (VI) Granting Related Relief* (Doc. ___) (the "Motion")[2] filed by Just

One More Restaurant Corp. ("JOMR") and Just One More Holding Corp. ("JOMH" and together

with JOMR, collectively, the "Chapter 11 Debtors") through Gerard A. McHale, Jr., not in his

individual capacity but solely in his capacity as the Chief Restructuring Officer of the Chapter 11

Debtors (the "CRO"), and Robert E. Tardif, Jr., not in his individual capacity but solely in his

capacity as the trustee (the "Trustee", and together with the CRO, collectively, the "Movants")

appointed in the chapter 7 bankruptcy cases of each of Bruce E. Bozzi, Sr. ("Bozzi") and Walter

J. Ganzi, Jr. ("Ganzi" and together with Bozzi, collectively, the "Chapter 7 Debtors"; together, the

Chapter 11 Debtors and the Chapter 7 Debtors, collectively, the "Debtors") on behalf of the estates

of the Chapter 7 Debtors and each of the business entities listed on Exhibit "A" attached to the

Motion (collectively, the "Palm OpCos" and together with the Chapter 11 Debtors, collectively,

the "Company") by the authority granted to the Movants by title 11 of the United States Code (the

"Bankruptcy Code") and the Palm OpCos Authorization Orders.  The Motion requests the entry

of an order: (a) approving the Bidding Procedures attached hereto as **Exhibit "1"** (the "Bidding

---

[2]    Any capitalized term not explicitly defined herein shall have the meaning ascribed to it, as applicable, in (i) the
Motion, (ii) the Bidding Procedures attached hereto as **Exhibit "1"**, or (iii) the Agreement (as such term is
defined in the Motion).

Procedures") in connection with the solicitation and acceptance of higher and better bids, including the Termination Fee, with respect to the Sale of the Purchased Assets, (b) scheduling on shortened notice the bid deadlines and the Auction, (c) scheduling on shortened notice the Sale Hearing to approve the Sale, and setting objection deadlines with respect to the Sale, (d) approving the form and manner of notice of the Sale and related Auction for the Purchased Assets, (e) establishing procedures for the assumption and assignment of certain executory contracts of JOMR to the Stalking Horse Bidder (the "Assigned JOMR Contracts"), and (f) granting related relief, all as more fully set forth in the Motion; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Movants' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a Hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing established just cause for the relief granted herein; and upon all of the proceedings had before this Court and at the Hearing; and after due deliberation and sufficient cause appearing therefor, does for the reasons stated in the Motion and on the record of the Hearing, all of which are incorporated herein:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

9501108-23

B.     This Court has jurisdiction over the Motion and the transactions contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases for the relief requested in the Motion are: (i) sections 105, 363, 365, 503 and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014; and (iii) rule 2081-1(h) of the Local Bankruptcy Rules for the Middle District of Florida (the "Local Rules").

D.     Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice is required except as set forth herein with respect to the hearing to be conducted to approve the transactions contemplated by the Agreement (the "Sale Hearing").  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

E.     The Movants' proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of substantially all of the Debtors' interests in the Company (the "Purchased Assets"), the auction (the "Auction") for the Purchased Assets, and the Bidding Procedures to be employed in connection therewith.

F.     The Movants have articulated good and sufficient reasons on behalf of the Debtors' estates for the Court to: (i) approve the Bidding Procedures; (ii) set the Sale Hearing on shortened notice and approve the manner of notice of the Motion and the Sale Hearing; (iii) approve the procedures for the assumption and assignment of the Assigned JOMR Contracts per the procedures

4

set forth in the Agreement; and (iv) grant the Breakup Fee and the Expense Reimbursement (together, the "Termination Fee") as provided in the Agreement and in this Order.

G.      The entry of this Order is in the best interests of the Debtors, their estates, creditors and other parties in interest.

H.      The Bidding Procedures are fair, reasonable and appropriate, and are designed to maximize the value to be achieved for the Purchased Assets. The Bidding Procedures were negotiated by the parties at arms' length and in good faith by the Movants and the Stalking Horse Bidder.

I.      The Movants have demonstrated a compelling business justification for the payment of the Termination Fee under the circumstances set forth in the Agreement. The Termination Fee: (i) is payable as provided in Section 7.5(c)(i) of the Agreement; (ii) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (iii) is of substantial benefit to the Debtors' estates; (iv) is reasonable and appropriate, including in light of the size and nature of the sale and the efforts that have been or will be expended by the Stalking Horse Bidder notwithstanding that the proposed sale is subject to higher or otherwise better offers for the Purchased Assets; (v) was negotiated by the parties at arm's length and in good faith; and (vi) is necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed acquisition of the Purchased Assets contemplated by the Agreement. The Termination Fee is a material inducement for, and a condition of, the Stalking Horse Bidder's entry into the Agreement.

J.      The Bidding Procedures are fair, reasonable and appropriate, and are designed to maximize the value to be achieved for the Purchased Assets.

K.     The procedures for the assumption and assignment of the Assigned JOMR Contracts are fair, reasonable, and appropriate, and comply with the provisions of section 365 of the Bankruptcy Code.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is **GRANTED** to the extent set forth herein.

2.     Except as explicitly provided herein to the contrary, all objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled and denied on the merits with prejudice.

3.     The Bidding Procedures, attached hereto as **Exhibit "1",** are hereby approved in their entirety, are incorporated herein by reference and shall govern the bids and proceedings related to the sale and the Auction.  The Bidding Procedures Key Dates, attached hereto as **Exhibit "2",** are hereby approved in their entirety.  The failure to recite or reference any particular provision of the Bidding Procedures in this Order shall not diminish the effectiveness of such provision, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

4.     The Movants are authorized to take any and all actions necessary to implement the Bidding Procedures.

5.     Golden Nugget, LLC, together with its permitted successors, assigns and designees, is approved as the Stalking Horse Bidder for the Purchased Assets, pursuant to the terms of the Agreement attached as Exhibit "C" to the Sale Motion and the Agreement, in substantially such form, is hereby approved; provided, that the rights of all parties to object to the Sale contemplated by the Agreement are preserved.

6.     The Bid Deadline is **March 6, 2020 at 5:00 p.m. (prevailing Eastern Time)**.

9501108-23

7.     If the Movants receive more than one Qualified Bid (as defined in the Bidding Procedures) by the Bid Deadline, an Auction shall take place on **March 9, 2020 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Berger Singerman LLP, located at 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, or such other place and time as the Movants shall notify all Qualified Bidders, including the Stalking Horse Bidder, counsel for the Stalking Horse Bidder and other invitees in accordance with the Bidding Procedures, and for the avoidance of any doubt, the Auction is subject to the right of the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Auction to a later date.  The Auction shall be conducted in accordance with the Bidding Procedures.  Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures, and (c) has consented to the core jurisdiction of this Court.

8.     In the event a party other than the Stalking Horse Bidder is the Successful Bidder for the Purchased Assets, subject to the terms of the Agreement, notwithstanding anything contrary in the Motion, the Debtors' estates shall pay the Breakup Fee to the Stalking Horse Bidder in an amount equal to $1,250,000.00 and shall reimburse the Stalking Horse Bidder for the actual and reasonable, documented out-of-pocket expenses up to a cap of $275,000.00 incurred by the Stalking Horse Bidder in performance of the Stalking Horse Bidder's due diligence investigation, review, research, and analysis regarding the Company's assets and the negotiations and documentation of the Agreement.  The Termination Fee shall constitute an allowed administrative expense claim against the Debtors' bankruptcy estates under section 503(b) of the Bankruptcy Code.  The obligation of the Debtors to pay the Termination Fee shall survive termination of the Agreement.

9501108-23

9.      The Termination Fee shall be payable by the Debtors' estates out of the proceeds of an Alternative Transaction within three (3) business days following the closing thereof, and shall be paid to the Stalking Horse Bidder prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Termination Fee).  No further or additional order from this Court shall be required in order to give effect to such provisions relating to the terms of payment of the Termination Fee and the Stalking Horse Bidders' professional advisors are not obligated to comply with any provisions of the Bankruptcy Code regarding Court approval of professional fees payable by the Debtors' estates and included in the Expense Reimbursement.

10.     Notwithstanding anything herein to the contrary, prior to payment of the Expense Reimbursement, the Stalking Horse Bidder shall provide the Movants with invoices detailing its documented, out-of-pocket expenses and the Movants shall have three (3) business days to object (the "Expense Reimbursement Objection Deadline") to the reasonableness of the expenses incurred.  The Expense Reimbursement shall be paid within three (3) business days following the expiration of the Expense Reimbursement Objection Deadline if no objections are received.

11.     In the event the Purchased Assets are acquired in an Alternative Transaction by the DIP Lender pursuant to a credit bid authorized by this Court, such DIP Lender shall be responsible for the payment of the Breakup Fee and the Expense Reimbursement in cash at a closing on such sale.

12.     If no Auction is to be held, the Sale Hearing shall be held before this Court on **March 9, 2020 at ____a.m./p.m. (prevailing Eastern Time)** and may be adjourned from time to time by the Movants, and for the avoidance of any doubt, the Sale Hearing is subject to the right of the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the

9501108-23

Sale Hearing to a later date, subject to the availability of the Court.  If there is no Auction, the Movants will file serve and file a notice with this Court not later than **March 6, 2020 at 8:00 p.m. (prevailing Eastern Time)** stating that there will be no Auction and the Movants are moving forward with the Sale Hearing on **March 9, 2020 at ____a.m./p.m. (prevailing Eastern Time)** with the Stalking Horse Bidder, subject to the proviso in the immediately preceding sentence.

13.      If an Auction is to be held, the Sale Hearing shall be held before this Court on **March 10/11, 2020 at ____a.m./p.m. (prevailing Eastern Time)** and may be adjourned from time to time by the Movants, and for the avoidance of any doubt, the Sale Hearing is subject to the right of the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Sale Hearing to a later date, subject to the availability of this Court.

14.      Objections, if any, to the sale of the Purchased Assets and the Sale contemplated by the Agreement, or the relief requested in the Sale Motion must: (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with this Court on or before **4:00 p.m. (prevailing Eastern Time) on March 3, 2020** (the "Sale Objection Deadline"); and (e) be served upon: (1) *JOMR and JOMH*, c/o (i) the Chief Restructuring Officer, McHale, P.A., 1601 Jackson Street, Suite 200, Fort Myers, FL 33901 (Attn: Gerard A. McHale, Jr., jerrym@thereceiver.net and Veronica Larriva, veronical@thereceiver.net) and (ii) *bankruptcy counsel for JOMR and JOMH*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com) and Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com)); (2) (i) *the Trustee*, Robert E. Tardif, Jr., P.O. Box No. 2140, Fort Myers, FL 33902 (Attn: Robert E. Tardif, Jr., Esq. (rtardif@comcast.net)) and (ii) *transaction counsel for the Trustee*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL

9501108-23

33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com) and Christopher

Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com)); (3) counsel for the Stalking Horse

Bidder, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware

19801 (Attn: Michael R. Nestor, Esq. (mnestor@ycst.com) and Andrew L. Magaziner, Esq.

(amagaziner@ycst.com); and (4) *counsel for the DIP Lender*, Reed Smith LLP, Three Logan

Square, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103 (Attn: Scott M. Esterbrook, Esq.

(SEsterbrook@ReedSmith.com) and Brian M. Schenker, Esq. (BSchenker@ReedSmith.com); and

(5) *the Office of the United States Trustee*, 501 East Polk Street, Room 1200, Tampa, FL 33602

(Attn: Benjamin E. Lambers, Esq. (Ben.E.Lambers@usdoj.gov) and Steven Wilkes, Esq.

(Steven.Wilkes@usdoj.gov)).

15.     The sale notice, substantially in the form attached hereto as **Exhibit "3"** (the "Sale

Notice"), is hereby approved.

16.     The proposed procedures related to the assumption and assignment of the Assigned

JOMR Contracts, and the payment by the Stalking Horse Bidder of any related Cure Costs, as set

forth in the Agreement, are approved.

17.     On or before one (1) business days after the entry of this Order, the Movants will

cause the Sale Notice and this Order to be served by ECF notification (where applicable) and by

first-class mail, to the following: (a) all creditors or their counsel known to the Debtors to assert a

lien (including any security interest), claim, right, interest, or encumbrance of record against all or

any portion of the Purchased Assets; (b) the Office of the United States Trustee for the Middle

District of Florida (Tampa Office); (c) counsel to the Stalking Horse Bidder; (d) counsel for the

DIP Lender; (e) all parties in interest who have requested notice pursuant to Bankruptcy Rule

2002; (f); the landlords for the leased locations at which the Sellers operate the restaurants; (g) all

counterparties to any executory contract or unexpired lease of the Chapter 11 Debtors; and (h) all potential bidders previously identified or otherwise known to the Movants.[3]

18.     For the reasons stated in the Motion and at the Hearing, the Court grants the Movants' request for shortened notice with respect to the relief requested in the Motion. Compliance with the foregoing notice provisions shall constitute sufficient notice of the Debtors' proposed sale of the Purchased Assets free and clear of certain liens, claims, interests and encumbrances as set forth in the Agreement, pursuant to Bankruptcy Code section 363(f) and otherwise, and except as set forth in this Order, no other or further notice of the sale shall be required to be provided by the Movants.

19.     The Stalking Horse Bidder is entitled to make any additional bids at the Auction in compliance with the Bidding Procedures.  For purposes of any Overbid, the Stalking Horse Bidder shall be entitled to a credit in the amount of the Termination Fee.

20.     The Sale Hearing may be continued, from time to time, without further notice to creditors or other parties in interest other than by announcement of said continuance before the Court on the date scheduled for such hearing or announced by the Movants in open court.

21.     Section 7.5(c)(i) of the Agreement is hereby approved.  In connection therewith, the obligation of the Debtors' estates to pay the Termination Fee, as provided by the Agreement, is hereby approved and shall survive termination of the Agreement and shall be payable out of the proceeds of an Alternative Transaction as provided in Section 7.5(c)(i) of the Agreement.

---

[3]    With respect to serving all potential bidders previously identified or otherwise known to the Movants, these are the investors who entered into non-disclosure agreements with the Movants, and the Movants are authorized to file under seal that part of the service list providing the names and mailing addresses for all such parties which are served with the Sale Notice and this Order.

9501108-23

22.     Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Purchased Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup, termination, or similar fee or payment.

23.     Except as otherwise provided in the Agreement or this Order, the Movants further reserve the right as they may reasonably determine to be in the best interests of the Debtors' estates (in consultation with the Consultation Party (i.e., the DIP Lender)) to: (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Company, the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders; (f) extend the deadlines set forth herein; and (g) continue or cancel the Auction and/or Sale Hearing in open court without further notice or by filing a notice on the docket.  Before extending any deadline, the Movants shall consult with the Stalking Horse Bidder and the Consultation Party.

24.     All persons and entities that participate in the bidding process or the Auction shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of Purchased Assets, the Auction and any transaction contemplated herein.

25.     To the extent that any order confirming any chapter 11 plan in the Chapter 11 Debtors' cases or any other order in these cases (including any order entered after any conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Order, the provisions of this Order shall control.  The

9501108-23

Movants' obligations under this Order, the provisions of this Order and the portions of the Agreement pertaining to the Bidding Procedures shall survive conversion of the cases of the Chapter 11 Debtors to cases under chapter 7 of the Bankruptcy Code, confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtors, any chapter 7 trustee, the reorganized or reconstituted debtors, as the case may be, after the effective date of a confirmed plan or plans in the Chapter 11 Debtors' cases (including any order entered after any conversion of the cases of the Chapter 11 Debtors to cases under chapter 7 of the Bankruptcy Code).

26.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014 or any other provisions of the Bankruptcy Rules or the Local Rules stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry and no automatic stay shall apply to this Order.

27.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

28.     The Movants are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

29.     In the event there is any inconsistency between the Motion, the Bidding Procedures, or this Order, this Order shall govern.  The rights and obligations of the Stalking Horse Bidder and the Movants and/or the Debtors are subject to the full terms and conditions of the Agreement, which shall control in the event of any conflict between this Order and the Agreement.

30.     The Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order. All matters arising from or related to the implementation of this

9501108-23

Order may be brought before the Court as a contested matter, without the necessity of commencing

an adversary proceeding.

*(Christopher Andrew Jarvinen, Esq. is directed to serve a copy of this order on interested parties who are non-CM/ECF users and to file a proof of service within three days of entry of the order.)*

14

**<u>EXHIBIT "1"</u>**

**Bidding Procedures**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

JUST ONE MORE RESTAURANT CORP.,                Case No. 9:19-bk-1947
and JUST ONE MORE HOLDING CORP.,[1]            (Jointly Administered with
                                               Case No. 9:19-bk-1948)
        Debtors.                               Chapter 11 Cases

_____/

In re:

BRUCE E. BOZZI, SR.,                           Case No. 9:19-bk-09677-FMD
                                               Chapter 7
        Debtor.

_____/

In re:

WALTER J. GANZI, JR.,                          Case No. 9:19-bk-09680-FMD
                                               Chapter 7
        Debtor.

_____/

## BIDDING PROCEDURES[2]

On March 7, 2019 (the "Chapter 11 Petition Date"), each of Just One More Restaurant Corp. ("JOMR") and Just One More Holding Corp. ("JOMH" and together with JOMR, collectively, the "Chapter 11 Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"). On October 11, 2019 (the "Chapter 7 Petition Date", and together with the Chapter 11 Petition Date, collectively, the "Petition Dates"), each of Bruce E. Bozzi, Sr. ("Bozzi") and Walter J. Ganzi, Jr.

---

[1]  The last four digits of each Chapter 11 Debtor's federal tax identification number are Just One More Restaurant Corp. (5070) and Just One More Holding Corp. (6081). The address of the Chapter 11 Debtors is 8955 Fontana Del Sol Way, 2nd Floor, Naples, FL 34109.

[2]  Any capitalized term not explicitly defined herein shall have the meaning ascribed to it in, as applicable, the Bidding Procedures Motion or the Bidding Procedures Order (as each is defined herein).

("Ganzi" and together with Bozzi, collectively, the "Chapter 7 Debtors") (together, the Chapter 11 Debtors and the Chapter 7 Debtors, collectively, the "Debtors") filed voluntary petitions for relief under chapter 7 of the Bankruptcy Code in the Bankruptcy Court.

On February 20, 2020, the *Joint Motion for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling a Hearing to Consider the Transaction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Procedures, and (VI) Granting Related Relief* (Doc. ___) (the "Bidding Procedures Motion") was filed by the Chapter 11 Debtors through Gerard A. McHale, Jr., not in his individual capacity but solely in his capacity as their Chief Restructuring Officer ("CRO"), and Robert E. Tardif, Jr., not in his individual capacity but solely in his capacity as the trustee (the "Trustee" and together with the CRO, collectively, the "Movants") appointed in the chapter 7 bankruptcy cases of each of the Chapter 7 Debtors on behalf of each of the business entities listed on Exhibit "A" attached to the Motion (collectively, the "Palm OpCos" and together with the Chapter 11 Debtors, collectively, the "Company") by the authority granted to the Movants by the Bankruptcy Code and the Palm OpCos Authorization Orders.

The Bidding Procedures Motion sought approval of, among other things, the procedures though which the Movants, in the exercise of the Debtors' business judgment, will determine the highest or otherwise best price for the sale of some, substantially all, or all of the Debtors' interests in the Company's assets (collectively, the "Purchased Assets") described in that certain Purchase Agreement (the "Agreement") by and among Golden Nugget, LLC, as purchaser (together with its permitted successors, assigns and designees, the "Stalking Horse Bidder") and the Movants, on behalf of the Debtors' estates, as sellers, a copy of which is attached as Exhibit "C" to the Sale Motion.

On February ___, 2020, the Bankruptcy Court entered an order approving the Bidding Procedures Motion (Doc. ___) (the "Bidding Procedures Order" and the procedures set forth herein, the "Bidding Procedures"), which, among other things, authorized the Movants to determine the highest or otherwise best price for the Purchased Assets through the process and procedures set forth in these Bidding Procedures.

Unless expressly indicated, the following Bidding Procedures apply to all bidders regardless of the phase of the Auction in which the bidder intends to participate.

## **Access to Diligence Materials**.

To participate in the bidding process and to receive access to due diligence information, including access to the electronic data room being maintained by Raymond James & Associates, Inc. ("Raymond James"), the investment banker retained by the Chapter 11 Debtors and the Trustee on behalf of the Chapter 11 Debtors and the Palm OpCos, and to additional non-public information regarding the Company and the Debtors (collectively, the "Diligence Materials"), a party must deliver to the Movants an executed confidentiality agreement in the form and substance satisfactory in the sole discretion of the Movants (the "Confidentiality Agreement") and evidence demonstrating a party's financial capability to close a transaction involving some, substantially

2

all, or all of the Purchased Assets (a "Alternative Transaction"), as determined by the Movants, in consultation with DIP Lender (the "Consultation Party").[3]

A party who qualifies for access to Diligence Materials (each, a "Preliminary Interested Investor") may proceed to conduct due diligence and ultimately submit a Bid as defined in the Bidding Procedures.  Only Preliminary Interested Investors may submit Bids.

All due diligence requests must be directed to Raymond James.  To the extent reasonably practicable, Raymond James will also facilitate meetings between any interested Preliminary Interested Investor and the Company's management team, which meetings will proceed in a manner determined by the Movants, in their sole discretion.

The due diligence period will end on the Bid Deadline, as defined below, and, subsequent to the Bid Deadline, the Movants and their representatives, including but not limited to the Debtors' Advisors, will have no obligation to furnish any due diligence information to any party. For the avoidance of doubt, no due diligence will continue after the Bid Deadline.

Neither the Movants nor any of their respective representatives, including the Debtors' Advisors, will be obligated to furnish any information relating to the Purchased Assets other than to Preliminary Interested Investors.   The Movants and the Debtors' Advisors make no representations or warranty as to the information to be provided through this due diligence process or otherwise, accept to the extent set forth in the Agreement or in any other definitive agreement a Successful Bidder executed and delivered to the Movants.

The Movants and the Debtors' Advisors will coordinate all reasonable requests from Preliminary Interested Investors for additional information and due diligence access; provided that the Movants may decline to provide such information to Preliminary Interested Investors who, at such time and in the Movants' exercise of the Debtors' business judgment, have not established, or who have raised doubt, that such Preliminary Interested Investor intends in good faith to, or has the capacity to, consummate an Alternative Transaction.

**For any Preliminary Interested Investor or Qualified Bidder who is a competitor of the Company or is affiliated with any competitor of the Company, the Movants reserve the right to withhold, or to delay providing, in their sole discretion, <u>any</u> Diligence Materials that the Movants determine are business-sensitive or otherwise inappropriate for disclosure to such Preliminary Interested Investor or Qualified Bidder, at any such time**.

**<u>All parties, Preliminary Interested Investors, and Qualified Bidders are prohibited from communicating with any of the Company's employees, directors, officers, landlords, vendors, suppliers, agents, existing lender(s) (including, but not limited to, the DIP Lender) or with any other potential bidder, Preliminary Interested Investor, or Qualified Bidder with respect to any Bid or Alternative Transaction absent the prior written consent of the Movants; provided that if such consent is given a representative of the Movants shall be</u>**

---

[3]    Notwithstanding anything in the Bidding Procedures to the contrary, the Movants will not consult with or provide copies of any bids or confidential information to the DIP Lender if the DIP Lender becomes an active bidder at any time for any of the Purchased Assets.

9501108-23

**present for or party to any such communications (unless otherwise agreed by the Movants in their sole discretion).**

Each Preliminary Interested Investor and Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Movants or the Debtors' Advisors regarding such Preliminary Interested Investor or Qualified Bidder.

Notwithstanding anything to the contrary herein, the DIP Lender and the Stalking Horse Bidder shall each be a Preliminary Interested Investor and a Qualified Bidder.

## Bid Qualification Process

### I.   Bid Deadline.

A Preliminary Interested Investor that desires to make a proposal, solicitation, or offer for some or all of the Purchased Assets (each, a "Bid") shall transmit such proposal, solicitation, or offer via email (in pdf or similar format) so as to be actually received by the following parties on or before **March 6, 2020, at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"):

   a.   *Bankruptcy Counsel to JOMR and JOMH and transaction counsel to the Trustee*: Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, Attn: Paul Steven Singerman (singerman@bergersingerman.com) and Christopher Andrew Jarvinen (cjarvinen@bergersingerman.com);

   b.   *The CRO for the Chapter 11 Debtors:* McHale, P.A., 1601 Jackson Street, Suite 200, Fort Myers, Florida 33901, Attn: Gerard A. McHale, Jr. (jerrym@thereceiver.net);

   c.   *The Trustee*: Robert E. Tardif, Jr., P.O. Box No. 2140, Fort Myers, Florida 33902 (rtardif@comcast.net); and

   d.   *The Investment Banker for the Chapter 11 Debtors and the Trustee:* Raymond James & Associates, Inc., 880 Carillon Parkway, St. Petersburg, Florida 33716, Attn: Geoffrey Richards (Geoffrey.Richards@RaymondJames.com) and Robert Arnold (Rob.Arnold@RaymondJames.com) (as defined, Raymond James, and together with Berger Singerman LLP, collectively, the "Debtors' Advisors").

### II.   Bid Requirements.

To be eligible to participate in the Auction (defined below), each Bid by a Preliminary Interested Investor (a "Bidder") must be submitted in writing and satisfy each of the following requirements (collectively, the "Bid Requirements") as determined by the Movants (in consultation with the Consultation Party):

   a.   Same or Better Terms: The Bid must be on terms that are substantially the same or better than the terms of the Agreement, as determined by the Movants in their sole discretion (in consultation with the Consultation Party) and the Bid must identify which assets the Bidder intends to purchase and include executed transaction

9501108-23

documents (as defined herein, an Alternative Transaction). A Bid shall include both a clean version (in MS-Word) and a blackline against the Agreement marked to show all changes requested by the Bidder.  A Bid will not be considered qualified for the Auction if: (i) such Bid contains additional material representations and warranties, covenants, closing conditions, termination rights, financing, or due diligence contingencies other than as may be included in the Agreement (it being agreed and understood that such Bid shall modify the Agreement as needed to comply in all respects with the Bidding Procedures Order (including removing any termination rights in conflict with the Bidding Procedures Order) and will remove provisions that apply only to the Stalking Horse Bidder, as the stalking horse bidder, such as the Termination Fee); (ii) such Bid is not received by the Movants in writing on or prior to the Bid Deadline, and (iii) such Bid does not contain evidence that the Bidder(s) has/have received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof that the Earnest Money Deposit (defined below) has been made.

b.  <u>Amount of Bid</u>:  Each Bid may be for all or a portion of the Purchased Assets and shall clearly show the amount of the purchase price.  In addition, a Bid (a) must propose a purchase price equal to or greater than the aggregate of the sum of (i) the value of the Bid set forth in the Agreement  executed by the Stalking Horse Bidder, as determined by the Movants in their sole discretion (in consultation with the Consultation Party); <u>*plus*</u> (ii) the dollar value of the Termination Fee in cash, <u>*plus*</u> (iii) $100,000.00 (the initial overbid amount), in cash, and (b) must obligate the Bidder to pay, to the extent provided in the Agreement, all amounts which the Stalking Horse Bidder under the Agreement has agreed to pay, including all Assumed Liabilities; *provided that* any Bid for Purchased Assets that constitute collateral subject to the DIP Loan Facility must (a) provide for payment solely in cash, unless and until the obligations subject to the DIP Loan Facility (as defined in any interim or final order approving the DIP Loan Facility), have been, or, pursuant to such Bid, will be, indefeasibly paid in cash in full, or (b) have the consent of the DIP Lender.

c.  <u>Earnest Money Deposit</u>:  Each Bid, other than the Agreement, must be accompanied by a cash deposit in the amount equal to ten (10%) percent of the aggregate value of the cash and non-cash consideration of the Bid to be held in an escrow account to be identified and established by the Movants (the "<u>Earnest Money Deposit</u>"), *provided that* the DIP Lender will not be required to provide a deposit with respect to the portion of any Bid that is a Credit Bid.

d.  <u>Proof of Financial Ability to Perform</u>:  The Bid must include written evidence that the Movants conclude in their sole discretion demonstrates that the Bidder has the necessary financial ability to close the Alternative Transaction and to provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternative Transaction.

e.    Identity:  Each Bid must fully disclose the identity of each person and entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder, including if such Bidder is an entity formed for the purpose of consummating the proposed Alternative Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' Advisors should contact regarding such Bid. Nothing herein shall preclude multiple Preliminary Interested Investors from submitting a joint Bid, subject to the Movants' prior written consent to such submission and the disclosure requirements set forth herein.

f.    Authorization:  Each Bid must contain written evidence acceptable to the Movants in their sole discretion that the Bidder has obtained appropriate authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Alternative Transaction contemplated in such Bid.

g.    Contingencies:  A Bid will not be considered qualified for the Auction if it (i) contains any of the contingencies set forth above in sub-paragraph "a", or (ii) is conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

h.    Irrevocable:  A Bid must be irrevocable through the Auction, provided, however, that if such Bid is accepted as the Successful Bid or a Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

i.    Adequate Assurance of Future Performance:  To the extent applicable, each Bid must contain evidence that the Bidder has the ability to comply with the requirements of adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code (the "Adequate Assurance Information"). Such Adequate Assurance Information may include: (i) information about the Bidder's financial condition, such as federal tax returns for two (2) years, a current  financial statement, or bank account statements; (ii) information demonstrating (as determined by the Movants in their exercise of the Debtors' reasonable business judgment (in consultation with the Consultation  Party)) that the Bidder has the financial capacity to consummate the proposed Alternative Transaction, (iii) evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with  respect to the submission of its Bid, (iv) the identity and exact name of the Bidder (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Alternative Transaction, (v) such additional information regarding the Bidder as the Bidder may elect to include, and (vi) such other documentation that the Movants may request.  By submitting a Bid, the Bidder(s) agree that the

Movants may disseminate their Adequate Assurance Information to affected landlords and contract counterparties in the event that the Movants determine such Bid to be a Qualified Bid.

j.  <u>As-Is, Where-Is</u>:  Each Bid must include a written acknowledgement and representation that the Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the assets prior to making its Bid; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the asset(s) in making its Bid; and (3) did not rely upon any written or oral statements, representations, warranties, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's mark-up of the Agreement.

k.  <u>Affirmative Statement</u>:  Each Bid shall be accompanied by an affirmative statement in which the Bidder explicitly agrees that (i) it has and will continue to comply with these Bidding Procedures; (ii) the Bid it submits does not entitle such Bidder (and if it becomes a Qualified Bidder) to any breakup fee, termination fee, expense reimbursement, or similar type of payment or reimbursement; and (iii) it waives any substantial contribution administrative expense claims under Bankruptcy Code section 503(b) related to bidding for the Purchased Assets.

By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures, including but not limited to, refraining from, after the conclusion of the Auction, either submitting a Bid or seeking to reopen the Auction. **The submission of a Bid shall constitute a binding and irrevocable offer to acquire the Purchased Assets (or assets) as reflected in such Bid**.

## III.   <u>Designation of Qualified Bidders</u>.

The Movants will review each Bid received from a Bidder.  A Bid will be considered a "<u>Qualified Bid</u>," and each Bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>," if the Movants determine, in their sole discretion and in the exercise of the Debtors' business judgment (in consultation with the Consultation Party), that such Bid was received before the Bid Deadline and satisfies the Bid Requirements set forth above.

Notwithstanding anything herein to the contrary, the Agreement submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid, and the Stalking Horse Bidder is a Qualified Bidder for each phase of the Auction.

No later than two (2) business days after the receipt of a Bid, the Movants will notify the relevant Bidder whether or not its Bid has been designated as a Qualified Bid.  Notwithstanding anything to the contrary herein, and without limiting the provisions of Section IV ("Right to Credit Bid") herein with respect to credit bids, the DIP Lender shall be a Qualified Bidder, and to the extent that the DIP Lender submits a Bid that is received by the Bid Deadline, such Bid shall be a Qualified Bid.

9501108-23

Upon the receipt of any competing Bid(s), the Movants shall immediately provide counsel for the Stalking Horse Bidder copies of any blackline of the Agreement received by the Movants from such Bidder(s).

If any Bid is determined by the Movants not to be a Qualified Bid, the Movants will refund such Bidder's Earnest Money Deposit on the date that is three (3) business days after the Movants inform the Bidder that its Bid is not a Qualified Bid, or as soon as is reasonably practicable thereafter.

Between the date that the Movants notify a Bidder that it is a Qualified Bidder and the Auction, the Movants may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Movants, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

## IV.    **Right to Credit Bid**.

The DIP Lender shall have the right to credit bid all or a portion of the value of such DIP Lender's secured claims pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline.

In the event the DIP Lender submits a Bid (whether it be a Qualified Bid, a credit bid or otherwise), the DIP Lender shall no longer be a Consultation Party and shall automatically be deemed excluded from the definition of Consultation Party.

## V.    **The Auction**.

If one or more Qualified Bids (other than the Agreement submitted by the Stalking Horse Bidder) are received by the Bid Deadline, the Movants will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid.  If no Qualified Bid (other than the Agreement) is received by the Bid Deadline, no Auction shall be conducted and the Agreement shall be deemed to be the Successful Bid and the Stalking Horse Bidder shall be deemed to be the Successful Bidder.  Only Qualified Bidders may participate in the Auction.

No later than **March 8, 2020 at 5:00 p.m. (prevailing Eastern Time)**, the Movants will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined by the Movants in their exercise of the Debtors' business judgment, in consultation with the Consultation Party (the "Auction Baseline Bid"), and will provide copies of the documents supporting the Auction Baseline Bid to all Qualified Bidders.

The determination of which Qualified Bid constitutes the Auction Baseline Bid and which Qualified Bid constitutes the Successful Bid (defined herein) shall take into account any factors that the Movants deem in their sole discretion to be relevant to the value of the Qualified Bid to the Debtors' estates and the Company, including, among other things: (a) the type and amount of

8

Purchased Assets (or assets) sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Auction Baseline Bid; (e) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed, including the assumption of collective bargaining agreements (collectively, the "Bid Assessment Criteria").

The Auction (if any) shall take place on **March 9, 2020 at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, or such other date and time and/or place as selected by the Movants (in consultation with the Consultation Party) shall notify all Qualified Bidders, including the Stalking Horse Bidder, counsel for the Stalking Horse Bidder and other invitees in accordance with these Bidding Procedures, and for the avoidance of any doubt, the Auction is subject to the right of the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Auction to a later date.

The Auction shall be conducted according to the following procedures:

a.    The Movants Shall Conduct the Auction.

The Movants and their professionals, including but not limited to the Debtors' Advisors, shall direct and preside over the Auction. At the start of the Auction, the Movants shall announce which Qualified Bid(s) is/are deemed to be the Auction Baseline Bid.

Only (i) the Movants, (ii) the Stalking Horse Bidder, (iii) any other Qualified Bidder, (iv) the Consultation Party (i.e., the DIP Lender), and (v) with respect to (i) through (iv), each of their respective representatives and legal and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.

b.    No Collusion; Good-Faith *Bona Fide* Offer

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding or sale of the Purchased Assets, and (ii) its Qualified Bid is a good-faith bona fide offer and it intends to consummate the proposed transaction for the Purchased Assets if selected as the Successful Bidder.

c.    Terms of Overbids

An "Overbid" means any bid made at the Auction by a Qualified Bidder subsequent to the Movants' announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(i)    Minimum Overbid Increment.    Any Overbid following the Auction

Baseline Bid shall be no less than the value of the $100,000.00 as determined by the Movants in their exercise of the Debtors' business judgment. Additional consideration in excess of the amount set forth in an Auction Baseline Bid may include cash and/or noncash consideration. For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to credit in the amount of the Termination Fee.

(ii)    <u>Remaining terms are the same as for Qualified Bids</u>. Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, <u>provided</u>, <u>however</u>, that the Bid Deadline shall not apply. Any Overbid must remain open and binding on the Bidder until and unless the Movants accept a higher Overbid. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Company and/or the Debtors' estates than any prior Qualified Bid or Overbid, as determined by the Movants in their exercise of the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

d.    <u>Consideration of Overbids</u>

The Movants reserve the right, in their exercise of the Debtors' business judgment and in consultation with the Consultation Party, to adjourn the Auction one or more times, to, among other things, to (i) facilitate discussions between the Movants and the Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Movants with such additional evidence as the Movants, in their exercise of the Debtors' business judgment, may require, that the relevant Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed purchase of the Purchased Assets at the prevailing Overbid amount.

Upon the solicitation of each round of Overbids, the Movants may announce a deadline (as the Movants may, in their exercise of the Debtors' business judgment, extend from time to time, the "<u>Overbid Round Deadline</u>") by which time any Overbids must be submitted to the Movants.

Subsequent to each Overbid Round Deadline, the Movants shall announce whether the Movants have identified, (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Auction Baseline Bid, or, (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Movants as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Movants shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Movants as the Prevailing Highest Bid as well as the value attributable by the Movants to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

e.    <u>Backup Bidder</u>

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction, as

9501108-23

determined by the Movants, in their exercise of the Debtors' business judgment (in consultation with the Consultation Party), will be designated as the backup bidder (the "Backup Bidder"). Subject to the Agreement, including Section 7.5(c)(ii) of the Agreement, the Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the conclusion of the Auction (the "Outside Backup Date") or the closing of the Alternative Transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder, the Movants may designate (in consultation with the Consultation Party) the Backup Bidder to be the new Successful Bidder, and the Movants will be authorized, but not required, to consummate the transaction, with the Backup Bidder.  A hearing to authorize a sale to the Backup Bidder will be held by the Bankruptcy Court on no less than three (3) days' notice, with supplemental objections due at least two (2) days prior to such hearing (the "Backup Sale Hearing").  For the avoidance of doubt, only parties who timely filed an objection to the Sale by the Sale Objection Deadline may supplement their objection to the Backup Bidder and all such issues shall be limited to issues relating to the identity of the Backup Bidder.  In such case, the defaulting Successful Bidder's Earnest Money Deposit shall be forfeited to the Movants on behalf of the Debtors' estates, and the Movants, on behalf of the Debtors, specifically reserve the right to seek all available damages from the defaulting Successful Bidder.  The Earnest Money Deposit of the Backup Bidder shall be held by the Movants until the earlier of one (1) business day after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date.

     f.     Additional and Modified Procedures

The Movants (in consultation with the Consultation Party) may announce at the Auction additional or modified rules and procedures that are reasonable under the circumstances (e.g., limitations on the amount of time to make subsequent Overbids, changes in minimum Overbid increments, etc.) for conducting the Auction so long as such rules are not inconsistent with the Bidding Procedures or the Agreement.

     g.     Consent to Jurisdiction as Condition to Bidding

The Stalking Horse Bidder and all Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection any disputes relating to these Bidding Procedures, the Auction, or the construction and enforcement of any documents relating to an Alternative Transaction.

     h.     Closing the Auction

The Auction shall continue until the Movants determine, in their exercise of the Debtors' reasonable business judgment (in consultation with Consultation Party), that there is a highest or otherwise best Qualified Bid or Qualified Bids at the Auction for some, substantially all, or all of the Purchased Assets (each a "Successful Bid" and each Bidder submitting such Successful Bid, a

"Successful Bidder").  The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid.  Within six (6) hours following the conclusion of the Auction, the Movants shall file a notice on the Bankruptcy Court's docket in each of the cases of the Chapter 7 Debtors and in the lead case for the Chapter 11 Debtors identifying (with specificity) the Successful Bidder for the Purchased Assets and any applicable Backup Bidders.  The Movants shall not consider any Bids submitted after the conclusion of the Auction and any and all such Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

Such acceptance by the Movants, on behalf of the Debtors, of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

The Movants shall maintain a written transcript of all Bids made and announced at the Auction, including the Auction Baseline Bid, all Overbids, all Prevailing Highest Bids, the Successful Bid and any Backup Bid.

## VI.    **Termination Fee**.

The Stalking Horse Bidder is entitled to payment of its Termination Fee pursuant to the terms of the Agreement.

The Movants recognize the value and benefits that the Stalking Horse Bidder has provided to the Debtors' estates by entering into the Agreement, as well as the Stalking Horse Bidder's expenditure of time, energy and resources.  Therefore, subject to the terms of the Agreement, the Movants shall pay the Breakup Fee and the Expense Reimbursement out of the proceeds of an Alternative Transaction to the Stalking Horse Bidder by wire transfer of immediately available funds to the account specified by the Stalking Horse Bidder to the Movants  in writing and shall be paid to the Stalking Horse Bidder prior to the payment of the proceeds of such sale to any third party asserting a lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee and the Expense Reimbursement.)

The Breakup Fee shall be paid three (3) business days following the closing of an Alternative Transaction. Prior to payment of the Expense Reimbursement, the Stalking Horse Bidder shall provide the Movants with invoices detailing its documented, out-of-pocket expenses and the Movants shall have three (3) business days to object (the "Expense Reimbursement Objection Deadline") to the reasonableness of the expenses incurred.   The Expense Reimbursement shall be paid within three (3) business days following the expiration of the Expense Reimbursement Objection Deadline if no objections are received.

The Termination Fee shall constitute an allowed administrative expense claim against the Debtors' bankruptcy estates.

Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Purchased Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

12

In the event no Qualified Bid, other than the Stalking Horse Bid, is received, the Movants reserve the right to request (in consultation with the Consultation Party) that the Bankruptcy Court advance the date of the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof.

The Sale Hearing may be adjourned or rescheduled from time to time.

## VII.    <u>Sale Hearing</u>.

Objections, if any, to the Sale and/or the sale of the Purchased Assets to the Successful Bidder and the transaction contemplated by the Agreement must be in writing and filed with the Bankruptcy Court no later than **4:00 p.m. (prevailing Eastern Time) on March 3, 2020** (the "<u>Sale Objection Deadline</u>") and be served such that they are actually received by the following parties prior to the Sale Objection Deadline: (1) *JOMR and JOMH*, c/o (i) the Chief Restructuring Officer, McHale, P.A., 1601 Jackson Street, Suite 200, Fort Myers, FL 33901 (Attn:  Gerard A. McHale, Jr., jerrym@thereceiver.net and Veronica Larriva, veronical@thereceiver.net) and (ii) *bankruptcy counsel for JOMR and JOMH*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com) and Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com)); (2) (i) *the Trustee*, Robert E. Tardif, Jr., P.O. Box No. 2140, Fort Myers, FL 33902 (Attn: Robert E. Tardif, Jr., Esq. (rtardif@comcast.net)) and (ii) *transaction counsel for the Trustee*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com) and Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com)); (3) counsel for the Stalking Horse Bidder, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor, Esq. (mnestor@ycst.com) and Andrew L. Magaziner, Esq. (amagaziner@ycst.com); and (4) *counsel for the DIP Lender*, Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103 (Attn: Scott M. Esterbrook, Esq. (SEsterbrook@ReedSmith.com) and Brian M. Schenker, Esq. (BSchenker@ReedSmith.com); and (5) *the Office of the United States Trustee*, 501 East Polk Street, Room 1200, Tampa, FL 33602 (Attn: Benjamin E. Lambers, Esq. (Ben.E.Lambers@usdoj.gov) and Steven Wilkes, Esq. (Steven.Wilkes@usdoj.gov)).

If no Auction is to be held, the Movants will file a notice **no later than 8:00 p.m. (prevailing Eastern Time) on March 6, 2020** with the Court in each of the Debtors' bankruptcy cases stating that there will be no Auction (the notice will be posted at the Court's website https://ecf.flmb.uscourts.gov/ which requires a court-issued login and passcode to access the notice).

In the event that no Auction is to be held, the Movants will seek a hearing (the "<u>Sale Hearing</u>") on **March 9, 2020 at _____ am/pm (prevailing Eastern Time)**, at which the Movants will seek approval of the transactions contemplated by the Agreement with the Successful Bidder, and for the avoidance of any doubt, the Sale Hearing is subject to the right of the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Sale Hearing to a later date, subject to the availability of the Court.  In the event that an Auction is to be held, the Movants will seek a Sale Hearing on **March 10/11, 2020 at _____ am/pm (prevailing Eastern Time)**, at which the Movants will seek approval of the transactions contemplated by the Agreement with the Successful Bidder, and for the avoidance of any doubt, the Sale Hearing is subject to the right of

13

the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Sale Hearing to a later date, subject to the availability of the Court.

**The Sale Hearing may be continued to a later date by the Movants by either filing a notice with the Bankruptcy Court prior to, or making an announcement in open court at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

The approved Sale shall close not later than March 31, 2020, unless the Movants, in the exercise of the Debtors' reasonable business judgment, agree to a later date.

## VIII.   Return of Earnest Money Deposit.

The Earnest Money Deposits for each Qualified Bidder (i) shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Movants in their sole discretion on behalf of the Debtors' estates, (ii) shall not become property of the Debtors' estates absent further order of the Bankruptcy Court, and (iii) shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on the date that is three (3) business days after the Sale Hearing, or as soon as is reasonably practicable thereafter.

The Earnest Money Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of one (1) business day after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date.  If the Successful Bidder timely closes its winning transaction, its Earnest Money Deposit shall be credited towards its purchase price.

Upon the return of the Earnest Money Deposit, the applicable Qualified Bidders shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Movants will not have any obligation to return the Earnest Money Deposit deposited by such Successful Bidder, which may be retained by the Debtors' estates as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Movants on behalf of the Debtors, and the Movants shall be free to consummate the proposed Alternative Transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## IX.   Free and Clear Sale.

Except as otherwise provided in the Agreement, the applicable purchase agreement of a different Successful Bidder, or the Sale Order, all of the Debtors' rights, title, and interests in the Purchased Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Encumbrances") in accordance with section 363 of the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the sale of the Purchased Assets.

9501108-23

## X.    **Fiduciary Duties**.

Notwithstanding anything to the contrary contained herein, nothing in the Bidding Procedures will prevent the Movants, on behalf of the Debtors, from exercising their respective fiduciary duties under applicable law.

## XI.    **Reservation of Rights**.

Except as otherwise provided in Agreement, the Bidding Procedures Order or the Sale Order, the Movants further reserve the right as they may reasonably determine at any time, whether before, during or after the Auction, in the exercise of the Debtors' business judgment (in consultation with the Consultation Party) to: (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids and reject any or all Bids or Qualified Bids; (c) determine which  Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Company or the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders other than the Stalking Horse Bidder; (f) modify these Bidding Procedures and/or implement additional procedural rules that the Movants determine will better promote the goals of the bidding process, including but not limited to adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (g) extend the deadlines set forth in these Bidding Procedures; and (h) adjourn or cancel the Auction at the Auction and/or the Sale Hearing in open court without further notice or by filing a notice on the docket (in consultation with the Stalking Horse Bidder and the Consultation Party).

For the avoidance of doubt, the Movants shall not be required to consult with the Consultation Party if it submits a Bid for so long as such Bid remains open, including any credit bid, if the Movants, in the exercise of the Debtors' reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection or determination is (a) likely to have a chilling effect on the potential bidding or (b) otherwise contrary to the goal of maximizing value from the sale process for the Debtors' estates, their creditors and all other interested parties.

**EXHIBIT "2"**

**Bidding Procedures Key Dates**

| Event | Date |
|---|---|
| Hearing on the Motion for Bidding Procedures | February 25, 2020 at 3:30 p.m. (prevailing Eastern Time) |
| Service of Bidding Procedures Order | Within one (1) business day after the Bankruptcy Court's entry of the Bidding Procedures Order |
| Sale Objection Deadline | March 3, 2020 at 4:00 p.m. (prevailing Eastern Time) |
| Bid Deadline | March 6, 2020 at 5:00 p.m. (prevailing Eastern Time) |
| Notice of No Auction to be Held (if applicable) | March 6, 2020 at 8:00 p.m. (prevailing Eastern Time) |
| Notification of Auction Baseline Bid to all Qualified Bidders | March 8, 2020 at 5:00 p.m. (prevailing Eastern Time) |
| Auction | March 9, 2020 at 10:00 a.m. (prevailing Eastern Time), subject to the right of the Movants, in their exercise of the reasonable business judgment of the Debtors, to adjourn the Auction to a later date.  If an Auction is to be held, it shall take place at the offices of the Escrow Agent (Berger Singerman LLP, 1450 Brickell Avenue, 19th Floor, Miami, Florida 33131). |
| Sale Hearing | *If no Auction is to be held*, March 9, 2020 at _____ a.m./p.m. (prevailing Eastern Time), subject to the right of the Movants, in their exercise of the reasonable business judgment of the Debtors, to adjourn the Sale Hearing to a later date, subject to the availability of the Court. <br><br> *If an Auction is to be held*, March 10/11, 2020 at _____ a.m./p.m. (prevailing Eastern Time), subject to the right of the Movants, in their exercise of the reasonable business judgment of the Debtors, to adjourn the Sale Hearing to a later date, subject to the availability of the Court. |
| Deadline to Close the Sale | March 31, 2020, subject to the right of the Movants, in their exercise of the reasonable business judgment of the Debtors, to agree to a later date. |

## EXHIBIT "3"

**Notice of Sale of Certain Assets at Auction**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

JUST ONE MORE RESTAURANT CORP.,     Case No. 9:19-bk-1947
and JUST ONE MORE HOLDING CORP.,[1]   (Jointly Administered with
                                    Case No. 9:19-bk-1948)
     Debtors.                     Chapter 11 Cases
_____/

In re:

BRUCE E. BOZZI, SR.,             Case No. 9:19-bk-09677-FMD
                                    Chapter 7
     Debtor.
_____/

In re:

WALTER J. GANZI, JR.,          Case No. 9:19-bk-09680-FMD
                                    Chapter 7
     Debtor.
_____/

## NOTICE OF SALE OF CERTAIN ASSETS AT AUCTION

PLEASE TAKE NOTICE THAT:

      1.      Pursuant to the *Order Approving Joint Motion for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling a Hearing to Consider the Transaction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Procedures, and (VI) Granting Related Relief* (Doc. ___) (the "Bidding Procedures Order")[2] entered by the United States Bankruptcy Court for the Middle District of Florida (the "Court") on February __, 2020, Just One More Restaurant Corp. ("JOMR") and Just One More Holding Corp. ("JOMH" and together with JOMR, collectively, the "Chapter 11 Debtors") through Gerard A. McHale, Jr., not in his individual capacity but solely in his capacity as the Chief Restructuring Officer of the Chapter 11 Debtors (the "CRO"), and Robert E. Tardif,

---

[1]    The last four digits of each Chapter 11 Debtor's federal tax identification number are Just One More Restaurant Corp. (5070) and Just One More Holding Corp. (6081). The address of the Chapter 11 Debtors is 8955 Fontana Del Sol Way, 2nd Floor, Naples, FL 34109.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them, as applicable, in the Bidding Procedures Order, the Motion (as defined in the Bidding Procedures Order) or the Agreement (as defined in the Bidding Procedures Order).

Jr., not in his individual capacity but solely in his capacity as the trustee (the "Trustee", and together with the CRO, collectively, the "Movants") appointed in the chapter 7 bankruptcy cases of each of Bruce E. Bozzi, Sr. ("Bozzi") and Walter J. Ganzi, Jr. ("Ganzi" and together with Bozzi, collectively, the "Chapter 7 Debtors"; together, the Chapter 11 Debtors and the Chapter 7 Debtors, collectively, the "Debtors") on behalf of the estates of the Chapter 7 Debtors and each of the business entities listed on Exhibit "A" attached to the Motion (collectively, the "Palm OpCos" and together with the Chapter 11 Debtors, collectively, the "Company") by the authority granted to the Movants by title 11 of the U.S. Code (the "Bankruptcy Code") and the Palm OpCos Authorization Orders, have entered into a Purchase Agreement (the "Agreement") with Golden Nugget, LLC (together with its permitted successors, assigns and designees, the "Stalking Horse Bidder") for the sale of substantially all of the Debtors' interests in the Company's assets subject to a competitive bidding process as set forth in the Bidding Procedures Order.  Capitalized terms used but not otherwise defined in this notice have the meanings ascribed to them, as applicable, in the Bidding Procedures Order or the Agreement.

2.       Copies of (i) the Motion, (ii) the Agreement, (iii) the proposed Sale Order, (iv) the Bidding Procedures, and (v) the Bidding Procedures Order can be obtained by contacting the Movants at either (i) *the investment banker retained by the Chapter 11 Debtors and the Trustee on behalf of the Palm OpCos*, Raymond James & Associates, Inc., 880 Carillon Parkway, St. Petersburg, FL  33716 (Attn: Geoffrey Richards (Geoffrey.Richards@RaymondJames.com) and Rob Arnold (Rob.Arnold@RaymondJames.com), or (ii) *the bankruptcy counsel for the Chapter 11 Debtors and transaction counsel for the Trustee*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131 (Attn: Paul Steven Singerman (singerman@bergersingerman.com) and Christopher Andrew Jarvinen (cjarvinen@bergersingerman.com).

3.       All interested parties are invited to make an offer to purchase the Purchased Assets in accordance with the terms and conditions approved by the Court (the "Bidding Procedures") by **5:00 p.m. (prevailing Eastern Time) on March 6, 2020**.  Pursuant to the Bidding Procedures, the Movants may conduct an Auction for the Purchased Assets (the "Auction") beginning at **10:00 a.m. (prevailing Eastern Time) on March 9, 2020** at the offices of Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, or such later time or other place as the Movants notify all Qualified Bidders who have submitted Qualified Bids, and for the avoidance of any doubt, the Auction is subject to the right of the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Auction to a later date.  Interested bidders are encouraged to read the Bidding Procedures carefully and, for further information, are invited to contact the bankruptcy counsel for the Chapter 11 Debtors and transaction counsel for the Trustee at Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131 (Attn: Paul Steven Singerman (singerman@bergersingerman.com) and Christopher Andrew Jarvinen (cjarvinen@bergersingerman.com)), or the investment banker retained by the Chapter 11 Debtors and the Trustee on behalf of the Palm OpCos, Raymond James & Associates, Inc., 880 Carillon Parkway, St. Petersburg, FL   33716 (Attn: Geoffrey Richards (Geoffrey.Richards@ RaymondJames.com) and Rob Arnold (Rob.Arnold@RaymondJames.com)).

4.       Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order.

5.      If no Auction is held, the Movants will file a notice **no later than 8:00 p.m. (prevailing Eastern Time) on March 6, 2020** with the Court in each of the Debtors' bankruptcy cases stating that there will be no Auction (the notice will be posted at the Court's website https://ecf.flmb.uscourts.gov/ which requires a court-issued login and passcode to access the notice).  In the event that an Auction is not held, the Movants will seek approval of the Sale of the Purchased Assets to the Stalking Horse Bidder at a hearing before the Court proposed to be held, in Courtroom 9A, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Tampa, FL 33602, before the Honorable Caryl E. Delano, United States Bankruptcy Judge, at _____**a.m./p.m. (prevailing Eastern Time) on March 9, 2020** (the "Sale Hearing").  On the other hand, in the event that an Auction is held, the Movants will seek a Sale Hearing, at _____**a.m./p.m. (prevailing Eastern Time) on March 10/11, 2020**.  The Sale Hearing may be adjourned without notice other than adjournment in open court or as identified on the agenda, and for the avoidance of any doubt, the Sale Hearing is subject to the right of the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Sale Hearing to a later date, subject to the availability of the Court.  Any party opposing the relief sought at the Sale Hearing must appear at the Sale Hearing or any objections or defenses may be deemed waived.  You are reminded that Local Rule 5073-1 restricts the entry of cellular telephones and, except in Orlando, computers into the Courthouse absent a specific order of authorization issued beforehand by the presiding judge, a valid Florida Bar identification card, or *pro hac vice* order.  Please take notice that as an additional security measure a photo ID is required for entry into the courthouse.

6.      **Objections, if any, to the proposed Sale must (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed with the Court no later than March 3, 2020 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") and be served such that they are actually received by the following parties prior to the Sale Objection Deadline: (1) *JOMR and JOMH*, c/o (i) the Chief Restructuring Officer, McHale, P.A., 1601 Jackson Street, Suite 200, Fort Myers, FL 33901 (Attn: Gerard A. McHale, Jr., jerrym@thereceiver.net and Veronica Larriva, veronical@thereceiver.net) and (ii) *bankruptcy counsel for JOMR and JOMH*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com) and Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com)); (2) (i) *the Trustee*, Robert E. Tardif, Jr., P.O. Box No. 2140, Fort Myers, FL 33902 (Attn: Robert E. Tardif, Jr., Esq. (rtardif@comcast.net)) and (ii) *transaction counsel for the Trustee*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com) and Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com)); (3) counsel for the Stalking Horse Bidder, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor, Esq. (mnestor@ycst.com) and Andrew L. Magaziner, Esq. (amagaziner@ycst.com); and (4) *counsel for the DIP Lender*, Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103 (Attn: Scott M. Esterbrook, Esq. (SEsterbrook@ReedSmith.com) and Brian M. Schenker, Esq. (BSchenker@ReedSmith.com); and (5) *the Office of the United States Trustee*, 501 East Polk Street, Room 1200, Tampa, FL 33602 (Attn: Benjamin E. Lambers, Esq. (Ben.E.Lambers@usdoj.gov) and Steven Wilkes, Esq. (Steven.Wilkes@usdoj.gov)).

7.      This notice is qualified in its entirety by the Bidding Procedures Order.

Dated: February ___, 2020          **BERGER SINGERMAN LLP**
Miami, Florida                              *Counsel for the Chapter 11 Debtors and*
                                                  *Transaction Counsel for the Trustee*
                                                  1450 Brickell Avenue, Suite 1900
                                                  Miami, Florida 33131
                                                  Telephone: (305) 755-9500
                                                  Facsimile: (305) 714-4340

                                          By:      Christopher Andrew Jarvinen
                                                    Paul Steven Singerman
                                                    Florida Bar No. 0378860
                                                    singerman@bergersingerman.com
                                                    Christopher Andrew Jarvinen
                                                    Florida Bar No. 021745
                                                    cjarvinen@bergersingerman.com

## EXHIBIT D

### JOMR IP

Registered Trademarks:

Palm
Palm with tree design
Palm Restaurant est. 1926 with tree design (without the circle)
Palm Restaurant with tree design in circle
Tree design
The Original Cool
837 Club
Prime Bites
Palm Bar & Grille with tree design in circle
Palm Pak

## **EXHIBIT E**

### Real Estate Leases of Operating Companies

Restaurant Lease Agreement dated November 11, 1994 between CCSH Atlanta LLC, as successor landlord to SNH Ackerman Associates, L.P., as landlord, and Atlanta Palm Food Corporation, as tenant, as amended

Indenture of Lease dated November 19, 2002 between Tropicana Atlantic City Corp., as successor landlord to Adamar of New Jersey, Inc. as landlord, and Atlantic City Palm, LLC, as tenant, as amended

Leased dated October 7, 2013 between 267 North Canon Drive LLC, as landlord, and Palm Beverly Hills Restaurant, LLC, as tenant

Lease dated March 30, 2012 between Fort Hill Square I Owner LLC, as landlord, and Boston Palm Corporation, as tenant, as amended

Lease Agreement dated March 5, 1997 between Phillips Place Partners, LLC, as successor landlord to The Harris Group of Carolinas, Inc., as landlord, and Charlotte Palm Corporation, as tenant, as amended

Restaurant Lease Agreement dated August 7, 1995 between CCSH Chicago LLC, as successor landlord to SNH Chicago, Inc., as landlord, and Chicago Palm, Inc., as tenant, as amended

Shopping Center Lease dated December 15, 1995 between CCP/MS SSIII Denver Tabor Center 1 Property Owner LLC, as successor landlord to Tabor Center Associates, L.P., as landlord, and Denver Palm Corporation, as tenant, as amended

Lease Agreement dated October 25, 2012 between Briargrove Retail, L.P., as landlord, and Palm Restaurant of Houston, Inc., as tenant, as amended

1100 South Flower Building Lease dated May 9, 2001 between PSP Investment Group, LLC, as successor landlord to Flower Holdings, LLC, as landlord, and L.A. Downtown Palm, LLC, as tenant, as amended

Lease dated October 23, 2014 between Forum Shops, LLC, as landlord, and Palm Restaurant of Las Vegas, Inc., as tenant, as amended

Lease dated August 19, 1987 between BHI Hotel, LLC, as successor landlord to The Sand Joint Venture, as landlord, and Miami Palm Restaurant, Inc., as tenant, as amended

Lease dated as of June 14, 2000 between Turnberry/Nashville Arena Hotel, LP, as landlord, and Nashville Palm Restaurant, L.L.C., as tenant, as amended

Lease dated December 21, 2007 between 200 Chambers, LLC, as successor landlord to West-Chambers Street Associates, LLC, as landlord, and Palm New York Downtown, LLC, as tenant, as amended

Agreement of Lease dated July 21, 1999 between UCF Hotel Venture, as landlord, and Palm Orlando Corporation, as tenant

Agreement of Lease dated January 1, 2016 between Palm Management Corporation, as landlord, and Palm Restaurant, Inc., as tenant (for ground floor and basement in building known as 838 Second Avenue, NY, NY)

Agreement of Lease dated January 23, 1990 between Katherine Seidner, as successor landlord to Anthony J. Mansucci and Marcy Belli, Trustees, as landlord, and Palm Restaurant, Inc., as tenant, as amended (for ground floor and basement in building known as 836 Second Avenue, NY, NY)

Lease Agreement dated August 29, 1972 between Janice Peterson Family GST Trust, Jeffrey Peterson Family GST Trust, and David Peterson Family GST Trust, as successor landlord to Pasqualina Peterson, as landlord, and La Pace Restaurant, Inc., as tenant, as amended (for ground floor and basement in building known as 840 Second Avenue, NY, NY)

Agreement of Lease dated November 17, 1998 between AvalonBay Communities, Inc., as successor landlord to Resnick Eighth Avenue Associates, LLC, as landlord, and Palm West Corporation, as tenant, as amended

Enclosed Mall Lease dated September 21, 2016 between Bellevue Associates, as landlord, and Palm Philadelphia Restaurant, LLC, as tenant, as amended

Lease Agreement dated November 11, 1998 between GrayStreet Houston – 229 E. Houston Street, LLC, as successor landlord to Street Retail San Antonio, LP, as landlord, and San Antonio Palm Restaurant, Inc., as tenant, as amended

Lease dated February 25, 1999 between TYE Development Company, LLC, as successor landlord to MDM Development Company, L.L.C., as landlord, and Palm Tysons Too, Inc., as tenant, as amended

Lease Agreement dated November 15, 2005 between MCP II Jefferson, LLC, as successor landlord to Metropolitan Life Insurance Company, as landlord, and Washington Palm, Inc., as tenant, as amended

Lease dated February 21, 2019 between MSC Sand Lake IV, Inc., as landlord, and Palm Management Corp., as tenant, as amended (office space)

Office Lease dated April 24, 1980, between Jefferson Limited Partnership and Washington Palm, Inc.

# **EXHIBIT F**

Form of Sale Order

(See attached)

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

JUST ONE MORE RESTAURANT CORP.,       Case No. 9:19-bk-1947
and JUST ONE MORE HOLDING CORP.,[1]    (Jointly Administered with
                                        Case No. 9:19-bk-1948)
          Debtors.                      Chapter 11 Cases
_____/


In re:

BRUCE E. BOZZI, SR.,                    Case No. 9:19-bk-09677-FMD
                                        Chapter 7
          Debtor.
_____/


In re:

WALTER J. GANZI, JR.,                   Case No. 9:19-bk-09680-FMD
                                        Chapter 7
          Debtor.
_____/

---

[1]   The last four digits of each Chapter 11 Debtor's federal tax identification number are Just One More Restaurant Corp. (5070) and Just One More Holding Corp. (6081). The address of the Chapter 11 Debtors is 8955 Fontana Del Sol Way, 2nd Floor, Naples, FL 34109.

9589219-7

**ORDER APPROVING
JOINT MOTION FOR ENTRY OF AN ORDER (I) APPROVING
PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN
ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE OF
BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR
OF ALL CLAIMS AND LIENS EXCEPT FOR PERMITTED LIENS, ENCUMBRANCES
AND ASSUMED LIABILITIES, (III) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
OF CHAPTER 11 DEBTOR JOMR, AND (IV) GRANTING RELATED RELIEF**

**THIS MATTER** came before the Court in Tampa, Florida for a preliminary hearing on Tuesday, February 25, 2020 at 3:30 p.m. and for a final hearing on _____, March __, 2020 at _____ a.m./p.m. (collectively, the "Sale Hearing") upon the *Joint Motion for Entry of an Order (I) Approving Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Claims and Liens Except for Permitted Liens, Encumbrances and Assumed Liabilities, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts of Chapter 11 Debtor JOMR, and (IV) Granting Related Relief* (Doc. ____) (the "Sale Motion")[2] filed by Just One More Restaurant Corp. ("JOMR") and Just One More Holding Corp. ("JOMH" and together with JOMR, collectively, the "Chapter 11 Debtors") through Gerard A. McHale, Jr., not in his individual capacity but solely in his capacity as the Chief Restructuring Officer of the Chapter 11 Debtors (the "CRO"), and Robert E. Tardif, Jr., not in his individual capacity but solely in his capacity as the trustee (the "Trustee", and together with the CRO, collectively, the "Movants") appointed in the chapter 7 bankruptcy cases of each of Bruce E. Bozzi, Sr. ("Bozzi") and Walter J. Ganzi, Jr. ("Ganzi" and together with Bozzi, collectively, the "Chapter 7 Debtors"; together, the Chapter 11 Debtors and the Chapter 7 Debtors, collectively, the "Debtors") on behalf of the estates of the

---

[2]    Any capitalized term not explicitly defined herein shall have the meaning ascribed to it, as applicable, in (i) the Sale Motion, (ii) the Bidding Procedures, or (iii) the Agreement (as defined herein).

9589219-7

Chapter 7 Debtors and each of the business entities listed on <u>Exhibit "A"</u> attached to the Sale Motion (collectively, the "<u>Palm OpCos</u>" and together with the Chapter 11 Debtors, collectively, the "<u>Company</u>") by the authority granted to the Movants by title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and the Palm OpCos Authorization Orders.  The Sale Motion requests the entry of an order: (i) approving the Purchase Agreement (the "<u>Agreement</u>"), a copy of which is attached to the Sale Motion as <u>Exhibit "C"</u>, among the Debtors and Golden Nugget, LLC (together with its permitted successors, assigns and designees, the "<u>Stalking Horse Bidder</u>"), or a Successful Bidder,[3] as applicable, and authorizing the sale of the Purchased Assets outside of the ordinary course of business; (ii) authorizing the sale free and clear of all Claims and Liens (as defined in the Agreement) (other than Assumed Liabilities and Encumbrances and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement) (the "<u>Sale</u>") of the Purchased Assets to the Purchaser; (iii) authorizing the assumption and assignment of the Assigned JOMR Contracts; and (iv) granting related relief, all as more fully set forth in the Sale Motion; and pursuant to this Court's *Order Approving Joint Motion for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling a Hearing to Consider the Transaction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Procedures, and (VI) Granting Related Relief* (Doc. __) (the "<u>Bidding Procedures Order</u>"), this Court having authorized the Sellers to enter into that certain Purchase Agreement by and between the Sellers and Golden Nugget, LLC, dated as of February 20, 2020 (as may be amended or otherwise modified from time to time and including all related instruments, documents, exhibits, schedules, and agreements thereto, collectively, the "<u>Agreement</u>"), a copy of which is attached

---

[3]   Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Agreement or the Bidding Procedures Motion (defined below), as applicable.

hereto as **Exhibit "A"**, pursuant to which Golden Nugget, LLC (together with its permitted successors, designees and assigns, collectively "Purchaser")) agreed to serve as the "Stalking Horse Bidder" with respect to the Purchased Assets, free and clear of certain Claims and Liens (as each is defined in the attached Agreement) (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement), with such sale to be in accordance with the terms and conditions of the Agreement; and the Bidding Procedures Order having authorized the Movants to conduct, and approved the terms and conditions of, an auction as set forth in the Bidding Procedures Order (the "Auction") to consider higher or otherwise better offers for the Purchased Assets, establishing a date for the Auction, and approving, among other things: (i) certain Bidding Procedures (the "Bidding Procedures") to be used in connection with the Auction; (ii) the form and manner of notice of the Auction and Bidding Procedures; (iii) the procedures relating to the assumption and assignment of the Assigned JOMR Contracts; and (iv) the Termination Fee; and this Court having established the date of the Sale Hearing; and this Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and in the Sale Motion, the relief requested therein, and [the responses thereto] being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties [and all responses and objections to the Sale Motion having been duly noted in the record of the Sale Hearing]; and upon the record of the Sale Hearing, and all other pleadings and proceedings in these bankruptcy cases; and this Court having found that the relief requested in the Sale Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Movants' notice of the Sale and the Sale Motion and opportunity for a

hearing on the Sale Motion were appropriate and no other notice need be provided; and this Court

having reviewed the Sale Motion and having heard the statements in support of the relief requested

therein at the Sale Hearing before this Court; and this Court having determined that the legal and

factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief

granted herein; and upon all of the proceedings had before this Court and at the Sale Hearing; and

after due deliberation and sufficient cause appearing therefor, does for the reasons stated in the

Sale Motion and on the record of the Sale Hearing, all of which are incorporated herein:

**IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:**

A.    The findings and conclusions set forth herein constitute the Court's findings of fact

and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    To the extent that any of the following findings of fact constitute conclusions of

law, they are adopted as such.  To the extent any of the following conclusions of law constitute

findings of fact, they are adopted as such.

C.    This Court has jurisdiction over this matter and over the property of the Debtors'

estates, including the Purchased Assets to be sold, transferred, or conveyed pursuant to the

Agreement, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a "core proceeding" pursuant

to 28 U.S.C. § 157(b)(2).  Venue of these bankruptcy cases and the Sale Motion in this district is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C.

§ 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal

Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds

that there is no just reason for delay in the implementation of this Order, and expressly directs

9589219-7

entry of this Order as set forth herein and the closing of all Transactions contemplated hereby without regard to any stay or delay in its implementation.

E.     The statutory and rule-based predicates for the relief requested in the Sale Motion and for the approvals and authorizations herein are (i) sections 102, 105, 363 and 365, 503 and 507 of the Bankruptcy Code, (ii) Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014 and (iii) Local Rule 2081-1(h).

F.     Proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding: the Sale Motion, the Auction, the Sale Hearing, and the Transactions contemplated by the Agreement, including the sale of the Purchased Assets (the "Sale") have been provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006, 9007, 9008, and 9014, the local rules of the Court, the procedural due process requirements of the United States Constitution, and in compliance with the Bidding Procedures Order. The Movants also gave due and proper notice of the potential assumption and assignment of the Assigned JOMR Contracts to each non-debtor party under each such Assigned JOMR Contract, as well as landlords to the non-debtor restaurant locations (collectively, the "Landlords").  Such notice was good and sufficient and appropriate under the particular circumstances, and the counterparties to the Assigned JOMR Contracts and the Landlords are hereby deemed to consent to the relief granted herein unless otherwise provided in this Order.  No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Sale Motion, the Auction, the Sale Hearing, the assumption and assignment of the Assigned JOMR Contracts, or of the entry of this Order is necessary or shall be required.

G.     A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities, including, without limitation, (i) all entities

that claim any interest in or lien upon the Purchased Assets, (ii) all non-debtor parties to the Assigned JOMR Contracts assumed and assigned pursuant to this Order, (iii) the Landlords, (iv) all relevant governmental taxing authorities that have, or as a result of the transfer of the Purchased Assets may have, Claims, contingent or otherwise, against the Debtors, (v) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002 or Local Rule 2002-1, (vi) all creditors (whether their Claims are liquidated, contingent, or unmatured) of the Debtors, (vii) all interested governmental authorities in the Debtors' bankruptcy cases, (viii) the Office of the United States Trustee for the Middle District of Florida, and (ix) all entities that heretofore entered into non-disclosure agreements with the Movants with respect to potential purchase of the Debtors' interests in the Company.  Other parties interested in bidding on the Purchased Assets were provided, pursuant to the Bidding Procedures Order, sufficient information to make an informed judgment on whether to bid on the Purchased Assets.

H.    The Purchased Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

I.    The Movants, in the exercise of the Debtors' reasonable business judgment, have demonstrated a sufficient basis and the existence of reasonable, appropriate and compelling circumstances requiring them, on behalf of the Debtors' estates, to enter into the Agreement, to transfer the Purchased Assets and assume and assign the Assigned JOMR Contracts, to the Purchaser under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' reasonable business judgment and in the best interests of the Debtors, their estates and their stakeholders.

J.    The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive, substantively and procedurally fair to all of the relevant parties.

7

K.    The Movants and their professionals have complied, in good faith, in all respects with the Bidding Procedures Order. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing or submitted by affidavit or declaration at or prior to the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, the Movants (a) afforded interested investors a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase all of the Debtors' interests in the Company (i.e., the Purchased Assets), (b) provided interested investors, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets, and (c) considered any bids submitted on or before the deadline to submit bids as set forth in the Bidding Procedures (the "Bid Deadline").

L.    The Purchaser has put forth the highest or otherwise best offer for the Purchased Assets pursuant to the terms of the Bidding Procedures Order.  The Bidding Procedures obtained the highest or best value for the Purchased Assets for the Debtors and their estates.

M.    The offer of the Purchaser, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agreement, (i) is the highest or best offer received by the Debtors and their estates, (ii) is fair and reasonable, (iii) is in the best interests of the Debtors' stakeholders and estates, (iv) constitutes full and fair consideration and reasonably equivalent value for the Purchased Assets, and (v) will provide a greater recovery for the Debtors' creditors, and other interested parties than would be provided by any other practically available alternative.  No other entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors' estates than the Purchaser.

9589219-7

N.    The Purchaser is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code and the decisions thereunder.  The Purchaser is a purchaser in "good faith," as that term is used in the Bankruptcy Code and the decisions thereunder and is entitled to the protections of section 363(m) and (n) of the Bankruptcy Code with respect to the Purchased Assets.  The Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind.  Neither the Movants, on behalf of the Debtors' estates, nor the Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) of the Bankruptcy Code to the Agreement or to the consummation of the sale transaction and transfer of the Purchased Assets, and the Assigned JOMR Contracts, to the Purchaser.  The Purchaser is purchasing the Purchased Assets (including the Assigned JOMR Contracts) in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is, therefore, entitled to the protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that:  (i) the Purchaser recognized that the Movants, on behalf of the Debtors' estates, were free to deal with any other party interested in acquiring the Purchased Assets, (ii) the Purchaser complied with the provisions in the Bidding Procedures Order, (iii) all consideration to be paid by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the sale have been disclosed, (iv) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction, and (v) the negotiations and execution of the Agreement and any other agreements or instruments related thereto were in good faith.

O.    The Debtors' estates have full corporate power and authority to execute the Agreement (and all other documents contemplated thereby) and to consummate the Transactions

9589219-7

contemplated therein, and the sale or transfer of the Purchased Assets has been duly and validly authorized by all necessary corporate actions on the part of the Debtors' estates.  No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Debtors' estates to consummate such Transactions.

P.    The Movants, on behalf of the Debtors' estates, have advanced sound business reasons for entering into the Agreement and transferring, or assuming and assigning (with respect to the Assigned JOMR Contracts), the Purchased Assets, as more fully set forth in the Sale Motion and the Agreement and as demonstrated at the Sale Hearing, and it is a reasonable exercise by the Movants of the Debtors' business judgment to transfer, or assume and assign (with respect to the Assigned JOMR Contracts), the Purchased Assets to the Purchaser and to consummate the Transactions contemplated by the Agreement with the Purchaser.    Notwithstanding any requirement for approval or consent by any person, the transfer of the Purchased Assets to the Purchaser and the assumption and assignment of the Assigned JOMR Contracts represent a legal, valid, and effective transfer of the Purchased Assets.

Q.    The terms and conditions of the Agreement, including the consideration to be realized by the Debtors' estates pursuant to the Agreement, are fair and reasonable, and the Transactions contemplated by the Agreement and reflected in this Order are in the best interests of the Debtors' estates.

R.    Except with respect to the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement, the Purchased Assets shall be sold free and clear of any and all liens (statutory or otherwise, including, without limitation, mechanics, materialmens' and other consensual and non-consensual liens and statutory liens), hypothecations, encumbrances, security interests,

10

mortgages, debts, levies, indentures, pledges, restrictions (whether on voting, sale, transfer, disposition or otherwise), charges, instruments, preferences, priorities, security agreements, conditional sales agreements, title retention contracts, options, Claims, judgments, offsets, rights of recovery, rights of pre-emption, rights of first refusal or other third party rights, Claims for reimbursement (other than the Sellers' rights and claims in the Agreement and other documents executed by the Purchaser in connection with the Transactions), contribution, indemnity, exoneration, products liability, alter-ego, environmental, or Tax (including Claims for any and all foreign, federal, state and local Taxes), decrees of any court or foreign or domestic governmental entity, orders of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any Claim based on any theory that either the Purchaser is a successor or a continuation of the Debtors or the Debtors' business), reclamation Claims, obligations, liabilities, demands, and guaranties, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, including Claims otherwise arising under doctrines of successor liability (collectively, as defined in the Agreement, the "<u>Liens</u>").

S.       Except with respect to the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement, the Liens shall attach to the consideration to be received by the Debtors in the

same priority and subject to the same defenses and avoidability, if any, as before the closing of the Transactions contemplated by the Agreement (the "Closing"), and the Purchaser would not enter into the Agreement to purchase the Purchased Assets or proceed to the Closing otherwise.

T.    The transfer of the Purchased Assets to the Purchaser under this Agreement and the Order will be a legal, valid, and effective transfer of the Purchased Assets to the Purchaser, with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any and all Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement). Except as specifically provided in the Agreement or this Order, the Purchaser shall not assume or become liable for any Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) relating to the Purchased Assets being sold by the Debtors.

U.    The transfer of the Purchased Assets to the Purchaser free and clear of all Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement) will not result in any undue burden or prejudice to any holders of any Liens, because all such Liens of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Purchased Assets received by the Debtors in the order of their priority, with the same validity, force, and effect which they now have as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. All persons having Liens of any kind or nature whatsoever against or in any of the Debtors, the Purchased Assets shall be forever barred and estopped from pursuing or asserting such Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as

9589219-7

otherwise set forth in the Agreement) against the Purchaser, or any of their respective assets, property, successors or assigns, the Purchased Assets.

V.      The Debtors may sell the Purchased Assets free and clear of all Liens of any kind or nature whatsoever (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, and except as otherwise set forth in the Agreement) because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  The (i) holders of Liens and (ii) non-debtor parties to the Assigned JOMR Contracts, who did not object, or who withdrew their objections, to the sale of the Purchased Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Except as set forth below, any objections to the Sale Motion, including objections by non-debtor parties to the Assigned JOMR Contracts, have been overruled or resolved.  Those holders of Liens who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, if any, attach to the proceeds of the Sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may claim any Liens, with such Liens being subject to treatment as prescribed in any chapter 11 plan or by separate order of this Court.

W.      Not selling the Purchased Assets free and clear of all Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) would adversely impact the Debtors' estates, and the sale of Purchased Assets other than one free and clear of all Liens (other than Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) would be of substantially less value to the Debtors' estates.

13

X.      The sale of the Purchased Assets outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan or reorganization of the Debtors.  The Sale does not constitute a *sub rosa* chapter 11 plan.

Y.      The Movants, on behalf of the Debtors' estates, and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including subsections 365(b)(1)(A), (B) and 365(f), in connection with the sale and the assumption and assignment of the Assigned JOMR Contracts.  The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned JOMR Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.

Z.      The assumption and assignment of the Assigned JOMR Contracts pursuant to the terms of this Order is integral to the Agreement and is in the best interests of the Debtors, their estates, their stakeholders and other parties in interest, and represents the exercise by the Movants of the sound and prudent business judgment of the Debtors' estates.

AA.    The Assigned JOMR Contracts are assignable notwithstanding any provisions contained therein to the contrary.  Pursuant to the Agreement, the Purchaser shall have sole responsibility for paying all Cure Costs required to assume and assign the Assigned JOMR Contracts to the Purchaser.  The notice and opportunity to object provided to the contract counterparties to such contracts and to other parties in interest, as set forth in the Bidding Procedures Order and Agreement, fairly and reasonably protects any rights that such contract counterparties and other parties in interest may have with respect to such contracts.

BB.     The notice and opportunity to object provided to the Debtors' parties in interest, as set forth in the Bidding Procedures Order and the Agreement, fairly and reasonably protects any rights of any party in interest.

CC.     The Movants, on behalf of the Debtors' estates, and the Purchaser will be acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the Transactions contemplated by the Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to any stay, including, without limitation, as provided by Bankruptcy Rules 6004(h), 6006(d) and Local Rule 2081-1(h).

DD.     Except as otherwise provided in the Agreement, (i) the Transactions contemplated under the Agreement do not amount to a consolidation, merger, or de facto merger of the Purchaser, on the one hand, and the Debtors and/or the Debtors' estates, on the other, (ii) there is not substantial continuity between the Purchaser, on the one hand, and the Debtors, on the other, (iii) there is no continuity of enterprise between the Debtors and the Purchaser, neither is the Purchaser is a mere continuation of the Debtors or their estates, and (ii) the Purchaser is not a successor to the Debtors or their estates.

EE.     The Agreement was not entered into, and none of the Movants, on behalf of the Debtors' estates, nor the Purchaser, have entered into the Agreement or proposed to consummate the Transactions contemplated thereby, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors.  The total consideration provided by the Purchaser for the Purchased Assets was the highest or otherwise best offer received by the Movants, on behalf of the Debtors' estates, and the Purchase Price and other consideration under the Agreement, including the assumption of the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, or otherwise set forth in the Agreement,

15

constitute (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

FF.     Time is of the essence in consummating the Sale.  In order to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Agreement.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

GG.     At and effective as of the Closing, the Purchaser shall assume sole responsibility for paying and satisfying the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, or otherwise set forth in the Agreement, including all liabilities and obligations of Sellers related to or arising under the Assigned JOMR Contracts.  After the Closing, the Debtors shall have no liability whatsoever with respect to the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, or as otherwise set forth in the Agreement.  The Purchaser shall have no obligations with respect to any liabilities of the Debtors other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement or as otherwise set forth in the Agreement.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     The relief requested in the Sale Motion is **GRANTED** as set forth herein and the Agreement is approved, subject to the terms and conditions contained herein.

2.      Except as otherwise expressly set forth herein, all objections, responses, reservations of rights, and requests for continuance concerning the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing.  To the extent any such objection, response, reservation of rights, or request for continuance was not otherwise withdrawn, waived, or settled, it is overruled and denied on the merits with prejudice.

3.      Notice of the Sale Hearing was fair, equitable, proper, and sufficient under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, the Local Rules, and as required by the Bidding Procedures Order.  For the reasons stated in the Sale Motion and at the Sale Hearing, the Court grants the Movants' request for shortened notice with respect to the relief requested in the Sale Motion.

4.      The Movants, on behalf of the Debtors, in transferring the Purchased Assets pursuant to this Order and section 363 of the Bankruptcy Code, are deemed, under section 1107(a) of the Bankruptcy Code, to have all rights and powers to perform all the functions and duties of a trustee serving in a bankruptcy case, and will transfer the property pursuant to this Order.

5.      Subject to the terms of this Order, the sale of the Purchased Assets, the terms and conditions of the Agreement (including all schedules and exhibits affixed thereto), and the Transactions contemplated thereby shall be, and hereby are, authorized and approved in all respects, and shall be enforceable against each of the Parties thereto.

6.      The failure specifically to include any particular provisions of the Agreement or any of the documents, ancillary documents, or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, Agreement, or instrument, it being the intent of the Court, the Movants (on behalf of the Debtors' estates), and

17

the Purchaser, that the Agreement and each document, ancillary document, or instrument be authorized and approved in its entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing Date.

7.      The Agreement and any related ancillary document(s), or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided, that any such modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the Agreement and any related ancillary documents.

8.      The sale of the Purchased Assets and the consideration provided by the Purchaser under the Agreement are fair and reasonable, the highest or otherwise best offer for the Purchased Assets and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.  The Sale of the Purchased Assets to the Purchaser is a legal, valid and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent of any entity.

9.      The Purchaser is hereby granted and is entitled to all the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code, including with respect to the transfer of the Assigned JOMR Contracts as part of the sale of the Purchased Assets pursuant to section 365 of the Bankruptcy Code and this Order.

10.      The Movants, on behalf of the Debtors' estates, and their employees, professional advisors, and agents shall be, and hereby are, authorized and directed to fully assume, perform under, consummate, and implement the terms of the Agreement together with any and all additional instruments and documents that may be necessary or desirable in connection with implementing and effectuating the terms of the Agreement, this Order, and/or the sale of the

Purchased Assets, including, without limitation, the certificates, deeds, assignments, and other instruments of transfer, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession, any or all of the Purchased Assets, or Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement, or otherwise set forth in the Agreement, as may be necessary or appropriate to the performance of the obligations of the Debtors' estates in accordance with, or as contemplated by, the Agreement, without any further corporate action or orders of this Court.

11.     The Movants, on behalf of the Debtors' estates, and each other person or entity having duties or responsibilities under the Agreement, any agreements or instruments related thereto or this Order, and their respective directors, officers, managers, employees, members, agents, representatives, attorneys, and other retained professionals are authorized and empowered, subject to the terms and conditions contained in the Agreement and this Order, to carry out all of the provisions of the Agreement and any related agreements or instruments; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement and any related agreements or instruments; to take any and all actions contemplated by the Agreement, any related agreements or instruments, or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary, desirable or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements or instruments, and this Order and the Transactions contemplated thereby and hereby, all without further application to, or order of, the Court or further action by their respective

directors, officers, managers, employees, members, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, managers, employees, members, agents, representatives, and attorneys of such entities. The Chief Restructuring Officer, on behalf of the Chapter 11 Debtor JOMR, and the Trustee, on behalf of the Chapter 7 Debtors' estates and the Palm OpCos, shall be, and each hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable).  The Movants, on behalf of the Debtors' estates, and the Purchaser are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Authority at the Purchaser's sole expense any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Transactions contemplated by the Agreement, any related agreements and this Order, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable Governmental Authorities or as the Movants, on behalf of any of the Debtors, may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporate laws of the states of formation of each corporate Debtor and all other applicable business, corporation, trust, and other laws of the applicable Governmental Authorities with respect to the implementation and consummation of the Agreement, any related agreements or instruments and this Order, and the Transactions contemplated thereby and hereby.

12.    To the fullest extent permitted by law, effective as of the Closing, (a) the transfer of the Purchased Assets to the Purchaser, shall constitute a legal, valid, and effective transfer of

9589219-7

the Purchased Assets notwithstanding any requirement for approval or consent by any Person and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets, free and clear of all Liens of any kind (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of the Assumed Liabilities, Encumbrances and Liens by the Purchaser shall constitute a legal, valid and effective delegation and assignment of all Assumed Liabilities, Encumbrances and Liens to the Purchaser and shall divest the Debtors' estates of all liability with respect to any Assumed Liabilities, Encumbrances and Liens.  Unless otherwise agreed to by the Movants, on behalf of the Debtors' estates, and the Purchaser, the Closing Date shall be March 31, 2020.  For the avoidance of doubt, the Purchaser shall be responsible for performing under the Assigned JOMR Contracts in accordance with the provisions of the applicable Assigned JOMR Contract.

13.    The sale of the Purchased Assets is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

14.    At the Closing, the Movants, on behalf of the Debtors' estates, shall be, and hereby are, authorized, empowered, and directed, pursuant to sections 105, 363(b), and 365 of the Bankruptcy Code, to transfer any such Purchased Assets to the Purchaser.  The transfer of the Purchased Assets shall vest the Purchaser with all right, title and interest of the Debtors to the Purchased Assets, in each instance, free and clear of any and all Liens (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement or except as otherwise set forth in the Agreement) with all such Liens to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now

have in or against the Purchased Assets, subject to all claims and defenses the Debtors may possess with respect thereto. Following the Closing Date, no holder of any Liens in the Purchased Assets (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) shall interfere with the Purchaser's enjoyment of the Purchased Assets based on or related to such Liens, or any actions that the Movants, on behalf of the Debtors' estates, may take in the Debtors' bankruptcy cases and no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the Transactions contemplated in or by the Agreement or this Order.

15.    The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Liens (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) shall be self-executing, and neither the Movants, on behalf of the Debtors' estates, nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order. However, the Movants, on behalf of the Debtors' estates, the Purchaser, and each of their respective officers, employees, attorneys, other retained professionals, and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Movants, on behalf of the Debtors' estates, or the Purchaser deem necessary, desirable or appropriate to implement and effectuate the terms of the Agreement and this Order, including amendments to the Agreement.

16.    On or before the Closing Date, the Debtors' creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release, effective as of the Closing, any Liens (other than the Assumed Liabilities, Encumbrances, and Liens that the

Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) of any kind against the Purchased Assets, as such Liens may have been recorded or may otherwise exist. Except as expressly provided in the Agreement, if any Person that has filed financing statements or other documents or agreements evidencing any Liens in or against the Purchased Assets (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement) shall not have delivered to the Movants, on behalf of the Debtors' estates, prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Liens that the Person has with respect to the Purchased Assets, effective as of the Closing, the Movants, on behalf of the Debtors' estates, and the Purchaser are hereby authorized to execute at the Purchaser's sole expense such statements, instruments, releases, and other documents on behalf of the Person with respect to such Purchased Assets prior to the Closing, and the Purchaser is authorized to file such documents after Closing.

17.     The Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, approval, certificate of occupancy, authorization, operating permit, registration, plan and the like of any Governmental Authority relating to the Purchased Assets or held by the Debtors' estates, and to the greatest extent available under applicable law, all such licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like of any Governmental Authority are deemed to have been, and hereby are, deemed to be transferred to the Purchaser, as of the Closing Date. Furthermore, immediately upon the Closing, the Purchaser shall be entitled to continue to sell alcoholic beverages at the premises included in the Purchased Assets upon the same terms such premises are currently selling such

9589219-7

alcoholic beverages, until such time as the Purchaser has obtained its own Liquor Licenses (as defined in the Agreement). All applicable state alcoholic beverage control, law enforcement, and regulatory agencies shall not interrupt any of the Business without first bringing the matter before this Court. Furthermore, the Business shall continue operating under all existing Liquor Licenses of the Debtors until such licenses have been changed to the name of the Purchaser, including but limited to state alcoholic beverage licenses, state food service licenses, local occupational licenses, and any other licenses need to operate the Business with no interruption to the Business.

18.     The Purchased Assets to be acquired by the Purchaser under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser. Upon the occurrence of the Closing, this Order shall be considered and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interest in the Purchased Assets under the Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets to the Purchaser.

19.     Except as otherwise provided in the Agreement, the Purchaser is not assuming nor shall it or any Affiliate of the Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the Closing Date, or any liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to the Closing Date, which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Purchaser or any affiliate of the Purchaser.

24

9589219-7

20.     Except as otherwise expressly provided in the Agreement, all Persons presently or on or after the Closing Date in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Purchaser, as applicable, on the Closing Date or at such time thereafter as the Purchaser may request.

21.     Subject to the terms of the Agreement and the occurrence of the Closing Date, the assumption by the Debtors of the Assigned JOMR Contracts, as provided for or contemplated by the Agreement, be, and hereby is, authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code.

22.     Unless otherwise provided herein, the Landlords shall be deemed to consent to the Transactions approved hereby and the Purchaser's go-forward operation of non-debtors' subject premises.

23.     The Assigned JOMR Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and assigned to the Purchaser at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to the payment of the Cure Costs by the Purchaser.

24.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest in and to each Assigned JOMR Contracts.  The Movants, on behalf of the Debtors' estates, shall reasonably cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

25.     Pursuant to sections 365(b)(l)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Order, within seven (7) days of the Closing Date, or such other date that the Assigned JOMR Contracts are assumed by JOMR and assigned to the Purchaser, the Purchaser

9589219-7

shall pay or cause to be paid to the non-debtor parties to any Assigned JOMR Contract the requisite Cure Costs agreed to between the non-Debtor party to the Assigned JOMR Contract and the Purchaser, or as to be determined by Court order, as the case may be, following the assumption and assignment thereof.   The Cure Costs are hereby fixed at the amounts set forth on the record of the Sale Hearing, as otherwise agreed between the non-Debtor party to the Assigned JOMR Contract and the Purchaser, or as determined by Court order, as the case may be, and each non-debtor party to any Assigned JOMR Contract is forever bound by such Cure Costs applicable to such Assigned JOMR Contract. For the avoidance of doubt, each counterparty to any of the Assigned JOMR Contracts shall also forever bound by the Cure Costs applicable to such Assigned JOMR Contract, except, but solely to the extent, the counterparty timely asserted an objection in accordance with the provisions of the Bidding Procedures Order.

26.     All defaults or other obligations under the Assigned JOMR Contracts arising prior to the Closing Date (without giving effect to any acceleration clauses, assignment fees, increases, advertising rates, or any other default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Costs and the counterparties to the Assigned JOMR Contracts shall be forever barred and estopped from asserting or claiming against the Debtors' estates or the Purchaser that any amounts are due or other defaults exist under such Assigned JOMR Contract as of the date of the assignment of such Assigned JOMR Contract; provided, however, but subject to the Agreement and the Bidding Procedures Order, that the Purchaser shall be responsible for the payment of any accrued but unbilled obligations with respect to any year-end adjustments or reconciliations when billed in accordance with the terms of the Assigned JOMR Contracts that become due and owing after the Closing Date (irrespective of whether such obligations accrued or relate to the period before the Closing Date).

27.     Any provision in any Assigned JOMR Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Assigned JOMR Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Costs, if any.  No sections or provisions of any Assigned JOMR Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor party to the Assigned JOMR Contract shall have any force and effect with respect to the sale transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code and no assignment of any Assigned JOMR Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Assigned JOMR Contract.  The non-debtor party to each Assigned JOMR Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the Debtors' rights and benefits under each such Assigned JOMR Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

28.     The Movants, on behalf of the Debtors' estates, and the Purchaser have satisfied all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under the Assigned JOMR Contracts.

29.     The Debtors and their estates shall have no liability for any claims accruing from and after the Closing under any of the Assigned JOMR Contracts, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

9589219-7

30.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all parties to the Assigned JOMR Contracts shall have no claims against the Purchaser relating to any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assigned JOMR Contracts existing as of the Closing Date or arising by reason of the Closing Date, except for any amounts that are Assumed Liabilities, including Cure Costs, being assumed by the Purchaser under the Agreement.

31.     In the event that the Sale does not close, none of the Assigned JOMR Contracts shall be assumed by virtue of this Order and shall remain subject to further administration in JOMR's bankruptcy case.

32.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement and this Order.  This Order and the Agreement shall be binding upon and govern the acts of all such federal, state, and local governmental agencies and departments, including any filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.

33.     To the extent permitted by section 525 of the Bankruptcy Code, no Governmental Authority may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Debtors' bankruptcy cases or the consummation of the Transactions contemplated by the Agreement.

9589219-7

34.     The Purchaser has not assumed or is otherwise not obligated for any of the Debtors

liabilities (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse

Bidder has agreed to permit under the Agreement and except as otherwise set forth in the

Agreement), and the Purchaser has not purchased any of the Debtors' assets expressly excluded

from the Purchased Assets pursuant to the Agreement (as defined in the Agreement, the "Excluded

Assets"). Consequently, all Persons, Governmental Units (as defined in sections 101(27) and

101(41) of the Bankruptcy Code) and all holders of Liens (other than the Permitted Liens) based

upon or arising out of liabilities retained by the Debtors may not take any action against the

Purchaser, or the Purchased Assets to recover any Liens or on account of any liabilities of the

Debtors (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse

Bidder has agreed to permit under the Agreement and except as otherwise set forth in the

Agreement).  All persons holding or asserting any Liens in the Excluded Assets may not assert or

prosecute such Liens or any cause of action against the Purchaser or the Purchased Assets for any

liability associated with the Excluded Assets.

35.     Except as otherwise provided by the Agreement, the Purchaser is not a "successor"

to the Debtors or their estates by reason of any theory of law or equity, and the Purchase shall not

assume, or be deemed to assume, or in any way be responsible for any liability or obligation of

any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor

liability, or similar liability (other than the Assumed Liabilities, Encumbrances, and Liens that the

Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth

in the Agreement).  Except as otherwise provided for in the Agreement, neither the transfer of the

Purchased Assets to the Purchaser, nor the fact that the Purchaser is using any of the Purchased

Assets previously owned by the Debtors, will cause the Purchaser or any of its affiliates, to be

9589219-7

deemed a successor in any respect to the Debtors' business within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

36.    Further, except as otherwise provided in the Agreement, the transfer of title and possession of the Purchased Assets shall be free and clear of any Claims pursuant to any successor or successor-in-interest liability theory, including the following: (a) any employment or labor agreements, (b) all deeds of trust and security interests, (c) any pension or medical benefit plan of the Debtors, compensation or other employee benefit plan of the Debtors, welfare, agreements, practices and programs, (d) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, Claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985 (unless otherwise provided for under such statute and any regulations promulgated thereunder), (x) state discrimination laws, (xi) state unemployment compensation laws or any other similar state laws, or (xii) any other state or federal benefits or Claims relating to any employment with the Debtors or any predecessors, (e) environmental or other Claims or Liens arising from existing conditions prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting or

contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq*., or other state or federal statute, (f) any bulk sales or similar law, (g) any Tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and (h) any and all theories of successor liability, including any theories on successor products liability grounds or otherwise.

37. Except as otherwise provided in the Agreement, pursuant to sections 105 and 363 of the Bankruptcy Code, all Persons including, but not limited to, the Debtors, all debt holders, equity security holders, the Debtors' employees or former employees, Governmental Authorities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a Lien of any kind or nature whatsoever against, in, or with respect to any of the Debtors or the Purchased Assets (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement), arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Purchased Assets to the Purchaser in accordance with the Agreement and this Order, shall be forever barred and estopped from asserting, prosecuting, or otherwise pursuing such Lien, including assertion of any right of setoff or subrogation, and enforcement, attachment, or collection of any judgment, award, decree, or order, against the Purchaser or any of their affiliates, successors or assigns thereof and each of their respective current and former members, officers, directors, attorneys, employees, partners, affiliates, financial advisors, and representatives (each of the foregoing in its individual capacity), with respect to the Purchased Assets.

38.     Without limiting the generality of the foregoing, except as otherwise provided in the Agreement, the Purchaser shall not assume or be obligated to pay, perform or otherwise discharge any workers' compensation debts, obligations, and liabilities of the Debtors arising pursuant to state law or otherwise, and this Order is intended to be all inclusive and shall encompass, but not be limited to, workers' compensation Claims or suits of any type, whether now known or unknown, whenever incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination, or other incidents, acts, or injuries prior to the Closing Date, including, but not limited to, any and all workers' compensation Claims filed or to be filed, or any reopening of such Claims, by or on behalf of any of the Business' current or former employees, persons on laid-off, inactive or retired status, or their respective dependents, heirs or assigns, as well as any and all premiums, assessments, or other obligations of any nature whatsoever of the Business relating in any way to workers' compensation liability, except as otherwise specifically set forth in the Agreement.

39.     Subject to the terms of the Agreement, the Agreement and any related agreements and/or instruments may be waived, modified, amended, or supplemented by agreement of the Movants, on behalf of the Debtors' estates, and the Purchaser, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not materially adverse to the Debtors' estates and substantially conforms to, and effectuates, the Agreement and any related agreements and/or instruments and this Order.

40.     The failure specifically to include any particular provisions of the Agreement or any related agreements or instruments in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court, the Movants, on behalf of the Debtors' estates, and the Purchaser that the Agreement and any related agreements and instruments are authorized

9589219-7

and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing, and each such provision of the Agreement shall be enforceable by or against each of the Parties thereto.

41.     Upon the commencement of the Chapter 7 bankruptcy cases by the Chapter 7 Debtors, the Trustee, not in his individual capacity but solely in his capacity as the Trustee of the estates of the Chapter 7 Debtors, shall be deemed admitted as a member of each of the Palm OpCos established as a Limited Liability Company (such entities, collectively, the "Palm Opco LLCs"). To the extent that the commencement of the Chapter 7 cases by the Chapter 7 Debtors caused any Palm Opco LLCs to dissolve under applicable non-bankruptcy law, such dissolution is hereby revoked as if it never occurred, and the Trustee, not in his individual capacity but solely in his capacity as the Trustee of the estates of the Chapter 7 Debtors and on behalf of the Chapter 7 Debtors, shall be deemed a member of the Palm Opco LLCs with the power and authority to transfer the subject assets to the Purchaser.

42.     The Sale approved hereby, and the Purchaser's acquisition of the assets described herein and in the Agreement, shall not constitute a change of control as such term is used, understood or implied in any affiliated agreement, contract, lease or similar instrument entered into by a non-debtor subsidiary of the Company and a third party relating to restaurants operated by the Palm Opcos.

43.     Nothing contained in this Order shall affect or impair the claims, rights, and powers of the United States of America; provided, however, that, except as otherwise provided in the Agreement, any such claims, rights or powers of the United States of America shall not be construed in any way as Assumed Liabilities under this Order or the Agreement.

9589219-7

44.     No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the Transactions contemplated by the Agreement.

45.     This Order and the Agreement shall be binding upon, enforceable against, and govern the acts of all Persons including, without limitation, the Movants, the Debtors and their estates, and the Purchaser, their respective successors, and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Chapter 11 Debtors' estates, any committee subsequently appointed in the cases of the Chapter 11 Debtors or any trustee appointed in a chapter 7 case if the cases of the Chapter 11 Debtors are converted from chapter 11 to a case under chapter 7 of the Bankruptcy Code, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.

46.     The Movants, on behalf of the Debtors' estates, on the one hand, and the Purchaser, on the other hand, hereby release each other from any and all claims except for such claims that are set forth in or arise from the Agreement and this Order.

47.     Nothing in any order of this Court or contained in any plan of reorganization or liquidation that may be confirmed in the cases of the Chapter 11 Debtors, or in any subsequent or converted cases of the Chapter 11 Debtors to cases under chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

48.     Notwithstanding Bankruptcy Rules 6004, 6006, and 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any Person obtaining a stay pending appeal, the Movants, on behalf of the Debtors'

9589219-7

estates, and the Purchaser are free to close under the Agreement at any time, subject to the terms

of the Agreement.  In the absence of any Person obtaining a stay pending appeal, if the Movants,

on behalf of the Debtors' estates, and the Purchaser close under the Agreement, the Movants, the

Sellers and the Purchase shall be deemed to be acting in "good faith" and the Purchaser shall be

entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the

Transactions under and pursuant to the Agreement if this Order or any authorization contained

herein is reversed or modified on appeal.

49.     The automatic stay provisions of section 362 of the Bankruptcy Code are vacated

and modified to the extent necessary to implement the terms and conditions of the Agreement and

the provisions of this Order.

50.     The provisions of this Order shall be binding on and inure to the benefit of all

successors and assignees of the Movants, the Sellers and the Purchaser.

51.     The Movants are authorized to enforce their rights under any confidentiality

agreements they entered into with other potential bidders with respect to the Purchased Assets for

the benefit of the Purchaser for the term of each respective confidentiality agreement.

52.     The Movants are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Sale Motion.

53.     In the event there is any inconsistency between the Sale Motion or this Order, this

Order shall govern.

54.     This Court shall retain exclusive jurisdiction to enforce the terms and provisions of

this Order, the Bidding Procedures Order, and the Agreement in all respects and to decide any

disputes concerning this Order, the Agreement, or the rights and duties of the parties hereunder or

thereunder or any issues relating to the Agreement and this Order including, but not limited to, the

interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Assigned Contracts, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of all Liens (other than the Assumed Liabilities, Encumbrances, and Liens that the Stalking Horse Bidder has agreed to permit under the Agreement and except as otherwise set forth in the Agreement).

*(Christopher Andrew Jarvinen, Esq. is directed to serve a copy of this order on interested parties who are non-CM/ECF users and to file a proof of service within three days of entry of the order.)*

9589219-7

## **EXHIBIT G**

Escrow Agreement

_____, 2020

Name
Address

Re:   Escrow Agreement

Gentlemen:

The undersigned appoint you as escrow agent ("Escrow Agent" or "you") under the following terms and conditions:

1.      Escrow Agent shall receive from _____, a _____ ("Purchaser"), pursuant to the terms of that certain Purchase Agreement dated _____, 2020 (the "Purchase Agreement") among Purchaser, on the one hand, and (i) Just One More Restaurant Corp., a New York corporation and a debtor-in-possession under chapter 11 of the United States Bankruptcy Code ("JOMR"), and (ii) Robert E. Tardif, Jr., in his capacity as Trustee appointed in the chapter 7 bankruptcy cases of Bruce E. Bozzi, Sr. ("Bozzi") and Walter J. Ganzi, Jr. ("Ganzi") under chapter 7 of the United States Bankruptcy Code, and not individually (the "Trustee", and together with JOMR and PMC, each a "Seller" and collectively "Sellers"), on the other hand, and hold in escrow and disburse pursuant to the terms of the Purchase Agreement and this agreement (the "Escrow Agreement") or as otherwise set forth in an Order of the Bankruptcy Court entered in the Bankruptcy Case, the amount of $_____ (the "Deposit" or the "Escrow Funds"). Purchaser shall deliver the Deposit to Escrow Agent by cashier's check or wire transfer of funds to the account set forth on Exhibit "A" attached hereto.

2.      (a)      Escrow Agent shall hold the Escrow Funds and shall not deliver or disperse the Escrow Funds, other than:

(i)      pursuant to written instructions executed by Sellers alone that are delivered to both Purchaser and Escrow Agent in the event (A) if there is no Auction or if Purchaser is designated as the Successful Bidder (as defined in the Bidding Procedures) at the Auction and, in each instance, Purchaser fails to close on the purchase of Sellers' assets, and the terms of the Purchase Agreement permit Sellers to retain any deposit made by Purchaser as a result of such failure to close; or (B) Purchaser is designated as the Backup Bidder at the Auction, the prevailing highest bid fails to close on the purchase of Sellers' assets, Purchaser fails to close on the

purchase of Sellers' assets, and the terms of the Purchase Agreement permit Seller to retain any deposit made by Purchaser as a result of such failure to close; provided, however, that Escrow Agent shall not make any disbursement with respect to such request until the expiration of five (5) Business Days after Escrow Agent's receipt of such written instructions;

(ii)    upon receipt of, and in accordance with, a Joint Written Direction. Such Joint Written Direction shall contain complete payment instructions, including funds transfer instructions or an address to which a check or wire shall be sent;

(iii)    pursuant to a final Order of the Bankruptcy Court;

(iv)    by delivering the Escrow Funds into the Bankruptcy Court pursuant to the provisions of Section 4;

(v)    by delivering the Escrow Funds to a successor escrow agent pursuant to this Escrow Agreement; or

(vi)    pursuant to written instructions by Purchaser, if Purchaser is not designated by Sellers as the Successful Bidder or the Backup Bidder at the Auction, to disburse the Deposit to Purchaser at the account designated on Exhibit A attached hereto.

3.    (a)    In the event a written objection by Purchaser to disbursement of the Escrow Funds is received by Escrow Agent within four (4) Business Days after Escrow Agent's receipt of Sellers' instructions pursuant to Section 2(a)(i), Escrow Agent will pay the Escrow Funds into the Bankruptcy Court pursuant to the provisions of Section 4.

(b)    Upon Escrow Agent's receipt of written instructions given to Escrow Agent pursuant to Section 2(a)(i) (other than in the case of Escrow Agent's receipt of a written objection from Purchaser that is governed by Section 3(a) above), Section 2(a)(ii), or Section 2(a)(vi), or upon the entry of a final Order of the Bankruptcy Court pursuant to Section 2(a)(iii), Escrow Agent shall deliver the Escrow Funds in accordance with such instructions or Order, as applicable, and Escrow Agent shall not be subject to any liability to any party for doing so, except for Escrow Agent's own willful misconduct or gross negligence.  Purchaser and Sellers each agree not to assert any claim against Escrow Agent for making a disbursement or payment in accordance with this Section 3(b), except to the extent such claim arises out of Escrow Agent's willful misconduct or gross negligence.

(c)    For purposes of this Escrow Agreement, "Joint Written Direction" shall mean a written direction identified as a "Joint Written Direction" and indicating that is being delivered pursuant to Section 2(a)(ii) of this Escrow Agreement, that is executed by both Purchaser and Sellers and delivered to Escrow Agent that directs you as to the disposition of the Escrow Funds then held by you pursuant to this Escrow Agreement.

4.      In the event of a dispute between the Purchaser and Sellers as to the proper disposition of all or a portion of the Escrow Funds, or if the Escrow Agent is uncertain as to the proper disposition of the Escrow Funds, Escrow Agent shall (i) deliver the Escrow Funds in accordance with a Joint Written Direction (including, for this purpose, an instruction to Escrow Agent to retain the Escrow Funds) or a final Order of the Bankruptcy Court, or (ii) in the absence of a Joint Written Direction or final Order, deliver the Escrow Funds into the Bankruptcy Court, and upon the taking of such action, Escrow Agent shall be relieved of all further responsibility. Escrow Agent shall give prompt written notice to Purchaser and Sellers of the action taken by Escrow Agent pursuant to this Section 4.

5.      Investment of the Escrow Funds and taxation of any earnings with respect to the Escrow Funds shall be as follows:

(a)      Upon Escrow Agent's receipt of the tax information required by this Section 5, Escrow Agent shall, within five (5) Business Days of the later of the date of this Escrow Agreement and Escrow Agent's receipt of the tax information required by this Section 5, invest the Escrow Funds in an interest bearing account or accounts customarily maintained by Escrow Agent with any bank or trust company with an office in Fort Lauderdale or Miami, Florida.  Until Escrow Agent's receipt of the income tax information required pursuant to Section 5(b), the Escrow Funds shall be held in a non-interest bearing account. Purchaser shall be entitled to the interest earned on the Escrow Funds.

(b)      The Escrow Agent will not have any interest in the Escrow Funds but is serving as escrow holder only and has only possession thereof.  Sellers and Purchaser agree that, for purposes of federal and other taxes based on income, Purchaser will be treated as the owner of the Escrow Funds.  Upon execution of this Escrow Agreement, Purchaser shall provide Escrow Agent with Purchaser's taxpayer identification number and the appropriate forms for or with respect to the reporting of such income for tax purposes together with any "know your customer" documentation requested by the Escrow Agent.

6.      The undersigned severally represent and warrant to you that the execution, delivery and performance of this Escrow Agreement has been duly authorized, and does not violate or conflict with any statute, regulation, order, judgment, or writ that is binding upon the representing party or its assets.

7.      To induce you to act as escrow agent hereunder, the undersigned agree as follows:

(a)      You shall not in any way be bound or affected by any notice of modification or cancellation of this Escrow Agreement unless in writing and signed by the parties hereto, nor shall you be bound by any modification hereof unless the same shall be satisfactory to you.  You shall be entitled to rely upon any judgment, order, notice, certification, demand or other writing delivered to you hereunder by any party hereto, and to rely upon and comply with any order, writ, judgment or decree which you determine is binding upon you or relates to the Escrow Funds, without being required to determine the authenticity or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgment or order.

(b)    You shall not be under any duty to give the property held by you hereunder any greater degree of care than you give your own similar property.  Your duties with respect to the Escrow Funds shall be fully performed by delivering such funds, in the manner provided for notices below (other than by fax) or pursuant to wire instructions furnished by the party entitled thereto, to the party entitled thereto.

(c)    You may act in reliance upon any signature (whether original or facsimile) believed by you to be genuine, and may assume that any person purporting to give any notice, instructions or receipt, or make any statements in connection with the provisions hereof, has been duly authorized to do so.

(d)    You may act relative hereto in reliance upon advice of counsel in reference to any matter connected herewith, and shall not be liable for any mistake of fact or error of judgment, or for any acts or omissions of any kind, unless caused by your willful misconduct or gross negligence.

(e)    You may resign and be discharged of your duties as escrow agent hereunder by giving twenty (20) days' written notice to the parties hereto.  Upon receipt of such notice, the parties shall attempt to designate a successor escrow agent satisfactory to them by delivery of a joint signed notice of such designation to you.  Your resignation shall take effect twenty (20) days after the giving of your notice of resignation, or upon receipt by you of an instrument of acceptance executed by a successor escrow agent and upon delivery by you to such successor of the Escrow Funds then held by you.  However, if such a successor escrow agent has not been designated as aforesaid by the end of such 20-day period, then you shall act in accordance with Section 4, above.

(f)    Purchaser and Sellers hereby agree to jointly and severally indemnify and hold harmless you, and each of your partners, employees, attorneys, and agents from and against any and all fines, penalties, losses, claims, liabilities, costs and expenses, including the fees and expenses of counsel, arising out of or related to this Escrow Agreement, including in connection with the performance of your duties hereunder, except in case of your own gross negligence or willful misconduct.  Purchaser and Sellers shall bear equally and pay directly to you, any reasonable and documented charges and expenses, as escrow agent, in administering the Escrow Funds.  Escrow Agent shall not charge a separate fee for acting as escrow agent under this Escrow Agreement.

(g)    Your duties and obligations shall be determined solely by the express provisions of this Escrow Agreement and those of the Purchase Agreement applicable to the Escrow Funds, and you shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Nothing contained herein shall be deemed to obligate you to deliver any funds, instrument, documents, or any other property referred to herein unless the same shall have first been received by you pursuant to this Escrow Agreement.

8.      Any notice, direction, request, or instruction to be given hereunder by any party to another shall be in writing, shall be delivered personally or sent by overnight courier service, next business day delivery guaranteed, or by certified mail, return receipt requested, or by email in each case with all postage and fees paid by the party sending the same, to the respective party or parties at the respective addresses and email addresses set forth under their names below, and shall be deemed to have been given when received.  Any party may change its address by written notice to each of the other parties.

9.      Subject to Section 7 of this Escrow Agreement, the parties acknowledge and agree that Escrow Agent serves as counsel to the Sellers, and may continue to do so in connection with the Purchase Agreement, the pending bankruptcy proceedings of JOMR, Ganzi and Bozzi, this Escrow Agreement, and any dispute arising in connection herewith or therewith (including but not limited to any interpleader or other proceeding relating to the Escrow Funds).  Nothing contained herein or any performance by you or any party hereunder shall impair or affect your ability and full right and authority to represent the Sellers or any of them in connection with any matter (including, without limitation, in connection with the Purchase Agreement or any interpleader action instituted by you arising from this Escrow Agreement), whether or not related to the subject matter hereof, nor shall your agreement to act as escrow agent hereunder create any impropriety or conflict of interest (or any appearance thereof) in connection with your representation of the Sellers in any matter.

10.     This Escrow Agreement may be signed in counterparts, all of which, taken together, shall be deemed one and the same agreement.  This Escrow Agreement may be delivered by electronic transmission with the same effect as delivery of an originally signed document.

11.     This Escrow Agreement shall be construed in accordance with and governed by the laws of the State of Florida, exclusive of its choice of law principles, and shall be binding upon and inure to the benefit of the parties hereto and the escrow agents and their respective successors and assigns.  Venue for any proceedings arising hereunder shall be in the Bankruptcy Court. Capitalized terms used in this Escrow Agreement and not otherwise defined in it shall have the meanings provided in the Purchase Agreement.


Please signify your agreement to the foregoing by signing and returning a copy of this agreement to all parties hereto.

PURCHASER:
[NAME]


By:_____
      Name:
      Title:

Address for Notices:
Email:

9586842-10

SELLERS:

JUST ONE MORE RESTAURANT CORP.

By: _____
    Gerard A. McHale
    Chief Restructuring Officer

Address for Notices:

Email:

_____
ROBERT E. TARDIF, JR.,
in his capacity as Trustee appointed in the
Bankruptcy Cases of Bruce E. Bozzi, Sr. and
Walter J. Ganzi, Jr. under chapter 7 of the U.S.
Bankruptcy Code

Address for Notices:

Email:

9586842-10

Agreed to by:

_____
Escrow Agent


By:_____

Address for Notices:



Email:

EXHIBIT "A"

**Wire instructions for**
**_____ Trust Account**

Bank Name:
Bank Address:
Bank Routing/ABA #:
Account Name:
Beneficiary Account #:
Reference #:

**EXHIBIT H-1**

Form of Assignment of Limited Liability Company Interests

**ASSIGNMENT OF LIMITED LIABILITY COMPANY INTERESTS**

THIS ASSIGNMENT OF LIMITED LIABILITY COMPANY INTERESTS ("<u>Assignment</u>") is made as of the _____ day of _____, 2020 (the "Effective Date"), by _____ ("<u>Assignor</u>"), to and in favor of _____ ("<u>Assignee</u>").

W I T N E S S E T H:

FOR VALUE RECEIVED, the sufficiency of which is hereby acknowledged, as of the Effective Date, Assignor hereby unconditionally grants, bargains, sells, transfers, assigns and confirms unto Assignee, 100% of the issued and outstanding limited liability company interests of _____, a _____ limited liability company (the "<u>Company</u>"), being all of the limited liability company interests of the Company owned and held by Assignor, including, without limitation, the corresponding rights, power, benefits, and privileges relating thereto or arising therefrom, and the obligations thereunder, pursuant to the [certificate of organization] and [the Limited Liability Company Agreement of the Company] dated _____ (as amended, the "<u>LLC Agreement</u>") relating to such limited liability company interests (collectively, the "<u>Assigned Property</u>").

This Assignment is delivered by Assignor and Assignee pursuant to that certain Purchase Agreement dated as of _____, 2020 entered into by, among others Assignor and Assignee (the "<u>Purchase Agreement</u>"), and pursuant to §363 of the Bankruptcy Code, and in accordance with that certain Order Approving the Sale of Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases entered on _____, Dkt. ____, in *In re:_____,* Case No. _____, in the United States Bankruptcy Court for the Middle District of Florida, Fort Myers Division.

By its execution hereof, (A) Assignee hereby (i) accepts the assignment of the Assigned Property as of the Effective Date, (ii) agrees to be bound by all the terms and conditions of the LLC Agreement of the Company as if Assignee were an original signatory thereto, and (iii) is admitted as the sole member of the Company, and (B) Assignor ceases to be a member of, or hold any interest in, the Company, and (ii) resigns as manager, officer, and any other capacity in the Company. Assignor and Assignee agree that the Company shall continue without dissolution.

The parties agrees that, to the extent this Assignment and the LLC Agreement conflict, the LLC Agreement shall be amended hereby.

This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This Assignment shall be construed in accordance with the laws of the State of Florida, exclusive of its choice of law principles. This Assignment may be delivered by electronic transmission with the same effect as delivery of an original.

9586842-10

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the date first set forth above.

ASSIGNOR:

ASSIGNEE:

## **EXHIBIT H-2**

### Form of Lost Certificate Affidavit

### LOST CERTIFICATE AFFIDAVIT

[Date]

The undersigned, [_____] (the "Affiant"), deposes and says:

**ARTICLE 1** 1.    That _____ ("Owner") is the owner of [____] [shares of stock][membership interests] in _____, which was represented by certificate [____] (the "Certificate").

**ARTICLE 2** 2.    That, upon information and belief, the Certificate has been lost, stolen or destroyed or cannot otherwise be located.

**ARTICLE 3** 3.    That if the Affiant should find or recover the Certificate, Affiant will immediately surrender the Certificate to [_____] or its designee for cancellation without requiring any consideration for such surrender.

[_____]

By: _____

Name:

Title:

## <u>EXHIBIT I</u>

<u>Form of JOMR IP Assignment</u>

**ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS**

THIS ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS ("<u>Assignment</u>") is made this _____ day of _____, 2020 by JUST ONE MORE RESTAURANT CORP., a New York corporation and a debtor and debtor in possession pursuant to 11 U.S.C. §§ 1107 ("<u>Assignor</u>"), to _____, a _____ ("<u>Assignee</u>").

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, Assignor hereby sells, assigns, sets over, delivers, and transfers to Assignee all of Assignor's right, title and interest in and to the JOMR IP (as defined in the Purchase Agreement (as defined below)), including the Intellectual Property described on <u>Exhibit "A"</u> attached hereto and made a part hereof (all of the foregoing being collectively referred to as the "<u>Assigned Intellectual Property</u>") together with all goodwill therein, causes of action relating thereto, and the right to profits or damages due or accrued, arising out of or in connection with, any and all past, present or future infringements of the JOMR IP in the United States or any other country or countries; the same to be held and enjoyed by Assignee for its own use and enjoyment, and for the use and enjoyment of its successors and assigns or other legal representatives, at common law and/or to the end of the term or terms for which registration of the Assigned Intellectual Property may be granted or renewed, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made.

The Assigned Intellectual Property is being conveyed pursuant to that certain Purchase Agreement dated _____, 2020 between, among others, Assignor and Assignee (as amended, the "<u>Purchase Agreement</u>"), and the [Order (A) Authorizing Sale of Debtors' Contract Services Assets Pursuant to 11 U.S.C. §363 Free and Clear of Liens, Claims, and Encumbrances and (B) Approving Assumption and Assignment of Assumed Contracts] entered on _____, Dkt. _____, in *In re: Just One More Restaurant Corp.,* Case No. 9:19-bk-1947-FMD, in the United States Bankruptcy Court for the Middle District of Florida, Fort Myers Division. Unless otherwise defined in this Assignment, all capitalized terms used herein shall have the meanings provided in the Purchase Agreement.

Assignor shall, without further consideration, comply with any reasonable request by Assignee to execute and deliver promptly any additional documents as may be necessary in order to give effect to the assignment reflected herein.  Such additional documents shall be effective as of the date hereof, if applicable, and may include, without limitation, additional assignment documents required by the Commissioner of Patents and Trademarks of the United States, the United States Copyright Office, or any other Governmental Authority; agreed amendments to <u>Exhibit "A"</u> to correct any inaccuracies or misstatements therein; any other documents necessary to further clarify or confirm the assignment and conveyance of the JOMR IP; and any and all affidavits, declarations, oaths, samples, exhibits, specimens, and other documentation as may be reasonably required in connection with: (a) preparation and prosecution of any Intellectual Property Registrations of any of the JOMR IP; (b) prosecution or defense of any cancellation,

opposition, infringement, or other proceedings that may arise in connection with any of the JOMR IP, including without limitation, testifying as to any facts relating to the JOMR IP and this Agreement; and (c) obtaining any additional protection for the JOMR IP that Assignee reasonably may deem appropriate that may be secured under the laws now or hereafter in effect in the United States, in each case at Assignee's cost and expense.

This Assignment shall be governed by the laws of the State of Florida, exclusive of its choice of law principles.  This Assignment may be signed in counterparts, all of which, taken together, shall be deemed one and the same Assignment.  This Assignment may be delivered by electronic transmission with the same effect as delivery of an original.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, Assignor has executed and delivered this Assignment of Intellectual Property Rights as of the date and year first above written.

JUST ONE MORE RESTAURANT CORP.


By: _____
     Gerard A. McHale
     Chief Restructuring Officer



STATE OF                 )
                              ) SS:
COUNTY OF             )

The foregoing instrument was acknowledged before me by means of physical presence this _____ day of _____, 2020, by Gerard A. McHale, as Chief Restructuring Officer of Just One More Restaurant Corp., a New York corporation and a debtor and debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108, on behalf of said corporation.  He is personally known to me or produced _____ as identification.



_____
Notary Public
Name:
My Commission Expires:

## <u>EXHIBIT J</u>

<u>Form of JOMR Assignment and Assumption Agreement</u>

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT ("<u>Agreement</u>") is made this \_\_\_\_ day of _____, 2020 by and between JUST ONE MORE RESTAURANT CORP., a New York corporation and a debtor and debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108 ("<u>Assignor</u>"), and _____, a _____ ("<u>Assignee</u>").

<u>Preliminary Statement</u>

Assignor and Assignee, among others, entered into a Purchase Agreement dated as of _____, 2020 (the "<u>Purchase Agreement</u>"). Capitalized terms used in this Agreement and not otherwise defined in it shall have the meanings set forth in the Purchase Agreement.

Pursuant to the Purchase Agreement and the Sale Order (as hereinafter defined), and subject to the terms and conditions thereof, Assignor has agreed to assign to Assignee all of Assignor's right, title and interest in and to certain of its assets used in connection with the Business, excluding, however, the Excluded Assets, and Assignee has agreed to assume certain liabilities of Assignor relating to the Acquired Assets.

NOW, THEREFORE, in consideration of the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1. The Preliminary Statement set forth above is true and correct and is incorporated into and made a part of this Agreement.

2. Effective on the date hereof, Assignor hereby unconditionally sells, assigns, conveys, transfers, delivers, and sets over unto Assignee all of Assignor's right, title and interest in and to the Assigned JOMR Contracts (the "<u>Assignment</u>").

3. Assignee hereby accepts the Assignment and assumes the payment and performance of the obligations and liabilities of Assignor comprising the Assumed Liabilities to be observed, performed, paid, or discharged from and after the Closing Date.

4. This Agreement is delivered by Assignor and Assignee pursuant to the Purchase Agreement, and pursuant to §365 of the Bankruptcy Code, and in accordance with that certain [Order Approving the Sale of Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases] entered on _____, Dkt. \_\_\_\_, in *In re: Just One More Restaurant Corp.,* Case No. 9:19-bk-1947-FMD, in the United States Bankruptcy Court for the Middle District of Florida, Fort Myers Division (the "<u>Sale Order</u>").

5.      This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns.

6.      This Agreement shall be governed by the laws of the State of Florida, exclusive of its choice of law principles.  This Agreement may be signed in counterparts, all of which, taken together, shall be deemed one and the same Agreement.  This Agreement may be delivered by electronic transmission with the same effect as delivery of an original.

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment and Assumption Agreement the date first set forth above.

ASSIGNOR:

JUST ONE MORE RESTAURANT CORP.

By: _____
    Gerald A. McHale
    Chief Restructuring Officer

ASSIGNEE:

[NAME]

By: _____
Name:
Title:

## <u>EXHIBIT K</u>

<u>Sellers' Closing Certificate</u>

## **CERTIFICATE OF SELLERS**

      The undersigned, in their respective capacities as (i) the Chief Restructuring Officer of Just One More Restaurant Corp., a New York corporation and a debtor and debtor in possession ("<u>JOMR</u>"), and (ii) Robert E. Tardif, Jr., in his capacity as the Trustee appointed in the chapter 7 bankruptcy cases of Bruce E. Bozzi, Sr. and Walter J. Ganzi, Jr. under chapter 7 of the United States Bankruptcy Code (the "<u>Trustee</u>"), and not in any individual capacity, hereby certify that they are authorized to execute and deliver this Certificate on behalf of Sellers (as defined below), and that:

      1.      This Certificate is being delivered pursuant to the Purchase Agreement dated as _____, 2020 (the "<u>Purchase Agreement</u>") among _____, a _____ ("<u>Purchaser</u>"), and JOMR and the Trustee (collectively, "<u>Sellers</u>").

      2.      The representations and warranties of Sellers contained in the Purchase Agreement are true and correct at and as of the date hereof, as if made at and as of the date hereof (except to the extent that such representations and warranties speak as of an earlier date, in which case they continue to be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be likely to have a Material Adverse Effect.

      3.      Sellers have performed in all material respects all of their respective obligations, covenants and agreements under the Purchase Agreement required to be performed by Sellers or complied with by Sellers at or prior to the date hereof.

      4.      Sellers have delivered all of the items required to be delivered by Sellers under Section 2.10 of the Purchase Agreement.

      5.      To the actual knowledge of the undersigned, no Material Adverse Effect has occurred and is continuing with respect to the Purchased Assets from the date of the Purchase Agreement to the date hereof.

      The certifications set forth herein shall not survive the Closing of the Transactions contemplated by the Purchase Agreement.

      Capitalized terms used in this Certificate and not otherwise defined in it shall have the meanings set forth in the Purchase Agreement. This Certificate may be delivered by electronic transmission with the same effect as delivery of an original.

IN WITNESS WHEREOF, the undersigned have executed this Certificate in the names and on behalf of Sellers as of the _____ day of _____, 2020.

SELLERS:

JUST ONE MORE RESTAURANT CORP.

By: _____
    Gerard A. McHale
    Chief Restructuring Officer

_____
ROBERT E. TARDIF, JR.,
in his capacity as Trustee appointed in the
Bankruptcy Cases of Bruce E. Bozzi, Sr. and
Walter J. Ganzi, Jr. under chapter 7 of the U.S.
Bankruptcy Code

## EXHIBIT L

Purchaser's Closing Certificate

## CERTIFICATE OF PURCHASER

The undersigned, as _____ of _____, a _____ ("Purchaser"), hereby certifies that he is authorized to execute and deliver this Certificate in the name of and on behalf of Purchaser, and that:

1.      This Certificate is being delivered pursuant to the Purchase Agreement dated as of _____, 2020 (the "Purchase Agreement") among _____, as Purchaser, and (i) Just One More Restaurant Corp., a New York corporation and a debtor-in-possession under chapter 11 of the United States Bankruptcy Code, and (ii) Robert E. Tardif, Jr., in his capacity as Trustee appointed in the chapter 7 bankruptcy cases of Bruce E. Bozzi, Sr. and Walter J. Ganzi, Jr. under chapter 7 of the United States Bankruptcy Code, and not individually (collectively "Sellers").

2.      The representations and warranties of Purchaser contained in the Purchase Agreement are true and correct in all material respects at and as of the date hereof, as if made at and as of the date hereof (except to the extent that such representations and warranties speak as of an earlier date, in which case they continue to be true and correct in all material respects as of such earlier date).

3.      Purchaser has performed in all material respects all of its obligations under the Purchase Agreement required to be performed by Purchaser at or prior to the date hereof.

4.      Purchaser has delivered all of the items required to be delivered by Purchaser under Section 2.11 of the Purchase Agreement.

Capitalized terms used in this Certificate and not otherwise defined in it shall have the meanings set forth in the Purchase Agreement.  This Certificate may be delivered by electronic transmission with the same effect as delivery of an original.

IN WITNESS WHEREOF**,** the undersigned has executed this Certificate in the name and on behalf of Purchaser as of the _____ day of _____, 2020.

[NAME]


By:_____
Name:
Title:

# **EXHIBIT M**

<u>Bidding Procedures</u>

(See attached)

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

JUST ONE MORE RESTAURANT CORP.,             Case No. 9:19-bk-1947
and JUST ONE MORE HOLDING CORP.,[1]          (Jointly Administered with
                                             Case No. 9:19-bk-1948)
      Debtors.                          Chapter 11 Cases

_____/


In re:

BRUCE E. BOZZI, SR.,                         Case No. 9:19-bk-09677-FMD
                                             Chapter 7
      Debtor.

_____/


In re:

WALTER J. GANZI, JR.,                        Case No. 9:19-bk-09680-FMD
                                             Chapter 7
      Debtor.

_____/


## BIDDING PROCEDURES[2]

      On March 7, 2019 (the "Chapter 11 Petition Date"), each of Just One More Restaurant Corp. ("JOMR") and Just One More Holding Corp. ("JOMH" and together with JOMR, collectively, the "Chapter 11 Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court").  On October 11, 2019 (the "Chapter 7 Petition Date", and together with the Chapter 11 Petition Date, collectively, the "Petition Dates"), each of Bruce E. Bozzi, Sr. ("Bozzi") and Walter J. Ganzi, Jr.

---

[1]    The last four digits of each Chapter 11 Debtor's federal tax identification number are Just One More Restaurant Corp. (5070) and Just One More Holding Corp. (6081).  The address of the Chapter 11 Debtors is 8955 Fontana Del Sol Way, 2nd Floor, Naples, FL 34109.

[2]    Any capitalized term not explicitly defined herein shall have the meaning ascribed to it in, as applicable, the Bidding Procedures Motion or the Bidding Procedures Order (as each is defined herein).

("Ganzi" and together with Bozzi, collectively, the "Chapter 7 Debtors") (together, the Chapter 11 Debtors and the Chapter 7 Debtors, collectively, the "Debtors") filed voluntary petitions for relief under chapter 7 of the Bankruptcy Code in the Bankruptcy Court.

On February 20, 2020, the *Joint Motion for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling a Hearing to Consider the Transaction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Procedures, and (VI) Granting Related Relief* (Doc. ___) (the "Bidding Procedures Motion") was filed by the Chapter 11 Debtors through Gerard A. McHale, Jr., not in his individual capacity but solely in his capacity as their Chief Restructuring Officer ("CRO"), and Robert E. Tardif, Jr., not in his individual capacity but solely in his capacity as the trustee (the "Trustee" and together with the CRO, collectively, the "Movants") appointed in the chapter 7 bankruptcy cases of each of the Chapter 7 Debtors on behalf of each of the business entities listed on Exhibit "A" attached to the Motion (collectively, the "Palm OpCos" and together with the Chapter 11 Debtors, collectively, the "Company") by the authority granted to the Movants by the Bankruptcy Code and the Palm OpCos Authorization Orders.

The Bidding Procedures Motion sought approval of, among other things, the procedures though which the Movants, in the exercise of the Debtors' business judgment, will determine the highest or otherwise best price for the sale of some, substantially all, or all of the Debtors' interests in the Company's assets (collectively, the "Purchased Assets") described in that certain Purchase Agreement (the "Agreement") by and among Golden Nugget, LLC, as purchaser (together with its permitted successors, assigns and designees, the "Stalking Horse Bidder") and the Movants, on behalf of the Debtors' estates, as sellers, a copy of which is attached as Exhibit "C" to the Sale Motion.

On February ___, 2020, the Bankruptcy Court entered an order approving the Bidding Procedures Motion (Doc. ___) (the "Bidding Procedures Order" and the procedures set forth herein, the "Bidding Procedures"), which, among other things, authorized the Movants to determine the highest or otherwise best price for the Purchased Assets through the process and procedures set forth in these Bidding Procedures.

Unless expressly indicated, the following Bidding Procedures apply to all bidders regardless of the phase of the Auction in which the bidder intends to participate.

## **Access to Diligence Materials**.

To participate in the bidding process and to receive access to due diligence information, including access to the electronic data room being maintained by Raymond James & Associates, Inc. ("Raymond James"), the investment banker retained by the Chapter 11 Debtors and the Trustee on behalf of the Chapter 11 Debtors and the Palm OpCos, and to additional non-public information regarding the Company and the Debtors (collectively, the "Diligence Materials"), a party must deliver to the Movants an executed confidentiality agreement in the form and substance satisfactory in the sole discretion of the Movants (the "Confidentiality Agreement") and evidence demonstrating a party's financial capability to close a transaction involving some, substantially

all, or all of the Purchased Assets (a "Alternative Transaction"), as determined by the Movants, in consultation with DIP Lender (the "Consultation Party").[3]

A party who qualifies for access to Diligence Materials (each, a "Preliminary Interested Investor") may proceed to conduct due diligence and ultimately submit a Bid as defined in the Bidding Procedures.  Only Preliminary Interested Investors may submit Bids.

All due diligence requests must be directed to Raymond James.  To the extent reasonably practicable, Raymond James will also facilitate meetings between any interested Preliminary Interested Investor and the Company's management team, which meetings will proceed in a manner determined by the Movants, in their sole discretion.

The due diligence period will end on the Bid Deadline, as defined below, and, subsequent to the Bid Deadline, the Movants and their representatives, including but not limited to the Debtors' Advisors, will have no obligation to furnish any due diligence information to any party.  For the avoidance of doubt, no due diligence will continue after the Bid Deadline.

Neither the Movants nor any of their respective representatives, including the Debtors' Advisors, will be obligated to furnish any information relating to the Purchased Assets other than to Preliminary Interested Investors.  The Movants and the Debtors' Advisors make no representations or warranty as to the information to be provided through this due diligence process or otherwise, accept to the extent set forth in the Agreement or in any other definitive agreement a Successful Bidder executed and delivered to the Movants.

The Movants and the Debtors' Advisors will coordinate all reasonable requests from Preliminary Interested Investors for additional information and due diligence access; provided that the Movants may decline to provide such information to Preliminary Interested Investors who, at such time and in the Movants' exercise of the Debtors' business judgment, have not established, or who have raised doubt, that such Preliminary Interested Investor intends in good faith to, or has the capacity to, consummate an Alternative Transaction.

**For any Preliminary Interested Investor or Qualified Bidder who is a competitor of the Company or is affiliated with any competitor of the Company, the Movants reserve the right to withhold, or to delay providing, in their sole discretion, _any_ Diligence Materials that the Movants determine are business-sensitive or otherwise inappropriate for disclosure to such Preliminary Interested Investor or Qualified Bidder, at any such time**.

**All parties, Preliminary Interested Investors, and Qualified Bidders are prohibited from communicating with any of the Company's employees, directors, officers, landlords, vendors, suppliers, agents, existing lender(s) (including, but not limited to, the DIP Lender) or with any other potential bidder, Preliminary Interested Investor, or Qualified Bidder with respect to any Bid or Alternative Transaction absent the prior written consent of the Movants; provided that if such consent is given a representative of the Movants shall be**

---

[3]    Notwithstanding anything in the Bidding Procedures to the contrary, the Movants will not consult with or provide copies of any bids or confidential information to the DIP Lender if the DIP Lender becomes an active bidder at any time for any of the Purchased Assets.

**present for or party to any such communications (unless otherwise agreed by the Movants in their sole discretion).**

Each Preliminary Interested Investor and Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Movants or the Debtors' Advisors regarding such Preliminary Interested Investor or Qualified Bidder.

Notwithstanding anything to the contrary herein, the DIP Lender and the Stalking Horse Bidder shall each be a Preliminary Interested Investor and a Qualified Bidder.

<h3 align="center">Bid Qualification Process</h3>

**I.    Bid Deadline**.

A Preliminary Interested Investor that desires to make a proposal, solicitation, or offer for some or all of the Purchased Assets (each, a "Bid") shall transmit such proposal, solicitation, or offer via email (in pdf or similar format) so as to be actually received by the following parties on or before **March 6, 2020, at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"):

a.    *Bankruptcy Counsel to JOMR and JOMH and transaction counsel to the Trustee*: Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, Attn: Paul Steven Singerman (singerman@bergersingerman.com) and Christopher Andrew Jarvinen (cjarvinen@bergersingerman.com);

b.    *The CRO for the Chapter 11 Debtors:* McHale, P.A., 1601 Jackson Street, Suite 200, Fort Myers, Florida 33901, Attn: Gerard A. McHale, Jr. (jerrym@thereceiver.net);

c.    *The Trustee*: Robert E. Tardif, Jr., P.O. Box No. 2140, Fort Myers, Florida 33902 (rtardif@comcast.net); and

d.    *The Investment Banker for the Chapter 11 Debtors and the Trustee:* Raymond James & Associates, Inc., 880 Carillon Parkway, St. Petersburg, Florida 33716, Attn: Geoffrey Richards (Geoffrey.Richards@RaymondJames.com) and Robert Arnold (Rob.Arnold@RaymondJames.com) (as defined, Raymond James, and together with Berger Singerman LLP, collectively, the "Debtors' Advisors").

**II.    Bid Requirements**.

To be eligible to participate in the Auction (defined below), each Bid by a Preliminary Interested Investor (a "Bidder") must be submitted in writing and satisfy each of the following requirements (collectively, the "Bid Requirements") as determined by the Movants (in consultation with the Consultation Party):

a.    Same or Better Terms: The Bid must be on terms that are substantially the same or better than the terms of the Agreement, as determined by the Movants in their sole discretion (in consultation with the Consultation Party) and the Bid must identify which assets the Bidder intends to purchase and include executed transaction

documents (as defined herein, an Alternative Transaction). A Bid shall include both a clean version (in MS-Word) and a blackline against the Agreement marked to show all changes requested by the Bidder. A Bid will not be considered qualified for the Auction if: (i) such Bid contains additional material representations and warranties, covenants, closing conditions, termination rights, financing, or due diligence contingencies other than as may be included in the Agreement (it being agreed and understood that such Bid shall modify the Agreement as needed to comply in all respects with the Bidding Procedures Order (including removing any termination rights in conflict with the Bidding Procedures Order) and will remove provisions that apply only to the Stalking Horse Bidder, as the stalking horse bidder, such as the Termination Fee); (ii) such Bid is not received by the Movants in writing on or prior to the Bid Deadline, and (iii) such Bid does not contain evidence that the Bidder(s) has/have received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof that the Earnest Money Deposit (defined below) has been made.

b.   <u>Amount of Bid</u>:  Each Bid may be for all or a portion of the Purchased Assets and shall clearly show the amount of the purchase price. In addition, a Bid (a) must propose a purchase price equal to or greater than the aggregate of the sum of (i) the value of the Bid set forth in the Agreement executed by the Stalking Horse Bidder, as determined by the Movants in their sole discretion (in consultation with the Consultation Party); <u>*plus*</u> (ii) the dollar value of the Termination Fee in cash, <u>*plus*</u> (iii) $100,000.00 (the initial overbid amount), in cash, and (b) must obligate the Bidder to pay, to the extent provided in the Agreement, all amounts which the Stalking Horse Bidder under the Agreement has agreed to pay, including all Assumed Liabilities; *provided that* any Bid for Purchased Assets that constitute collateral subject to the DIP Loan Facility must (a) provide for payment solely in cash, unless and until the obligations subject to the DIP Loan Facility (as defined in any interim or final order approving the DIP Loan Facility), have been, or, pursuant to such Bid, will be, indefeasibly paid in cash in full, or (b) have the consent of the DIP Lender.

c.   <u>Earnest Money Deposit</u>:   Each Bid, other than the Agreement, must be accompanied by a cash deposit in the amount equal to ten (10%) percent of the aggregate value of the cash and non-cash consideration of the Bid to be held in an escrow account to be identified and established by the Movants (the "<u>Earnest Money Deposit</u>"), *provided that* the DIP Lender will not be required to provide a deposit with respect to the portion of any Bid that is a Credit Bid.

d.   <u>Proof of Financial Ability to Perform</u>:  The Bid must include written evidence that the Movants conclude in their sole discretion demonstrates that the Bidder has the necessary financial ability to close the Alternative Transaction and to provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternative Transaction.

9501108-23

e.    Identity:  Each Bid must fully disclose the identity of each person and entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder, including if such Bidder is an entity formed for the purpose of consummating the proposed Alternative Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' Advisors should contact regarding such Bid. Nothing herein shall preclude multiple Preliminary Interested Investors from submitting a joint Bid, subject to the Movants' prior written consent to such submission and the disclosure requirements set forth herein.

f.    Authorization:  Each Bid must contain written evidence acceptable to the Movants in their sole discretion that the Bidder has obtained appropriate authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Alternative Transaction contemplated in such Bid.

g.    Contingencies:  A Bid will not be considered qualified for the Auction if it (i) contains any of the contingencies set forth above in sub-paragraph "a", or (ii) is conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

h.    Irrevocable:  A Bid must be irrevocable through the Auction, provided, however, that if such Bid is accepted as the Successful Bid or a Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

i.    Adequate Assurance of Future Performance:  To the extent applicable, each Bid must contain evidence that the Bidder has the ability to comply with the requirements of adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code (the "Adequate Assurance Information").  Such Adequate Assurance Information may include: (i) information about the Bidder's financial condition, such as federal tax returns for two (2) years, a current  financial statement, or bank account statements; (ii) information demonstrating (as determined by the Movants in their exercise of the Debtors' reasonable business judgment (in consultation with the Consultation  Party)) that the Bidder has the financial capacity to consummate the proposed Alternative Transaction, (iii) evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with  respect to the submission of its Bid, (iv) the identity and exact name of the Bidder (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Alternative Transaction, (v) such additional information regarding the Bidder as the Bidder may elect to include, and (vi) such other documentation that the Movants may request.  By submitting a Bid, the Bidder(s) agree that the

6

Movants may disseminate their Adequate Assurance Information to affected landlords and contract counterparties in the event that the Movants determine such Bid to be a Qualified Bid.

j.    <u>As-Is, Where-Is</u>: Each Bid must include a written acknowledgement and representation that the Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the assets prior to making its Bid; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the asset(s) in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's mark-up of the Agreement.

k.    <u>Affirmative Statement</u>:  Each Bid shall be accompanied by an affirmative statement in which the Bidder explicitly agrees that (i) it has and will continue to comply with these Bidding Procedures; (ii) the Bid it submits does not entitle such Bidder (and if it becomes a Qualified Bidder) to any breakup fee, termination fee, expense reimbursement, or similar type of payment or reimbursement; and (iii) it waives any substantial contribution administrative expense claims under Bankruptcy Code section 503(b) related to bidding for the Purchased Assets.

By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures, including but not limited to, refraining from, after the conclusion of the Auction, either submitting a Bid or seeking to reopen the Auction. **The submission of a Bid shall constitute a binding and irrevocable offer to acquire the Purchased Assets (or assets) as reflected in such Bid**.

III.    <u>**Designation of Qualified Bidders**</u>.

The Movants will review each Bid received from a Bidder.  A Bid will be considered a "<u>Qualified Bid</u>," and each Bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>," if the Movants determine, in their sole discretion and in the exercise of the Debtors' business judgment (in consultation with the Consultation Party), that such Bid was received before the Bid Deadline and satisfies the Bid Requirements set forth above.

Notwithstanding anything herein to the contrary, the Agreement submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid, and the Stalking Horse Bidder is a Qualified Bidder for each phase of the Auction.

No later than two (2) business days after the receipt of a Bid, the Movants will notify the relevant Bidder whether or not its Bid has been designated as a Qualified Bid.  Notwithstanding anything to the contrary herein, and without limiting the provisions of Section IV ("Right to Credit Bid") herein with respect to credit bids, the DIP Lender shall be a Qualified Bidder, and to the extent that the DIP Lender submits a Bid that is received by the Bid Deadline, such Bid shall be a Qualified Bid.

9501108-23

Upon the receipt of any competing Bid(s), the Movants shall immediately provide counsel for the Stalking Horse Bidder copies of any blackline of the Agreement received by the Movants from such Bidder(s).

If any Bid is determined by the Movants not to be a Qualified Bid, the Movants will refund such Bidder's Earnest Money Deposit on the date that is three (3) business days after the Movants inform the Bidder that its Bid is not a Qualified Bid, or as soon as is reasonably practicable thereafter.

Between the date that the Movants notify a Bidder that it is a Qualified Bidder and the Auction, the Movants may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Movants, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

## IV.    **Right to Credit Bid**.

The DIP Lender shall have the right to credit bid all or a portion of the value of such DIP Lender's secured claims pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid is received by the Bid Deadline.

In the event the DIP Lender submits a Bid (whether it be a Qualified Bid, a credit bid or otherwise), the DIP Lender shall no longer be a Consultation Party and shall automatically be deemed excluded from the definition of Consultation Party.

## V.    **The Auction**.

If one or more Qualified Bids (other than the Agreement submitted by the Stalking Horse Bidder) are received by the Bid Deadline, the Movants will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid. If no Qualified Bid (other than the Agreement) is received by the Bid Deadline, no Auction shall be conducted and the Agreement shall be deemed to be the Successful Bid and the Stalking Horse Bidder shall be deemed to be the Successful Bidder. Only Qualified Bidders may participate in the Auction.

No later than **March 8, 2020 at 5:00 p.m. (prevailing Eastern Time)**, the Movants will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined by the Movants in their exercise of the Debtors' business judgment, in consultation with the Consultation Party (the "Auction Baseline Bid"), and will provide copies of the documents supporting the Auction Baseline Bid to all Qualified Bidders.

The determination of which Qualified Bid constitutes the Auction Baseline Bid and which Qualified Bid constitutes the Successful Bid (defined herein) shall take into account any factors that the Movants deem in their sole discretion to be relevant to the value of the Qualified Bid to the Debtors' estates and the Company, including, among other things: (a) the type and amount of

Purchased Assets (or assets) sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Auction Baseline Bid; (e) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed, including the assumption of collective bargaining agreements (collectively, the "Bid Assessment Criteria").

The Auction (if any) shall take place on **March 9, 2020 at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, or such other date and time and/or place as selected by the Movants (in consultation with the Consultation Party) shall notify all Qualified Bidders, including the Stalking Horse Bidder, counsel for the Stalking Horse Bidder and other invitees in accordance with these Bidding Procedures, and for the avoidance of any doubt, the Auction is subject to the right of the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Auction to a later date.

The Auction shall be conducted according to the following procedures:

a.     The Movants Shall Conduct the Auction.

The Movants and their professionals, including but not limited to the Debtors' Advisors, shall direct and preside over the Auction.  At the start of the Auction, the Movants shall announce which Qualified Bid(s) is/are deemed to be the Auction Baseline Bid.

Only (i) the Movants, (ii) the Stalking Horse Bidder, (iii) any other Qualified Bidder, (iv) the Consultation Party (i.e., the DIP Lender), and (v) with respect to (i) through (iv), each of their respective representatives and legal and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.

b.     No Collusion; Good-Faith *Bona Fide* Offer

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding or sale of the Purchased Assets, and (ii) its Qualified Bid is a good-faith bona fide offer and it intends to consummate the proposed transaction for the Purchased Assets if selected as the Successful Bidder.

c.     Terms of Overbids

An "Overbid" means any bid made at the Auction by a Qualified Bidder subsequent to the Movants' announcement of the Auction Baseline Bid.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(i)     Minimum Overbid Increment.     Any Overbid following the Auction

Baseline Bid shall be no less than the value of the $100,000.00 as determined by the Movants in their exercise of the Debtors' business judgment. Additional consideration in excess of the amount set forth in an Auction Baseline Bid may include cash and/or noncash consideration. For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to credit in the amount of the Termination Fee.

(ii)    Remaining terms are the same as for Qualified Bids. Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must remain open and binding on the Bidder until and unless the Movants accept a higher Overbid. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Company and/or the Debtors' estates than any prior Qualified Bid or Overbid, as determined by the Movants in their exercise of the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

d.    Consideration of Overbids

The Movants reserve the right, in their exercise of the Debtors' business judgment and in consultation with the Consultation Party, to adjourn the Auction one or more times, to, among other things, to (i) facilitate discussions between the Movants and the Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Movants with such additional evidence as the Movants, in their exercise of the Debtors' business judgment, may require, that the relevant Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed purchase of the Purchased Assets at the prevailing Overbid amount.

Upon the solicitation of each round of Overbids, the Movants may announce a deadline (as the Movants may, in their exercise of the Debtors' business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Movants.

Subsequent to each Overbid Round Deadline, the Movants shall announce whether the Movants have identified, (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Auction Baseline Bid, or, (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Movants as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid"). The Movants shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Movants as the Prevailing Highest Bid as well as the value attributable by the Movants to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

e.    Backup Bidder

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction, as

10

determined by the Movants, in their exercise of the Debtors' business judgment (in consultation with the Consultation Party), will be designated as the backup bidder (the "Backup Bidder"). Subject to the Agreement, including Section 7.5(c)(ii) of the Agreement, the Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the conclusion of the Auction (the "Outside Backup Date") or the closing of the Alternative Transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder, the Movants may designate (in consultation with the Consultation Party) the Backup Bidder to be the new Successful Bidder, and the Movants will be authorized, but not required, to consummate the transaction, with the Backup Bidder. A hearing to authorize a sale to the Backup Bidder will be held by the Bankruptcy Court on no less than three (3) days' notice, with supplemental objections due at least two (2) days prior to such hearing (the "Backup Sale Hearing"). For the avoidance of doubt, only parties who timely filed an objection to the Sale by the Sale Objection Deadline may supplement their objection to the Backup Bidder and all such issues shall be limited to issues relating to the identity of the Backup Bidder. In such case, the defaulting Successful Bidder's Earnest Money Deposit shall be forfeited to the Movants on behalf of the Debtors' estates, and the Movants, on behalf of the Debtors, specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The Earnest Money Deposit of the Backup Bidder shall be held by the Movants until the earlier of one (1) business day after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date.

f.    Additional and Modified Procedures

The Movants (in consultation with the Consultation Party) may announce at the Auction additional or modified rules and procedures that are reasonable under the circumstances (e.g., limitations on the amount of time to make subsequent Overbids, changes in minimum Overbid increments, etc.) for conducting the Auction so long as such rules are not inconsistent with the Bidding Procedures or the Agreement.

g.    Consent to Jurisdiction as Condition to Bidding

The Stalking Horse Bidder and all Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection any disputes relating to these Bidding Procedures, the Auction, or the construction and enforcement of any documents relating to an Alternative Transaction.

h.    Closing the Auction

The Auction shall continue until the Movants determine, in their exercise of the Debtors' reasonable business judgment (in consultation with Consultation Party), that there is a highest or otherwise best Qualified Bid or Qualified Bids at the Auction for some, substantially all, or all of the Purchased Assets (each a "Successful Bid" and each Bidder submitting such Successful Bid, a

9501108-23

"Successful Bidder").  The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid.  Within six (6) hours following the conclusion of the Auction, the Movants shall file a notice on the Bankruptcy Court's docket in each of the cases of the Chapter 7 Debtors and in the lead case for the Chapter 11 Debtors identifying (with specificity) the Successful Bidder for the Purchased Assets and any applicable Backup Bidders.  The Movants shall not consider any Bids submitted after the conclusion of the Auction and any and all such Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

Such acceptance by the Movants, on behalf of the Debtors, of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

The Movants shall maintain a written transcript of all Bids made and announced at the Auction, including the Auction Baseline Bid, all Overbids, all Prevailing Highest Bids, the Successful Bid and any Backup Bid.

## VI.    **Termination Fee**.

The Stalking Horse Bidder is entitled to payment of its Termination Fee pursuant to the terms of the Agreement.

The Movants recognize the value and benefits that the Stalking Horse Bidder has provided to the Debtors' estates by entering into the Agreement, as well as the Stalking Horse Bidder's expenditure of time, energy and resources.  Therefore, subject to the terms of the Agreement, the Movants shall pay the Breakup Fee and the Expense Reimbursement out of the proceeds of an Alternative Transaction to the Stalking Horse Bidder by wire transfer of immediately available funds to the account specified by the Stalking Horse Bidder to the Movants  in writing and shall be paid to the Stalking Horse Bidder prior to the payment of the proceeds of such sale to any third party asserting a lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee and the Expense Reimbursement.)

The Breakup Fee shall be paid three (3) business days following the closing of an Alternative Transaction. Prior to payment of the Expense Reimbursement, the Stalking Horse Bidder shall provide the Movants with invoices detailing its documented, out-of-pocket expenses and the Movants shall have three (3) business days to object (the "Expense Reimbursement Objection Deadline") to the reasonableness of the expenses incurred.   The Expense Reimbursement shall be paid within three (3) business days following the expiration of the Expense Reimbursement Objection Deadline if no objections are received.

The Termination Fee shall constitute an allowed administrative expense claim against the Debtors' bankruptcy estates.

Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Purchased Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

In the event no Qualified Bid, other than the Stalking Horse Bid, is received, the Movants reserve the right to request (in consultation with the Consultation Party) that the Bankruptcy Court advance the date of the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof.

The Sale Hearing may be adjourned or rescheduled from time to time.

**VII.    <u>Sale Hearing</u>**.

Objections, if any, to the Sale and/or the sale of the Purchased Assets to the Successful Bidder and the transaction contemplated by the Agreement must be in writing and filed with the Bankruptcy Court no later than **4:00 p.m. (prevailing Eastern Time) on March 3, 2020** (the "<u>Sale Objection Deadline</u>") and be served such that they are actually received by the following parties prior to the Sale Objection Deadline: (1) *JOMR and JOMH*, c/o (i) the Chief Restructuring Officer, McHale, P.A., 1601 Jackson Street, Suite 200, Fort Myers, FL 33901 (Attn:  Gerard A. McHale, Jr., jerrym@thereceiver.net and Veronica Larriva, veronical@thereceiver.net) and (ii) *bankruptcy counsel for JOMR and JOMH*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com) and Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com)); (2) (i) *the Trustee*, Robert E. Tardif, Jr., P.O. Box No. 2140, Fort Myers, FL 33902 (Attn: Robert E. Tardif, Jr., Esq. (rtardif@comcast.net)) and (ii) *transaction counsel for the Trustee*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com) and Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com)); (3) counsel for the Stalking Horse Bidder, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor, Esq. (mnestor@ycst.com) and Andrew L. Magaziner, Esq. (amagaziner@ycst.com); and (4) *counsel for the DIP Lender*, Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103 (Attn: Scott M. Esterbrook, Esq. (SEsterbrook@ReedSmith.com) and Brian M. Schenker, Esq. (BSchenker@ReedSmith.com); and (5) *the Office of the United States Trustee*, 501 East Polk Street, Room 1200, Tampa, FL 33602 (Attn: Benjamin E. Lambers, Esq. (Ben.E.Lambers@usdoj.gov) and Steven Wilkes, Esq. (Steven.Wilkes@usdoj.gov)).

If no Auction is to be held, the Movants will file a notice **no later than 8:00 p.m. (prevailing Eastern Time) on March 6, 2020** with the Court in each of the Debtors' bankruptcy cases stating that there will be no Auction (the notice will be posted at the Court's website https://ecf.flmb.uscourts.gov/ which requires a court-issued login and passcode to access the notice).

In the event that no Auction is to be held, the Movants will seek a hearing (the "<u>Sale Hearing</u>") on **March 9, 2020 at _____ am/pm (prevailing Eastern Time)**, at which the Movants will seek approval of the transactions contemplated by the Agreement with the Successful Bidder, and for the avoidance of any doubt, the Sale Hearing is subject to the right of the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Sale Hearing to a later date, subject to the availability of the Court.  In the event that an Auction is to be held, the Movants will seek a Sale Hearing on **March 10/11, 2020 at _____ am/pm (prevailing Eastern Time)**, at which the Movants will seek approval of the transactions contemplated by the Agreement with the Successful Bidder, and for the avoidance of any doubt, the Sale Hearing is subject to the right of

9501108-23

the Movants, in the exercise of the reasonable business judgment of the Debtors, to adjourn the Sale Hearing to a later date, subject to the availability of the Court.

**The Sale Hearing may be continued to a later date by the Movants by either filing a notice with the Bankruptcy Court prior to, or making an announcement in open court at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

The approved Sale shall close not later than March 31, 2020, unless the Movants, in the exercise of the Debtors' reasonable business judgment, agree to a later date.

## VIII.    Return of Earnest Money Deposit.

The Earnest Money Deposits for each Qualified Bidder (i) shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Movants in their sole discretion on behalf of the Debtors' estates, (ii) shall not become property of the Debtors' estates absent further order of the Bankruptcy Court, and (iii) shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on the date that is three (3) business days after the Sale Hearing, or as soon as is reasonably practicable thereafter.

The Earnest Money Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of one (1) business day after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date.  If the Successful Bidder timely closes its winning transaction, its Earnest Money Deposit shall be credited towards its purchase price.

Upon the return of the Earnest Money Deposit, the applicable Qualified Bidders shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Movants will not have any obligation to return the Earnest Money Deposit deposited by such Successful Bidder, which may be retained by the Debtors' estates as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Movants on behalf of the Debtors, and the Movants shall be free to consummate the proposed Alternative Transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## IX.    Free and Clear Sale.

Except as otherwise provided in the Agreement, the applicable purchase agreement of a different Successful Bidder, or the Sale Order, all of the Debtors' rights, title, and interests in the Purchased Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Encumbrances") in accordance with section 363 of the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the sale of the Purchased Assets.

X.    **Fiduciary Duties**.

Notwithstanding anything to the contrary contained herein, nothing in the Bidding Procedures will prevent the Movants, on behalf of the Debtors, from exercising their respective fiduciary duties under applicable law.

XI.    **Reservation of Rights**.

Except as otherwise provided in Agreement, the Bidding Procedures Order or the Sale Order, the Movants further reserve the right as they may reasonably determine at any time, whether before, during or after the Auction, in the exercise of the Debtors' business judgment (in consultation with the Consultation Party) to: (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids and reject any or all Bids or Qualified Bids; (c) determine which  Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Company or the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders other than the Stalking Horse Bidder; (f) modify these Bidding Procedures and/or implement additional procedural rules that the Movants determine will better promote the goals of the bidding process, including but not limited to adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (g) extend the deadlines set forth in these Bidding Procedures; and (h) adjourn or cancel the Auction at the Auction and/or the Sale Hearing in open court without further notice or by filing a notice on the docket (in consultation with the Stalking Horse Bidder and the Consultation Party).

For the avoidance of doubt, the Movants shall not be required to consult with the Consultation Party if it submits a Bid for so long as such Bid remains open, including any credit bid, if the Movants, in the exercise of the Debtors' reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection or determination is (a) likely to have a chilling effect on the potential bidding or (b) otherwise contrary to the goal of maximizing value from the sale process for the Debtors' estates, their creditors and all other interested parties.

## DISCLOSURE SCHEDULES

## INTRODUCTION

The disclosures set forth in this Disclosure Schedule (this "Disclosure Schedule") are made and given pursuant to the Purchase Agreement (the "Agreement"), dated as of February 20, 2020, by and among Golden Nugget, LLC, a Nevada limited liability company ("Purchaser"), on the one hand, and (i) Just One More Restaurant Corp., a New York corporation and a debtor-in-possession under chapter 11 of the United States Bankruptcy Code ("JOMR"), and (ii) Robert E. Tardif, Jr., in his capacity as Trustee appointed in the bankruptcy cases of Bruce E. Bozzi, Sr. ("Bozzi") and Walter J. Ganzi, Jr. ("Ganzi" and together with Bozzi, each a "Chapter 7 Debtor" and collectively the "Chapter 7 Debtors"; and the Chapter 7 Debtors, together with JOMR, each a "Debtor" and collectively the "Debtors") under chapter 7 of the United States Bankruptcy Code (the "Trustee", and together with JOMR, each a "Seller" and jointly, "Sellers"), and not individually, on the other hand.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

The specific disclosures set forth in this Disclosure Schedule are organized to correspond to a specific section reference in the Agreement to which the qualifying and correspondingly numbered disclosure relates. This Disclosure Schedule is subject to the terms and conditions set forth in the Agreement, as well as the following:

1. Any information provided in this Disclosure Schedule does not constitute an admission by Sellers that such information is "material" as that term is used in the Agreement. Also, matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be reflected herein, and such additional matters are included for information purposes.

2. The fact that any disclosure in any section of this Disclosure Schedule is not required to be disclosed in order to render the applicable representation or warranty to which it relates true, or that the absence of such disclosure in any section of this Disclosure Schedule would not constitute a breach of such representation or warranty, shall not be deemed or construed to expand the scope of any representation or warranty contained in the Agreement or to establish a standard of disclosure in respect of any representation or warranty.

3. Headings have been inserted for each section of this Disclosure Schedule for convenience of reference only, shall not have, to any extent, the effect of amending or changing the express description of the corresponding numbered sections of the Agreement, and shall not be considered in construing or interpreting any section of this Disclosure Schedule.

4. The information provided in this Disclosure Schedule is being provided solely for the purpose of making the required disclosures to Sellers and Purchaser under the Agreement. In disclosing this information, the Sellers expressly do not waive any attorney-client privilege associated with such information or any protection

afforded by the work product doctrine with respect to any of the matters disclosed or discussed herein.

5.    No disclosure in this Disclosure Schedule relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred, and nothing in this Disclosure Schedule shall constitute an admission of any liability or obligation of the Sellers to any third party or shall confer or give to any third party any remedy, claim, liability, reimbursement, cause of action or other right.

6.    The disclosure of an item in one section of this Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the applicability of such disclosure to such other representations and warranties is reasonably apparent on the face of the disclosure.

7.    Any reference to a contract contained in this Disclosure Schedule shall be deemed to include all amendments, modifications, supplements, extensions, renewals, assignments, easements, restatements, purchase orders, sales orders, schedules, exhibits or other similar documents related to such contract.

This introduction is expressly made part of this Disclosure Schedule.

**Schedule 1.1(a)**

**Store Level Opening Cash Balances**

| RESTAURANT | OPENING CASH BALANCE |
|---|---|
| Atlanta Palm Food Corporation | ▮ |
| Atlantic City Palm, LLC | ▮ |
| Boston Palm Corporation | ▮ |
| Charlotte Palm Corporation | ▮ |
| Chicago Palm, Inc. | ▮ |
| Denver Palm Corporation | ▮ |
| L.A. Downtown Palm, LLC | ▮ |
| Miami Palm Restaurant, Inc. | ▮ |
| Nashville Palm Restaurant, L.L.C. | ▮ |
| Palm Airport, LLC | ▮ |
| Palm Beverly Hills Restaurant, LLC | ▮ |
| Palm Management Corporation (Huntting Inn, East Hampton) | ▮ |
| Palm New York Downtown, LLC | ▮ |
| Palm Orlando Corporation | ▮ |
| Palm Philadelphia Restaurant, LLC | ▮ |
| Palm Restaurant Inc. | ▮ |
| Palm Restaurant of Las Vegas, Inc. | ▮ |
| Palm Restaurant of Houston, Inc. | ▮ |
| Palm Tysons Too, Inc. | ▮ |
| Palm West Corporation | ▮ |

| | |
|---|---|
| San Antonio Palm Restaurant, Inc. | ███ |
| The Washington Palm, Inc. | ███ |

**<u>Schedule 1.1(b)</u>**

**<u>Retention Payment Agreement Recipients</u>**



**Schedule 1.1(c)**

**Pre-Closing Company Professionals**



## **Schedule 2.6(b)**

### **Allocation Methodology**

Class I Assets                    Face value as of the Closing.

Class II Assets                   None.

Class III Assets                  None.

Class IV Assets                   Sellers' cost.

Class V Assets                    As determined pursuant to Purchase Agreement.

Class VI Assets                   As determined pursuant to Purchase Agreement.

Class VII Assets                  As determined pursuant to Purchase Agreement.

**Schedule 3.3**

**Governmental Authorizations**

1.      Voluntary Compliance Agreement, by and between the United States of America and Palm Restaurant Inc., Palm New York Downtown LLC, Palm Management Corporation and Palm West Corporation

2.      Any and all gaming licenses/permits required for operation of Atlantic City Palm, LLC and Palm Restaurant of Las Vegas, Inc.

3.      The following Liquor Licenses:

| **RESTAURANT** | **GOVERNMENTAL AUTHORITY** | **LICENSE NO.** |
|---|---|---|
| Atlanta Palm Food Corporation | Georgia Dept. of Revenue | 172782 |
| Atlantic City Palm, LLC | New Jersey Division of Gaming Enforcement | 3333-01-03-9-001 |
| Boston Palm Corporation | Licensing Board for the City of Boston Massachusetts | CV7AL0136 |
| Charlotte Palm Corporation | ABC Commission - North Carolina | MX9080 |
| Chicago Palm, Inc. | City of Chicago License Certificate | 2579055 2579054 |
| Denver Palm Corporation | Colorado Dept. of Revenue | 03727170000 |
| L.A. Downtown Palm, LLC | California Dept. of Alcoholic Beverage Control | 58-383618 47-383618 |
| Miami Palm Restaurant, Inc. | Florida Dept. of Business and Professional Regulation | BEV2307173 |
| Nashville Palm Restaurant, L.L.C. | Tennessee Alcoholic Beverage Commission | LBDRST-DAV-1900149 |
| Palm Beverly Hills Restaurant, LLC | California Dept. of Alcoholic Beverage Control | 47-548049 |
| Palm Management Corporation | New York State Liquor Authority | 1045891-B0884322 |
| Palm New York Downtown, LLC | New York State Liquor Authority | 1205727-897949 |
| Palm Orlando Corporation | Florida Dept. of Business and Professional Regulation | BEV5808163 |
| Palm Philadelphia Restaurant, LLC | Pennsylvania Liquor Control Board | R6173, LID - 84792 |
| Palm Restaurant Inc. | New York State Liquor Authority | 1028471-B0884435 |

| | | |
|---|---|---|
| Palm Restaurant of Las Vegas, Inc. | Clark County Business License | 1005267-LIQ-124 |
| B.W. Associates, Inc. | Harris County Alcoholic Beverage License/Permit PE108523 | LB108523 MB108523 |
| | City of Houston | City Permit Nos. 393912, 393913, 393914 |
| Palm Tysons Too, Inc. | Virginia Alcoholic Beverage Control Authority | 006007 |
| Palm West Corporation | New York State Liquor Authority | 1026336-0907009 |
| San Antonio Palm Restaurant, Inc. DGMB Associates, Inc. | Texas Alcoholic Beverage Commission | MB472849 |
| The Washington Palm, Inc. | Washington Alcoholic Beverage Regulation Administration | ABRA-001151 |

**Schedule 3.5**

**Required Consents**

There are gaming authority consents relating to change in control of tenants under the leases for Atlantic City and Las Vegas Leased Real Properties.

**Schedule 3.6**

**Litigation**

1. Decision and Judgment, on appeal.

2. <u>Luis Batista v. Palm West Corporation *et al*.</u> (1:19-cv-04455-JMF, U.S. District Court for Southern District of New York) – Action claiming discriminatory employment practices on the basis of race, national origin and sex/gender with respect to promotions and hostile work environment, sexual harassment, retaliation and constructive discharge.

3. <u>Michael Trenticosta v. Nashville Palm Restaurant LLC and Palm Management Corporation</u> (19C2354, Circuit Court of the State of Tennessee, Davidson County, and 20th Judicial District) – Action claiming age discrimination. Case is in discovery phase.

4. <u>Tracye Shearin v. Palm West Corporation d/b/a Palm West Side</u> (10196598, New York State Division of Human Rights and Equal Employment Opportunity Commission) – Dual filing with each agency for claims of discrimination based on race, sex and age and retaliation/hostile work environment and sexual harassment. Case has been adjourned until April 2020.



**Schedule 3.7(a)**

**JOMR IP**

1. See attached list of active trademarks as of February 11, 2020.

2. Domain Name: https://www.thepalm.com/

3. Social media accounts below:

|  | Facebook | Twitter | Instagram |
|---|---|---|---|
| Palm Corporate | https://www.facebook.com/PalmRestaurant | https://twitter.com/PalmRestaurant | https://www.instagram.com/palmrestaurant/ |
| Atlanta | https://www.facebook.com/PalmAtlanta/ | https://twitter.com/thepalm_atl | https://www.instagram.com/thepalm_atl/ |
| Atlantic City | https://www.facebook.com/AtlanticCity/ | https://twitter.com/ThePalmAC | https://www.instagram.com/thepalmac/ |
| Beverly Hills | https://www.facebook.com/PalmBeverlyHills/ | N/A | https://www.instagram.com/palmbeverlyhills/ |
| Boston | https://www.facebook.com/PalmBoston/ | https://twitter.com/ThePalmBoston | https://www.instagram.com/thepalmboston/ |
| Charlotte | https://www.facebook.com/PalmCharlotte/ | N/A | https://www.instagram.com/thepalmcharlotte/ |
| Chicago | https://www.facebook.com/PalmChicago/ | https://twitter.com/ThePalmChicago | https://www.instagram.com/thepalmrestaurantchicago/ |
| Denver | https://www.facebook.com/PalmDenver/ | https://twitter.com/PalmDenver | https://www.instagram.com/palmdenver/ |
| Houston | https://www.facebook.com/PalmHouston/ | https://twitter.com/thepalmhouston | https://www.instagram.com/thepalmhouston/ |
| Huntting Inn | https://www.facebook.com/PalmEastHampton/ | N/A | https://www.instagram.com/palmhunttinginn/ |
| Las Vegas | https://www.facebook.com/PalmLasVegas/ | https://twitter.com/PalmLasVegas | https://www.instagram.com/palmlasvegas/ |
| LADT | https://www.facebook.com/palmdowntown/ | N/A | https://www.instagram.com/palmdtla/ |
| Miami | https://www.facebook.com/MiamiPalm/ | N/A | https://www.instagram.com/thepalmmiami/ |
| Nashville | https://www.facebook.com/PalmNashville/ | https://twitter.com/NashvillePalm | https://www.instagram.com/thepalmnashville/ |
| Palm Too | https://www.facebook.com/Palmtoo/ | https://twitter.com/ThePalmToo | https://www.instagram.com/palmtoo/ |
| Palm Tribeca | https://www.facebook.com/PalmTribeca/ | https://twitter.com/ThePalmTribeca | https://www.instagram.com/thepalmtribeca/ |
| Palm West Side | https://www.facebook.com/palmwestnyc/ | https://twitter.com/PalmWestNYC | https://www.instagram.com/thepalmwest/ |
| Orlando | https://www.facebook.com/PalmOrlando/ | https://twitter.com/PalmOrlando | https://www.instagram.com/palmorlando/ |
| Philadelphia | https://www.facebook.com/PalmPhiladelphia/ | https://twitter.com/ThePalm_PHL | https://www.instagram.com/thepalm_phl/ |
| San Antonio | https://www.facebook.com/palm.sanantonio/ | https://twitter.com/PalmSanAntonio1 | https://www.instagram.com/palmsanantonio/ |
| Tysons Corner | https://www.facebook.com/PalmTysonsCorner/ | https://twitter.com/ThePalmTysons | https://www.instagram.com/thepalmtysons/ |
| Washington DC | https://www.facebook.com/PalmDC/ | https://twitter.com/ThePalmDC | https://www.instagram.com/thepalmdc/ |

| Other Social Media Accounts | Linkedin: https://www.linkedin.com/company/the-palm-restaurant/<br>https://www.linkedin.com/company/the-palm-restaurant/<br>Youtube: https://www.youtube.com/user/ThePalmRestaurant<br>Pinterest: https://www.pinterest.com/palmrestaurant/ |
|---|---|

IP Challenges/Restrictions by or against JOMR

1. Decision and Judgment.

2. Just One More Restaurant Corporation v. Caves D'Esclans, U.S. Opposition No. 91245804 (THE PALM BY WHISPERING ANGEL and Design, Ser. No. 79221883) and U.S. Cancellation No. 92070293 (THE PALM BY WHISPERING ANGEL (Word), Reg. No. 5445704) pending before the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office. Challenge by JOMR for use of Palm logo.  Proceedings suspended and set to resume March 31, 2020.

| Country | Mark | Appl. No | App. Date | Reg. Date | Reg. No | Status |
|---------|------|----------|-----------|-----------|---------|--------|
| Benelux | PALM with Tree Design | 655929 | Feb 17 1983 | Feb 17 1983 | 388856 | Registered |

29: GOURMET FOODS, NAMELY, OLIVE OIL, PROCESSED OLIVES, EDIBLE OILS, EXTRA-VIRGINIA OLIVE OIL, DIPPING OILS, STEAK, FISH, PORK, CHICKEN, COCKTAIL, ONIONS, PROCESSED CHERRIES; ASSORTED JARRED VEGETABLES; SUN-DRIED TOMATOES; DIPS; SNACK MI X CONSISTING PRIMARILY OF DEHYDRATED FRUITS, PROCESSED NUTS AND ALSO INCLUDING SESAME STICKS; PROCESSED NUTS

30: FOODS WERE PROVIDED IN THIS CLASS; PUDDINGS AND OTHER DESSERTS, SNACKS AND PREPARED MEALS

| Country | Mark | Appl. No | App. Date | Reg. Date | Reg. No | Status |
|---------|------|----------|-----------|-----------|---------|--------|
| Benelux | THE PALM | 741231 | Feb 9 1990 | Feb 9 1990 | 478364 | Registered |

43: RESTAURANT SERVICES

| Country | Mark | Appl. No | App. Date | Reg. Date | Reg. No | Status |
|---------|------|----------|-----------|-----------|---------|--------|
| Canada | PALM | 1010286 | Mar 30 1990 | Apr 11 2005 | 637058 | Registered |

RESTAURANT SERVICES

| Country | Mark | Appl. No | App. Date | Reg. Date | Reg. No | Status |
|---------|------|----------|-----------|-----------|---------|--------|
| Canada | THE PALM with Tree Design | 1010287 | Mar 30 1999 | Mar 31 2005 | 636498 | Registered |

RESTAURANT SERVICES

| Country | Mark | Appl. No | App. Date | Reg. Date | Reg. No | Status |
|---------|------|----------|-----------|-----------|---------|--------|
| China | PALM RESTAURANT with Tree Design in Circle | 932896 | Apr 16 2007 | Apr 16 2007 | 932896 | Registered |

43: RESTAURANT AND BAR SERVICES FEATURING HAPPY HOUR-EVENTS AND PROMOTIONS

| Country | Mark | Appl. No | App. Date | Reg. Date | Reg. No | Status |
|---------|------|----------|-----------|-----------|---------|--------|
| EUTM | PALM RESTAURANT with Tree Design in Circle | 932896 | Apr 16 2007 | Apr 16 2007 | 932896 | Registered |

43: RESTAURANT AND BAR SERVICES

| Country | Mark | Appl. No | App. Date | Reg. Date | Reg. No | Status |
|---------|------|----------|-----------|-----------|---------|--------|
| France | PALM with Tree Design | 1223825 | Jan 7 1983 | Jan 7 1993 | 1223825 | Registered |

43: RESTAURANT AND BAR SERVICES

| Germany | PALM with Tree Design | | J18028 | Jan 4 1983 | Feb 16 1984 | 1059764 | Registered |

43: RESTAURANT AND BAR SERVICES

| Hong Kong | PALM RESTAURANT with Tree Design in Circle | | 301035927 | Jan 21 2008 | Jan 21 2008 | 301035927 | Registered |

43: RESTAURANT AND BAR SERVICES

| Hong Kong | THE PALM | | 301035918 | Jan 12 2008 | Jan 12 2008 | 301035918 | Registered |

43: RESTAURANT AND BAR SERVICES FEATURING HAPPY HOUR-TYPE EVENTS AND PROMOTIONS

| Italy | PALM with Tree Design | | 17898-C/83 | Mar 9 1983 | Apr 14 1986 | 1530631 WAS 1043567 | Registered |

42: RESTAURANT SERVICES

| Japan | THE PALM in Katakana Characters | | H04-189110 | Sep 16 1992 | Jul 31 1996 | 3177606 | Registered |

42: PROVIDING FOODS AND BEVERAGES

| Japan | PALM RESTAURANT with Tree Design in Circle | | 932896 | Apr 16 2007 | Apr 16 2007 | 932896 | Registered |

43: RESTAURANT SERVICES

| Japan | THE PALM | | H04-189109 | Sep 16 1992 | Jul 31 1996 | 3177605 | Registered |

43: PROVIDING FOODS AND BEVERAGES

| Macau | PALM RESTAURANT with Tree Design in Circle | | 30235 | Jul 25 2007 | Jan 3 2008 | 30235 | Registered |

43: RESTAURANT SERVICES

| Macau | THE PALM | | 31256 | Sep 19 2007 | Feb 25 2008 | 31256 | Registered |

43: RESTAURANT SERVICES

| Mexico | THE PALM | | 386263 | May 30 1990 | Nov 12 1990 | 386263 | Registered |

42: RESTAURANT SERVICES

| Mexico | NEW YORK PALM | | 217067 | Nov 17 1994 | Nov 29 1995 | 538056 | Registered |
|---|---|---|---|---|---|---|---|

43: RESTAURANT AND BAR SERVICES

| Mexico | PALM BAR & GRILLE with Tree Design in Circle |  | 910454 | Jan 30 2008 | Jun 30 2008 | 1048172 | Registered |
|---|---|---|---|---|---|---|---|

43: RESTAURANT AND BAR SERVICES

| Mexico | PALM with Tree Design |  | 185668 | Dec 10 1993 | Sep 13 1994 | 473303 | Registered |
|---|---|---|---|---|---|---|---|

43: RESTAURANT AND BAR SERVICES

| Republic of Korea (South) | THE PALM | | 41-1988-538 | Mar 17 1988 | Aug 31 1989 | 41-10282 | Registered |
|---|---|---|---|---|---|---|---|

42: RESTAURANT SERVICES

| Republic of Korea (South) | PALM RESTAURANT with Tree Design in Circle |  | 932896 | Sep 19 2008 | Sep 19 2008 | 932896 | Registered |
|---|---|---|---|---|---|---|---|

43: RESTAURANT SERVICES

| Spain | PALM with Tree Design |  | 1026338 | Jan 14 1983 | Jul 1 1984 | 1026338 | Registered |
|---|---|---|---|---|---|---|---|

42: RESTAURANT SERVICES

| Switzerland | THE PALM with Tree Design |  | 05008/1993 | Apr 1 1993 | Apr 1 1994 | 409704 | Registered |
|---|---|---|---|---|---|---|---|

42: RESTAURANT SERVICES

| Taiwan | PALM RESTAURANT with Tree Design in Circle |  | 096043594 | Sep 12 2007 | Aug 16 2008 | 1325020 | Registered |

8: TABLEWARE, NAMELY, KNIVES, FORKS AND SPOONS

11: SALT AND PEPPER SHAKERS

42: TABLE LINEN

43: RESTAURANT SERVICES

| United States of America | PALM RESTAURANT EST. 1926 with Tree Design (without the circle) | | 77/743401 | May 22 2009 | Sep 2 2014 | 4597380 | Registered |

21: PAPER TOWEL HOLDERS; KITCHENWARE, NAMELY, BREAD BOXES; HOUSEHOLD CONTAINERS FOR FOODS; NON-ELECTRIC HOUSEHOLD OR KITCHEN CONTAINERS NOT MADE OF PRECIOUS METALS; PORTABLE COOLERS; PORTABLE BEVERAGE COOLERS AND BEVERAGE DISPENSERS; PORTABLE ICE CHESTS FOR FOOD AND BEVERAGES; THERMAL INSULATED CONTAINERS AND TOTE BAGS FOR FOOD AND BEVERAGES; WHISKS, PIE SERVERS, NON-ELECTRIC JUICERS, JUICE REAMERS, KNIFE BLOCKS, COLANDERS FOR HOUSEHOLD USE, FLOUR SIFTERS, COOKING SIFTERS, POTATO MASHERS, MELON BALLERS, CORN ON THE COB HOLDERS AND SKEWERS, ICE CREAM SCOOPERS, SKIMMERS, VEGETABLE BRUSHES, MIXING BOWLS, TRIVETS, GARLIC PRESSES, AND BRUSHES FOR BASTING MEAT; SALT AND PEPPER SHAKERS; DINNERWARE, NAMELY, GLASS, EARTHENWARE, PORCELAIN AND PLASTIC DISHES, PLATES, BOWLS, SERVING PLATTERS, TEAPOTS NOT OF PRECIOUS METAL, AND CHINA DINNERWARE; GLASS, EARTHENWARE, PORCELAIN AND PLASTIC BEVERAGEWARE, NAMELY, MUGS, CUPS, TUMBLERS, GOBLETS, CARAFES, DECANTERS, PITCHERS, BEVERAGE STIRRERS, BEER JUGS, DRINKING STEINS AND GLASSES, FLASKS; COASTERS NOT OF PAPER OR LINEN, BOTTLES SOLD EMPTY AND GLASS STORAGE JARS SOLD EMPTY, INSULATING JARS, COOKIE JARS AND GLASS JARS FOR JAMS; SERVEWARE AND HOUSEHOLD UTENSILS, NAMELY, SERVING SPOONS, SERVING FORKS, SLOTTED SPOONS, MIXING SPOONS, GRATERS, SPATULAS, BASTING SPOONS AND LADLES; BARWARE, NAMELY, COCKTAIL SHAKERS, CORKSCREWS, BOTTLE OPENERS, CORK HOLDERS, COOLERS OR COOLING BUCKETS FOR WINE OR BEVERAGE COOLING, BOTTLE STANDS; PLASTIC BUCKETS AND ICE BUCKETS; BAKEWARE; BAKING DISHES; BEER MUGS; BEVERAGE GLASSWARE; BEVERAGEWARE; BOTTLE OPENERS; BOWLS; BREAD BOARDS, BOXES AND CASES; BRUSHES FOR BASTING MEAT; BUTTER COOLERS; DISHES AND PANS; BUTTER-DISH AND CHEESE-DISH COVERS; CAKE BRUSHES, MOLDS, PANS, RESTS, RINGS, SERVERS, STANDS AND TINS; CANISTER SETS; CARVING BOARDS; CASSEROLES; CHEESE GRATERS; CHOPPING BOARDS FOR KITCHEN USE; LEMON SQUEEZERS; COFFEE CUPS, MEASURES, POTS NOT OF PRECIOUS METAL, SERVICES NOT OF PRECIOUS METAL AND STIRRERS; COLANDERS; CONFECTIONERS' DECORATING BAGS; COOKIE CUTTERS, JARS AND SHEETS; COOKING POTS AND PANS, SIEVES AND SIFTERS, SKEWERS, STEAMERS AND STRAINERS; COOKWARE, NAMELY, POTS AND PANS, ROASTING PANS AND STEAMERS; COOLERS FOR WINE; CUPS; CUTTING BOARDS; DECORATING BAGS FOR CONFECTIONERS; DINNERWARE, NAMELY, PLATES, CUPS AND SAUCERS; DISHES AND PLATES; DISPENSERS FOR LIQUID SOAP AND FOR PAPER TOWELS; DRINKING CUPS AND GLASSES; DUTCH OVENS; EARTHENWARE MUGS; EGG CUPS, POACHERS AND SEPARATORS; FRYING PANS; GLASS BEVERAGEWARE, BOWLS, CARAFES, DISHES, MUGS, PANS AND STORAGE JARS; GOBLETS; GRAVY BOATS; HOUSEHOLD CONTAINERS FOR FOODS; HOUSEHOLD UTENSILS, NAMELY, GRATERS, SIEVES, SPATULAS AND TURNERS; ICE CREAM SCOOPS; KITCHEN LADLES AND URNS; KNIFE BLOCKS, BOARDS AND RESTS; MEAL TRAYS; MIXING CUPS AND SPOONS; MUFFIN TINS; MUGS; NAPKIN HOLDERS NOT OF PRECIOUS METAL; NON-ELECTRIC EGG BEATERS, GRIDDLES, JUICERS, KETTLES, KITCHEN CONTAINERS NOT OF PRECIOUS METAL, PRESSURE COOKERS AND PRESSURE COOKING SAUCEPANS; OVEN TO TABLE RACKS; OVENWARE; PASTRY BOARDS, CUTTERS AND MOLDS; PIE PANS AND SERVERS; PLATES; POTS; ROASTING DISHES; ROLLING PINS; SALAD BOWLS AND SPINNERS; SAUCEBOATS NOT OF PRECIOUS METAL; SAUCEPANS; SAUCERS; SCRAPERS FOR HOUSEHOLD USE; SERVING BOWLS, DISHES, FORKS, LADLES, SPOONS AND TONGS; SERVING PLATTERS AND TRAYS NOT OF PRECIOUS METAL; SOUP TUREENS; STEMWARE; TRAYS NOT OF PRECIOUS METAL; UTENSILS FOR BARBECUES, NAMELY, FORKS, TONGS AND TURNERS; WHISKS; WOKS; GENERAL PURPOSE STORAGE BINS FOR HOUSEHOLD USE

29: GOURMET FOODS, NAMELY, OLIVE OIL, PROCESSED OLIVES, EDIBLE OILS, EXTRA-VIRGIN OLIVE OIL, DIPPING OILS, INFUSED VEGETABLE OILS, COCKTAIL ONIONS, PROCESSED CHERRIES; PROCESSED NUTS

30: GOURMET FOODS, NAMELY, BALSAMIC VINEGAR; WHOLE BEAN AND GROUND COFFEE

32: NON-ALCOHOLIC COCKTAIL MIXES

| United States of America | PRIME BITES | | 77/786020 | Jul 21 2009 | Nov 23 2010 | 3881828 | Registered |

29: RESTAURANT MENU ITEMS IN THE NATURE OF APPETIZERS AND SNACK FOODS, FOR CONSUMPTION ON THE PREMISES, CONSISTING PRIMARILY OF POULTRY, MEAT AND SEAFOOD

| United States of America | 837 CLUB | | 78/152507 | Aug 8 2002 | Dec 30 2003 | 2800296 | Registered |

35: CUSTOMER LOYALTY PROGRAMS, NAMELY A BONUS INCENTIVE PROGRAM FOR RESTAURANT CUSTOMERS

| United States of America | PALM PAK | | 75/593809 | Nov 23 1998 | Jul 3 2001 | 2464888 | Registered |

35: TELEPHONE SHOP-AT-HOME SERVICES AND MAIL ORDER CATALOG SERVICES BOTH FEATURING FRESH AND FROZEN MEAT PRODUCTS

| United States of America | PALM | | 75/593,808 | Nov 23 1998 | Jan 25 2000 | 2311431 | Registered |

42: RESTAURANT SERVICES

| United States of America | PALM RESTAURANT with Tree Design in Circle | | 75/601346 | Dec 8 1998 | Feb 1 2000 | 2314101 | Registered |
|---|---|---|---|---|---|---|---|

42: RESTAURANT SERVICES

| United States of America | PALM with Tree Design | | 75/593810 | Nov 23 1998 | Jan 25 2000 | 2311432 | Registered |
|---|---|---|---|---|---|---|---|

42: RESTAURANT SERVICES

| United States of America | PALM BAR & GRILLE with Tree Design in Circle | | 77/379998 | Jan 24 2008 | Oct 19 2010 | 3864862 | Registered |
|---|---|---|---|---|---|---|---|

43: RESTAURANT AND BAR SERVICES

| United States of America | THE ORIGINAL COOL | | 85/561,696 | Mar 6 2012 | Oct 16 2012 | 4225290 | Registered |
|---|---|---|---|---|---|---|---|

43: RESTAURANT SERVICES

| United States of America | TREE Design | | 85/570848 | Mar 15 2012 | Oct 23 2012 | 4229759 | Registered |
|---|---|---|---|---|---|---|---|

43: RESTAURANT SERVICES

| United States of America | PALM RESTAURANT with Tree Design in Circle | | 77/419211 | Mar 11 2008 | May 10 2011 | 3958131 | Registered |
|---|---|---|---|---|---|---|---|

8: TABLEWARE, NAMELY, KNIVES, FORKS AND SPOONS

11: BARBECUE GRILLS

21: SALT AND PEPPER SHAKERS; DRINKING GLASSES

24: TABLE LINEN

| United States of America | PALM | | 77/419186 | Mar 11 2008 | May 10 2011 | 3958130 | Registered |
|---|---|---|---|---|---|---|---|

8: TABLEWARE, NAMELY, KNIVES, FORKS AND SPOONS

21: SALT AND PEPPER SHAKERS; DRINKING GLASSES

24: TABLE LINEN

| United States of America | PALM with Tree Design |  | 77/419,206 | Mar 11 2008 | May 17 2011 | 3962129 | Registered |

8: TABLEWARE, NAMELY, KNIVES, FORKS AND SPOONS

21: SALT AND PEPPER SHAKERS; DRINKING GLASSES

24: TABLE LINEN

| **WIPO** | PALM RESTAURANT with Tree Design in Circle | | 932896 | Apr 16 2007 | Apr 16 2007 | 932896 | Registered |

43: RESTAURANT SERVICES

**Schedule 3.7(b)**

**Challenges to IP; IP Licenses**

Licenses

1.  Letter of Authorization, dated January 18, 2013, by Palm Airport LLC in favor of SSP America, Inc.
2.  License Agreement, dated January 1, 2010, by and between JOMR and Atlanta Palm Food Corporation*
3.  License Agreement, dated January 1, 2010, by and between JOMR and Atlantic City Palm, LLC*
4.  License Agreement, dated November 1, 2014, by and between JOMR and Palm Beverly Hills Restaurant, LLC*
5.  License Agreement, dated January 1, 2010, by and between JOMR and Boston Palm Corporation*
6.  License Agreement, dated January 1, 2010, by and between JOMR and Charlotte Palm Corporation*
7.  License Agreement, dated January 1, 2010, by and between JOMR and Chicago Palm, LLC*
8.  License Agreement, dated January 1, 2010, by and between JOMR and Denver Palm Corporation*
9.  License Agreement, dated January 1, 2010, by and between JOMR and Palm Restaurant of Houston, Inc.*
10. License Agreement, dated January 1, 2010, by and between JOMR and Palm Management Corporation, dba Huntting Inn*
11. License Agreement, dated January 1, 2010, by and between JOMR and LA Downtown Palm, LLC*
12. License Agreement, dated January 1, 2010, by and between JOMR and Palm Restaurant of Las Vegas, Inc.*
13. License Agreement, dated January 1, 2010, by and between JOMR and Miami Palm Restaurant, Inc.*
14. License Agreement, dated January 1, 2010, by and between JOMR and Nashville Palm Restaurant, LLC*
15. License Agreement, dated January 1, 2010, by and between JOMR and Palm Orlando Corporation*
16. License Agreement, dated January 1, 2010, by and between JOMR and Palm Restaurant, Inc.*
17. License Agreement, dated January 1, 2010, by and between JOMR and Palm West Corporation*
18. License Agreement, dated January 1, 2010, by and between JOMR and Palm Restaurant of Philadelphia, Inc.*
19. License Agreement, dated January 1, 2010, by and between JOMR and San Antonio Palm Restaurant, Inc.*

20.    License Agreement, dated January 1, 2010, by and between JOMR and Palm New York Downtown, LLC*

21.    License Agreement, dated January 1, 2010, by and between JOMR and Palm Tysons Too, Inc.*

22.    License Agreement, dated January 1, 2010, by and between JOMR and The Washington Palm, Inc.*

* This licensing agreement was declared void by the Supreme Court of the State of New York pursuant to the Decision and Judgment (subject to appeal).

Trademark Renewals

1.    There are deadlines for trademarks in the next 90 days in Canada.  JOMR's Intellectual Property counsel has not yet instructed the renewal of those registrations.

**Schedule 3.8(a)**

**Defaults Under License Agreements; Exercised Termination Rights**

**Schedule 3.12**

**Balance Sheet and Statement of Operations**

See attached. The Financial Statements are prepared on an accrual basis except for legal expenses, which is on a cash basis.

PALM RESTAURANT GROUP
CONSOLIDATED BALANCE SHEET
October 31, 2019

ATLANTA | ATLANTIC CITY | BEVERLY HILLS | BOSTON | CHARLOTTE | CHICAGO | DALLAS | DENVER | HOUSTON | HUNTTING | LA DOWNTOW | LAS VEGAS | MIAMI | NASHVILLE

INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS

2

PALM RESTAURANT GROUP
CONSOLIDATED BALANCE SHEET
OCTOBER 31, 2019



| ORLANDO | PALM ONE | PALM TOO | PALM TRIBECA | PALM WEST | PHILLY LLC | SAN ANTONIO | TYSONS | WASHINGTON | PMC | INTERCO | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|

INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS

3

PALM RESTAURANT GROUP
CONSOLIDATED INCOME STATEMENT
For the Month Ending October 31, 2019

TOTALS

WASHINGTON

PHILLY LLC

PALM WEST

PALM TRIBECA

PALM TOO

MIAMI

HUNTING



INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS

**PALM RESTAURANT GROUP**
**CONSOLIDATED INCOME STATEMENT**
**For the Month Ending October 31, 2019**

| ATLANTA | ATLANTIC CITY | BOSTON | CHARLOTTE | NASHVILLE | ORLANDO | TYSONS | TOTALS |
|---|---|---|---|---|---|---|---|

INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS

PALM RESTAURANT GROUP
CONSOLIDATED INCOME STATEMENT
For the Month Ending October 31, 2019

| | BEVERLY HILLS | DENVER | HOUSTON | LA DOWNTOWN | LAS VEGAS | SAN ANTONIO | TOTALS |
|---|---|---|---|---|---|---|---|

INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS



PALM RESTAURANT GROUP
CONSOLIDATED INCOME STATEMENT
For the Month Ending October 31, 2019

INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS

PALM RESTAURANT GROUP
CONSOLIDATED INCOME STATEMENT
For the Ten Months Ending October 31, 2019

| HUNTING | MIAMI | PALM TOO | PALM TRIBECA | PALM WEST | PHILLY LLC | WASHINGTON | TOTALS |
|---|---|---|---|---|---|---|---|

INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS

8

**PALM RESTAURANT GROUP**
**CONSOLIDATED INCOME STATEMENT**
**For the Ten Months Ending October 31, 2019**

| ATLANTA | ATLANTIC CITY | BOSTON | CHARLOTTE | NASHVILLE | ORLANDO | TYSONS | TOTALS |
|---------|---------------|--------|-----------|-----------|---------|--------|--------|

INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS

PALM RESTAURANT GROUP
CONSOLIDATED INCOME STATEMENT
For the Ten Months Ending October 31, 2019



BEVERLY HILLS   DENVER   HOUSTON   LA DOWNTOWN   LAS VEGAS   SAN ANTONIO   TOTALS

9

INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS

PALM RESTAURANT GROUP
CONSOLIDATED INCOME STATEMENT
For the Ten Months Ending October 31, 2019



COMP RESTS | CHICAGO | DALLAS | PALM ONE | ALL RESTS | PMC | COMP STORES | ALL STORES

INTERIM STATEMENT - SUBJECT TO YEAR END ADJUSTMENTS

**Schedule 3.13**

**Subsidiaries and Ownership**

| Company | Shareholders | Percent Ownership |
|---|---|---|
| Chicago Palm, Inc., an Illinois corporation | WG Chicago, LLC | 40.81% |
| | BB Chicago, LLC | 40.81% |
| | ██████████* | ███ |
| | ███████* | ███ |
| | ████████* | ███ |
| | ██████* | ███ |
| | ███████* | ███ |
| | ██████████* | ███ |
| | ████████* | ███ |
| B.W. Associates, Inc., a Texas corporation | Palm Restaurant of Houston, Inc. | 100% |
| DGMB Associates, Inc., a Texas corporation | San Antonio Palm Restaurant, Inc. | 100% |

* indicates equity not owned by Chapter 7 Debtors

| Company | Members | Percent Ownership |
|---|---|---|
| Palm Beverly Hills Restaurant, LLC, a Delaware limited liability company | Palm Beverly Hills Restaurant Manager, LLC | 50% |
| | ▮▮▮▮▮* | ▮ |
| | ▮▮▮▮▮▮* | ▮ |
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮* | ▮ |
| | ▮▮▮▮▮* | ▮ |
| | ▮▮▮▮* | ▮ |
| | ▮▮▮▮▮* | ▮ |
| | ▮▮▮▮▮▮* | ▮ |
| | ▮▮▮▮* | ▮ |
| | ▮▮▮▮▮* | ▮ |
| | ▮▮▮▮▮▮* | ▮ |
| Palm Philadelphia Restaurant, LLC, a Delaware limited liability company | Palm Philadelphia Investor, LLC | 50% |
| | ▮▮▮▮▮▮* | ▮ |

* indicates equity not owned by Chapter 7 Debtors

## Schedule 3.14

## Ownership of Each Company; Outstanding Options, Voting Trusts, etc.

**OWNERSHIP:**

| Company | Shareholders | Stock/Share Amount | Certificate No. | Percent Ownership |
|---|---|---|---|---|
| Atlanta Palm Food Corporation | Bruce E. Bozzi, Sr. | 25 | 4 | 50% |
| | Walter J. Ganzi, Jr. | 25 | 3 | 50% |
| Boston Palm Corporation | Bruce E. Bozzi, Sr. | 100 | 4 | 50% |
| | Walter J. Ganzi, Jr. | 100 | 3 | 50% |
| Charlotte Palm Corporation | Bruce E. Bozzi, Sr. | 100 | 4 | 50% |
| | Walter J. Ganzi, Jr. | 100 | 3 | 50% |
| Denver Palm Corporation | Bruce E. Bozzi, Sr. | 100 | 5 | 50% |
| | Walter J. Ganzi, Jr. | 100 | 6 | 50% |
| Miami Palm Restaurant, Inc. | Bruce E. Bozzi, Sr. | 250 | 7 | 50% |
| | Walter J. Ganzi, Jr. | 250 | 8 | 50% |
| Palm Management Corporation | Bruce E. Bozzi, Sr. | 2 | 11 | 50% |
| | Walter J. Ganzi, Jr. | 2 | 12 | 50% |

| <u>Company</u> | <u>Shareholders</u> | <u>Stock/Share Amount</u> | <u>Certificate No.</u> | Percent <u>Ownership</u> |
|---|---|---|---|---|
| Palm Orlando Corporation | Bruce E. Bozzi, Sr. | 100 | 4 | 50% |
| | Walter J. Ganzi, Jr. | 100 | 3 | 50% |
| Palm Restaurant Inc. | Bruce E. Bozzi, Sr. | 15 | 11 and 13 | 50% |
| | Walter J. Ganzi, Jr. | 15 | 12 and 14 | 50% |
| Palm Restaurant of Las Vegas, Inc. | Bruce E. Bozzi, Sr. | 25 | 5 | 50% |
| | Walter J. Ganzi, Jr. | 25 | 6 | 50% |
| Palm Restaurant of Houston, Inc. | Bruce E. Bozzi, Sr. | 200 | 7 | 50% |
| | Walter J. Ganzi, Jr. | 200 | 8 | 50% |
| Palm Tysons Too, Inc. | Bruce E. Bozzi, Sr. | 100 | 4 | 50% |
| | Walter J. Ganzi, Jr. | 100 | 5 | 50% |
| Palm West Corporation | Bruce E. Bozzi, Sr. | 25 | 4 | 50% |
| | Walter J. Ganzi, Jr. | 25 | 3 | 50% |
| San Antonio Palm Restaurant, Inc. | Bruce E. Bozzi, Sr. | 100 | 4 | 50% |
| | Walter J. Ganzi, Jr. | 100 | 3 | 50% |

| Company | Shareholders | Stock/Share Amount | Certificate No. | Percent Ownership |
|---|---|---|---|---|
| The Washington Palm, Inc. | Bruce E. Bozzi, Sr. | 1060 | 149 | 50% |
| | Walter J. Ganzi, Jr. | 1060 | 150 | 50% |

| Company | Members | Percent Ownership |
|---|---|---|
| Atlantic City Palm, LLC | Bruce E. Bozzi, Sr. | 50% |
|  | Walter J. Ganzi, Jr. | 50% |
| L.A. Downtown Palm, LLC | Bruce E. Bozzi, Sr. | 50% |
|  | Walter J. Ganzi, Jr. | 50% |
| Nashville Palm Restaurant, L.L.C. | Bruce E. Bozzi, Sr. | 50% |
|  | Walter J. Ganzi, Jr. | 50% |
| Palm Airport, LLC | Bruce E. Bozzi, Sr. | 50% |
|  | Walter J. Ganzi, Jr. | 50% |
| Palm New York Downtown, LLC | Bruce E. Bozzi, Sr. | 50% |
|  | Walter J. Ganzi, Jr. | 50% |
| Palm Beverly Hills Restaurant Manager, LLC | Bruce E. Bozzi, Sr. | 50% |
|  | Walter J. Ganzi, Jr. | 50% |
| Palm Philadelphia Investor, LLC | Bruce E. Bozzi, Sr. | 50% |
|  | Walter J. Ganzi, Jr. | 50% |

| Company | Members | Percent Ownership |
|---|---|---|
| Palm Philadelphia Manager LLC | Bruce E. Bozzi, Sr. | 50% |
| | Walter J. Ganzi, Jr. | 50% |
| BB Chicago, LLC | Bruce E. Bozzi, Sr. | 100% |
| WG Chicago, LLC | Walter J. Ganzi, Jr. | 100% |

**EQUITY SECURITY RIGHTS:**

1. Stockholders Agreement dated December 1, 2017, by and among Chicago Palm, Inc. and its stockholders

2. Palm Philadelphia Restaurant, LLC Limited Liability Company Agreement, dated September 2016, by and between Palm Philadelphia Investor LLC and Bel-Palm Investors LLC.

3. Amended Restated Limited Liability Company Agreement of Palm Beverly Hills Restaurant, LLC, dated as of January 15, 2014, by and among the managers and members listed therein.

**Schedule 3.16**

**Material Contracts; Defaults under Material Contracts**

MATERIAL CONTRACTS:





EXCEPTIONS TO "FULL FORCE AND EFFECT" AND "NO BREACH":

**<u>Schedule 3.17(a)</u>**

**<u>Permits</u>**



**Schedule 3.17(b)**

**Liquor Licenses**

1. All Liquor Licenses listed on Schedule 3.3 are incorporated herein by reference.

**<u>Schedule 3.18(a)</u>**

**<u>Real Estate Lease Notices of Default</u>**

**Schedule 3.19**

**Employment Matters**

(a) MATERIAL BENEFIT PLANS:

1. 401K Plan
2. Phantom Stock Plans
3. KEIP/KERP[1]
4. Company Health Benefit Plan - The Companies are self-insured and utilize the Cigna network of providers. Cigna is also the administrator of the policy.
5. Individual stop loss insurance policy with Cigna (copy in Data Room).
6. The Companies use Lincoln Financial for its Dental Plan, Life Insurance, LT/ST disability and accidental and critical illness insurance options.

(e) COLLECTIVE BARGAINING AGREEMENTS:

████████████████████████████████████████████████████

(f) EMPLOYEE MATTERS:

1. Luis Batista v. Palm West Corporation *et al.* (1:19-cv-04455-JMF, U.S. District Court for Southern District of New York) – Action claiming discriminatory employment practices on the basis of race, national origin and sex/gender with respect to promotions and hostile work environment, sexual harassment, retaliation and constructive discharge.

2. Michael Trenticosta v. Nashville Palm Restaurant LLC and Palm Management Corporation (19C2354, Circuit Court of the State of Tennessee, Davidson County, and 20th Judicial District) – Action claiming age discrimination. Case is in discovery phase.

3. Tracye Shearin v. Palm West Corporation d/b/a Palm West Side (10196598, New York State Division of Human Rights and Equal Employment Opportunity Commission) – Dual filing with each agency for claims of discrimination based on race, sex and age and retaliation/hostile work environment and sexual harassment. Case has been adjourned until April 2020.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[1] Do not constitute Company plans and shall remain obligation of Sellers

**<u>Schedule 3.21</u>**

**<u>Litigation</u>**

The disclosure items listed in Schedule 3.6 are incorporated herein by reference.

## **Schedule 4.7**

## **Purchaser's Broker**

None.

Label Matrix for local noticing
113A-9
Case 9:19-bk-01947-FMD
Middle District of Florida
Ft. Myers
Thu Feb 20 13:10:11 EST 2020

Michele L. Angell
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

Bank of America, N.A.
c/o Andrew T. Jenkins, Esq.
Bush Ross, PA
PO Box 3913
Tampa, FL 33601-3913

Bruce E Bozzi, Sr.
Robert A. Schatzman, Esq.
GrayRobinson, P.A.
333 S.E. 2nd Ave., #3200
Miami, FL 33131-2191

David L. Eades
Moore & Van Allen, PLLC
100 North Tryon Street
Suite 4700
Charlotte, NC 28202-4003

Scott Esterbrook
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103-2762

Walter J Ganzi, Jr.
c/o Robert A. Schatzman, Esq.
GrayRobinson, P.A.
333 S.E. 2nd Ave., #3200
Miami, FL 33131-2191

Stephen E. Gruendel
Moore & VanAllen
100 North Tryon St., Ste. 4700
Charlotte, NC 28202-4003

Hoguet Newman Regal & Kenney, LLP
One Grand Central Place
60 E. 42nd Street
48th Floor
New York, NY 10165-3003

Just One More Holding Corp.
8955 Fontana Del Sol Way
2nd Floor
Naples, FL 34109-4428

Just One More Restaurant Corp.
Just One More Holding Corp.9:19-bk-01948
Jointly Administered
8955 Fontana Del Sol Way, 2nd Floor
Naples, FL 34109-4428

Marc E Kasowitz
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

Sarmad M. Khojasteh
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

Raymond James & Associates, Inc.
880 Carillon Parkway
St Petersburg, FL 33716-1100

David S. Rosner
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

SF V CLE Lending, LLC
c/o Reed Smith LLP
1001 Brickell Bay Dr.
Suite 900
Miami, FL 33131-4937

Adam L. Shiff
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

Adam L. Shiff, Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

Alan Levine, Esq.
Cooley LLP
1114 Avenue of the Americas
46th Floor
New York, NY 10036-7703

Atlanta Palm Food Corp.
c/o The Palm Atlanta
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Atlantic City Palm, LLC
c/o The Palm Atlantic City
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Bank of America, N.A.
P.O. Box 448
Location Code SC3-240-03-05
Columbia, SC 29202-0448

Bank of America, National Association
c/o Andrew T Jenkins, Esq
Bush Ross, PA
PO Box 3913
Tampa, FL  33601-3913

Boston Palm Corporation
c/o The Palm Boston
1730 Rhode Island AVe., N.W.
#900
Washington, DC 20036-3113

Bruce E Bozzi, Jr and Walter J Ganzi, Jr
c/o David S Rosner
1633 Broadway
New York, NY 10019-6708

Bruce E Bozzi, Sr
c/o Robert A Schatzman, Esq
GrayRobinson, PA
333 SE 2nd Ave, Suite 3200
Miami, FL 33131-2191

Bruce E Bozzi, Sr
c/o Steve J Solomon, Esq
GrayRobinson, PA
333 SE 2nd Ave, Suite 3200
Miami, FL 33131-2191

Bruce E Bozzi, Sr & Walter J Ganzi Jr
c/o Michele L Angell
1633 Broadway
New York, NY 10019-6708

Bruce E Bozzi, Sr and Walter J Ganzi, Jr
c/o Adam L Shiff
1633 Broadway
New York, NY 10019-6708

Bruce E Bozzi, Sr and Walter J Ganzi, Jr
c/o Marc E Kasowitz
1633 Broadway
New York, NY 10019-6708

Bruce E Bozzi, Sr and Walter J Ganzi, Jr
c/o Sarmad M Khojasteh
1633 Broadway
New York, NY 10019-6708

Bruce E. Bozzi, Sr.
2161 Gulf of Mexico Drive
Apt. 3B-1
Longboat Key, FL 34228-5230

Charlotte Palm Corporation
c/o The Palm Charlotte
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Chicago Palm, Inc.
c/o The Palm Chicago
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Claire Breen
7 Ryan Street
Syosset, NY 11791-2129

Cooley LLP
Attn: Alan Levine, Esq.
1114 Avenue of the Americas
16th Floor
New York, NY 10036-7772

Cooley LLP
Attn: Alan Levine, Esq.
1114 Avenue of the Americas
46th Floor
New York, NY 10036-7703

Cooley LLP
attn: J. Michael Kelly
101 California St., 5th Fl
San Francisco, CA 94111-5800

Coral Gables Palm Restaurant
4425 Ponce de Leon Blvd.
Ste. 140
Miami, FL 33146-1837

(c)CORPORATE CREATIONS
11380 PROSPERITY FARMS RD STE 221
PALM BEACH GARDENS FL  33410-3465

David Rosner, Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

David S. Rosner, Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

Denver Palm Corporation
c/o The Palm Denver
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Department of Revenue
PO Box 6668
Tallahassee FL 32314-6668

Estate of Charles Cook
c/o Meridithe Shields
58 Bluestone Court
Kingston, NY 12401-4323

Frederic S. Newman, Esq.
Hoguet Newman Regal & Kenney
10 East 40th Street
35th Floor
New York, NY 10016-0304

Gary Ganzi
74 Valleyfield Street
Lexington, MA 02421-7939

Gary Ganzi and Claire Breen
c/o Eric D. Jacobs, Esq.
Genovese Joblove & Batista, P.A.
100 N. Tampa Street, Suite 2600
Tampa, FL 33602-5810

Gary Ganzi and Claire Breen
c/o Michael A. Friedman, Esq.
Genovese Joblove & Batista, P.A.
100 N. Tampa Street, Suite 2600
Tampa, FL 33602-5810

Gary Ganzi and Claire Breen
c/o Robert F Elgidely, Esq
Genovese Joblove & Batista, PA
200 East Broward Blv, Suite 1110
Fort Lauderdale, FL 33301-3535

Hoguet Newman Regal & Kenney, LLP
c/o Fredric S. Newman, Esq.
60 E. 42nd Street, 48th Floor
New York, NY 10165-3003

Hoteles Presidente, S.A.
Campos Eliseos 218 - 11th Fl
Polanco, CP 11560
Mexico

Ian Shapiro, Esq.
Cooley LLP
1114 Avenue of the Americas
46th Floor
New York, NY 10036-7703

Ian Shapiro, Esq.
Cooley LLP
1114 Avenue of the Americas
New York, NY 10036-7703

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Just One More Restaurant Cor
8955 Fontana Del Sol Way
2nd Floor
Naples, FL 34109-4428

LA Downtown Palm, LLC
c/o The Palm Los Angeles
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Los Angeles Palm, Inc.
c.o The Los Angeles Palm
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Miami Palm Restaurant Inc.
c/o The Palm Miami
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

NY Department of Finance
P.O. Box 3933
New York, NY 10008-3933

NYC Department of Finance
P.O. Box 3922
New York, NY 10085

NYC Department of Finance
P.O. Box 680
Newark, NJ 07101-0680

NYD Dept. of Health and
Mental Division of Permits
Church Street Station
P.O. Box 4081
New York, NY 10261-4081

NYS Department of Taxation
and Finance
WA Harrington Campus
Albany, NY 12227-0001

Nashville Palm Restaurant LL
c/o The Palm Nashville
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

New York State Department of Taxation &
New york State Tax & Finance Bankruptcy
Bankruptcy Section
P O Box 5300
Albany, NY 12205-0300

Northbrook Palm, LLC
2000 Northbrook Court
Northbrook, IL 60062-1411

PMC d/b/a Hedges Inn
c/o the James Lane Cafe Rest
73 James Lane
East Hampton, NY 11937

PMC d/b/a Huntting Inn
c/o The Palm East Hampton
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Palm Beverly Hills
Restaurant, LLC
1730 Rhode Island Ave., N.W.
Suite 900
Washington, DC 20036-3113

Palm Management Corporation
1730 Rhode Island Ave., N.W.
Ste. 900
Washington, DC 20036-3113

Palm Management Corporation
1730 Rhode Island Avenue, NW
Ste. 900
Washington, DC 20036-3113

Palm New York Downtown LLC
c/o The Palm Tribeca
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Palm Orlando Corporation
c/o The Palm Orlando
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Palm Restaurant Puerto Rico
c/o The San Juan Palm Restau
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Palm Restaurant of Houston
c/o The Palm Houston
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Palm Restaurant of Las Vegas
c/o The Palm Las Vegas
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Palm Restaurant of Philadelp
c/o The Palm Philadelphia
1730 Rhode Island Ave., N.W.
Washington, DC 20036-3101

Palm Restaurant, Inc.
c/o The Palm Too
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Palm Troy Company, LLC
c/o The Troy Palm Restaurant
5600 Crooks Road
Troy, MI 48098-2811

Palm Tysons Too, Inc.
c/o The Palm Tysons Corner
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Palm West Corporation
c/o The Palm West Side
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Robert A. Schatzman, Esq.
GrayRobinson P.A.
333 S.E. 2nd Ave., Ste. 3200
Miami, FL 33131-2191

San Antonio Palm Restaurant
c/o The Palm San Antonio
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

San Diego Palm, LLC
c/o The San Diego Palm Resta
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Steven J. Solomon, Esq.
GrayRobinson P.A.
333 S.E. 2nd Ave., Ste. 3200
Miami, FL 33131-2191

Tampa Palm Restaurant, LLC
c/o The Tampa Palm Restauran
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

The Dallas Palm Restaurant
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

The Washington Palm, Inc.
c/o The Palm Washington DC
1730 Rhode Island Ave., N.W.
#900
Washington, DC 20036-3113

Walter J Ganzi, Jr
c/o Robert A Schatzman, Esq
GrayRobinson, PA
333 SE 2nd Ave, Suite 3200
Miami, FL 33131-2191

Walter J Ganzi, Jr
c/o Steve J Solomon, Esq
GrayRobinson, PA
333 SE 2nd Ave, Suite 3200
Miami, FL 33131-2191

Walter J. Ganzi, Jr.
8171 Bay Colony Drive
Apt. 1902
Naples, FL 34108-7567

Benjamin E. Lambers +
Timberlake Annex
501 E. Polk Street, Suite 1200
Tampa, FL 33602-3945

Robert A. Schatzman +
Gray Robinson, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131-2191

United States Trustee - FTM +
Timberlake Annex, Suite 1200
501 E. Polk Street
Tampa, FL 33602-3949

Andrew T. Jenkins +
Bush Ross, PA
Post Office Box 3913
Tampa, FL 33601-3913

Robert F Elgidely +
Fox Rothschild LLP
2 South Biscayne Boulevard, Suite 2750
Miami, FL 33131-1833

Paul Steven Singerman +
Berger Singerman, LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-5319

Paul A Avron +
Berger Singerman LLP
One Town Center Road
Suite 301
Boca Raton, FL 33486-1014

Marian G Kennady +
Reed Smith LLP
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131-4937

J Steven Wilkes +
Office of United States Trustee
501 East Polk Street
Tampa, FL 33602-3949

Christopher A Jarvinen +
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-5319

Gerard A McHale Jr+
McHale PA
1601 Jackson St. Suite 200
Fort Myers, FL 33901-2968

Eric D Jacobs +
Genovese Joblove & Batista, P.A.
100 North Tampa Street, Suite 2600
Tampa, FL 33602-5810

Joshua D Rievman +
Dunning Rievman & Davies, LLP
434 West 33rd Street
New York, NY 10001-2601

Fredric S. Newman +
Hoguet Newman Regal & Kenney, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165-3003

Julia A May +
Moore & Van Allen PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003

Addresses marked (c) above for the following entity/entities were corrected
as required by the USPS Locatable Address Conversion System (LACS).

Corporate Creations
11380 Prosperity Farms Road
#221E
Palm Beach Gardens, FL 33410

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Claire Breen

(u)Gary Ganzi

(u)Gary Ganzi and Claire Breen as Attorneys-i

(d)Cooley LLP
Attn: Alan Levine, Esq.
1114 Avenue of the Americas, 46th Floor
New York, NY 10036-7703

(d)Frederic S. Newman, Esq.
Hoguet Newman Regal & Kenney
10 East 40th Street, 35th Fl
New York, NY 10016-0304

(d)Just One More Holding Corp.
8955 Fontana Del Sol Way
2nd Floor
Naples, FL 34109-4428

End of Label Matrix
Mailable recipients    106
Bypassed recipients      6
Total                  112

Label Matrix for local noticing
113A-9
Case 9:19-bk-09677-FMD
Middle District of Florida
Ft. Myers
Thu Feb 20 13:09:37 EST 2020

Bank of America, N.A.
Bush Ross PA
c/o Andrew T. Jenkins, Esq.
PO Box 3913
Tampa, FL 33601-3913

Bank of America, N.A.
Phelan Hallinan Diamond & Jones, PLLC
2001 NW 64th Street
Suite 100
Ft. Lauderdale, FL 33309-1844

Bruce E. Bozzi Sr.
2161 Gulf of Mexico Drive
Longboat Key, FL 34228-5230

Douglas Elliman
20 Main Street
East Hampton, NY 11937-2745

Scott Esterbrook
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103-2762

Hoguet Newman Regal & Kenney, LLP
One Grand Central Place
60 E. 42nd Street
48th Floor
New York, NY 10165-3003

Just One More Holding Corp.
8955 Fontana Del Sol Way
2nd Floor
Naples, FL 34109-4428

Just One More Restaurant Corp.
8955 Fontana Del Sol Way
2nd Floor
Naples, FL 34109-4428

Soneet Kapila
1000 South Federal Highway
Suite 200
Ft. Lauderdale, FL 33316-1237

Raymond James & Associates, Inc
880 Carillon Parkway
St. Petersburg, FL 33716-1100

SF V CLE Lending, LLC
c/o Reed Smith LLP
1001 Brickell Bay Dr.
Suite 900
Miami, FL 33131-4937

Atlanta Palm Food Corp.
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

B.W. Associates, Inc.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Bank of America
Global Commercial Banking
1301 Gervais Street, Suite 2020
SC3-230-20-02
Columbia, SC 29201-3354

Bank of America
PO Box 660576
Dallas, TX 75266-0576

Bank of America, N.A.
c/o Andrew T. Jenkins
Post Office Box 3913
Tampa, Florida 33601-3913

Boston Palm Corporation
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Briargrove Retail LP
One Riverway, Suite 100
Houston, TX 77056-1962

Charlotte Palm Corp.
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Chicago Palm, Inc.
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Claire Breen
c/o Frederic Newman, Esq.
Hoguett Newman Regal & Kenney
60 E. 42nd St., 48th Floor
New York, NY 10165-3003

Cooley LLP
101 California Street, 5th F
San Francisco, CA 94111-5800

DGMB Associates, Inc.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Denver Palm Corporation
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Estate of Charles Cook
c/o Frederic Newman, Esq.
Hoguet Newman Regal & Kenney
60E. 42nd St., 48th Floor
New York, NY 10165-3003

Frederic Newman, Esq.
Hoguet Newman Regal & Kenney
60 E. 42nd St., 48th Floor
New York, NY 10165-3003

Gary Ganzi
c/o Frederic Newman, Esq.
Hoguet Newman Regal & Kenney
60 E. 42nd St., 48th Floor
New York, NY 10165-3003

Home Tech
6400 Techster Blvd.
Fort Myers  FL 33966-4721

INTERNAL REVENUE SERVICE
P O BOX 7346
PHILADELPHIA,PA 19101-7346

Just One More Rest. Corp.
8955 Fontana del Sol Way
2nd Floor
Naples, FL 34109-4428

Just One More Restaurant Holdings
8955 Fontana del Sol Way, 2nd Floor
Naples, FL 34109-4428

Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

Kasowitz Benson Torres LLP
16 Broadway
New York, NY 10004-1703

LA Downtown Palm, LLC
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Mary Ann Bozzi
2161 Gulf of Mexico Drive
Longboat Key FL 34228-5230

Mercedes-Benz Credit Corp.
PO Box 5209
Carol Stream IL 60197-5209

Mercedes-Benz Financial Services USA
PO Box 5260
Carol Stream IL 60197-5260

Miami Palm Restaurant, Inc.
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Nashville Palm Restaurant
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Airport, LLC
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Beverly Hills Rest. Mgr
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm New York Downtown
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Orlando Corp.
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Philadelphia Investor
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Philadelphia Manager
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Restaurant Inc.
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Restaurant of Houston
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Restaurant of Las Vegas
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm Tysons Too Inc.
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Palm West Corp.
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

San Antonio Palm Restaurant
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Sparkling Pools
PO Box 1280
Sag Harbor NY 11963

The Washington Palm, Inc.
c/o Palm Management Corp.
7380 West Sand Lake Road
Suite 450
Orlando, FL 32819-5251

Victor Ganzi
126 East 56th Street, 14th Floor
New York, NY 10022-3077

W.B. Associates, Inc.
7380 West Sand Lake Road
Suite 450
Orlando FL 32819-5251

Walter J. Ganzi
8171 Bay Colony Drive
#1902
Naples FL 34108-7567

Weber & Grahn
216 E. Montauk Hwy.
Hampton Bays NY 11946-1902

Robert E Tardif Jr.+
Trustee
Post Office Box 2140
Fort Myers, FL 33902-2140

Benjamin E. Lambers +
Timberlake Annex
501 E. Polk Street, Suite 1200
Tampa, FL 33602-3945

Robert A. Schatzman +
Gray Robinson, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131-2191

Steven J Solomon +
GrayRobinson, PA
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131-2191

Robert E Tardif, Attorney for Trustee +
Robert E. Tardif, Jr., P.A.
Post Office Box 2140
Fort Myers, FL 33902-2140

United States Trustee - TPA7/13 +
Timberlake Annex, Suite 1200
501 E Polk Street
Tampa, FL 33602-3949

Andrew T. Jenkins +
Bush Ross, PA
Post Office Box 3913
Tampa, FL 33601-3913

Robert F Elgidely +
Fox Rothschild LLP
2 South Biscayne Boulevard, Suite 2750
Miami, FL 33131-1833

Paul Steven Singerman +
Berger Singerman, LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-5319

Marian G Kennady +
Reed Smith LLP
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131-4937

J Steven Wilkes +
Office of United States Trustee
501 East Polk Street
Tampa, FL 33602-3949

Christopher A Jarvinen +
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-5319

Gregg A Steinman +
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131-5340

Brenda E Carpenter +
Phelan Hallinan Diamond & Jones, PLLC
2001 NW 64th Street, Suite 100
Fort Lauderdale, FL 33309-1844

Joshua D Rievman +
Dunning Rievman & Davies, LLP
434 West 33rd Street
New York, NY 10001-2601

Fredric S. Newman +
Hoguet Newman Regal & Kenney, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165-3003

Megan Preusker +
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606-0029

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Claire Breen

(u)Gary Ganzi

(u)Victor F. Ganzi

(u)Gary Ganzi and Claire Breen as Attorneys-i

(u)MCP II Jefferson, LLC

(d)Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

(d)Just One More Restaurant Corp.
8955 Fontana del Sol Way, 2nd Floor
Naples, FL 34109-4428

End of Label Matrix
Mailable recipients    75
Bypassed recipients     7
Total                  82

Label Matrix for local noticing
113A-9
Case 9:19-bk-09680-FMD
Middle District of Florida
Ft. Myers
Thu Feb 20 13:08:59 EST 2020

Bank of America, N.A.
Bush Ross PA
c/o Andrew T. Jenkins, Esq.
PO Box 3913
Tampa, FL 33601-3913

Tom Crouch
Benson & Mangold
116 N. Talbot Street, Suite A
Saint Michaels, MD 21663-2144

Scott Esterbrook
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103-2762

Walter J. Ganzi Jr
8171 Bay Colony Drive
#1902
Naples, FL 34108-7567

Hoguet Newman Regal & Kenney, LLP
One Grand Central Place
60 E. 42nd Street
48th Floor
New York, NY 10165-3003

Just One More Holding Corp.
8955 Fontana Del Sol Way
2nd Floor
Naples, FL 34109-4428

Just One More Restaurant Corp.
8955 Fontana Del Sol Way
2nd Floor
Naples, FL 34109-4428

Soneet R Kapila
Kapila & Company
1000 S. Federal Highway
Suite 200
Ft. Lauderdale
FL, FL 33316-1237

SF V CLE Lending, LLC
c/o Reed Smith LLP
1001 Brickell Bay Dr.
Suite 900
Miami, FL 33131-4937

Bank of America
Global Commercial Banking
1301 Gervais Street, Suite 2020
SC3-230-20-02
Columbia, SC 29201-3354

Bank of America
PO Box 660576
Dallas, TX 75266-0576

Briargrove Retail LP
One Riverway, Suite 100
Houston, TX 77056-1962

Claire Breen
c/o Frederic Newman, Esq.
Hoguet Newman Regal & Kenney
60 E. 42nd St., 48th Floor
New York, NY 10165-3003

Cooley LLP
101 California Street, 5th F
San Francisco, CA 94111-5800

Estate of Charles Cook
c/o Frederic Newman, Esq.
Hoguet Newman Regal & Kenney
60 E. 42nd St., 48th Floor
New York, NY 10165-3003

Frederic Newman, Esq.
Hoguet Newman Regal & Kenney
60 E. 42nd St., 48th Floor
New York, NY 10165-3003

Gary Ganzi
c/o Frederic Newman, Esq.
Hoguet Newman Regal & Kenney
60 E. 42nd St., 48th Floor
New York, NY 10165-3003

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Just One More Holding Corp.,
1450 Brickell Avenue
Ste 1900
Miami FL 33191-0001

Just One More Restaurant Holdings
8955 Fontana del Sol Way, 2nd Floor
Naples, FL 34109-4428

Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019-6708

Land Rover Financial Group
1820 East Sky Harbour Circle #150
Phoenix, AZ 85034-4875

Verizon
by American InfoSource as agent
PO Box 4457
Houston, TX  77210-4457

Victor Ganzi
126 Eaast 56th Street, 14th Floor
New York, NY 10022

Robert E Tardif Jr.+
Trustee
Post Office Box 2140
Fort Myers, FL 33902-2140

Robert A. Schatzman +
Gray Robinson, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131-2191

Steven J Solomon +
GrayRobinson, PA
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131-2191

Robert E Tardif, Attorney for Trustee +
Robert E. Tardif, Jr., P.A.
Post Office Box 2140
Fort Myers, FL 33902-2140

United States Trustee - FTM7/13 +
Timberlake Annex, Suite 1200
501 E Polk Street
Tampa, FL 33602-3949

Andrew T. Jenkins +
Bush Ross, PA
Post Office Box 3913
Tampa, FL 33601-3913

Robert F Elgidely +
Fox Rothschild LLP
2 South Biscayne Boulevard, Suite 2750
Miami, FL 33131-1833

Paul Steven Singerman +
Berger Singerman, LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-5319

Marian G Kennady +
Reed Smith LLP
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131-4937

J Steven Wilkes +
Office of United States Trustee
501 East Polk Street
Tampa, FL 33602-3949

Christopher A Jarvinen +
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-5319

Gregg A Steinman +
DLA Piper LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131-5340

Joshua D Rievman +
Dunning Rievman & Davies, LLP
434 West 33rd Street
New York, NY 10001-2601

Fredric S. Newman +
Hoguet Newman Regal & Kenney, LLP
One Grand Central Place
60 East, 42nd Street, 28th Floor
New York, NY 10165-3003

Megan Preusker +
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606-0029


The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.


(u)Claire Breen

(u)Gary Ganzi

(u)Victor F. Ganzi


(u)Gary Ganzi and Claire Breen as Attorneys-i

(u)MCP II Jefferson, LLC

(u)Raymond James & Associates, Inc.


(d)Just One More Restaurant Corp.
8955 Fontana del Sol Way, 2nd Floor
Naples, FL 34109-4428

End of Label Matrix
Mailable recipients      39
Bypassed recipients       7
Total                    46

## ADDITIONAL SERVICE LIST

### Atlanta
CCSH Atlanta, LLC
c/o Swissotel Atlanta
3391 Peachtree Road, N.E.
Atlanta, GA  30326

### Atlantic City
Adamar of New Jersey, Inc.
c/o Kravco Company
P.O. Box 1528
King of Prussia, PA  19406

Tropicana Atlantic City Corp.
Brighton Avenue and the Boardwalk
Atlantic City, NJ  08401-6390

### Beverly Hills
267 North Canon Drive, LLC
Attn:  Peter Strauss
621 N. Beverly Drive
Beverly Hills, CA  90210

Garfield & Hecht, P.C.
Attn:  Ronald Garfield, Esq.
601 E. Hyman Avenue
Aspen, CO  81611

### Boston
Fort Hill Square 1 Owner, LLC
c/o The Chiofaro Company, Inc.
One International Place, 46th Floor
Boston, MA  02110

Fort Hill Square 1 Owner LLC
c/o Prudential Real Estate Investors
8 Campus Drive, 4th Floor
Parsippany, NJ  07054

DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110
Attn:  William B. Forbush, III

### Charlotte
The Harris Group of Carolinas, Inc.
d/b/a The Harris Group
Rotunda, Ste. 175
4201 Congress Street
Charlotte, NC  28209
Attn:  John W. Harris

Charles O. DuBose, Esq.
Kennedy Covington Lobdell & Hickman
100 North Tyron Street, Ste. 4200
Charlotte, NC  28202-4006

Phillips Place Partners, LLC
c/o Harris Group Partners – Phillips Place,
LLC
Attn:  J. Patrick Clayton
4725 Piedmont Row Drive, Ste. 800
Charlotte, NC  28210-4284

### Chicago
SNH Chicago, Inc.
323 East Wacker Drive
Chicago, IL  60601

Andreas T. Meinhold, Senior VP
Swissotel Management Corporation
The Drake Hotel
440 Park Avenue
New York, NY  10022

Arnall Golden & Gregory
2800 One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3400
Attn:  Jeffrey B. Berg, Esq.

CCSH Chicago LLC
c/o Host Hotels & Resorts, Inc.
6903 Rockledge Drive, Ste. 1500
Bethesda, MD 20817
Attn:  Law Dept./Asset Mgmt.

**Denver**
Tabor Center Associates, L.P.
c/o The Yarmouth Group Property
Management, Inc.
P.O. Box 10363
Newark, NJ  07193-0363

The Shops at Tabor Center
1201 – 16th Street, Ste. 120
Denver, CO  80202

EOP-Tabor, L.L.C.
c/o Equity Office Properties
1201 – 16th Street, Ste. 120
Denver, CO  80202
Attn:   Building Manager

Equity Office Properties
Two North Riverside Plaza
Ste. 2200
Chicago, IL  60606
Attn:  Regional Counsel – Denver Region

Urban Retail Properties Company
900 North Michigan Avenue, Ste. 1300
Chicago, IL  60611-1575
Attn:  David Kattar, Exec. VP

CCP/MS SSIII Denver Tabor Center 1
Property Owner LLC
3203 Paysphere Circle
Chicago, IL  60674

SITQ BST-REIT LP
1001, rue du Square-Victoria, bureau C-500
Montreal (Quebec) H2Z 2B5

Callahan Capital Partners
Attn:  Tom Gershman
10 S. Riverside Plaza, Ste. 1250
Chicago, IL  60606

**Houston**
Briargrove Shopping Center Joint Venture
2000 Crawford
Houston, TX  77002

Briargrove Retail, L.P.
c/o Unilev Management Corporation
One Riverway, Ste. 100
Houston, TX  77056

**LA Downtown**
Flower Holdings, LLC
1100 South Flower Street, Ste. 3100
Los Angeles, CA  90015
Attn:  Ted Tanner

Flower Holdings, LLC
1111 South Figueroa Street, Ste. 3100
Los Angeles, CA  90015
Attn:  Ted Fikre

PSP Investment Group, LLC
425 East Pico Boulevard, Ste. 206
Los Angeles, CA  90015
Attn:  Messrs. George and Jake Peykar

PSP Investment Group, LLC
c/o Wall Street Investment Group
425 East Pico Boulevard, Ste. 206
Los Angeles, CA  90015

**Las Vegas**
Forum Developers Limited Partnership
c/o M.S. Management Associates Inc.
One Merchants Plaza
P.O. Box 7033
Indianapolis, IN  46207

Caesars Palace Realty Corp.
1801 Century Park East, Ste. 2600
Los Angeles, CA  90067
Attn:  General Counsel

2

Forum Shops, LLC
c/o M.S. Management Associates, Inc.
225 West Washington Street
Indianapolis, IN  46204-3438

Caesars Palace Realty
c/o Harrah's Entertainment, Inc.
One Caesars Palace Drive
Las Vegas, NV 89109-8969
Attn:  General Counsel

Forum Shops, LLC
867011 Reliable Parkway
Chicago, IL  60686-0070

**Miami**
The Sand Joint Venture
9560 E. Bay Harbor Drive
Bay Harbor Islands, FL  33154

CSL Sand Leasing, Inc.
88 W. Riverside Drive
Jupiter, FL  33469
Attn:  Alexander M. Lankler, President

Johnson & Wales University
1701 N.E. 127 Street
North Miami, FL  33181
Attn:  Donald M. McGregor, President

BHI Hotel, LLC
2138 Rose Theatre Circle
Olney, MD  20832
Attn:  Samuel M. Spiritos

**Nashville**
Turnberry/Nashville Arena Hotel, LP
c/o 19501 Biscayne Blvd., Ste. 400
Aventura, FL  33180
Attn:  Jeffrey Soffer

Turnberry Development, LLC
19501 Biscayne Blvd., Ste. 400
Aventura, FL  33180
Attn:  Legal Department

**New York - Downtown**
West-Chambers Street Associates, LLC
c/o Jack Resnick & Sons, Inc.
110 East 59th Street, 34th Floor
New York, NY  10022

200 Chambers, LLC
c/o Jack Resnick & Sons, Inc.
110 East 59th Street, 34th Floor
New York, NY  10022

**Orlando**
UFC Hotel Venture
1000 Universal Studios Plaza
Orlando, FL  32819
Attn:  Mr. Thomas Williams

UFC Hotel Venture
6800 Lakewood Plaza Drive
Orlando, FL  32819
Attn:  Director of Administration

Loews Hotels Holding Corporation
667 Madison Avenue, 8th Floor
New York, NY  10021-8087
Attn:  Corporate Secretary

Hughes Hubbard & Reed LLP
201 S. Biscayne Blvd., Ste. 2500
Miami, FL 33131
Attn: William A. Weber, Esq.

**Palm Too**
Katherine Seidner
836 Second Avenue
New York, NY  10017

Mandell Mandell LLP
80-02 Kew Gardens Road, Ste. 606
Kew Gardens, NY  11415
Attn:  Mark, J. Mandell, Esq.

**Palm West**
Resnick Eighth Avenue Associates, LLC
110 East 59th Street
New York, NY  10022

3

9594273-1

AvalonBay Communities, Inc.
Attn: Senior Director, Retail
671 N. Glebe Road, Ste. 800
Arlington, VA  22203

**Philadelphia**
Bellevue Associates
200 South Broad Street, 3rd Floor
Philadelphia, PA  19103
Attn:  Ronald Rubin

**San Antonio**
Street Retail San Antonio, LP
c/o Federal Realty Investment Trust
1626 East Jefferson Street
Rockville, MD  20852-4041
Attn:  Legal Department

GrayStreet Houston – 229 E. Houston, LLC
P.O. Box 461406
San Antonio, TX  78246-1406

GrayStreet Houston Management, LLC
c/o Kevin Covey, Manager
Caliburn Capital, LLC
4515 San Pedro Avenue
San Antonio, TX  78212

**Palm Management Corporation**
MSC Sand Lake IV, Inc.
c/o Washington Capital Management, Inc.
260 Franklin Street, Ste. 1900
Boston, MA  02110
Attn:  Asset Management

Foundry Commercial, LLC
420 S. Orange Avenue, Ste. 950
Orlando, FL  32801
Attn:  Property Manager

MSC Sand Lake IV, Inc.
7280 Sand Lake Road, Ste. 150
Orlando, FL  32819

**Tysons Too**
MDM Development Company, LLC
c/o Lerner Corporation, Managing Agent
1150 Huff Court
North Bethesda, MD  20895-1094
Attn:  Legal Department

Tye Development Company, LLC
200 Tower Oaks Bl;vd., 8th Floor
Rockville, MD  20852

**Washington**

Metropolitan Life Insurance Company
c/o CPP 1125 DC LLC
c/o Core Plus Properties LLC
One Dock Street, Ste. 408
Stamford, CT  06902
Attn:  Mr. James C. B. Millard

Metropolitan Life Insurance Company
c/o BlackRock Realty Advisors, Inc.
300 Campus Drive, 3rd Floor
Florham Park, NJ  07932
Attn:  Tower Fund – Asset Manager

Metropolitan Life Insurance Company
c/o BlackRock Realty Advisors, Inc.
300 Campus Drive, 3rd Floor
Florham Park, NJ  07932
Attn:  Tower Fund – Counsel

Duane Morris LLP
227 West Monroe Street, Ste. 3400
Chicago, IL  60606
Attn:  David B. Allswang, Esq.

9594273-1